# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

CPI Security Systems, Inc.,

     Plaintiff,

         v.

Vivint Smart Home, Inc. f/k/a Mosaic
Acquisition Corp.; and Legacy Vivint Smart
Home, Inc. f/k/a Vivint Smart Home, Inc.

     Defendant.

Case No. 3:20-cv-00504

## **COMPLAINT**

Plaintiff CPI Security Systems, Inc. ("CPI"), brings this action for damages, treble damages, punitive damages, attorneys' fees and costs against Defendants Vivint Smart Home, Inc. f/k/a Mosaic Acquisition Corp. and Legacy Vivint Smart Home, Inc. f/k/a Vivint Smart Home Inc. (together "Vivint"), and in support alleges as follows:

## **SUMMARY OF THE CASE**

1.     This case is about Vivint's false and misleading sales practices on the doorsteps and in the homes of significant numbers of CPI customers across the Southeast. Through well-rehearsed deceptive tactics, Vivint's sales representatives posing as CPI employees or affiliates have bound CPI customers to high-priced, multi-year finance and monitoring contacts with Vivint, all the while making it impossible for customers to cancel these contracts once Vivint's scam comes to light.

2.     To do so, Vivint tricks CPI customers into believing, among other things: (1) that Vivint has purchased or is purchasing CPI; (2) that Vivint is purchasing or "taking over" CPI

customer accounts; (3) that Vivint manufactures CPI's equipment and is present at customers' homes simply to upgrade CPI's system; and (4) that Vivint was sent, or is acting on behalf of, CPI. These (and other) routinely-made, false and misleading statements about Vivint's affiliation with CPI permit Vivint to take advantage of CPI's goodwill, damage CPI's name, and lead CPI's customers to do business with Vivint under false pretenses.

3.     Vivint's practices violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 et seq., and related common law of unfair competition. CPI seeks damages to remedy: (1) its loss of numerous customers, both known and unknown, and the disruption of countless others since Vivint's deceptive practices began; (2) CPI's injuries to its goodwill and reputation; (3) CPI's lost royalties from Vivint's unauthorized use of the CPI brand; (4) Vivint's profits from its ill-gotten gains; (5) CPI's attorneys' fees; (6) treble damages; and (7) punitive damages to punish and deter Vivint from continuing to engage in its intentionally false and misleading conduct.

4.     Vivint has a long history of committing these false affiliation misrepresentations to customers of competing alarm companies. But despite recognizing the severe damage inflicted by these type of deceptive sales practices, Vivint only takes deceptive sales practices seriously when they impact Vivint customers. Vivint has established a "slam" department—the industry term for the type of deceptive sales practices and misrepresentations of affiliation at issue here—to investigate and prosecute incidents that occur to Vivint customers. In fact, Vivint has filed dozens of separate lawsuits against competitors and competitors' sales representatives in the past several years premised on these exact same claims, yet refuses to correct its own longstanding history of unrelenting deceptive sales conduct.

2

5.     Vivint also recognizes that the number of *reported* incidents about deceptive sales practices is only the tip of the iceberg of customers actually subject to deceptive sales. For every report of a deceptive sales incident, there are many more that go unreported—even if the customer ultimately cancels CPI's services or becomes so frustrated with CPI because of Vivint's practices that the customer stops paying for any alarm system. Indeed, in a past Lanham Act action Vivint brought against another competitor in the alarm industry, Vivint represented to the District of Utah that the fact that only 4% of deceived customers take the time to complain is so uncontroversial that it is capable of judicial notice. On information and belief, Vivint internal documents regarding consumer behavior confirm this "tip of the iceberg" concept.

6.     Vivint's conduct in the alarm and security services market has continued unchecked. CPI has received, and continues to receive, reports of deceptive sales encounters by Vivint representatives from CPI customers throughout North Carolina, South Carolina and elsewhere. In one encounter, a CPI customer reports a Vivint representative came to her door posing as a CPI salesperson, falsely stating that Vivint was "buying out" customers from CPI, complaining the representative was "trying to instill fear into us and intimidate us." In another encounter, a CPI customer reports a Vivint representative came to his home and unhooked all of the wires connecting the CPI system. Vivint's deceptive sales practices and claims of affiliation with CPI highlighted in these encounters are not atypical of the countless other complaints CPI has received from its customers about Vivint since Vivint's conduct began.

7.     Refusing to be dissuaded from its deceitful conduct even by the COVID-19 global pandemic, and showing no regard for appropriate health precautions needed to protect homeowners, Vivint salesmen continue to commit deceptive sales practices on customers' doorsteps. Vivint has shown no intention of stopping its deceptive sales practices, and CPI

4852-1741-6394

anticipates by the time of trial the volume of reports about deceptive sales practices by Vivint will be even more numerous.

8.     To be sure, Vivint's deceptive practices do not start and end with CPI's customers. Vivint has a long history of deceptive, scamming practices that have resulted in multiple lawsuits and government actions not only in North Carolina, but across the country. Over the past decade, actions have been brought in states such as Oregon, Wisconsin, Arkansas, Wyoming, California, Ohio, Florida, Nebraska, Kansas, and Pennsylvania.

9.     As Vivint's storied history of deceitful and predatory conduct reveals, Vivint is not only harming CPI and its customers, but the entire industry, leading the consuming public to distrust home alarm providers—companies that make their keep by instilling a sense of security and trust in their customers.

10.     Because all regulatory and industry efforts to date—including prior lawsuits—have failed to halt Vivint's deceptive sales tactics against CPI and against the industry at large, CPI seeks an award of punitive damages in an amount that will make it financially unprofitable for Vivint to continue this conduct.

## PARTIES

11.     Plaintiff CPI Security Systems, Inc. is a North Carolina corporation with its principal place of business at 4300 Sandy Porter Road, Charlotte, North Carolina 28273. A leader in customized security and home automation solutions for more than 25 years, CPI is the largest privately-led security provider in the Southeast.

12.     Defendant Vivint Smart Home, Inc., formerly known as Mosaic Acquisition Corp., is a Delaware corporation with its principal place of business located at 4931 North 300 West, Provo Utah 84604. Vivint Smart Home, Inc. (f/k/a Mosaic Acquisition Corp.) was created on

4

January 17, 2020 pursuant to an Agreement and Plan of Merger, dated September 15, 2019, by and among Vivint Smart Home, Inc. (f/k/a Mosaic Acquisition Corp.), Maiden Merger Sub, Inc., and Legacy Vivint Smart Home, Inc. (f/k/a Vivint Smart Home, Inc.). Vivint Smart Home, Inc.'s (f/k/a Mosaic Acquisition Corp.) registered agent for service of process is The Corporate Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, Delaware, 19801.

13.     Vivint Smart Home, Inc. (f/k/a Mosaic Acquisition Corp.) is listed on the New York Stock exchange and currently has a market capitalization of $3.6 billion.

14.     On information and belief, following the January 17, 2020 merger, Defendant Vivint Smart Home, Inc. (f/k/a Mosaic Acquisition Corp.) has assumed liability or is otherwise liable as a successor for the tortious conduct committed by Legacy Vivint Smart Home, Inc. (formerly known as Vivint Smart Home, Inc.) and/or its employees prior to the merger.

15.     On information and belief, following the January 17, 2020 merger, employees of Legacy Vivint Smart Home, Inc. (formerly known as Vivint Smart Home, Inc.) became employees of Vivint Smart Home, Inc. (formerly known as Mosaic Acquisition Corp.).

16.     Defendant Legacy Vivint Smart Home, Inc., formerly known as Vivint Smart Home, Inc., is a Delaware corporation with its principal place of business located at 4931 North 300 West, Provo Utah 84604. On January 17, 2020 pursuant to an Agreement and Plan of Merger dated September 15, 2019, Legacy Vivint Smart Home Inc. (f/k/a Vivint Smart Home, Inc.) merged into Vivint Smart Home, Inc. (f/k/a Mosaic Acquisition Corp.). Upon information and belief, until the January 17, 2020 merger with Vivint Smart Home, Inc. (f/k/a Mosaic Acquisition Corp.), Legacy Vivint Smart Home, Inc. (f/k/a Vivint Smart Home, Inc.) employed the Vivint sales persons who generated and sold new accounts on behalf of Vivint. Legacy Vivint Smart

4852-1741-6394

Home, Inc. (f/k/a Vivint Smart Home, Inc.)'s registered agent for service of process is The Corporate Trust Company, 4931 N. 300 West, Provo, UT 84604.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over this action pursuant to Section 1331 of Title 28 because it presents a federal question under Section 43 of the Lanham Act.

18. This Court has supplemental jurisdiction over the state-law claims also asserted in this action pursuant to Section 1367(a) of Title 28.

19. This Court also has jurisdiction over this action pursuant to Section 1332 of Title 28 because the parties are completely diverse and the amount in controversy exceeds $75,000.

20. Venue lies in this District pursuant to Section 1391(b) of Title 28 because a substantial number of the events giving rise to the claims asserted in this Complaint occurred in this District and because Vivint is subject to the Court's personal jurisdiction in this District for committing tortious conduct purposefully directed at this District as described in this Complaint.

## OTHER FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

21. CPI provides security, automation, and smart-home services and equipment in the Southeast region of the United States and is engaged in interstate commerce for the purposes of the Lanham Act.

22. CPI's name and trademark is registered with the United States Patent and Trademark Office bearing the registration number 2537673 (the "CPI Trademark").

23. As a North Carolina resident, CPI is injured in North Carolina by Vivint's tortious activities.

24. Vivint began selling and installing alarm systems under the name APX Alarm Security Solutions in 1999. APX rebranded itself as "Vivint" in 2011.

4852-1741-6394

25.     Today, Vivint operates in most states, including North Carolina. Vivint is registered to do business in North Carolina. A substantial fraction of the violations that form the basis of this Complaint occurred in North Carolina. At all times relevant to this Complaint, Vivint misled CPI customers in North Carolina and elsewhere and engaged in the deceptive sales practices that are the subject of this civil action.

26.     Vivint and CPI are direct competitors in the security systems, automation and smart home markets. CPI and Vivint market and sell substantially similar goods made by the same suppliers through the same channels to the same target markets of residential consumers. The companies also provide substantially similar security monitoring services to their respective customers.

27.     Vivint's sales agents target CPI customers in various ways, often by seeking houses with the distinctive CPI yard sign that CPI's customers post on their premises to deter burglars and trespassers.

28.     Vivint's sales agents solicit CPI's customers in unannounced "cold" door-to-door sales visits to the customers' homes. At the beginning of these visits, and often throughout the sales encounter, the agents use deceptive sales pitches that are intended to mislead (and that do mislead) CPI's customers into believing that Vivint represents CPI, or that Vivint is affiliated with CPI, that they are visiting at CPI's direction, that they work for the companies that made the CPI's alarm equipment installed in the customers' homes, or that Vivint has purchased or is purchasing CPI.

29.     Vivint's agents use these pitches to induce CPI customers to believe that they have an existing business relationship with the agents, to trust them, and to grant the agents entry into their homes. Once inside, having won the customers' trust by this deception, the agents coerce

7

customers to sign Vivint contracts and install Vivint alarm systems in the often mistaken belief that they are receiving new CPI equipment from CPI, a CPI affiliate, or a CPI successor, or that Vivint is assuming the CPI account, or that the customer has no choice but to permit the transaction to go forward if he or she wishes to continue to have operational alarm-monitoring services. In reality, Vivint is converting the CPI account into a new Vivint account.

30. Vivint's deceptive practices injure CPI by causing CPI's customers to listen to their deceptive sales pitches, allow Vivint's agents entry to their homes under false pretenses, sign Vivint contracts, uninstall their CPI alarm systems, replace these systems with Vivint's equipment, and terminate the customers' CPI contracts.

31. Vivint, by falsely claiming an affiliation with CPI in its sales to consumers, further injures CPI by taking for itself the essential benefit of being a CPI affiliate without paying any royalty or other consideration to CPI for the claim of affiliation. This is a benefit which is worth significant financial consideration to CPI and one which CPI would require a substantial licensing fee or royalty from Vivint to utilize. But through its false and deceptive practices, Vivint pays nothing to use CPI's name and brand for the benefit of Vivint, and Vivint does not abide by any guidelines which CPI would require if Vivint properly licensed use of CPI's name and brand.

32. Vivint's false sales pitches also injure CPI's goodwill and reputation. Some customers are left with the false belief that CPI is out of business, that CPI has been acquired, that their CPI alarm systems are outdated and vulnerable to burglars, or that Vivint has taken over CPI accounts. Others mistakenly assume that Vivint had access to the private data the customers had entrusted to CPI, leaving them to question CPI's ability to safeguard their interests. Yet others understand the false pitch for what it is, but reconsider their CPI service because CPI is a target of scammers. In many ways the Vivint agents' false sales pitches damage CPI's goodwill and

4852-1741-6394

reputation as a reliable provider of security, automation and smart home services. Some customers may cease all such services as a result of falling victim to these types of false and misleading practices. Some wrongly blame CPI for Vivint's conduct and never come to understand the lack of affiliation between Vivint and CPI.

33.     As a result of Vivint's deceptive practices, a number of CPI customers have confused Vivint's sales agents with CPI representatives, and thus have unwittingly found themselves with Vivint's alarm systems installed in their homes and with contractual obligations to both Vivint and CPI. For many of CPI's customers who become stuck in a contractual relationship with Vivint, many find it impossible to get out. Vivint requires customers to pay substantial contract termination fees without consideration that the customer's contract was acquired through false and deceptive means. Therefore, some customers retain Vivint's systems and terminate their CPI contracts simply because Vivint makes it too cumbersome and time-consuming for the customer to end the Vivint service despite it being consummated through fraud. For customers that are able to terminate their contracts with Vivint, Vivint's deceptive practices have also forced CPI to send technicians to the deceived customers' houses to reinstall the removed CPI equipment at considerable expense to CPI.

34.     Such practices violate statutory and common-law prohibitions against the use of false and deceptive statements and claims of affiliation in commerce. They also violate the security systems industry's own Code of Ethics and Standards of Conduct, which requires that companies "truthfully and clearly identify themselves by name . . . at the initiation of a sales presentation, without request from the consumer," and which prohibits as common deceptive sales practices, *inter alia*, (a) any claim that a competitor is going out of business, (b) any claim that the company

9

is taking over the competitor's accounts, or (c) any offer of an "update" or "upgrade" of an existing system that requires the execution of a contract with a new security services provider.

35.     Vivint knows these types of sales practices are contrary to the law and established industry standards, yet it knowingly continues such conduct. Vivint has not taken appropriate action to curb such conduct by its agents. Some of the worst actors continue to be employed by Vivint despite numerous reports of deceptive conduct by those salespeople. Vivint does not terminate or appropriately discipline such agents because they bring substantial revenue streams to Vivint. Instead, Vivint engages in window dressing: providing half-hearted discouragement of such practices at the initial onboarding of new salespeople and promulgating empty-shell written policies purportedly prohibiting the practices. In reality, Vivint management condones and even teaches such deceptive sales tactics. The individuals knowledgeable of how to successfully pull off deceptive sales practices are promoted in the sales force and then teach such tactics to new recruits as they are brought in each year. The cycle repeats in contagious fashion.

36.     Occasionally, Vivint "fines" salespeople for committing deceptive sales, but often that is only when a competitor like CPI gets involved and aids the customer in seeking resolution with Vivint. On information and belief, these "fines" are not always actually collected from the representative, and sometimes they are merely deducted from a salesperson's incentive bonuses for meeting certain sales thresholds. In other words, and also on information and belief, the fines are paid from the very money the agent gains from using such deceptive sales practices in the first place. It is profitable to the agent (and Vivint) because the salesperson gets "caught" on many fewer occasions than the conduct actually occurs. In any event, the "fines" levied are not sufficient to deter repetitive deceptive sales conduct by Vivint salespeople. Some of the worst offenders continue to be employed by Vivint, and some have been elevated into managerial positions.

4852-1741-6394

37.     The constant need to assist CPI customers in fixing problems resulting from Vivint's deceptive sales conduct imposes a substantial cost on CPI to maintain and train customer service agents appropriately. In effect, CPI is forced to constantly police Vivint's salespeople. Vivint is also liable for these costs and damages.

38.     The violations and torts alleged in this Complaint have been the subject of numerous prior public enforcement actions by various state agencies. For example, in January 2017, Vivint settled an enforcement proceeding with the Pennsylvania Attorney General that found that Vivint's sales agents had violated the state's consumer protection laws by falsely stating in door-to-door solicitations that they were affiliated with the consumers' existing security companies, that the consumers' existing security providers had gone out of business, that they were purchased or taken over by Vivint, and that the consumers' alarm systems needed to be updated.

39.     Vivint's conduct is geographically widespread and numerically voluminous, especially when understood in the proper context that many deceptive sales encounters never get reported to CPI.

40.     Vivint's conduct is knowing and intentional. At worst, Vivint knowingly teaches and condones these actions by its sales agents. At best, Vivint is aware of such conduct but does not take sufficient actions to stop them despite having the ability to do so.

41.     Vivint's conduct has not stopped, and will not stop, because Vivint has built itself into the number two residential alarm services provider in the United States based in part on these practices. Vivint profits to the tune of millions of dollars off the deceptive sales tactics of its sales force. Every alarm account Vivint acquires through deceptive sales conduct creates a new revenue stream for Vivint potentially for several years beyond the initial term of the new contract, and for

substantially more value than the cost to Vivint in the cases where it "buys out" the customer's CPI account. In the big picture, Vivint's profits increase exponentially by acquiring as many accounts as possible through whatever means possible. On information and belief, such conduct has permitted Vivint to bolster its financial reports and receive new credit and equity investments that otherwise might not be possible without the illegal sales conduct. Such profits should be disgorged to the full extent permitted by the Lanham Act and related common law.

42.     During the course of discovery, CPI anticipates eliciting sworn testimony from a sampling of such customers so that the finder of fact may hear about Vivint's conduct directly from the customers who have fallen victim to it.

43.     Upon information and belief, Vivint's own internal records will show how widespread and common its deceptive sales practices are. Many CPI customers subject to deceptive sales practices by Vivint never complain to CPI. Rather, upon learning of Vivint's fraud, they complain to Vivint. CPI therefore does not have any record of those incidents. Vivint is in exclusive possession and control of such records.

44.     The population of reported instances to CPI is, in turn, but a small fraction of the likely number of overall numbers of occurrences in the market. It is an accepted (even by Vivint) and obvious tenet of consumer complaint behavior that for every aggrieved customer who reports a deceptive sales practice, many more go uncounted. And, many customers only complain to Vivint such that CPI has no means of knowing of those incidents.

45.     As a result of Vivint's claims of affiliation with CPI, CPI's customers allow Vivint's agents into their homes in the mistaken belief that they are speaking with a person affiliated somehow with CPI, visiting to provide the customers with goods and services that are

related to their existing CPI alarm system. CPI's customers repeatedly confirm that but for this initial confusion, they would never have allowed Vivint's sales agents into their homes.

46.     This confusion, both at the outset of, and throughout, a sales transaction harms CPI by allowing competitors like Vivint to freeride on CPI's goodwill with its customers to gain their attention and trust.

47.     Customers often blame themselves for falling victim to Vivint's false and misleading sales tactics. Such self-blame also contributes to an under-reporting of deceptive sales conduct. Such self-blame also harms CPI's goodwill and reputation because customers believe they never would have fallen victim if they did not have a CPI alarm system in their home in the first place.

48.     Often in conjunction with or as an alternative to the use of deceptive sales practices, Vivint also has begun a "buyout" program, which is itself rife with abuse and is contrary to common law against interference with contract and advantageous business relations. On information and belief, Vivint often uses its "buyouts" to help appease customers after they have complained about falling victim to Vivint deceptive sales practices. Once the customer raises the fact they were defrauded and misled by Vivint's sales representative in one of the numerous ways described above, Vivint then offers to buy out the customer's CPI contract as a way to "save" the sale. Vivint does so because it is profitable. Vivint acquires the account through deceptive means, and if caught, pays a sum to the customer to pay off their CPI contract that is far less than the new revenue stream to Vivint will generate. Vivint gains because the value of the account is many, if not most times, much more valuable than the amount required to pay off the CPI account.

49.     Even when not connected to a deceptive sales practice, Vivint's buyout program is in itself illegal. Vivint knows that the customer is in a contract with CPI, but nevertheless

4852-1741-6394

wrongfully interferes with such contractual relationship and induces the customer to breach their

CPI agreement. CPI also seeks damages related to this conduct.

**COUNT I**
**UNFAIR COMPETITION IN VIOLATION**
**OF THE LANHAM ACT, 15 U.S.C. § 1125(a)**

50.     CPI incorporates paragraphs 1 through 49 as if set forth fully herein.

51.     CPI owns the CPI Trademark. CPI is injured by any effort by Vivint to confuse CPI

customers as to the affiliations of Vivint's sales agents with CPI.

52.     Vivint's sales agents use false representations of affiliation with CPI to confuse

CPI's customers as to the agents' true affiliation, to interest the customers in their pitches, to win

the customers' trust, and to gain access to their homes.

53.     In fact, the Vivint's sales agents do not represent CPI, nor is Vivint itself affiliated

in any manner with CPI.

54.     Vivint's sales agents make these false representations to CPI's customers with the

intent of deceiving CPI's customers as to a relationship or affiliation with CPI that does not exist,

and that has never existed.

55.     These false and misleading statements are likely to confuse consumers regarding

Vivint's apparent (but false) affiliation with CPI in the initial stages of a sale. In fact, they already

have created confusion among consumers, and will continue to do so if permitted to continue.

56.     Some CPI customers, initially confused at their doorsteps, eventually realize by the

end of the sale that the sales agents represent Vivint, not CPI. But many do not, remain confused

at the point of sale and sign contracts with Vivint in the mistaken belief that they are contracting

with CPI or one of its affiliates. Even when the customer is initially confused but later comes to

14

understand the sales agent is not affiliated with CPI, CPI is still damaged by Vivint's freeriding on CPI's name and brand recognition.

57. CPI has been and will continue to be damaged as a result of Vivint's false representations by the confusion of the market for CPI's goods and services, by the disruption of CPI's relationships with its customers, by the diversion of CPI's customers to Vivint, by CPI's lost royalties, by CPI's loss of control of the use of its brand in the market, and by damage to CPI's goodwill and reputation as a reliable provider of security systems.

58. CPI has also been and will continue to be damaged as a result of having to police Vivint's conduct and to expend time and resources to reinstall CPI systems into the homes of former CPI customers who have fallen victim to Vivint's false and deceptive practices.

59. CPI has entitled to an award of compensatory damages, as well as Vivint's profits, attorney fees, and the costs of this action pursuant to 15 U.S.C. § 1117(a). The Court, pursuant the discretion confided to it under this section of the Act, should also consider enhancing these damages to compensate CPI fully for its losses.

WHEREFORE, CPI respectfully requests that the Court enter judgment in its favor and against Vivint, and award the following relief:

a. Compensatory damages, in an amount to be established at trial, but believed to be in excess of $10 Million;

b. An accounting of Vivint's profits resulting from its deceptive practices, and payment of such profits to CPI;

c. Attorneys' fees and costs incurred in the prosecution of this action, as provided by 15 U.S.C. § 1117(a); and

4852-1741-6394

d.  Such other and further relief as the Court may deem appropriate in the circumstances.

## COUNT II
## COMMON LAW UNFAIR COMPETITION

60.    CPI incorporates paragraphs 1 through 49 as if set forth fully herein.

61.    CPI and Vivint compete for a common pool of customers. Both market security, automation, and smart-home services to the same target market of residential customers.

62.    Vivint has engaged in unfair and deceptive misconduct by fielding a staff of sales agents who prey on unsuspecting and sometimes elderly and infirm customers and who make false sales pitches to CPI's customers that are designed to mislead them into believing that they are acting on CPI's behalf, when in fact they represent a competitor freeriding CPI's goodwill to interfere with CPI's contracts with its customers, and to sell and install new Vivint alarm systems.

63.    Vivint's actions are contrary to honest practices in industrial or commercial matters. They are prohibited by the alarm industry's own code of conduct. They are independently actionable as tortious interferences with CPI's contractual relationships, and as violations of the Lanham Act.

64.    Vivint's actions are likely to cause confusion among consumers, and in fact already have caused confusion, not only in the initial stages of their agents' sales pitches, but also at the point of sale.

65.    Vivint's actions are also contrary to law because they prey upon elderly and infirm customers who are easy targets for their agents' false sales pitches.

66.    CPI has been and will continue to be damaged as a result of Vivint's false representations by the confusion of the market for CPI's goods and services, by the disruption of CPI's relationships with its customers, by the diversion of CPI's customers to Vivint, by CPI's lost

16

royalties, by CPI's loss of control of the use of its brand in the market, and by damage to CPI's goodwill and reputation as a reliable provider of security systems.

67.     CPI has also been and will continue to be damaged as a result of having to police Vivint's conduct and to expend time and resources to reinstall CPI systems into the homes of former CPI customers who have fallen victim to Vivint's false and deceptive practices.

68.     Vivint's sales agents' false sales pitches at customer doorsteps are knowing and willful. Accordingly, the Court should award punitive damages in an amount sufficient to deter Vivint from continuing to engage in unfair competition in the market for electronic security services through their sales agents.

WHEREFORE, CPI respectfully requests that the Court enter judgment in its favor and against Vivint, and award the following relief:

a.  Compensatory damages, in an amount to be established at trial, but believed to be no less than $10 Million;

b.  Punitive damages in a sum sufficient to deter Vivint from engaging in further deceptive sales tactics;

c.  Attorneys' fees and costs incurred in the prosecution of this action; and

d.  Such other and further relief as the Court may deem appropriate in the circumstances.

## COUNT III
## VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT, N.C. GEN. STAT. § 75-1.1 *ET SEQ.*

69.     CPI incorporates paragraphs 1 through 49 as if set forth fully herein.

70.     CPI is a North Carolina resident and legitimate business enterprise entitled to the protections of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") and with standing to bring claims for violation of UDTPA.

71.     Vivint, by selling security, automation and smart-home systems and services, is engaged in "commerce" in North Carolina as defined in N.C. Gen. Stat. Ann. § 75-1.1(b).

72.     Vivint has intentionally engaged in deceptive and unfair trade practices in violation of N.C. Gen. Stat. Ann. § 75-1.1(a) by engaging its sales agents to represent to CPI's customers that their CPI security, automation and smart home systems are outdated and unsafe; that CPI's security systems are incapable of protecting CPI's customers from burglaries without "upgrades;" that Vivint's sales agents are from CPI, or are in some manner affiliated with CPI; and that they will provide free "upgrades" to their CPI security systems without disclosing that they are competitors of CPI, seeking to replace CPI's equipment and services, not upgrade them.

73.     These practices are commonly recognized by industry members as deceptive and unfair trade practices that are intended to confuse and mislead consumers. These practices have specifically been barred as such by the security systems industry's code of ethics.

74.     Vivint's agents' false sales pitches were likely to, and did, mislead CPI's customers into believing that they were continuing and "upgrading" their CPI services, when in fact the agents were obliging them to new contracts for new services from Vivint.

75.     Vivint has also violated UDTPA through offering to "buyout" customers' contracts with CPI but failing to fully inform the customer of their obligation to CPI, failing to fully and accurately describe the buyout program, using the program as a means to "save" sales created through deceptive sales practices as alleged elsewhere in this Complaint, and/or affirmatively misrepresenting facts regarding the transaction.

4852-1741-6394

76.     CPI has been aggrieved by Vivint's violations of UDTPA, and is entitled to its actual damages suffered as a result of those violations, plus its attorney fees and costs as provided in N.C. Gen. Stat. § 75-16.1.

77.     Specifically, CPI has been and will continue to be damaged as a result of Vivint's false representations by the confusion of the market for CPI's goods and services, by the disruption of CPI's relationships with its customers, by the diversion of CPI's customers to Vivint, by CPI's lost royalties, by CPI's loss of control of the use of its brand in the market, and by damage to CPI's goodwill and reputation as a reliable provider of security systems.

78.     CPI has also been and will continue to be damaged as a result of having to police Vivint's conduct and to expend time and resources to reinstall CPI systems into the homes of former CPI customers who have fallen victim to Vivint's false and deceptive practices.

79.     CPI contends that the North Carolina Unfair and Deceptive Trade Practices Act was enacted to protect North Carolina residents; that CPI is a North Carolina resident; and that all of Vivint's acts alleged in this Complaint may therefore be addressed under UDTPA. If, however, the Court concludes that UDTPA does not reach Vivint's sales to consumers outside North Carolina, CPI pleads in the alternate that Vivint's false sales pitches violate the corresponding unfair and deceptive trade practices statutes of the various states in which the sales occurred.

WHEREFORE, CPI respectfully requests that the Court enter judgment in its favor and against Vivint, and award the following relief:

    a.  Actual damages in an amount to be established at trial, for damages resulting from Vivint's numerous violations of the Act;

    b.  Treble damages or punitive damages as provided by N.C. Gen. Stat. § 75-16;

19

c.   Attorneys' fees and costs incurred in the prosecution of this action, as provided by N.C. Gen. Stat. § 75-16.1; and

d.   Such other and further relief as the Court may deem appropriate in the circumstances.

## COUNT IV
## TRADE SLANDER/COMMERCIAL DISPARAGEMENT

80.   CPI incorporates paragraphs 1 through 49 as if set forth fully herein.

81.   Vivint, through its sales agents, has intentionally made false and misleading statements about CPI, and about CPI's products and services, in their sales pitches to CPI's customers as alleged herein.

82.   Vivint's false and misleading statements demean the quality of CPI's goods and services.

83.   At the time the statements were made, Vivint knew the statements to be false.

84.   The statements are defamatory *per se* in that the statements suggest conduct incompatible with the lawful exercise of business.

85.   The statements are injurious and damage CPI in its industry and marketplace by causing CPI to lose sales and goodwill, and to suffer injury to its reputation as described in this Complaint.

WHEREFORE, CPI respectfully requests that the Court enter judgment in its favor and against Vivint, and award the following relief:

a.   Compensatory damages, in an amount to be established at trial;

b.   Punitive damages in a sum sufficient to deter Vivint from engaging in further deceptive sales tactics; and

4852-1741-6394

c. Such other and further relief as the Court may deem appropriate in the circumstances.

## COUNT V
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

86.     CPI incorporates paragraphs 1 through 49 as if set forth fully herein.

87.     CPI maintains valid and enforceable contracts and business relationships with its customers.

88.     Typically, CPI customers display a CPI sign outside their homes to deter potential burglars and broadcast to the outside world that the home is protected by CPI's alarm system.

89.     Vivint is knowledgeable of the contractual and business relationship between CPI and its customers. When Vivint sales agents visit the homes of these individuals, they become (or are already) aware of such relationship and contract by, among other means: the sign displayed in front of the customer's home, talking with the customer, observing the CPI equipment in the customer's home, or through prior research and intelligence conducted on the customer's address regarding existing alarm systems.

90.     Despite knowledge of the customer's contractual and business relationship with CPI, Vivint sales representatives intentionally and without valid justification interfere with such relationship and procure the breach of the CPI contract upon the promise that Vivint will "buy out" the remaining term by paying to the customer an amount equal to the remaining obligation on their CPI contract.

91.     Vivint also offers buyouts to "save" sales procured through deceptive sales conduct in an attempt to pacify the customer.

92.     The customer does not always remit such payment to CPI. Even when the customer does, CPI is damaged because the value of the customer's future account revenue often exceeds

21

the contractual value of the remaining contractual term. For example, it is not uncommon for a customer with two years left on his or her CPI contract to remain a loyal and paying customer to CPI for many years beyond the remaining two-year term. This is also why Vivint wrongfully engages in such buyout practices: Vivint knows the value of an alarm account often exceeds the immediate value under the contract.

93. CPI is damaged by Vivint's unlawful conduct by losing revenue streams that otherwise would remain with CPI absent Vivint's "buy out" offer, and also because the customer does not always remit any remaining amounts due and owing to CPI that Vivint provides to the customer.

WHEREFORE, CPI respectfully requests that the Court enter judgment in its favor and against Vivint, and award the following relief:

    a. Compensatory damages, in an amount to be established at trial, for the damages to CPI caused by Vivint's unlawful "buyout" practices;

    b. Punitive damages in a sum sufficient to deter Vivint from engaging in further deceptive sales tactics;

    c. Attorneys' fees and costs incurred in the prosecution of this action; and

    d. Such other and further relief as the Court may deem appropriate in the circumstances.

## **JURY DEMAND**

CPI demands a trial by jury on all issues so triable.

Dated: September 11, 2020.         Respectfully submitted,

                       By: /s/ Caroline M. Gieser
                       Caroline M. Gieser (NC Bar No. 51610)

22

cgieser@shb.com
**SHOOK, HARDY & BACON L.L.P.**
1230 Peachtree Street, Suite 1200
Atlanta, Georgia 30309
Tel: (470)-867-6013
Fax: (470)-867-6001


-and-

Charles C. Eblen (*pro hac vice forthcoming*)
ceblen@shb.com
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Blvd.
Kansas City, Missouri 64108
Tel: (816) 474-6550
Fax: (816) 421-5547

-and-

Eric J. Hobbs (*pro hac vice forthcoming*)
ehobbs@shb.com
**SHOOK, HARDY & BACON L.L.P.**
1660 17th Street, Suite 450
Denver, Colorado 80202
Tel: (303) 285-5300
Fax: (303) 285-5301

*Counsel for Plaintiffs CPI Security Systems, Inc.*

4852-1741-6394