1  UNITED STATES DISTRICT COURT
   FOR THE WESTERN DISTRICT OF NORTH CAROLINA
2  CHARLOTTE DIVISION
   CIVIL ACTION NO. 3:20-CV-00504-FDW-DSC
3
4  CPI SECURITY SYSTEMS, INC.,
5       Plaintiff and Counterclaim Defendant,
6  vs.
7  VIVINT SMART HOME, INC., f/k/a
   Mosaic Acquisition Corp.; and
8  LEGACY VIVINT SMART HOME, INC.,
   f/k/a Vivint Smart Home, Inc.,
9
        Defendants and Counterclaimants.
10
11 VIDEOCONFERENCE
   AND VIDEOTAPED
12 DEPOSITION OF:    LAURA WARD
13 DATE:             Tuesday, July 20, 2021
14 TIME:             3:19 p.m.
15 LOCATION:         Springhill Suites by Marriott Sumter
                     2645 Broad Street
16                   Sumter, South Carolina 29150
17 TAKEN BY:         Attorney for Plaintiff/
                     Counterclaim Defendant
18                   CPI Security Systems, Inc.
19 REPORTED BY:      Ann C. Makris, Court Reporter
20
21
22
23
24
25 Job No. CS4699399

1 APPEARANCES OF COUNSEL:
2     ATTORNEY FOR PLAINTIFF
      AND COUNTERCLAIM DEFENDANT:
3
      SHOOK, HARDY & BACON, L.L.P.
4     BY: Charles C. Eblen
      2555 Grand Boulevard
5     Kansas City, Missouri 64108-2613
      (816) 474-6550
6     ceblen@shb.com
7 ATTORNEYS FOR DEFENDANTS
   AND COUNTERCLAIMANTS:
8
      GREENBERG TRAURIG, P.A.
9     BY: GREGORY W. HERBERT
      450 South Orange Avenue, Suite 650
10    Orlando, Florida 32801
      herbert@gtlaw.com
11    (407) 420-1000
12 IN ATTENDANCE: Rodney Myers, Videographer
               Veritext
13             Alan Metts, Laptop Tech
14
15
16
17
18
19
20
21
22
23
24
25       (INDEX AT REAR OF TRANSCRIPT)

1     VIDEOGRAPHER: Okay. Good afternoon. We
2 are going on the record now at 3:19 p.m. on July
3 20th, 2021. Please note that the microphones are
4 sensitive and may pick up whispering, private
5 conversations, and cellular interference. Please
6 turn off all cell phones and place them away from
7 the microphones as they can interfere with the
8 deposition audio. Audio and video recording will
9 continue to take place unless all parties agree to
10 go off the record.
11     This is Media Unit 1 in the
12 video-recorded deposition of Laura Ward taken by
13 counsel for Plaintiff in the matter of CPI Security
14 Systems, Inc., vs. Vivint Smart Home, Incorporated,
15 filed in the United States District Court for the
16 Western District of North Carolina, Charlotte
17 Division. The case number is 320-cv-00504-FDW-DSC.
18     This deposition is being held via Zoom
19 located online. My name is Rodney Myers from the
20 firm Veritext, and I am the videographer. The
21 court reporter is Ann Makris from the firm
22 Veritext.
23     I'm not authorized to administer an oath.
24 I am not related to any party in this action, nor
25 am I financially interested in the outcome.

1     Counsel and all present in the room and
2 everyone attending remotely will now state their
3 appearances and affiliations for the record. If
4 there are any objections to proceeding, please
5 state them at the time of your appearance,
6 beginning with the noticing attorney.
7     MR. EBLEN: Yes. This is Charlie Eblen
8 for the plaintiff, CPI Security.
9     MR. HERBERT: And good afternoon, this is
10 Gregory Herbert for the defendant Vivint and I
11 believe my paralegal, Paula Castro, may be on.
12     Paula, are you on? I guess not.
13 Just me.
14     VIDEOGRAPHER: All right. Will the court
15 reporter please now swear in the witness and then
16 we may proceed.
17     COURT REPORTER: Okay. Ms. Ward, if you
18 would raise your right hand to be sworn, please.
19 Do you swear or affirm to tell the truth, the whole
20 truth, and nothing but the truth?
21     THE WITNESS: Yes.
22     COURT REPORTER: Thank you.
23     (The witness, after having been advised of her
24 right to read and sign this transcript, does not
25 waive that right.)

1     LAURA WARD,
2     being first duly sworn, testified as follows:
3     EXAMINATION
4 BY MR. EBLEN:
5     Q. Hello. Good afternoon, Ms. Ward. Can you
6 hear me okay?
7     A. Yes, sir.
8     Q. All right. If you can't hear me or we get
9 interrupted by technology, would you just let me know
10 and I'll speak up or re-ask the question to you?
11     A. Okay.
12     Q. Would you please introduce yourself?
13     A. Laura Ward.
14     Q. Where do you live, Ms. Ward?
15     A. 825 Gray Fox Trail in Sumter, South
16 Carolina.
17     Q. How long have you lived at that address?
18     A. Since 1991.
19     Q. And do you live with anyone else at that
20 address?
21     A. No.
22     Q. Do you have family?
23     A. Yes.
24     Q. Tell us a little bit about your family?
25     A. Well, I have a brother that lives in

1  Utica, Mississippi, and I have a sister that lives in
2  Mountain Home, Texas, and sister-in-law and nieces live
3  in New Braunfels, Texas, and other nieces and nephews
4  that live in Madison, Mississippi, and let's see what
5  else? That's about it.
6      Q.  All right. I'll ask a little bit more
7  about your background. What's your birthday?
8      A.  [REDACTED] 1952.
9      Q.  And give me a little bit about your
10  educational background?
11      A.  I spent 22 years in the military after
12  graduating from high school, some college courses, and
13  then I started to work for South Carolina Department of
14  Corrections after I retired from the military and worked
15  there for 15 years. Then, I had surgery and had to
16  retire.
17      Q.  In what branch of the military did you
18  serve?
19      A.  U.S. Air Force.
20      Q.  And what rank did you reach in the Air
21  Force?
22      A.  E-5.
23      Q.  And then when you went to work for the
24  South Carolina Department of Corrections, what position
25  did you hold there?

1      A.  I was a correctional officer.
2      Q.  Any -- any particular rank?
3      A.  That was my rank. That's the lowest rank.
4      Q.  Got you. And then you said you had a back
5  injury or something?
6      A.  No, I had colostomy surgery.
7      Q.  Okay. And are you currently retired?
8      A.  Yes, sir. I had to retire because of
9  surgery.
10      Q.  All right. Well, as you know, this case
11  that we've asked you to testify about involves a company
12  named Vivint. Are you familiar with the name of that
13  company?
14      A.  I wasn't until -- until they came to my
15  house.
16      Q.  And did you have a -- a positive business
17  experience with Vivint?
18      MR. HERBERT: Object to the form.
19      A.  No.
20  BY MR. EBLEN:
21      Q.  All right. So, as I understand it, prior
22  to June of 2020, what company provided alarm security
23  services at your house?
24      A.  CPI.
25      Q.  How long at that point had you used CPI?

1      A.  I can't really remember when I started,
2  but it was at least, I -- I guess -- I'd guess about
3  three or four years maybe. That's a -- a guess -- a
4  guesstimate.
5      Q.  As of June 2020, were you pleased with
6  CPI?
7      A.  Yes.
8      Q.  Were you in any way looking to switch
9  alarm providers?
10      A.  No.
11      Q.  Do you have a "no solicitation" sign at
12  your home?
13      A.  Yes, sir; I do.
14      Q.  Do you expect people to pay attention that
15  sign?
16      MR. HERBERT: Object to the form. I'm --
17  I'm sorry, Ms. Ward. I -- if you'll just give me one
18  second. I need to make some objections for the record.
19  I object to the form. It's vague as to the time frame,
20  among other objections.
21      A.  Well, I thought they would.
22  BY MR. EBLEN:
23      Q.  All right. In June of 2020 -- and if you
24  need to -- I -- I should -- I'll stop here for just as a
25  second.

1      Mr. Herbert is right. He's going to
2  object from time to time so that will break the
3  questioning a little bit, but when he makes an
4  objection, you can still go ahead and answer the
5  question, okay, and -- and also I should tell you --
6  yeah, I see you have some water there. For any reason
7  you need to take a break, just let us know.
8      A.  Okay.
9      Q.  This is by no means an endurance context,
10  so if you just want to take a break for whatever reason,
11  just speak up, okay?
12      A.  Okay.
13      Q.  All right. So let's pick back up. In
14  June of 2020, did you have a no solicitation sign at
15  your house?
16      A.  Yes, sir; on my door, my outside door.
17  What do you call it, the glass --
18      Q.  Storm door?
19      A.  Storm door. Yes. Thank you.
20      Q.  And why did you have that sign on your
21  storm door?
22      A.  Because we -- we get a lot of solicitors
23  come through the neighborhood, and I just -- I even had
24  one made and I was going to put it in the yard but that
25  particular day, that was -- that was on the door, and he

1  did see the sign because he -- he -- he stressed that he
2  -- he didn't -- he -- he wasn't a solicitor.
3      Q.   All right.  All right.  So you started
4  saying that you said "he."  Let's focus in on sometime
5  in late June of 2020, did someone who you now understand
6  worked for Vivint approached your home?
7          MR. HERBERT  Object to the form; leading.
8      A.   Correct.
9  BY MR. EBLEN:
10     Q.   In two-thousand -- in June of 2020, did
11 anyone from an alarm company come to your door?
12     A.   Yes, sir.
13     Q.   And who do you now understand or -- or let
14 me ask that differently.
15         From what company do you now understand
16 the gentleman who approached your door in June of 2020
17 worked?
18     A.   Vivint.
19     Q.   When he approached -- well, describe what
20 happened when that gentleman approached your house in
21 June of 2020.
22         MR. HERBERT:  We object to the form.
23     A.   Do you want me to answer that?
24     Q.   Yes, please.
25     A.   Well, he showed up in my yard and rung my

1  doorbell and he -- I -- I walked -- I walked over to the
2  window and I told him to look at the sign on my door
3  meaning no soliciting and he basically said, "I'm not a
4  solicitor," so I went and answered the door and he said,
5  "I'm with Vivint and Vivint is buying out CPI and you
6  will no longer have CPI for your security company, and I
7  -- I guess I got scared and worried and he pretty much
8  talked me into going with Vivint.
9      Q.   So, as -- as I understand it, he comes to
10 the door and you -- you said you told him -- you pointed
11 to the sticker; is that right?
12     A.   Yes, sir.
13     Q.   Okay.
14     A.   He knew the sticker was on the door.  He
15 knew that -- the sign's about like that and he knew it
16 was on the door and he did specify or he said, "I'm not
17 a solicitor.
18     Q.   And then he told you that Vivint had
19 bought out CPI?
20     A.   Correct.
21         MR. HERBERT:  Correct.
22     A.   Correct.
23 BY MR. EBLEN:
24     Q.   So, at -- at that point in time in your
25 mind, did you believe that the gentleman at the door was

1  -- was working for the company taking over your CPI
2  alarm account?
3      A.   Yes.
4          MR. HERBERT:  Object to the form.
5  BY MR. EBLEN:
6      Q.   And why did you believe that?
7      A.   Well, he sounded convincing.  You know, he
8  -- he basically just sounded convincing.
9      Q.   And did he tell you that directly in -- in
10 those exact words?
11         MR. HERBERT:  Object to the form.
12     A.   Exact words that they -- that Vivint was
13 buying out CPI.
14     Q.   When someone approaches your door like
15 that, do you expect them to be truthful with you in your
16 home?
17         MR. HERBERT:  Object to the form.
18     A.   Yes, I do.  That would be -- that would be
19 nice.
20 BY MR. EBLEN:
21     Q.   With everything that you've now learned
22 and we'll go through everything that's happened since
23 then, do you believe that the gentleman from Vivint who
24 approached your door that day in late June of 2020 was
25 honest with you?

1      A.   Now, I don't -- I don't believe he was
2  honest with me.  I think he pretty much -- he just
3  basically lied to me, yeah.
4      Q.   Did -- did you later discover the truth
5  about whether or not Vivint had, in fact, bought out
6  CPI?
7      A.   Yes.
8      Q.   What did you discover?
9      A.   I discovered -- well, I called up CPI and
10 talked to one of the representatives at CPI and -- and I
11 told -- I asked him if Vivint had bought out CPI and he
12 said, no, that's a lie.  The guy I talked to -- the
13 representative I talked to said, no, that's a lie.
14         MR. HERBERT:  I'm --
15     A.   He said we're not selling out to Vivint.
16         MR. HERBERT:  Just note an objection for
17 the record and for the record, I moved to strike any
18 hearsay statement in response, and I object to the
19 question to the extent it called for hearsay.
20     Q.   Do you know the name of the gentleman who
21 approached your door from Vivint?
22     A.   Curtis Kuntz, K-U-N-T-Z, I -- I believe
23 that's how you spell it.
24     Q.   Do you know what Mr. Kuntz' job title at
25 Vivint was at the time that he approached your door?

1    A.    As far as I know, he was a representative
2  for -- for Vivint, a salesperson.
3    Q.    And so far -- and -- and describe what
4  happened after Mr. Kuntz told you that Vivint had bought
5  out CPI; what happened after that?
6    A.    Well, they -- they came into my house --
7  well, basically he told me -- the -- the guy who came
8  into my house took up all the equipment.  Let me back
9  up.
10         Curtis said that they had -- they were
11  going around all over the neighborhood and hooking up
12  Vivint equipment and switching out from CPI to Vivint.
13         So when the guy came into my house, he
14  took -- I asked him, I said, "So how many other houses
15  have you done," and he said, "You are our first one,"
16  and this is like 2 o'clock in the afternoon and, anyway,
17  they had to put new holes in my house.  From -- from
18  where CPI had holes, they put new holes in my house.
19  They took down the CPI camera and cut the wires, so I
20  couldn't even use the camera that I'd paid CPI something
21  like a hundred -- I think $150 for.  I couldn't use the
22  camera no more because they cut it up and some of the
23  wiring, they -- in the house, they messed up a little
24  bit, and it was just a nightmare with those people, a
25  nightmare.

1    Q.    It sounds like Mr. Kuntz also told you
2  that Vivint had changed out a bunch of CPI customers in
3  your neighborhood, and did I hear that?
4    A.    Yes, he --
5         MR. HERBERT:  Object to the form.
6  BY MR. EBLEN:
7    Q.    And did you find out whether or not that
8  was true?
9    A.    No, I didn't.  The only thing the -- the
10  guy that was in my house hooking up the equipment told
11  me, but the -- the monitoring box that CPI had put up,
12  Vivant took down and they even broke that.  They even
13  broke that, so when CPI came in to re-hook up all my
14  equipment, they had to put in all brand new stuff.  I
15  couldn't even reuse my original CPI stuff.
16    Q.    All right.  So to back up a little bit.
17  At the point in time when Mr. Kuntz approaches your door
18  with a no solicitation sign, had he been honest from the
19  get-go and said I'm a competitor here, I want to try to
20  sell you a better alarm system, would you even have
21  listened to his sales pitch?
22         MR. HERBERT:  Let me object to the form of
23  the question.
24    A.    No.
25         MR. HERBERT:  Pardon.  I'm sorry to

1  interrupt, Ms. Ward.  Let me just get my objection on
2  the record and proper foundation.  Calls for a
3  hypothetical and speculation.
4  BY MR. EBLEN:
5    Q.    If Mr. Kuntz had been honest about his
6  intentions when he approached your door, would you have
7  listened to his sales pitch?
8    A.    No.
9         MR. HERBERT:  Same objection.
10  BY MR. EBLEN:
11    Q.    Would you have let him in your home?
12    A.    No.
13    Q.    And --
14    A.    He didn't come in my house anyway.  I
15  wouldn't let him in.
16    Q.    Would --
17    A.    They were out -- they stayed outside the
18  whole time.  I wouldn't let him in my -- he wanted to
19  come in my house, but I told -- I told him, no, you
20  going to have to do this on the outside, so no -- no,
21  the answer to that question, no.
22    Q.    Did you have any intention of changing
23  alarm providers the day that Mr. Kuntz --
24    A.    No.
25    Q.    All right.  So we're at the point you've

1  describe pretty much all of your old equipment.  What
2  happened to it?
3    A.    It was -- he -- they tore it up.  When --
4  when he took -- when he unhooked the CPI equipment and
5  hooked up the Vivint equipment, it was a -- pretty much
6  a -- the same exact monitor that -- that they -- they
7  had in my house, he -- he broke it.  He -- and the --
8  when the guy came out to -- the CPI guy came out to put
9  in my -- put -- re-hook back up my equipment, he
10  couldn't use it.  They had to throw it away.
11    Q.    All right.  Fast-forwarding a little bit -
12  - well, actually, let -- let me -- I'm -- I'm going to
13  go ahead and show you a document on the screen in front
14  of you, so just give me a second here.
15         (PLF/DFT. EXH. 1, System Purchase Service
16  Agreement, 6/26/2020, marked for identification)
17    Q.    Okay.  Can you see that document okay?
18    A.    Oh, yeah.  I can't read it, but I can see
19  it.
20    Q.    All right.  We'll treat this as Exhibit 1.
21  Do you see the top left-hand corner of the document?
22  Does it say "Vivint" in the upper left-hand corner?
23    A.    Yes.
24    Q.    And I'll -- I'll blow it up a little bit
25  so we can see it a little bit better.

5 (Pages 14 - 17)

1    A.    No -- that'll help.
2    Q.    And so I've moved the document a little
3  bit.  Do you see your name --
4    A.    Yes.
5    Q.    -- in the video.
6    A.    Yes, uh-huh.
7    Q.    And is that your phone number, email
8  address and home address?
9    A.    (technical interruption)
10    Q.    And do you see that this -- do you -- can
11  you read the date of this contract?
12    A.    26th of June --
13    Q.    Two-thousand - -
14    A.    -- of 2020.
15    Q.    Does that sound right to you as far as the
16  time frame of when --
17    A.    That's the time -- that's the date I wrote
18  down when they hooked up my equipment so, yes, I would
19  -- I would say that's the correct date.
20    Q.    Was that the same day that Mr. Kuntz
21  knocked on your door?
22    A.    That's the same day he knocked on my door
23  and that's the same day they hooked up all the
24  equipment.
25    Q.    And then I'm scrolling down and in it

1  looks like Field 2.1 there and do you -- do you see
2  where there's the charges associated with your alarm
3  system?
4    A.    Yes, sir.
5    Q.    And it -- it says that it's a 60-month
6  contract; is that right?
7    A.    Yes, sir.
8    Q.    And --
9    A.    Well, 16-month -- where's that at?  Oh,
10  60-month, yes.
11    Q.    And what did you understand about -- it --
12  it looks like there's a monthly service fee, do you see
13  that --
14    A.    Yes, sir.
15    Q.    -- on the 24th?
16        Was that -- was that the only amount you
17  were paying monthly to Vivint?
18    A.    No.  I was -- I -- altogether, I was
19  paying about fifty-something dollars because they had
20  one charge going through a bank and then I was paying
21  Vivint another amount of money.  So I think I was paying
22  Vivint, I think it was, $42 then I was paying
23  another to the bank -- or one of the to the bank I was
24  paying thirteen-dollars and something.  I can't --
25    Q.    So as I'm understanding what you're

1  describing, was the $24.00 plus the $1.48, was that all
2  that you were paying per month to Vivint?
3    A.    No.  I was paying close to about fifty-
4  something altogether.
5    Q.    Was that more or less than your CPI
6  contract?
7    A.    That was less, but I'd rather pay more and
8  have CPI.
9    Q.    Did -- and the time that you entered into
10  the agreement with Vivint, did they disclose to you that
11  you were taking out a loan with a bank?
12    A.    If they did, I don't remember.  I don't
13  remember --
14    Q.    Do you --
15    A.    -- them telling me that.
16    Q.    Do you remember.  Mr. Kuntz describing to
17  you that you would be taking out a loan with a bank?
18        MR. HERBERT:  Object to the form.  Asked
19  and answered.
20        THE WITNESS:  What did -- what did he say?
21        MR. HERBERT:  Yes, ma'am.  Object to the
22  form.  The question was already asked and you -- you
23  answered it.
24  BY MR. EBLEN:
25    Q.    Did -- and I'll ask it again.  Did Mr.

1  Kuntz ever tell you, specifically, that you would be
2  taking out a loan from a bank to pay for your Vivint
3  alarm system?
4    A.    If he -- if he did --
5        MR. HERBRT:  The same objection.
6    A.    If he did, I don't -- I don't remember.  I
7  mean, he could have, but I don't -- I don't remember.
8  That day was a very, very hot day and I was -- I -- I
9  don't remember.  I just don't remember.
10    Q.    Did you have any discussion with Mr. Kuntz
11  or anyone from Vivint about whether or not a hard credit
12  check would be run in order for you to obtain your
13  Vivint alarm system?
14    A.    That, I don't remember either.  I'm -- I'm
15  thinking they did, but I don't remember.
16    Q.    All right.  And I'm scrolling down to the
17  bottom of this page.  Do you see the name, "Curtis
18  Kuntz?"
19    A.    Correct.
20    Q.    And is that the name that you recall as
21  the Vivint salesman?
22    A.    Oh, yes.
23    Q.    And then -- whoops, I made that little
24  again -- and then over on the right is your name with,
25  it looks like, an electronic signature --

1    A.   Yes, sir.
2    Q.   -- (technical interruption)?
3    A.   Yes, sir.
4    Q.   When you executed this document that we'll
5  call Exhibit 1, the Vivint Contract, did you do that,
6  like, on a tablet or some sort of a computer device?
7    A.   To be honest, I never got this form that
8  you're showing me now.  I never got that phone, but I
9  have a little bitty teeny-weeny piece of paper form and
10  the -- the one -- the form before this one, I -- I never
11  got that form.
12    Q.   So the document that we've just been
13  discussing, is that a document that you ever saw before
14  today?
15    A.   I must have because apparently my
16  signature is there so but....
17    Q.   Did you place the signature on this
18  document or did Mr. Kuntz?
19        MR. HERBERT:  Object to the form.
20    A.   I think I did sign that.
21  BY MR. EBLEN:
22    Q.   Do you recall on what format he signed it,
23  whether it was a computer or a -- like a tablet,
24  something like that?
25    A.   I think -- I think he had a tablet, a -- a

1  metal thing with -- with the form on it.  I think that's
2  what he had.
3    Q.   What did you understand about your right
4  to cancel this contract?
5    A.   On the -- on the form I have, it says I
6  have three days and I called within two days, and they
7  told me I couldn't but, apparently, from CPI, Shelley,
8  told me that I had -- I think she said I had 30 days,
9  but I had called within two days and they told me I
10  could not cancel.  I'd have to pay the three-three or
11  twenty-four hundred dollars to get out of it.
12    Q.   Okay.  So let's stop right there.  We've
13  gone through the contract.  At -- at what point in time
14  did you realize that you -- in agreeing to this Vivint
15  contract did you realize that Vivint and CPI were still
16  separate companies?
17    A.   I didn't.  I -- I hadn't -- found that out
18  yet.  I just called within two days because I didn't
19  like Vivint.  I didn't like the company.  I didn't like
20  the videos.  I didn't like anything about the company.
21  It just -- every -- every -- the video clips, you
22  couldn't delete.  In one certain part on my cellphone,
23  you couldn't delete them and it was just -- you know,
24  they just kept clocking up and clocking up and clocking
25  up and I couldn't delete them, and so I called up Vivint

1  -- Vivint and I said, "Hey, I want to cancel out of this
2  contract.  I'm within my time period," and they said,
3  "No, you can't -- you can't -- you're too late, you
4  can't do it."  So they wouldn't let me -- they -- the
5  guy wouldn't let me cancel out.  But what I think he did
6  do, he -- on the -- that $24 a month, I think he lowered
7  the payment or something.  Something -- he lowered the
8  payment or something.  I'm trying to remember, but I
9  think he lowered the payment, and so I went on for,
10  what, I can't remember how long, and then I called -- I
11  guess the following week, I talked to CPI and then CPI -
12  - that's when I found out CPI said that Vivint had not
13  bought out CPI.
14        MR. HERBERT:  And, I'm sorry to interrupt,
15  but let me interpose an objection and move to strike as
16  (indiscernible) not responsive to the question, but go
17  ahead.
18  BY MR. EBLEN:
19    Q.   So we'll -- we'll break this down a little
20  bit.  You described what you would call within a couple
21  of days, you reached out to Vivint --
22    A.   Right.
23    Q.   -- is that right?
24    A.   Well, part of the -- part of the time
25  period that I had to cancel was over the weekend, over a

1  Saturday and a Sunday, which Vivint is not open.  So I
2  had to -- you know, when I called that -- I think it was
3  that following Monday, that's when they told me I
4  couldn't -- I couldn't get out of the contract.
5    Q.   Right.  And at the time that you spoke to
6  Vivint, as I understood your testimony, did you still
7  think that Vivint had bought out CPI?
8        MR. HERBERT:  Object to the form.
9    A.   No.
10        MR. HERBERT:  Object to the form.
11    A.   No.
12  BY MR. EBLEN:
13    Q.   When did you realize that -- that --
14    A.   Well, let me back up.  Let me -- I
15  misunderstood that question.
16    Q.   Sure.
17    A.   Yes, I did think that until I talked to
18  the CPI guy, the person -- the representatives at CPI,
19  up until that point, I did think that Vivint had bought
20  out CPI, and I didn't -- I didn't know the whole truth
21  until I talked to the -- the representative at CPI.
22    Q.   Okay.  So your first call with Vivint, did
23  you have any success canceling your contract?
24    A.   No.
25    Q.   All right.  And so then you called CPI.

1  Do you know what day you called CPI?
2      A.  It was probably around -- it was that
3  following Monday after the -- after the -- I think I
4  signed the contract on the 26th, so I think it was that
5  following Monday.
6      Q.  And tell us what you learned from your
7  call with CPI?
8      A.  That they did not sell out to Vivint.
9      Q.  All right.  And -- and --
10     A.  And that --
11     Q.  -- at that point -- did you want to keep
12 your Vivint contract at that point?
13     A.  No, I did not.  I mean, I did not.  I was
14 -- I was crying.  I was upset.  I was talking to the CPI
15 guy, and I was just really upset because I -- I said I
16 can't -- I thought to myself, I cannot afford 23-2400 to
17 get out of this contract, and I did not want to stay in
18 that contract.  I wanted out of that contract, because I
19 realized they -- you know, they had told me so many lies
20 that, you know, I just -- I just wanted out of the
21 contract.
22     Q.  What steps did you take from there to try
23 to get out of the Vivint contract?
24     A.  On, talking to CPI lots of times, calling
25 Vivint up and the problem is, is when you call Vivint

1  up, if -- if they do answer the phone, they put you on
2  hold and you -- you know, then -- well, they answer the
3  phone and then you tell them your problem, and then they
4  put you on hold and you wait on hold forever and ever
5  and a day, and it just -- it was just -- it was just a
6  long process to try -- just to try to get through.  I
7  mean, I was on the phone with Vivint or trying to get on
8  the phone with Vivint just about every day and, at one
9  point, you'd -- I'd call and they'd put me on hold and
10 they'd play this loud music, and then the music would
11 drop down, and then they'd play loud music again, the
12 music would lower and, finally, you just hang up the
13 phone because you got aggravated.  You'd get aggravated,
14 and it was just a long, hard process to try to get out
15 of the contract.
16     Q.  And when you did finally get a hold of
17 somebody on the phone from Vivint, were they helpful in
18 trying to help you get out of the --
19     A.  Well, they seemed to be helpful.  They --
20 they -- they -- the -- they -- they listened to me and,
21 you know, the -- but then they'd turn around and put me
22 on hold, and the somebody else would get on the phone,
23 and I'd have to tell them the same thing I just told the
24 other person, and it was just a -- a long process to try
25 to just to get through and get through to those people.

1      It was like -- they were -- they were
2  nice.  Everybody was nice.  I didn't have a problem in
3  that area, but it was like, you know, you -- you're
4  talking to them, but the speaker's not on, you know, so
5  to speak, you know.
6      Q.  Did you feel sort of like you were getting
7  the runaround?
8      MR. HERBERT:  Object to the form.
9      A.  Oh, yes, definitely, the run around.  I
10 mean, they -- they -- that's -- that's -- I think that's
11 the game they play with you.  They send you around and
12 around in a circle and hoping you'd just get tired of
13 fooling with them and, you know, won't call them no
14 more, and I just had a Hell of a -- a heck of a time
15 trying to -- trying to deal with them.
16     Q.  How many times would you estimate you
17 called Vivint trying to get --
18     A.  At --
19     Q.  -- contact?
20     A.  At least -- I don't know, at least three
21 or four times a week.
22     Q.  Four how many weeks?
23     A.  Three months.  Three months.
24     Q.  So maybe 30 to 40 times, just kind of
25 running some loose math?

1      A.  Mm-hmm.  Yeah.  I don't -- I don't have a
2  calculator on me but, yes, about -- I'd say about that
3  time, you know, about that much or it may be more, you
4  know.
5      Q.  How much time would you estimate between
6  talking to CPI and Vivint to try to rectify this whole
7  situation?  How much time do you think you spent on
8  that?
9      A.  Well, between CPI -- Vivint and CPI, CPI
10 was -- was really trying to help me, and they put me
11 through to a guy by the name of David, and David hooked
12 me up with a girl by the -- a lady by the name of
13 Shelley and between CPI office and mostly David and
14 Shelley, I was able to -- to get everything swapped back
15 to CPI, but it took -- I think it took almost three to
16 four months before I could really get back to CPI.
17     Q.  And --
18     A.  It was a long, hard road.
19     Q.  Yeah.  In total, how much time -- you
20 know, and I know this is probably a rough estimate.  But
21 if you'd give a rough estimate between all of your calls
22 to Vivint and all of your calls to CPI and any other
23 effort that you put into trying to get back to where you
24 were before Mr. Kuntz showed up, how much time do you
25 think you spent?

1     MR. HERBERT: Object to the form.
2     A. Before Mr. Kuntz showed up?
3     Q. Yeah. No, I'm saying -- you -- you
4  basically -- as I understand it -- well, let me ask this
5  question: Did you eventually get a CPI system
6  reinstalled?
7     A. Yes.
8     Q. And when did that --
9     A. Reinstalled. Reinstalled.
10    Q. Yeah. When, to the best of your
11 recollection in 2020 did you have a CPI system
12 reinstalled?
13    A. I think it was close to the end of the
14 year, I think. I'm trying to remember. I -- I can't --
15    Q. If -- if we have a contract that -- that's
16 from September 23rd, 2000, does that sound about right
17 to you?
18    MR. HERBERT: Object to the form.
19    A. Yes, that's -- that sounds about right.
20    Q. So from the time -- and -- and what I'm
21 asking is, from the time that Mr. Kuntz showed up at
22 your door and you ended up with a Vivint system until
23 the time you went back to CPI, if you had to put an
24 estimate on it, between all of the phone calls at CPI,
25 Vivint, and other efforts you may have made, how much

1  time did it take you to get back to having a CPI system
2  in your home?
3     MR. HERBERT: Object to the form.
4     A. Approximately, four months. As far as
5  times goes, the actual time, I just know it was a long
6  time. It took me a long time to get back to CPI, and it
7  was very, very upsetting because their system is --
8  wasn't like CPI's system and I mean, I could -- I could
9  understand CPI's system. I didn't have an issue with
10 CPI's system, but Vivint's system was -- it wasn't
11 necessarily complicated. It was kind of going from an
12 old newspaper -- an new newspaper to an old newspaper --
13 newspaper. I mean, it was -- you going from a new
14 system to an old system, and I just wanted CPI back. I
15 didn't want to be with Vivint anymore.
16    Q. Did Vivint refund your --
17    MR. HERBERT: Objection. I'm sorry. Let
18 me just interpose an objection and motion to strike the
19 portions of the response that were not responsive to the
20 question that was posed.
21 BY MR. EBLEN:
22    Q. Did Vivint refund the money that you had
23 paid to it?
24    A. I don't know if they refunded all my
25 money, but I got the majority of it back. I think I'm

1  still missing about 40-50 bucks, but I was so happy to
2  get relieved out of Vivint contract that the 40-50 bucks
3  didn't matter, you know, so.
4     Q. Going back to the day that Mr. Kuntz came
5  to your home, did you have to take like a video survey
6  that asked you a series of questions on his iPad after
7  the installation took place?
8     A. I don't remember if I did that or -- I
9  don't remember if I did or not.
10    Q. And if --
11    A. There was --
12    Q. Go ahead.
13    A. I -- I was just saying I don't -- I don't
14 remember if I did or not. I -- I could have. I just --
15 I -- I don't really remember.
16    Q. At any point in time after Mr. Kuntz came
17 to your house when you were attempting to get out of the
18 Vivint contract, did you have any more communications
19 with Mr. Kuntz?
20    A. No. No, I didn't. As a matter of fact, I
21 tried to call him after -- you know, after he left my
22 house a day or two later, and I tried to call him
23 numerous of times and the phone -- he -- he wouldn't
24 answer the phone.
25    Q. Do you view Mr. Kuntz as being an honest

1  salesperson?
2     A. Now, I don't. Now -- Now, that I -- I --
3  I definitely believe he was totally dishonest to me and
4  lied one lie after another.
5     Q. If I told you that at the time your
6  transaction with Vivint occurred Mr. Kuntz -- he wasn't
7  just a sales representative, he was a sales manager who
8  also recruits and trains other salespeople, what would
9  your reaction to that be?
10    MR. HERBERT: Object to the form. It
11 calls for speculation and is a hypothetical.
12    A. A joke.
13 BY MR. EBLEN:
14    Q. And why is that?
15    MR. HERBERT: The same objection.
16    A. Because a manager shouldn't come to
17 someone's house and flat-out tell lies like that and --
18 and, you know, con people into something that he knows
19 is not true. I mean, to me --
20    Q. Would you --
21    A. -- a manager is --
22    Q. Would you trust --
23    A. -- a manager is supposed to be -- it's --
24 you -- you're supposed to be honest.
25    Q. Would you trust him to train other Vivint

1 salespeople to be honest to customers?
2     A. I wouldn't --
3     MR. HERBERT: Object to the form, calls
4 for foundation, hypothetical, speculation.
5     A. I wouldn't trust him to feed my dog, if I
6 had a dog.
7     Q. Personally, for you, how was the
8 experience dealing with Mr. Kuntz and then everything
9 else that you went through to get back to your CPI
10 system?
11     MR. HERBERT: Object to the form; vague,
12 calls for a narrative, and asked and answered.
13     A. Not a good experience and one I don't want
14 to ever have to have again, especially with Mr. Kuntz --
15 Mr. Curtis, and I'd love to see him in person to tell
16 him that.
17     MR. EBLEN: I believe, Ms. Ward, that's
18 all the questions that I have for you right now. Thank
19 you.
20     THE WITNESS: Okay. Thank you.
21     EXAMINATION
22 BY MR. HERBERT:
23     Q. And, good afternoon, Ms. ward. My name is
24 Greg Herbert, and I would have just a couple of quick
25 follow-up questions for you. One thing that Mr. Eblen

1 asked you about was that -- he asked you about your "No
2 Solicitors" sign on the door. Let me ask you that.
3 Despite that sign and by pointing it out to the sales
4 representative you were just discussing, you did
5 continue to -- to speak with the Vivint sales
6 representative and then, ultimately enter a contract;
7 that's correct, isn't it?
8     A. Yes, sir.
9     Q. And is it your opinion that any sales
10 representatives that, you know, do knock on the door,
11 even though there is a no solicitation sign, that that
12 is something that is improper or dishonest by itself?
13     A. Could you repeat that, please?
14     Q. Oh, I was saying is -- is it -- based on
15 your testimony, is it your opinion that simply the act
16 of knock -- for a sales representative to knock on
17 somebody's door and ask to speak with them, despite the
18 fact that there is a no solicitor sign on the door, is
19 -- is that something that you view as, by itself,
20 dishonest?
21     A. Well, I would assume that if you see a no
22 soliciting sign on someone's door, you will turn around
23 and walk away and not keep knocking and ringing --
24 knocking on the door and ringing the doorbell.
25     Q. All right. But -- but that by itself

1 isn't something that is inherently dishonest by itself?
2 If that was the only thing that -- that -- that happens,
3 you wouldn't necessarily have complained of that, is it
4 -- would you?
5     A. If I put a no soliciting sign on my door,
6 I expect the person coming to my door trying to sell me
7 something would respect that I do have a no soliciting
8 sign on my door and they will turn around and walk away
9 and leave my yard.
10     Q. I understand that. And, Ms. Ward, will
11 you -- will you surprised to learn that CPI sales
12 representatives also solicit customers who have a no
13 solicitation signs on the door in the yard?
14     MR. EBLEN: Object to the form and
15 foundation.
16     A. I don't know what CPI does or don't do.
17 The only thing I know is what Vivint did and that was
18 totally dishonest what he -- you know, whether he saw my
19 sign or not, it was totally dishonest for him to come to
20 my door and tell me a lie, pointblank, out, you know. I
21 don't know where -- where he got the audacity to show up
22 at my door and tell me a lie like that.
23     Q. Ms. Ward, well, I need to just ask you one
24 -- another question about something you testified about.
25 You -- you testified that -- I believe you testified

1 after you signed the contract with Vivint that the
2 Vivint rep came in and -- and -- and broke your -- your
3 former CPI equipment in your house.
4     A. That's correct.
5     Q. Now, that was equipment that under the
6 contract you signed was to be replaced with the new
7 Vivint equipment, in any event, right, based on the
8 contract you signed? You understood that, right?
9     A. No, I didn't understand that. I -- I --
10 you know, when he took my CPI equipment off or -- I --
11 off the wall of -- in my house, I didn't expect him to
12 break it and when he took my camera down from the --
13 from the outside of my house, I didn't expect him to cut
14 the wires so I couldn't use the camera anymore. I
15 didn't know he did that until Vivint, I mean, the CPI
16 guy that came to -- he was going to re-hook back up the
17 same camera and he says, "I can't do this because it's
18 -- they've cut the wires.
19     Q. All right. Well, let me ask you,
20 ultimately, CPI replaced that equipment that the Vivint
21 helpers installed in -- in your home, equipment?
22     A. Yes. They -- they put in their equipment,
23 Vivint equipment. Vivint monitoring box, which is
24 basically the same thing CPI was/is and the camera is
25 pretty much the same camera, but I paid an additional --

1  up and above my contract with CPI, I paid an additional
2  I think it was a $150 for the -- for the camera that was
3  on the outside of my house that Vivint tore up, cut the
4  wires on it. I couldn't use it anymore. That was --
5  that was my camera. It wasn't CPI camera, it was my
6  camera.
7      Q.   (indiscernible crosstalk)
8      A.   I paid for it.
9      Q.   My -- my question -- my question was
10  actually, ultimately, once you -- once you reinstated
11  your service with CPI or Vivint, they -- they -- they
12  came in and installed all new equipment so that you got
13  all equipment that you were satisfied with from CPI is
14  that --
15     A.   Right. But I wouldn't have had to -- they
16  wouldn't have had to replace the camera if Vivint hadn't
17  have tore up the camera.
18     Q.   Okay. I understand.
19         Let me change gears a little bit and ask
20  you about something that Mr. Eblen asked you about
21  earlier and that was a survey, a video survey that you
22  were asked to take at the -- prior to the installation
23  of the -- the Vivint equipment. When Mr. -- and Mr.
24  Eblen asked you if you -- if you remembered taking a --
25  a video survey or if the Vivint sales representative

1  administered a video survey, and I believe you testified
2  that you don't -- you don't remember specifically; is
3  that right?
4      A.   No, sir. I -- I could have, but I really
5  don't remember. I'm -- I'm sorry. I don't remember.
6      Q.   No. No problem at all. I -- I -- I
7  understand. Now, he referred to it as a video survey,
8  so it might be a little bit difficult to understand. I
9  think that you remember the Vivint sales representative
10  showing you something on his tablet or his device where
11  they asked you like a series of question and it said,
12  you know, there was a -- a microphone icon and it asked
13  you to tap that and you were asked certain questions and
14  then you answered them. Does that sound familiar or
15  does that refresh your memory?
16     A.   It -- it could -- I -- to tell you the
17  truth, I just don't remember.
18     Q.   Okay.
19     A.   I mean, it was a long day that day.
20     Q.   I -- I understand.
21     A.   A long, hot day.
22     Q.   I understand. If I represented to you
23  that that survey -- you did take that survey and in that
24  survey you did indicate that you understood that Vivint
25  and CPI were not affiliated companies, as you sit here

1  today, it sounds like you -- you can't remember one way
2  or another whether you said that, would that refresh
3  your recollection if I just represented that to you?
4          MR. EBLEN: Object to form and foundation.
5  It assumes facts. You may answer.
6  BY MR. HERBERT:
7      Q.   I can rephrase the question. It wasn't
8  probably all that clear, and I apologize.
9          My question is if I represented to you
10  that you -- you did take a -- a video survey
11  administered by the -- by the Vivint sales rep --
12     A.   I don't remember a video. I definitely do
13  not remember a video. Now, I -- I could have, but I
14  don't remember no video.
15     Q.   Right. And you might have only seen a
16  tablet and -- and have been -- been asked questions that
17  you responded to. You might not have seen the video
18  camera or seen yourself on video, but you were asked
19  questions at the time of your interaction with the
20  Vivint sales rep presented and you answered several of
21  those questions and what I -- what I -- we can -- we can
22  play a clip from the video here in a minute, but I
23  wanted to say -- ask you does it refresh your
24  recollection if I represent to you that one of the
25  questions in that video survey was whether you

1  understood that Vivint was not affiliated with your
2  previous security company and -- and you answered that,
3  yes, you understood that. So does that refresh your
4  recollection?
5      A.   No. The only thing I know is, is whatever
6  he told me in front of my house in front of my door that
7  Vivint was buying out CPI and whatever he said or is
8  written down or whatever, I know what he said. I know
9  what Mr. Curtis said that CPI -- Vivint was buying out
10  CPI.
11     Q.   All right. Well, let me -- I'm just going
12  to play a little short clip for you of the video survey.
13  I'm going to share my screen so that should appear. It
14  might be a minute. This is the first time I've used
15  this technology, so be patient with me because I'll wait
16  until Charlie clears out his screen.
17         MR. HERBERT: Do you want to stop sharing
18  your screen, Charlie?
19         MR. EBLEN: Yes, sir.
20  BY MR. HERBERT:
21     Q.   Okay. It might start playing right away
22  or it (indiscernible) some time. Let me back up. All
23  right. Ms. Ward, can you -- can you see the screen now.
24  It looks like a blue blank -- like a video player with a
25  little play button at the bottom, do you see that?

1    A.    Yes, sir.

2    Q.    So I'm going to play a video and ask you

3  to -- to look at it and tell me if you -- if you

4  recognize the video.  Okay.  Give me one second.

5         (Video clip is played for the witness.)

6    Q.    So, Ms. Ward, were you able to hear the --

7  the audio component of that video clip?

8    A.    I thought I heard my voice, yes.

9    Q.    All right.  And did you see yourself?

10    A.    No.

11    Q.    Okay.  I'm sorry.  Hold on one second.  I

12  guess I didn't do this right.

13         (Video clip is played for the witness.)

14    Q.    Give me one second.  Let me

15  (indiscernible).

16    A.    Okay.  I see -- I see a picture of me.

17    Q.    All right.  I apologize for that.  I'm

18  going to -- I'm going to start this over and play it

19  again.  Okay.  All right.  So you -- you -- this -- now

20  this is a still frame from the beginning of the clip

21  that I want to play and you -- you can -- do you

22  recognize that as a -- as a still frame of the -- a

23  picture of yourself there?

24    A.    Yes, sir.

25    Q.    All right.  I'm going to play it and let

1  me know if you can hear it, okay?

2         (Video is played for the witness.)

3    Q.    Okay.  So, Ms. Ward, did you -- did that

4  refresh your recollection about some questions that you

5  were asked on -- on the day of the -- you entered into

6  the contract with Vivint?

7    A.    That kind of, sort of, was but you -- I --

8  you're still talking a long time ago, I mean, as far as

9  my -- my memory goes, I mean.

10    Q.    But that was -- that was you in the video,

11  correct?

12    A.    That was me.

13    Q.    All right.  And -- and you understood the

14  question that was asked of you in that video when you

15  answered it yes?

16    A.    Maybe I didn't understand the question

17  because the only thing I know is Mr. Curtis told me

18  Vivint was buying out CPI.  That's the only thing I know

19  --

20    Q.    All right.

21    A.    -- so whatever he -- he -- they -- that --

22  that video you just showed says, it's not what Curtis

23  said.

24    Q.    I -- I understand, but you're not --

25  you're not disputing that you answered the question that

1  was asked in that video clip?

2    A.    I answered the question, but I may have

3  not answered the question knowing what I know now.

4    Q.    Okay.  Hold on one second.  I don't think

5  I -- I don't think I'll have any other questions.  Just

6  give me one little break.  Ms. Ward?

7    A.    Sir?

8    Q.    Yeah.  Just -- just one quick follow-up

9  question.  You recall that your prior contract with CPI

10  was also a contract for 60 months, that the term of the

11  contract was a 60-month or five-year period?

12    A.    Probably.  I -- I don't remember that

13  either but....

14    Q.    Okay.  So if I represented to you that --

15  that the original contract you did sign with CPI back in

16  2015 was a a -- was a 60-month contract, you don't have

17  any --

18    A.    Yeah.

19    Q.    -- reason to disagree with me, is that

20  fair enough?

21    A.    I'm -- I'm not disagreeing with you, no.

22    Q.    Okay.

23         MR. HERBERT:  No further -- I think those

24  are all the questions I have subject to I might have

25  some follow-up if Mr. Eblen has any follow-up.  Thank

1  you for your time.

2         THE WITNESS:  Thank you.

3         EXAMINATION

4  BY MR. EBLEN:

5    Q.    Yeah.  Just a couple of questions, Ms.

6  Ward.  Regardless of whatever was asked to you on that

7  tablet survey, did you expect somebody who was coming to

8  your door to be honest with you about whom they

9  represent?

10    A.    Well, I would -- I would have thought so

11  but, you know, it's like, you know, you -- you expect

12  people to be honest but sometimes, they're not, and Mr.

13  Curtis Kuntz was not honest with me from the get-go.  I

14  mean, there were several lies he -- he just told me and,

15  I mean, the -- the main reason I switched over from CPI

16  to Vivint is because he told me he was -- they were

17  buying out CPI.  That's the main -- I wouldn't have -- I

18  wouldn't have even -- I had no interest in switching

19  security companies until he told me that.

20    Q.    When he told you that at the time, did you

21  trust him?

22    A.    I guess at that point I did because he --

23  he mentioned he had a wife and he showed me a picture of

24  his baby, his newborn -- his new baby and, you know,

25  told me so -- showed me pictures of supposedly

1 quote/unquote his house, which was another lie. It was
2 not his house. It was a -- just a video of a house they
3 use on -- on camera and it -- yes, I probably -- I
4 probably did trust him because of what he said about his
5 wife and -- and -- and baby and --
6     MR. HERBERT: I'm going to move to strike
7 portions of the answer that are responsive to the
8 question.
9 BY MR. EBLEN:
10     Q. After what you've described going through
11 to try and get out of the Vivint contract, do you -- do
12 you -- sitting here today, do you regret the -- the
13 trust that you placed in Mr. Kuntz?
14     A. Yes. And I was -- I was very -- very
15 upset with myself because I did trust him and I not a --
16 the type of person -- when -- when solicitors come up to
17 my door, I pretty much point a shotgun at them and, yes,
18 I was -- I was upset with him.
19     Q. And why were you upset with yourself?
20     A. Because, I guess, I fell for his -- his
21 lies. I -- I fell for it, and I shouldn't have done. I
22 shouldn't have fell for it. I shouldn't have fell for
23 his lies.
24     Q. And how did that make you feel?
25     MR. HERBERT: Object to the form.

1     A. Awful. I mean, awful.
2     MR. EBLEN: That's all the questions I
3 have. Thank you.
4     MR. HERBERT: No further questions. Thank
5 you for your time, Ms. Ward.
6     THE WITNESS: Thank you.
7     VIDEOGRAPHER: All right. We are off the
8 record now at 4:17 p.m. and this concludes today's
9 deposition done by Laura Ward. The total number of
10 media exhibits is one and they will be retained by
11 Veritext.
12     (The deposition concluded at 4:17 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

1         I N D E X
2         WITNESSES
3 ALL WITNESSES:         PAGE:
4   LAURA WARD:         5
    Examination by Mr. Eblen:     5
5     Examination by Mr. Herbert:     34
    Examination by Mr. Eblen:     45
6   Certificate of Reporter:     49
7         EXHIBITS
8 NO.   DESCRIPTION         PAGE:
9 For Plaintiff/Counterclaim Defendant:
10 P/D-1   System Purchase Service Agreement   17
    For Identification
11
12
        Requested Documents/Information
13     (No requested information)
14
15
16
17
18
19
20
21
22
23
24
25

1     CERTIFICATE OF REPORTER
2     I, Ann C. Makris, Court Reporter and Notary
3 Public for the State of South Carolina at Large, do
4 hereby certify that the foregoing transcript is a true,
5 accurate, and complete record.
6     I further certify that I am neither related to
7 nor counsel for any party to the cause pending or
8 interested in the events thereof.
9     Witness my hand, I have hereunto affixed my
10 official seal this 9th day of August, 2021 at Florence,
11 Florence County, South Carolina.
12
13
14
15     _Ann C. Makris_
16     Ann C. Makris, Court Reporter
17     Notary Public for South Carolina
18     My Commission Expires:
19     October 1, 2028
20
21
22
23
24
25

Veritext Legal Solutions

1  Charles C. Eblen, Esq.

2  ceblen@shb.com

3        August 9th, 2021

4  RE:   CPI Security Systems, Inc, v. Vivint Smart Home, Inc.

5  7/20/2021, Laura Ward (#4699399)

6  The above-referenced transcript is available for

7  review.

8    Within the applicable timeframe, the witness should

9  read the testimony to verify its accuracy. If there are

10 any changes, the witness should note those with the

11 reason, on the attached Errata Sheet.

12   The witness should sign the Acknowledgment of

13 Deponent and Errata and return to the deposing attorney.

14 Copies should be sent to all counsel, and to Veritext at

15 erratas-cs@veritext.com

16

17 Return completed errata within 30 days from

18 receipt of testimony.

19  If the witness fails to do so within the time

20 allotted, the transcript may be used as if signed.

21

22      Yours,

23      Veritext Legal Solutions

24

25

1  CPI Security Systems, Inc, v. Vivint Smart Home, Inc.

2  Laura Ward (#4699399)

3      ACKNOWLEDGEMENT OF DEPONENT

4    I, Laura Ward, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11 _____  _____

12 Laura Ward              Date

13 *If notary is required

14      SUBSCRIBED AND SWORN TO BEFORE ME THIS

15 _____ DAY OF _____, 20___.

16

17

18      _____

19 NOTARY PUBLIC

20

21

22

23

24

25

1  CPI Security Systems, Inc, v. Vivint Smart Home, Inc.

2  Laura Ward (#4699399)

3      E R R A T A   S H E E T

4  PAGE_____ LINE_____ CHANGE_____

5  _____

6  REASON_____

7  PAGE_____ LINE_____ CHANGE_____

8  _____

9  REASON_____

10 PAGE_____ LINE_____ CHANGE_____

11 _____

12 REASON_____

13 PAGE_____ LINE_____ CHANGE_____

14 _____

15 REASON_____

16 PAGE_____ LINE_____ CHANGE_____

17 _____

18 REASON_____

19 PAGE_____ LINE_____ CHANGE_____

20 _____

21 REASON_____

22

23 _____  _____

24 Laura Ward              Date

25

| & | 3 | a | alan 2:13 |
|---|---|---|---|

**&** | **3** | **a** | **alan** 2:13

### &

**&** 2:3

### 0

**00504** 1:2 3:17

### 1

**1** 3:11 17:15,20
22:5 48:10 49:19
**1.48** 20:1
**15** 6:15
**150** 14:21 38:2
**16** 19:9
**17** 48:10
**1952** 6:8
**1991** 5:18

### 2

**2** 14:16
**2.1** 19:1
**20** 1:13 52:15
**2000** 30:16
**2015** 44:16
**2020** 7:22 8:5,23
9:14 10:5,10,16,21
12:24 18:14 30:11
**2021** 1:13 3:3
49:10 50:3
**2028** 49:19
**20th** 3:3
**22** 6:11
**22150** 49:15
**23-2400** 26:16
**23rd** 30:16
**24** 24:6
**24.00** 20:1
**24th** 19:15
**2555** 2:4
**2645** 1:15
**26th** 18:12 26:4
**29150** 1:16

### 3

REDACTED

**320** 3:17
**32801** 2:10
**34** 48:5
**3:19** 1:14 3:2
**3:20** 1:2

### 4

**40** 28:24
**40-50** 32:1,2
**407** 2:11
**42** 19:22
**420-1000** 2:11
**45** 48:5
**450** 2:9
**4699399** 50:5 51:2
52:2
**474-6550** 2:5
**49** 48:6
**4:17** 47:8,12

### 5

**5** 6:22 48:4,4

### 6

**6/26/2020** 17:16
**60** 19:5,10 44:10
44:11,16
**64108-2613** 2:5
**650** 2:9

### 7

**7/20/2021** 50:5

### 8

**816** 2:5
**825** 5:15

### 9

**9th** 49:10 50:3

---

**able** 29:14 42:6
**account** 12:2
**accuracy** 50:9
**accurate** 49:5
**acknowledgement**
52:3
**acknowledgment**
50:12
**acquisition** 1:7
**act** 35:15
**action** 1:2 3:24
**actual** 31:5
**additional** 37:25
38:1
**additions** 52:6
**address** 5:17,20
18:8,8
**administer** 3:23
**administered** 39:1
40:11
**advised** 4:23
**affiliated** 39:25
41:1
**affiliations** 4:3
**affirm** 4:19
**affixed** 49:9
**afford** 26:16
**afternoon** 3:1 4:9
5:5 14:16 34:23
**aggravated** 27:13
27:13
**ago** 43:8
**agree** 3:9
**agreeing** 23:14
**agreement** 17:16
20:10 48:10
**ahead** 9:4 17:13
24:17 32:12
**air** 6:19,20

---

**alarm** 7:22 8:9
10:11 12:2 15:20
16:23 19:2 21:3
21:13
**allotted** 50:20
**altogether** 19:18
20:4
**amount** 19:16,21
**ann** 1:19 3:21 49:2
49:16
**answer** 9:4 10:23
16:21 27:1,2
32:24 40:5 46:7
**answered** 11:4
20:19,23 34:12
39:14 40:20 41:2
43:15,25 44:2,3
**anymore** 31:15
37:14 38:4
**anyway** 14:16
16:14
**apologize** 40:8
42:17
**apparently** 22:15
23:7
**appear** 41:13
**appearance** 4:5
**appearances** 2:1
4:3
**appended** 52:7
**applicable** 50:8
**approached** 10:6
10:16,19,20 12:24
13:21,25 16:6
**approaches** 12:14
15:17
**approximately**
31:4
**area** 28:3

**asked** 7:11 13:11 14:14 20:18,22 32:6 34:12 35:1,1 38:20,22,24 39:11 39:12,13 40:16,18 43:5,14 44:1 45:6
**asking** 30:21
**associated** 19:2
**assume** 35:21
**assumes** 40:5
**attached** 50:11
**attempting** 32:17
**attendance** 2:12
**attending** 4:2
**attention** 8:14
**attorney** 1:17 2:2 4:6 50:13
**attorneys** 2:7
**audacity** 36:21
**audio** 3:8,8 42:7
**august** 49:10 50:3
**authorized** 3:23
**available** 50:6
**avenue** 2:9
**awful** 47:1,1

**b**

**baby** 45:24,24 46:5
**back** 7:4 9:13 14:8 15:16 17:9 25:14 29:14,16,23 30:23 31:1,6,14,25 32:4 34:9 37:16 41:22 44:15
**background** 6:7 6:10
**bacon** 2:3
**bank** 19:20,23,23 20:11,17 21:2
**based** 35:14 37:7

**basically** 11:3 12:8 13:3 14:7 30:4 37:24
**beginning** 4:6 42:20
**believe** 4:11 11:25 12:6,23 13:1,22 33:3 34:17 36:25 39:1
**best** 30:10
**better** 15:20 17:25
**birthday** 6:7
**bit** 5:24 6:6,9 9:3 14:24 15:16 17:11 17:24,25 18:3 24:20 38:19 39:8
**bitty** 22:9
**blank** 41:24
**blow** 17:24
**blue** 41:24
**bottom** 21:17 41:25
**bought** 11:19 13:5 13:11 14:4 24:13 25:7,19
**boulevard** 2:4
**box** 15:11 37:23
**branch** 6:17
**brand** 15:14
**braunfels** 6:3
**break** 9:2,7,10 24:19 37:12 44:6
**broad** 1:15
**broke** 15:12,13 17:7 37:2
**brother** 5:25
**bucks** 32:1,2
**bunch** 15:2
**business** 7:16
**button** 41:25

**buying** 11:5 12:13 41:7,9 43:18 45:17

**c**

**c** 1:19 2:4 49:2,16 50:1
**calculator** 29:2
**call** 9:17 22:5 24:20 25:22 26:7 26:25 27:9 28:13 32:21,22
**called** 13:9,19 23:6 23:9,18,25 24:10 25:2,25 26:1 28:17
**calling** 26:24
**calls** 16:2 29:21,22 30:24 33:11 34:3 34:12
**camera** 14:19,20 14:22 37:12,14,17 37:24,25 38:2,5,5 38:6,16,17 40:18 46:3
**cancel** 23:4,10 24:1,5,25
**canceling** 25:23
**carolina** 1:1,16 3:16 5:16 6:13,24 49:3,11,17
**case** 3:17 7:10
**castro** 4:11
**cause** 49:7
**ceblen** 2:6 50:2
**cell** 3:6
**cellphone** 23:22
**cellular** 3:5
**certain** 23:22 39:13
**certificate** 48:6 49:1

**certify** 49:4,6
**change** 38:19 51:4 51:7,10,13,16,19
**changed** 15:2
**changes** 50:10 52:6
**changing** 16:22
**charge** 19:20
**charges** 19:2
**charles** 2:4 50:1
**charlie** 4:7 41:16 41:18
**charlotte** 1:2 3:16
**check** 21:12
**circle** 28:12
**city** 2:5
**civil** 1:2
**clear** 40:8
**clears** 41:16
**clip** 40:22 41:12 42:5,7,13,20 44:1
**clips** 23:21
**clocking** 23:24,24 23:24
**close** 20:3 30:13
**college** 6:12
**colostomy** 7:6
**come** 9:23 10:11 16:14,19 33:16 36:19 46:16
**comes** 11:9
**coming** 36:6 45:7
**commission** 49:18
**communications** 32:18
**companies** 23:16 39:25 45:19
**company** 7:11,13 7:22 10:11,15 11:6 12:1 23:19 23:20 41:2

**competitor** 15:19
**complained** 36:3
**complete** 49:5
  52:8
**completed** 50:17
**complicated** 31:11
**component** 42:7
**computer** 22:6,23
**con** 33:18
**concluded** 47:12
**concludes** 47:8
**contact** 28:19
**context** 9:9
**continue** 3:9 35:5
**contract** 18:11
  19:6 20:6 22:5
  23:4,13,15 24:2
  25:4,23 26:4,12,17
  26:18,18,21,23
  27:15 30:15 32:2
  32:18 35:6 37:1,6
  37:8 38:1 43:6
  44:9,10,11,15,16
  46:11
**conversations** 3:5
**convincing** 12:7,8
**copies** 50:14
**corner** 17:21,22
**corp** 1:7
**correct** 10:8 11:20
  11:21,22 18:19
  21:19 35:7 37:4
  43:11 52:8
**correctional** 7:1
**corrections** 6:14
  6:24 52:6
**counsel** 2:1 3:13
  4:1 49:7 50:14
**counterclaim** 1:5
  1:17 2:2 48:9

**counterclaimants**
  1:9 2:7
**county** 49:11
**couple** 24:20
  34:24 45:5
**courses** 6:12
**court** 1:1,19 3:15
  3:21 4:14,17,22
  49:2,16
**cpi** 1:4,18 3:13 4:8
  7:24,25 8:6 11:5,6
  11:19 12:1,13
  13:6,9,10,11 14:5
  14:12,18,19,20
  15:2,11,13,15 17:4
  17:8 20:5,8 23:7
  23:15 24:11,11,12
  24:13 25:7,18,18
  25:20,21,25 26:1,7
  26:14,24 29:6,9,9
  29:9,13,15,16,22
  30:5,11,23,24 31:1
  31:6,14 34:9
  36:11,16 37:3,10
  37:15,20,24 38:1,5
  38:11,13 39:25
  41:7,9,10 43:18
  44:9,15 45:15,17
  50:4 51:1 52:1
**cpi's** 31:8,9,10
**credit** 21:11
**crosstalk** 38:7
**crying** 26:14
**cs** 50:15
**cs4699399** 1:25
**currently** 7:7
**curtis** 13:22 14:10
  21:17 34:15 41:9
  43:17,22 45:13
**customers** 15:2
  34:1 36:12

**cut** 14:19,22 37:13
  37:18 38:3
**cv** 1:2 3:17

**d**

**d** 48:1,10
**date** 1:13 18:11,17
  18:19 51:24 52:12
**david** 29:11,11,13
**day** 9:25 12:24
  16:23 18:20,22,23
  21:8,8 26:1 27:5,8
  32:4,22 39:19,19
  39:21 43:5 49:10
  52:15
**days** 23:6,6,8,9,18
  24:21 50:17
**deal** 28:15
**dealing** 34:8
**declare** 52:4
**deemed** 52:6
**defendant** 1:5,17
  2:2 4:10 48:9
**defendants** 1:9 2:7
**definitely** 28:9
  33:3 40:12
**delete** 23:22,23,25
**department** 6:13
  6:24
**deponent** 50:13
  52:3
**deposing** 50:13
**deposition** 1:12
  3:8,12,18 47:9,12
**describe** 10:19
  14:3 17:1
**described** 24:20
  46:10
**describing** 20:1,16
**description** 48:8
**despite** 35:3,17

**device** 22:6 39:10
**dft** 17:15
**differently** 10:14
**difficult** 39:8
**directly** 12:9
**disagree** 44:19
**disagreeing** 44:21
**disclose** 20:10
**discover** 13:4,8
**discovered** 13:9
**discussing** 22:13
  35:4
**discussion** 21:10
**dishonest** 33:3
  35:12,20 36:1,18
  36:19
**disputing** 43:25
**district** 1:1,1 3:15
  3:16
**division** 1:2 3:17
**document** 17:13
  17:17,21 18:2
  22:4,12,13,18
**documents** 48:12
**dog** 34:5,6
**dollars** 19:19,24
  20:4 23:11
**door** 9:16,16,18,19
  9:21,25 10:11,16
  11:2,4,10,14,16,25
  12:14,24 13:21,25
  15:17 16:6 18:21
  18:22 30:22 35:2
  35:10,17,18,22,24
  36:5,6,8,13,20,22
  41:6 45:8 46:17
**doorbell** 11:1
  35:24
**drop** 27:11
**dsc** 1:2 3:17

| duly 5:2 | eventually 30:5 | finally 27:12,16 | front 17:13 41:6,6 |
|---|---|---|---|
| **e** | everybody 28:2 | financially 3:25 | further 44:23 47:4 |
| e 6:22 48:1 51:3,3 | exact 12:10,12 | find 15:7 | 49:6 |
| 51:3 | 17:6 | firm 3:20,21 | **g** |
| earlier 38:21 | examination 5:3 | first 5:2 14:15 | game 28:11 |
| eblen 2:4 4:7,7 5:4 | 34:21 45:3 48:4,5 | 25:22 41:14 | gears 38:19 |
| 7:20 8:22 10:9 | 48:5 | five 44:11 | gentleman 10:16 |
| 11:23 12:5,20 | executed 22:4 | flat 33:17 | 10:20 11:25 12:23 |
| 15:6 16:4,10 | exh 17:15 | florence 49:10,11 | 13:20 |
| 20:24 22:21 24:18 | exhibit 17:20 22:5 | florida 2:10 | getting 28:6 |
| 25:12 31:21 33:13 | exhibits 47:10 | focus 10:4 | girl 29:12 |
| 34:17,25 36:14 | 48:7 | follow 34:25 44:8 | give 6:9 8:17 17:14 |
| 38:20,24 40:4 | expect 8:14 12:15 | 44:25,25 | 29:21 42:4,14 |
| 41:19 44:25 45:4 | 36:6 37:11,13 | following 24:11 | 44:6 |
| 46:9 47:2 48:4,5 | 45:7,11 | 25:3 26:3,5 | given 52:9 |
| 50:1 | experience 7:17 | follows 5:2 | glass 9:17 |
| educational 6:10 | 34:8,13 | fooling 28:13 | go 3:10 9:4 12:22 |
| effort 29:23 | expires 49:18 | force 6:19,21 | 15:19 17:13 24:16 |
| efforts 30:25 | extent 13:19 | foregoing 49:4 | 32:12 45:13 |
| either 21:14 44:13 | **f** | 52:5 | goes 31:5 43:9 |
| electronic 21:25 | f 1:7,8 | forever 27:4 | going 3:2 9:1,24 |
| email 18:7 | fact 13:5 32:20 | form 7:18 8:16,19 | 11:8 14:11 16:20 |
| ended 30:22 | 35:18 | 10:7,22 12:4,11,17 | 17:12 19:20 31:11 |
| endurance 9:9 | facts 40:5 | 15:5,22 20:18,22 | 31:13 32:4 37:16 |
| enter 35:6 | fails 50:19 | 22:7,9,10,11,19 | 41:11,13 42:2,18 |
| entered 20:9 43:5 | fair 44:20 | 23:1,5 25:8,10 | 42:18,25 46:6,10 |
| equipment 14:8 | familiar 7:12 | 28:8 30:1,18 31:3 | good 3:1 4:9 5:5 |
| 14:12 15:10,14 | 39:14 | 33:10 34:3,11 | 34:13,23 |
| 17:1,4,5,9 18:18 | family 5:22,24 | 36:14 40:4 46:25 | graduating 6:12 |
| 18:24 37:3,5,7,10 | far 14:1 18:15 | format 22:22 | grand 2:4 |
| 37:20,21,22,23 | 31:4 43:8 | former 37:3 | gray 5:15 |
| 38:12,13,23 | fast 17:11 | forwarding 17:11 | greenberg 2:8 |
| errata 50:11,13,17 | fdw 1:2 3:17 | found 23:17 24:12 | greg 34:24 |
| erratas 50:15 | fee 19:12 | foundation 16:2 | gregory 2:9 4:10 |
| especially 34:14 | feed 34:5 | 34:4 36:15 40:4 | gtlaw.com 2:10 |
| esq 50:1 | feel 28:6 46:24 | four 8:3 23:11 | guess 4:12 8:2,2,3 |
| estimate 28:16 | fell 46:20,21,22,22 | 28:21,22 29:16 | 11:7 24:11 42:12 |
| 29:5,20,21 30:24 | field 19:1 | 31:4 | 45:22 46:20 |
| event 37:7 | fifty 19:19 20:3 | fox 5:15 | guesstimate 8:4 |
| events 49:8 | filed 3:15 | frame 8:19 18:16 | guy 13:12 14:7,13 |
|  |  | 42:20,22 | 15:10 17:8,8 24:5 |

25:18 26:15 29:11
37:16

## h

**h** 51:3
**hand** 4:18 17:21
17:22 49:9
**hang** 27:12
**happened** 10:20
12:22 14:4,5 17:2
**happens** 36:2
**happy** 32:1
**hard** 21:11 27:14
29:18
**hardy** 2:3
**hear** 5:6,8 15:3
42:6 43:1
**heard** 42:8
**hearsay** 13:18,19
**heck** 28:14
**held** 3:18
**hell** 28:14
**hello** 5:5
**help** 18:1 27:18
29:10
**helpers** 37:21
**helpful** 27:17,19
**herbert** 2:9,10 4:9
4:10 7:18 8:16 9:1
10:7,22 11:21
12:4,11,17 13:14
13:16 15:5,22,25
16:9 20:18,21
22:19 24:14 25:8
25:10 28:8 30:1
30:18 31:3,17
33:10,15 34:3,11
34:22,24 40:6
41:17,20 44:23
46:6,25 47:4 48:5
**herbrt** 21:5

**hereto** 52:7
**hereunto** 49:9
**hey** 24:1
**high** 6:12
**hmm** 29:1
**hold** 6:25 27:2,4,4
27:9,16,22 42:11
44:4
**holes** 14:17,18,18
**home** 1:7,8,8 3:14
6:2 8:12 10:6
12:16 16:11 18:8
31:2 32:5 37:21
50:4 51:1 52:1
**honest** 12:25 13:2
15:18 16:5 22:7
32:25 33:24 34:1
45:8,12,13
**hook** 15:13 17:9
37:16
**hooked** 17:5 18:18
18:23 29:11
**hooking** 14:11
15:10
**hoping** 28:12
**hot** 21:8 39:21
**house** 7:15,23 9:15
10:20 14:6,8,13,17
14:18,23 15:10
16:14,19 17:7
32:17,22 33:17
37:3,11,13 38:3
41:6 46:1,2,2
**houses** 14:14
**huh** 18:6
**hundred** 14:21
23:11
**hypothetical** 16:3
33:11 34:4

## i

**icon** 39:12
**identification**
17:16 48:10
**improper** 35:12
**incorporated** 3:14
**index** 2:25
**indicate** 39:24
**indiscernible**
24:16 38:7 41:22
42:15
**information** 48:12
48:13
**inherently** 36:1
**injury** 7:5
**installation** 32:7
38:22
**installed** 37:21
38:12
**intention** 16:22
**intentions** 16:6
**interaction** 40:19
**interest** 45:18
**interested** 3:25
49:8
**interfere** 3:7
**interference** 3:5
**interpose** 24:15
31:18
**interrupt** 16:1
24:14
**interrupted** 5:9
**interruption** 18:9
22:2
**introduce** 5:12
**involves** 7:11
**ipad** 32:6
**issue** 31:9

## j

**job** 1:25 13:24
**joke** 33:12
**july** 1:13 3:2
**june** 7:22 8:5,23
9:14 10:5,10,16,21
12:24 18:12

## k

**k** 1:7,8 13:22
**kansas** 2:5
**keep** 26:11 35:23
**kept** 23:24
**kind** 28:24 31:11
43:7
**knew** 11:14,15,15
**knock** 35:10,16,16
**knocked** 18:21,22
**knocking** 35:23,24
**know** 5:9 7:10 9:7
12:7 13:20,24
14:1 23:23 25:2
25:20 26:1,19,20
27:2,21 28:3,4,5
28:13,20 29:3,4,20
29:20 31:5,24
32:3,21 33:18
35:10 36:16,17,18
36:20,21 37:10,15
39:12 41:5,8,8
43:1,17,18 44:3
45:11,11,24
**knowing** 44:3
**knows** 33:18
**kuntz** 13:22,24
14:4 15:1,17 16:5
16:23 18:20 20:16
21:1,10,18 22:18
29:24 30:2,21
32:4,16,19,25 33:6
34:8,14 45:13

46:13

## l

**l.l.p.** 2:3
**lady** 29:12
**laptop** 2:13
**large** 49:3
**late** 10:5 12:24
24:3
**laura** 1:12 3:12
5:1,13 47:9 48:4
50:5 51:2,24 52:2
52:4,12
**law** 6:2
**leading** 10:7
**learn** 36:11
**learned** 12:21 26:6
**leave** 36:9
**left** 17:21,22 32:21
**legacy** 1:8
**legal** 50:23
**lie** 13:12,13 33:4
36:20,22 46:1
**lied** 13:3 33:4
**lies** 26:19 33:17
45:14 46:21,23
**line** 51:4,7,10,13
51:16,19
**listened** 15:21
16:7 27:20
**little** 5:24 6:6,9 9:3
14:23 15:16 17:11
17:24,25 18:2
21:23 22:9 24:19
38:19 39:8 41:12
41:25 44:6
**live** 5:14,19 6:2,4
**lived** 5:17
**lives** 5:25 6:1
**loan** 20:11,17 21:2
**located** 3:19

**location** 1:15
**long** 5:17 7:25
24:10 27:6,14,24
29:18 31:5,6
39:19,21 43:8
**longer** 11:6
**look** 11:2 42:3
**looking** 8:8
**looks** 19:1,12
21:25 41:24
**loose** 28:25
**lot** 9:22
**lots** 26:24
**loud** 27:10,11
**love** 34:15
**lower** 27:12
**lowered** 24:6,7,9
**lowest** 7:3

## m

**ma'am** 20:21
**madison** 6:4
**main** 45:15,17
**majority** 31:25
**makris** 1:19 3:21
49:2,16
**manager** 33:7,16
33:21,23
**marked** 17:16
**marriott** 1:15
**math** 28:25
**matter** 3:13 32:3
32:20
**mean** 21:7 26:13
27:7 28:10 31:8
31:13 33:19 37:15
39:19 43:8,9
45:14,15 47:1
**meaning** 11:3
**means** 9:9
**media** 3:11 47:10

**memory** 39:15
43:9
**mentioned** 45:23
**messed** 14:23
**metal** 23:1
**metts** 2:13
**microphone** 39:12
**microphones** 3:3,7
**military** 6:11,14
6:17
**mind** 11:25
**minute** 40:22
41:14
**missing** 32:1
**mississippi** 6:1,4
**missouri** 2:5
**misunderstood**
25:15
**mm** 29:1
**monday** 25:3 26:3
26:5
**money** 19:21
31:22,25
**monitor** 17:6
**monitoring** 15:11
37:23
**month** 19:5,9,10
20:2 24:6 44:11
44:16
**monthly** 19:12,17
**months** 28:23,23
29:16 31:4 44:10
**mosaic** 1:7
**motion** 31:18
**mountain** 6:2
**move** 24:15 46:6
**moved** 13:17 18:2
**music** 27:10,10,11
27:12
**myers** 2:12 3:19

## n

**n** 13:22 48:1
**name** 3:19 7:12
13:20 18:3 21:17
21:20,24 29:11,12
34:23
**named** 7:12
**narrative** 34:12
**necessarily** 31:11
36:3
**necessary** 52:6
**need** 8:18,24 9:7
36:23
**neighborhood**
9:23 14:11 15:3
**neither** 49:6
**nephews** 6:3
**never** 22:7,8,10
**new** 6:3 14:17,18
15:14 31:12,13
37:6 38:12 45:24
**newborn** 45:24
**newspaper** 31:12
31:12,12,13
**nice** 12:19 28:2,2
**nieces** 6:2,3
**nightmare** 14:24
14:25
**north** 1:1 3:16
**notary** 49:2,17
52:13,19
**note** 3:3 13:16
50:10
**noted** 52:7
**noticing** 4:6
**number** 3:17 18:7
47:9
**numerous** 32:23

| **o** | |
|---|---|
| **o'clock** 14:16 | |
| **oath** 3:23 | |
| **object** 7:18 8:16 | |
| 8:19 9:2 10:7,22 | |
| 12:4,11,17 13:18 | |
| 15:5,22 20:18,21 | |
| 22:19 25:8,10 | |
| 28:8 30:1,18 31:3 | |
| 33:10 34:3,11 | |
| 36:14 40:4 46:25 | |
| **objection** 9:4 | |
| 13:16 16:1,9 21:5 | |
| 24:15 31:17,18 | |
| 33:15 | |
| **objections** 4:4 | |
| 8:18,20 | |
| **obtain** 21:12 | |
| **occurred** 33:6 | |
| ████ REDACTED ████ | |
| **office** 29:13 | |
| **officer** 7:1 | |
| **official** 49:10 | |
| **oh** 17:18 19:9 | |
| 21:22 28:9 35:14 | |
| **okay** 3:1 4:17 5:6 | |
| 5:11 7:7 9:5,8,11 | |
| 9:12 11:13 17:17 | |
| 17:17 23:12 25:22 | |
| 34:20 38:18 39:18 | |
| 41:21 42:4,11,16 | |
| 42:19 43:1,3 44:4 | |
| 44:14,22 | |
| **old** 17:1 31:12,12 | |
| 31:14 | |
| **once** 38:10,10 | |
| **online** 3:19 | |
| **open** 25:1 | |
| **opinion** 35:9,15 | |
| **orange** 2:9 | |

**order** 21:12
**original** 15:15
44:15
**orlando** 2:10
**outcome** 3:25
**outside** 9:16 16:17
16:20 37:13 38:3

| **p** | |
|---|---|
| **p** 48:10 | |
| **p.a.** 2:8 | |
| **p.m.** 1:14 3:2 47:8 | |
| 47:12 | |
| **page** 21:17 48:3,8 | |
| 51:4,7,10,13,16,19 | |
| **paid** 14:20 31:23 | |
| 37:25 38:1,8 | |
| **paper** 22:9 | |
| **paralegal** 4:11 | |
| **pardon** 15:25 | |
| **part** 23:22 24:24 | |
| 24:24 | |
| **particular** 7:2 | |
| 9:25 | |
| **parties** 3:9 | |
| **party** 3:24 49:7 | |
| **patient** 41:15 | |
| **paula** 4:11,12 | |
| **pay** 8:14 20:7 21:2 | |
| 23:10 | |
| **paying** 19:17,19 | |
| 19:20,21,22,24 | |
| 20:2,3 | |
| **payment** 24:7,8,9 | |
| **pending** 49:7 | |
| **people** 8:14 14:24 | |
| 27:25 33:18 45:12 | |
| **period** 24:2,25 | |
| 44:11 | |
| **person** 25:18 | |
| 27:24 34:15 36:6 | |
| 46:16 | |

**personally** 34:7
**phone** 18:7 22:8
27:1,3,7,8,13,17
27:22 30:24 32:23
32:24
**phones** 3:6
**pick** 3:4 9:13
**picture** 42:16,23
45:23
**pictures** 45:25
**piece** 22:9
**pitch** 15:21 16:7
**place** 3:6,9 22:17
32:7
**placed** 46:13
**plaintiff** 1:5,17 2:2
3:13 4:8 48:9
**play** 27:10,11
28:11 40:22 41:12
41:25 42:2,18,21
42:25
**played** 42:5,13
43:2
**player** 41:24
**playing** 41:21
**please** 3:3,5 4:4,15
4:18 5:12 10:24
35:13
**pleased** 8:5
**plf** 17:15
**plus** 20:1
**point** 7:25 11:24
15:17 16:25 23:13
25:19 26:11,12
27:9 32:16 45:22
46:17
**pointblank** 36:20
**pointed** 11:10
**pointing** 35:3
**portions** 31:19
46:7

**posed** 31:20
**position** 6:24
**positive** 7:16
**present** 4:1
**presented** 40:20
**pretty** 11:7 13:2
17:1,5 37:25
46:17
**previous** 41:2
**prior** 7:21 38:22
44:9
**private** 3:4
**probably** 26:2
29:20 40:8 44:12
46:3,4
**problem** 26:25
27:3 28:2 39:6
**proceed** 4:16
**proceeding** 4:4
**process** 27:6,14,24
**proper** 16:2
**provided** 7:22
**providers** 8:9
16:23
**public** 49:3,17
52:19
**purchase** 17:15
48:10
**put** 9:24 14:17,18
15:11,14 17:8,9
27:1,4,9,21 29:10
29:23 30:23 36:5
37:22

| **q** | |
|---|---|
| **question** 5:10 9:5 | |
| 13:19 15:23 16:21 | |
| 20:22 24:16 25:15 | |
| 30:5 31:20 36:24 | |
| 38:9,9 39:11 40:7 | |
| 40:9 43:14,16,25 | |
| 44:2,3,9 46:8 | |

| | | | |
|---|---|---|---|
| **questioning** 9:3 | **referenced** 50:6 | **represented** 39:22 | **running** 28:25 |
| **questions** 32:6 | **referred** 39:7 | 40:3,9 44:14 | **s** |
| 34:18,25 39:13 | **refresh** 39:15 40:2 | **requested** 48:12 | |
| 40:16,19,21,25 | 40:23 41:3 43:4 | 48:13 | **s** 51:3 |
| 43:4 44:5,24 45:5 | **refund** 31:16,22 | **required** 52:13 | **sales** 15:21 16:7 |
| 47:2,4 | **refunded** 31:24 | **respect** 36:7 | 33:7,7 35:3,5,9,16 |
| **quick** 34:24 44:8 | **regardless** 45:6 | **responded** 40:17 | 36:11 38:25 39:9 |
| **quote** 46:1 | **regret** 46:12 | **response** 13:18 | 40:11,20 |
| **r** | **reinstalled** 30:6,9 | 31:19 | **salesman** 21:21 |
| | 30:9,12 | **responsive** 24:16 | **salespeople** 33:8 |
| **r** 51:3,3 | **reinstated** 38:10 | 31:19 46:7 | 34:1 |
| **raise** 4:18 | **related** 3:24 49:6 | **retained** 47:10 | **salesperson** 14:2 |
| **rank** 6:20 7:2,3,3 | **relieved** 32:2 | **retire** 6:16 7:8 | 33:1 |
| **reach** 6:20 | **remember** 8:1 | **retired** 6:14 7:7 | **satisfied** 38:13 |
| **reached** 24:21 | 20:12,13,16 21:6,7 | **return** 50:13,17 | **saturday** 25:1 |
| **reaction** 33:9 | 21:9,9,14,15 24:8 | **reuse** 15:15 | **saw** 22:13 36:18 |
| **read** 4:24 17:18 | 24:10 30:14 32:8 | **review** 50:7 | **saying** 10:4 30:3 |
| 18:11 50:9 52:5 | 32:9,14,15 39:2,5 | **right** 4:14,18,24 | 32:13 35:14 |
| **realize** 23:14,15 | 39:5,9,17 40:1,12 | 4:25 5:8 6:6 7:10 | **says** 19:5 23:5 |
| 25:13 | 40:13,14 44:12 | 7:21 8:23 9:1,13 | 37:17 43:22 |
| **realized** 26:19 | **remembered** | 10:3,3 11:11 | **scared** 11:7 |
| **really** 8:1 26:15 | 38:24 | 15:16 16:25 17:11 | **school** 6:12 |
| 29:10,16 32:15 | **remotely** 4:2 | 17:20 18:15 19:6 | **screen** 17:13 41:13 |
| 39:4 | **rep** 37:2 40:11,20 | 21:16,24 23:3,12 | 41:16,18,23 |
| **rear** 2:25 | **repeat** 35:13 | 24:22,23 25:5,25 | **scrolling** 18:25 |
| **reason** 9:6,10 | **rephrase** 40:7 | 26:9 30:16,19 | 21:16 |
| 44:19 45:15 50:11 | **replace** 38:16 | 34:18 35:25 37:7 | **seal** 49:10 |
| 51:6,9,12,15,18,21 | **replaced** 37:6,20 | 37:8,19 38:15 | **second** 8:18,25 |
| **recall** 21:20 22:22 | **reported** 1:19 | 39:3 40:15 41:11 | 17:14 42:4,11,14 |
| 44:9 | **reporter** 1:19 3:21 | 41:21,23 42:9,12 | 44:4 |
| **receipt** 50:18 | 4:15,17,22 48:6 | 42:17,19,25 43:13 | **security** 1:4,18 |
| **recognize** 42:4,22 | 49:1,2,16 | 43:20 47:7 | 3:13 4:8 7:22 11:6 |
| **recollection** 30:11 | **represent** 40:24 | **ringing** 35:23,24 | 41:2 45:19 50:4 |
| 40:3,24 41:4 43:4 | 45:9 | **road** 29:18 | 51:1 52:1 |
| **record** 3:2,10 4:3 | **representative** | **rodney** 2:12 3:19 | **see** 6:4 9:6 10:1 |
| 8:18 13:17,17 | 13:13 14:1 25:21 | **room** 4:1 | 17:17,18,21,25 |
| 16:2 47:8 49:5 | 33:7 35:4,6,16 | **rough** 29:20,21 | 18:3,10 19:1,12 |
| **recorded** 3:12 | 38:25 39:9 | **run** 21:12 28:9 | 21:17 34:15 35:21 |
| **recording** 3:8 | **representatives** | **runaround** 28:7 | 41:23,25 42:9,16 |
| **recruits** 33:8 | 13:10 25:18 35:10 | **rung** 10:25 | 42:16 |
| **rectify** 29:6 | 36:12 | | **seen** 40:15,17,18 |

**sell** 15:20 26:8
36:6
**selling** 13:15
**send** 28:11
**sensitive** 3:4
**sent** 50:14
**separate** 23:16
**september** 30:16
**series** 32:6 39:11
**serve** 6:18
**service** 17:15
19:12 38:11 48:10
**services** 7:23
**share** 41:13
**sharing** 41:17
**shb.com** 2:6 50:2
**sheet** 50:11
**shelley** 23:7 29:13
29:14
**shook** 2:3
**short** 41:12
**shotgun** 46:17
**show** 17:13 36:21
**showed** 10:25
29:24 30:2,21
43:22 45:23,25
**showing** 22:8
39:10
**sign** 4:24 8:11,15
9:14,20 10:1 11:2
15:18 22:20 35:2
35:3,11,18,22 36:5
36:8,19 44:15
50:12
**sign's** 11:15
**signature** 21:25
22:16,17 49:15
**signed** 22:22 26:4
37:1,6,8 50:20
**signs** 36:13

**simply** 35:15
**sir** 5:7 7:8 8:13
9:16 10:12 11:12
19:4,7,14 22:1,3
35:8 39:4 41:19
42:1,24 44:7
**sister** 6:1,2
**sit** 39:25
**sitting** 46:12
**situation** 29:7
**smart** 1:7,8,8 3:14
50:4 51:1 52:1
**solicit** 36:12
**solicitation** 8:11
9:14 15:18 35:11
36:13
**soliciting** 11:3
35:22 36:5,7
**solicitor** 10:2 11:4
11:17 35:18
**solicitors** 9:22
35:2 46:16
**solutions** 50:23
**somebody** 27:17
27:22 45:7
**somebody's** 35:17
**someone's** 33:17
35:22
**sorry** 8:17 15:25
24:14 31:17 39:5
42:11
**sort** 22:6 28:6 43:7
**sound** 18:15 30:16
39:14
**sounded** 12:7,8
**sounds** 15:1 30:19
40:1
**south** 1:16 2:9
5:15 6:13,24 49:3
49:11,17

**speak** 5:10 9:11
28:5 35:5,17
**speaker's** 28:4
**specifically** 21:1
39:2
**specify** 11:16
**speculation** 16:3
33:11 34:4
**spell** 13:23
**spent** 6:11 29:7,25
**spoke** 25:5
**springhill** 1:15
**start** 41:21 42:18
**started** 6:13 8:1
10:3
**state** 4:2,5 49:3
**statement** 13:18
**states** 1:1 3:15
**stay** 26:17
**stayed** 16:17
**steps** 26:22
**sticker** 11:11,14
**stop** 8:24 23:12
41:17
**storm** 9:18,19,21
**street** 1:15
**stressed** 10:1
**strike** 13:17 24:15
31:18 46:6
**stuff** 15:14,15
**subject** 44:24
**subscribed** 52:14
**success** 25:23
**suite** 2:9
**suites** 1:15
**sumter** 1:15,16
5:15
**sunday** 25:1
**supposed** 33:23,24
**supposedly** 45:25

**sure** 25:16
**surgery** 6:15 7:6,9
**surprised** 36:11
**survey** 32:5 38:21
38:21,25 39:1,7,23
39:23,24 40:10,25
41:12 45:7
**swapped** 29:14
**swear** 4:15,19
**switch** 8:8
**switched** 45:15
**switching** 14:12
45:18
**sworn** 4:18 5:2
52:14
**system** 15:20
17:15 19:3 21:3
21:13 30:5,11,22
31:1,7,8,9,10,10
31:14,14 34:10
48:10
**systems** 1:4,18
3:14 50:4 51:1
52:1

**t**

**t** 13:22 51:3,3
**tablet** 22:6,23,25
39:10 40:16 45:7
**take** 3:9 9:7,10
26:22 31:1 32:5
38:22 39:23 40:10
**taken** 1:17 3:12
**talked** 11:8 13:10
13:12,13 24:11
25:17,21
**talking** 26:14,24
28:4 29:6 43:8
**tap** 39:13
**tech** 2:13
**technical** 18:9
22:2

**technology** 5:9
41:15
**teeny** 22:9
**tell** 4:19 5:24 9:5
12:9 21:1 26:6
27:3,23 33:17
34:15 36:20,22
39:16 42:3
**telling** 20:15
**term** 44:10
**testified** 5:2 36:24
36:25,25 39:1
**testify** 7:11
**testimony** 25:6
35:15 50:9,18
52:8
**texas** 6:2,3
**thank** 4:22 9:19
34:18,20 44:25
45:2 47:3,4,6
**thereof** 49:8
**thing** 15:9 23:1
27:23 34:25 36:2
36:17 37:24 41:5
43:17,18
**think** 13:2 14:21
19:21,22 22:20,25
22:25 23:1,8 24:5
24:6,9 25:2,7,17
25:19 26:3,4
28:10 29:7,15,25
30:13,14 31:25
38:2 39:9 44:4,5
44:23
**thinking** 21:15
**thirteen** 19:24
**thought** 8:21
26:16 42:8 45:10
**thousand** 10:10
18:13

**three** 8:3 23:6,10
23:10 28:20,23,23
29:15
**throw** 17:10
**time** 1:14 4:5 8:19
9:2,2 11:24 13:25
15:17 16:18 18:16
18:17 20:9 23:13
24:2,24 25:5
28:14 29:3,5,7,19
29:24 30:20,21,23
31:1,5,6,6 32:16
33:5 40:19 41:14
41:22 43:8 45:1
45:20 47:5 50:19
**timeframe** 50:8
**times** 26:24 28:16
28:21,24 31:5
32:23
**tired** 28:12
**title** 13:24
**today** 22:14 40:1
46:12
**today's** 47:8
**told** 11:2,10,18
13:11 14:4,7 15:1
15:10 16:19,19
23:7,8,9 25:3
26:19 27:23 33:5
41:6 43:17 45:14
45:16,19,20,25
**top** 17:21
**tore** 17:3 38:3,17
**total** 29:19 47:9
**totally** 33:3 36:18
36:19
**trail** 5:15
**train** 33:25
**trains** 33:8
**transaction** 33:6

**transcript** 2:25
4:24 49:4 50:6,20
52:5,8
**traurig** 2:8
**treat** 17:20
**tried** 32:21,22
**true** 15:8 33:19
49:4 52:8
**trust** 33:22,25
34:5 45:21 46:4
46:13,15
**truth** 4:19,20,20
13:4 25:20 39:17
**truthful** 12:15
**try** 15:19 26:22
27:6,6,14,24 29:6
46:11
**trying** 24:8 27:7
27:18 28:15,15,17
29:10,23 30:14
36:6
**tuesday** 1:13
**turn** 3:6 27:21
35:22 36:8
**twenty** 23:11
**two** 10:10 18:13
23:6,9,18 32:22
**type** 46:16

**u**

**u** 13:22
**u.s.** 6:19
**uh** 18:6
**ultimately** 35:6
37:20 38:10
**understand** 7:21
10:5,13,15 11:9
19:11 23:3 30:4
31:9 36:10 37:9
38:18 39:7,8,20,22
43:16,24

**understanding**
19:25
**understood** 25:6
37:8 39:24 41:1,3
43:13
**unhooked** 17:4
**unit** 3:11
**united** 1:1 3:15
**unquote** 46:1
**upper** 17:22
**upset** 26:14,15
46:15,18,19
**upsetting** 31:7
**use** 14:20,21 17:10
37:14 38:4 46:3
**utica** 6:1

**v**

**v** 50:4 51:1 52:1
**vague** 8:19 34:11
**verify** 50:9
**veritext** 2:12 3:20
3:22 47:11 50:14
50:23
**veritext.com**
50:15
**video** 3:8,12 18:5
23:21 32:5 38:21
38:25 39:1,7
40:10,12,13,14,17
40:18,22,25 41:12
41:24 42:2,4,5,7
42:13 43:2,10,14
43:22 44:1 46:2
**videoconference**
1:11
**videographer** 2:12
3:1,20 4:14 47:7
**videos** 23:20
**videotaped** 1:11
**view** 32:25 35:19

**vivant** 15:12
**vivint** 1:7,8,8 3:14
 4:10 7:12,17 10:6
 10:18 11:5,5,8,18
 12:12,23 13:5,11
 13:15,21,25 14:2,4
 14:12,12 15:2
 17:5,22 19:17,21
 19:22 20:2,10
 21:2,11,13,21 22:5
 23:14,15,19,25
 24:1,12,21 25:1,6
 25:7,19,22 26:8,12
 26:23,25,25 27:7,8
 27:17 28:17 29:6
 29:9,22 30:22,25
 31:15,16,22 32:2
 32:18 33:6,25
 35:5 36:17 37:1,2
 37:7,15,20,23,23
 38:3,11,16,23,25
 39:9,24 40:11,20
 41:1,7,9 43:6,18
 45:16 46:11 50:4
 51:1 52:1
**vivint's** 31:10
**voice** 42:8
**vs** 1:6 3:14

**w**

**w** 2:9
**wait** 27:4 41:15
**waive** 4:25
**walk** 35:23 36:8
**walked** 11:1,1
**wall** 37:11
**want** 9:10 10:23
 15:19 24:1 26:11
 26:17 31:15 34:13
 41:17 42:21
**wanted** 16:18
 26:18,20 31:14

40:23
**ward** 1:12 3:12
 4:17 5:1,5,13,14
 8:17 16:1 34:17
 34:23 36:10,23
 41:23 42:6 43:3
 44:6 45:6 47:5,9
 48:4 50:5 51:2,24
 52:2,4,12
**water** 9:6
**way** 8:8 40:1
**we've** 7:11 22:12
 23:12
**week** 24:11 28:21
**weekend** 24:25
**weeks** 28:22
**weeny** 22:9
**went** 6:23 11:4
 24:9 30:23 34:9
**western** 1:1 3:16
**whispering** 3:4
**whoops** 21:23
**wife** 45:23 46:5
**window** 11:2
**wires** 14:19 37:14
 37:18 38:4
**wiring** 14:23
**witness** 4:15,21,23
 20:20 34:20 42:5
 42:13 43:2 45:2
 47:6 49:9 50:8,10
 50:12,19
**witnesses** 48:2,3
**words** 12:10,12
**work** 6:13,23
**worked** 6:14 10:6
 10:17
**working** 12:1
**worried** 11:7
**written** 41:8

**wrote** 18:17

**x**

**x** 48:1

**y**

**yard** 9:24 10:25
 36:9,13
**yeah** 9:6 13:3
 17:18 29:1,19
 30:3,10 44:8,18
 45:5
**year** 30:14 44:11
**years** 6:11,15 8:3

**z**

**z** 13:22
**zoom** 3:18

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.