EXHIBIT
2

Page 1

1          UNITED STATES DISTRICT COURT
2      FOR THE WESTERN DISTRICT OF NORTH CAROLINA
3              CHARLOTTE DIVISION
4        CIVIL ACTION NO. 3:20-CV-00504-FDW-DSC
5

6

7  CPI SECURITY SYSTEMS, INC.,      )
                                    )
8          Plaintiff,               )
                                    )
9  vs.                              )
                                    )
10 VIVINT SMART HOME, INC. f/k/a    )
   Mosaic Acquisitions             )
11 Corporation; and LEGACY VIVINT  )
   SMART HOME, INC. f/k/a Vivint   )
12 Smart Home, Inc.,                )
                                    )
13         Defendants and           )
   Counterclaimants.               )
14                                  )
15 _____

16

17

18          DEPOSITION OF SHANTELL CHEEK
19            (TAKEN BY PLAINTIFF)
20             TAKEN VIA ZOOM
21          Thursday, August 19, 2021
22

23

24

           Reported in Stenotype by
25              Erin Ramsey
   Transcript produced by computer-aide transcription

1    APPEARANCES
2 ON BEHALF OF PLAINTIFF:
3        DANIEL ROHNER, ESQUIRE
         Shook, Hardy & Bacon, LLP
4        1660 17th Street
         Suite 450
5        Denver, Colorado 80202
         (303) 285-5300
6        Drohner@shb.com
7
   ON BEHALF OF DEFENDANTs:
8
         GREGORY HERBERT, ESQUIRE
9        Greenberg Traurig
         450 S. Orange Avenue
10       Suite 650
         Orlando, Florida 32801
11       (407) 420-1000
         Herbertg@gtlaw.com
12
13
14
15 Job No. CS4749790
16
17
18
19
20
21       DEPOSITION OF SHANTELL CHEEK, a witness called
22 on behalf Plaintiff, before Erin Ramsey, Notary
23 Public, in and for the State of North Carolina, at
24 taken via Zoom, on Thursday, August 19th, 2021,
25 commencing at 4:04 p.m.

1        INDEX OF EXAMINATIONS
2 BY MR. ROHNER.............................. PAGE 4
3 BY MR. HERBERT............................. PAGE 19
4
5
6
7        INDEX OF EXHIBITS
8 NUMBER        EXHIBIT              MARKED
9 Exhibit 1   CPI Contract..........................9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1        THE VIDEOGRAPHER:  This is the beginning
2 of the videotape deposition of Shantell Cheek in the
3 matter of CPI Securities Systems Incorporated versus
4 Vivint Smart Home Incorporated, et al.  Today's date
5 is August 19th, 2021, and the time is 4:04 p.m.
6        Counsel, please introduce yourselves after
7 which our court reporter will swear in the witness.
8        MR. ROHNER:  This is Dan Rohner,
9 R-o-h-n-e-r, from Shook, Hardy & Bacon, LLP, on behalf
10 of the plaintiff, CPI Security Systems, Inc.
11       MR. HERBERT:  This is Gregory Herbert with
12 the law firm of Greenberg Traurig on behalf of the
13 defendants, Vivint.  And also with me listening in are
14 Matthew Steward of the law firm Clyde Snow also
15 representing the defendant and our paralegal, Paula
16 Castro will be listening only.
17       SHANTELL CHEEK,
18 called as a witness by the Plaintiff, was first duly
19 sworn, as hereinafter certified, examined, and
20 testified as follows:
21       EXAMINATION
22 BY MR. ROHNER:
23   Q.  Good afternoon, Ms. Cheek.  My name is Dan
24 Rohner, you just heard me introduce myself for the
25 record, I represent CPI Security Systems, Inc.  And I

1 want to let you know we really appreciate you taking
2 the time to be here today.
3        The first question I have for you, have you
4 ever been involved in a deposition before?
5    A.  Nope.  Have not.
6    Q.  So why don't I start by just going over a few
7 ground rules that help things move a little smoother
8 and help ensure that we have a clear record.
9 Ms. Ramsey who you heard speaking before, she's a
10 court reporter and she's actually taking down
11 everything that I'm saying, everything that you're
12 saying and anything that any of the other lawyers say.
13 So one thing I'd like to remind everybody, especially
14 if you've never done this before, is that it's really
15 important that we endeavor not to speak over each
16 other.  And probably that's more my issue than yours,
17 but I have to remind myself to wait until the witness
18 has answered the question fully before I ask my next
19 question.
20       But I would caution you too sometimes witnesses
21 we just normally we anticipate what someone is going
22 to ask and it's not uncommon to start answering a
23 question while there still maybe words in the question
24 being asked.  So I ask you to sort of take a pause,
25 make sure that we're done with the questions before

1 you answer and I'll do the exact same or try to do the
2 exact same thing for you.
3     Does that make sense?
4 A. Sounds good.
5 Q. Another ground rule is that since it's
6 important for the record to be clear, there are times
7 when I may question where the answer is yes or no and
8 in the past we've had witnesses that may shake their
9 head up and down or to the side or may say uh-huh or
10 uh-uh, and those are the kinds of answers that will
11 drive a court reporter crazy because they don't know
12 exactly what the answer was. So if the answer to a
13 question I ask you is yes I'm going to ask that you
14 audibly say yes or no. And it's okay that it happens
15 where people forget and I'll remind you but that's why
16 I'm asking you to give you those audible responses so
17 the court reporter can get the answers down.
18     Does that make sense?
19 A. Yes.
20 Q. Another ground rule is if at any point I ask a
21 question that you don't understand I'm going to ask
22 that you let me know that because I'm happy to
23 rephrase it. The goal here is to get a clear and
24 truthful testimony so if I ask a question and you need
25 me to repeat it or you would like for me to be

1 rephrase it, please feel that you're committed to do
2 that. I don't want you answering any questions if you
3 feel you don't understand the question I'm asking.
4 A. Okay.
5 Q. And lastly, I don't anticipate this is going to
6 be very long, but if at any point you need a break to
7 use the restroom just let me know and I'm happy to
8 take that break and give you the time that you need.
9 A. All right. Sounds good. Thank you.
10 Q. Okay. You said your name now, I want to make
11 sure I'm pronouncing it, is Shantell Cheek?
12 A. Yes, that's correct.
13 Q. And where do you live, Ms. Cheek?
14 A. I live in Winterville, North Carolina.
15 Q. And how long have you lived there?
16 A. My current address I have been since 2014.
17 Q. And what's your current address?
18 A. 2408 Carlow Place, C-a-r-l-o-w, Place and
19 that's Winterville and the zip code is 28590.
20 Q. And seeing that you're uniform I think I know
21 the answer to this question but are you currently
22 employed?
23 A. Yes.
24 Q. And what do you do?
25 A. And am the director of an Uninsured Program.

1 Q. What --
2 A. Nurse program.
3 Q. What is an Uninsured Program?
4 A. So we actually try to coordinate care for those
5 without health insurance. So we work with providers,
6 specialists, whomever in the health care industry to
7 see if we can't get some patients taken care of.
8 Q. And how long have you been doing that?
9 A. 2009 I've been with the -- with this employer.
10 Q. And are you a nurse?
11 A. I am. Yes.
12 Q. At your current residence do you have a
13 security system?
14 A. Yes.
15 Q. And who is your current security services
16 provider?
17 A. We use CPI.
18 Q. Okay. How long have you been a customer of
19 CPI?
20 A. You know, I'm not 100 percent sure. I know we
21 moved into in 2014 so shortly thereafter.
22 Q. Do you have a recollection of actually signing
23 a contract with CPI to provide services?
24 A. Yes.
25 Q. I'm going to share my screen and hopefully

1 there will be an exhibit that will pop up, Ms. Cheek.
2 So let me know if you see it and then I'm going to ask
3 you a couple of questions about the exhibit.
4     (Plaintiff's Exhibit 1 was marked for
5     identification.)
6 A. Okay.
7 Q. Okay. So hopefully you see a document in front
8 of you.
9 A. Yes.
10 Q. That at the top it says CPI Security
11 Installation and Monitoring agreement; do you see
12 that?
13 A. Yes.
14 Q. Okay. And I don't know -- let me blow this up
15 a little bit. At the top where it says customer name;
16 is that your name?
17 A. Yes.
18 Q. I'm going to scroll -- it's a seven-page
19 document, I'm going to scroll down so you have a
20 chance to look at. If you need me to slow down just
21 let me know. You see at the bottom at the first page
22 is a signature block with your name dated May 1st,
23 2018. Keep scrolling down here. And that's the last
24 page. So I'm going to go back up to the first page.
25 Do you see recognize this document? It's been marked

1  as Plaintiff's Exhibit 1.
2  A.  Yes.
3  Q.  And what is it?
4  A.  I think that's the contract I signed, yes.
5  Q.  And I think I noted this but at the bottom
6  there's -- of the first page where your signature is
7  there's a date of May 1st, 2018; do you see that?
8  A.  I do.
9  Q.  Does that refresh your recollection at all as
10  to when you may have become a CPI customer?
11  A.  Yeah, it does.  I do remember after moving in
12  we did not immediately get an alarm system but shortly
13  thereafter so that seems accurate.
14  Q.  And since the date of this agreement, May 1st,
15  2018, have you consistently remained a CPI customer
16  during that period of time up through today?
17  A.  Yes.
18  Q.  Now, since you became a CPI customer have you
19  ever been solicited by another security company?
20  A.  Yes.
21  Q.  And what security company were you solicited
22  by?
23  A.  Vivint.  Vivint.  Not sure of the
24  pronunciation.
25  Q.  It's pronounced Vivint so you --

1  A.  Okay.
2  Q.  And you're not the first witness that
3  mispronounces it.  It's a tough pronunciation
4  sometimes.
5      Okay.  So tell me what you remember about when
6  you were solicited.  Was it at your home or somewhere
7  else?
8  A.  No, it was at my home.  Doorbell rang, went to
9  the door to see who it was, gentleman saying that CPI
10  and Vivint were now run by the same company, something
11  to the effect that they were merging or something to
12  that effect, and they were just wondering if they
13  could talk to me about the security system.
14  Q.  So let me kind of back up a little bit.  From
15  memory you opened it up, did you tell this person you
16  were a CPI customer?
17  A.  No.  I have one of the signs, the home
18  monitoring signs outside in the front lawn.
19  Q.  And so you mentioned you opened the door and
20  what's the first thing you remember him saying?
21      MR. HERBERT:  Object to form.
22  A.  Can't tell you exactly.  It probably was hello,
23  you know, how are you.  But I can't, you know, be
24  exactly sure what that was but I do know when, you
25  know, he said I want to talk to you about your

1  security system, CPI, and, you know, his company were
2  now doing business, something to that effect, and he
3  want wanted to discuss the security system with me.
4  Q.  Okay.  You -- earlier in your testimony you
5  mentioned the word merge or merger; do you remember
6  him using that word that the two companies had merged?
7      MR. HERBERT:  Object to the form.
8  A.  Not sure if it was merge but it gave that
9  impression that they were now one company or doing
10  business together.  So it was basically Vivint and CPI
11  were now one based on his wording from my recollection
12  and my understanding.
13  Q.  After he told you this -- made this statement
14  about the two companies working together or merging,
15  what happened next?
16  A.  I told him I wasn't interested, I thought it
17  was a little fishy, said no thank you, and he sort of
18  persisted that he wanted to discuss the security
19  system with me, and I said no thank you, went inside
20  and shut the door.
21  Q.  You just testified that it seemed fishy to you,
22  why did it seem fishy?
23  A.  Usually from my experience companies will maybe
24  send something like that in the mail or, you know,
25  make a phone call and not necessarily going from

1  home -- you know, ringing on the doorbell.  It just
2  seemed odd.  So I just didn't want to take any part in
3  it until I got something in writing per se.
4  Q.  While he was on this doorstep did he say
5  anything else about -- about the company he worked for
6  or its relationship with CPI --
7      MR. HERBERT:  Object to form.
8  Q.  -- that you remember?
9  A.  Not that I recall.  He just kept asking, you
10  know, can we have a discussion about your security
11  system and that's what really, you know, heightened
12  alert because he was asking about the security system
13  itself and I just thought it was maybe a scam, someone
14  trying to get in, and eventually come back and, you
15  know, maybe rob the house or something.  Maybe just
16  due to my hypervigilance but he just kept referencing
17  the security system.
18  Q.  Now, had you told him anything about your
19  security system?
20  A.  No, and did not ever tell him anything about my
21  security system.  I told him --
22  Q.  Did you --
23  A.  I'm sorry.
24  Q.  No, I'm sorry.  I interrupted you so please
25  finish.

4 (Pages 10 - 13)

1    A. No, I told him we were with CPI and that we
2 were good. So, you know, sort of turned around and
3 closed the door.
4    Q. Did he indicate that he knew anything about you
5 or your security system?
6    A. Not that I recall. You know, he didn't call me
7 by name or anything. Didn't have anything that
8 alerted me to maybe them being one company.
9    Q. You mentioned before that after you told him
10 that you were with CPI and you were happy that he
11 persisted; what did you mean by that?
12        MR. HERBERT: Object to form.
13    A. He just asking do you mind if we have a
14 conversation, you know, since we're now, you know, one
15 in the same, do you mind if we keep talking about your
16 security system, and my answer was the same, no, not
17 interested.
18    Q. You said that at a certain point you did end
19 the conversation?
20    A. I did.
21    Q. And how did the conversation end?
22    A. Basically me saying pretty sternly I'm not
23 interested, I turned around and walked back in my home
24 and locked the door and watched through the peephole.
25    Q. And what did you see out the peephole after the

1 conversation was over?
2    A. He went to another neighbor's house.
3    Q. Do you know if that neighbor also had a CPI
4 security system?
5        MR. HERBERT: Object to the form.
6    A. No.
7    Q. After this interaction -- well, actually let me
8 take a step back. Did you get the name of the
9 salesperson that was at your door step from Vivint?
10    A. I did not get the name but I did get a picture
11 of the vehicle and a license plate.
12    Q. Okay. Do you still have that -- those
13 pictures?
14    A. Yes.
15    Q. Do you have any objection to sharing those with
16 CPI and Vivint if we follow up and --
17    A. No.
18    Q. Okay.
19    A. No, not at all. I sent them in previously and
20 I don't mind doing that again.
21    Q. You sent them in -- where did you send them to?
22    A. I'll have to close out the Zoom to look at my
23 e-mail but when I was called about possibly
24 participating in the deposition I was asked to send
25 them so I sent them. And then once I -- once CPI did,

1 I guess, years ago sent out an e-mail saying that
2 Vivint and CPI are not the same company so be aware I
3 called customer service and they gave me another
4 e-mail to send that in. So I sent it in twice. You
5 know, initially when it happened and then just not too
6 long ago, maybe a month ago if that long.
7    Q. And just to be clear, what you sent was a
8 picture of the license plate of the vehicle that the
9 man was driving?
10    A. Correct, yes.
11    Q. And what else?
12    A. That was it. A picture of the truck and a
13 picture of the license plate.
14    Q. Okay. Now, you mentioned that you had put in a
15 call to CPI, that call happened after this
16 interaction?
17    A. Yes, it did. I believe we were sent some kind
18 of e-mail possibly alerting us -- CPI customers that
19 this was happening, different salespeople going to
20 homes and so I wanted to let them know that that
21 indeed happened to us and I guess that's what got the
22 ball rolling as far as my involvement.
23    Q. After you had this interaction did you have any
24 concerns about your experience with the Vivint
25 salesperson?

1        MR. HERBERT: Object to the form.
2    A. I thought it was odd but, you know, after I
3 shut the door, didn't think anything else of it, I did
4 see the same vehicle back in the neighborhood sometime
5 after. I don't know if it was a day after but he was
6 still back in the neighborhood and then after getting
7 the e-mail correspondence from CPI my antenna was
8 definitely raised and that's when I called them to let
9 them know that I did experience some strange
10 interaction with them.
11    Q. You mentioned that the vehicle was still in the
12 area the next day, do you know how long that
13 salesperson remained in the area in your neighborhood?
14    A. No, I'm not sure.
15    Q. After -- at any point since that interaction
16 have you had any interactions with Vivint either that
17 salesperson or another salesperson from Vivint?
18    A. I have not but my husband has. Just recently
19 another salesperson came to the door with the same
20 kind of, I guess, pitch but my husband did the same,
21 said that we weren't interested and then closed the
22 door, and of course I looked through the peephole and
23 I saw that he was at another neighbor's house on a
24 segway and going door to door.
25    Q. You said same sort of pitch, what do you mean

1 by same sort of pitch?
2      MR. HERBERT: I'm going to object to the
3 form of the question.
4      I'm sorry, Ms. Cheek. Occasionally I
5 might have to interpose an objection on the record. I
6 don't mean to interrupt you, I'm just going to note an
7 objection for the record to the extent that the
8 question solicits hearsay statements of another person
9 and otherwise object to the form.
10    Q. Do you remember my question, Ms. Cheek? Let me
11 ask it again. And he may object again and then we'll
12 go forward.
13      So the question was, you said the same sort of
14 pitch and I asked what did you mean by same sort of
15 pitch?
16      Hold on one second so Mr. Herbert can get his
17 objection in.
18      MR. HERBERT: I'll just say same
19 objection.
20    Q. And now you may answer.
21    A. Okay. It was someone -- salesperson came to
22 the door asking my husband if he could have a
23 conversation about the security system and again, my
24 husband's reply was no thank you, we're good, we're
25 with CPI and closed the door.

1    Q. Thank you.
2    A. Uh-huh.
3    Q. And I may have asked you this, anything else
4 about the interaction with the Vivint salesperson that
5 caused you any concern?
6      MR. HERBERT: Object to form.
7    A. Well, he was kind of pushy, maybe, and I don't
8 know -- kind of pushy and that's what sort of made me
9 come back kind of stern and say no, we're not
10 interested and just turned around and just shut the
11 door. Normally would not have done that to someone.
12 But just kept asking and kept pushing about discussing
13 the security system.
14      MR. ROHNER: I have no further questions.
15 Thank you.
16      THE WITNESS: Thank you.
17      EXAMINATION
18 BY MR. HERBERT:
19    Q. Hi, Ms. Cheek. I just have a couple of
20 follow-up questions. Let me ask you, you have never
21 spent one dollar with Vivint ever in your life, right?
22    A. No, I have not.
23    Q. Okay. And same for your husband, right?
24    A. Correct, yes. Correct, we have not.
25    Q. And this interaction that you talked about

1 didn't persuade you to do business with Vivint at all,
2 correct?
3    A. No, it did not. Completely opposite.
4    Q. And you you are still under contract with CPI,
5 correct?
6    A. Yes.
7    Q. And you plan on renewing your contract with CPI
8 when it expires?
9    A. Yes, as far as I know.
10    Q. Okay. So this interaction that you testified
11 about, that did not in any way cause you to
12 discontinue doing business with CPI; is that a fair
13 statement?
14    A. Yes, that's a fair statement.
15    Q. Okay. So CPI didn't lose any money that you
16 know of as a result of this interaction that you
17 testified about, right?
18      MR. ROHNER: Object to form.
19    A. No, they didn't lose any money from me, no.
20    Q. Okay. And then I wanted to also ask you about
21 you mentioned that your husband had an interaction
22 that you testified about. Now, were you actually
23 physically there at the door present when your husband
24 had that interaction or was he just on his own and he
25 told you about it afterwards?

1    A. Yeah, I was in our bedroom and he answered the
2 door and it happened so quickly by the time I came out
3 of the bedroom to see who was at the door, he already
4 closed the door and locked so it was a very brief
5 interaction.
6    Q. Okay. And you being in the bedroom I would
7 assume you could not hear that conversation at the
8 front door at that time, right?
9    A. Correct, I did not.
10    Q. Okay. So -- and just to clarify then, you
11 personally didn't hear anything that that sales rep
12 said to your husband in that one brief interaction; is
13 that a fair statement?
14    A. Yes, that's accurate. I could not overhear the
15 conversation.
16    Q. Okay. You talked a little bit about an e-mail
17 that you received from CPI; do you remember that?
18    A. I do, uh-huh, yes.
19    Q. And now that e-mail, did that appear to be sort
20 of like an e-mail blast that was sent to all CPI
21 customers as far as you can tell?
22    A. I would assume so. Maybe from customer
23 service. I would have to say yes.
24    Q. Okay. So it wasn't just an e-mail to you
25 personally saying dear Ms. Cheek, we want to let you

1 personally know about this based on your particular
2 contract with us, it was something more general and
3 broad intended for all CPI customers as far as you
4 could tell?
5   A.  I would assume so.  Maybe it had been reported
6 by other CPI customers that this was happening so I
7 guess they were just sending out a general customer
8 care e-mail.
9   Q.  Okay.  And do you recall did you get that
10 e-mail was that before or was that after your
11 interaction that you testified about earlier?
12   A.  It was after.
13   Q.  And did you say that you got two separate
14 e-mails like that from CPI or just the one?
15   A.  No, just one.  The two e-mails I referenced was
16 me sending the photograph of the truck and of the
17 license plate.  I sent that to CPI twice.  Well, CPI
18 and the lawyers I guess.  The legal office, the law
19 office.
20   Q.  Okay.  So I just wanted to focus on the e-mail
21 that you got from CPI and from testimony I know you
22 got one of these blast e-mails that was talking about
23 Vivint, but what I didn't recall is whether you
24 mentioned that you also got a second follow-up blast
25 e-mail from CPI.

1     Do you recall if you only just got that one
2 that you talked about or did you get two?
3   A.  No.  I got one general care e-mail and then
4 it's when I made the phone call and then I got an
5 e-mail very specifically to me asking me to share
6 photos.
7   Q.  Okay.  So I just want to ask about the first,
8 sort of, blast e-mail that you got.  That blast
9 e-mail, was -- it was talking about Vivint as a
10 company, right?
11   A.  Yes.  I think it was more along the lines that
12 just be aware that this is happening, CPI is still
13 just CPI, it hasn't joined forces with anyone as far
14 as I recollect, that's what -- it was a general care
15 e-mail.
16   Q.  Do you recall -- did that e-mail say that
17 Vivint as a company is a scam?
18   A.  I don't recall reading that or the e-mail
19 saying anything like that.
20   Q.  Okay.  Did you ever receive any type of e-mail
21 that was entitled Vivint door knocker scam alert; does
22 that sound familiar?
23   A.  I would hate -- no, I don't recall anything
24 like that.  I would hate to say yes or no one way or
25 the other.

1   Q.  Sure.  Sure.  Fair enough.  Do you recall
2 anything else that that blast e-mail said about Vivint
3 specifically?
4   A.  I think it was more or less reach out to
5 customer service if you have any concerns or any
6 questions and so that was my next action step to reach
7 out to them to let them know what was happening in our
8 area.
9   Q.  Do you recall if the e-mail said something
10 along the lines of Vivint has a long history of making
11 false statements; does that sound familiar to you?
12   A.  I can't say that I remember that.  Sorry.
13   Q.  No problem.  Let me ask you, do you happen to
14 know -- you -- I think you mentioned you have a CPI
15 sign in your front yard or outside the house?
16   A.  Yes.
17   Q.  Okay.  Do you happen to know what the shape of
18 that sign is or the colors off hand?
19   A.  I'm sorry.  It's a red and white sign attached
20 to a metal stake that we have outside in our mulch.
21   Q.  Do you know what shape the sign is?
22   A.  Maybe an octagon.  Something like that.
23   Q.  Okay.  Other than Vivint and CPI, are you
24 aware -- do you know about any other home security or
25 alarm company providers that are out there in the

1 market?
2       MR. ROHNER:  Object to form.
3   A.  Yes, I'm aware of them.
4   Q.  Could you name some other companies that are
5 out there other than CPI or Vivint?
6   A.  Yeah.  There's ADT, there's SimpliSafe, if I'm
7 not mistaken I think Brinks has one, just from what I
8 researched to look into security company.  I
9 researched.
10   Q.  Okay.  So you think you might know ADTs logo if
11 you saw it?
12   A.  I know the color is blue and the words are in
13 white if I remember correctly.
14   Q.  Let me ask you, do you have any knowledge about
15 the CEO of CPI, man -- gentleman by the name of Mr.
16 Ken Gil, there was some controversy regarding some
17 comments that he made last summer; are you generally
18 aware of that?
19   A.  I am.
20   Q.  Okay.  What do you recall about that
21 controversy or those comments?
22   A.  I think it has something to do with the
23 protests that were happening across the nation when it
24 had -- you know, dealing with -- started with kneeling
25 and he just made some comments that were -- could have

7 (Pages 22 - 25)

1 been taken as being disparaging depending on what side
2 of the fence you were on.
3    Q. Do you remember that certain sports teams ended
4 their relationship with CPI as a result of that
5 controversy?
6    A. I do. Carolina Panthers ended their sports
7 contract with them.
8    Q. Okay. And do you recall that the Charlotte
9 Hornets did as well?
10    A. I did not know that, no.
11    Q. Did you -- were you aware about any
12 comments that the basketball star Michael Jordan made
13 about that controversy and the Hornets ending that
14 relationship?
15    A. No, I don't.
16    Q. Okay. How about Bojangles, does that ring a
17 bell? Bojangles terminating their relationship with
18 CPI?
19    A. No, I didn't know that either.
20    Q. Okay. But you had heard about the Carolina
21 Panthers ending that relationship?
22    A. Yes, we're a huge football family.
23    Q. Panthers fan I take it?
24    A. My son is.
25    Q. Lot a Florida State players on the Panthers at

1 one point so kind of a fan myself.
2    A. I hear you.
3    Q. You saw that in the news or on the internet or
4 heard it on the radio or something along those lines?
5    A. Probably on the internet. And then I went and
6 did my own research to see what was said.
7    Q. Okay. And did you look up and see what the
8 comments were?
9    A. Yes. I don't remember 100 percent exactly what
10 they were, you know, word for word right now but yes,
11 I do remember reading that the comments were caused --
12 caused some disparaging feelings and they were some
13 remarks that, you know -- again, depending on what
14 side of the fence you're on could cause -- could stir
15 up some emotion.
16    Q. Okay. Did you ever discuss that with CPI,
17 maybe call their customer service and asked them about
18 those comments or the controversy surrounding that?
19    A. I think I do remember asking how long I had on
20 my contract before I had gone and done some research
21 about what, you know, was actually said. It caused
22 some emotion -- it elicited some emotion in me as well
23 so -- but I think I called asking about how long we
24 had on our contract.
25    Q. And I would guess if you were contemplating

1 terminating your contract with CPI at that time when
2 you were calling asking how much time you had left?
3      MR. ROHNER: Object to form.
4      THE WITNESS: I'm sorry, I cut you off.
5      MR. ROHNER: No. I object to form and now
6 you can answer. Sorry.
7    A. We had had some conversation within the
8 household just thinking about -- yes, thinking about
9 possibility ending our contract.
10    Q. Okay. And then ultimately you decided to
11 continue with CPI despite those comments and that
12 controversy surrounding those comments?
13    A. Yes.
14    Q. Okay. And then the interaction that you
15 testified about with the sales rep at your door, that
16 didn't -- did that happen before or after you had
17 called CPI about this controversy and the comments; do
18 you remember?
19    A. I believe that was after.
20    Q. Okay. Okay. Do you recall --
21    A. I'm sorry, can I just?
22    Q. Of course.
23    A. I want to make sure I answer that question
24 correctly. The interaction with the salesperson
25 happened before so my call to CPI about my contract

1 happened after my interaction with the representative
2 at the door. I just wanted to be sure I answered that
3 correctly.
4    Q. Okay. I got it. So the end result was you and
5 your family made the decision that despite that
6 controversy you were going to continue your
7 contractual relationship with CPI, right? The sound
8 cut off a little bit, that was a yes?
9    A. Yes. It's a yes.
10      MR. HERBERT: Okay. All right. I have no
11 further questions. Thank you very much. I might have
12 some more if Mr. Rohner is going to follow up, I might
13 possibility have one or two but hopefully not.
14      MR. ROHNER: I have no further questions.
15      MR. HERBERT: Neither do I. Thank you
16 very much for your time, Ms. Cheek. I appreciate it.
17      MR. ROHNER: Thank you, Ms. Cheek.
18      THE WITNESS: Thank you.
19      THE VIDEOGRAPHER: The time is 4:42 p.m.,
20 we're off the record.
21      (Off the record at 4:42 p.m.)
22      (Signature was waived.)
23
24
25

8 (Pages 26 - 29)

1  STATE OF NORTH CAROLINA
   COUNTY OF GUILFORD
2
3           REPORTER'S CERTIFICATE
4       I, Erin Ramsey, a Notary Public in and for the
5  State of North Carolina, do hereby certify that there
6  came before me on Thursday, the 19th day of August,
7  2021, the person hereinbefore name, in Pitt County,
8  who was by me duly sworn to testify to the truth and
9  nothing but the truth of his knowledge concerning the
10 matters in controversy in this cause; that the witness
11 was thereupon examined under oath, the examination
12 reduced to typewriting under my direction, and the
13 deposition is a true record of the testimony given by
14 the witness.
15      I further certify that I am neither attorney or
16 counsel for, nor related to or employed by, any
17 attorney or counsel employed by the parties hereto or
18 financially interested in the action.
19      IN WITNESS WHEREOF, I have hereto set my hand,
20 this the 27th day of August, 2021, according to the
21 emergency video notarization requirements contained in
22 G.S. 10B-25.
23
24
25       Erin Ramsey, Notary Public
         Notary Number: 201814200166

Veritext Legal Solutions

800-567-8658                                973-410-4098

| & | |
|---|---|
| **&** | 2:3 4:9 |

| 0 | |
|---|---|
| **00504** | 1:4 |

| 1 | |
|---|---|
| **1** | 3:9 9:4 10:1 |
| **100** | 8:20 27:9 |
| **10b** | 30:22 |
| **1660** | 2:4 |
| **17th** | 2:4 |
| **19** | 1:21 3:3 |
| **19th** | 2:24 4:5 30:6 |
| **1st** | 9:22 10:7,14 |

| 2 | |
|---|---|
| **2009** | 8:9 |
| **2014** | 7:16 8:21 |
| **2018** | 9:23 10:7,15 |
| **201814200166** | |
| | 30:25 |
| **2021** | 1:21 2:24 4:5 |
| | 30:7,20 |
| **21602** | 30:24 |
| **2408** | 7:18 |
| **25** | 30:22 |
| **27th** | 30:20 |
| **285-5300** | 2:5 |
| **28590** | 7:19 |

| 3 | |
|---|---|
| **303** | 2:5 |
| **32801** | 2:10 |
| **3:20** | 1:4 |

| 4 | |
|---|---|
| **4** | 3:2 |
| **407** | 2:11 |
| **420-1000** | 2:11 |
| **450** | 2:4,9 |
| **4:04** | 2:25 4:5 |
| **4:42** | 29:19,21 |

| 6 | |
|---|---|
| **650** | 2:10 |

| 8 | |
|---|---|
| **80202** | 2:5 |

| 9 | |
|---|---|
| **9** | 3:9 |

| a | |
|---|---|
| **accurate** | 10:13 |
| | 21:14 |
| **acquisitions** | 1:10 |
| **action** | 1:4 24:6 |
| | 30:18 |
| **address** | 7:16,17 |
| **adt** | 25:6 |
| **adts** | 25:10 |
| **afternoon** | 4:23 |
| **ago** | 16:1,6,6 |
| **agreement** | 9:11 |
| | 10:14 |
| **aide** | 1:25 |
| **al** | 4:4 |
| **alarm** | 10:12 24:25 |
| **alert** | 13:12 23:21 |
| **alerted** | 14:8 |
| **alerting** | 16:18 |
| **answer** | 6:1,7,12 |
| | 6:12 7:21 14:16 |
| | 18:20 28:6,23 |
| **answered** | 5:18 |
| | 21:1 29:2 |
| **answering** | 5:22 |
| | 7:2 |
| **answers** | 6:10,17 |
| **antenna** | 17:7 |
| **anticipate** | 5:21 7:5 |
| **appear** | 21:19 |
| **appearances** | 2:1 |
| **appreciate** | 5:1 |
| | 29:16 |

| area | 17:12,13 24:8 |
|---|---|
| **asked** | 5:24 15:24 |
| | 18:14 19:3 27:17 |
| **asking** | 6:16 7:3 |
| | 13:9,12 14:13 |
| | 18:22 19:12 23:5 |
| | 27:19,23 28:2 |
| **assume** | 21:7,22 |
| | 22:5 |
| **attached** | 24:19 |
| **attorney** | 30:15,17 |
| **audible** | 6:16 |
| **audibly** | 6:14 |
| **august** | 1:21 2:24 |
| | 4:5 30:6,20 |
| **avenue** | 2:9 |
| **aware** | 16:2 23:12 |
| | 24:24 25:3,18 |
| | 26:11 |

| b | |
|---|---|
| **back** | 9:24 11:14 |
| | 13:14 14:23 15:8 |
| | 17:4,6 19:9 |
| **bacon** | 2:3 4:9 |
| **ball** | 16:22 |
| **based** | 12:11 22:1 |
| **basically** | 12:10 |
| | 14:22 |
| **basketball** | 26:12 |
| **bedroom** | 21:1,3,6 |
| **beginning** | 4:1 |
| **behalf** | 2:2,7,22 4:9 |
| | 4:12 |
| **believe** | 16:17 |
| | 28:19 |
| **bell** | 26:17 |
| **bit** | 9:15 11:14 |
| | 21:16 29:8 |
| **blast** | 21:20 22:22 |
| | 22:24 23:8,8 24:2 |

| block | 9:22 |
|---|---|
| **blow** | 9:14 |
| **blue** | 25:12 |
| **bojangles** | 26:16 |
| | 26:17 |
| **bottom** | 9:21 10:5 |
| **break** | 7:6,8 |
| **brief** | 21:4,12 |
| **brinks** | 25:7 |
| **broad** | 22:3 |
| **business** | 12:2,10 |
| | 20:1,12 |

| c | |
|---|---|
| **c** | 7:18 |
| **call** | 12:25 14:6 |
| | 16:15,15 23:4 |
| | 27:17 28:25 |
| **called** | 2:21 4:18 |
| | 15:23 16:3 17:8 |
| | 27:23 28:17 |
| **calling** | 28:2 |
| **care** | 8:4,6,7 22:8 |
| | 23:3,14 |
| **carlow** | 7:18 |
| **carolina** | 1:2 2:23 |
| | 7:14 26:6,20 30:1 |
| | 30:5 |
| **castro** | 4:16 |
| **cause** | 20:11 27:14 |
| | 30:10 |
| **caused** | 19:5 27:11 |
| | 27:12,21 |
| **caution** | 5:20 |
| **ceo** | 25:15 |
| **certain** | 14:18 26:3 |
| **certificate** | 30:3 |
| **certified** | 4:19 |
| **certify** | 30:5,15 |
| **chance** | 9:20 |
| **charlotte** | 1:3 26:8 |

cheek 1:18 2:21 4:2,17,23 7:11,13 9:1 18:4,10 19:19 21:25 29:16,17
civil 1:4
clarify 21:10
clear 5:8 6:6,23 16:7
close 15:22
closed 14:3 17:21 18:25 21:4
clyde 4:14
code 7:19
color 25:12
colorado 2:5
colors 24:18
come 13:14 19:9
commencing 2:25
comments 25:17 25:21,25 26:12 27:8,11,18 28:11 28:12,17
committed 7:1
companies 12:6,14 12:23 25:4
company 10:19,21 11:10 12:1,9 13:5 14:8 16:2 23:10 23:17 24:25 25:8
completely 20:3
computer 1:25
concern 19:5
concerning 30:9
concerns 16:24 24:5
consistently 10:15
contained 30:21
contemplating 27:25
continue 28:11 29:6

contract 3:9 8:23 10:4 20:4,7 22:2 26:7 27:20,24 28:1,9,25
contractual 29:7
controversy 25:16 25:21 26:5,13 27:18 28:12,17 29:6 30:10
conversation 14:14,19,21 15:1 18:23 21:7,15 28:7
coordinate 8:4
corporation 1:11
correct 7:12 16:10 19:24,24 20:2,5 21:9
correctly 25:13 28:24 29:3
correspondence 17:7
counsel 4:6 30:16 30:17
counterclaimants 1:13
county 30:1,7
couple 9:3 19:19
course 17:22 28:22
court 1:1 4:7 5:10 6:11,17
cpi 1:7 3:9 4:3,10 4:25 8:17,19,23 9:10 10:10,15,18 11:9,16 12:1,10 13:6 14:1,10 15:3 15:16,25 16:2,15 16:18 17:7 18:25 20:4,7,12,15 21:17 21:20 22:3,6,14,17

22:17,21,25 23:12 23:13 24:14,23 25:5,15 26:4,18 27:16 28:1,11,17 28:25 29:7
crazy 6:11
cs4749790 2:15
current 7:16,17 8:12,15
currently 7:21
customer 8:18 9:15 10:10,15,18 11:16 16:3 21:22 22:7 24:5 27:17
customers 16:18 21:21 22:3,6
cut 28:4 29:8
cv 1:4

**d**

dan 4:8,23
daniel 2:3
date 4:4 10:7,14
dated 9:22
day 17:5,12 30:6 30:20
dealing 25:24
dear 21:25
decided 28:10
decision 29:5
defendant 4:15
defendants 1:13 2:7 4:13
definitely 17:8
denver 2:5
depending 26:1 27:13
deposition 1:18 2:21 4:2 5:4 15:24 30:13
despite 28:11 29:5

different 16:19
direction 30:12
director 7:25
discontinue 20:12
discuss 12:3,18 27:16
discussing 19:12
discussion 13:10
disparaging 26:1 27:12
district 1:1,2
division 1:3
document 9:7,19 9:25
doing 8:8 12:2,9 15:20 20:12
dollar 19:21
door 11:9,19 12:20 14:3,24 15:9 17:3 17:19,22,24,24 18:22,25 19:11 20:23 21:2,3,4,8 23:21 28:15 29:2
doorbell 11:8 13:1
doorstep 13:4
drive 6:11
driving 16:9
drohner 2:6
dsc 1:4
due 13:16
duly 4:18 30:8

**e**

e 4:9 15:23 16:1,4 16:18 17:7 21:16 21:19,20,24 22:8 22:10,14,15,20,22 22:25 23:3,5,8,9 23:15,16,18,20 24:2,9
earlier 12:4 22:11

**effect** 11:11,12 12:2
**either** 17:16 26:19
**elicited** 27:22
**emergency** 30:21
**emotion** 27:15,22 27:22
**employed** 7:22 30:16,17
**employer** 8:9
**endeavor** 5:15
**ended** 26:3,6
**ensure** 5:8
**entitled** 23:21
**erin** 1:25 2:22 30:4 30:25
**especially** 5:13
**esquire** 2:3,8
**et** 4:4
**eventually** 13:14
**everybody** 5:13
**exact** 6:1,2
**exactly** 6:12 11:22 11:24 27:9
**examination** 4:21 19:17 30:11
**examinations** 3:1
**examined** 4:19 30:11
**exhibit** 3:8,9 9:1,3 9:4 10:1
**exhibits** 3:7
**experience** 12:23 16:24 17:9
**expires** 20:8
**extent** 18:7

**f**

**f** 1:10,11
**fair** 20:12,14 21:13 24:1

**false** 24:11
**familiar** 23:22 24:11
**family** 26:22 29:5
**fan** 26:23 27:1
**far** 16:22 20:9 21:21 22:3 23:13
**fdw** 1:4
**feel** 7:1,3
**feelings** 27:12
**fence** 26:2 27:14
**financially** 30:18
**finish** 13:25
**firm** 4:12,14
**first** 4:18 5:3 9:21 9:24 10:6 11:2,20 23:7
**fishy** 12:17,21,22
**florida** 2:10 26:25
**focus** 22:20
**follow** 15:16 19:20 22:24 29:12
**follows** 4:20
**football** 26:22
**forces** 23:13
**forget** 6:15
**form** 11:21 12:7 13:7 14:12 15:5 17:1 18:3,9 19:6 20:18 25:2 28:3,5
**forward** 18:12
**front** 9:7 11:18 21:8 24:15
**fully** 5:18
**further** 19:14 29:11,14 30:15

**g**

**g.s.** 30:22
**general** 22:2,7 23:3,14

**generally** 25:17
**gentleman** 11:9 25:15
**getting** 17:6
**gil** 25:16
**give** 6:16 7:8
**given** 30:13
**go** 9:24 18:12
**goal** 6:23
**going** 5:6,21 6:13 6:21 7:5 8:25 9:2 9:18,19,24 12:25 16:19 17:24 18:2 18:6 29:6,12
**good** 4:23 6:4 7:9 14:2 18:24
**greenberg** 2:9 4:12
**gregory** 2:8 4:11
**ground** 5:7 6:5,20
**gtlaw.com** 2:11
**guess** 16:1,21 17:20 22:7,18 27:25
**guilford** 30:1

**h**

**h** 4:9
**hand** 24:18 30:19
**happen** 24:13,17 28:16
**happened** 12:15 16:5,15,21 21:2 28:25 29:1
**happening** 16:19 22:6 23:12 24:7 25:23
**happens** 6:14
**happy** 6:22 7:7 14:10
**hardy** 2:3 4:9

**hate** 23:23,24
**head** 6:9
**health** 8:5,6
**hear** 21:7,11 27:2
**heard** 4:24 5:9 26:20 27:4
**hearsay** 18:8
**heightened** 13:11
**hello** 11:22
**help** 5:7,8
**herbert** 2:8 3:3 4:11,11 11:21 12:7 13:7 14:12 15:5 17:1 18:2,16 18:18 19:6,18 29:10,15
**herbertg** 2:11
**hereinafter** 4:19
**hereinbefore** 30:7
**hereto** 30:17,19
**hi** 19:19
**history** 24:10
**hold** 18:16
**home** 1:10,11,12 4:4 11:6,8,17 13:1 14:23 24:24
**homes** 16:20
**hopefully** 8:25 9:7 29:13
**hornets** 26:9,13
**house** 13:15 15:2 17:23 24:15
**household** 28:8
**huge** 26:22
**huh** 6:9 19:2 21:18
**husband** 17:18,20 18:22 19:23 20:21 20:23 21:12
**husband's** 18:24
**hypervigilance** 13:16

**i**

identification 9:5
immediately 10:12
important 5:15
  6:6
impression 12:9
incorporated 4:3
  4:4
index 3:1,7
indicate 14:4
industry 8:6
initially 16:5
inside 12:19
installation 9:11
insurance 8:5
intended 22:3
interaction 15:7
  16:16,23 17:10,15
  19:4,25 20:10,16
  20:21,24 21:5,12
  22:11 28:14,24
  29:1
interactions 17:16
interested 12:16
  14:17,23 17:21
  19:10 30:18
internet 27:3,5
interpose 18:5
interrupt 18:6
interrupted 13:24
introduce 4:6,24
involved 5:4
involvement 16:22
issue 5:16

**j**

job 2:15
joined 23:13
jordan 26:12

**k**

k 1:10,11
keep 9:23 14:15
ken 25:16
kept 13:9,16 19:12
  19:12
kind 11:14 16:17
  17:20 19:7,8,9
  27:1
kinds 6:10
kneeling 25:24
knew 14:4
knocker 23:21
know 5:1 6:11,22
  7:7,20 8:20,20 9:2
  9:14,21 11:23,23
  11:24,25 12:1,24
  13:1,10,11,15 14:2
  14:6,14,14 15:3
  16:5,20 17:2,5,9
  17:12 19:8 20:9
  20:16 22:1,21
  24:7,14,17,21,24
  25:10,12,24 26:10
  26:19 27:10,13,21
knowledge 25:14
  30:9

**l**

l 7:18
lastly 7:5
law 4:12,14 22:18
lawn 11:18
lawyers 5:12
  22:18
left 28:2
legacy 1:11
legal 22:18
license 15:11 16:8
  16:13 22:17

**life** 19:21
lines 23:11 24:10
  27:4
listening 4:13,16
little 5:7 9:15
  11:14 12:17 21:16
  29:8
live 7:13,14
lived 7:15
llp 2:3 4:9
locked 14:24 21:4
logo 25:10
long 7:6,15 8:8,18
  16:6,6 17:12
  24:10 27:19,23
look 9:20 15:22
  25:8 27:7
looked 17:22
lose 20:15,19
lot 26:25

**m**

mail 12:24 15:23
  16:1,4,18 17:7
  21:16,19,20,24
  22:8,10,20,25 23:3
  23:5,8,9,15,16,18
  23:20 24:2,9
mails 22:14,15,22
making 24:10
man 16:9 25:15
marked 3:8 9:4,25
market 25:1
matter 4:3
matters 30:10
matthew 4:14
mean 14:11 17:25
  18:6,14
memory 11:15
mentioned 11:19
  12:5 14:9 16:14
  17:11 20:21 22:24

24:14
merge 12:5,8
merged 12:6
merger 12:5
merging 11:11
  12:14
metal 24:20
michael 26:12
mind 14:13,15
  15:20
mispronounces
  11:3
mistaken 25:7
money 20:15,19
monitoring 9:11
  11:18
month 16:6
mosaic 1:10
move 5:7
moved 8:21
moving 10:11
mulch 24:20

**n**

n 4:9
name 4:23 7:10
  9:15,16,22 14:7
  15:8,10 25:4,15
  30:7
nation 25:23
necessarily 12:25
need 6:24 7:6,8
  9:20
neighbor 15:3
neighbor's 15:2
  17:23
neighborhood
  17:4,6,13
neither 29:15
  30:15
never 5:14 19:20

news 27:3
nope 5:5
normally 5:21
  19:11
north 1:2 2:23
  7:14 30:1,5
notarization 30:21
notary 2:22 30:4
  30:25,25
note 18:6
noted 10:5
number 3:8 30:25
nurse 8:2,10

**o**

o 4:9 7:18
oath 30:11
object 11:21 12:7
  13:7 14:12 15:5
  17:1 18:2,9,11
  19:6 20:18 25:2
  28:3,5
objection 15:15
  18:5,7,17,19
occasionally 18:4
octagon 24:22
odd 13:2 17:2
office 22:18,19
okay 6:14 7:4,10
  8:18 9:6,7,14 11:1
  11:5 12:4 15:12
  15:18 16:14 18:21
  19:23 20:10,15,20
  21:6,10,16,24 22:9
  22:20 23:7,20
  24:17,23 25:10,20
  26:8,11,16,20 27:7
  27:16 28:10,14,20
  28:20 29:4,10
once 15:25,25
opened 11:15,19

opposite 20:3
orange 2:9
orlando 2:10
outside 11:18
  24:15,20
overhear 21:14

**p**

p.m. 2:25 4:5
  29:19,21
page 3:2,3 9:18,21
  9:24,24 10:6
panthers 26:6,21
  26:23,25
paralegal 4:15
part 13:2
participating
  15:24
particular 22:1
parties 30:17
patients 8:7
paula 4:15
pause 5:24
peephole 14:24,25
  17:22
people 6:15
percent 8:20 27:9
period 10:16
persisted 12:18
  14:11
person 11:15 18:8
  30:7
personally 21:11
  21:25 22:1
persuade 20:1
phone 12:25 23:4
photograph 22:16
photos 23:6
physically 20:23
picture 15:10 16:8
  16:12,13

pictures 15:13
pitch 17:20,25
  18:1,14,15
pitt 30:7
place 7:18,18
plaintiff 1:8,19 2:2
  2:22 4:10,18
plaintiff's 9:4 10:1
plan 20:7
plate 15:11 16:8
  16:13 22:17
players 26:25
please 4:6 7:1
  13:24
point 6:20 7:6
  14:18 17:15 27:1
pop 9:1
possibility 28:9
  29:13
possibly 15:23
  16:18
present 20:23
pretty 14:22
previously 15:19
probably 5:16
  11:22 27:5
problem 24:13
produced 1:25
program 7:25 8:2
  8:3
pronounced 10:25
pronouncing 7:11
pronunciation
  10:24 11:3
protests 25:23
provide 8:23
provider 8:16
providers 8:5
  24:25
public 2:23 30:4
  30:25

pushing 19:12
pushy 19:7,8
put 16:14

**q**

question 5:3,18,19
  5:23,23 6:7,13,21
  6:24 7:3,21 18:3,8
  18:10,13 28:23
questions 5:25 7:2
  9:3 19:14,20 24:6
  29:11,14
quickly 21:2

**r**

r 4:9,9 7:18
radio 27:4
raised 17:8
ramsey 1:25 2:22
  5:9 30:4,25
rang 11:8
reach 24:4,6
reading 23:18
  27:11
really 5:1,14 13:11
recall 13:9 14:6
  22:9,23 23:1,16,18
  23:23 24:1,9
  25:20 26:8 28:20
receive 23:20
received 21:17
recognize 9:25
recollect 23:14
recollection 8:22
  10:9 12:11
record 4:25 5:8
  6:6 18:5,7 29:20
  29:21 30:13
red 24:19
reduced 30:12
referenced 22:15

**referencing** 13:16
**refresh** 10:9
**regarding** 25:16
**related** 30:16
**relationship** 13:6
  26:4,14,17,21 29:7
**remained** 10:15
  17:13
**remarks** 27:13
**remember** 10:11
  11:5,20 12:5 13:8
  18:10 21:17 24:12
  25:13 26:3 27:9
  27:11,19 28:18
**remind** 5:13,17
  6:15
**renewing** 20:7
**rep** 21:11 28:15
**repeat** 6:25
**rephrase** 6:23 7:1
**reply** 18:24
**reported** 1:24 22:5
**reporter** 4:7 5:10
  6:11,17
**reporter's** 30:3
**represent** 4:25
**representative**
  29:1
**representing** 4:15
**requirements**
  30:21
**research** 27:6,20
**researched** 25:8,9
**residence** 8:12
**responses** 6:16
**restroom** 7:7
**result** 20:16 26:4
  29:4
**right** 7:9 19:21,23
  20:17 21:8 23:10
  27:10 29:7,10

**ring** 26:16
**ringing** 13:1
**rob** 13:15
**rohner** 2:3 3:2 4:8
  4:8,22,24 19:14
  20:18 25:2 28:3,5
  29:12,14,17
**rolling** 16:22
**rule** 6:5,20
**rules** 5:7
**run** 11:10

### s

**s** 2:9
**sales** 21:11 28:15
**salespeople** 16:19
**salesperson** 15:9
  16:25 17:13,17,17
  17:19 18:21 19:4
  28:24
**saw** 17:23 25:11
  27:3
**saying** 5:11,12
  11:9,20 14:22
  16:1 21:25 23:19
**says** 9:10,15
**scam** 13:13 23:17
  23:21
**screen** 8:25
**scroll** 9:18,19
**scrolling** 9:23
**se** 13:3
**second** 18:16
  22:24
**securities** 4:3
**security** 1:7 4:10
  4:25 8:13,15 9:10
  10:19,21 11:13
  12:1,3,18 13:10,12
  13:17,19,21 14:5
  14:16 15:4 18:23
  19:13 24:24 25:8

**see** 8:7 9:2,7,11,21
  9:25 10:7 11:9
  14:25 17:4 21:3
  27:6,7
**seeing** 7:20
**segway** 17:24
**send** 12:24 15:21
  15:24 16:4
**sending** 22:7,16
**sense** 6:3,18
**sent** 15:19,21,25
  16:1,4,7,17 21:20
  22:17
**separate** 22:13
**service** 16:3 21:23
  24:5 27:17
**services** 8:15,23
**set** 30:19
**seven** 9:18
**shake** 6:8
**shantell** 1:18 2:21
  4:2,17 7:11
**shape** 24:17,21
**share** 8:25 23:5
**sharing** 15:15
**shb.com** 2:6
**shook** 2:3 4:9
**shortly** 8:21 10:12
**shut** 12:20 17:3
  19:10
**side** 6:9 26:1 27:14
**sign** 24:15,18,19
  24:21
**signature** 9:22
  10:6 29:22 30:24
**signed** 10:4
**signing** 8:22
**signs** 11:17,18
**simplisafe** 25:6
**slow** 9:20

**smart** 1:10,11,12
  4:4
**smoother** 5:7
**snow** 4:14
**solicited** 10:19,21
  11:6
**solicits** 18:8
**son** 26:24
**sorry** 13:23,24
  18:4 24:12,19
  28:4,6,21
**sort** 5:24 12:17
  14:2 17:25 18:1
  18:13,14 19:8
  21:19 23:8
**sound** 23:22 24:11
  29:7
**sounds** 6:4 7:9
**speak** 5:15
**speaking** 5:9
**specialists** 8:6
**specifically** 23:5
  24:3
**spent** 19:21
**sports** 26:3,6
**stake** 24:20
**star** 26:12
**start** 5:6,22
**started** 25:24
**state** 2:23 26:25
  30:1,5
**statement** 12:13
  20:13,14 21:13
**statements** 18:8
  24:11
**states** 1:1
**stenotype** 1:24
**step** 15:8,9 24:6
**stern** 19:9
**sternly** 14:22

steward 4:14
stir 27:14
strange 17:9
street 2:4
suite 2:4,10
summer 25:17
sure 5:25 7:11
8:20 10:23 11:24
12:8 17:14 24:1,1
28:23 29:2
surrounding
27:18 28:12
swear 4:7
sworn 4:19 30:8
system 8:13 10:12
11:13 12:1,3,19
13:11,12,17,19,21
14:5,16 15:4
18:23 19:13
systems 1:7 4:3,10
4:25

**t**

take 5:24 7:8 13:2
15:8 26:23
taken 1:19,20 2:24
8:7 26:1
talk 11:13,25
talked 19:25 21:16
23:2
talking 14:15
22:22 23:9
teams 26:3
tell 11:5,15,22
13:20 21:21 22:4
terminating 26:17
28:1
testified 4:20
12:21 20:10,17,22
22:11 28:15
testify 30:8

testimony 6:24
12:4 22:21 30:13
thank 7:9 12:17,19
18:24 19:1,15,16
29:11,15,17,18
thing 5:13 6:2
11:20
things 5:7
think 7:20 10:4,5
17:3 23:11 24:4
24:14 25:7,10,22
27:19,23
thinking 28:8,8
thought 12:16
13:13 17:2
thursday 1:21
2:24 30:6
time 4:5 5:2 7:8
10:16 21:2,8 28:1
28:2 29:16,19
times 6:6
today 5:2 10:16
today's 4:4
told 12:13,16
13:18,21 14:1,9
20:25
top 9:10,15
tough 11:3
transcript 1:25
transcription 1:25
traurig 2:9 4:12
truck 16:12 22:16
true 30:13
truth 30:8,9
truthful 6:24
try 6:1 8:4
trying 13:14
turned 14:2,23
19:10
twice 16:4 22:17

two 12:6,14 22:13
22:15 23:2 29:13
type 23:20
typewriting 30:12

**u**

uh 6:9,10,10 19:2
21:18
ultimately 28:10
uncommon 5:22
understand 6:21
7:3
understanding
12:12
uniform 7:20
uninsured 7:25
8:3
united 1:1
use 7:7 8:17
usually 12:23

**v**

vehicle 15:11 16:8
17:4,11
versus 4:3
video 30:21
videographer 4:1
29:19
videotape 4:2
vivint 1:10,11,11
4:4,13 10:23,23,25
11:10 12:10 15:9
15:16 16:2,24
17:16,17 19:4,21
20:1 22:23 23:9
23:17,21 24:2,10
24:23 25:5
vs 1:9

**w**

w 7:18
wait 5:17

waived 29:22
walked 14:23
want 5:1 7:2,10
11:25 12:3 13:2
21:25 23:7 28:23
wanted 12:3,18
16:20 20:20 22:20
29:2
watched 14:24
way 20:11 23:24
we've 6:8
went 11:8 12:19
15:2 27:5
western 1:2
whereof 30:19
white 24:19 25:13
winterville 7:14
7:19
witness 2:21 4:7
4:18 5:17 11:2
19:16 28:4 29:18
30:10,14,19
witnesses 5:20 6:8
wondering 11:12
word 12:5,6 27:10
27:10
wording 12:11
words 5:23 25:12
work 8:5
worked 13:5
working 12:14
writing 13:3

**y**

yard 24:15
yeah 10:11 21:1
25:6
years 16:1

**z**

zip 7:19

**zoom** 1:20 2:24
15:22

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.