EXHIBIT 4

1     UNITED STATES DISTRICT COURT
2   FOR THE WESTERN DISTRICT OF NORTH CAROLINA
3      CHARLOTTE DIVISION
4   CIVIL ACTION NO. 3:20-CV-00504-FDW-DSC

5

6

CPI SECURITY SYSTEMS, INC., )
7            )
    Plaintiff,    )
8            )
vs.          )
9            )
VIVINT SMART HOME, INC. f/k/a )
10 Mosaic Acquisitions   )
Corporation; and LEGACY VIVINT)
11 SMART HOME, INC. f/k/a Vivint )
Smart Home, Inc.,    )
12           )
    Defendants and   )
13 Counterclaimants.    )
14 _____

15

16

17

18     DEPOSITION OF JOYCE MARISO
19      (TAKEN BY PLAINTIFF)
20       TAKEN VIA ZOOM
21     Thursday, August 19, 2021

22

23

24

      Reported in Stenotype by
25       Erin Ramsey
  Transcript produced by computer-aide transcription

1 APPEARANCES
2 ON BEHALF OF PLAINTIFF:
3      ERIC HOBBS, ESQUIRE
        Shook, Hardy & Bacon, LLP
4      1660 17th Street
        Suite 450
5      Denver, Colorado 80202
        (303) 285-5300
6      Ehobbs@shb.com
7
  ON BEHALF OF DEFENDANT:
8
        GREGORY HERBERT, ESQUIRE
9      Greenberg Traurig
        450 S. Orange Avenue
10     Suite 650
        Orlando, Florida 32801
11     (407) 420-1000
        Herbertg@gtlaw.com
12
13
14
15
16
17
18
19 Job No. CS4749790
20
21
22      DEPOSITION OF JOYCE MARISO, a witness called on
23 behalf Plaintiff, before Erin Ramsey, Notary Public,
24 in and for the State of North Carolina, taken via Zoom
25 on Thursday, August 19, 2021, commencing at 1:03 p.m.

1           INDEX OF EXAMINATIONS
2 BY MR. HOBBS............................... PAGE 4
3 BY MR. HERBERT............................ PAGE 54
4 BY MR. HOBBS.............................. PAGE 70
5
6
7           INDEX OF EXHIBITS
8 NUMBER        EXHIBIT              MARKED
9 Exhibit 1   CPI Contract..........................12
10 Exhibit 2   Vivint Contract......................33
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1      THE VIDEOGRAPHER: This is the beginning
2 of the videotape deposition of Joyce Mariso in the
3 matter of CPI Security Systems, Incorporated, versus
4 Vivint Smart Home, Incorporated, et al. Todays' date
5 is August 19th, 2021, and the time is 1:03 p.m.
6      Counsel, please introduce yourselves after
7 which our court reporter will swear in the witness.
8      MR. HOBBS: Yes. This is Eric Hobbs at
9 the law firm at Shook, Hardy & Bacon on behalf of CPI,
10 the plaintiff.
11      MR. HERBERT: Good afternoon. This is
12 Gregory Herbert with the law firm Greenberg Traurig on
13 behalf of the defendants. And also with me listening
14 in is Matthew Steward of the law firm Clyde Snow also
15 on behalf of defendant, and my paralegal Paula Castro
16 is listening in.
17          JOYCE MARISO,
18 called as a witness by the Plaintiff, was first duly
19 sworn, as hereinafter certified, examined, and
20 testified as follows:
21          EXAMINATION
22 BY MR. HOBBS:
23  Q. Okay. Well, thank you for joining us. I know
24 it's this afternoon your time on the east coast,
25 Mrs. Mariso. It's still morning here in Denver,

1 Colorado where I'm Zooming in from. Again, my name is
2 Eric Hobbs, I'm one of the attorneys on behalf of the
3 plaintiff in this lawsuit, CPI Security Systems.
4      Let me first just start by saying thank you for
5 joining us. The pandemic has forced us to practice
6 law in a new way taking depositions like virtually
7 this as opposed to in person. It does cut down on our
8 travel costs, sometimes it does create additional
9 obstacles but thank you for allowing us to join in and
10 virtually come into your home.
11      If for any reason we have any technical
12 difficulties or if we have -- we get disconnected in
13 some way we will either try to telephone or e-mail you
14 and reestablish a connection. But I ask that you
15 please kind of stand by for a few minutes so we can do
16 that. Is that okay?
17  A. Okay.
18  Q. Have you given a deposition before?
19  A. I don't think so. Let me see. Uh-uh.
20  Q. Okay. Well, I know this can be kind of a
21 strange process but this will proceed kind of like
22 you're sitting in court where both of the attorneys
23 will have opportunities to ask you questions, the
24 other attorney might make objections. Although
25 there's not a court here to -- or a judge here to rule

1 on those objections, typically when an objection is
2 stated we'll go ahead and ask you to just go ahead and
3 answer the question; does that make sense?
4 A. Okay. Okay.
5 Q. Similarly, Erin Ramsey is our court reporter
6 here today and she is kindly typing out our
7 conversation as we have it and I'm always told by the
8 court reporters that it makes their jobs easier if the
9 witness could allow the attorney to finish their
10 question before you start your answer that way
11 Mrs. Ramsey can get a clean transcript; can you do
12 that?
13 A. Yes. And I have something to say.
14 Q. Sure.
15 A. I don't know how many years ago it was, maybe
16 ten. A case against Goya because I found something --
17 so I think -- I was it was a deposition. So I don't
18 want to say no and then find out so I think that
19 was --
20 Q. Okay. But that was more than ten years ago?
21 A. Where I gave testimony yeah I gave testimony
22 yeah.
23 Q. But was that in court or in a deposition?
24 A. It was on screen and it was in the lawyer's
25 office and there was a big room, you know, like a

1 conference room type setting --
2 Q. Was that in North Carolina?
3 A. -- and had to be questioned by both attorneys,
4 yes.
5 Q. Okay. Was that there in North Carolina?
6 A. No, that's when I lived in New York. That was
7 a while ago.
8 Q. Okay. Okay. One last thing that I'll say just
9 so it doesn't become confusing. Sometimes I might
10 reference can you explain for the jury or I might say
11 help the jury understand. The reason I do that is
12 ultimately this video which is being recorded today
13 might get played for the jury in our case; do you
14 understand that?
15 A. Okay. Okay. Yes.
16 Q. Let me just first have you spell your full name
17 for the record.
18 A. Okay. Joyce, J-o-y-c-e, last name Mariso,
19 M-a-r-i-s-o.
20 Q. And Mrs. Mariso, what is your current address?
21 A. 404 Sportsman Trail, Wendell, North Carolina
22 27590. 91, 91.
23 Q. And how long have you been at that address?
24 A. We built four years. Four years.
25 Q. Okay. And where were you before you moved to

1 that address?
2 A. Summit Ridge Loop in Morrisville. Here in
3 North Carolina but in Morrisville. We lived there for
4 maybe a year and a half and -- because I came in 2015
5 so yeah, like two years we lived in Morrisville and
6 then I had my home built and we moved here.
7 Q. You said you came in 2015, did you move from
8 somewhere else?
9 A. Brooklyn, New York.
10 Q. And how long did you spend in New York?
11 A. All my life. So take my age minus six years
12 and so --
13 Q. Understood.
14 A. I was in New York all my life.
15 Q. Understood. Are you currently employed?
16 A. No, I'm retired.
17 Q. Where did you work before you retired?
18 A. State Insurance Fund.
19 Q. And what was your position with State
20 Insurance?
21 A. I was a supervisor in the service department.
22 Q. How long did you hold that role?
23 A. Oh, I retired, like, 18 years. But that role
24 that -- because I worked my way up. I didn't start as
25 a supervisor.

1 Q. Okay.
2 A. So I took that specific -- I might have been
3 there for five years. Yeah, in that position but I
4 retired from State Insurance Fund.
5 Q. Okay. And how long total did you spend with
6 that company?
7 A. Like 18 years.
8 Q. And what is the highest level of education
9 you've attained?
10 A. Two years of college. I never finished. I
11 never went back to finish.
12 Q. Was that in New York?
13 A. Yes.
14 Q. Do you recall the name of the university?
15 A. The name of the university? Yes. I went to
16 Medgar Evers College and Hunter College.
17 Q. And before I go any further I've been saying
18 Mrs. Mariso, are you currently married?
19 A. Yes, I am.
20 Q. What is your husband's name?
21 A. Phillip, double L.
22 Q. How long have you been married to Phillip?
23 A. 30 years.
24 Q. Congratulations.
25 A. Thank you. My anniversary was two weeks ago.

3 (Pages 6 - 9)

1    Q.  Did you do anything fun?
2    A.  No.  But the end of September we're going away
3  to Ocean City.  Yeah, yeah.
4    Q.  Do you and Phillip have any children?
5    A.  Yes, we do.
6    Q.  How many?
7    A.  Two.
8    Q.  What are their names?
9    A.  My daughter, Nia Mariso and my son, Naylor
10  Kwakou Robinson.
11    Q.  Okay.  Just so I'm clear, what were those two
12  names?
13    A.  My daughter is Nia, N-i-a, Mariso and my son is
14  Naylor, N-a-y-l-o-r, Robinson, R-o-b-i-n-s-o-n.
15    Q.  And how old are each of your daughters?
16    A.  No.  My son is Naylor and my daughter is Nia.
17  And my son is 37 and my daughter is 27.
18    Q.  Does anybody else live with you at your home
19  right now?
20    A.  Yes, my mother does.  I brought my mom to live
21  with me.
22    Q.  And what is her name?
23    A.  All this is necessary?  Della, D-e-l-l-a
24  Goodman.
25    Q.  Okay.  And does Nia live with you as well?

1    A.  Yes, she does.
2    Q.  Okay.  Anybody else?
3    A.  Nope.  Phillip, myself, Nia, and my mom.
4    Q.  Okay.  I want to turn now and just ask you some
5  general questions about your alarm system in your
6  home.  Let me first ask, do you currently have an
7  alarm system in your home?
8    A.  Yeah.  Yes, we do.
9    Q.  And who is the provider of that alarm system
10  currently?
11    A.  CPI.
12    Q.  Okay.  When did you first get CPI's alarm
13  system installed into your home?
14    A.  When they was building they installed it.
15    Q.  Okay.  And I think you testified a few moments
16  ago that you lived at one address while they were
17  building another home.
18    A.  Yes.
19    Q.  Is that the home that you're joining us from
20  today?
21    A.  I'm at the home where I built, yes.
22    Q.  Okay.  And is that the 404 Sportsman Trail
23  address?
24    A.  Yes, it is, yes.
25    Q.  Why did you initially choose CPI as your alarm

1  service provider?
2    A.  Well, basically because I'm -- the builders and
3  they -- you know you go to those different workshops
4  or whatever you call them and CPI was in the community
5  so it was like presented to us, you know, when we
6  initially did the paperwork and when you go to the
7  showroom.  CPI -- it wasn't part of the contract but
8  they offered it to us.
9    Q.  Okay.  Had you heard of CPI before from being
10  in North Carolina?
11    A.  Not really.  Because in New York it's not
12  like -- no, I hadn't.
13    Q.  Okay.  I'm going to pull up an exhibit that I'm
14  going mark as Exhibit 1.  I'm going to share it one my
15  screen if you'll bear with me for a moment.  It takes
16  a --
17    A.  Okay.
18    Q.  -- couple clicks of a mouse here.  For the
19  record this is CPI 376 through 377.
20       Okay.  Mrs. Mariso, I brought up on my screen
21  what I mark as Exhibit 1.  Are you able to see that on
22  your screen?
23       (Plaintiff's Exhibit 1 was marked for
24       identification.)
25    A.  Yes, that's what we -- yes, yes.

1    Q.  Okay.  Do you recognize this document.
2    A.  I certainly do.
3    Q.  Okay.  What is it?
4    A.  That's the contract that we have with CPI.
5    Q.  Okay.  And up at the top do you see your name
6  there?
7    A.  Yes.
8    Q.  And that is your address and phone number?
9    A.  Well, that's probably -- that's probably my
10  husband's phone number.
11    Q.  Okay.
12    A.  I can check it.  Yeah.  It's 917 it's one of
13  ours because it's from New York.
14    Q.  Okay.  I'm going to scroll down to the bottom
15  of the first page here.  You can see where I marked it
16  as Exhibit 1.  Over here at the bottom left there's a
17  signature there.  Do you recognize that signature?
18    A.  Yeah, that's my signature.
19    Q.  Okay.  And do you see where it's dated right
20  below your signature?
21    A.  Mm-hmm.  That's right.
22    Q.  Do you see it dated as 10/30/17?
23    A.  2017, yep.  That's when we moved in.
24    Q.  Okay.  That was going to be my question.  Is
25  that when your services with CPI began?

1  A.  Yes.

2  Q.  If I scroll up a little bit kind of towards the

3  middle of this first page there's an amount written

4  there it says 49.99; do you see that?

5  A.  Yep, mm-hmm.

6  Q.  Were you paying CPI on a monthly basis for your

7  home alarm monitoring?

8  A.  Yes.

9  Q.  And was that the amount that you were paying

10  CPI?

11  A.  Yep.  Yes, it is.

12  Q.  Before I pull this document down up at the top

13  left it says equipment package and it kind of has some

14  handwritten marks in that section.  We don't need to

15  go through every single one of those, but can you just

16  generally describe what the alarm system that CPI

17  installed in your home was comprised of?

18  A.  The door camera, the windows have the alarm

19  stickers on them, my mom's room, the living room

20  windows, we have so many windows.  But they gave us a

21  nice package.  So we have the alarm upstairs and then,

22  you know, when you open and close the doors it tells

23  you, the voice.  And yeah, stuff like that.

24  Q.  Now, the main kind of keypad system that they

25  provided you, was that digital or was it kind of --

1  did it have actual physical buttons on it?

2  A.  No.  It was -- okay.  So since then it changed

3  it.  The initial one -- it was an update.  So the

4  initial one -- the initial one may have had keypads.

5  Not a keypad but -- no, it was always digital.

6  Q.  Okay.

7  A.  But it had -- it was different than the one now

8  because you know you guys upgraded.

9  Q.  Okay.  We'll come back to that in a moment but

10  my last question on this document is below where it

11  describes the equipment it says package equipment

12  costs and it looks like it was zero written there; do

13  you see that?

14  A.  Yes.

15  Q.  Do you recall when CPI initially began

16  providing you this alarm that they provided you all

17  that equipment at zero cost?

18  A.  That's right.  Sure did.

19  Q.  Okay.

20  A.  And that's why -- okay.  But go ahead.  Let me

21  answer not out of order.  Go ahead.

22  Q.  Sure.  Sure.  I'm just going to pull this

23  document down.  We'll talk about your interactions

24  with another alarm company here in a second but before

25  we get there -- before you were approached by another

1  company were you generally happy with the CPI system

2  in your home?

3  A.  Was -- ask me again, Eric, what you say?

4  Q.  Were you happy with the CPI system that was in

5  your home?

6  A.  Yes, yes.  And if we ever had any problems they

7  would come but I don't know -- I mean yeah, it was

8  fine.

9  Q.  As a part of CPI providing you an alarm system

10  did they also give you some sort of yard sign to put

11  out in front of your house?

12  A.  Yes, they did.

13  Q.  Can you describe for the jury what that looked

14  like?

15  A.  What is it, red and white octagon I think it

16  was eight or is it a circle?  Whichever, but it's CPI

17  and you stick it in the ground in the front yard.

18  Q.  And did you place that in front of your home?

19  A.  Sure, yeah.

20  Q.  Would it have been out there from the point of

21  when you entered into the contract with CPI?

22  A.  Oh, yes.

23  Q.  Now, what about any stickers or anything like

24  that, did you place any -- did CPI give you any

25  stickers to place on windows?

1  A.  No.  We never had any stickers, only the sign

2  that sits in the front yard.

3  Q.  Okay.  And would that sign be visible to anyone

4  that was walking up to your home?

5  A.  Yes.

6  Q.  I want to turn now and talk to you about your

7  interaction with another alarm company last summer; is

8  that okay?

9  A.  Yes.

10  Q.  Before we go too far let me just ask about the

11  date of that interaction.  Do you recall the date that

12  that happened?

13  A.  I should have checked.  I would have to look

14  up.

15  Q.  Actually Mrs. Mariso, we can come back to that

16  and I'll ask you some questions about that.

17  A.  Okay.

18  Q.  Let me first ask, it looks like you're flipping

19  through a few papers; what is it that you have in

20  front of you?

21  A.  Well, I had my cell phone in front of me.  I

22  was going to look up some messages.  First I had to

23  think of the name so yeah.

24  Q.  And that's okay.  Go ahead and set that aside

25  and?

5 (Pages 14 - 17)

1    A. Okay.
2    Q. Maybe some of the other documents we'll look at
3  will refresh your recollection.
4    A. Okay.
5    Q. But generally speaking in terms of timing was
6  this interaction -- did it happen in the year 2020?
7    A. COVID -- no, the year before. Last year was
8  COVID, right? So this is 2021. Was it in 2019, the
9  latter part of -- I'd have to go look. 2020 was just
10 last year. Nothing much happened last year. If it
11 was it was in the beginning or it was the end of 2019.
12   Q. Okay. Again, we'll come back to that and we'll
13 see if maybe anything can refresh your recollection.
14 Let me ask, where were you when this interaction took
15 place?
16        MR. HERBERT: Object to the form of the
17 questions.
18        I'm sorry Ms. Mariso, as Mr. Hobbs warned
19 you, I might make an objection here and there. And I
20 got to get my peace in so I might say object to the
21 form of the question. And I'm just putting it on the
22 record to note my objection to the manner in which the
23 question was asked. Okay.
24        THE WITNESS: Okay.
25        MR. HERBERT: I'll try not to interrupt

1  you. I'll try to get my objection in there quickly so
2  I don't speak over you.
3        THE WITNESS: Okay.
4        MR. HERBERT: Okay. Thank you.
5        THE WITNESS: What did he object to? What
6  question you was asking me?
7  BY MR. HOBBS:
8    Q. I'll ask the same question so there will be the
9  same objection.
10       Where were you when this interaction took place
11 with another company?
12       MR. HERBERT: Same objection.
13   A. I got to ask you when you say where was I do
14 you mean in terms of in the house, outside? What do
15 you mean where was I?
16   Q. That's I guess my question. I'm sorry if it
17 was a bad question. Where did the interaction take
18 place. Was it at your house or someplace --
19   A. My home, yes. My daughter and my husband was
20 outside talking to -- was his name Bob? Anyway -- and
21 I was here in the home, yes and then they called me
22 because they were so enthused with everything he was
23 feeding them.
24   Q. Okay.
25   A. Yeah.

1    Q. Okay.
2    A. So we were here at home.
3    Q. Right. What I'd like to do is go as slowly as
4  possible. I know it can be hard just through a series
5  of questions about how this interaction unfolded.
6        So it sounds like you were inside your home and
7  at some point did you go outside of your home or did
8  -- did your husband and daughter come inside your
9  home?
10       MR. HERBERT: Object to form.
11   A. Yeah. My -- eventually they came in and then
12 the gentleman come in. So did he have on a mask, was
13 it 2020? Okay. So anyway, go ahead.
14   Q. So your husband and daughter came in and then a
15 gentleman came in. Who was that gentleman?
16   A. I think his name was Bob. Gosh. He was a
17 representative for Vivint and I think his name was
18 Bob.
19   Q. Okay. And when -- again, I just want to go
20 very slowly through the dialogue that you had with
21 this individual.
22   A. Okay.
23   Q. When they came into your home what do you
24 recall initially discussing with this representative?
25       MR. HERBERT: Object to the form of the

1  question, foundation, compound, and leading.
2    A. It was Ben. Ben.
3    Q. Okay. So when Ben came into your home, subject
4  to the same objection, what do you recall discussing
5  with him initially?
6        MR. HERBERT: Same objection.
7    A. Is he on my phone? It doesn't say the year.
8  So September 3rd -- so it had to be -- what is this?
9  This is September so it couldn't have been -- it had
10 to be 2019.
11   Q. Okay. And we'll come back to the date here in
12 a moment --
13   A. Yeah.
14   Q. -- Mrs. Mariso.
15   A. Because that's September 3rd. I'm ready.
16   Q. What I'd like to focus on is substance of the
17 conversation you had.
18   A. Okay.
19   Q. So when Ben came into your home what do you
20 recall him saying to you at least initially?
21       MR. HERBERT: Object to form.
22   A. Can I answer? Did he object again?
23   Q. Yeah. So just again, there will be objections
24 but go ahead and answer the question after that.
25   A. Okay. Basically he came in and he was trying

1 to persuade me how Vivint was a better product than
2 CPI. And he even went as far as to say they were
3 taking over CPI and the equipment that we have from
4 CPI was made by who they have their equipment made by
5 and that the equipment was better and what they had to
6 offer, and I was letting him know that what I was
7 getting was fine at the 49.99. And he was saying I
8 can give it to you for 59.99. So then by the time it
9 all ended it was like 89.99 and then we winded up
10 having to take out a loan with this company that we
11 had to pay for the equipment. I didn't pay for
12 anything for CPI.
13 Q. Okay.
14 A. Go ahead.
15 Q. I'm sorry to interrupt but you covered a lot of
16 ground there and so I just want to ask a few specific
17 follow-up questions about a few of the things that you
18 discussed.
19 A. Okay.
20 Q. So you indicated that Ben mentioned something
21 about Vivint taking over CPI. Did I hear you
22 correctly?
23 A. Yes.
24 Q. What did he say in that regard?
25 A. Word verbatim I can't really remember to be

1 honest but --
2      MR. HERBERT: I'm sorry Ms. Mariso, I
3 forgot to note my object to the form but you can
4 continue.
5      A. Okay. Okay. Word verbatim I don't remember
6 exactly everything but he led us to believe that
7 Vivint was going to be in charge of CPI or was in
8 charge of CPI.
9 Q. And did you believe him when he told you that?
10 A. Yeah, we did. He was good. He really was.
11 Q. Did that statement cause you to continue the
12 conversation with Ben that day?
13 A. Yes.
14      MR. HERBERT: Object to form.
15 A. What did he say?
16 Q. And so again, I just kind of want to go frame
17 by frame through the discussion to the best that you
18 can recall. After you had that initial discussion
19 with Ben do you remember anything else that he said to
20 you before you got to signing any paperwork or doing
21 anything like that?
22 A. Yep.
23 Q. What else did he tell you?
24 A. Like I said, basically that CPI's equipment
25 wasn't that great and how their equipment was better

1 and how he would keep the cost minimal and it will be
2 done as soon as possible and that's another thing I
3 just didn't go over it. Install the equipment as soon
4 as possible and how we needed to call CPI and
5 disconnect so they could come in and do theirs. It
6 was all just moving so fast. And then -- I guess I'm
7 jumping but when the night was all done it was like
8 this man was knocking at the door and it's like nine
9 o'clock at night 20 to 10:00 and I'm like what are you
10 doing and he's, like, coming in because Ben told him
11 to come to put the equipment in.
12      So he said that we had to call CPI right then
13 to tell them to cut off our equipment, which is what
14 we did. And then things just wasn't sitting right,
15 you know. And then when we got this call from this
16 company that we owed all this -- it was so much money
17 from --
18 Q. Let me -- I don't mean interrupt.
19 A. I'm going too fast, too far.
20 Q. Yeah, I just want to make sure your testimony
21 is clear for the jury.
22 A. Okay.
23 Q. It's a couple of follow-up questions before we
24 kind of go further in time in this interaction.
25 A. Okay.

1 Q. One of the things you testified to a moment ago
2 is that Ben stated something about the equipment that
3 was already in your home was manufactured by the same
4 company or something like that did I --
5 A. Yes
6      MR. HERBERT: Object to the form.
7 Q. And I know I'm not exactly reciting your
8 testimony correctly and that's why I wanted to ask you
9 what specifically did he say in that regard?
10      MR. HERBERT: Same objection.
11 A. He said that the same that made Vivint's
12 equipment is the company that was making CPI's but
13 Vivint's equipment is better than what they were
14 making -- like, their's was secondary, it wasn't as
15 good as the equipment that Vivint had.
16 Q. Okay. And did he talk about any relationship
17 between Vivint and CPI beyond what you already
18 testified to?
19      MR. HERBERT: Object to form.
20 A. Nothing. Just the fact that Vivint was -- he
21 was telling us, like, CPI was a subdivision at this
22 point or was going to be of Vivint.
23 Q. Okay. Now, couple other questions for you.
24 Well, let me first ask, did you ultimately signing
25 anything that day?

7 (Pages 22 - 25)

1  A. Mm-hmm yeah.
2  Q. And I think you testified a moment ago that
3  ultimately they did swap out your equipment that day?
4  A. That night. Yes, they did.
5  Q. Before we get into --
6  A. They couldn't get the door knob -- the door
7  alarm to work because they couldn't override the CPI
8  code on the wall so they couldn't get it to work so
9  then he was going to come back but then they didn't
10  come back and that's when we got that letter about how
11  much we owed for the equipment.
12  Q. Okay. I want to kind of talk about each of
13  these things in turn.
14  A. Okay.
15  Q. But before you went to sign anything that day
16  did Ben indicate anything about running a credit
17  check?
18      MR. HERBERT: Object to form.
19      THE WITNESS: What did he say? I'm sorry.
20      MR. HERBERT: I object to form is what I
21  said.
22      THE WITNESS: Okay. So answer?
23  Q. Yes, please.
24  A. I signed it and he said something about once
25  the equipment was in that it was ours, something along

1  that nature. But I felt after all the equipment
2  wasn't still here because the door lock wasn't here so
3  therefore it still wasn't done, it wasn't a signed
4  contract as far as I was concerned.
5  Q. Okay.
6  A. And I didn't say anything about you doing a
7  credit check to, like, have to -- it was like I was
8  paying for this equipment and the bill had gone up so
9  high then I owed this company plus I owed Vivint and
10  no, I didn't want it.
11  Q. Okay. I just want to kind of come back to the
12  specific question I was asking. Did you at any point
13  that day discuss whether Vivint would run a credit
14  check on you?
15  A. Yeah. He didn't run a credit check on me
16  because we had just gotten -- but he did my daughter,
17  yeah.
18  Q. Okay. And why did he run it on your daughter
19  and not you, did you have --
20  A. Because I told him I didn't want it on me.
21  Q. Okay. Did he ask your daughter for permission
22  to run her credit -- run a check on her credit?
23  A. No, he -- well, she was a little upset after he
24  did it but it was like -- a no and a yes if that's
25  possible.

1  Q. Okay. How so?
2  A. Because --
3      MR. HERBERT: Object to the form. I'm
4  sorry, Ms. Mariso. I got to object to the form.
5      THE WITNESS: Okay. It's all right.
6      MR. HERBERT: Okay. I got to object to
7  the whole line of questioning as calling for hearsay
8  and lacking foundation and otherwise being improper in
9  form, but with that please go ahead.
10      THE WITNESS: Because she would have to be
11  here to do it, that's what he's saying, do it herself.
12      MR. HOBBS: He's just stating an objection
13  for the record, Mrs. Mariso. Subject to those
14  objections I will ask a couple of additional questions
15  on this topic.
16      You testified that Ben did not run a
17  credit check on you but instead on Nia; did I
18  understand your testimony correctly?
19  A. Yes. If I remember correctly that's the way it
20  went yes.
21  Q. And why was that?
22  A. Because I had just gotten a home and I didn't
23  want it. No.
24  Q. And when -- did you ever discuss with Nia this
25  issue of running a credit check using her name?

1      MR. HERBERT: Form.
2  A. Yeah, she was here. She was here. And my
3  husband was here, we all were here. Because what
4  happened initially was that Ben overtook them so to
5  speak. He had drawed them in and then when I came
6  because I'm not that easy -- I was like no, no, no,
7  and then he kept giving us reasons why, why, why and
8  they was loving the equipment and what have you. And
9  that's why she said okay. Put it under my name which
10  is my daughter's name. And then we didn't know that
11  were were going to get this big old from this loan
12  company.
13  Q. Okay. Let me ask you a couple questions about
14  that. Did Ben explain whether there would be any
15  upfront charges for them doing any work on your alarm
16  system that day?
17  A. None.
18      MR. HERBERT: Object to form.
19  Q. And you testified that at some point, it sounds
20  like, you got a bill was that at a later date?
21  A. Well, it might --
22      MR. HERBERT: Form.
23  A. -- 24 hours type thing. She got it against her
24  credit, which her credit is great, and she got, like,
25  a notice. She's like what is this and that's when I

1 immediately, you know, text Ben and it was like, no, I
2 don't want this, we didn't talk about this, this
3 shouldn't be like this.  The charges that were on
4 there were ridiculous.
5          MR. HERBERT:  I'm sorry.  I'm sorry, Eric.
6 I'm just going to have to note an objection to the
7 form and move to strike the testimony as
8 nonresponsive.
9     Q.  Ms. Mariso, I was just going to ask a couple of
10 additional questions about this topic.  It sounds like
11 at some point after the date you interacted with Ben
12 your daughter Nia got a bill from a company related to
13 the work that Vivint did in your home; am I
14 understanding your testimony correctly?
15          MR. HERBERT:  Objection.
16     A.  Yeah.
17     Q.  Okay.  And just so -- I'll ask some very
18 particular questions if you can just answer the
19 question that I ask and we'll have a more general
20 conversation.
21     A.  Okay.
22     Q.  Do you remember how long after the day that you
23 interacted with Ben your daughter received that bill?
24     A.  Maybe 24 hours.
25     Q.  Okay.  And when she received that bill you said

1 that you were surprised.  Can you describe for the
2 jury why you reacted that way?
3          MR. HERBERT:  Object to form, leading.
4     Q.  Go ahead.
5     A.  Because the amount of money that was on there.
6 I wasn't expecting to pay that.
7     Q.  And why were you not expecting to pay that?
8     A.  Because I didn't know that we were putting out
9 a loan to help pay for this equipment.  He literally
10 signed us up for a loan to pay for this equipment.
11     Q.  And that was going to be my question, is the
12 day that you were speaking with Ben in your home did
13 he explain that to you?
14     A.  No, not in that matter.  No, he did not.
15     Q.  Do you recall what he did say the day he was in
16 your home in regard to the paperwork you were signing
17 and what you were signing up for?
18     A.  That I knew that I didn't want my bill to go
19 anyplace past $69, which would have been $20 more and
20 my daughter said okay well, I'll help you with that,
21 and that was it.  When we got this bill it was like
22 99, 109, whatever it was.  I probably still have the
23 papers someplace on my e-mail, I don't remember the
24 exact amount, but it was not an amount that I was to
25 pay.  Even if it was $40 more, it was 89.99, it didn't

1 matter, that was not what he explained to me.
2      He promised me that he wouldn't -- he would do
3 what he had to do, how would you put it, not to let it
4 exceed --
5          MR. HERBERT:  I'm going to have to impose
6 an objection and move to strike the testimony again as
7 nonresponsive.
8     Q.  Did all of those statements that you just
9 recounted for the jury, did those statements induce
10 you or lead you to do business with Vivint?
11          MR. HERBERT:  Object to form.
12          THE WITNESS:  Object -- okay.
13          MR. HERBERT:  I'm objecting to the form of
14 the question because, Ms. Mariso, I believe you
15 testified that you're not the person who signed the
16 contract so you didn't personally enter into any
17 contract with Vivint.
18     A.  Yeah.  I signed it or well, Nia -- well,
19 it's -- I signed it but -- did she sign anything?  I
20 would have to look and see but I handled everything
21 and that's why I was able to talk to the Vivint lawyer
22 back then and everybody that I spoke to in Vivint I
23 spoke to them because it was my house, I handled it.
24 Yes, he put her name down but she wasn't in charge of
25 that bill, I was.

1     Q.  Okay.  And let me ask you a couple more
2 questions on that, Mrs. Mariso.  Do you -- is the home
3 titled in your name?
4     A.  Yes, it is.
5     Q.  And the contract with CPI we looked at earlier,
6 that was in your name as well?
7     A.  Yes.
8     Q.  I'm going to pull up what I marked as Exhibit
9 2.  For the record this is Vivint 7847 through 48.
10      So Mrs. Mariso, I pulled up on my screen what I
11 marked down here Exhibit 2.  Are you able to see that
12 okay?
13          (Plaintiff's Exhibit 2 was marked for
14          identification.)
15     A.  Yes, I am.  Nia signed it.  Yes, see all that
16 money?  They're crazy.
17     Q.  Up at the top do you see where it says Vivint?
18     A.  Yes.
19     Q.  Okay.  And down here under customer name it
20 says Nia Mariso; do you see that?
21     A.  Right.  Yes.
22     Q.  And it also has Phillip Mariso?
23     A.  Yes.
24     Q.  And again, who is Phillip Mariso?
25     A.  That's my husband.

1   Q. Scrolling down of the bottom of the document
2 here --
3   A. And they signed it, yes. I didn't put my name
4 on anything but I was still the one that got out of
5 the contract because I handle our business. But
6 anyway, yeah, they signed it. They said yeah, we'll
7 sign it.
8   Q. And I wanted to direct your attention down here
9 at the bottom of the document.
10   A. It was 2020. Okay.
11   Q. Says date of transaction; do you see that?
12   A. Okay. Yes.
13   Q. And does looking at that date does that refresh
14 your recollection?
15   A. It is. It's correct.
16   Q. And so what was the date that you had this
17 interaction with the Vivint sales representative?
18   A. If that's August and this is September 3rd. So
19 it had to be, like, the day before or that day when
20 that was -- yeah, because they signed it here -- yeah,
21 so it was August 28th exactly. Okay.
22   Q. And what year?
23   A. I think it was two or three days that they have
24 on that little card that we had to get out of it but
25 then it was a weekend I think or something happened

1 because this text is to him on September 3rd.
2   Q. Okay. Well, the particular question I just
3 want to ask right now is the date on this document
4 says 8/28/2020 --
5   A. Yes.
6   Q. -- does that refresh your recollection in terms
7 of --
8   A. Yes.
9   Q. -- the date that you actually -- I'm sorry, I
10 just got to finish my question.
11   A. I'm sorry.
12   Q. Does that refresh your recollection as to the
13 date that you interacted with Ben in your home?
14   A. Yes, it does.
15   Q. Okay. And over here at the bottom left there's
16 a name for somebody else; do you see that?
17   A. Mm-hmm yes.
18   Q. Do you recognize that name there?
19   A. Yeah, that's Ben.
20   Q. Okay. And who is that?
21   A. That was the gentleman that sold us the
22 package.
23   Q. Okay. I want to ask you a couple follow-up
24 questions too because you said that you personally did
25 not sign this document; did I understand you

1 correctly?
2   A. Correct.
3   Q. And why did you -- being the homeowner of this
4 address why did you not sign this document?
5   A. Well, I mean the husband's the homeowner as
6 well but I don't want my name on there. You know,
7 they liked it, okay go ahead you get it. But then
8 things started falling apart and I was like no. So he
9 understood too that I was making the decisions but
10 they put their name on the document because I didn't
11 want to put my name.
12   Q. Okay. Let me ask you this, in your household
13 are you the final decision maker on these types of
14 decisions?
15   A. There you go. Absolutely.
16   Q. And so the question I want to ask you is, if
17 you did not consent to this happening would it have
18 happened?
19       MR. HERBERT: Object to form.
20   A. No.
21   Q. Okay. Do you recall any further discussion
22 when Nia -- let me strike that for a second. Were you
23 present in the room when either Nia or Phillip were
24 signing any of these documents?
25   A. Yes, I was.

1   Q. Okay. And do you recall any discussion in
2 terms of when these -- this document was presented
3 about -- was there any further discussion about Vivint
4 taking over CPI at that time?
5       MR. HERBERT: Object to the form of the
6 question.
7   A. We got -- this came -- see this was e-mailed to
8 us, this wasn't given to us when Ben was there.
9 That's why -- that's when -- I'm getting ready to
10 skoal down on my computer but that's your exhibit.
11     We got that -- we didn't get that the night
12 of -- when the contract was closed. This came to us,
13 like, in the e-mail or what have you.
14   Q. Okay. Let me ask that question is, in what
15 form was this document presented to you? Was it on
16 paper or electronically on, like, a tablet?
17       MR. HERBERT: Object to form.
18   A. Electronic.
19   Q. And when it was presented to you and Nia and
20 Phillip were you all given an opportunity to flip
21 through the document?
22   A. No, because the card had -- what he left with
23 us had already said that we had a certain amount of
24 days. Then when she got this in her e-mail and we
25 looked at it that's when I was, like, come get your

1 equipment.
2 Q. Okay. I'm going to pull down Exhibit 2. At
3 any time on August 28th of 2020 when Ben was in your
4 home do you recall either you or Nia or Phillip being
5 placed on a phone call to, like, Vivint headquarters
6 to go through a series of questions on the phone?
7     MR. HERBERT: Object to form.
8 A. No. I don't recall that, no.
9 Q. Do you recall -- and again --
10 A. I know he told me to call CPI because I had to
11 call them to disalarm the system but we were -- I
12 don't believe so no.
13 Q. Again, did you and your daughter and your
14 husband were you all in the same room throughout the
15 course of this interaction with Ben?
16 A. Yes, we were.
17 Q. Do you have any memory of anyone else talking
18 on the phone with a customer service representative at
19 Vivint to go through a series of questions in
20 conjunction with signing the Vivint paperwork?
21     MR. HERBERT: Object to form.
22 A. I don't believe so, Eric. But I know Ben was
23 on the phone and he handled a few things but I don't
24 remember any of us speaking to anyone on the phone.
25 Q. What do you recall about Ben being on the

1 phone?
2     MR. HERBERT: Object to form.
3 A. Speaking to maybe a representative from Vivint
4 and definitely when he spoke to the gentleman that
5 came to install the equipment. And I thought
6 turnaround time was even too fast, he just made it
7 happen just too fast.
8 Q. Okay. That was going to be next line of
9 questions is after the electronic paperwork was taken
10 care of how long after that did they actually start
11 working on the equipment in your home?
12 A. Ben left and then the guy came within half an
13 hour maybe.
14 Q. And do you recall the name of this other person
15 who came about --
16 A. No, I don't. I don't.
17 Q. And when he arrived do you remember what he
18 did?
19 A. You know what, it was during that because he
20 asked to use and he couldn't -- yeah, it was during
21 COVID. Okay. I just remembered something
22 else. What was the question, Eric? I'm sorry.
23 Q. Yeah. What just, I guess, spurred your memory
24 there?
25 A. No. It was during 2020 because he had asked to

1 use the bathroom and I didn't want him to go upstairs
2 in my mom's bathroom because she has her own section
3 here and I wasn't allowing him so he got a little bit
4 of an attitude but I don't care but anyway.
5 Q. Were you concerned because of the pandemic
6 issues?
7 A. Yeah.
8 Q. And was he wearing a mask?
9 A. I believe so, yes. Yes, he was wearing a mask.
10 Q. Can you just describe for the jury what work he
11 did on your alarm system that day?
12 A. What he did?
13 Q. Yeah.
14 A. Yeah. First thing he did which I didn't like
15 was that he put that -- you know how they have the box
16 against the wall because we have it in another hall
17 over there with CPI he placed someplace where
18 everybody can't see it and it's not visible and if
19 we're going into the garage we do it right there but
20 he put it on the wall right here. So that was a --
21 that was there, the first thing that made me upset, he
22 changed the placement of our box -- of the box. Then
23 he changed -- he just -- I just got upset. He was
24 just -- and then it was late, it was late at night.
25 Who comes to your house after ten o'clock at night to

1 put in equipment? It just was all so mysterious.
2 Q. Okay. Let me ask a couple questions on that.
3 Do you recall generally what time he arrived first
4 arrived to your home?
5 A. It had to be 9:00, 9:30. It was late.
6 Q. And do you recall about what time he finally
7 left your home?
8 A. Yeah. It was at least an hour and a half so it
9 was pretty late 'cause I was getting very annoyed.
10 Q. When he began working in your home, again, you
11 had a CPI alarm system already in the home, correct?
12 A. Yes.
13 Q. Did he -- what did he do with the CPI alarm
14 equipment that was already in your home?
15 A. He put it all together. We had it so CPI able
16 to come and take that down and put my CPI back. We
17 had all the equipment, we still had everything.
18 Q. Okay. And that was my question is when he did
19 the work did he, for lack of a better term, integrate
20 the alarm equipment that was already in your home into
21 that new system or did he put in all new equipment?
22 A. No. That's why -- okay. He took everything
23 off or everything down, however you want to put it,
24 but the system that goes on the wall, the box, he was
25 not able to override CPI's code for the door lock,

1 that's why he couldn't change the door lock. So then
2 we were with a door that it wouldn't respond to
3 locking it and it wouldn't respond to the app and you
4 know. So that's when he said they were going to come
5 back. So I got in touch with Ben and he did as well
6 and he said he couldn't override it for whatever
7 reason and Ben was saying how they usually could, did
8 you call, did you tell them, yes I had called, I told
9 them to disarm it. But still, like I was saying, for
10 some reason they couldn't override it and those were
11 his words. And then I'm left here with no -- it was a
12 lock on the door but it was CPI's lock because he
13 couldn't because he couldn't put his lock on it
14 because it wouldn't allow him to for whatever reason,
15 and we didn't have a system for the door lock and that
16 was like a day that he didn't come back and that's
17 when I got in touch with Ben and then we had received
18 that enormous bill and I was like come get your
19 equipment. So he couldn't put everything the way it
20 should have been.
21    Q. When he was doing that work on the door code,
22 the CPI door code, did you ever have any further
23 discussion with the installer about the topic of
24 Vivint taking over CPI?
25        MR. HERBERT: Object to form.

1    A. No, not with him. He was just -- no, I didn't.
2    Q. Was it still your understanding that Vivint was
3 taking over CPI?
4        MR. HERBERT: Object to form.
5    A. Was it still -- you said don't answer or to
6 answer?
7    Q. You can answer subject to the objection.
8    A. Okay. So you said was it silly to understand?
9    Q. No, I'm sorry. I may have misspoke or you may
10 have misheard me. You testified earlier that Ben had
11 told you that Vivint was taking over CPI.
12    A. Yes.
13    Q. And so my question is, when the technician was
14 having problems kind of overriding the CPI door code
15 was it still your understanding that Vivint was taking
16 over CPI?
17        MR. HERBERT: Object to the form.
18    A. Yes, it was. But it was never spoken about
19 with the technician.
20    Q. Okay. At any point when they kind of took down
21 the CPI system did alarm dispatcher or CPI ever
22 contact you?
23    A. Sure. It comes on your phone. It comes on my
24 phone.
25    Q. Okay.

1    A. And that's also -- go ahead.
2    Q. Go ahead. I didn't mean to interrupt you. Go
3 ahead.
4    A. And it comes on the phone and that's again when
5 I called CPI again to let them know no, I had the
6 system removed. And then I had to eat crow and call
7 them back to ask them to please come put my system
8 back.
9    Q. Okay. Let's turn and talk about that issue.
10 How many days went by before you, I guess, took any
11 other action with respect to your alarm system?
12    A. I could really look back. It had to be within
13 the week. It was definitely within the week. Now, I
14 don't remember -- I think it was at least two to three
15 days by the time I asked CPI to come and put my
16 equipment back because Ben wouldn't send the guy out
17 to take the equipment down so I asked CPI -- go ahead.
18 I'm sorry.
19    Q. I was just going to pause you there so I could
20 ask you some questions about that.
21    A. Okay.
22    Q. You just testified that you called Vivint to
23 come remove their system. Why --
24    A. September 3rd to be exact. It's September 3rd
25 that I asked Ben to please -- I'm asking you again

1 please come -- have someone come out and remove the
2 equipment that has been installed. I will greatly
3 appreciate it if this can be done ASAP.
4    Q. And --
5    A. And that's September 3rd.
6    Q. It looks like maybe you were looking at your
7 phone, is that what you were just doing?
8    A. Yes.
9    Q. Did you have a series of text messages with
10 Ben?
11    A. No. Well, he didn't respond and whenever I
12 called he didn't respond so that led me to be even a
13 little more upset and that's when it had to be after
14 September 3rd that I called CPI to ask them to please
15 come and put my equipment back. And then I started my
16 complaints with the Better -- I made a few complaints
17 through a few different people and in return they also
18 got in touch with Vivint and what money we had paid
19 was refunded.
20        MR. HERBERT: Objection. Move to strike
21 the testimony as nonresponsive.
22    Q. Let me ask, why did you reach out to Vivint or
23 to Ben to have them come remove their system?
24    A. Because the money they had received and also
25 because they didn't come to put -- I had no door lock,

1 you know, from Vivint, I still had the CPI door lock.
2 So they never completed the job so as far as I was
3 concerned the contract wasn't completed anyway because
4 you didn't do what you needed to have done. And
5 that's what was in my complaint also to the Better
6 Business -- I sent out e-mails to a few people. But
7 anyway, go ahead because I'm not supposed to answer
8 unless you ask me. I'm sorry.
9      Q. No problem. I just want to ask a follow up to
10 that. Did Ben tell you specifically that the door
11 code that you currently had in your home when he
12 visited you would continue to work with Vivint's
13 system?
14           MR. HERBERT: Object to form.
15      A. They said that they were going to put in
16 their's, that they could override it.
17      Q. And so when you reached out to Ben did he ever
18 respond to you?
19      A. He did once by phone, never by text, and then
20 it was like after that he was like a ghost. I never
21 seen or heard from him again.
22      Q. When he reached out to you by phone can you
23 describe what the conversation was you had with Ben at
24 that time?
25           MR. HERBERT: Object to form.

1      A. He assured me that the guy was going to --
2 okay. He assured me that the gentleman was going to
3 come and be patient and we just misunderstand each
4 other. No, when I'm getting a bill like this I didn't
5 misunderstand anything. I know what you told me, what
6 you promised me, and I would love for someone to come
7 and take the equipment out and then he said it was
8 past the time that was on the card that he left with
9 us. And I said yeah but I don't even have a door lock
10 so it doesn't matter about the time frame from the
11 August 20th till like September 1st or 2nd. And like
12 I said, that's when I finally called CPI and had them
13 come and take it all down because I wasn't paying for
14 it.
15      Q. In addition to talking with Ben did you ever
16 try to call anyone at Vivint?
17      A. Yes.
18      Q. How many times did you call Vivint?
19      A. The customer service there is horrible. When I
20 finally got through to someone -- I probably can look
21 back and take notes but I don't remember her name but
22 they told me -- first they told me what Ben told me
23 that I had waited past the time and I said nope it
24 doesn't matter, I want this equipment out of my house,
25 it's already -- by that time the equipment had been

1 taken down because I had gone back to CPI and they
2 finally connected me to a supervisor which eventually
3 a lawyer called and she said sorry, you know, and give
4 me back my money, what have you, whatever, don't worry
5 about the contract. But that's only because too that
6 they had heard from the Consumers -- I had e-mailed a
7 few people. So that's really because they had heard
8 from all of them probably.
9           MR. HERBERT: Move to strike the testimony
10 as nonresponsive.
11           THE WITNESS: Sorry.
12      Q. No problem, Mrs. Mariso. Just the way that
13 this process works is I try to ask questions I can and
14 if you can try to answer the question that I ask.
15      A. Okay.
16      Q. I'll try to ask a few more questions on all
17 these issues.
18      A. Okay.
19      Q. My first question was just how many times do
20 you recall calling Vivint to try to get this issue
21 addressed?
22      A. Maybe three.
23      Q. And between those three calls can you estimate
24 how much time you actually spent on the phone?
25      A. With the whole time maybe one time 50 minutes

1 or more, just whole time but determined not to hang up
2 because if you hung up and you call back the whole
3 time -- and I understand too because in Indiana --
4 where were they at? They were someplace else. And I
5 understand also it's COVID there, because it was COVID
6 everyplace so their staff was small as well. So when
7 I did speak to someone she tried to explain it to me,
8 then she got a gentleman finally to get on and talk
9 with me. But it was always such a long time holding
10 and then like I said finally someone got back to me.
11           MR. HERBERT: Same objection, same motion.
12           THE WITNESS: Okay.
13      Q. And so it sounds like you at least spoke to an
14 initial customer service representative. Did they
15 ever transfer you on to somebody else?
16      A. Yes.
17      Q. And who did they transfer you to; do you
18 remember?
19      A. She transferred me to a gentleman that was her
20 supervisor.
21      Q. Now, you also mentioned a moment ago that at
22 some point you spoke to an attorney; did I hear you
23 right?
24      A. Yes, from Vivint.
25      Q. Okay. And how did that come about?

13 (Pages 46 - 49)

1    A.  Because they were closing it and they want to
2  send me back my money and, you know, all of that sort
3  of thing.
4    Q.  Okay.  And then you also mentioned a moment ago
5  that you ended up filing some complaints with
6  different entities; did I understand you correctly
7  there?
8    A.  Yes.
9    Q.  Can you describe for the jury what sort of
10  complaints that you filed and who with?
11         MR. HERBERT:  Object to form.
12    A.  I believe it was the Consumers of -- I would
13  have to look.  It was -- I know the Better Business
14  Bureau, it's letters BB, whatever, and then the
15  Consumers of something, something.  I know it was
16  three of them.  And I don't remember the others right
17  now.
18    Q.  And why did you go to that length to file those
19  complaints?
20    A.  Because I didn't like what they had done and
21  then they left that equipment here, I wanted them to
22  come and get that equipment so I wouldn't be
23  responsible for it.
24    Q.  Before you filed those complaints were you able
25  to get Vivint to address the issues that you had?

1    A.  No.
2    Q.  After you filed those complaints did you hear
3  from Vivint?
4    A.  Yes.
5    Q.  Is that the time that you eventually were
6  contacted by an attorney on behalf of --
7    A.  Yes.
8    Q.  And after you filed those complaints did they
9  agree to the resolution that you wanted?
10    A.  Yes.
11    Q.  And what was that?
12    A.  To come and get the equipment and refund me my
13  money.
14    Q.  Do you remember how much money they had charged
15  you?
16    A.  My daughter --
17         MR. HERBERT:  Object to form.
18    A.  I'm sorry what did he say?
19         MR. HERBERT:  I just said I object to the
20  form of the question.
21    A.  I don't remember the exact amount but they sent
22  us a check and she sent someone to get the equipment
23  and once they got the equipment then they let them
24  know that they got the equipment and then they
25  refunded me.

1    Q.  Okay.  The other questions I wanted to ask you
2  just once you resolved your issues with Vivint did you
3  ask CPI to come back to your home at any point?
4    A.  No.  It had been -- they had already given
5  me -- CPI had already did me right.  I was just
6  waiting for Vivint to come and get the equipment.  And
7  we boxed everything the way that -- and I took a
8  picture of everything that they had installed.  It was
9  all taken down and boxed in the correct box and --
10  yeah.
11    Q.  When did CPI send a technician back to your
12  home?
13    A.  It had to be around September 4th or 5th, I'm
14  not sure.  I don't remember.  I'd have to look back
15  and see but I don't remember off the top of my head.
16    Q.  To the best that you can recall was it within a
17  week or two?
18    A.  Exactly.  So that was -- it had to be around
19  the 5th or 6th, maybe, September.
20    Q.  And did CPI charge you any additional money
21  to --
22    A.  No, not that all.
23    Q.  Just a few final questions.  Do you believe
24  that Ben, the Vivint sales representative that came to
25  your door on August 28th of 2020, fairly and

1  accurately represented Vivint's products and services
2  to you?
3         MR. HERBERT:  Object to form.  You can
4  answer.
5    A.  No.  No, I do not.
6    Q.  Do you believe that he was truthful in his
7  interactions to you?
8    A.  No, I do not.
9    Q.  Do you believe he was deceptive in the
10  statements he made to you?
11    A.  Very much so.
12    Q.  And why did you ultimately come back to CPI
13  after being visited by Ben and having your system
14  swapped over to Vivint system?
15    A.  First of all, customer service.  To me that's
16  very important.  Secondly, I like my 49.99 and the
17  equipment was the same.  I mean, the backyard camera,
18  the front camera, talking, I didn't see any -- look, I
19  think one thing with Vivint the range outside is, you
20  know, bigger, you know, down the way but still, when
21  someone comes to your door I can still look at my
22  phone and see who it is.  And it's the customer
23  service and the price and I didn't like the deception.
24  That was not good.
25         MR. HOBBS:  Okay.  Those are the only

1 questions I have right, Mrs. Mariso. Mr. Herbert will
2 have an opportunity to ask you some questions on
3 behalf of Vivint and I might have a few follow-up
4 questions. I will say if you need to take a break now
5 might be a good time to do it. We can take five
6 minutes.
7          THE WITNESS: Okay. I'm going to get
8 water.
9          MR. HOBBS: Okay. Well, let's go ahead
10 and take five minutes and come back at 2:15 your time
11 and we'll go from there. Thank you.
12          THE VIDEOGRAPHER: All right. Time is
13 2:11 p.m., we're off the record.
14          (A recess was taken.)
15          THE VIDEOGRAPHER: The time is 2:12
16 p.m. -- 2:18 p.m., we're back on the record.
17                  EXAMINATION
18 BY MR. HERBERT:
19     Q. Good afternoon, Mrs. Mariso. And am I saying
20 that is right, is it Mariso?
21     A. Yes, it is.
22     Q. Okay. Thank you. Ms. Mariso, one big picture
23 question I have for you is that the end result of this
24 process was that before the events that you testified
25 about you had a contract with CPI, correct?

1     A. Yes.
2     Q. And that was a contract that you had signed
3 that contract as we saw in the document, right?
4     A. Yes.
5     Q. And at the end of this process you ended up
6 renewing your contract with CPI for a period of 36
7 months; is that right?
8     A. Yes.
9     Q. Do you recall that around the time this
10 interaction your prior contract with CPI was getting
11 close to expiring and had about 5 months left on it,
12 right?
13     A. Yes.
14     Q. And also the end result was that Vivint didn't
15 get any of your money in the end, right?
16     A. Well, we got a refund. Yes, they did get money
17 from us.
18     Q. But they refunded it, right? That was the end
19 result?
20     A. Yes, they refunded it.
21     Q. And I wanted to talk a little bit about the
22 initial interaction with your daughter and your
23 husband with the Vivint sales rep that you testified
24 about. I believe you indicated that the Vivint sales
25 rep was first talking to your daughter and your

1 husband out in the yard and you were in the house; is
2 that right?
3     A. Yes, absolutely.
4     Q. Okay. So then the initial sales pitch that the
5 Vivint rep made to your daughter and husband, you
6 didn't hear that initial pitch, right?
7     A. No, no.
8     Q. Okay. They later may have summarized it or
9 told you about what the sales rep said, right?
10     A. Well, he came and they said he could better
11 explain it so we allowed him yes and he explained it.
12     Q. Okay. And I know you testified that you had
13 called CPI a couple times or CPI had called you to
14 discuss this interaction, right?
15     A. No. That evening I called CPI to cut it off
16 and then after that when I wasn't satisfied with
17 Vivint I called CPI to come to re -- put it back.
18     Q. Right. And I want to ask you a couple of
19 questions about some of your conversations with CPI
20 after the fact, after the date that you testified
21 about when you were calling them to talk about these
22 events, that's what I want to ask you about some of
23 that. Okay?
24     A. Okay.
25     Q. You remember you had told CPI in those phone

1 calls that you really liked the equipment that Vivint
2 had, that it was very sleek and very modern; do you
3 remember that?
4     A. Yes.
5     Q. You really liked the thermostat, that was one
6 thing in particular I think that you indicated that
7 you liked a lot?
8     A. Right. Because CPI had called me to ask me why
9 did I switch over initially, yes.
10     Q. Right. And in that phone call when they first
11 called you about why did you switch over you remember
12 you had indicated that you had heard some comments
13 made by the CEO of CPI regarding the Black Lives
14 Matter movement?
15     A. Was it recorded?
16     Q. Yes.
17     A. Okay. What did he say? Yeah, we talked a lot.
18 He was telling me some things, yes, about Vivint and
19 initially the gentleman that was there, right, that
20 was working for CPI, yes, and -- yeah, that one of the
21 head gentleman, yes.
22     Q. Do you remember if you talked to a guy named
23 Felix; do you remember that?
24     A. Yep.
25     Q. You said Felix like Felix that cat, you

15 (Pages 54 - 57)

1 mentioned that?

2 A. Absolutely. Felix was great, yes.

3 Q. You remember that he personally apologized to

4 you for some of the comments that the CEO of CPI had

5 made that came up in that conversation?

6 A. Yes, he did and I informed him that some of

7 that stuff I hadn't heard anyway. But he was telling

8 me that also because -- yeah, because Ben had said --

9 yeah, I don't want to rehash -- but yes, he apologized

10 to me, yes.

11 Q. Let me ask you, did your daughter bring up

12 those comments that the CEO of CPI made about the BLM

13 movement?

14 A. Yeah, I believe that she did because I believe

15 Ben had said something to that nature so it was like

16 we got to get out of CPI, you know.

17 Q. Your daughter said that to you that was one of

18 the reasons why she wanted to get out of CPI because

19 of those comments?

20 A. Some things that Ben had said and some things

21 that she had heard, exactly.

22 Q. And the contract that was entered into with

23 Vivint was only signed by your daughter Nia --

24 A. Yes.

25 Q. -- and your husband Phillip, correct?

1 A. Yes, absolutely.

2 Q. So the only contracts that you ever signed were

3 contracts with CPI, the old contract you had before

4 this interaction and then your current contract you're

5 under now, right?

6 A. Yes.

7 Q. Let me ask you, you indicated that when you

8 initially entered into your contract with CPI you had

9 never heard of CPI the company before; is that right?

10 A. No. We didn't use alarm systems in New York.

11 Well, they -- but no, I hadn't never heard of it, no.

12 Q. Okay. So you didn't know what CPI's logo or

13 sign looked like at the time when you --

14 A. No, I did not.

15 Q. Okay. So that contract you signed you

16 indicated it was something that the builder kind of

17 suggested to you that to you that this is an alarm

18 company they recommend or something like that?

19 A. Yeah. Because it was like it wasn't in the

20 package but this is who they were using but if you

21 wanted to change it you could. But I didn't know one

22 so we just said no, we'll go with CPI. So as they

23 build they build the wires in the wall and stuff

24 already.

25 Q. Are you familiar with other alarm companies out

1 there or their signs or their logos?

2 A. Yes. ADT, right? I believe it's ADT. We have

3 some ADTs out here but that's all. I think now we

4 might have one or two Vivints but it's CPI basically

5 or it's ADT.

6 Q. Okay. Do you recall what the ADT sign looks

7 like by any chance?

8 A. Is it blue and white? I don't recall. I think

9 it might be blue and white. I don't know.

10 Q. Okay. And going back a little bit back in 2017

11 when you first entered into the agreement with CPI,

12 I'm going to ask you to think back at that time. At

13 that time were you aware of ADT as a company, had you

14 heard of their name?

15 A. I'm quite sure I had. I had heard -- yeah.

16 But like I said, basically the builders said the CPI

17 thing so just went along with it.

18 Q. Okay. Ask you one other question regarding the

19 mention of ADT. Do you recall in one of your

20 conversations with Felix from CPI do you recall him

21 telling you that all the equipment that CPI and ADT

22 and Vivint use that it's all basically the same

23 equipment?

24 A. Yeah. I think the same company -- it's one

25 company that makes all of the different units, I

1 believe. Yes.

2 Q. Okay. Okay. Is it fair to say that --

3 A. Can I say something? I'm sorry.

4 Q. Of course.

5 A. Felix was trying to explain to me that one

6 wasn't that much better than I thought. One wasn't so

7 much inferior than the other because it's just one

8 company that makes everything.

9 Q. Right. And that's what I was going to get at

10 next. Is it fair to say that part of the reason that

11 your husband and your daughter were impressed and

12 wanted to switch from CPI to Vivint was because --

13 because of the equipment that they perceived it to be

14 better, more modern; is that a fair statement?

15 A. Yes.

16 MR. HOBBS: Object to form, foundation.

17 THE WITNESS: Oops.

18 Q. And then in your call CPI the CPI

19 representative was essentially telling you no, no, no,

20 that's not true you got a misconception or

21 misunderstanding, these companies equipment is all

22 pretty much the same and that was part of the reason

23 why you were okay with going back and switching back?

24 A. No. They gave me -- they upgraded my

25 equipment. Because in each company -- everybody --

1 just all the technology it upgrades. So they upgraded
2 my equipment.
3     Q. Okay. So CPI agreed to upgrade the equipment
4 that CPI was giving you under your current contract --
5     A. Yes.
6     Q. -- which was much different than the equipment
7 you had under your prior contract?
8     A. Absolutely.
9     Q. Okay. So then -- and the equipment you got
10 from CPI, the new equipment, the equipment you have in
11 your house now, from your perspective it looks and it
12 operates somewhat similar to the equipment that the
13 Vivint sales rep was showing you when he made the
14 sales pitch to your family?
15     A. Yes.
16     Q. Okay. And so that new equipment you got now is
17 definitely an upgrade from the prior CPI equipment
18 that you had, right?
19     A. Yes.
20     Q. Okay. So wanted to talk a little bit about
21 your testimony about the call you needed to make to
22 CPI after the interaction with the Vivint sales rep
23 with your daughter and your husband. I believe you
24 indicated that he told you all that you need to call
25 CPI because you got to disarm their system, right?

1     A. Yes.
2     Q. And then there's was an issue with the door
3 lock and he said they were trying to ask you to
4 contact CPI to try to override that CPI door lock,
5 right?
6     A. Right.
7     Q. At that point you understood that CPI was a
8 separate company from Vivint, right?
9         MR. HOBBS: Object to form.
10     A. They were always separate companies but what I
11 think Ben was trying to tell us was that, what is that
12 called, Vivint was going to take over CPI. It was
13 going to be an umbrella type thing.
14     Q. But you understood at the time you had to call
15 CPI?
16     A. Yeah. It was CPI and then it was Vivint, yeah.
17     Q. Okay. Okay. And let me ask you a little bit
18 about what you testified about the umbrella concept
19 that you just mentioned. Is that something that your
20 daughter told you that the Vivint rep had said when
21 she was talking to them out in the yard?
22     A. No, Ben said it. He said it.
23     Q. What about your husband, did he say that the
24 Vivint rep said that to him?
25     A. No.

1     Q. Let me ask you, in the BBB complaint that you
2 filed you didn't make any mention of this umbrella or
3 takeover statement as one of the reasons why you
4 wanted to cancel your contract with Vivint.
5     A. No. Just that I was miss -- no, I did not.
6     Q. Okay. You mentioned the pricing issue and the
7 financing issue but you didn't mention this umbrella
8 takeover concept, right?
9     A. No, I did not.
10     Q. And Mr. Hobbs asked you a little bit about
11 whether or not you had -- at the time that your
12 daughter and your husband signed the contract with
13 Vivint if they had a call or video call with your
14 daughter or your husband asking them some questions.
15     A. Especially not a video call, no. Nope.
16     Q. Do you remember that the sales rep had a phone
17 out and asked your daughter a series of questions that
18 they were questions that came up and then she had to
19 answer the questions to move the process along?
20     A. Yeah, I believe that she did. To my
21 recollection -- yeah. He was on the phone but she
22 never spoke to anyone, he might have asked her
23 questions and he gave the response to the person on
24 the other end but Nia never spoke to anyone.
25     Q. Okay. But Nia being the one that signed the

1 contract was the one who was answering the series of
2 questions, right?
3     A. Yes.
4     Q. And you recall that Nia was asked if she
5 understands that Vivint was not affiliated with your
6 prior home security provider? You recall that as one
7 of the last questions that they asked her?
8     A. No, I do not.
9     Q. Now, your husband didn't answer any questions
10 like that in that format with the phone and then the
11 series of questions, right, just Nia, right?
12     A. Yes.
13     Q. Let me back up and ask you a little bit about
14 when your daughter mentioned to you about the comments
15 that the CEO of CPI had made about the BLM movement.
16 You might have indicated that you weren't as familiar
17 with those comments, that your daughter was more
18 concerned with them; is that a fair statement?
19     A. Mr. Greg, can you ask me that question again?
20     Q. Yeah, let me back up. Do you recall that there
21 was a controversy about CPI's CEO making some
22 disparaging statements about the Black Lives Matter
23 protesters; do you recall that?
24     A. I do recall that. Yes, I do.
25     Q. Okay. And do you recall that the Charlotte

1 Hornets they terminated their relationship with CPI
2 because of that; did you see that in the news?
3 A. No, I can't say that I did.
4 Q. Okay.
5 A. I don't remember that.
6 Q. You happen to remember Michael Jordan -- you
7 know Michael Jordan the basketball player, right?
8 A. Yes.
9 Q. Everybody knows him, right?
10 A. Mm-hmm.
11 Q. Do you remember that he's the one who made an
12 announcement --
13 A. Charlotte Hornets, yeah. No, I didn't
14 remember. I don't know.
15 Q. Okay. How about the Carolina Panthers. You're
16 not from North Carolina so you may not be a Panthers
17 fan --
18 A. Yeah, my daughter says I jump around too much
19 for her. But she would -- no, I didn't recall it.
20 No.
21 Q. All right. So you didn't see anything in the
22 news about the Carolina Panthers terminating their
23 relationship with CPI?
24 A. No, I did not.
25 Q. Okay. What about Bojangles, did you hear about

1 Bojangles ending their relationship with CPI?
2 A. No. I just know that he said some things and a
3 few people were distancing themselves from CPI but me
4 personally, I never heard anything.
5 Q. At the time that the Vivint sales rep was doing
6 the -- has a phone and was asking a series of
7 questions to your daughter, Nia, were you present --
8 were you there next to her when she was answering
9 those questions?
10 A. Yeah, yeah. We were in the same space, yes.
11 Q. Okay. So do you recall them asking any of
12 those questions about, you know, the financing
13 arrangement, the fact that there would be a second
14 company involved?
15 A. Nope, nope, not at all.
16 Q. Okay. All right. So if I represented to you
17 that we got recordings of your daughter answering
18 those questions --
19 A. Okay.
20 Q. -- you wouldn't have any reason to dispute that
21 your daughter indicated that she understood that the
22 Vivint was not affiliated with CPI in any way, right?
23 MR. HOBBS: Hold one one second.
24 A. I wouldn't object to it if you have the tape.
25 I can't.

1 MR. HOBBS: I object to form, foundation.
2 Q. Okay. And the same thing is true with the
3 financing arrangement, the financing arrangement with
4 the separate company, do you recall that that was --
5 bless you.
6 A. Thank you.
7 Q. Do you recall that the financing arrangement
8 was set forth in the agreement that your daughter and
9 your husband signed with Vivint?
10 A. Ask me the question again.
11 Q. No problem at all. Of course I don't mind.
12 You indicated that -- let me strike that.
13 The fact that there was a financing component
14 connected with this arrangement with Vivint that your
15 daughter and your husband signed, that was disclosed
16 to them in the written contract, correct?
17 A. Yeah. But we didn't receive the written
18 contract, that paper that he showed, that -- we didn't
19 receive that until after everything was done and that
20 night we didn't receive that contract, we had no
21 idea -- go ahead.
22 Q. I'm sorry. Didn't your daughter sign that
23 contract electronically on a tablet?
24 A. Yeah. But -- yeah. Yes, she did. And you
25 scroll and you sign, and then he scroll and you sign,

1 and he scroll and you sign. So yeah, she did.
2 Q. And that was there with the gentleman you said
3 was Ben that's when that happened, right, he presented
4 that to her?
5 A. Mr. Greg, I guess so yeah. Probably so.
6 Q. And your husband also signed it too? Scrolled
7 and signed as well, right?
8 A. Probably, yes. Can I say something or not yet?
9 Q. Of course you can.
10 A. Okay. When we finally got it like I'm saying
11 on her e-mail and we saw what it was I was like no
12 this is -- we can't do this. And I don't know -- I
13 don't want change the testimony, I don't know if he
14 changed -- I don't know but whatever it was we weren't
15 accepting it and we were misled.
16 Q. Let me ask you this, you weren't the one that
17 signed the contract with Vivint, right?
18 A. No, I was not.
19 Q. Is it fair to say that your daughter was a
20 little bit more excited or interested in Vivint and
21 their equipment, right?
22 A. Yeah.
23 Q. And she's the one that signed the contract and
24 you were a little bit less interested in it than she
25 was?

1    A. Yes, true.
2    Q. And so ultimately once she took a closer look
3  at the paperwork and you saw what was all involved in
4  the documents that your daughter and husband signed
5  you weren't happy about that once you took a closer
6  look and wanted to cancel that, right?
7    A. Yes.
8         MR. HERBERT: I don't think I have any
9  further questions Mrs. Mariso. But I might if
10 Mr. Hobbs -- I think he's going to have a couple
11 follow ups and if he does I might have a couple follow
12 ups after him but I'll try hard to keep it brief.
13         RE-EXAMINATION
14 BY MR. HOBBS:
15   Q. Ms. Mariso, I think we're just about done. I
16 had to switch over to my fancy little headset here
17 because my computer is starting to freeze up on me and
18 I was afraid I was going to lose you.
19        But are you still able to hear me okay?
20   A. Yes.
21   Q. Okay. I just want to go to the subjects that
22 Mr. Herbert asked you a few questions about the
23 controversy surrounding the Black Lives Matter
24 movement. You'll recall that that was a very serious
25 topic last summer that got a lot of attention; would

1  that be fair?
2    A. Yes. My daughter explained it to me.
3    Q. Yeah. And I just want to be clear, when Ben
4  was in your home on August 28th of 2020, did he bring
5  up that issue to you in trying to, I guess, get you to
6  make a change with respect to your alarm system?
7    A. Yes. Him and my daughter spoke about it, yes.
8  And how CPI wasn't that great anymore and they were
9  taking over CPI and the gentleman that was in charge
10 and this and that and the other and that's why she was
11 like mommy we got to get from under CPI, what have
12 you, whatever. But then I explained to her well,
13 okay. Yes, yes, yes.
14   Q. Did it -- what was your reaction to Ben
15 bringing up this subject of the Black Lives Matter
16 movement while he was in your home trying to convert
17 your alarm system?
18         MR. HERBERT: Object to form.
19   A. I don't think it was fair to use something of
20 that nature to try to get business and this is what I
21 teach my daughter. See because she has to understand
22 the sales pitch. She's just graduating college and --
23 well, now she's back in because she's getting her
24 master's but you know they're young, they don't
25 understand, all she knows is this person is out there

1  trying to sell us something. And they're going to use
2  whatever they can use and the end result I didn't
3  appreciate it, and then when I spoke to Felix and we
4  spoke about it even more then I explained that to her
5  that to her as well. But yeah, he used that, he
6  pushed with that, he used it.
7    Q. Did Ben bring up the -- when he was talking
8  about the Black Lives Matter did he talk any further
9  about why -- about the issue of Vivint taking over
10 CPI?
11   A. No. Just that it was a better company and they
12 had better equipment but nothing in detail, no.
13   Q. Okay. And then Mr. Herbert asked you a couple
14 questions and part of your testimony was you said that
15 Ben was explaining there's kind of different companies
16 but they're under the same --
17   A. Yes.
18   Q. -- umbrella if I recall?
19        What specifically did Ben say and if he made
20 any gestures can you make clear for the jury kind of
21 what that dialogue was.
22        MR. HERBERT: Object to form, compound.
23        THE WITNESS: I'm sorry, Mr. Herbert.
24        MR. HERBERT: That's okay, Ms. Mariso.
25 I'm just going to object to the form of the question

1  among other objections it's a compound question and a
2  leading question but you can answer.
3    A. He didn't so much -- that was my umbrella thing
4  but he did mention that CPI was under Vivint and that
5  Vivint was taking over CPI and sort of, like, knocking
6  them out and eventually -- from my understanding even
7  the name CPI would be Vivint, it wasn't going to be
8  anymore CPI. So -- but not necessary, like I said,
9  the umbrella thing or any hand gestures or anything of
10 that nature. Just that Vivint was better and they
11 were taking over CPI.
12        MR. HOBBS: Okay. Those are my only
13 questions unless Mr. Herbert has anything further.
14        MR. HERBERT: No, no further questions.
15 Thank you very much for your time, Mrs. Mariso.
16        THE WITNESS: Okay.
17        THE VIDEOGRAPHER: All right. The time is
18 2:45 p.m., we're off the record.
19        (Off the record at 2:45 p.m.)
20        (Signature was waived.)
21
22
23
24
25

19 (Pages 70 - 73)

1  STATE OF NORTH CAROLINA
   COUNTY OF GUILFORD
2
3         REPORTER'S CERTIFICATE
4      I, Erin Ramsey, a Notary Public in and for the
5  State of North Carolina, do hereby certify that there
6  came before me on Thursday, the 19th day of August,
7  2021, the person hereinbefore name, in Wake County,
8  who was by me duly sworn to testify to the truth and
9  nothing but the truth of his knowledge concerning the
10 matters in controversy in this cause; that the witness
11 was thereupon examined under oath, the examination
12 reduced to typewriting under my direction, and the
13 deposition is a true record of the testimony given by
14 the witness.
15     I further certify that I am neither attorney or
16 counsel for, nor related to or employed by, any
17 attorney or counsel employed by the parties hereto or
18 financially interested in the action.
19     IN WITNESS WHEREOF, I have hereto set my hand,
20 this the 27th day of August, 2021, according to the
21 emergency video notarization requirements contained in
22 G.S. 10B-25.
23
24     _Erin C Ramsey_
25     Erin Ramsey, Notary Public
       Notary Number: 201814200166

Veritext Legal Solutions
800-567-8658                                    973-410-4098

| & |
| --- |
| **&** 2:3 4:9 |

| 0 |
| --- |
| **00504** 1:4 |

| 1 |
| --- |
| **1** 3:9 12:14,21,23 13:16 |
| **10/30/17** 13:22 |
| **109** 31:22 |
| **10:00** 24:9 |
| **10b** 74:22 |
| **12** 3:9 |
| **1660** 2:4 |
| **17th** 2:4 |
| **18** 8:23 9:7 |
| **19** 1:21 2:25 |
| **19th** 4:5 74:6 |
| **1:03** 2:25 4:5 |
| **1st** 47:11 |

| 2 |
| --- |
| **2** 3:10 33:9,11,13 38:2 |
| **20** 24:9 31:19 |
| **2015** 8:4,7 |
| **2017** 13:23 60:10 |
| **201814200166** 74:25 |
| **2019** 18:8,11 21:10 |
| **2020** 18:6,9 20:13 34:10 38:3 39:25 52:25 71:4 |
| **2021** 1:21 2:25 4:5 18:8 74:7,20 |
| **20th** 47:11 |
| **21602** 74:24 |
| **24** 29:23 30:24 |
| **25** 74:22 |
| **27** 10:17 |
| **27590** 7:22 |

| 27th | 74:20 |
| --- | --- |
| **285-5300** 2:5 |
| **28th** 34:21 38:3 52:25 71:4 |
| **2:11** 54:13 |
| **2:15** 54:10 |
| **2:18** 54:16 |
| **2:45** 73:18,19 |
| **2nd** 47:11 |

| 3 |
| --- |
| **30** 9:23 |
| **303** 2:5 |
| **32801** 2:10 |
| **33** 3:10 |
| **36** 55:6 |
| **37** 10:17 |
| **376** 12:19 |
| **377** 12:19 |
| **3:20** 1:4 |
| **3rd** 21:8,15 34:18 35:1 44:24,24 45:5,14 |

| 4 |
| --- |
| **4** 3:2 |
| **40** 31:25 |
| **404** 7:21 11:22 |
| **407** 2:11 |
| **420-1000** 2:11 |
| **450** 2:4,9 |
| **48** 33:9 |
| **49.99** 14:4 53:16 |
| **49.99.** 22:7 |
| **4th** 52:13 |

| 5 |
| --- |
| **5** 55:11 |
| **50** 48:25 |
| **54** 3:3 |
| **59.99.** 22:8 |
| **5th** 52:13,19 |

| 6 |
| --- |
| **650** 2:10 |
| **69** 31:19 |
| **6th** 52:19 |

| 7 |
| --- |
| **70** 3:4 |
| **7847** 33:9 |

| 8 |
| --- |
| **8/28/2020** 35:4 |
| **80202** 2:5 |
| **89.99** 22:9 31:25 |

| 9 |
| --- |
| **91** 7:22,22 |
| **917** 13:12 |
| **99** 31:22 |
| **9:00** 41:5 |
| **9:30** 41:5 |

| a |
| --- |
| **able** 12:21 32:21 33:11 41:15,25 50:24 70:19 |
| **absolutely** 36:15 56:3 58:2 59:1 62:8 |
| **accepting** 69:15 |
| **accurately** 53:1 |
| **acquisitions** 1:10 |
| **action** 1:4 44:11 74:18 |
| **actual** 15:1 |
| **addition** 47:15 |
| **additional** 5:8 28:14 30:10 52:20 |
| **address** 7:20,23 8:1 11:16,23 13:8 36:4 50:25 |
| **addressed** 48:21 |
| **adt** 60:2,2,5,6,13 60:19,21 |

| adts | 60:3 |
| --- | --- |
| **affiliated** 65:5 67:22 |
| **afraid** 70:18 |
| **afternoon** 4:11,24 54:19 |
| **age** 8:11 |
| **ago** 6:15,20 7:7 9:25 11:16 25:1 26:2 49:21 50:4 |
| **agree** 51:9 |
| **agreed** 62:3 |
| **agreement** 60:11 68:8 |
| **ahead** 6:2,2 15:20 15:21 17:24 20:13 21:24 22:14 28:9 31:4 36:7 44:1,2,3 44:17 46:7 54:9 68:21 |
| **aide** 1:25 |
| **al** 4:4 |
| **alarm** 11:5,7,9,12 11:25 14:7,16,18 14:21 15:16,24 16:9 17:7 26:7 29:15 40:11 41:11 41:13,20 43:21 44:11 59:10,17,25 71:6,17 |
| **allow** 6:9 42:14 |
| **allowed** 56:11 |
| **allowing** 5:9 40:3 |
| **amount** 14:3,9 31:5,24,24 37:23 51:21 |
| **anniversary** 9:25 |
| **announcement** 66:12 |
| **annoyed** 41:9 |

**answer** 6:3,10
 15:21 21:22,24
 26:22 30:18 43:5
 43:6,7 46:7 48:14
 53:4 64:19 65:9
 73:2
**answering** 65:1
 67:8,17
**anybody** 10:18
 11:2
**anymore** 71:8
 73:8
**anyplace** 31:19
**anyway** 19:20
 20:13 34:6 40:4
 46:3,7 58:7
**apart** 36:8
**apologized** 58:3,9
**app** 42:3
**appearances** 2:1
**appreciate** 45:3
 72:3
**approached** 15:25
**arrangement**
 67:13 68:3,3,7,14
**arrived** 39:17 41:3
 41:4
**asap** 45:3
**aside** 17:24
**asked** 18:23 39:20
 39:25 44:15,17,25
 64:10,17,22 65:4,7
 70:22 72:13
**asking** 19:6 27:12
 44:25 64:14 67:6
 67:11
**assured** 47:1,2
**attained** 9:9
**attention** 34:8
 70:25

**attitude** 40:4
**attorney** 5:24 6:9
 49:22 51:6 74:15
 74:17
**attorneys** 5:2,22
 7:3
**august** 1:21 2:25
 4:5 34:18,21 38:3
 47:11 52:25 71:4
 74:6,20
**avenue** 2:9
**aware** 60:13

**b**

**b** 10:14
**back** 9:11 15:9
 17:15 18:12 21:11
 26:9,10 27:11
 32:22 41:16 42:5
 42:16 44:7,8,12,16
 45:15 47:21 48:1
 48:4 49:2,10 50:2
 52:3,11,14 53:12
 54:10,16 56:17
 60:10,10,12 61:23
 61:23 65:13,20
 71:23
**backyard** 53:17
**bacon** 2:3 4:9
**bad** 19:17
**basically** 12:2
 21:25 23:24 60:4
 60:16,22
**basis** 14:6
**basketball** 66:7
**bathroom** 40:1,2
**bb** 50:14
**bbb** 64:1
**bear** 12:15
**began** 13:25 15:15
 41:10

**beginning** 4:1
 18:11
**behalf** 2:2,7,23 4:9
 4:13,15 5:2 51:6
 54:3
**believe** 23:6,9
 32:14 38:12,22
 40:9 50:12 52:23
 53:6,9 55:24
 58:14,14 60:2
 61:1 62:23 64:20
**ben** 21:2,2,3,19
 22:20 23:12,19
 24:10 25:2 26:16
 28:16 29:4,14
 30:1,11,23 31:12
 35:13,19 37:8
 38:3,15,22,25
 39:12 42:5,7,17
 43:10 44:16,25
 45:10,23 46:10,17
 46:23 47:15,22
 52:24 53:13 58:8
 58:15,20 63:11,22
 69:3 71:3,14 72:7
 72:15,19
**best** 23:17 52:16
**better** 22:1,5
 23:25 25:13 41:19
 45:16 46:5 50:13
 56:10 61:6,14
 72:11,12 73:10
**beyond** 25:17
**big** 6:25 29:11
 54:22
**bigger** 53:20
**bill** 27:8 29:20
 30:12,23,25 31:18
 31:21 32:25 42:18
 47:4

**bit** 14:2 40:3 55:21
 60:10 62:20 63:17
 64:10 65:13 69:20
 69:24
**black** 57:13 65:22
 70:23 71:15 72:8
**bless** 68:5
**blm** 58:12 65:15
**blue** 60:8,9
**bob** 19:20 20:16
 20:18
**bojangles** 66:25
 67:1
**bottom** 13:14,16
 34:1,9 35:15
**box** 40:15,22,22
 41:24 52:9
**boxed** 52:7,9
**break** 54:4
**brief** 70:12
**bring** 58:11 71:4
 72:7
**bringing** 71:15
**brooklyn** 8:9
**brought** 10:20
 12:20
**build** 59:23,23
**builder** 59:16
**builders** 12:2
 60:16
**building** 11:14,17
**built** 7:24 8:6
 11:21
**bureau** 50:14
**business** 32:10
 34:5 46:6 50:13
 71:20
**buttons** 15:1

**c**

c 7:18
call 12:4 24:4,12
  24:15 38:5,10,11
  42:8 44:6 47:16
  47:18 49:2 57:10
  61:18 62:21,24
  63:14 64:13,13,15
called 2:22 4:18
  19:21 42:8 44:5
  44:22 45:12,14
  47:12 48:3 56:13
  56:13,15,17 57:8
  57:11 63:12
calling 28:7 48:20
  56:21
calls 48:23 57:1
camera 14:18
  53:17,18
cancel 64:4 70:6
card 34:24 37:22
  47:8
care 39:10 40:4
carolina 1:2 2:24
  7:2,5,21 8:3 12:10
  66:15,16,22 74:1,5
case 6:16 7:13
castro 4:15
cat 57:25
cause 23:11 41:9
  74:10
cell 17:21
ceo 57:13 58:4,12
  65:15,21
certain 37:23
certainly 13:2
certificate 74:3
certified 4:19
certify 74:5,15
chance 60:7

change 42:1 59:21
  69:13 71:6
changed 15:2
  40:22,23 69:14
charge 23:7,8
  32:24 52:20 71:9
charged 51:14
charges 29:15
  30:3
charlotte 1:3
  65:25 66:13
check 13:12 26:17
  27:7,14,15,22
  28:17,25 51:22
checked 17:13
children 10:4
choose 11:25
circle 16:16
city 10:3
civil 1:4
clean 6:11
clear 10:11 24:21
  71:3 72:20
clicks 12:18
close 14:22 55:11
closed 37:12
closer 70:2,5
closing 50:1
clyde 4:14
coast 4:24
code 26:8 41:25
  42:21,22 43:14
  46:11
college 9:10,16,16
  71:22
colorado 2:5 5:1
come 5:10 15:9
  16:7 17:15 18:12
  20:8,12 21:11
  24:5,11 26:9,10
  27:11 37:25 41:16

42:4,16,18 44:7,15
  44:23 45:1,1,15,23
  45:25 47:3,6,13
  49:25 50:22 51:12
  52:3,6 53:12
  54:10 56:17
comes 40:25 43:23
  43:23 44:4 53:21
coming 24:10
commencing 2:25
comments 57:12
  58:4,12,19 65:14
  65:17
community 12:4
companies 59:25
  61:21 63:10 72:15
company 9:6
  15:24 16:1 17:7
  19:11 22:10 24:16
  25:4,12 27:9
  29:12 30:12 59:9
  59:18 60:13,24,25
  61:8,25 63:8
  67:14 68:4 72:11
complaint 46:5
  64:1
complaints 45:16
  45:16 50:5,10,19
  50:24 51:2,8
completed 46:2,3
component 68:13
compound 21:1
  72:22 73:1
comprised 14:17
computer 1:25
  37:10 70:17
concept 63:18
  64:8
concerned 27:4
  40:5 46:3 65:18

concerning 74:9
conference 7:1
confusing 7:9
congratulations
  9:24
conjunction 38:20
connected 48:2
  68:14
connection 5:14
consent 36:17
consumers 48:6
  50:12,15
contact 43:22 63:4
contacted 51:6
contained 74:21
continue 23:4,11
  46:12
contract 3:9,10
  12:7 13:4 16:21
  27:4 32:16,17
  33:5 34:5 37:12
  46:3 48:5 54:25
  55:2,3,6,10 58:22
  59:3,4,8,15 62:4,7
  64:4,12 65:1
  68:16,18,20,23
  69:17,23
contracts 59:2,3
controversy 65:21
  70:23 74:10
conversation 6:7
  21:17 23:12 30:20
  46:23 58:5
conversations
  56:19 60:20
convert 71:16
corporation 1:10
correct 34:15 36:2
  41:11 52:9 54:25
  58:25 68:16

correctly 22:22
25:8 28:18,19
30:14 36:1 50:6
cost 15:17 24:1
costs 5:8 15:12
counsel 4:6 74:16
74:17
counterclaimants
1:13
county 74:1,7
couple 12:18
24:23 25:23 28:14
29:13 30:9 33:1
35:23 41:2 56:13
56:18 70:10,11
72:13
course 38:15 61:4
68:11 69:9
court 1:1 4:7 5:22
5:25 6:5,8,23
covered 22:15
covid 18:7,8 39:21
49:5,5
cpi 1:6 3:9 4:3,9
5:3 11:11,25 12:4
12:7,9,19 13:4,25
14:6,10,16 15:15
16:1,4,9,16,21,24
22:2,3,4,12,21
23:7,8 24:4,12
25:17,21 26:7
33:5 37:4 38:10
40:17 41:11,13,15
41:16 42:22,24
43:21 44:5,15,17
45:14 46:1 47:12
48:1 52:3,5,11,20
53:12 54:25 55:6
55:10 56:13,13,15
56:17,19,25 57:8

57:13,20 58:4,12
58:16,18 59:3,8,9
59:22 60:4,11,16
60:20,21 61:12,18
61:18 62:3,4,10,17
62:22,25 63:4,4,7
63:12,15,16 65:15
66:1,23 67:1,3,22
71:8,9,11 72:10
73:4,5,7,8,11
cpi's 11:12 23:24
25:12 41:25 42:12
59:12 65:21
crazy 33:16
create 5:8
credit 26:16 27:7
27:13,15,22,22
28:17,25 29:24,24
crow 44:6
cs4749790 2:19
current 7:20 59:4
62:4
currently 8:15
9:18 11:6,10
46:11
customer 33:19
38:18 47:19 49:14
53:15,22
cut 5:7 24:13
56:15
cv 1:4

**d**

d 10:23
date 4:4 17:11,11
21:11 29:20 30:11
34:11,13,16 35:3,9
35:13 56:20
dated 13:19,22
daughter 10:9,13
10:16,17 19:19
20:8,14 27:16,18

27:21 30:12,23
31:20 38:13 51:16
55:22,25 56:5
58:11,17,23 61:11
62:23 63:20 64:12
64:14,17 65:14,17
66:18 67:7,17,21
68:8,15,22 69:19
70:4 71:2,7,21
daughter's 29:10
daughters 10:15
day 23:12 25:25
26:3,15 27:13
29:16 30:22 31:12
31:15 34:19,19
40:11 42:16 74:6
74:20
days 34:23 37:24
44:10,15
deception 53:23
deceptive 53:9
decision 36:13
decisions 36:9,14
defendant 2:7
4:15
defendants 1:12
4:13
definitely 39:4
44:13 62:17
della 10:23
denver 2:5 4:25
department 8:21
deposition 1:18
2:22 4:2 5:18 6:17
6:23 74:13
depositions 5:6
describe 14:16
16:13 31:1 40:10
46:23 50:9
describes 15:11

detail 72:12
determined 49:1
dialogue 20:20
72:21
different 12:3 15:7
45:17 50:6 60:25
62:6 72:15
difficulties 5:12
digital 14:25 15:5
direct 34:8
direction 74:12
disalarm 38:11
disarm 42:9 62:25
disclosed 68:15
disconnect 24:5
disconnected 5:12
discuss 27:13
28:24 56:14
discussed 22:18
discussing 20:24
21:4
discussion 23:17
23:18 36:21 37:1
37:3 42:23
disparaging 65:22
dispatcher 43:21
dispute 67:20
distancing 67:3
district 1:1,2
division 1:3
document 13:1
14:12 15:10,23
34:1,9 35:3,25
36:4,10 37:2,15,21
55:3
documents 18:2
36:24 70:4
doing 23:20 24:10
27:6 29:15 42:21
45:7 67:5

**door** 14:18 24:8
26:6,6 27:2 41:25
42:1,2,12,15,21,22
43:14 45:25 46:1
46:10 47:9 52:25
53:21 63:2,4
**doors** 14:22
**double** 9:21
**drawed** 29:5
**dsc** 1:4
**duly** 4:18 74:8

**e**

**e** 5:13 7:18 10:23
31:23 37:7,13,24
46:6 48:6 69:11
**earlier** 33:5 43:10
**easier** 6:8
**east** 4:24
**easy** 29:6
**eat** 44:6
**education** 9:8
**ehobbs** 2:6
**eight** 16:16
**either** 5:13 36:23
38:4
**electronic** 37:18
39:9
**electronically**
37:16 68:23
**emergency** 74:21
**employed** 8:15
74:16,17
**ended** 22:9 50:5
55:5
**enormous** 42:18
**enter** 32:16
**entered** 16:21
58:22 59:8 60:11
**enthused** 19:22
**entities** 50:6

**equipment** 14:13
15:11,11,17 22:3,4
22:5,11 23:24,25
24:3,11,13 25:2,12
25:13,15 26:3,11
26:25 27:1,8 29:8
31:9,10 38:1 39:5
39:11 41:1,14,17
41:20,21 42:19
44:16,17 45:2,15
47:7,24,25 50:21
50:22 51:12,22,23
51:24 52:6 53:17
57:1 60:21,23
61:13,21,25 62:2,3
62:6,9,10,10,12,16
62:17 69:21 72:12
**eric** 2:3 4:8 5:2
16:3 30:5 38:22
39:22
**erin** 1:25 2:23 6:5
74:4,25
**especially** 64:15
**esquire** 2:3,8
**essentially** 61:19
**estimate** 48:23
**et** 4:4
**evening** 56:15
**events** 54:24 56:22
**eventually** 20:11
48:2 51:5 73:6
**evers** 9:16
**everybody** 32:22
40:18 61:25 66:9
**everyplace** 49:6
**exact** 31:24 44:24
51:21
**exactly** 23:6 25:7
34:21 52:18 58:21
**examination** 4:21
54:17 70:13 74:11

**examinations** 3:1
**examined** 4:19
74:11
**exceed** 32:4
**excited** 69:20
**exhibit** 3:8,9,10
12:13,14,21,23
13:16 33:8,11,13
37:10 38:2
**exhibits** 3:7
**expecting** 31:6,7
**expiring** 55:11
**explain** 7:10 29:14
31:13 49:7 56:11
61:5
**explained** 32:1
56:11 71:2,12
72:4
**explaining** 72:15

**f**

**f** 1:9,11
**fact** 25:20 56:20
67:13 68:13
**fair** 61:2,10,14
65:18 69:19 71:1
71:19
**fairly** 52:25
**falling** 36:8
**familiar** 59:25
65:16
**family** 62:14
**fan** 66:17
**fancy** 70:16
**far** 17:10 22:2
24:19 27:4 46:2
**fast** 24:6,19 39:6,7
**fdw** 1:4
**feeding** 19:23
**felix** 57:23,25,25
58:2 60:20 61:5
72:3

**felt** 27:1
**file** 50:18
**filed** 50:10,24 51:2
51:8 64:2
**filing** 50:5
**final** 36:13 52:23
**finally** 41:6 47:12
47:20 48:2 49:8
49:10 69:10
**financially** 74:18
**financing** 64:7
67:12 68:3,3,7,13
**find** 6:18
**fine** 16:8 22:7
**finish** 6:9 9:11
35:10
**finished** 9:10
**firm** 4:9,12,14
**first** 4:18 5:4 7:16
11:6,12 13:15
14:3 17:18,22
25:24 40:14,21
41:3 47:22 48:19
53:15 55:25 57:10
60:11
**five** 9:3 54:5,10
**flip** 37:20
**flipping** 17:18
**florida** 2:10
**focus** 21:16
**follow** 22:17 24:23
35:23 46:9 54:3
70:11,11
**follows** 4:20
**forced** 5:5
**forgot** 23:3
**form** 18:16,21
20:10,25 21:21
23:3,14 25:6,19
26:18,20 28:3,4,9
29:1,18,22 30:7

31:3 32:11,13
36:19 37:5,15,17
38:7,21 39:2
42:25 43:4,17
46:14,25 50:11
51:17,20 53:3
61:16 63:9 68:1
71:18 72:22,25
**format** 65:10
**forth** 68:8
**found** 6:16
**foundation** 21:1
28:8 61:16 68:1
**four** 7:24,24
**frame** 23:16,17
47:10
**freeze** 70:17
**front** 16:11,17,18
17:2,20,21 53:18
**full** 7:16
**fun** 10:1
**fund** 8:18 9:4
**further** 9:17 24:24
36:21 37:3 42:22
70:9 72:8 73:13
73:14 74:15

**g**

**g.s.** 74:22
**garage** 40:19
**general** 11:5 30:19
**generally** 14:16
16:1 18:5 41:3
**gentleman** 20:12
20:15,15 35:21
39:4 47:2 49:8,19
57:19,21 69:2
71:9
**gestures** 72:20
73:9
**getting** 22:7 37:9
41:9 47:4 55:10

71:23
**ghost** 46:20
**give** 16:10,24 22:8
48:3
**given** 5:18 37:8,20
52:4 74:13
**giving** 29:7 62:4
**go** 6:2,2 9:17 12:3
12:6 14:15 15:20
15:21 17:10,24
18:9 20:3,7,13,19
21:24 22:14 23:16
24:3,24 28:9 31:4
31:18 36:7,15
38:6,19 40:1 44:1
44:2,2,17 46:7
50:18 54:9,11
59:22 68:21 70:21
**goes** 41:24
**going** 10:2 12:13
12:14,14 13:14,24
15:22 17:22 23:7
24:19 25:22 26:9
29:11 30:6,9
31:11 32:5 33:8
38:2 39:8 40:19
42:4 44:19 46:15
47:1,2 54:7 60:10
60:12 61:9,23
63:12,13 70:10,18
72:1,25 73:7
**good** 4:11 23:10
25:15 53:24 54:5
54:19
**goodman** 10:24
**gosh** 20:16
**gotten** 27:16 28:22
**goya** 6:16
**graduating** 71:22
**great** 23:25 29:24
58:2 71:8

**greatly** 45:2
**greenberg** 2:9
4:12
**greg** 65:19 69:5
**gregory** 2:8 4:12
**ground** 16:17
22:16
**gtlaw.com** 2:11
**guess** 19:16 24:6
39:23 44:10 69:5
71:5
**guilford** 74:1
**guy** 39:12 44:16
47:1 57:22
**guys** 15:8

**h**

**half** 8:4 39:12 41:8
**hall** 40:16
**hand** 73:9 74:19
**handle** 34:5
**handled** 32:20,23
38:23
**handwritten**
14:14
**hang** 49:1
**happen** 18:6 39:7
66:6
**happened** 17:12
18:10 29:4 34:25
36:18 69:3
**happening** 36:17
**happy** 16:1,4 70:5
**hard** 20:4 70:12
**hardy** 2:3 4:9
**head** 52:15 57:21
**headquarters** 38:5
**headset** 70:16
**hear** 22:21 49:22
51:2 56:6 66:25
70:19

**heard** 12:9 46:21
48:6,7 57:12 58:7
58:21 59:9,11
60:14,15 67:4
**hearsay** 28:7
**help** 7:11 31:9,20
**herbert** 2:8 3:3
4:11,12 18:16,25
19:4,12 20:10,25
21:6,21 23:2,14
25:6,10,19 26:18
26:20 28:3,6 29:1
29:18,22 30:5,15
31:3 32:5,11,13
36:19 37:5,17
38:7,21 39:2
42:25 43:4,17
45:20 46:14,25
48:9 49:11 50:11
51:17,19 53:3
54:1,18 70:8,22
71:18 72:13,22,23
72:24 73:13,14
**herbertg** 2:11
**hereinafter** 4:19
**hereinbefore** 74:7
**hereto** 74:17,19
**high** 27:9
**highest** 9:8
**hmm** 13:21 14:5
26:1 35:17 66:10
**hobbs** 2:3 3:2,4
4:8,8,22 5:2 18:18
19:7 28:12 53:25
54:9 61:16 63:9
64:10 67:23 68:1
70:10,14 73:12
**hold** 8:22 67:23
**holding** 49:9
**home** 1:9,11,11
4:4 5:10 8:6 10:18

11:6,7,13,17,19,21
14:7,17 16:2,5,18
17:4 19:19,21
20:2,6,7,9,23 21:3
21:19 25:3 28:22
30:13 31:12,16
33:2 35:13 38:4
39:11 41:4,7,10,11
41:14,20 46:11
52:3,12 65:6 71:4
71:16
**homeowner** 36:3,5
**honest** 23:1
**hornets** 66:1,13
**horrible** 47:19
**hour** 39:13 41:8
**hours** 29:23 30:24
**house** 16:11 19:14
19:18 32:23 40:25
47:24 56:1 62:11
**household** 36:12
**hung** 49:2
**hunter** 9:16
**husband** 19:19
20:8,14 29:3
33:25 38:14 55:23
56:1,5 58:25
61:11 62:23 63:23
64:12,14 65:9
68:9,15 69:6 70:4
**husband's** 9:20
13:10 36:5

**i**

**idea** 68:21
**identification**
12:24 33:14
**immediately** 30:1
**important** 53:16
**impose** 32:5
**impressed** 61:11

**improper** 28:8
**incorporated** 4:3
4:4
**index** 3:1,7
**indiana** 49:3
**indicate** 26:16
**indicated** 22:20
55:24 57:6,12
59:7,16 62:24
65:16 67:21 68:12
**individual** 20:21
**induce** 32:9
**inferior** 61:7
**informed** 58:6
**initial** 15:3,4,4
23:18 49:14 55:22
56:4,6
**initially** 11:25
12:6 15:15 20:24
21:5,20 29:4 57:9
57:19 59:8
**inside** 20:6,8
**install** 24:3 39:5
**installed** 11:13,14
14:17 45:2 52:8
**installer** 42:23
**insurance** 8:18,20
9:4
**integrate** 41:19
**interacted** 30:11
30:23 35:13
**interaction** 17:7
17:11 18:6,14
19:10,17 20:5
24:24 34:17 38:15
55:10,22 56:14
59:4 62:22
**interactions** 15:23
53:7
**interested** 69:20
69:24 74:18

**interrupt** 18:25
22:15 24:18 44:2
**introduce** 4:6
**involved** 67:14
70:3
**issue** 28:25 44:9
48:20 63:2 64:6,7
71:5 72:9
**issues** 40:6 48:17
50:25 52:2

**j**

**j** 7:18
**job** 2:19 46:2
**jobs** 6:8
**join** 5:9
**joining** 4:23 5:5
11:19
**jordan** 66:6,7
**joyce** 1:18 2:22
4:2,17 7:18
**judge** 5:25
**jump** 66:18
**jumping** 24:7
**jury** 7:10,11,13
16:13 24:21 31:2
32:9 40:10 50:9
72:20

**k**

**k** 1:9,11
**keep** 24:1 70:12
**kept** 29:7
**keypad** 14:24 15:5
**keypads** 15:4
**kind** 5:15,20,21
14:2,13,24,25
23:16 24:24 26:12
27:11 43:14,20
59:16 72:15,20
**kindly** 6:6

**knew** 31:18
**knob** 26:6
**knocking** 24:8
73:5
**know** 4:23 5:20
6:15,25 12:3,5
14:22 15:8 16:7
20:4 22:6 24:15
25:7 29:10 30:1
31:8 36:6 38:10
38:22 39:19 40:15
42:4 44:5 46:1
47:5 48:3 50:2,13
50:15 51:24 53:20
53:20 56:12 58:16
59:12,21 60:9
66:7,14 67:2,12
69:12,13,14 71:24
**knowledge** 74:9
**knows** 66:9 71:25
**kwakou** 10:10

**l**

**l** 9:21 10:14,23,23
**lack** 41:19
**lacking** 28:8
**late** 40:24,24 41:5
41:9
**law** 4:9,12,14 5:6
**lawsuit** 5:3
**lawyer** 32:21 48:3
**lawyer's** 6:24
**lead** 32:10
**leading** 21:1 31:3
73:2
**led** 23:6 45:12
**left** 13:16 14:13
35:15 37:22 39:12
41:7 42:11 47:8
50:21 55:11
**legacy** 1:10

**length** 50:18
**letter** 26:10
**letters** 50:14
**letting** 22:6
**level** 9:8
**life** 8:11,14
**liked** 36:7 57:1,5,7
**line** 28:7 39:8
**listening** 4:13,16
**literally** 31:9
**little** 14:2 27:23
  34:24 40:3 45:13
  55:21 60:10 62:20
  63:17 64:10 65:13
  69:20,24 70:16
**live** 10:18,20,25
**lived** 7:6 8:3,5
  11:16
**lives** 57:13 65:22
  70:23 71:15 72:8
**living** 14:19
**llp** 2:3
**loan** 22:10 29:11
  31:9,10
**lock** 27:2 41:25
  42:1,12,12,13,15
  45:25 46:1 47:9
  63:3,4
**locking** 42:3
**logo** 59:12
**logos** 60:1
**long** 7:23 8:10,22
  9:5,22 30:22
  39:10 49:9
**look** 17:13,22 18:2
  18:9 32:20 44:12
  47:20 50:13 52:14
  53:18,21 70:2,6
**looked** 16:13 33:5
  37:25 59:13

**looking** 34:13 45:6
**looks** 15:12 17:18
  45:6 60:6 62:11
**loop** 8:2
**lose** 70:18
**lot** 22:15 57:7,17
  70:25
**love** 47:6
**loving** 29:8

**m**

**m** 7:19
**mail** 5:13 31:23
  37:13,24 69:11
**mailed** 37:7 48:6
**mails** 46:6
**main** 14:24
**maker** 36:13
**making** 25:12,14
  36:9 65:21
**man** 24:8
**manner** 18:22
**manufactured**
  25:3
**mariso** 1:18 2:22
  4:2,17,25 7:18,20
  9:18 10:9,13
  12:20 17:15 18:18
  21:14 23:2 28:4
  28:13 30:9 32:14
  33:2,10,20,22,24
  48:12 54:1,19,20
  54:22 70:9,15
  72:24 73:15
**mark** 12:14,21
**marked** 3:8 12:23
  13:15 33:8,11,13
**marks** 14:14
**married** 9:18,22
**mask** 20:12 40:8,9
**master's** 71:24

**matter** 4:3 31:14
  32:1 47:10,24
  57:14 65:22 70:23
  71:15 72:8
**matters** 74:10
**matthew** 4:14
**mean** 16:7 19:14
  19:15 24:18 36:5
  44:2 53:17
**medgar** 9:16
**memory** 38:17
  39:23
**mention** 60:19
  64:2,7 73:4
**mentioned** 22:20
  49:21 50:4 58:1
  63:19 64:6 65:14
**messages** 17:22
  45:9
**michael** 66:6,7
**middle** 14:3
**mind** 68:11
**minimal** 24:1
**minus** 8:11
**minutes** 5:15
  48:25 54:6,10
**misconception**
  61:20
**misheard** 43:10
**misled** 69:15
**misspoke** 43:9
**misunderstand**
  47:5
**misunderstanding**
  61:21
**misunderstood**
  47:3
**mm** 13:21 14:5
  26:1 35:17 66:10
**modern** 57:2
  61:14

**mom** 10:20 11:3
**mom's** 14:19 40:2
**moment** 12:15
  15:9 21:12 25:1
  26:2 49:21 50:4
**moments** 11:15
**mommy** 71:11
**money** 24:16 31:5
  33:16 45:18,24
  48:4 50:2 51:13
  51:14 52:20 55:15
  55:16
**monitoring** 14:7
**monthly** 14:6
**months** 55:7,11
**morning** 4:25
**morrisville** 8:2,3,5
**mosaic** 1:10
**mother** 10:20
**motion** 49:11
**mouse** 12:18
**move** 8:7 30:7
  32:6 45:20 48:9
  64:19
**moved** 7:25 8:6
  13:23
**movement** 57:14
  58:13 65:15 70:24
  71:16
**moving** 24:6
**mysterious** 41:1

**n**

**n** 10:13,14,14,14
**name** 5:1 7:16,18
  9:14,15,20 10:22
  13:5 17:23 19:20
  20:16,17 28:25
  29:9,10 32:24
  33:3,6,19 34:3
  35:16,18 36:6,10
  36:11 39:14 47:21

60:14 73:7 74:7
**named** 57:22
**names** 10:8,12
**nature** 27:1 58:15
  71:20 73:10
**naylor** 10:9,14,16
**necessary** 10:23
  73:8
**need** 14:14 54:4
  62:24
**needed** 24:4 46:4
  62:21
**neither** 74:15
**never** 9:10,11 17:1
  43:18 46:2,19,20
  59:9,11 64:22,24
  67:4
**new** 5:6 7:6 8:9,10
  8:14 9:12 12:11
  13:13 41:21,21
  59:10 62:10,16
**news** 66:2,22
**nia** 10:9,13,16,25
  11:3 28:17,24
  30:12 32:18 33:15
  33:20 36:22,23
  37:19 38:4 58:23
  64:24,25 65:4,11
  67:7
**nice** 14:21
**night** 24:7,9 26:4
  37:11 40:24,25
  68:20
**nine** 24:8
**nonresponsive**
  30:8 32:7 45:21
  48:10
**nope** 11:3 47:23
  64:15 67:15,15
**north** 1:2 2:24 7:2
  7:5,21 8:3 12:10

66:16 74:1,5
**notarization** 74:21
**notary** 2:23 74:4
  74:25,25
**note** 18:22 23:3
  30:6
**notes** 47:21
**notice** 29:25
**number** 3:8 13:8
  13:10 74:25

---

### o

**o** 7:18,19 10:14,14
  10:14
**o'clock** 24:9 40:25
**oath** 74:11
**object** 18:16,20
  19:5 20:10,25
  21:21,22 23:3,14
  25:6,19 26:18,20
  28:3,4,6 29:18
  31:3 32:11,12
  36:19 37:5,17
  38:7,21 39:2
  42:25 43:4,17
  46:14,25 50:11
  51:17,19 53:3
  61:16 63:9 67:24
  68:1 71:18 72:22
  72:25
**objecting** 32:13
**objection** 6:1
  18:19,22 19:1,9,12
  21:4,6 25:10
  28:12 30:6,15
  32:6 43:7 45:20
  49:11
**objections** 5:24
  6:1 21:23 28:14
  73:1
**obstacles** 5:9

**ocean** 10:3
**octagon** 16:15
**offer** 22:6
**offered** 12:8
**office** 6:25
**oh** 8:23 16:22
**okay** 4:23 5:16,17
  5:20 6:4,4,20 7:5
  7:8,8,15,15,18,25
  9:1,5 10:11,25
  11:2,4,12,15,22
  12:9,13,17,20 13:1
  13:3,5,11,14,19,24
  15:2,6,9,19,20
  17:3,8,17,24 18:1
  18:4,12,23,24 19:3
  19:4,24 20:1,13,19
  20:22 21:3,11,18
  21:25 22:13,19
  23:5,5 24:22,25
  25:16,23 26:12,14
  26:22 27:5,11,18
  27:21 28:1,5,6
  29:9,13 30:17,21
  30:25 31:20 32:12
  33:1,12,19 34:10
  34:12,21 35:2,15
  35:20,23 36:7,12
  36:21 37:1,14
  38:2 39:8,21,21
  41:2,18,22 43:8,20
  43:25 44:9,21
  47:2 48:15,18
  49:12,25 50:4
  52:1 53:25 54:7,9
  54:22 56:4,8,12,23
  56:24 57:17 59:12
  59:15 60:6,10,18
  61:2,2,23 62:3,9
  62:16,20 63:17,17
  64:6,25 65:25

66:4,15,25 67:11
  67:16,19 68:2
  69:10 70:19,21
  71:13 72:13,24
  73:12,16
**old** 10:15 29:11
  59:3
**once** 26:24 46:19
  51:23 52:2 70:2,5
**oops** 61:17
**open** 14:22
**operates** 62:12
**opportunities** 5:23
**opportunity** 37:20
  54:2
**opposed** 5:7
**orange** 2:9
**order** 15:21
**orlando** 2:10
**outside** 19:14,20
  20:7 53:19
**override** 26:7
  41:25 42:6,10
  46:16 63:4
**overriding** 43:14
**overtook** 29:4
**owed** 24:16 26:11
  27:9,9

---

### p

**p.m.** 2:25 4:5
  54:13,16,16 73:18
  73:19
**package** 14:13,21
  15:11 35:22 59:20
**page** 3:2,3,4 13:15
  14:3
**paid** 45:18
**pandemic** 5:5 40:5
**panthers** 66:15,16
  66:22

**paper** 37:16 68:18
**papers** 17:19
31:23
**paperwork** 12:6
23:20 31:16 38:20
39:9 70:3
**paralegal** 4:15
**part** 12:7 16:9
18:9 61:10,22
72:14
**particular** 30:18
35:2 57:6
**parties** 74:17
**patient** 47:3
**paula** 4:15
**pause** 44:19
**pay** 22:11,11 31:6
31:7,9,10,25
**paying** 14:6,9 27:8
47:13
**peace** 18:20
**people** 45:17 46:6
48:7 67:3
**perceived** 61:13
**period** 55:6
**permission** 27:21
**person** 5:7 32:15
39:14 64:23 71:25
74:7
**personally** 32:16
35:24 58:3 67:4
**perspective** 62:11
**persuade** 22:1
**phillip** 9:21,22
10:4 11:3 33:22
33:24 36:23 37:20
38:4 58:25
**phone** 13:8,10
17:21 21:7 38:5,6
38:18,23,24 39:1
43:23,24 44:4

45:7 46:19,22
48:24 53:22 56:25
57:10 64:16,21
65:10 67:6
**physical** 15:1
**picture** 52:8 54:22
**pitch** 56:4,6 62:14
71:22
**place** 16:18,24,25
18:15 19:10,18
**placed** 38:5 40:17
**placement** 40:22
**plaintiff** 1:7,19 2:2
2:23 4:10,18 5:3
**plaintiff's** 12:23
33:13
**played** 7:13
**player** 66:7
**please** 4:6 5:15
26:23 28:9 44:7
44:25 45:1,14
**plus** 27:9
**point** 16:20 20:7
25:22 27:12 29:19
30:11 43:20 49:22
52:3 63:7
**position** 8:19 9:3
**possible** 20:4 24:2
24:4 27:25
**practice** 5:5
**present** 36:23 67:7
**presented** 12:5
37:2,15,19 69:3
**pretty** 41:9 61:22
**price** 53:23
**pricing** 64:6
**prior** 55:10 62:7
62:17 65:6
**probably** 13:9,9
31:22 47:20 48:8
69:5,8

**problem** 46:9
48:12 68:11
**problems** 16:6
43:14
**proceed** 5:21
**process** 5:21 48:13
54:24 55:5 64:19
**produced** 1:25
**product** 22:1
**products** 53:1
**promised** 32:2
47:6
**protesters** 65:23
**provided** 14:25
15:16
**provider** 11:9 12:1
65:6
**providing** 15:16
16:9
**public** 2:23 74:4
74:25
**pull** 12:13 14:12
15:22 33:8 38:2
**pulled** 33:10
**pushed** 72:6
**put** 16:10 24:11
29:9 32:3,24 34:3
36:10,11 40:15,20
41:1,15,16,21,23
42:13,19 44:7,15
45:15,25 46:15
56:17
**putting** 18:21 31:8

**q**

**question** 6:3,10
13:24 15:10 18:21
18:23 19:6,8,16,17
21:1,24 27:12
30:19 31:11 32:14
35:2,10 36:16
37:6,14 39:22

41:18 43:13 48:14
48:19 51:20 54:23
60:18 65:19 68:10
72:25 73:1,2
**questioned** 7:3
**questioning** 28:7
**questions** 5:23
11:5 17:16 18:17
20:5 22:17 24:23
25:23 28:14 29:13
30:10,18 33:2
35:24 38:6,19
39:9 41:2 44:20
48:13,16 52:1,23
54:1,2,4 56:19
64:14,17,18,19,23
65:2,7,9,11 67:7,9
67:12,18 70:9,22
72:14 73:13,14
**quickly** 19:1
**quite** 60:15

**r**

**r** 7:19 10:14,14
**ramsey** 1:25 2:23
6:5,11 74:4,25
**range** 53:19
**reach** 45:22
**reached** 46:17,22
**reacted** 31:2
**reaction** 71:14
**ready** 21:15 37:9
**really** 12:11 22:25
23:10 44:12 48:7
57:1,5
**reason** 5:11 7:11
42:7,10,14 61:10
61:22 67:20
**reasons** 29:7 58:18
64:3
**recall** 9:14 15:15
17:11 20:24 21:4

21:20 23:18 31:15
36:21 37:1 38:4,8
38:9,25 39:14
41:3,6 48:20
52:16 55:9 60:6,8
60:19,20 65:4,6,20
65:23,24,25 66:19
67:11 68:4,7
70:24 72:18
**receive** 68:17,19
68:20
**received** 30:23,25
42:17 45:24
**recess** 54:14
**reciting** 25:7
**recognize** 13:1,17
35:18
**recollection** 18:3
18:13 34:14 35:6
35:12 64:21
**recommend** 59:18
**record** 7:17 12:19
18:22 28:13 33:9
54:13,16 73:18,19
74:13
**recorded** 7:12
57:15
**recordings** 67:17
**recounted** 32:9
**red** 16:15
**reduced** 74:12
**reestablish** 5:14
**reference** 7:10
**refresh** 18:3,13
34:13 35:6,12
**refund** 51:12
55:16
**refunded** 45:19
51:25 55:18,20
**regard** 22:24 25:9
31:16

**regarding** 57:13
60:18
**rehash** 58:9
**related** 30:12
74:16
**relationship** 25:16
66:1,23 67:1
**remember** 22:25
23:5,19 28:19
30:22 31:23 38:24
39:17 44:14 47:21
49:18 50:16 51:14
51:21 52:14,15
56:25 57:3,11,22
57:23 58:3 64:16
66:5,6,11,14
**remembered**
39:21
**remove** 44:23 45:1
45:23
**removed** 44:6
**renewing** 55:6
**rep** 55:23,25 56:5
56:9 62:13,22
63:20,24 64:16
67:5
**reported** 1:24
**reporter** 4:7 6:5
**reporter's** 74:3
**reporters** 6:8
**representative**
20:17,24 34:17
38:18 39:3 49:14
52:24 61:19
**represented** 53:1
67:16
**requirements**
74:21
**resolution** 51:9
**resolved** 52:2

**respect** 44:11 71:6
**respond** 42:2,3
45:11,12 46:18
**response** 64:23
**responsible** 50:23
**result** 54:23 55:14
55:19 72:2
**retired** 8:16,17,23
9:4
**return** 45:17
**ridge** 8:2
**ridiculous** 30:4
**right** 10:19 13:19
13:21 15:18 18:8
20:3 24:12,14
28:5 33:21 35:3
40:19,20 49:23
50:16 52:5 54:1
54:12,20 55:3,7,12
55:15,18 56:2,6,9
56:14,18 57:8,10
57:19 59:5,9 60:2
61:9 62:18,25
63:5,6,8 64:8 65:2
65:11,11 66:7,9,21
67:16,22 69:3,7,17
69:21 70:6 73:17
**robinson** 10:10,14
**role** 8:22,23
**room** 6:25 7:1
14:19,19 36:23
38:14
**rule** 5:25
**run** 27:13,15,18
27:22,22 28:16
**running** 26:16
28:25

|  s  |
|---|

**s** 2:9 7:19 10:14
**sales** 34:17 52:24
55:23,24 56:4,9

62:13,14,22 64:16
67:5 71:22
**satisfied** 56:16
**saw** 55:3 69:11
70:3
**saying** 5:4 9:17
21:20 22:7 28:11
42:7,9 54:19
69:10
**says** 14:4,13 15:11
33:17,20 34:11
35:4 66:18
**screen** 6:24 12:15
12:20,22 33:10
**scroll** 13:14 14:2
68:25,25 69:1
**scrolled** 69:6
**scrolling** 34:1
**second** 15:24
36:22 67:13,23
**secondary** 25:14
**secondly** 53:16
**section** 14:14 40:2
**security** 1:6 4:3
5:3 65:6
**see** 5:19 12:21
13:5,15,19,22 14:4
15:13 18:13 32:20
33:11,15,17,20
34:11 35:16 37:7
40:18 47:21 52:15
53:18,22 66:2,21
71:21
**seen** 46:21
**sell** 72:1
**send** 44:16 50:2
52:11
**sense** 6:3
**sent** 46:6 51:21,22
**separate** 63:8,10
68:4

**september** 10:2
21:8,9,15 34:18
35:1 44:24,24
45:5,14 47:11
52:13,19
**series** 20:4 38:6,19
45:9 64:17 65:1
65:11 67:6
**serious** 70:24
**service** 8:21 12:1
38:18 47:19 49:14
53:15,23
**services** 13:25
53:1
**set** 17:24 68:8
74:19
**setting** 7:1
**share** 12:14
**shb.com** 2:6
**shook** 2:3 4:9
**showed** 68:18
**showing** 62:13
**showroom** 12:7
**sign** 16:10 17:1,3
26:15 32:19 34:7
35:25 36:4 59:13
60:6 68:22,25,25
69:1
**signature** 13:17,17
13:18,20 73:20
74:24
**signed** 26:24 27:3
31:10 32:15,18,19
33:15 34:3,6,20
55:2 58:23 59:2
59:15 64:12,25
68:9,15 69:6,7,17
69:23 70:4
**signing** 23:20
25:24 31:16,17
36:24 38:20

**signs** 60:1
**silly** 43:8
**similar** 62:12
**similarly** 6:5
**single** 14:15
**sits** 17:2
**sitting** 5:22 24:14
**six** 8:11
**skoal** 37:10
**sleek** 57:2
**slowly** 20:3,20
**small** 49:6
**smart** 1:9,11,11
4:4
**snow** 4:14
**sold** 35:21
**somebody** 35:16
49:15
**someplace** 19:18
31:23 40:17 49:4
**somewhat** 62:12
**son** 10:9,13,16,17
**soon** 24:2,3
**sorry** 18:18 19:16
22:15 23:2 26:19
28:4 30:5,5 35:9
35:11 39:22 43:9
44:18 46:8 48:3
48:11 51:18 61:3
68:22 72:23
**sort** 16:10 50:2,9
73:5
**sounds** 20:6 29:19
30:10 49:13
**space** 67:10
**speak** 19:2 29:5
49:7
**speaking** 18:5
31:12 38:24 39:3
**specific** 9:2 22:16
27:12

**specifically** 25:9
46:10 72:19
**spell** 7:16
**spend** 8:10 9:5
**spent** 48:24
**spoke** 32:22,23
39:4 49:13,22
64:22,24 71:7
72:3,4
**spoken** 43:18
**sportsman** 7:21
11:22
**spurred** 39:23
**staff** 49:6
**stand** 5:15
**start** 5:4 6:10 8:24
39:10
**started** 36:8 45:15
**starting** 70:17
**state** 2:24 8:18,19
9:4 74:1,5
**stated** 6:2 25:2
**statement** 23:11
61:14 63:3 65:18
**statements** 32:8,9
53:10 65:22
**states** 1:1
**stating** 28:12
**stenotype** 1:24
**steward** 4:14
**stick** 16:17
**stickers** 14:19
16:23,25 17:1
**strange** 5:21
**street** 2:4
**strike** 30:7 32:6
36:22 45:20 48:9
68:12
**stuff** 14:23 58:7
59:23

**subdivision** 25:21
**subject** 21:3 28:13
43:7 71:15
**subjects** 70:21
**substance** 21:16
**suggested** 59:17
**suite** 2:4,10
**summarized** 56:8
**summer** 17:7
70:25
**summit** 8:2
**supervisor** 8:21,25
48:2 49:20
**supposed** 46:7
**sure** 6:14 15:18,22
15:22 16:19 24:20
43:23 52:14 60:15
**surprised** 31:1
**surrounding**
70:23
**swap** 26:3
**swapped** 53:14
**swear** 4:7
**switch** 57:9,11
61:12 70:16
**switching** 61:23
**sworn** 4:19 74:8
**system** 11:5,7,9,13
14:16,24 16:1,4,9
29:16 38:11 40:11
41:11,21,24 42:15
43:21 44:6,7,11,23
45:23 46:13 53:13
53:14 62:25 71:6
71:17
**systems** 1:6 4:3
5:3 59:10

**t**

**tablet** 37:16 68:23
**take** 8:11 19:17
22:10 41:16 44:17

47:7,13 54:4,5,10
63:12
**taken** 1:19,20 2:24
39:9 48:1 52:9
54:14
**takeover** 64:3,8
**takes** 12:15
**talk** 15:23 17:6
25:16 26:12 30:2
32:21 44:9 49:8
55:21 56:21 62:20
72:8
**talked** 57:17,22
**talking** 19:20
38:17 47:15 53:18
55:25 63:21 72:7
**tape** 67:24
**teach** 71:21
**technical** 5:11
**technician** 43:13
43:19 52:11
**technology** 62:1
**telephone** 5:13
**tell** 23:23 24:13
42:8 46:10 63:11
**telling** 25:21 57:18
58:7 60:21 61:19
**tells** 14:22
**ten** 6:16,20 40:25
**term** 41:19
**terminated** 66:1
**terminating** 66:22
**terms** 18:5 19:14
35:6 37:2
**testified** 4:20
11:15 25:1,18
26:2 28:16 29:19
32:15 43:10 44:22
54:24 55:23 56:12
56:20 63:18

**testify** 74:8
**testimony** 6:21,21
24:20 25:8 28:18
30:7,14 32:6
45:21 48:9 62:21
69:13 72:14 74:13
**text** 30:1 35:1 45:9
46:19
**thank** 4:23 5:4,9
9:25 19:4 54:11
54:22 68:6 73:15
**their's** 25:14 46:16
**theirs** 24:5
**thermostat** 57:5
**thing** 7:8 24:2
29:23 40:14,21
50:3 53:19 57:6
60:17 63:13 68:2
73:3,9
**things** 22:17 24:14
25:1 26:13 36:8
38:23 57:18 58:20
58:20 67:2
**think** 5:19 6:17,18
11:15 16:15 17:23
20:16,17 26:2
34:23,25 44:14
53:19 57:6 60:3,8
60:12,24 63:11
70:8,10,15 71:19
**thought** 39:5 61:6
**three** 34:23 44:14
48:22,23 50:16
**thursday** 1:21
2:25 74:6
**till** 47:11
**time** 4:5,24 22:8
24:24 37:4 38:3
39:6 41:3,6 44:15
46:24 47:8,10,23
47:25 48:24,25,25

49:1,3,9 51:5 54:5
54:10,12,15 55:9
59:13 60:12,13
63:14 64:11 67:5
73:15,17
**times** 47:18 48:19
56:13
**timing** 18:5
**titled** 33:3
**today** 6:6 7:12
11:20
**todays** 4:4
**told** 6:7 23:9 24:10
27:20 38:10 42:8
43:11 47:5,22,22
47:22 56:9,25
62:24 63:20
**top** 13:5 14:12
33:17 52:15
**topic** 28:15 30:10
42:23 70:25
**total** 9:5
**touch** 42:5,17
45:18
**trail** 7:21 11:22
**transaction** 34:11
**transcript** 1:25
6:11
**transcription** 1:25
**transfer** 49:15,17
**transferred** 49:19
**traurig** 2:9 4:12
**travel** 5:8
**tried** 49:7
**true** 61:20 68:2
70:1 74:13
**truth** 74:8,9
**truthful** 53:6
**try** 5:13 18:25
19:1 47:16 48:13
48:14,16,20 63:4

70:12 71:20
**trying** 21:25 61:5
63:3,11 71:5,16
72:1
**turn** 11:4 17:6
26:13 44:9
**turnaround** 39:6
**two** 8:5 9:10,25
10:7,11 34:23
44:14 52:17 60:4
**type** 7:1 29:23
63:13
**types** 36:13
**typewriting** 74:12
**typically** 6:1
**typing** 6:6

**u**

**uh** 5:19,19
**ultimately** 7:12
25:24 26:3 53:12
70:2
**umbrella** 63:13,18
64:2,7 72:18 73:3
73:9
**understand** 7:11
7:14 28:18 35:25
43:8 49:3,5 50:6
71:21,25
**understanding**
30:14 43:2,15
73:6
**understands** 65:5
**understood** 8:13
8:15 36:9 63:7,14
67:21
**unfolded** 20:5
**united** 1:1
**units** 60:25
**university** 9:14,15
**update** 15:3

| | | | y |
|---|---|---|---|
| **upfront** 29:15 | 54:3 55:14,23,24 | 42:19 48:12 52:7 | |
| **upgrade** 62:3,17 | 56:5,17 57:1,18 | 53:20 67:22 | **y** 7:18 10:14 |
| **upgraded** 15:8 | 58:23 60:22 61:12 | **wearing** 40:8,9 | 17:2 56:1 63:21 |
| 61:24 62:1 | 62:13,22 63:8,12 | **week** 44:13,13 | **yard** 16:10,17 |
| **upgrades** 62:1 | 63:16,20,24 64:4 | 52:17 | **yeah** 6:21,22 8:5 |
| **ups** 70:11,12 | 64:13 65:5 67:5 | **weekend** 34:25 | 9:3 10:3,3 11:8 |
| **upset** 27:23 40:21 | 67:22 68:9,14 | **weeks** 9:25 | 13:12,18 14:23 |
| 40:23 45:13 | 69:17,20 72:9 | **wendell** 7:21 | 16:7,19 17:23 |
| **upstairs** 14:21 | 73:4,5,7,10 | **went** 9:11,15 22:2 | 19:25 20:11 21:13 |
| 40:1 | **vivint's** 25:11,13 | 26:15 28:20 44:10 | 21:23 23:10 24:20 |
| **use** 39:20 40:1 | 46:12 53:1 | 60:17 | 26:1 27:15,17 |
| 59:10 60:22 71:19 | **vivints** 60:4 | **western** 1:2 | 29:2 30:16 32:18 |
| 72:1,2 | **voice** 14:23 | **whereof** 74:19 | 34:6,6,20,20 35:19 |
| **usually** 42:7 | **vs** 1:8 | **whichever** 16:16 | 39:20,23 40:7,13 |
| **v** | **w** | **white** 16:15 60:8,9 | 40:14 41:8 47:9 |
| **verbatim** 22:25 | **waited** 47:23 | **winded** 22:9 | 52:10 57:17,20 |
| 23:5 | **waiting** 52:6 | **windows** 14:18,20 | 58:8,9,14 59:19 |
| **versus** 4:3 | **waived** 73:20 | 14:20 16:25 | 60:15,24 63:16,16 |
| **video** 7:12 64:13 | **wake** 74:7 | **wires** 59:23 | 64:20,21 65:20 |
| 64:15 74:21 | **walking** 17:4 | **witness** 2:22 4:7 | 66:13,18 67:10,10 |
| **videographer** 4:1 | **wall** 26:8 40:16,20 | 4:18 6:9 18:24 | 68:17,24,24 69:1,5 |
| 54:12,15 73:17 | 41:24 59:23 | 19:3,5 26:19,22 | 69:22 71:3 72:5 |
| **videotape** 4:2 | **want** 6:18 11:4 | 28:5,10 32:12 | **year** 8:4 18:6,7,7 |
| **virtually** 5:6,10 | 17:6 20:19 22:16 | 48:11 49:12 54:7 | 18:10,10 21:7 |
| **visible** 17:3 40:18 | 23:16 24:20 26:12 | 61:17 72:23 73:16 | 34:22 |
| **visited** 46:12 | 27:10,11,20 28:23 | 74:10,14,19 | **years** 6:15,20 7:24 |
| 53:13 | 30:2 31:18 35:3 | **word** 22:25 23:5 | 7:24 8:5,11,23 9:3 |
| **vivint** 1:9,10,11 | 35:23 36:6,11,16 | **words** 42:11 | 9:7,10,23 |
| 3:10 4:4 20:17 | 40:1 41:23 46:9 | **work** 8:17 26:7,8 | **yep** 13:23 14:5,11 |
| 22:1,21 23:7 | 47:24 50:1 56:18 | 29:15 30:13 40:10 | 23:22 57:24 |
| 25:15,17,20,22 | 56:22 58:9 69:13 | 41:19 42:21 46:12 | **york** 7:6 8:9,10,14 |
| 27:9,13 30:13 | 70:21 71:3 | **worked** 8:24 | 9:12 12:11 13:13 |
| 32:10,17,21,22 | **wanted** 25:8 34:8 | **working** 39:11 | 59:10 |
| 33:9,17 34:17 | 50:21 51:9 52:1 | 41:10 57:20 | **young** 71:24 |
| 37:3 38:5,19,20 | 55:21 58:18 59:21 | **works** 48:13 | **z** |
| 39:3 42:24 43:2 | 61:12 62:20 64:4 | **workshops** 12:3 | |
| 43:11,15 44:22 | 70:6 | **worry** 48:4 | **zero** 15:12,17 |
| 45:18,22 46:1 | **warned** 18:18 | **written** 14:3 15:12 | **zoom** 1:20 2:24 |
| 47:16,18 48:20 | **water** 54:8 | 68:16,17 | **zooming** 5:1 |
| 49:24 50:25 51:3 | **way** 5:6,13 6:10 | | |
| 52:2,6,24 53:14,19 | 8:24 28:19 31:2 | | |

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.