

1          UNITED STATES DISTRICT COURT
2      FOR THE WESTERN DISTRICT OF NORTH CAROLINA
3               CHARLOTTE DIVISION
4        CIVIL ACTION NO. 3:20-CV-00504-FDW-DSC
5

CPI SECURITY SYSTEMS,          )
6    INC.,                         )
                                   )
7                                  )
     Plaintiff and Counterclaim   )
8    Defendant,                    )
                                   )
9                                  )
     v.                            )
10                                  )
     VIVINT SMART HOME, INC.       )
11   f/k/a Mosaic Acquisition      )
     Corp.; and LEGACY VIVINT      )
12   SMART HOME, INC. f/k/a        )
     Vivint Smart Home, Inc.,      )
13                                  )
     Defendants and               )
14   Counterclaimants.             )
15
16        Zoom Video Deposition of JOHGRE HINTON
17        (Taken by the Plaintiff and Defendants)
18             Knightdale, North Carolina
19              Friday, August 20, 2021
20
21
22
23
     Job No. CS4749807
24   Reported by:    Marisa Munoz-Vourakis -
                     RMR, CRR and Notary Public
25

1 APPEARANCE OF COUNSEL BY ZOOM:
2 For the Plaintiff and Counterclaim Defendant:
3     CHARLES C. EBLEN, ESQ.
4     Shook, Hardy & Bacon L.L.P.
5     2555 Grand Boulevard
6     Kansas City, MO 64108-2613
7     816-474-6550
8     ceblen@shb.com
9
10 For the Defendants and Counterclaimants:
11     MATTHEW A. STEWARD, ESQ.
12     Clyde Snow & Sessions
13     201 S. Main Street, Suite 1300
14     Salt Lake City, UT 84111
15     mas@clydesnow.com
16     -and-
17     GREGORY W. HERBERT, ESQ.
18     Greenberg Traurig P.A.
19     450 S. Orange Avenue, Suite 650
20     Orlando, FL 32801
21     407-420-1000
22     herbertg@gtlaw.com
23 Also Present by Zoom: DELISHA HINTON
24 Also Present by Zoom: DeANDRAE SHIVERS, Videographer
25

1
2
3
4
5
6           O0O
7
8
9     Zoom Video Deposition of JOHGRE HINTON,
10 taken by the Plaintiff and Defendants, at Knightdale,
11 North Carolina, on the 20th day of August, 2021 at 1:01
12 p.m., before Marisa Munoz-Vourakis, Registered Merit
13 Reporter, Certified Realtime Reporter and Notary Public.
14
15
16
17
18
19
20
21
22
23
24
25

1        I N D E X
2 Examination of:            Page

3  JOHGRE HINTON
4     EXAMINATION BY MR. EBLEN . . . . . . . . . 5
5     EXAMINATION BY MR. STEWARD . . . . . . .22
6     FURTHER EXAMINATION BY MR. EBLEN . . . . .87
7     FURTHER EXAMINATION BY MR. STEWARD . . . .90
8     DEPOSITION EXHIBITS
9 EXHIBIT NUMBER    DESCRIPTION     PAGE

10 Exhibit 2  Mr. Hinton's LinkedIn profile   27
         page
11
 Exhibit 3  Bates number CPI 242     54
12
 Exhibit 4  Vivint contract     55
13
 Exhibit 5  Bates number 244     66
14
 Exhibit 6  CPI monthly charge sheet     77
15
16
17
18
19
20
21
22
23
24
25

1     P R O C E E D I N G S
2     THE VIDEOGRAPHER: This is the
3 beginning of the videotape deposition of
4 Johgre Hinton in the matter of CPI Security
5 Systems, Incorporated versus Vivint Smart
6 Home, Incorporated, et al.
7     Today's date is August 20, 2021, and
8 the time is 1:01 p.m.
9     Counsel please introduce yourselves,
10 after which our court reporter will swear in
11 the witness.
12     MR. EBLEN: This is Charlie Eblen
13 representing CPI, the plaintiff.
14     MR. STEWARD: Matt Steward of Clyde
15 Snow on behalf of the defendants. Also on
16 the Zoom deposition today is Gregory Herbert
17 of Greenberg Traurig also representing the
18 defendants.
19 Whereupon, JOHGRE HINTON, having
20 been first duly affirmed, was examined
21 and testified as follows:
22     EXAMINATION BY COUNSEL FOR PLAINTIFF
23     BY MR. EBLEN:
24 Q.   Good afternoon, Mr. Hinton. How are you?
25 A.   Doing well, thank you. How about you?

1    Q.    I'm doing well.
2          Could you please introduce yourself?
3    A.    Johgre Hinton.  I am a customer of CPI as
4    well as Vivint, living at the address 1319 Gaby Lane,
5    Knightdale, North Carolina.
6    Q.    How long have you lived at that address?
7    A.    Since June of 2015.
8    Q.    Who all lives in your home with you?
9    A.    So me and my wife Delisha.
10   Q.    And you mentioned that you're a customer of
11   CPI and Vivint?
12   A.    Yes, recently -- go ahead.
13   Q.    Go ahead.  Do you have a system both from
14   Vivint an CPI?
15   A.    I was originally on a contract with CPI
16   when we started living here.  The contract with CPI ran
17   out in June of last year, 2020, so it was a five-year,
18   60-month agreement.  Started a contract with Vivint in
19   November of 2018.  So I'm currently not a customer of
20   CPI but just a customer of Vivint.
21   Q.    And we'll talk in some detail about your
22   relationship, both with CPI and Vivint, but to get a
23   little more background from you, could you give me an
24   idea of your educational background?
25   A.    Sure.  I'm a degreed engineer from North

1    Carolina State University, civil engineer.  I have a
2    master in business administration from the University
3    of North Carolina, Chapel Hill.
4    Q.    What kind of work are you in?
5    A.    I am a manager over a couple of different
6    engineering, engineering technology groups for the
7    local utility company.
8    Q.    All right.  Drawing your attention now back
9    to your relationship that you had with CPI, for how
10   long did you have a contract with CPI?
11   A.    My contract with CPI was for 60 months,
12   five years.  It started in June of 2015.
13   Q.    Were you pleased with your product and
14   service that you had with CPI?
15   A.    Yes, we were pleased with the service.
16   Q.    Did you have any problems with CPI?
17   A.    There was no problems with CPI.
18   Q.    All right.  And as I understand it,
19   sometime around November of 2018, did you have some
20   interactions with a representative from Vivint?
21          MR. STEWARD: Objection, leading.
22          BY MR. EBLEN:
23   Q.    You can answer.
24   A.    So our first interaction with Vivint we
25   were at the BJ's, which is the local wholesale store.

1    Vivint was in the store.  They had representatives in
2    the store and they stopped us.  We had a conversation.
3    They told us how we could save money with -- you know,
4    that kind of sparked our interest from there.
5          Later on, they had a representative to come
6    out to the house where we could talk more in detail
7    about what they would offer and the cost of the
8    service.
9    Q.    Tell me everything that you remember about
10   your interaction with the Vivint representatives in
11   BJ's?
12   A.    So in BJ's it was just, you know, regular
13   day of -- regular shopping trip.  They were in there.
14   We've seen signs, but you never really, you know,
15   looked at it or had any interest of switching companies
16   at the time.  We were satisfied with our service.
17          They asked who our current security service
18   provider was and informed them it was CPI, and then
19   they told us that, you know, they could probably beat
20   their rates.
21   Q.    At the time you met with the Vivint
22   representatives in BJ's, did either of them make any
23   sort of representation that they had an affiliation
24   with CPI?
25          MR. STEWARD:  Objection, leading.

1    A.    So I don't recall if in the store they said
2    that, you know, they had any affiliation.  It was later
3    when a Vivint representative was in our home is when
4    those -- the conversations that they had affiliation
5    with CPI came up.
6    Q.    Okay.  So fast forward when the Vivint rep
7    came out to your home, do you recall about how much
8    time past before the rep came to your home?
9    A.    It was when we got home.  Our typical
10   grocery shopping is like three hours.  So from the time
11   we're shopping, you know, get back home, put the
12   groceries away.  So it was probably about two hours
13   maybe that -- if that.
14   Q.    It was the same day though?
15   A.    It was the same day, yes.
16   Q.    Was it one of the same representatives who
17   was in the store or a different person?
18   A.    No, it was a different representative.
19   They probably wouldn't have been able to get more
20   customers if the person from the store came to the
21   house.
22   Q.    Do you remember the name of the gentleman
23   who came to your house, or was it a woman or a man?
24   A.    It was a male.  His name is Craig.
25   Q.    Do you know Craig's last name?

3 (Pages 6 - 9)

1     A.   Craig Darrow.
2     Q.   And when the Vivint representative Craig
3 came to your home, tell us what all he represented to
4 you about Vivint?
5     A.   Well, he basically told in addition -- I
6 don't know if it's relevant or not -- but when he was
7 telling us that they could save us some money, my
8 mother, she didn't have a -- at the time she didn't
9 have a service, a security service. So I invited her
10 over to the house. So basically it was a sales pitch
11 coming to two customers at a time.
12     So with, you know, going through that, he
13 basically was telling us how we didn't have to pay for
14 additional equipment, because they could just take over
15 the equipment here at the house. And that kind of made
16 me question like how are you able to -- how is a
17 different company able to take over another company's
18 equipment? And that's when he started to allude to that,
19 you know, they were working together.
20     Q.   You said he alluded to them working
21 together. Tell us specifically what all you remember
22 the Vivint representative saying about any relationship
23 with CPI?
24     MR. STEWARD: Objection to form.
25     Mr. Hinton, I apologize, I periodically am

1 going to make an objection to the form of
2 the question, and I apologize, I know that
3 interrupts you, but unless you're instructed
4 not to answer, which is very unlikely to
5 happen, go ahead and answer the question
6 after I've made the objection.
7     Does that make sense?
8     THE WITNESS: Yes.
9     MR. STEWARD: Thank you.
10     A.   You want to repeat the question or?
11     Q.   Yeah, sure. I can repeat it for you.
12     So tell us everything you recall about your
13 conversation with the Vivint representative about CPI
14 having any relationship with Vivint?
15     MR. STEWARD: Objection to form.
16     Go ahead, Mr. Hinton.
17     A.   So when he was saying that he didn't have
18 to install any new equipment, because he could
19 basically take over the equipment that they have, he
20 was saying that CPI's equipment was older, but it was
21 of the same version of what Vivint would install, and
22 that, you know from there, it was like so are you a
23 partnership? Are you working together? And he was
24 like you know, like yes, you know, we kind of work
25 together, and things of that nature. No clear answer

1 and direction, but still, still kind of iffy and things
2 of that nature. Ran it by my wife. She, you know, was
3 still comfortable with it, so we proceeded at that
4 time.
5     Q.   On that day, based on what you just
6 described, did you have the impression that there was
7 some sort of a connection between CPI and Vivint?
8     A.   Yeah, so from not getting clear answers,
9 and then just when I think of security, I think of this
10 one company is the only person that has access to their
11 equipment. I don't think of well, this one company and
12 any other security company who wants access to their
13 equipment can have access to it. To me that's just an
14 uncomfortable feeling.
15     So, you know, those are the questions that
16 I was asking trying to get clarity around that, and
17 then that's when he eventually was basically like oh,
18 yeah, we're one in the same and left it at that.
19     Q.   Did you find out later whether or not that
20 representation was true?
21     A.   Yeah, found out through -- it was around
22 June of last year when we found out that representation
23 was not true. There was some additional charges that I
24 was -- that was on my credit card. And basically, I
25 guess up front, Vivint was giving us the difference of

1 the cost that it would be for CPI. So I guess they
2 couldn't buy us out of a contract, but they could give
3 us a discount for it.
4     So then when I started seeing the charges,
5 that's when I called and asked about it.
6     It was also around the same time CPI, you
7 know, they see you and said what they said, the
8 customer rep was thinking that's why we were leaving
9 the company, but it was just time for either renewal
10 or, you know, just part ways.
11     So I was telling the customer rep, well, we
12 have a contract with Vivint, so we're not going to
13 renew. We're not going to continue to carry, you know,
14 two contracts, and we're not getting a discount from,
15 you know, Vivint anymore to cover CPI. So we was just
16 going to part ways, and that's when the customer rep
17 had started informing me that Vivint had, you know, was
18 doing some misleading practices and things of that
19 nature. And when I called Vivint to see if I could,
20 you know, terminate the services, there was some term
21 that the customer rep had given me to mention to the
22 Vivint rep, and he was saying well, we can't let you
23 out of the contract, but you can buy your way out, and
24 that -- I was like almost payment of hundred -- you
25 know, short of $800, and then a notice of cancellation.

1    Q.  Do you feel like the Vivint sales rep who
2  came to your home was honest with you?
3    A.  No, I don't think so.
4    Q.  And why is that?
5    A.  It's pretty evident now. You know, we was
6  quoted for 39.99 a month. We were paying $50 a month
7  with CPI. We were quoted 39.99 a month, and then like
8  now, like the total charges are somewhere around $61 a
9  month.
10     So, again, one, that's not savings. We're
11  actually paying more for equipment that we already had.
12  They did install some newer equipment and gave us a
13  doorbell with a camera, some lighting smart lock, the
14  Google mini, so they did add some additional equipment,
15  but all the other equipment, as far as sensors and
16  things of that nature, was already installed on the
17  house.
18     Then also just having conversations with
19  the customer rep, and then they instructed me it's like
20  you can do your own research. I don't want to kind of
21  lead you to believe with anything. So just go look up
22  on the Better Business Bureau, and when I looked up
23  there, I saw all the complaints. I saw that a lot of
24  customers, you know, were treated the same way we were
25  treated.

1    Q.  You made reference to for some number of
2  months Vivint helped pay for the monthly service
3  charges. How did they help? What form of payment did
4  they make to help you pay for the service charges?
5    A.  I guess it was just, I guess it was just
6  seemingly a discount to what their service would have
7  been. So they was giving us a discount on their end to
8  supplement what we would be paying towards CPI for the
9  remaining of the term.
10    Q.  Did they give you a gift card or any money
11  up front as part of the contract?
12    A.  No. No money up front.
13    Q.  Did they make any representations --
14    A.  I don't, I don't recall receiving any money
15  or anything up front.
16    Q.  Did the Vivint representative make any
17  representations about Vivint being willing to buy out
18  any remaining balance on your CPI contract?
19    A.  Well, that was, I guess, the discount. I
20  guess they couldn't, I guess, buy us out, buy us out of
21  the contract. So I guess that's how they were making
22  up for it, giving us the discount.
23    Q.  And how long did the discounted rate last?
24    A.  So we started in November of 2018, so until
25  the CPI contract ended in June of 2020.

1    Q.  Was it your understanding that the lower
2  rate was going to stay that rate for the duration of
3  the contract with Vivint?
4    A.  That's what I believed. I mean, I've given
5  you my background as far as engineering and MBA, so
6  doing the numbers, I would have ended up paying more,
7  so that's not a savings.
8    Q.  Right. Were you told by the Vivint
9  representatives that the rate was going to stay at the
10  discounted rate that you thought you were getting?
11    A.  Yes, it was --
12     MR. STEWARD: I'm sorry, objection as
13  to form. Go ahead Mr. Hinton.
14    A.  Okay, yeah, so as I was saying, you know,
15  background, just running numbers, just to see how it
16  would have calculated over time, you know, from what
17  they told us, you know, that 39.99 rate would have been
18  the cost savings for us, not just monthly but, you
19  know, over the duration of the time. I mean, it was a
20  surprise to me that I basically had a credit card
21  opened, not by me, but on behalf of Vivint, and that's
22  when I started to see additional charges on my BJ's
23  credit card. I think it's a Citizen's One loan or
24  something like that, that I didn't open up. So that
25  was frustrating as well.

1    Q.  So do you still have a loan with Citizen's
2  One related to your Vivint alarm system transaction?
3    A.  Yeah, it will be there until I either pay
4  out the contract for Vivint or until, what is it, 2023
5  when the Vivint 60-month contract comes up.
6    Q.  So am I right that you actually are making
7  two different payments to Vivint; one directly to
8  Vivint, and one to Citizen's One?
9    A.  Yeah, so it's 19.49 from Citizen's One loan
10  and then 41.47 directly to Vivint.
11    Q.  And as I'm understand your testimony, is it
12  the Citizen's One payment that started later on in
13  2020?
14    A.  I tried to go back to see if it started
15  before January of 2020. I could see in January 2020
16  from the BJ's statements that it was there. I tried to
17  see if it went back farther than that, but it did start
18  from -- I do have charges from 2020.
19    Q.  Did the sales representative from Vivint
20  make it clear to you that in addition to paying Vivint,
21  you would also be taking out a third-party loan with a
22  bank?
23     MR. STEWARD: Objection to form.
24    A.  No. If I was instructed I was going to be
25  taking out a loan from a third party, I would not have

1  done it. We're very conscious of our credit and what
2  we're pulling it for. I would not have done that.
3  Plus, it wasn't part of the conversation, because the
4  39.99 was what we were told we were going to be paying.
5     Q.  Did you after you realized that you had a
6  third-party loan with Citizen's One Bank, did you get
7  on Experian or one of the other credit bureaus to see
8  if in fact a hard credit inquiry had been run for that
9  loan?
10     MR. STEWARD: Objection to form,
11  leading.
12     A.  No, I didn't. I didn't go check to see if
13  a hard credit was run during that time.
14     Q.  Do you know one way or another whether a
15  hard credit check was run as part of the Citizen's One
16  financing for your alarm system?
17     A.  If you would like me to check right now, I
18  could see from Experian.
19     Q.  You don't need to. I'm just wondering if
20  sitting here, do you know one way or another?
21     A.  I don't, I don't, I don't recall right now
22  at this moment, no. I think, you know, hard credit
23  runs stay on the credit report for two years. So from
24  2018 to 2021 is more than two years, so it wouldn't be
25  there anymore.

1     Q.  When you realized that you had a loan with
2  Citizen's One that you weren't expecting to have, did
3  you call in to Vivint to complain about that?
4     MR. STEWARD: Objection, form,
5  leading.
6     A.  I don't think I called to complain about
7  that in particular. It was all around the same time
8  of, you know, June 2020 when the CPI contract was
9  coming up, and then, you know, finding out about you
10  know, the prices that Vivint has.
11     So I don't know if it was just that one
12  thing that made me call, other than trying to get a
13  handle on what's really going on and how do we get out
14  of the mess that we're in.
15     Q.  How many times would you estimate that you
16  called in to Vivint to talk to them about your
17  contract?
18     A.  Maybe two, two times. I know it was around
19  June 8th, I think, maybe was the original conversation
20  or maybe a little bit before, being that June 11th I
21  think it was the day that we moved in. And so that
22  would be about time to end the contract. So just
23  trying to beat that.
24     And then some of the customer reps, one guy
25  named Jose, he followed up on June 10th to give us the

1  contract as well as or, you know, the things -- well,
2  he had the contract as well as telling us that if we
3  wanted to cancel the contract, then we had to pay the
4  nearly $800 and send a letter of, I guess, notification
5  to cancel.
6     Q.  If you didn't have to pay the $800 to
7  cancel, would you have canceled at that time?
8     A.  Yes. Yeah, I just didn't like, you know,
9  finding out, you know, what I found out about their
10  practices and the things that I was reading in addition
11  to the equipment doesn't -- for the doorbell doesn't
12  work as I would like. But you will probably think I'm
13  a little paranoid being at home, because the camera
14  goes off all the time. So it's like it could be that
15  one time where it's going off for a true incident, like
16  the little boy that cried wolf, if you don't pay
17  attention to it, it could be that one time where
18  something happens.
19     It says -- you know, sometimes it says the
20  door is locked when it's actually locked or when it is
21  locked it's actually unlocked. So you got to really be
22  mindful of that.
23     Fortunately enough, we're working from home
24  now, but before that, having the neighbors to go check
25  or having to leave work to go back home and check.

1     In addition, when we first, you know, got
2  the equipment, there was some time where they had
3  representatives still walking around or on the scooter,
4  however you want to say, on the scooter in the
5  neighborhood. And it just seemed odd, because, you
6  know, he asked a question, you know, how things are
7  going? We told him there's an issue with the products.
8  Oh, I can remote into it and do it now, which was an
9  uncomfortable feeling that you had, a guy, a person
10  walking around a neighborhood able to remote into your
11  devices whenever they wanted to.
12     So it wasn't just the credit. It was all
13  of that together that made me want to just part ways.
14     Q.  Had you known about the, what your actual
15  rate would be, and the third-party financing involved
16  before the sale, would you have entered into a contract
17  with Vivint?
18     MR. STEWARD: Objection, form.
19     A.  Given the other questions and answers, you
20  know, just kind of summarize it, no. I mean, it wasn't
21  saving money. It wasn't, you know, honest and up front
22  communication. Still having issues and things of that
23  nature. I wouldn't have entered in that contract. We
24  still go to BJ's. We get approached by like AT&T, and
25  we have another service, the provider, and we see that

1    they can't save us money, so there's no need for us to
2    talk to them, plus we were happy with the service that
3    we had. We were happy with CPI. The only thing is if
4    you were providing equal service as well as a savings,
5    then, you know, we would switch. But the service
6    wasn't equal and the savings -- there were no savings.
7    Q.   So at bottom, when you look back at the
8    transaction that you entered into with Vivint, do you
9    feel like the Vivint sales representative was up front
10   and honest with you?
11   A.   No, I don't feel like the Vivint service
12   reps were up front and honest.
13       MR. EBLEN:  That's all the questions
14      that I have for you now, Mr. Hinton. I may
15      have some more after Mr. Steward asks you
16      some questions. Thank you.
17       EXAMINATION BY COUNSEL FOR DEFENDANTS
18      BY MR. STEWARD:
19   Q.   Good afternoon, Mr. Hinton. My name is
20   Matt Steward, and I'm one of the attorneys that
21   represent Vivint in this lawsuit.
22      Let me first ask you about how you were
23   contacted to make arrangements for today's deposition?
24   Did somebody on behalf of CPI reach out to you at some
25   point regarding this deposition?

1    A.   So I had gotten some phone calls, I guess,
2   from Shook Hardy & Bacon, so that's how I was informed.
3   Q.   Okay. And did you answer those phone
4   calls, or did they leave you a voice message initially?
5   A.   So, no, I didn't answer. They left a voice
6   mail. The first time I heard it, I didn't, you know, I
7   have a feature on my phone to let me know that, you
8   know, it could be potential spam. It's not an area
9   that I would normally talk to someone, unknown number.
10   Listen to the voice mail. I said if it's legit, they
11   will call back, which they did, and then from there
12   when I got the voice mail, I was intending to call them
13   back but didn't get a chance to, and the third time
14   they called, that's when I answered.
15   Q.   Okay. And do you recall who on behalf of
16   Shook Hardy you spoke with on that call?
17   A.   I believe her name is Erin Farmer.
18   Q.   Erin Farmer?
19   A.   It was a lady, yes.
20   Q.   Okay. And to the best of your
21   recollection, when, approximately, was that phone call?
22   A.   I can look at the call log and tell you
23   right now.
24   Q.   Okay.
25   A.   Erin Fishman, that was, yeah, the phone

1    call. June 23 is when I received a voice mail.
2   Q.   Of this year?
3   A.   July 23 of 2021, yes.
4   Q.   Okay. And that was the voice message. And
5   does your call log show the subsequent call where you
6   answered the phone?
7   A.   That call, I can see voicemails quicker
8   than I can see call log for the -- I can't go back that
9   far for call log.
10   Q.   That's fine. Do you recall approximately
11   how long you spoke with Ms. Fishman?
12   A.   We may have spoken for maybe -- I had her
13   on hold for a little while. So the duration of the
14   call probably was maybe like ten minutes.
15   Q.   On this call with Ms. Fishman, what did she
16   say to you?
17   A.   She was telling me that she was a
18   representative of CPI, that there was a case between
19   CPI and Vivint and wanted to see if she could have a
20   few minutes of my time to talk about the interaction
21   with me, CPI, and Vivint. And then asked after I
22   shared, you know, she asked questions. I answered.
23   After that, she asked if I would be willing to discuss
24   it.
25   Q.   Okay. Did Ms. Fishman -- I'm sorry, were

1    you finished?
2   A.   No. I mean, just basically if I would be
3   willing to do this that I'm doing today.
4   Q.   Understood. Did Ms. Fishman do anything to
5   try to refresh your recollection about any of the
6   interactions you had with either CPI or Vivint?
7   A.   No. As we were having conversations,
8   things started to come back to, come back to mind. But
9   she didn't have any -- she didn't have any answers to
10   try to put in my head or anything that, so.
11   Q.   Right. Did she show you any documents or
12   refer you to any documents on that call?
13   A.   No.
14   Q.   Did you have any other calls subsequent to
15   the phone conversation with Ms. Fishman with anybody
16   from CPI or Shook Hardy?
17   A.   The last conversation that I had with CPI
18   was June 20, probably late June 2020, when someone
19   called and asked if I would, you know, talk to them
20   more about what happened, and they left voicemails, but
21   I never called them back.
22   Q.   Right. And I'll go over that call. I
23   believe that was the call you had with CPI where you
24   referenced the controversy involving CPI's CEO Ken
25   Gill. Was that the conversation you testified about

1 earlier?

2    A. Yeah. And there was a part of the

3 conversation that we had about some of their practices

4 or what they said, yeah.

5    Q. Right. And so I'll get to that. I'm going

6 to try to approach this chronologically.

7    Let me first, just because I have it here

8 and I was impressed by it, make sure I can use this

9 technology.

10    Can you all -- I have introduced an

11 exhibit, I think now I have to share that screen.

12    A. You pulled up my LinkedIn.

13    Q. I did. Can you see your LinkedIn profile

14 on there?

15    A. Yeah.

16    Q. It's not showing up on my screen.

17    Are you guys seeing his LinkedIn profile?

18    MR. EBLEN: Yes.

19    MR. STEWARD: Okay, great.

20    MR. EBLEN: It's pretty small Matt.

21    MR. STEWARD: Yeah, and we don't need

22  to get into details.

23    Q. Does this appear to be a true and accurate

24 copy of your LinkedIn profile, Mr. Hinton?

25    A. Like I mentioned, I can barely see it.

1    (The document referred to was marked

2  Deposition Exhibit Number 2 for

3  identification.)

4    Q. I apologize. Let me see if I can make that

5 better. Can you see that now?

6    A. Yeah.

7    Q. Okay. And does that appear to be a true

8 and accurate copy of your LinkedIn profile?

9    A. So how are you seeing my notifications?

10 Are you in my profile?

11    Q. I just Googled your name and this came up.

12 I don't believe I'm in any of your notifications or

13 your messages. I certainly didn't access your account.

14 This is just the public facing LinkedIn page.

15    A. The public facing you can see how many

16 messages and notifications that someone else has?

17    Q. Apparently, because I didn't do anything to

18 log into your account. And we're going to talk about

19 that a little bit, because I sense that you're very

20 sensitive to your privacy, which I appreciate. But,

21 yes, this is what is available online on your LinkedIn

22 profile. But this does appear to be a true and

23 accurate copy of your LinkedIn profile?

24    A. From the last time I checked, yeah, it

25 should be.

1    Q. Okay, great.

2    MR. STEWARD: It was marked as Exhibit

3  2.

4    Q. Mr. Hinton, I think you testified, I can't

5 remember if you gave the exact date, that you entered

6 into the Vivint contract on or about November 27, 2018,

7 is that correct?

8    A. That was -- yes.

9    Q. So with respect to the events around that

10 date, those occurred almost three years ago, is that

11 right?

12    A. Yes, three years, three months and seven

13 days, yeah.

14    Q. Right. And is it fair to say that given

15 the passage of time, you may not have a precise

16 recollection of the words that the Vivint sales rep

17 used when he came and visited you at your home?

18    A. Did I know his exact words?

19    Q. That's my question. You don't know his

20 exact words, correct? Or you don't recall his exact

21 words?

22    A. I don't recall his exact words.

23    Q. Okay. And we'll get into more detail about

24 that June 2020 call you had with CPI. But do you

25 recall on that phone call you had with CPI in June of

1 2020 that the CPI representative is the one who raised

2 the issue that the Vivint rep had made some statement

3 that he worked with or was affiliated with CPI? That

4 you didn't raise that issue, it was actually raised

5 first by CPI? Do you recall that?

6    MR. EBLEN: Object to form.

7    A. I'm not sure, you know, who raised the

8 issue, but I know what I felt when I first interacted

9 with him.

10    Q. So let's go back to that first interaction.

11    The first interaction was at BJ's, is that

12 correct?

13    A. That's correct.

14    Q. And did these Vivint representatives, did

15 they have like a desk or a booth set up in BJ's?

16    A. Yeah, they had a little booth, you know,

17 right there by the electronics.

18    Q. And did that booth, was it clearly

19 identified as being there on behalf of the company

20 Vivint? Did it have some kind of logo or anything that

21 identified it as being a Vivint booth, if you recall?

22    A. It was orange, you know, colors and signs,

23 yeah.

24    Q. Okay. And how many individuals were there

25 manning the booth, so to speak?

1    A.   I recall one. There may have been two, but
2  I only recall the person I spoke with.
3    Q.   Okay. And did that person that you spoke
4  with, were they -- did they clearly identify themselves
5  as being there on behalf of Vivint?
6    A.   Yes, they was just saying that, you know,
7  Vivint Security Company.
8    Q.   Right. And there was no -- that booth
9  didn't have anything that would indicate that it was --
10  had been set up and was marketing on behalf of CPI, did
11  it?
12    A.   Not at that time, no.
13    Q.   Right. And the sales rep that you
14  interacted with, they didn't say or suggest that they
15  were working with or there on behalf of CPI, did they?
16    A.   At BJ's?
17    Q.   Yes, at BJ's.
18    A.   No. I mean, it's like if I was talking
19  with AT&T, I wouldn't expect them to tell me they can
20  save me money.
21    Q.   Right. And so -- and I guess that's the --
22  that's my point. You understood at BJ's that Vivint
23  and CPI were different companies operating in the same
24  residential security space, correct?
25        MR. EBLEN: Objection.

1    A.   Yes. You helped me make my point. You
2  know, I wouldn't have associated them together, but
3  when we started talking about actually transitioning,
4  that's when the rep at my house made that accusation or
5  assumption or whatever you want to call it.
6    Q.   I want to get there, but I want to take
7  these -- I want to take these in isolated steps, so to
8  speak.
9        So when you first interfaced with the
10  Vivint representatives at BJ's, you clearly understood
11  that Vivint and CPI were different companies, like you
12  testified the difference between AT&T and Verizon,
13  right?
14        MR. EBLEN: Object to form.
15    A.   That's what I would assume, but you pulled
16  up my LinkedIn profile, so you know where I work. If
17  someone to say Piedmont Natural Gas, you wouldn't
18  assume they were Duke Energy.
19    Q.   Right, exactly. And I don't want you to
20  assume. It sounds to me like yes, at BJ's you
21  understood that Vivint and CPI were competitors,
22  correct?
23    A.   Yes.
24    Q.   Okay.
25    A.   Yeah.

1    Q.   Okay.
2    A.   And that's what I would have -- yeah,
3  that's what I would have -- I wouldn't have assumed
4  that they were together.
5    Q.   Well, not just you wouldn't have assumed
6  they were together, you knew that Vivint was there
7  because it wanted your residential security business,
8  right?
9    A.   Um-hum.
10    Q.   Yeah, and it was a different -- you
11  understood that wasn't CPI? You understood that was a
12  different company than your then provider, correct?
13    A.   At that location, yes.
14    Q.   Great. And it sounds like you were
15  attracted, generally, you and your wife are attracted
16  to opportunities that may result in saving money,
17  getting a similar or better product for a lower price,
18  is that fair?
19    A.   Yes.
20    Q.   Okay. And at this booth, did they have any
21  physical equipment, like a panel or anything there to
22  show you some of the equipment and features of that
23  equipment?
24    A.   I don't recall. And the reason why is
25  around that time, we had saw all of their equipment and

1  stuff in Best Buy when we was going to look at a
2  separate purchase. So I don't recall, but they were,
3  you know, close together, you know, like what's this
4  orange thing? You know, so we looked at it at Best
5  Buy, and then we had a conversation in BJ's with him.
6  I think they may have had probably the camera and the
7  panel, and I don't recall anything else.
8    Q.   Okay. Fair enough. So it sounds like you
9  were somewhat actively shopping for residential
10  security products and features during this time frame?
11    A.   No, not actively looking. I mean, we had
12  two years left on the contract. Like I said, it was
13  just -- it's just different with their marketing, with
14  the orange that they had versus, you know, dull colors
15  that other security companies had. It was just like,
16  you know, what is this? What is this thing that they
17  have here?
18    Q.   Right. And you would agree with me that
19  the name Vivint and CPI aren't confusingly similar,
20  right? Those are very different names?
21    A.   Right. Those are, those are different
22  names.
23    Q.   And the logos are very different logos,
24  correct?
25    A.   Yes.

1    Q.   Right.  You wouldn't look at the Vivint
2   logo and think of CPI; or you didn't look at the Vivint
3   logo and think of CPI, did you?
4    A.   I don't look at Piedmont National Gas and
5   think Duke Energy.
6    Q.   Absolutely.  All right.  So you had some
7   problems with your CPI system prior to this entering
8   into the contract with Vivint, didn't you?
9    A.   If you can jog my memory, I don't --
10    Q.   Yeah.  I reviewed a number, several of --
11   several phone calls that you had with CPI, where there
12   was a false alarm or false notification triggered by a
13   motion sensor in your living room.  Does that refresh
14   your recollection?
15    A.   That a motion was -- that there was like
16   there was no motion, and it was saying that there was a
17   motion?
18    Q.   That's exactly right.
19    A.   It may be.
20    Q.   Okay.
21    A.   Same motion camera that's here now with --
22   that Vivint overtook.
23    Q.   Right.  And the equipment is very
24   interesting to me.
25    Are you kind of a tech savvy guy, or are

1   you somebody who is interested?  Not that much?
2    A.   No.
3    Q.   So and your engineering degree is civil
4   engineering, is that right?
5    A.   Yes.
6    Q.   Okay.  And that's primarily -- I don't know
7   a lot of about civil engineering, but --
8    A.   Well, I mean, let me kind of rephrase that,
9   because technology, I mean, weights are technology.  So
10   when you say tech savvy, you mean like -- well, can you
11   elaborate?
12    Q.   That is a great point and clarification,
13   because that is an overly broad thing.  I am sure there
14   is lots of technology involved in civil engineering,
15   which you probably know a lot about.  I'm talking more
16   about your familiarity with things like high definition
17   cameras, smart phone applications, things of that
18   nature?
19    A.   I just know how to use it, for the most
20   part.
21    Q.   Okay.  Okay.  Because I want to get into
22   this concern you had about Vivint being able to utilize
23   some equipment that was existing at your home, right?
24   You had testified about that concern?
25    A.   Yes.

1    Q.   And I want to represent to you that CPI and
2   other companies, when they take over, when they switch
3   a customer to their platform, if there's equipment that
4   they can utilize with the new service, they utilize it.
5   That's just part of the practice of the industry.  Do
6   you have any information to disagree with that?
7    MR. EBLEN:  Object to form, assumes
8    facts.  You can answer.
9    A.   I don't, I don't know.  I mean, I
10   haven't -- this is my first time having security system
11   in my own home where someone else is coming in.  If it
12   was anybody, you know, any other situation, any other
13   time, I would still question, hey, how are you able to
14   take over someone else's security equipment.
15    Q.   Right.  And I'll represent to you that, you
16   know, it's done every day within this industry, in part
17   to save -- you know, not to have to buy new equipment
18   if the existing equipment is compatible.  And it
19   doesn't sound like anybody has told you or you read
20   anything to suggest that there's anything improper
21   about one security company, if they take over an
22   account, utilizing the existing equipment, right?
23    MR. EBLEN:  Object to form,
24    foundation.
25    A.   I'm still --

1    MR. STEWARD:  I'm trying to lay a
2    foundation.
3    Q.   Do you have any knowledge to suggest that
4   there is something improper about one alarm company, if
5   they take over an account from another company, that
6   they utilize that equipment, if it's compatible and
7   still functional?
8    MR. EBLEN:  Object to form.
9    A.   Yeah, I mean, you're speaking to, you know,
10   that lack of knowledge, why I was discomfort -- why I
11   was uncomfortable with hey, how can you just take over,
12   you know, the system which led to, you know, the
13   inquiries of, you know, again, how are you able to just
14   take over the system and led to, you know, the guy
15   alluding to that they were part of CPI.
16    Q.   Right.  You know, it's funny, do you recall
17   in that June 2020 phone call you had with the CPI
18   representative when you articulated that concern, she
19   said yeah, yeah, it's all on different wavelengths.  It
20   could have never been compatible?
21    Do you recall her reinforcing your concern
22   about that?
23    MR. EBLEN:  Object to form.
24    A.   You keep bringing it up, and if you have
25   it, just play it so I can jog my memory.

10 (Pages 34 - 37)

1    Q.    Okay. I'm just asking you, as you sit here
2    today, whether you have a recollection of her making
3    that statement?
4    A.    Not at this time, no.
5    Q.    Okay.
6    A.    Can you tell me that lady's name?
7    Q.    It's Kay is her name.
8    A.    I remember Kay left a voice mail.
9    Q.    Yeah, she called you and left a voice
10   message. Then she called back, and you have a feature
11   on your phone that is a filter, right?
12   A.    At that time, the phone that I had, yeah.
13   Q.    Okay. At that time. And she identified
14   herself, and you picked up, and you had a rather -- a
15   pretty long conversation with her. Does that sound
16   right?
17   A.    Yeah, probably longer than I would have
18   intended, yeah.
19   Q.    I'm sure that's true, and we'll get to
20   that. I want to go back to the chronology.
21            You leave BJ's. You understand Vivint and
22   CPI are different companies. You're interested in
23   potentially saving money and improving the quality of
24   your system, right?
25   A.    At the time when I left, I would not have

1    associated them together. I didn't feel comfortable
2    that they were, you know, overtaking existing equipment
3    and then taking the probe, and then the guy alluding to
4    that, you know, they're one in the same.
5    Q.    Okay. And do you recall what the panel,
6    the control panel you had with your CPI system, what
7    that looked like?
8    A.    I still have both of them.
9    Q.    You still have both of the panels?
10   A.    Yes.
11   Q.    Okay. Are you on your phone?
12   A.    I am on the computer.
13   Q.    Oh, okay. Is there any way that you
14   could -- I assume the Vivint panel is on the wall and
15   is functional currently?
16   A.    Yes, both panels are on the wall, and we
17   both -- and we still own both of them.
18   Q.    Okay. Is the CPI panel functional? Is it
19   connected to any devices within your home?
20   A.    It's still connected to all the same
21   devices.
22   Q.    Okay. Is it being monitored by CPI, if you
23   know?
24   A.    Not that I know of at this time.
25   Q.    Okay.

1    A.    We use it --
2    Q.    Are you -- I'm sorry, are you on a laptop
3    or on a desk computer?
4    A.    I'm on a laptop.
5    Q.    This is a funny request, but would you be
6    able to take your laptop to where those panels are on
7    the wall and just orient the camera so we can see
8    those? I would be curious to see what panels they are.
9    A.    No.
10   Q.    No, what?
11   A.    I'm not walking around my house --
12   Q.    Well, what you could do --
13   A.    -- with the video camera.
14   Q.    Yeah --
15   A.    Well, the thing is, so we have this...top
16   priority...walk and talk --
17   Q.    Let me just -- go ahead.
18   A.    Go ahead.
19   Q.    Well, I was just going to say, to address
20   your concern, so you're not showing us your home, you
21   could turn the video off on the Zoom, go to the panel,
22   activate it so we're just looking at the panel, and
23   then turn the video off.
24   A.    So you saw that I work for Duke Energy.
25   Safety is a top priority. One thing that we have as a

1    rule, and I try to take home is, you know, we don't
2    walk and talk on mobile devices. You do one thing or
3    the other.
4    Q.    Okay. Okay. All right. Can you describe
5    those two panels that are still on your wall?
6    A.    They are, you know, the triangle shape --
7    the rectangular shape. They have the touch buttons.
8    Vivint is pretty much all touch screen. CPI has the
9    three, you know, big main buttons that you would press,
10   and for the most part, the other functions are on the
11   touch screen on the side, so.
12   Q.    Got it. So obviously with respect to the
13   panels, this concern you had about Vivint using CPI
14   equipment, obviously that didn't apply to the panel,
15   because they put a new panel on, is that right?
16   A.    So he said they had to put a new panel in.
17   Q.    Right. Vivint needed to put a new panel
18   in, correct?
19   A.    Yeah. So, I mean, it was upgraded. The
20   additional equipment that we had would not be
21   compatible, I guess, with that kind of current CPI
22   panel with the cameras and things of that nature.
23   Q.    Right. And that panel says Vivint on it,
24   right?
25   A.    Yeah, it says Vivint.

11 (Pages 38 - 41)

1    Q.    It doesn't say CPI, does it?
2    A.    Piedmont Natural Gas sign says Piedmont
3  Natural Gas. It doesn't say Duke Energy.
4    Q.    And I understand the analogies you want to
5  draw, and that's great. But I also need you to answer
6  the question that's pending, and that is that Vivint
7  panel doesn't make any reference, doesn't have anything
8  on it to suggest that it's a CPI piece of equipment,
9  does it?
10   A.    No. I didn't know if it was a merger or
11  anything. You know, I asked them again like how are
12  you able to take over this stuff, and then that's when
13  he alluded to the fact that we're one in the same. I
14  said okay.
15   Q.    Well, are you sure -- I want you to be very
16  careful here, because Vivint has, through companies
17  that it started, has manufactured residential home
18  automation and security equipment that has been
19  utilized by other alarm companies. Were you aware of
20  that fact?
21        MR. EBLEN: Object to form,
22    foundation.
23        MR. STEWARD: Yeah, I was just asking
24    if he was aware of that fact.
25   A.    Aware that Vivint has manufactured?

1    Q.    Yes. That companies with Vivint and
2  companies within the Vivint umbrella have from time to
3  time manufactured and made available to other
4  companies, competitors, certain residential home
5  automation and security equipment?
6        MR. EBLEN: Form and foundation.
7    A.    So the guy was saying that Vivint, you
8  know, is a bigger company. They've merged with a lot
9  of folks, and that they have the same equipment as
10  other companies. I didn't know who manufactured it.
11   Q.    Right. No, he didn't say that Vivint had
12  merged with CPI, did he?
13   A.    No. What he said, I mean, he didn't really
14  answer it clearly. He said, you know, we're one in the
15  same.
16   Q.    Okay. And I want to be certain that you
17  are clear in your recollection that the exact words he
18  used are Vivint and CPI are one in the same?
19   A.    I don't know if he was referring to the
20  companies or the equipment when he said, you know,
21  we're one in the same.
22   Q.    Okay. So you believe he may have been
23  referring to the equipment, not the companies, is that
24  right?
25   A.    I believe it was --

1        MR. EBLEN: Object to form.
2        BY MR. STEWARD:
3    Q.    Go ahead.
4    A.    I really don't know what to believe. I
5  know one, he was already able to take over the
6  equipment. So that's why I thought, you know, if one
7  company is able to take over another company's
8  equipment, that they must be one in the same as far as
9  companies. But he just informed me that, you know,
10  companies take over each other equipment all the time.
11  I didn't know that prior to when that conversation with
12  me and Craig was going on.
13   Q.    Okay. And Craig clearly identified himself
14  as being there on behalf of the company Vivint, right?
15   A.    I believe so, yes.
16   Q.    He likely had a hat and a shirt that had
17  Vivint on it. Do you recall that?
18   A.    I don't recall -- I think he did have a hat
19  on, but, yeah, I know he had the shirt on.
20   Q.    And probably had some of the orange
21  coloring that you referenced with respect --
22   A.    Yeah, I think it just had the word Vivint.
23   Q.    Vivint in orange?
24   A.    In orange, yeah.
25   Q.    Okay. Nothing on his person suggested he

1  was there on behalf of CPI, right?
2    A.    No, nothing, nothing on his person.
3    Q.    Okay. Okay. That's helpful.
4        He never said that he was an employee or
5  that he worked for CPI, did he?
6    A.    No, he never said those words, no.
7    Q.    And he didn't say that he was a partner of
8  CPI, did he?
9    A.    He didn't say those words. Like I said,
10  the only words that, you know, made me allude to, you
11  know, think that they were one in the same is those
12  exact words he said, you know, were one in the same.
13  It was reference to a company or just equipment.
14   Q.    Or just equipment, okay perfect.
15   A.    Just was hey, get out -- because, I mean,
16  if you come to my house to do some work, I'm going
17  to -- I'm walking around with you. So I'm asking
18  questions. I don't know if it was just to get me out
19  of his way so he can go on about his day.
20   Q.    I understand. You were interested in kind
21  of the capability of the equipment. It sounds like it
22  was a surprise to you that one company could use
23  another company's, at least some of their equipment, if
24  it was compatible, right?
25   A.    Correct.

1   Q.   And the panel, for instance, was obviously
2   not compatible, because they had to put a Vivint panel
3   in there to control the Vivint doorbell cam, right, or
4   to monitor the Vivint doorbell cam, right?
5   A.   Correct.
6   Q.   Okay.  Oh, yeah, let's go to -- oh, was
7   your wife home when Craig visited you at your home?
8   A.   Yes.
9   Q.   And was she part of these conversations?
10       Were you both interacting with Craig?
11  A.   I was more engaging with Craig, you know,
12  but still getting her input, making sure that she was,
13  you know, trying to see if she was comfortable with
14  things.  Like I said, my mother was there as well,
15  because she was, you know, always there, you know
16  because -- I mean, it sound good from when we were in
17  the store, so we wanted her to hear it as well and get
18  a system on her home.
19  Q.   Did she ultimately get a system?
20  A.   My mother?
21  Q.   Yeah.
22  A.   Yes.
23  Q.   And that was a Vivint system?
24  A.   Yes.
25  Q.   And do you know was Craig the sales rep for

1   your mother's system?
2   A.   Yeah, I mean, we were all here in my living
3   room.
4   Q.   Okay.  And then he said -- and then at some
5   point, presumably, they went and installed the system
6   at your mother's house, is that right?
7   A.   Yes.
8   Q.   Okay.  And I don't think I got your
9   mother's name?
10  A.   I didn't give it.  I'm not going to give
11  it.
12  Q.   Okay, that's fair.
13       Does she have the same last name as you?
14  A.   Maybe.
15  Q.   Okay, all right.  And just to put you at
16  ease --
17  A.   I tell you, I mean, you said earlier like
18  you see I'm pretty, you know, close to the vest type
19  thing.
20  Q.   Yeah, yeah, and, yeah, and I totally
21  respect that and I understand.  You probably never had
22  your deposition taken before, right?
23  A.   No.
24  Q.   Okay.  And, you know, I apologize for
25  taking your time, but CPI is the one who kind of

1   involved you in this lawsuit that it has with Vivint,
2   right?  And so I apologize, but I'm just doing my job,
3   but I do want to represent to you, you know, I'm not
4   going to -- any personal information that --
5   A.   You can't say that to me.  You just pulled
6   up my LinkedIn.  So I don't believe a word you say.
7   Q.   Well, that's -- I want you to believe what
8   I'm saying, because -- and we can -- I can Google -- I
9   can share a screen with you and show you exactly how I
10  got your LinkedIn page.
11  A.   That's fine.
12  Q.   Do you want to do that?
13  A.   No.  I just want to go ahead and, you know,
14  get this over with.  I didn't want to be on the phone
15  with anybody this long.  I don't like really talking
16  and engaging too much, and it's already been over an
17  hour of my time.
18  Q.   I understand.  And, again, this was Shook
19  Hardy who set this up, not me.  So did Shook Hardy,
20  they from time to time send witnesses LinkedIn messages
21  to try to contact them.  Did you receive a LinkedIn
22  message from Shook Hardy?
23  A.   That I'm aware of?
24  Q.   That's a no?
25  A.   I mean, not that I'm aware of.  Like you

1   saw there's some unread messages.
2   Q.   Okay.  Right.  Okay.  So they may have, and
3   you may not have read them, but you didn't leave a
4   message for Shook Hardy on your LinkedIn?
5       MR. EBLEN:  Object to form.
6       MR. STEWARD:  And I'll withdraw that.
7   It doesn't matter.
8   Q.   Do you recall the equipment that you had
9   with CPI?
10  A.   The equipment that I had with CPI?
11  Q.   Yes.
12  A.   I think we had the glass break, all the
13  sensors on the windows, you know, all the sensors on
14  the windows that's downstairs.
15  Q.   Living room motion detector?
16  A.   Living room motion detector, internal
17  cameras.
18  Q.   You do have CPI internal cameras?
19  A.   Yes.
20  Q.   Okay.  Those weren't on the schedule of
21  equipment.  Were those part of the original install?
22  A.   Yes.
23  Q.   Okay.  How many internal cameras do you
24  have with CPI?
25  A.   Two.

13 (Pages 46 - 49)

1    Q.   Okay.  Sounds like you didn't have a
2  doorbell camera with CPI, correct?
3    A.   No.
4    Q.   No other exterior facing cameras, right?
5    A.   No.
6    Q.   You didn't have a smart garage controller,
7  is that right?
8    A.   No.
9    Q.   Okay.  And I don't think you had a carbon
10  monoxide detector.  I know that Vivint installed one.
11  Did you have a carbon monoxide detector with CPI, if
12  you know?
13    A.   Prior to I don't.  Not one that was linked
14  to a security system.
15    Q.   Got it, okay.  The doorbell camera was an
16  attractive feature to you, correct?
17    A.   Yeah, we were, you know, talking about
18  exterior cameras.  So, yeah, that was an attractive
19  feature.
20    Q.   Okay.  Did you, at the time that the Vivint
21  equipment was installed, were you provided information
22  regarding the smart home app, the Vivint Smart Home
23  app?
24    A.   I know at first it worked very well.  We
25  thought it was, you know, pretty cool, you know, until

1  the cameras and stuff started messing up and the door
2  locks telling us that it was unlocked, and it was
3  locked.  But other than that, it was pretty responsive.
4  You know, we -- I think we highlighted that on a call
5  or talking to the guy that was around.
6    Q.   That those were features you enjoyed?
7    A.   Well, I mean, that it was a nice app, yeah.
8    Q.   CPI introduced an app at one point.  Did
9  you have a CPI app on your phone?
10    A.   Yeah, we had the app.  I don't know if I
11  was talking to CPI, or if I put it in the customer,
12  either one of those things, but I was telling them how
13  I would like to be able to, I guess, call the police
14  from the app if I needed to, or it might have been
15  them, one or the other.
16    Q.   Does your doorbell camera have the deter
17  feature, such that if it senses motion, you have the
18  option for them to tell someone they're being recorded
19  by the doorbell camera?
20    A.   Not that I'm aware of.  I mean, it doesn't
21  do that.
22    Q.   Does it record activity at the front door?
23    A.   Yeah, it records like 30 seconds, yeah.
24    Q.   And you can access those recordings on your
25  smart phone app, is that right?

1    A.   Sometimes, yeah.  Sometimes if I look at it
2  now, it's probably going to, if I say look at a live
3  video or something, it's probably going to still tell
4  me that somebody was here from yesterday.  It's now
5  like delayed.
6    Q.   Okay.  Have you called -- have you made any
7  services to -- made any calls to Vivint to get
8  technical assistance with your service?
9    A.   I have called, yes.
10    Q.   Okay.  Well, I would encourage you --
11    A.   On occasion.
12    Q.   I would encourage you if you are having any
13  technical issues, to call Vivint and have them address
14  those technical issues for you.  I want to make sure
15  your system is functioning as you want it to.
16    A.   That's not a threat, is it?
17    Q.   A threat?
18    A.   I'm just saying, like I said, I'm pretty --
19  make sure the system --
20    Q.   I understand.  I was laughing, because I
21  have a colleague who says, you know, some people think
22  I'm paranoid, but I just call it a higher sense of
23  awareness a heightened sense of awareness.  So I
24  understand that.
25    A.   I should adopt that statement.

1    Q.   Would that accurately describe your
2  perspective on that?
3    A.   Yeah, I mean, it was kind of out of the
4  blue, so I just wanted to see what you were saying.
5    Q.   Yeah, understood.  I understand.  Okay.
6  Mr. Eblen had asked you about expense.  Do you recall
7  the monthly monitoring rate that you were paying to
8  CPI?
9    A.   Yeah, it was like originally like 25.  I
10  think it was 50.
11    Q.   I'll represent to you, I want to go quickly
12  to be respectful of your time, I'll represent to you
13  that without tax on the contract it was 49.99.  Does
14  that sound right?
15    A.   Yeah, $50.
16    Q.   And CPI also charged you in addition to the
17  $50 a month, they also charged you for the equipment,
18  correct?
19    A.   I think I was just charged around $50 a
20  month.
21    Q.   Okay.  Let me pull up the CPI contract.
22  We'll mark -- this is CPI 242 is the document control
23  number, and I guess this will be Exhibit 3.
24        (The document referred to was marked
25        Deposition Exhibit Number 3 for

1     identification.)

2     Q.   Do you see the equipment installation total

3 there of $105.68?

4     A.   I see it.

5     Q.   And it looks like here your equipment is

6 identified, and I do see here the two In Touch interior

7 cameras and then the other equipment. Does this

8 refresh your recollection about whether CPI charged you

9 for equipment in addition to -- it's small, but I'll

10 draw your attention, here's the monthly monitoring rate

11 of 49.99. Does that refresh your recollection?

12     A.   Are you saying we paid the 105 up front and

13 then the 49.99?

14     Q.   I believe that's what happened, but I

15 wasn't there. That's just what the contract says. And

16 if you don't recall, it's not important.

17     A.   I asked you the question thinking you were

18 asking monthly payment. You know, I told you it was

19 around like $50. That initially $106 there very well

20 could have been, yeah.

21     Q.   Okay. And if I've done this correctly this

22 will be Exhibit 4.

23     (The document referred to was marked

24     Deposition Exhibit Number 4 for

25     identification.)

1     Q.   See if I can zoom in, Mr. Hinton.

2     Does this appear to be a copy of your

3 Vivint contract?

4     A.   Yeah, I believe so, yeah. That's what was

5 provided from, I think, Jose.

6     Q.   Okay. And you would agree with me that the

7 name Vivint is prominently displayed in the upper left

8 corner of the first page of the contract?

9     A.   Yes.

10    Q.   And I want to, on the second, you know,

11 2.1, I guess, paragraph 2.1, under price payment

12 financial disclosure and terms, do you see that?

13    A.   Yes.

14    Q.   Okay. Now, do you see where it says total

15 equipment and fees $1,168.98?

16    A.   Yes.

17    Q.   Okay. And you didn't pay that for the

18 equipment up front, did you?

19    A.   I don't recall. Like I don't recall paying

20 the CPI equipment up front.

21    Q.   I'll represent to you that you didn't pay

22 this, and the contract you agreed that this amount

23 would be financed at zero percent interest. Does that

24 refresh your recollection of that?

25    MR. EBLEN: Object to form.

1     A.   No. Are you saying that's where the 19.49

2 monthly payment has come in?

3     Q.   Correct. In this contract, you agreed

4 rather than pay the $1168.98 up front, that that amount

5 would be financed over a period of time at zero percent

6 interest. Does that refresh your recollection?

7     A.   It might have been. Like I said, when I

8 saw it, it was a surprise. So I don't, I don't even

9 remember if, you know, that would be the case. You

10 know, I don't think I would have been surprised by the

11 additional credit card payment if I knew that up front

12 or if I remembered it.

13    Q.   Okay. It's possible you just didn't

14 remember that you had agreed to finance that over time,

15 as opposed to pay it up front?

16    A.   Right.

17    Q.   Okay. And then you see the monthly service

18 fee of 39.99?

19    A.   Yes.

20    Q.   And that is what you have been paying for a

21 monthly service fee for your Vivint system, correct?

22    A.   That plus tax, the 41.47.

23    Q.   Right, which is in fact less than the

24 monthly monitoring fee that you were paying CPI,

25 correct?

1     A.   You add the 19.49, no.

2     Q.   Yeah, but I need you to separate the cost

3 of the equipment from the monthly monitoring rate,

4 because, you know, Vivint would take very seriously the

5 allegation that it lied to you that it would provide a

6 lower monthly monitoring rate, and it is in fact true

7 that the Vivint account provides a lower monthly

8 monitoring rate, correct?

9     A.   You're putting monitor in there. They

10 said, you know, monthly costs.

11    Q.   Well, let's use the words from the

12 contract. It says monthly service fees, correct?

13    A.   Correct.

14    Q.   Okay. And does that appear to be your

15 signature at the bottom right of this contract?

16    A.   Yes.

17    Q.   Okay. And the date of November 27, 2018?

18    A.   Yes.

19    Q.   Does it appear to be the date? Okay.

20    When you, as part of finalizing the

21 purchase of the Vivint account, do you recall having a

22 discussion with somebody who was appearing remotely,

23 either through a tablet or on a phone, a corporate

24 representative of Vivint, someone --

25    A.   Yeah, it was somebody that Craig had

1 called.
2     Q.    Right.  So Craig called the Vivint
3 corporate and put you on, was it on a tablet or a
4 phone, if you recall?
5     A.    I think we were talking on the phone and he
6 had a tablet.
7     Q.    Okay.  And do you recall that Vivint
8 representative, who was on the phone, asking you
9 whether you had an existing home security system with
10 any company?
11    A.    I don't recall.
12    Q.    Okay.  You don't recall.
13          Do you recall that individual asking you
14 whether you understood that Vivint was not affiliated
15 with your previous or existing provider of home
16 security?
17    A.    I don't recall.  I don't recall talking
18 much, you know, much reflect on the call with the
19 person that was on the phone, mostly just with the
20 person that was in the house.
21    Q.    Okay.  So you just don't recall -- you're
22 not saying no, I didn't confirm that I understood that
23 Vivint wasn't affiliated with CPI, you just don't have
24 a recollection of whether he said that, is that fair?
25    A.    That's fair.  But I'm pretty sure they like

1 monitor, all calls are recorded.  And if you can play
2 it back, jog my memory, that would be good.
3     Q.    Yeah, and I may do that.
4           But I want to continue on this timeline,
5 because there was an event that Mr. Eblen, it was
6 actually in the documents that they produced, but he
7 didn't go you about.
8           And do you recall on or about December 13,
9 2018, okay, so we're talking about approximately 17
10 days after the Vivint system was installed, that you
11 recall you and your wife being on the phone with CPI
12 and asking for a copy of the contract to determine how
13 much was left on that contract?
14          MR. EBLEN:  Object to form.
15    A.    I didn't recall it until maybe you just
16 brought it up.
17    Q.    Okay.  Do you remember asking -- I mean,
18 you understood when you entered into the contract with
19 Vivint that you still had a contract with CPI, correct?
20    A.    That we were under two contracts?
21    Q.    Yeah.
22    A.    Oh, I guess so, we had at some point in
23 time.
24    Q.    Well, I'll represent to you, and I'll ask
25 your wife about this, but you were both on the call,

1 that you made a telephone call to CPI on December 13,
2 17 days after the entering into the Vivint contract to
3 ask for a copy of the contract and an invoice with
4 respect to how much was still owed on that contract.
5           And my question is do you recall -- as you
6 sit here today, do you recall that phone call?
7           MR. EBLEN:  Object to form.
8     A.    I mean, you're starting to jog my memory.
9     Q.    Okay.  So now you're recalling that that
10 phone call did take place, is that right?
11    A.    I mean, we probably did.
12    Q.    And I'll represent to you that the
13 conclusion, they basically said it's the weekend.
14 Customer service isn't here anymore.  And I will let
15 them know you want a copy of your contract.
16          Does that refresh your recollection?
17          MR. EBLEN:  Object to form.
18    A.    Yeah, I think we ended up getting it in
19 like an email or something.
20    Q.    Exactly.  They said they were going to put
21 it in the cue for someone to email a copy of the CPI
22 contract.  Do you recall that?
23    A.    They probably said those words.  I think we
24 received it in the email, yeah.
25    Q.    Okay.  And so it sounds like you had a

1 recollection of sometime after that phone call of
2 receiving an email with the CPI contract?
3     A.    Yes.
4     Q.    Okay.  And I guess -- here's my confusion.
5 If you thought that Vivint and CPI were one in the
6 same, having just purchased the Vivint system, why
7 would you be calling CPI and asking for them to send
8 you a copy of your contract?  And I'm not saying you're
9 not being truthful here today.  I'm confused by that
10 fact.
11    A.    I don't care to lie for anybody.  I am not
12 getting anything out of this.  I just don't care to lie
13 in general.  So your comments about me being truthful
14 is if I don't remember, I don't remember.  The -- what
15 I say I remember, that's what I do remember.
16    Q.    Okay.  And so I want to come back to what
17 is sort of the critical factor.
18          When you believed that the sales rep made a
19 statement that caused you to believe there was some
20 connection between the companies, you don't recall
21 whether he was referring to the equipment or the
22 companies, right?
23          MR. EBLEN:  Object to form.
24    A.    Right.
25    Q.    Okay.  So let's fast forward.  We've got

1 the November 27 purchase. We've got the call to CPI
2 asking for a copy of the contract. You believe they
3 emailed that to you. The next time that it appears
4 that you called CPI was on June -- let me just make
5 sure I have this right -- oh, yeah on -- well, do you
6 have a recollection on calling CPI on June 2, 2020 and
7 telling them that you wanted to cancel because you had
8 Vivint installed and no longer needed CPI?
9      MR. EBLEN: Object to form.
10    A. Yeah, we probably, probably did. I mean, I
11 think we was coming up on the end of that contract, or
12 we were coming up on the end of that contract, and
13 there was, you know, no need to continue on or have
14 them believe that we would continue on, so.
15    Q. And the notation said that you told them
16 that it wasn't anything CPI did. You had just decided
17 to go to Vivint. Does that sound right?
18    A. Yeah, I mean --
19      MR. EBLEN: Object to form.
20    A. Yeah, there's no need for them to call me
21 back. I mean, it was, you know, we was just going to,
22 you know, part ways.
23    Q. Right. You had made the decision to go to
24 Vivint, and you no longer needed the CPI contract,
25 right?

1    A. Well, I wouldn't have been able to get out
2 of the contract with Vivint, so, I mean, just go ahead
3 and finish that out for, I think at that time it would
4 have been like three years.
5    Q. Okay. I'll represent -- well, did you ever
6 call Vivint and make a complaint about Craig Darrow,
7 the sales representative?
8    A. I don't know. I think we did complain
9 about someone. I don't know if we called about Craig,
10 or if we called about the guy that was hanging around
11 the neighborhood.
12    Q. Okay. And then -- and I don't have a copy
13 of these calls. For some reason, they weren't
14 produced. I don't have a copy of the June 2 call, if
15 it was recorded.
16    Then there was a call later that day, also
17 on June 2, also which if it was recorded, we weren't
18 provided, and the customer said he wanted to cancel
19 service because he went with Vivint.
20    Do you have a recollection of that
21 subsequent call telling CPI you wanted to cancel
22 because you had gone with Vivint?
23      MR. EBLEN: Object to form.
24    A. Probably so. You know who the
25 representative was for that? Was that a guy or a girl?

1    Q. That, I believe, was a guy.
2    A. Black male?
3    Q. Yeah, it may be. I don't have a copy of
4 that call. A recording wasn't provided, but in a
5 subsequent call that was recorded, you referenced that
6 discussion with that individual.
7    Does that refresh your recollection?
8    A. Yeah, I don't know if it was the same day,
9 but I know the conversation occurred.
10    Q. Okay. And on that call, that individual
11 told you that, you know, you should look into this
12 company Vivint. You should look at their BBB ratings,
13 you know, and think about your decision.
14    Do you recall something along those lines?
15      MR. EBLEN: Object to form.
16    A. Yeah, I had mentioned that earlier, yeah.
17    Q. And then there's a notation on six days
18 later, and I also don't have a copy of this call, but
19 there's a notation CPI produced that says you called on
20 June 8, and it was you, your name, Johgre. Did I get
21 that right, Johgre?
22    A. That's correct.
23    Q. Johgre wants to cancel, because he already
24 started service with another company and doesn't want
25 to pay anymore, and he doesn't use the CPI system?

1    A. Um-hum.
2    Q. Do you have a recollection of calling on
3 June 8 and again asking for a copy of the contract and
4 telling them you want to cancel, and that you don't use
5 the CPI system?
6      MR. EBLEN: Object to form.
7    A. What you just said that conversation
8 happened on the 2nd?
9    Q. There's a subsequent call on the 8th where
10 here you're reinforcing your desire to cancel, but
11 you're also asking, again, for a copy of your contract.
12    Do you recall that?
13    A. Probably so. I know I also received, I
14 think, a copy of Vivint's contract. It was either the
15 6th or the 10th or around that same time, the 8th or
16 the 10th, around that same time.
17    Q. Okay. And then ultimately, I believe, CPI
18 canceled your service on, I think July of 2020 was the
19 last time that they debited your credit card for that
20 monthly monitoring rate. Does that sound right to you?
21    A. Maybe. I don't know if it was -- I think
22 the contract we started in June. So if we pay in
23 advance or if you pay in arrears, so, possibly.
24    Q. You're right. As I looked at -- well, it's
25 not clear. It looks to me like 7-1-2020, but they for

17 (Pages 62 - 65)

1  sure billed you for June of 2020, but it's not clear to
2  me whether they billed you in July.  It looks like they
3  did bill you in July.  Let me pull this up and see if
4  this refreshes your recollection.  And I agree with you
5  it was past the 60-month period, and I don't know why
6  that would be, but let's look.
7          This is a document produced by CPI, Bates
8  control number or document control number 244, and this
9  is -- I've got this on my screen in what we call the
10  native format, because it's an Excel spreadsheet.  It's
11  very difficult to create a PDF that's legible.
12          Can you read this, or do I need to enlarge
13  it?
14      A.   It's fine.
15          (The document referred to was marked
16          Deposition Exhibit Number 5 for
17          identification.)
18      Q.   Okay.  And I'm under the tab on the far
19  right, payment history.  Do you see that?
20      A.   I see it, yes.
21      Q.   Okay.  And it looks to me like -- so this
22  goes all the way back to July or June 2015.
23          Do you see that?
24      A.   Yes.
25      Q.   Okay.  And these are all of the -- I

1  believe that they had -- was it a credit card or a
2  debit card that you used to pay CPI?
3      A.   I'm not sure.
4      Q.   Okay.  But it was an automatic?  You didn't
5  mail a check in every month?  It came out of an
6  account?
7      A.   Yes. automatic draft.
8      Q.   Right, okay.  Just to tie this issue off,
9  it looks like there's an auto pay of -- charge for
10  $105.68 on June 24, 2015.  Do you see that?
11      A.   Yeah, I see it.
12      Q.   Okay.  So you would agree with me it looks
13  like that's the exact same amount as the equipment
14  charge from CPI.  So it looks like you did in fact pay
15  for that equipment up front?
16      A.   Right.
17      Q.   Yeah, okay.  And then you called --
18          MR. STEWARD:  Mr. Hinton, the court
19          reporter has asked that we take a brief
20          five-minute break.  So if you need a glass
21          of water, go to the restroom or anything,
22          this would be a good time to do that.
23          THE WITNESS:  Good to go.
24          MR. STEWARD:  Thanks.  It is 12:29 my
25          time, so let's go back at 12:35.

1          THE VIDEOGRAPHER:  It's 2:29 p.m.,
2  we're off the record.
3          (Recess.)
4          THE VIDEOGRAPHER:  The time is
5  2:39 p.m.  We're back on the record.
6      BY MR. STEWARD:
7      Q.   Mr. Hinton, we had previously talked about
8  a phone call you had with CPI in June of 2020 where you
9  discussed the controversy around Ken Gill, the CEO of
10  CPI.  Do you recall that?
11      A.   Yeah, I probably had some mention of it,
12  yeah.
13      Q.   And this call was with a customer service
14  representative by the name of Kay, and she appears to
15  have the voice of a female.  I don't know if that's
16  appropriate to say in these times but she sounded like
17  a woman.  Do you recall having a conversation in June
18  of last year with a female representative from CPI?
19      A.   Yes.
20      Q.   Okay.  And do you recall, and I'll
21  represent to you that this is the first time that the
22  issue of this confusion about the companies or the
23  equipment came up.  Do you have a recollection of
24  raising that concern you had about the equipment or the
25  companies at any time prior to this call with anybody

1  from Vivint or CPI?
2          MR. EBLEN:  Object to form.
3      A.   I don't recall.
4      Q.   Okay.  And I'll indicate to you on this
5  call do you recall that -- well, let me back up.
6          Kay, the CPI representative, basically told
7  you that Vivint was a fraudulent company.
8          Do you recall that?
9          MR. EBLEN:  Object to form.
10      A.   I don't know if she used those words.
11      Q.   You don't recall her saying that Vivint
12  engages in this type activity with lots of people or
13  anything to that effect?
14      A.   Yeah, this is following a call that I had
15  with the guy?
16      Q.   Correct.
17      A.   Yeah, yeah, I remember that.  I think she
18  was -- I don't know if she was part of the legal team
19  or somebody that was, you know, investigating the issue
20  or not.
21      Q.   Because she had called you, right?
22      A.   Right.
23      Q.   You had already called to cancel.  This is
24  her now calling you?
25      A.   I think she just wanted like some

18 (Pages 66 - 69)

1  background information on, you know, why I was leaving
2  or whatever.
3      Q.   Right.  But she didn't just provide
4  background information, she actually instructed you to
5  take certain actions to try to get out of your Vivint
6  contract.  Do you recall that?
7      A.   I was talking with that guy before.  He was
8  saying I don't want to lead you, you know, let you
9  think for yourself, but, you know, you can go look on
10 the Better Business Bureau.  And after that, I had saw
11 that, and that's when I started, okay, well, maybe we
12 should try to take action.  And then at some point, I
13 had a conversation with Kay, I think that was her name
14 that you just said, Kay.
15     Q.   Kay.
16     A.   And she was telling -- whatever the legal
17 term is about, you know, dual contracts or something
18 like that.
19     Q.   Do you recall telling Kay what the sales
20 rep told you was that he would buy out your CPI
21 contract?
22     A.   Possibly, yeah, something like that.
23     Q.   Yeah, okay.  And if Vivint and CPI were
24 somehow one company, you know, Vivint wouldn't be
25 offering to buy out your CPI contract, right?  That

1  doesn't make sense.
2          MR. EBLEN:  Object to form.
3      A.   I don't know, you know, the terms that
4  people use to, you know, try to keep it in layman's
5  terms for the individual customers.  Like I call
6  Delisha my wife, but she's not my wife, she's my life
7  partner.  You know, she's more than my wife, but I use
8  wife, so you get on with your day.
9      Q.   That makes sense to me.
10         Do you recall Kay telling you that if you
11 wanted to get out of your Vivint contract, what you
12 should do is call the North Carolina Attorney General
13 and make a complaint?  Do you recall that?
14     A.   Yeah.
15     Q.   Yeah.  Did you call the North Carolina
16 Attorney General and make a complaint?
17     A.   I don't, I don't know.  I mean, I don't
18 recall.  I try to live a drama free, you know,
19 messless(sic) life, and I felt like it was just messy,
20 and I didn't know if I wanted to really get into all of
21 that.
22         I think she had said -- yeah, she had said
23 that, because she was saying, you know, something about
24 change in administration, you know, people want to win
25 over folks and things.  You know, they are probably,

1  you know, more likely to jump on and do something about
2  that, but I don't recall taking any action on it.
3      Q.   Okay.  So just so we've got our records
4  clear, yes, you recall Kay telling you you should
5  complain to the North Carolina Attorney General,
6  correct?
7          MR. EBLEN:  Object to form.
8      A.   Yes.
9      Q.   And two, that you didn't in fact call to
10 complain to the North Carolina Attorney General.
11         Do I have that right?
12     A.   I don't, I don't think I called, no.
13     Q.   Okay.  She also instructed you to call the
14 Vivint legal department and make a complaint.
15         Did you call the Vivint legal department
16 and make a complaint?
17     A.   I called Vivint and was just asking, I
18 think it was just a customer, customer rep, I don't
19 think it was the legal department.
20     Q.   Okay.  And that's where, and the notation
21 on that call is you said that Vivint agreed to buy out
22 your CPI contract.  Does that refresh your recollection
23 regarding that call?
24     A.   What?  Talking to Vivint?
25     Q.   Yeah.

1      A.   I don't, I don't know.
2      Q.   Okay.  It doesn't refresh your recollection
3  that the notation says that you were calling because
4  the rep said he would buy out the CPI contract?
5          MR. EBLEN:  Object to form.
6      A.   Say it again?
7      Q.   Yeah, I apologize.
8          In June of 2020, approximately the same
9  time that you called Vivint, do you recall that call?
10     A.   Yeah, I called Vivint and CPI, you know,
11 too many times.  I just want service.  I don't need to
12 talk to these people all the time, but, yeah, I called
13 them too many times.
14     Q.   Right.  And do you have a recollection of
15 tell Vivint that you were calling because Vivint was
16 supposed to buy out your CPI contract?
17     A.   Something along those terms, yeah, but, you
18 know, I guess from CPI, they were saying, you know, you
19 can't be in dual contracts with folks.
20     Q.   Right.  And so let's go back on that topic.
21 Let's go back -- oh, do you recall calling CPI, I think
22 they had called you actually.  Do you recall receiving
23 a call from CPI or calling CPI in October -- on
24 October 20 of 2020, that they were going to meet with
25 you to assist in getting out of Vivint?

1    A.    In October?

2    Q.    Yes.

3    A.    So months after?

4    Q.    Yeah. And, you know, they haven't produced

5    recordings for any of these. All they have is customer

6    notes. And so my recollection --

7    A.    They said we had a conversation?

8    Q.    It says: Spoke to MR. Was going into --

9    oh, going into a meeting to assist with getting out of

10   Vivint. Spoke to MR. So that may not be a phone call

11   with you, I apologize.

12          But let me just ask. Do you recall in

13   October of 2020 having a phone call with CPI, either

14   initiated by you or CPI?

15   A.    They might have called and I probably told

16   them I was going into a meeting. If we did have a

17   conversation, like I said, at that point, you know, we

18   was out of the contract with CPI. I didn't want to get

19   into a mess. I don't want to be here today, really.

20   Q.    And I understand, and I apologize. Again,

21   I'm doing my job. CPI has sued Vivint. It's made some

22   very serious allegations in that lawsuit about Vivint

23   conduct, and my client Vivint is entitled to defend

24   itself.

25   A.    That's cool. And just to be respectful of

1    our time, I think you only asked for like 30 minutes.

2    It's been over an hour and a half, and it's supposedly

3    to get into Delisha's deposition, and I know she has

4    some things that she has to do, so.

5    Q.    I'll understand. I will be quick. But

6    understand, I didn't tell you that it would be 30

7    minutes. I'm guessing that Shook Hardy attorneys, who

8    asked you to appear today, told you it would be 30

9    minutes.

10          So, again, they've made some very serious

11   allegations and statements about my client, and this is

12   my client's opportunity to get, you know, your story;

13   and so that's what we're doing. But I will be as

14   respectful of your time as I can be.

15          Let's go back to the payment history. This

16   again, these are CPI's records. We established that

17   they first charged you in June of 2015, and that it was

18   a 60-month contract, is that correct?

19   A.    Right.

20   Q.    Okay. And then as we go down, it looks to

21   me like the final charge was actually July of 2020. Do

22   you see that? There's a charge for 32.99?

23   A.    Yeah, I see that.

24   Q.    And then there's charges for $5, $5, $2,

25   and $5. Do you see those?

1    A.    Yeah, I see that.

2    Q.    Okay.

3    A.    17 leading up to the 49.99, yes.

4    Q.    Right. And you had clearly called them and

5    told them you wanted to cancel at least at June 2,

6    2020. Do you know why they continued to charge you or

7    charge your card after that date?

8    A.    As previously mentioned, I don't know if

9    they, you know, pay in advance or pay in arrears. But

10   if you are suggesting I should, you know, go, you know,

11   get my 49.99 plus tax.

12   Q.    Well, it looks to me like your contract

13   would have expired in May of 2020, and that you were

14   charged for June and July. So I'm not going to tell

15   you what to do, but it just looks to me from CPI's

16   records that they charged you for a greater period of

17   time than the 60 months you were under contract with

18   them.

19          MR. EBLEN: Object to form.

20          BY MR. STEWARD:

21   Q.    Do you monitor these monthly charges that

22   come directly off a card or account?

23   A.    In a way.

24   Q.    Were you aware that you were charged in

25   both June and July of 2020 by CPI?

1    A.    Maybe. Maybe at the time. Again, thinking

2    like not being sure, you know, you pay up front or in

3    arrears.

4    Q.    Right. I'll indicate the payment record

5    seems to be from each and every month from June of 2015

6    to July of 2020, so.

7          Let's turn to the conversation, and let me

8    stop sharing this and share a different screen with

9    you. I think we're on 6, Marisa, if I have that right.

10   A.    Is 3 and 4 the audio? I think we just

11   looked at 2, 5 and 6.

12   Q.    I will have to go back. We looked at both

13   CPI and the Vivint contracts, and I'm trying to see

14   what else -- oh, yeah, before I go here, I actually

15   want to look at a different, and this was associated,

16   so this will be 6.

17          (The document referred to was marked

18          Deposition Exhibit Number 6 for

19          identification.)

20   Q.    And this was produced by Vivint. This was

21   in their records.

22          First, let me ask you if you recognize this

23   document, and whether you recall providing a copy of

24   this document to Vivint?

25   A.    I think Vivint was asking me about the

1 first or something?
2    Q.   Yeah, I think, but tell me what your
3 recollection is, I think you shared this with Vivint to
4 establish what you were paying CPI for a buyout, but I
5 want to know if you recall sending this to Vivint?  And
6 if you don't, let me know that as well.
7    A.   I think they were asking, I guess, for
8 proof of what I was paying.  So I guess they could
9 credit me or something like that.
10   Q.   Okay.  That's my understanding as well.
11        And it looks like you provided them -- this
12 is your CPI monthly rate, is that right?
13   A.   Right.
14   Q.   Okay.  And did you receive a credit from
15 Vivint, to your knowledge?
16   A.   I believe so.  I believe so.
17   Q.   Yeah, that's my understanding as well.
18   A.   Delisha just messaged.  She said she got to
19 run at 3:15, so if you can't get to her before that
20 then --
21   Q.   Okay.  Her deposition was also noticed by
22 CPI's attorneys, not me.  So I didn't subpoena her.  So
23 I don't, you know, she has to do what she has to do,
24 but.
25   A.   Yeah, I don't think she has any -- like I

1 said, I was the one that was pretty much engaged with
2 CPI, so I don't know if she has any more --
3    Q.   Yeah, I think the only thing that she was
4 primarily involved in was that December 13th call to
5 Vivint.  You were on that call as well, but I believe
6 she initiated that call, that's where she wanted a pay
7 off amount.  She asked for CPI to email the contract
8 and the invoice, and she had started that call.
9        Does that refresh your recollection?
10   A.   I probably started it, and she was just
11 speaking if I was doing something else at the time.
12 But it's -- pretty much any engagement that you all
13 need to have is with me.  She can't provide you
14 anything more than I can.
15   Q.   Understood.  And I would agree with you
16 that other than that December 13 phone call, I didn't
17 see or hear anything that had Delisha's voice or name
18 on it.  But, again, I didn't notice her deposition, so.
19        Oh, let's go to -- this is one I wanted to
20 reference.  I actually did want to ask Delisha about
21 this, but you may know what her perspective is.  We had
22 talked about this controversy around Ken Gill, the CEO
23 of CPI.  Do you recall that?
24   A.   Yeah, I remember that.
25   Q.   And what do you recall about that?  What

1 caused that controversy?
2    A.   Pretty much he just, you know, just the
3 things and the events that was going on, I guess, in
4 the Charlotte area.  He had, you know, said some
5 negative things about the black community.
6    Q.   Right.  He said -- what happened was
7 somebody had sent an email on, I think this was during
8 the George Floyd tragedy and kind of the awareness
9 around police reform, and somebody had sent him an
10 email about police reform, and his response was
11 quote -- this email got leaked -- can you see the
12 screen?  I'll enlarge it?
13   A.   Yeah, I mean, it doesn't matter what he
14 said, so go ahead.
15   Q.   Well it says: "George, please spend your
16 time in a more productive way.  I challenge your
17 statistics.  A better use of time, would be to focus on
18 the black on black crime and senseless killing of our
19 young men by other young men.  Have a great day, Ken
20 Gill.  Do you see that?
21   A.   I see it.
22   Q.   And was this the issue that you brought up
23 with Kay on your call with her in June of 2020?
24   A.   Yeah, I think people were -- I think they
25 were concerned that's why they might have been

1 losing a customer.
2    Q.   Right.  And because a number of North
3 Carolina prominent organizations elected to terminate
4 the relationship with CPI as a result of these
5 statements.  Do you recall that?
6    A.   Yeah, this is an area, you know, at the
7 time of cancel culture, so yeah.
8    Q.   And so were you aware that North Carolina
9 State Athletics Program terminated its relationship
10 with CPI?
11   A.   You recall my memory to you know, memory to
12 it, so.
13   Q.   Yes?
14   A.   Yeah, I mean, you just jogged my memory to
15 it.
16   Q.   Let me just run through this.  I just
17 wanted to see if you were aware of these organizations
18 terminated their relationship with CPI as a result of
19 its CEO, Ken Gill's, comments.  North Carolina State
20 Athletics, were you aware of that?
21        MR. EBLEN:  Object to form.
22   A.   You're jogging my memory now.
23   Q.   And your wife works for North Carolina,
24 isn't that correct?
25   A.   That's correct.

21 (Pages 78 - 81)

1    Q.   And the Charlotte Hornets, at least
2  partially owned by Michael Jordan, also terminated
3  their relationship with CPI. Were you aware of that?
4        MR. EBLEN: Object to form.
5    A.   Possibly. Like I said, I don't remember
6  all the companies. I mean, they're all in Charlotte.
7  CPI is in Charlotte. I'm pretty sure that they were
8  working together, so.
9    Q.   Right. But my question is if you have
10 knowledge, because a lot of this was in the news, if
11 you have knowledge that the Bojangles' organization
12 terminated its relationship with CPI as a result of
13 those comments?
14       MR. EBLEN: Object to form.
15   A.   Another, you know, North Carolina company,
16 I think that Charlotte, probably the football team as
17 well.
18   Q.   Yeah, the Carolina Panthers did as well.
19 It sounds like you had recollection of that?
20   A.   Yeah, I haven't watched them since how they
21 treated, you know, Kaepernick, so.
22   Q.   Right, understood. Were you personally
23 offended by the comments of the CEO Ken Gill about the
24 Black Lives Matter and the police reform issues that
25 were so present at this time period?

1        MR. EBLEN: Object to form.
2    A.   Kind of diversity and inclusion, you know,
3  especially being prevalent topics, I think that he just
4  needs to be aware. I now know people that work at CPI.
5  I don't think that they should, you know, not be able
6  to have a job or be concerned about their jobs because
7  of what, you know, one person says. I just think he
8  needs some, you know, just some awareness.
9    Q.   Right. Do you think that his comments in
10 this regard damaged CPI's reputation?
11       MR. EBLEN: Object to form.
12   A.   I'm not, I'm not sure. Other than what you
13 just said about, you know, companies, you know,
14 severing their partnership, I'm not sure of the other
15 impacts that led to that -- you know, probably they
16 lost some customers, because that's one of Kay's
17 concerns, but other than that, I'm not sure of any
18 negative impacts.
19   Q.   Do you recall telling Kay, the CPI customer
20 service -- you raised this issue about the CEO's
21 comments. Do you recall her telling you she was an
22 Hispanic female, and that she was bothered by
23 Mr. Gill's comments?
24       MR. EBLEN: Object to form.
25   A.   That's, you know, her preference, I mean.

1    Q.   Right, but my question is --
2    A.   Does the comment bother me? I'm a black
3  male, you know, yeah, but I understand that we need to
4  teach white privileged males and to make them aware of,
5  you know, the blindness that they have to these types
6  of situations. So it was insensitive, but, you know,
7  if we hold him accountable to it, you teach him, and he
8  doesn't learn from it, then, you know, you cancel him,
9  you know, but.
10   Q.   Right, I understand that. That's a very
11 developed view of the world. My question was do you
12 remember her, Kay telling you --
13   A.   I don't. I don't -- I do now when you jog
14 my memory. I do now, just basically her being, trying
15 to, I guess, be empathetic to the situation. As you
16 assumed, you thought I was as bothered by the comment
17 being a black male, but, you know.
18   Q.   Right. Well, I mean, I would ask the same
19 questions if you were not a black male, just because I
20 think that comments like that did have an influence on
21 people's perception of Mr. Gill, if not CPI, because of
22 the association.
23   A.   I didn't even know he was the -- who the
24 CEO of CPI was prior to this comment.
25   Q.   Right. Right. This sort of put him on the

1  map. Let me just check my notes. I think oh, do you
2  recall, you know, Delisha had asked CPI to send her an
3  invoice with the amount remaining on the contract. Do
4  you recall if you or Delisha ever received an invoice
5  from CPI identifying the amount left on the CPI
6  contract?
7    A.   I was asking if he was referring following
8  that December phone call. I don't recall if we
9  received that. I mean, I could check the emails.
10   Q.   Okay. Oh, after November 2018, when you
11 had both the CPI and the Vivint systems, was one your
12 primary, the primary system you used? I know in the
13 call you told CPI you didn't use their system anymore,
14 and I didn't know was there a period of time when you
15 were using both, or once you had the Vivint system,
16 were you using the Vivint system primarily?
17   A.   We still pretty -- you know, I still set
18 that alarm, CPI. I don't think it's going to contact
19 anybody, but it's, you know, that additional security
20 to let me know if something happens. Like I said, the
21 cameras a lot from Vivint, you know, gives you false
22 positives. So the CPI kind of help give us additional
23 security to really know if someone were to come in or
24 not.
25   Q.   Okay. So it sounds to me like you

1  intentionally maintained both systems at least for some
2  period of time?
3      A.   Yeah, I actually just changed the batteries
4  in the CPI alarm the other day.
5      Q.   Okay.  But you don't believe -- do you
6  think CPI is still monitoring that after they stopped
7  charging you in July of 2020 or do you know?
8      A.   I don't think they do.  It was kind of a
9  false alarm that happened the other day.  CPI didn't
10 call.  So, you know, they should not have called,
11 because we don't have service with them right now.
12     Q.   And was that false alarm on the CPI system?
13     A.   No, the false alarm was what Vivint is
14 monitoring.  You know, we just forgot to take the alarm
15 off when we opened the door.
16     Q.   Got it.  So was it the Vivint alarm that
17 went off because it was armed when you opened the door,
18 is that right?
19     A.   Yeah, I mean, they both did, but, you know,
20 CPI shouldn't be monitored by off site system, so.
21     MR. STEWARD:  Understood.  Okay,
22 Mr. Hinton, those are all my questions.  I
23 may have a couple of follow up if Mr. Eblen
24 has follow-up questions.  I appreciate your
25 time, and I apologize for taking up so much

1  of your time, but thank you.
2      FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
3      BY MR. EBLEN:
4      Q.   Mr. Hinton, thank you for your time.  I
5  just have a couple of real quick follow-up questions
6  for you.
7      Other than the phone call that you had with
8  Ms. Fishman, have you ever met anybody from my law
9  firm?
10     A.   No.
11     Q.   Had you ever even seen my name or heard my
12 name before I appeared on here today?
13     A.   No.  Yeah, I heard your name like a couple
14 of minutes before.  I wasn't sure if I was in the right
15 place.  So I called back the number that Ms. Fishman
16 called from just to ask, because the link says on the
17 document is not the same link that was in the email.
18 So I just wanted to confirm.
19     Q.   And I think you made reference to this in
20 response to Mr. Steward's questions, but do you have a
21 desire to be involved in this today?
22     A.   No.
23     Q.   Have you testified truthfully today?
24     A.   Yes.  Yes.
25     Q.   And when someone comes in your home as a

1  sales representative for a company, do you expect that
2  person to be honest?
3      MR. STEWARD:  Object, form.
4      A.   Yes.
5      Q.   Do you expect that person to not tell half
6  truths?
7      MR. STEWARD:  Object, form.
8      A.   I expect transparency when I'm engaging
9  with a representative of a company.
10     Q.   Do you feel like with the Vivint sales
11 representative you got transparency?
12     MR. STEWARD:  Objection, form.
13     A.   No, I don't.  That was -- I don't think
14 there was transparency.  Again, I don't know if the guy
15 was just rushing to get me out of his way so he can,
16 you know, go on about his day, but it's also a level of
17 discomfort having a representative from the company
18 that you just started doing business with, especially
19 security, hanging around your house.
20     Q.   And in your mind on the day that the Vivint
21 representative was at your house in November of 2018,
22 based on what he said that you've described were one in
23 the same, in your mind, did you believe that there was
24 some relationship between Vivint and CPI on that day?
25     MR. STEWARD:  Objection, form,

1  foundation.
2      A.   You need to rephrase that or something?  Or
3  do you want me to answer?
4      MR. STEWARD:  Again, object as to
5      form, assumes facts not in evidence.  He's
6      testified to this, what he understood that
7      to be.  So you have plowed this ground, but
8      go ahead.
9      A.   Put this in the context of the
10 conversation, you know, saying that, you know, Vivint
11 has merged with a lot of companies, and I think he said
12 something about they were on what was it Shark Tank or
13 something like that, I think?  I don't know.  And they
14 said they can take over the equipment when he answered
15 one in the same, in my mind, they are the one company,
16 you know, so, but anybody can read the same thing, but
17 interpretation is different so.
18     Q.   And as it relates to you finding out that
19 you had a third-party loan with Citizen's Bank, do you
20 feel like the sales representative was honest and up
21 front with you about that?
22     MR. STEWARD:  Objection, form.
23     A.   You know, they explained to me that it was
24 going to be like paid over time up front, I don't
25 recall that.  That's why it was a surprise to me when

23 (Pages 86 - 89)

1 we saw the charges, so I mean.
2 Q. At the time that you entered into the
3 agreement with Vivint, was it clear in your mind that
4 you were taking out a loan with a private bank?
5 MR. STEWARD: Objection, form.
6 A. Maybe at that time, but as I think about it
7 now, I don't recall having a conversation about taking
8 out a loan.
9 MR. EBLEN: Those are all the
10 questions that I have for you today. Thank
11 you.
12 FURTHER EXAMINATION BY COUNSEL FOR DEFENDANTS
13 BY MR. STEWARD:
14 Q. Just one follow-up question, Mr. Hinton,
15 because I know that it's important that your testimony
16 is accurately reflected on this record.
17 My understanding is that the -- of your
18 testimony is that the sales rep made this company, this
19 reference, it's all one in the same, in response to
20 your question about Vivint's use of the CPI equipment,
21 correct?
22 MR. EBLEN: Object to form.
23 A. In the context of the conversation, I was
24 asking how are they able to take over. And then, you
25 know, leading up into those questions, it was they gave

1 some more sales pitch about how they, you know, merged
2 and become this big company and things of that nature.
3 So saying one in the same and merger, to me is they are
4 the same company. But, again, I don't know if that was
5 his intent. That was how I interpreted especially when
6 you put those two things together.
7 Q. Okay. And I appreciate that. But, again,
8 he didn't -- at no time did the sales rep or anybody on
9 behalf of Vivint tell you that they had merged with
10 CPI, correct?
11 A. I just told you of the situation. It's
12 like Zaxby's, I like Zaxby's, I'm hungry now. You
13 would think I want to go get Zaxby's.
14 So he said talking about mergers, and then
15 I said, you know, when he said one in the same, I as --
16 in my mind, you merge together, that's why you're one
17 in the same.
18 Q. Well, and I apologize for taking more of
19 your time, but I thought you, and I had clearly
20 established that you weren't sure if he was referring
21 to the equipment or the companies?
22 MR. EBLEN: Object to form.
23 A. That's what I just said. I just, but, you
24 know, if he asked me in my mind what did I think, you
25 know, you put the content of that conversation

1 together, I don't know what the guy was thinking. I
2 don't know if he was saying in reference to the
3 equipment or to the company. It's just what I
4 thought --
5 Q. I got it.
6 A. -- in another conversation.
7 Q. I got it. So I think that's an important
8 clarification.
9 I think what you're saying is that you
10 was -- that you were confused about that, but you can't
11 say that the sales rep intended to suggest that Vivint
12 and CPI had merged or were the same company? That's
13 the distinction you're trying to make, right?
14 MR. EBLEN: Object to form.
15 A. I'm saying he wasn't clear and transparent
16 with his answers to make sure that there was no
17 confusion.
18 MR. STEWARD: Okay. I understand.
19 Thank you again for your time.
20 MR. EBLEN: I don't have any
21 additional questions. We're done.
22 MR. STEWARD: We are. Mr. Hinton,
23 thanks again. You can resume your day.
24 Apologize for taking so much of your time.
25 I think you already covered the read

1 transcript, Marisa, is that right? Okay.
2 THE VIDEOGRAPHER: The time is
3 3:13 p.m. We're off the record.
4 (Whereupon the deposition was
5 concluded at 3:13 p.m.)
6 (Signature reserved.)

1         C E R T I F I C A T E
2     I, Marisa Munoz-Vourakis, Stenographic Reporter, RMR,
3   CRR and Notary Public, certify that on August 20, 2021, in
4   Knightdale, North Carolina, having produced satisfactory
5   evidence of identification, and having been first duly
6   sworn to me according to the emergency video notarization
7   requirements contained in G.S. 10B-25, to tell the truth,
8   thereupon testified as set forth in the preceding pages,
9   exclusive of errata sheet and signature page, if required,
10   the examination being reported by me verbatim and reduced
11   to typewritten form by me personally.
12     I further certify that I am neither counsel for,
13   related to, nor employed by any of the parties to this
14   action in which this proceeding was conducted, and
15   further, that I am not a relative or employee of any
16   attorney or counsel employed by the parties thereof, nor
17   financially or otherwise interested in the outcome of the
     action.
18   This the 23rd day of August, 2021.
19
20
      *Maria Mzy-Vonai*
21   MARISA MUNOZ-VOURAKIS
     Notary #20032900127
22
23
24
25

1   Gregory W. Herbert, Esq.
2   herbertg@gtlaw.com
3       August 23rd, 2021
4   RE: CPI Security Systems, Inc. v. Vivint Smart Home, Inc.
5   8/20/2021, Johgre Hinton (#4749807)
6    The above-referenced transcript is available for
7   review.
8    Within the applicable timeframe, the witness should
9   read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   erratas-cs@veritext.com
16
17   Return completed errata within 30 days from
18   receipt of testimony.
19   If the witness fails to do so within the time
20   allotted, the transcript may be used as if signed.
21
22      Yours,
23      Veritext Legal Solutions
24
25

1   CPI Security Systems, Inc. v. Vivint Smart Home, Inc., Et Al.
2   Johgre Hinton (#4749807)
3      E R R A T A  S H E E T
4   PAGE_____ LINE_____ CHANGE_____
5   _____
6   REASON_____
7   PAGE_____ LINE_____ CHANGE_____
8   _____
9   REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____  _____
24   Johgre Hinton         Date
25

1   CPI Security Systems, Inc. v. Vivint Smart Home, Inc., Et Al.
2   Johgre Hinton (#4749807)
3     ACKNOWLEDGEMENT OF DEPONENT
4    I, Johgre Hinton, do hereby declare that I
5   have read the foregoing transcript, I have made any
6   corrections, additions, or changes I deemed necessary as
7   noted above to be appended hereto, and that the same is
8   a true, correct and complete transcript of the testimony
9   given by me.
10
11   _____  _____
12   Johgre Hinton         Date
13   *If notary is required
14     SUBSCRIBED AND SWORN TO BEFORE ME THIS
15     _____ DAY OF _____, 20___.
16
17
18   _____
19   NOTARY PUBLIC
20
21
22
23
24
25

| & |
|---|
| **&**   2:4,12 23:2 |

| 0 |
|---|
| **00504**   1:4 |

| 1 |
|---|
| **1,168.98**   55:15 |
| **105**   54:12 |
| **105.68**   54:3 67:10 |
| **106**   54:19 |
| **10b**   94:7 |
| **10th**   19:25 65:15 |
|   65:16 |
| **1168.98**   56:4 |
| **11th**   19:20 |
| **12:29**   67:24 |
| **12:35**   67:25 |
| **13**   59:8 60:1 79:16 |
| **1300**   2:13 |
| **1319**   6:4 |
| **13th**   79:4 |
| **17**   59:9 60:2 76:3 |
| **19.49**   17:9 56:1 |
|   57:1 |

| 2 |
|---|
| **2**   4:10 27:2 28:3 |
|   62:6 63:14,17 |
|   75:24 76:5 77:11 |
| **2.1**   55:11,11 |
| **20**   1:19 5:7 25:18 |
|   73:24 94:3 97:15 |
| **20032900127** |
|   94:21 |
| **201**   2:13 |
| **2015**   6:7 7:12 |
|   66:22 67:10 75:17 |
|   77:5 |
| **2018**   6:19 7:19 |
|   15:24 18:24 28:6 |
|   57:17 59:9 85:10 |
|   88:21 |

| 2020 |
|---|
| **2020**   6:17 15:25 |
|   17:13,15,15,18 |
|   19:8 25:18 28:24 |
|   29:1 37:17 62:6 |
|   65:18 66:1 68:8 |
|   73:8,24 74:13 |
|   75:21 76:6,13,25 |
|   77:6 80:23 86:7 |
| **2021**   1:19 3:11 5:7 |
|   18:24 24:3 94:3 |
|   94:18 95:3 |
| **2023**   17:4 |
| **20th**   3:11 |
| **21571**   94:20 |
| **22**   4:5 |
| **23**   24:1,3 |
| **23rd**   94:18 95:3 |
| **24**   67:10 |
| **242**   4:11 53:22 |
| **244**   4:13 66:8 |
| **25**   53:9 94:7 |
| **2555**   2:5 |
| **27**   4:10 28:6 57:17 |
|   62:1 |
| **2:29**   68:1 |
| **2:39**   68:5 |
| **2nd**   65:8 |

| 3 |
|---|
| **3**   4:11 53:23,25 |
|   77:10 |
| **30**   51:23 75:1,6,8 |
|   95:17 |
| **32.99**   75:22 |
| **32801**   2:20 |
| **39.99**   14:6,7 16:17 |
|   18:4 56:18 |
| **3:13**   93:3,5 |
| **3:15**   78:19 |
| **3:20**   1:4 |

| 4 |
|---|
| **4**   4:12 54:22,24 |
|   77:10 |
| **407-420-1000**   2:21 |
| **41.47**   17:10 |
| **41.47.**   56:22 |
| **450**   2:19 |
| **4749807**   95:5 96:2 |
|   97:2 |
| **49.99**   54:13 76:3 |
|   76:11 |
| **49.99.**   53:13 54:11 |

| 5 |
|---|
| **5**   4:4,13 66:16 |
|   75:24,24,25 77:11 |
| **50**   14:6 53:10,15 |
|   53:17,19 54:19 |
| **54**   4:11 |
| **55**   4:12 |

| 6 |
|---|
| **6**   4:14 77:9,11,16 |
|   77:18 |
| **60**   6:18 7:11 17:5 |
|   66:5 75:18 76:17 |
| **61**   14:8 |
| **64108-2613**   2:6 |
| **650**   2:19 |
| **66**   4:13 |
| **6th**   65:15 |

| 7 |
|---|
| **7-1-2020**   65:25 |
| **77**   4:14 |

| 8 |
|---|
| **8**   64:20 65:3 |
| **8/20/2021**   95:5 |
| **800**   13:25 20:4,6 |
| **816-474-6550**   2:7 |
| **84111**   2:14 |

| 87 |
|---|
| **87**   4:6 |
| **8th**   19:19 65:9,15 |

| 9 |
|---|
| **90**   4:7 |

| a |
|---|
| **able**   9:19 10:16,17 |
|   21:10 35:22 36:13 |
|   37:13 40:6 42:12 |
|   44:5,7 51:13 63:1 |
|   83:5 90:24 |
| **absolutely**   34:6 |
| **access**   12:10,12,13 |
|   27:13 51:24 |
| **account**   27:13,18 |
|   36:22 37:5 57:7 |
|   57:21 67:6 76:22 |
| **accountable**   84:7 |
| **accuracy**   95:9 |
| **accurate**   26:23 |
|   27:8,23 |
| **accurately**   53:1 |
|   90:16 |
| **accusation**   31:4 |
| **acknowledgement** |
|   97:3 |
| **acknowledgment** |
|   95:12 |
| **acquisition**   1:11 |
| **action**   1:4 70:12 |
|   72:2 94:14,17 |
| **actions**   70:5 |
| **activate**   40:22 |
| **actively**   33:9,11 |
| **activity**   51:22 |
|   69:12 |
| **actual**   21:14 |
| **add**   14:14 57:1 |
| **addition**   10:5 |
|   17:20 20:10 21:1 |
|   53:16 54:9 |

**additional** 10:14
  12:23 14:14 16:22
  41:20 56:11 85:19
  85:22 92:21
**additions** 97:6
**address** 6:4,6
  40:19 52:13
**administration**
  7:2 71:24
**adopt** 52:25
**advance** 65:23
  76:9
**affiliated** 29:3
  58:14,23
**affiliation** 8:23 9:2
  9:4
**affirmed** 5:20
**afternoon** 5:24
  22:19
**ago** 28:10
**agree** 33:18 55:6
  66:4 67:12 79:15
**agreed** 55:22 56:3
  56:14 72:21
**agreement** 6:18
  90:3
**ahead** 6:12,13
  11:5,16 16:13
  40:17,18 44:3
  48:13 63:2 80:14
  89:8
**al** 5:6 96:1 97:1
**alarm** 17:2 18:16
  34:12 37:4 42:19
  85:18 86:4,9,12,13
  86:14,16
**allegation** 57:5
**allegations** 74:22
  75:11
**allotted** 95:20

**allude** 10:18 45:10
**alluded** 10:20
  42:13
**alluding** 37:15
  39:3
**amount** 55:22
  56:4 67:13 79:7
  85:3,5
**analogies** 42:4
**answer** 7:23 11:4
  11:5,25 23:3,5
  36:8 42:5 43:14
  89:3
**answered** 23:14
  24:6,22 89:14
**answers** 12:8
  21:19 25:9 92:16
**anybody** 25:15
  36:12,19 48:15
  61:11 68:25 85:19
  87:8 89:16 91:8
**anymore** 13:15
  18:25 60:14 64:25
  85:13
**apologize** 10:25
  11:2 27:4 47:24
  48:2 73:7 74:11
  74:20 86:25 91:18
  92:24
**app** 50:22,23 51:7
  51:8,9,10,14,25
**apparently** 27:17
**appear** 26:23 27:7
  27:22 55:2 57:14
  57:19 75:8
**appearance** 2:1
**appeared** 87:12
**appearing** 57:22
**appears** 62:3
  68:14

**appended** 97:7
**applicable** 95:8
**applications** 35:17
**apply** 41:14
**appreciate** 27:20
  86:24 91:7
**approach** 26:6
**approached** 21:24
**appropriate** 68:16
**approximately**
  23:21 24:10 59:9
  73:8
**area** 23:8 80:4
  81:6
**armed** 86:17
**arrangements**
  22:23
**arrears** 65:23 76:9
  77:3
**articulated** 37:18
**asked** 8:17 13:5
  21:6 24:21,22,23
  25:19 42:11 53:6
  54:17 67:19 75:1
  75:8 79:7 85:2
  91:24
**asking** 12:16 38:1
  42:23 45:17 54:18
  58:8,13 59:12,17
  61:7 62:2 65:3,11
  72:17 77:25 78:7
  85:7 90:24
**asks** 22:15
**assist** 73:25 74:9
**assistance** 52:8
**associated** 31:2
  39:1 77:15
**association** 84:22
**assume** 31:15,18
  31:20 39:14

**assumed** 32:3,5
  84:16
**assumes** 36:7 89:5
**assumption** 31:5
**at&t** 21:24 30:19
  31:12
**athletics** 81:9,20
**attached** 95:11
**attention** 7:8
  20:17 54:10
**attorney** 71:12,16
  72:5,10 94:16
  95:13
**attorneys** 22:20
  75:7 78:22
**attracted** 32:15,15
**attractive** 50:16
  50:18
**audio** 77:10
**august** 1:19 3:11
  5:7 94:3,18 95:3
**auto** 67:9
**automatic** 67:4,7
**automation** 42:18
  43:5
**available** 27:21
  43:3 95:6
**avenue** 2:19
**aware** 42:19,24,25
  48:23,25 51:20
  76:24 81:8,17,20
  82:3 83:4 84:4
**awareness** 52:23
  52:23 80:8 83:8

**b**

**back** 7:8 9:11
  17:14,17 20:25
  22:7 23:11,13
  24:8 25:8,8,21
  29:10 38:10,20
  59:2 61:16 62:21

66:22 67:25 68:5
69:5 73:20,21
75:15 77:12 87:15
**background** 6:23
6:24 16:5,15 70:1
70:4
**bacon** 2:4 23:2
**balance** 15:18
**bank** 17:22 18:6
89:19 90:4
**barely** 26:25
**based** 12:5 88:22
**basically** 10:5,10
10:13 11:19 12:17
12:24 16:20 25:2
60:13 69:6 84:14
**bates** 4:11,13 66:7
**batteries** 86:3
**bbb** 64:12
**beat** 8:19 19:23
**beginning** 5:3
**behalf** 5:15 16:21
22:24 23:15 29:19
30:5,10,15 44:14
45:1 91:9
**believe** 14:21
23:17 25:23 27:12
43:22,25 44:4,15
48:6,7 54:14 55:4
61:19 62:2,14
64:1 65:17 67:1
78:16,16 79:5
86:5 88:23
**believed** 16:4
61:18
**best** 23:20 33:1,4
**better** 14:22 27:5
32:17 70:10 80:17
**big** 41:9 91:2
**bigger** 43:8

**bill** 66:3
**billed** 66:1,2
**bit** 19:20 27:19
**bj's** 7:25 8:11,12
8:22 16:22 17:16
21:24 29:11,15
30:16,17,22 31:10
31:20 33:5 38:21
**black** 64:2 80:5,18
80:18 82:24 84:2
84:17,19
**blindness** 84:5
**blue** 53:4
**bojangles** 82:11
**booth** 29:15,16,18
29:21,25 30:8
32:20
**bother** 84:2
**bothered** 83:22
84:16
**bottom** 22:7 57:15
**boulevard** 2:5
**boy** 20:16
**break** 49:12 67:20
**brief** 67:19
**bringing** 37:24
**broad** 35:13
**brought** 59:16
80:22
**bureau** 14:22
70:10
**bureaus** 18:7
**business** 7:2 14:22
32:7 70:10 88:18
**buttons** 41:7,9
**buy** 13:2,23 15:17
15:20,20 33:1,5
36:17 70:20,25
72:21 73:4,16
**buyout** 78:4

**c**

**c** 2:3 5:1 94:1,1
**calculated** 16:16
**call** 19:3,12 23:11
23:12,16,21,22
24:1,5,5,7,8,9,14
24:15 25:12,22,23
28:24,25 31:5
37:17 51:4,13
52:13,22 58:18
59:25 60:1,6,10
61:1 62:1,20 63:6
63:14,16,21 64:4,5
64:10,18 65:9
66:9 68:8,13,25
69:5,14 71:5,12,15
72:9,13,15,21,23
73:9,23 74:10,13
79:4,5,6,8,16
80:23 85:8,13
86:10 87:7
**called** 13:5,19 19:6
19:16 23:14 25:19
25:21 38:9,10
52:6,9 58:1,2 62:4
63:9,10 64:19
67:17 69:21,23
72:12,17 73:9,10
73:12,22 74:15
76:4 86:10 87:15
87:16
**calling** 61:7 62:6
65:2 69:24 73:3
73:15,21,23
**calls** 23:1,4 25:14
34:11 52:7 59:1
63:13
**cam** 46:3,4
**camera** 14:13
20:13 33:6 34:21
40:7,13 50:2,15

51:16,19
**cameras** 35:17
41:22 49:17,18,23
50:4,18 51:1 54:7
85:21
**cancel** 20:3,5,7
62:7 63:18,21
64:23 65:4,10
69:23 76:5 81:7
84:8
**canceled** 20:7
65:18
**cancellation** 13:25
**capability** 45:21
**carbon** 50:9,11
**card** 12:24 15:10
16:20,23 56:11
65:19 67:1,2 76:7
76:22
**care** 61:11,12
**careful** 42:16
**carolina** 1:2,18
3:11 6:5 7:1,3
71:12,15 72:5,10
81:3,8,19,23 82:15
82:18 94:4
**carry** 13:13
**case** 24:18 56:9
**caused** 61:19 80:1
**ceblen** 2:8
**ceo** 25:24 68:9
79:22 81:19 82:23
84:24
**ceo's** 83:20
**certain** 43:4,16
70:5
**certainly** 27:13
**certified** 3:13
**certify** 94:3,12
**challenge** 80:16

chance 23:13
change 71:24 96:4
96:7,10,13,16,19
changed 86:3
changes 95:10
97:6
chapel 7:3
charge 4:14 67:9
67:14 75:21,22
76:6,7
charged 53:16,17
53:19 54:8 75:17
76:14,16,24
charges 12:23
13:4 14:8 15:3,4
16:22 17:18 75:24
76:21 90:1
charging 86:7
charles 2:3
charlie 5:12
charlotte 1:3 80:4
82:1,6,7,16
check 18:12,15,17
20:24,25 67:5
85:1,9
checked 27:24
chronologically
26:6
chronology 38:20
citizen's 16:23
17:1,8,9,12 18:6
18:15 19:2 89:19
city 2:6,14
civil 1:4 7:1 35:3,7
35:14
clarification 35:12
92:8
clarity 12:16
clear 11:25 12:8
17:20 43:17 65:25
66:1 72:4 90:3

92:15
clearly 29:18 30:4
31:10 43:14 44:13
76:4 91:19
client 74:23 75:11
client's 75:12
close 33:3 47:18
clyde 2:12 5:14
clydesnow.com
2:15
colleague 52:21
coloring 44:21
colors 29:22 33:14
come 8:5 25:8,8
45:16 56:2 61:16
76:22 85:23
comes 17:5 87:25
comfortable 12:3
39:1 46:13
coming 10:11 19:9
36:11 62:11,12
comment 84:2,16
84:24
comments 61:13
81:19 82:13,23
83:9,21,23 84:20
communication
21:22
community 80:5
companies 8:15
30:23 31:11 33:15
36:2 38:22 42:16
42:19 43:1,2,4,10
43:20,23 44:9,10
61:20,22 68:22,25
82:6 83:13 89:11
91:21
company 7:7
10:17 12:10,11,12
13:9 29:19 30:7
32:12 36:21 37:4

37:5 43:8 44:7,14
45:13,22 58:10
64:12,24 69:7
70:24 82:15 88:1
88:9,17 89:15
90:18 91:2,4 92:3
92:12
company's 10:17
44:7 45:23
compatible 36:18
37:6,20 41:21
45:24 46:2
competitors 31:21
43:4
complain 19:3,6
63:8 72:5,10
complaint 63:6
71:13,16 72:14,16
complaints 14:23
complete 97:8
completed 95:17
computer 39:12
40:3
concern 35:22,24
37:18,21 40:20
41:13 68:24
concerned 80:25
83:6
concerns 83:17
concluded 93:5
conclusion 60:13
conduct 74:23
conducted 94:14
confirm 58:22
87:18
confused 61:9
92:10
confusingly 33:19
confusion 61:4
68:22 92:17

connected 39:19
39:20
connection 12:7
61:20
conscious 18:1
contact 48:21
85:18
contacted 22:23
contained 94:7
content 91:25
context 89:9 90:23
continue 13:13
59:4 62:13,14
continued 76:6
contract 4:12 6:15
6:16,18 7:10,11
13:2,12,23 15:11
15:18,21,25 16:3
17:4,5 19:8,17,22
20:1,2,3 21:16,23
28:6 33:12 34:8
53:13,21 54:15
55:3,8,22 56:3
57:12,15 59:12,13
59:18,19 60:2,3,4
60:15,22 61:2,8
62:2,11,12,24 63:2
65:3,11,14,22 70:6
70:21,25 71:11
72:22 73:4,16
74:18 75:18 76:12
76:17 79:7 85:3,6
contracts 13:14
59:20 70:17 73:19
77:13
control 39:6 46:3
53:22 66:8,8
controller 50:6
controversy 25:24
68:9 79:22 80:1

**conversation** 8:2 11:13 18:3 19:19 25:15,17,25 26:3 33:5 38:15 44:11 64:9 65:7 68:17 70:13 74:7,17 77:7 89:10 90:7 90:23 91:25 92:6
**conversations** 9:4 14:18 25:7 46:9
**cool** 50:25 74:25
**copies** 95:14
**copy** 26:24 27:8 27:23 55:2 59:12 60:3,15,21 61:8 62:2 63:12,14 64:3,18 65:3,11,14 77:23
**corner** 55:8
**corp** 1:11
**corporate** 57:23 58:3
**correct** 28:7,20 29:12,13 30:24 31:22 32:12 33:24 41:18 45:25 46:5 50:2,16 53:18 56:3,21,25 57:8,12 57:13 59:19 64:22 69:16 72:6 75:18 81:24,25 90:21 91:10 97:8
**corrections** 97:6
**correctly** 54:21
**cost** 8:7 13:1 16:18 57:2
**costs** 57:10
**counsel** 2:1 5:9,22 22:17 87:2 90:12 94:12,16 95:14

**counterclaim** 1:7 2:2
**counterclaimants** 1:14 2:10
**couple** 7:5 86:23 87:5,13
**court** 1:1 5:10 67:18
**cover** 13:15
**covered** 92:25
**cpi** 1:5 4:11,14 5:4 5:13 6:3,11,14,15 6:16,20,22 7:9,10 7:11,14,16,17 8:18 8:24 9:5 10:23 11:13 12:7 13:1,6 13:15 14:7 15:8 15:18,25 19:8 22:3,24 24:18,19 24:21 25:6,16,17 25:23 28:24,25 29:1,3,5 30:10,15 30:23 31:11,21 32:11 33:19 34:2 34:3,7,11 36:1 37:15,17 38:22 39:6,18,22 41:8,13 41:21 42:1,8 43:12,18 45:1,5,8 47:25 49:9,10,18 49:24 50:2,11 51:8,9,11 53:8,16 53:21,22 54:8 55:20 56:24 58:23 59:11,19 60:1,21 61:2,5,7 62:1,4,6,8 62:16,24 63:21 64:19,25 65:5,17 66:7 67:2,14 68:8 68:10,18 69:1,6 70:20,23,25 72:22

73:4,10,16,18,21 73:23,23 74:13,14 74:18,21 76:25 77:13 78:4,12 79:2,7,23 81:4,10 81:18 82:3,7,12 83:4,19 84:21,24 85:2,5,5,11,13,18 85:22 86:4,6,9,12 86:20 88:24 90:20 91:10 92:12 95:4 96:1 97:1
**cpi's** 11:20 25:24 75:16 76:15 78:22 83:10
**craig** 9:24 10:1,2 44:12,13 46:7,10 46:11,25 57:25 58:2 63:6,9
**craig's** 9:25
**create** 66:11
**credit** 12:24 16:20 16:23 18:1,7,8,13 18:15,22,23 21:12 56:11 65:19 67:1 78:9,14
**cried** 20:16
**crime** 80:18
**critical** 61:17
**crr** 1:24 94:3
**cs** 95:15
**cs4749807** 1:23
**cue** 60:21
**culture** 81:7
**curious** 40:8
**current** 8:17 41:21
**currently** 6:19 39:15
**customer** 6:3,10 6:19,20 13:8,11,16 13:21 14:19 19:24

36:3 51:11 60:14 63:18 68:13 72:18 72:18 74:5 81:1 83:19
**customers** 9:20 10:11 14:24 71:5 83:16
**cv** 1:4

**d**

**d** 4:1 5:1
**damaged** 83:10
**darrow** 10:1 63:6
**date** 5:7 28:5,10 57:17,19 76:7 96:24 97:12
**day** 3:11 8:13 9:14 9:15 12:5 19:21 36:16 45:19 63:16 64:8 71:8 80:19 86:4,9 88:16,20,24 92:23 94:18 97:15
**days** 28:13 59:10 60:2 64:17 95:17
**deandrae** 2:24
**debit** 67:2
**debited** 65:19
**december** 59:8 60:1 79:4,16 85:8
**decided** 62:16
**decision** 62:23 64:13
**declare** 97:4
**deemed** 97:6
**defend** 74:23
**defendant** 1:8 2:2
**defendants** 1:13 1:17 2:10 3:10 5:15,18 22:17 90:12
**definition** 35:16

degree 35:3
degreed 6:25
delayed 52:5
delisha 2:23 6:9
 71:6 78:18 79:20
 85:2,4
delisha's 75:3
 79:17
department 72:14
 72:15,19
deponent 95:13
 97:3
deposing 95:13
deposition 1:16
 3:9 4:8 5:3,16
 22:23,25 27:2
 47:22 53:25 54:24
 66:16 75:3 77:18
 78:21 79:18 93:4
describe 41:4 53:1
described 12:6
 88:22
description 4:9
desire 65:10 87:21
desk 29:15 40:3
detail 6:21 8:6
 28:23
details 26:22
detector 49:15,16
 50:10,11
deter 51:16
determine 59:12
developed 84:11
devices 21:11
 39:19,21 41:2
difference 12:25
 31:12
different 7:5 9:17
 9:18 10:17 17:7
 30:23 31:11 32:10
 32:12 33:13,20,21

33:23 37:19 38:22
 77:8,15 89:17
difficult 66:11
direction 12:1
directly 17:7,10
 76:22
disagree 36:6
disclosure 55:12
discomfort 37:10
 88:17
discount 13:3,14
 15:6,7,19,22
discounted 15:23
 16:10
discuss 24:23
discussed 68:9
discussion 57:22
 64:6
displayed 55:7
distinction 92:13
district 1:1,2
diversity 83:2
division 1:3
document 27:1
 53:22,24 54:23
 66:7,8,15 77:17,23
 77:24 87:17
documents 25:11
 25:12 59:6
doing 5:25 6:1
 13:18 16:6 25:3
 48:2 74:21 75:13
 79:11 88:18
door 20:20 51:1,22
 86:15,17
doorbell 14:13
 20:11 46:3,4 50:2
 50:15 51:16,19
downstairs 49:14
draft 67:7

drama 71:18
draw 42:5 54:10
drawing 7:8
dsc 1:4
dual 70:17 73:19
duke 31:18 34:5
 40:24 42:3
dull 33:14
duly 5:20 94:5
duration 16:2,19
 24:13

**e**

e 4:1 5:1,1 94:1,1
 96:3,3,3
earlier 26:1 47:17
 64:16
ease 47:16
eblen 2:3 4:4,6
 5:12,12,23 7:22
 22:13 26:18,20
 29:6 30:25 31:14
 36:7,23 37:8,23
 42:21 43:6 44:1
 49:5 53:6 55:25
 59:5,14 60:7,17
 61:23 62:9,19
 63:23 64:15 65:6
 69:2,9 71:2 72:7
 73:5 76:19 81:21
 82:4,14 83:1,11,24
 86:23 87:3 90:9
 90:22 91:22 92:14
 92:20
educational 6:24
effect 69:13
either 8:22 13:9
 17:3 25:6 51:12
 57:23 65:14 74:13
elaborate 35:11
elected 81:3

electronics 29:17
else's 36:14
email 60:19,21,24
 61:2 79:7 80:7,10
 80:11 87:17
emailed 62:3
emails 85:9
emergency 94:6
empathetic 84:15
employed 94:13
 94:16
employee 45:4
 94:15
encourage 52:10
 52:12
ended 15:25 16:6
 60:18
energy 31:18 34:5
 40:24 42:3
engaged 79:1
engagement 79:12
engages 69:12
engaging 46:11
 48:16 88:8
engineer 6:25 7:1
engineering 7:6,6
 16:5 35:3,4,7,14
enjoyed 51:6
enlarge 66:12
 80:12
entered 21:16,23
 22:8 28:5 59:18
 90:2
entering 34:7 60:2
entitled 74:23
equal 22:4,6
equipment 10:14
 10:15,18 11:18,19
 11:20 12:11,13
 14:11,12,14,15
 20:11 21:2 32:21

32:22,23,25 34:23
35:23 36:3,14,17
36:18,22 37:6
39:2 41:14,20
42:8,18 43:5,9,20
43:23 44:6,8,10
45:13,14,21,23
49:8,10,21 50:21
53:17 54:2,5,7,9
55:15,18,20 57:3
61:21 67:13,15
68:23,24 89:14
90:20 91:21 92:3
**erin** 23:17,18,25
**errata** 94:9 95:11
95:13,17
**erratas** 95:15
**especially** 83:3
88:18 91:5
**esq** 2:3,11,17 95:1
**establish** 78:4
**established** 75:16
91:20
**estimate** 19:15
**et** 5:6 96:1 97:1
**event** 59:5
**events** 28:9 80:3
**eventually** 12:17
**evidence** 89:5 94:5
**evident** 14:5
**exact** 28:5,18,20
28:20,22 43:17
45:12 67:13
**exactly** 31:19
34:18 48:9 60:20
**examination** 4:2,4
4:5,6,7 5:22 22:17
87:2 90:12 94:10
**examined** 5:20
**excel** 66:10

**exclusive** 94:9
**exhibit** 4:9,10,11
4:12,13,14 26:11
27:2 28:2 53:23
53:25 54:22,24
66:16 77:18
**exhibits** 4:8
**existing** 35:23
36:18,22 39:2
58:9,15
**expect** 30:19 88:1
88:5,8
**expecting** 19:2
**expense** 53:6
**experian** 18:7,18
**expired** 76:13
**explained** 89:23
**exterior** 50:4,18

**f**

**f** 1:11,12 94:1
**facing** 27:14,15
50:4
**fact** 18:8 42:13,20
42:24 56:23 57:6
61:10 67:14 72:9
**factor** 61:17
**facts** 36:8 89:5
**fails** 95:19
**fair** 28:14 32:18
33:8 47:12 58:24
58:25
**false** 34:12,12
85:21 86:9,12,13
**familiarity** 35:16
**far** 14:15 16:5
24:9 44:8 66:18
**farmer** 23:17,18
**fast** 9:6 61:25
**fdw** 1:4
**feature** 23:7 38:10
50:16,19 51:17

**features** 32:22
33:10 51:6
**fee** 56:18,21,24
**feel** 14:1 22:9,11
39:1 88:10 89:20
**feeling** 12:14 21:9
**fees** 55:15 57:12
**felt** 29:8 71:19
**female** 68:15,18
83:22
**filter** 38:11
**final** 75:21
**finalizing** 57:20
**finance** 56:14
**financed** 55:23
56:5
**financial** 55:12
**financially** 94:17
**financing** 18:16
21:15
**find** 12:19
**finding** 19:9 20:9
89:18
**fine** 24:10 48:11
66:14
**finish** 63:3
**finished** 25:1
**firm** 87:9
**first** 5:20 7:24
21:1 22:22 23:6
26:7 29:5,8,10,11
31:9 36:10 50:24
55:8 68:21 75:17
77:22 78:1 94:5
**fishman** 23:25
24:11,15,25 25:4
25:15 87:8,15
**five** 6:17 7:12
67:20
**fl** 2:20

**floyd** 80:8
**focus** 80:17
**folks** 43:9 71:25
73:19
**follow** 86:23,24
87:5 90:14
**followed** 19:25
**following** 69:14
85:7
**follows** 5:21
**football** 82:16
**foregoing** 97:5
**forgot** 86:14
**form** 10:24 11:1
11:15 15:3 16:13
17:23 18:10 19:4
21:18 29:6 31:14
36:7,23 37:8,23
42:21 43:6 44:1
49:5 55:25 59:14
60:7,17 61:23
62:9,19 63:23
64:15 65:6 69:2,9
71:2 72:7 73:5
76:19 81:21 82:4
82:14 83:1,11,24
88:3,7,12,25 89:5
89:22 90:5,22
91:22 92:14 94:11
**format** 66:10
**forth** 94:8
**fortunately** 20:23
**forward** 9:6 61:25
**found** 12:21,22
20:9
**foundation** 36:24
37:2 42:22 43:6
89:1
**frame** 33:10
**fraudulent** 69:7

free 71:18
friday 1:19
front 12:25 15:11
  15:12,15 21:21
  22:9,12 51:22
  54:12 55:18,20
  56:4,11,15 67:15
  77:2 89:21,24
frustrating 16:25
functional 37:7
  39:15,18
functioning 52:15
functions 41:10
funny 37:16 40:5
further 4:6,7
  17:17 87:2 90:12
  94:12,15

**g**

g 5:1
g.s. 94:7
gaby 6:4
garage 50:6
gas 31:17 34:4
  42:2,3
general 61:13
  71:12,16 72:5,10
generally 32:15
gentleman 9:22
george 80:8,15
getting 12:8 13:14
  16:10 32:17 46:12
  60:18 61:12 73:25
  74:9
gift 15:10
gill 25:25 68:9
  79:22 80:20 82:23
  84:21
gill's 81:19 83:23
girl 63:25
give 6:23 13:2
  15:10 19:25 47:10

47:10 85:22
given 13:21 16:4
  21:19 28:14 97:9
gives 85:21
giving 12:25 15:7
  15:22
glass 49:12 67:20
go 6:12,13 11:5,16
  14:21 16:13 17:14
  18:12 20:24,25
  21:24 24:8 25:22
  29:10 38:20 40:17
  40:18,21 44:3
  45:19 46:6 48:13
  53:11 59:7 62:17
  62:23 63:2 67:21
  67:23,25 70:9
  73:20,21 75:15,20
  76:10 77:12,14
  79:19 80:14 88:16
  89:8 91:13
goes 20:14 66:22
going 10:12 11:1
  13:12,13,16 16:2,9
  17:24 18:4 19:13
  20:15 21:7 26:5
  27:18 33:1 40:19
  44:12 45:16 47:10
  48:4 52:2,3 60:20
  62:21 73:24 74:8
  74:9,16 76:14
  80:3 85:18 89:24
good 5:24 22:19
  46:16 59:2 67:22
  67:23
google 14:14 48:8
googled 27:11
gotten 23:1
grand 2:5
great 26:19 28:1
  32:14 35:12 42:5

80:19
greater 76:16
greenberg 2:18
  5:17
gregory 2:17 5:16
  95:1
groceries 9:12
grocery 9:10
ground 89:7
groups 7:6
gtlaw.com 2:22
  95:2
guess 12:25 13:1
  15:5,5,19,20,20,21
  20:4 23:1 30:21
  41:21 51:13 53:23
  55:11 59:22 61:4
  73:18 78:7,8 80:3
  84:15
guessing 75:7
guy 19:24 21:9
  34:25 37:14 39:3
  43:7 51:5 63:10
  63:25 64:1 69:15
  70:7 88:14 92:1
guys 26:17

**h**

h 96:3
half 75:2 88:5
handle 19:13
hanging 63:10
  88:19
happen 11:5
happened 25:20
  54:14 65:8 80:6
  86:9
happens 20:18
  85:20
happy 22:2,3
hard 18:8,13,15
  18:22

hardy 2:4 23:2,16
  25:16 48:19,19,22
  49:4 75:7
hat 44:16,18
head 25:10
hear 46:17 79:17
heard 23:6 87:11
  87:13
heightened 52:23
help 15:3,4 85:22
helped 15:2 31:1
helpful 45:3
herbert 2:17 5:16
  95:1
herbertg 2:22 95:2
hereto 97:7
hey 36:13 37:11
  45:15
high 35:16
higher 52:22
highlighted 51:4
hill 7:3
hinton 1:16 2:23
  3:9 4:3 5:4,19,24
  6:3 10:25 11:16
  16:13 22:14,19
  26:24 28:4 55:1
  67:18 68:7 86:22
  87:4 90:14 92:22
  95:5 96:2,24 97:2
  97:4,12
hinton's 4:10
hispanic 83:22
history 66:19
  75:15
hold 24:13 84:7
home 1:10,12,12
  5:6 6:8 9:3,7,8,9
  9:11 10:3 14:2
  20:13,23,25 28:17
  35:23 36:11 39:19

40:20 41:1 42:17
43:4 46:7,7,18
50:22,22 58:9,15
87:25 95:4 96:1
97:1
**honest** 14:2 21:21
22:10,12 88:2
89:20
**hornets** 82:1
**hour** 48:17 75:2
**hours** 9:10,12
**house** 8:6 9:21,23
10:10,15 14:17
31:4 40:11 45:16
47:6 58:20 88:19
88:21
**hum** 32:9 65:1
**hundred** 13:24
**hungry** 91:12

**i**

**idea** 6:24
**identification** 27:3
54:1,25 66:17
77:19 94:5
**identified** 29:19
29:21 38:13 44:13
54:6
**identify** 30:4
**identifying** 85:5
**iffy** 12:1
**impacts** 83:15,18
**important** 54:16
90:15 92:7
**impressed** 26:8
**impression** 12:6
**improper** 36:20
37:4
**improving** 38:23
**incident** 20:15
**inclusion** 83:2

**incorporated** 5:5
5:6
**indicate** 30:9 69:4
77:4
**individual** 58:13
64:6,10 71:5
**individuals** 29:24
**industry** 36:5,16
**influence** 84:20
**information** 36:6
48:4 50:21 70:1,4
**informed** 8:18
23:2 44:9
**informing** 13:17
**initially** 23:4
54:19
**initiated** 74:14
79:6
**input** 46:12
**inquiries** 37:13
**inquiry** 18:8
**insensitive** 84:6
**install** 11:18,21
14:12 49:21
**installation** 54:2
**installed** 14:16
47:5 50:10,21
59:10 62:8
**instance** 46:1
**instructed** 11:3
14:19 17:24 70:4
72:13
**intended** 38:18
92:11
**intending** 23:12
**intent** 91:5
**intentionally** 86:1
**interacted** 29:8
30:14
**interacting** 46:10

**interaction** 7:24
8:10 24:20 29:10
29:11
**interactions** 7:20
25:6
**interest** 8:4,15
55:23 56:6
**interested** 35:1
38:22 45:20 94:17
**interesting** 34:24
**interfaced** 31:9
**interior** 54:6
**internal** 49:16,18
49:23
**interpretation**
89:17
**interpreted** 91:5
**interrupts** 11:3
**introduce** 5:9 6:2
**introduced** 26:10
51:8
**investigating**
69:19
**invited** 10:9
**invoice** 60:3 79:8
85:3,4
**involved** 21:15
35:14 48:1 79:4
87:21
**involving** 25:24
**isolated** 31:7
**issue** 21:7 29:2,4,8
67:8 68:22 69:19
80:22 83:20
**issues** 21:22 52:13
52:14 82:24

**j**

**january** 17:15,15
**job** 1:23 48:2
74:21 83:6

**jobs** 83:6
**jog** 34:9 37:25
59:2 60:8 84:13
**jogged** 81:14
**jogging** 81:22
**johgre** 1:16 3:9
4:3 5:4,19 6:3
64:20,21,23 95:5
96:2,24 97:2,4,12
**jordan** 82:2
**jose** 19:25 55:5
**july** 24:3 65:18
66:2,3,22 75:21
76:14,25 77:6
86:7
**jump** 72:1
**june** 6:7,17 7:12
12:22 15:25 19:8
19:19,20,25 24:1
25:18,18 28:24,25
37:17 62:4,6
63:14,17 64:20
65:3,22 66:1,22
67:10 68:8,17
73:8 75:17 76:5
76:14,25 77:5
80:23

**k**

**k** 1:11,12
**kaepernick** 82:21
**kansas** 2:6
**kay** 38:7,8 68:14
69:6 70:13,14,15
70:19 71:10 72:4
80:23 83:19 84:12
**kay's** 83:16
**keep** 37:24 71:4
**ken** 25:24 68:9
79:22 80:19 81:19
82:23

**killing** 80:18
**kind** 7:4 8:4 10:15
  11:24 12:1 14:20
  21:20 29:20 34:25
  35:8 41:21 45:20
  47:25 53:3 80:8
  83:2 85:22 86:8
**knew** 32:6 56:11
**knightdale** 1:18
  3:10 6:5 94:4
**know** 8:3,12,14,19
  9:2,11,25 10:6,12
  10:19 11:2,22,24
  11:24 12:2,15
  13:7,10,13,15,17
  13:20,25 14:5,24
  16:14,16,17,19
  18:14,20,22 19:8,9
  19:10,11,18 20:1,8
  20:9,19 21:1,6,6
  21:20,21 22:5
  23:6,7,8 24:22
  25:19 28:18,19
  29:7,8,16,22 30:6
  31:2,16 33:3,3,4
  33:14,16 35:6,15
  35:19 36:9,12,16
  36:17 37:9,12,12
  37:13,14,16 39:2,4
  39:23,24 41:1,6,9
  42:10,11 43:8,10
  43:14,19,20 44:4,5
  44:6,9,11,19 45:10
  45:11,12,18 46:11
  46:13,15,15,25
  47:18,24 48:3,13
  49:13 50:10,12,17
  50:24,25,25 51:4
  51:10 52:21 54:18
  55:10 56:9,10
  57:4,10 58:18

  60:15 62:13,21,22
  63:8,9,24 64:8,9
  64:11,13 65:13,21
  66:5 68:15 69:10
  69:18,19 70:1,8,9
  70:17,24 71:3,3,4
  71:7,17,18,20,23
  71:24,25 72:1
  73:1,10,18,18 74:4
  74:17 75:3,12
  76:6,8,9,10,10
  77:2 78:5,6,23
  79:2,21 80:2,4
  81:6,11 82:15,21
  83:2,4,5,7,8,13,13
  83:15,25 84:3,5,6
  84:8,9,17,23 85:2
  85:12,14,17,19,20
  85:21,23 86:7,10
  86:14,19 88:14,16
  89:10,10,13,16,23
  90:15,25 91:1,4,15
  91:24,25 92:1,2
**knowledge** 37:3
  37:10 78:15 82:10
  82:11
**known** 21:14

**l**

**l.l.p.** 2:4
**lack** 37:10
**lady** 23:19
**lady's** 38:6
**lake** 2:14
**lane** 6:4
**laptop** 40:2,4,6
**late** 25:18
**laughing** 52:20
**law** 87:8
**lawsuit** 22:21 48:1
  74:22

**lay** 37:1
**layman's** 71:4
**lead** 14:21 70:8
**leading** 7:21 8:25
  18:11 19:5 76:3
  90:25
**leaked** 80:11
**learn** 84:8
**leave** 20:25 23:4
  38:21 49:3
**leaving** 13:8 70:1
**led** 37:12,14 83:15
**left** 12:18 23:5
  25:20 33:12 38:8
  38:9,25 55:7
  59:13 85:5
**legacy** 1:11
**legal** 69:18 70:16
  72:14,15,19 95:23
**legible** 66:11
**legit** 23:10
**letter** 20:4
**level** 88:16
**lie** 61:11,12
**lied** 57:5
**life** 71:6,19
**lighting** 14:13
**line** 96:4,7,10,13
  96:16,19
**lines** 64:14
**link** 87:16,17
**linked** 50:13
**linkedin** 4:10
  26:12,13,17,24
  27:8,14,21,23
  31:16 48:6,10,20
  48:21 49:4
**listen** 23:10
**little** 6:23 19:20
  20:13,16 24:13
  27:19 29:16

**live** 52:2 71:18
**lived** 6:6
**lives** 6:8 82:24
**living** 6:4,16 34:13
  47:2 49:15,16
**loan** 16:23 17:1,9
  17:21,25 18:6,9
  19:1 89:19 90:4,8
**local** 7:7,25
**location** 32:13
**lock** 14:13
**locked** 20:20,20,21
  51:3
**locks** 51:2
**log** 23:22 24:5,8,9
  27:18
**logo** 29:20 34:2,3
**logos** 33:23,23
**long** 6:6 7:10
  15:23 24:11 38:15
  48:15
**longer** 38:17 62:8
  62:24
**look** 14:21 22:7
  23:22 33:1 34:1,2
  34:4 52:1,2 64:11
  64:12 66:6 70:9
  77:15
**looked** 8:15 14:22
  33:4 39:7 65:24
  77:11,12
**looking** 33:11
  40:22
**looks** 54:5 65:25
  66:2,21 67:9,12,14
  75:20 76:12,15
  78:11
**losing** 81:1
**lost** 83:16
**lot** 14:23 35:7,15
  43:8 82:10 85:21

89:11
**lots** 35:14 69:12
**lower** 16:1 32:17
57:6,7

**m**

**mail** 23:6,10,12
24:1 38:8 67:5
**main** 2:13 41:9
**maintained** 86:1
**making** 15:21 17:6
38:2 46:12
**male** 9:24 64:2
84:3,17,19
**males** 84:4
**man** 9:23
**manager** 7:5
**manning** 29:25
**manufactured**
42:17,25 43:3,10
**map** 85:1
**marisa** 1:24 3:12
77:9 93:1 94:2,21
**mark** 53:22
**marked** 27:1 28:2
53:24 54:23 66:15
77:17
**marketing** 30:10
33:13
**mas** 2:15
**master** 7:2
**matt** 5:14 22:20
26:20
**matter** 5:4 49:7
80:13 82:24
**matthew** 2:11
**mba** 16:5
**mean** 16:4,19
21:20 25:2 30:18
33:11 35:8,9,10
36:9 37:9 41:19
43:13 45:15 46:16

47:2,17 48:25
51:7,20 53:3
59:17 60:8,11
62:10,18,21 63:2
71:17 80:13 81:14
82:6 83:25 84:18
85:9 86:19 90:1
**meet** 73:24
**meeting** 74:9,16
**memory** 34:9
37:25 59:2 60:8
81:11,11,14,22
84:14
**men** 80:19,19
**mention** 13:21
68:11
**mentioned** 6:10
26:25 64:16 76:8
**merge** 91:16
**merged** 43:8,12
89:11 91:1,9
92:12
**merger** 42:10 91:3
**mergers** 91:14
**merit** 3:12
**mess** 19:14 74:19
**message** 23:4 24:4
38:10 48:22 49:4
**messaged** 78:18
**messages** 27:13,16
48:20 49:1
**messing** 51:1
**messless** 71:19
**messy** 71:19
**met** 8:21 87:8
**michael** 82:2
**mind** 25:8 88:20
88:23 89:15 90:3
91:16,24
**mindful** 20:22

**mini** 14:14
**minute** 67:20
**minutes** 24:14,20
75:1,7,9 87:14
**misleading** 13:18
**mo** 2:6
**mobile** 41:2
**moment** 18:22
**money** 8:3 10:7
15:10,12,14 21:21
22:1 30:20 32:16
38:23
**monitor** 46:4 57:9
59:1 76:21
**monitored** 39:22
86:20
**monitoring** 53:7
54:10 56:24 57:3
57:6,8 65:20 86:6
86:14
**monoxide** 50:10
50:11
**month** 6:18 14:6,6
14:7,9 17:5 53:17
53:20 66:5 67:5
75:18 77:5
**monthly** 4:14 15:2
16:18 53:7 54:10
54:18 56:2,17,21
56:24 57:3,6,7,10
57:12 65:20 76:21
78:12
**months** 7:11 15:2
28:12 74:3 76:17
**mosaic** 1:11
**mother** 10:8 46:14
46:20
**mother's** 47:1,6,9
**motion** 34:13,15
34:16,17,21 49:15
49:16 51:17

**moved** 19:21
**munoz** 1:24 3:12
94:2,21

**n**

**n** 4:1 5:1
**name** 9:22,24,25
22:19 23:17 27:11
33:19 38:6,7 47:9
47:13 55:7 64:20
68:14 70:13 79:17
87:11,12,13
**named** 19:25
**names** 33:20,22
**national** 34:4
**native** 66:10
**natural** 31:17 42:2
42:3
**nature** 11:25 12:2
13:19 14:16 21:23
35:18 41:22 91:2
**nearly** 20:4
**necessary** 97:6
**need** 18:19 22:1
26:21 42:5 57:2
62:13,20 66:12
67:20 73:11 79:13
84:3 89:2
**needed** 41:17
51:14 62:8,24
**needs** 83:4,8
**negative** 80:5
83:18
**neighborhood**
21:5,10 63:11
**neighbors** 20:24
**neither** 94:12
**never** 8:14 25:21
37:20 45:4,6
47:21
**new** 11:18 36:4,17
41:15,16,17

newer 14:12
news 82:10
nice 51:7
normally 23:9
north 1:2,18 3:11
  6:5,25 7:3 71:12
  71:15 72:5,10
  81:2,8,19,23 82:15
  94:4
notarization 94:6
notary 1:24 3:13
  94:3,21 97:13,19
notation 62:15
  64:17,19 72:20
  73:3
note 95:10
noted 97:7
notes 74:6 85:1
notice 13:25 79:18
noticed 78:21
notification 20:4
  34:12
notifications 27:9
  27:12,16
november 6:19
  7:19 15:24 28:6
  57:17 62:1 85:10
  88:21
number 4:9,11,13
  15:1 23:9 27:2
  34:10 53:23,25
  54:24 66:8,8,16
  77:18 81:2 87:15
numbers 16:6,15

**o**

o 5:1
o0o 3:6
object 29:6 31:14
  36:7,23 37:8,23
  42:21 44:1 49:5
  55:25 59:14 60:7

60:17 61:23 62:9
62:19 63:23 64:15
65:6 69:2,9 71:2
72:7 73:5 76:19
81:21 82:4,14
83:1,11,24 88:3,7
89:4 90:22 91:22
92:14
objection 7:21
  8:25 10:24 11:1,6
  11:15 16:12 17:23
  18:10 19:4 21:18
  30:25 88:12,25
  89:22 90:5
obviously 41:12
  41:14 46:1
occasion 52:11
occurred 28:10
  64:9
october 73:23,24
  74:1,13
odd 21:5
offended 82:23
offer 8:7
offering 70:25
oh 12:17 21:8
  39:13 46:6,6
  59:22 62:5 73:21
  74:9 77:14 79:19
  85:1,10
okay 9:6 16:14
  23:3,15,20,24 24:4
  24:25 26:19 27:7
  28:1,23 29:24
  30:3 31:24 32:1
  32:20 33:8 34:20
  35:6,21,21 38:1,5
  38:13 39:5,11,13
  39:18,22,25 41:4,4
  42:14 43:16,22
  44:13,25 45:3,3,14

46:6 47:4,8,12,15
47:24 49:2,2,20,23
50:1,9,15,20 52:6
52:10 53:5,21
54:21 55:6,14,17
56:13,17 57:14,17
57:19 58:7,12,21
59:9,17 60:9,25
61:4,16,25 63:5,12
64:10 65:17 66:18
66:21,25 67:4,8,12
67:17 68:20 69:4
70:11,23 72:3,13
72:20 73:2 75:20
76:2 78:10,14,21
85:10,25 86:5,21
91:7 92:18 93:1
older 11:20
once 85:15
online 27:21
open 16:24
opened 16:21
  86:15,17
operating 30:23
opportunities
  32:16
opportunity 75:12
opposed 56:15
option 51:18
orange 2:19 29:22
  33:4,14 44:20,23
  44:24
organization
  82:11
organizations 81:3
  81:17
orient 40:7
original 19:19
  49:21
originally 6:15
  53:9

orlando 2:20
outcome 94:17
overly 35:13
overtaking 39:2
overtook 34:22
owed 60:4
owned 82:2

**p**

p 5:1
p.a. 2:18
p.m. 3:12 5:8 68:1
  68:5 93:3,5
page 4:2,9,10
  27:14 48:10 55:8
  94:9 96:4,7,10,13
  96:16,19
pages 94:8
paid 54:12 89:24
panel 32:21 33:7
  39:5,6,14,18 40:21
  40:22 41:14,15,16
  41:17,22,23 42:7
  46:1,2
panels 39:9,16
  40:6,8 41:5,13
panthers 82:18
paragraph 55:11
paranoid 20:13
  52:22
part 13:10,16
  15:11 18:3,15
  21:13 26:2 35:20
  36:5,16 37:15
  41:10 46:9 49:21
  57:20 62:22 69:18
partially 82:2
particular 19:7
parties 94:13,16
partner 45:7 71:7
partnership 11:23
  83:14

**party** 17:21,25
18:6 21:15 89:19
**passage** 28:15
**pay** 10:13 15:2,4
17:3 20:3,6,16
55:17,21 56:4,15
64:25 65:22,23
67:2,9,14 76:9,9
77:2 79:6
**paying** 14:6,11
15:8 16:6 17:20
18:4 53:7 55:19
56:20,24 78:4,8
**payment** 13:24
15:3 17:12 54:18
55:11 56:2,11
66:19 75:15 77:4
**payments** 17:7
**pdf** 66:11
**pending** 42:6
**people** 52:21
69:12 71:4,24
73:12 80:24 83:4
**people's** 84:21
**percent** 55:23 56:5
**perception** 84:21
**perfect** 45:14
**period** 56:5 66:5
76:16 82:25 85:14
86:2
**periodically** 10:25
**person** 9:17,20
12:10 21:9 30:2,3
44:25 45:2 58:19
58:20 83:7 88:2,5
**personal** 48:4
**personally** 82:22
94:11
**perspective** 53:2
79:21

**phone** 23:1,3,7,21
23:25 24:6 25:15
28:25 34:11 35:17
37:17 38:11,12
39:11 48:14 51:9
51:25 57:23 58:4
58:5,8,19 59:11
60:6,10 61:1 68:8
74:10,13 79:16
85:8 87:7
**physical** 32:21
**picked** 38:14
**piece** 42:8
**piedmont** 31:17
34:4 42:2,2
**pitch** 10:10 91:1
**place** 60:10 87:15
**plaintiff** 1:7,17 2:2
3:10 5:13,22 87:2
**platform** 36:3
**play** 37:25 59:1
**please** 5:9 6:2
80:15
**pleased** 7:13,15
**plowed** 89:7
**plus** 18:3 22:2
56:22 76:11
**point** 22:25 30:22
31:1 35:12 47:5
51:8 59:22 70:12
74:17
**police** 51:13 80:9
80:10 82:24
**positives** 85:22
**possible** 56:13
**possibly** 65:23
70:22 82:5
**potential** 23:8
**potentially** 38:23
**practice** 36:5

**practices** 13:18
20:10 26:3
**preceding** 94:8
**precise** 28:15
**preference** 83:25
**present** 2:23,24
82:25
**press** 41:9
**presumably** 47:5
**pretty** 14:5 26:20
38:15 41:8 47:18
50:25 51:3 52:18
58:25 79:1,12
80:2 82:7 85:17
**prevalent** 83:3
**previous** 58:15
**previously** 68:7
76:8
**price** 32:17 55:11
**prices** 19:10
**primarily** 35:6
79:4 85:16
**primary** 85:12,12
**prior** 34:7 44:11
50:13 68:25 84:24
**priority** 40:16,25
**privacy** 27:20
**private** 90:4
**privileged** 84:4
**probably** 8:19
9:12,19 20:12
24:14 25:18 33:6
35:15 38:17 44:20
47:21 52:2,3
60:11,23 62:10,10
63:24 65:13 68:11
71:25 74:15 79:10
82:16 83:15
**probe** 39:3
**problems** 7:16,17
34:7

**proceeded** 12:3
**proceeding** 94:14
**produced** 59:6
63:14 64:19 66:7
74:4 77:20 94:4
**product** 7:13
32:17
**productive** 80:16
**products** 21:7
33:10
**profile** 4:10 26:13
26:17,24 27:8,10
27:22,23 31:16
**program** 81:9
**prominent** 81:3
**prominently** 55:7
**proof** 78:8
**provide** 57:5 70:3
79:13
**provided** 50:21
55:5 63:18 64:4
78:11
**provider** 8:18
21:25 32:12 58:15
**provides** 57:7
**providing** 22:4
77:23
**public** 1:24 3:13
27:14,15 94:3
97:19
**pull** 53:21 66:3
**pulled** 26:12 31:15
48:5
**pulling** 18:2
**purchase** 33:2
57:21 62:1
**purchased** 61:6
**put** 9:11 25:10
41:15,16,17 46:2
47:15 51:11 58:3
60:20 84:25 89:9

91:6,25
**putting** 57:9

## q

**quality** 38:23
**question** 10:16
11:2,5,10 21:6
28:19 36:13 42:6
54:17 60:5 82:9
84:1,11 90:14,20
**questions** 12:15
21:19 22:13,16
24:22 45:18 84:19
86:22,24 87:5,20
90:10,25 92:21
**quick** 75:5 87:5
**quicker** 24:7
**quickly** 53:11
**quote** 80:11
**quoted** 14:6,7

## r

**r** 5:1 94:1 96:3,3
**raise** 29:4
**raised** 29:1,4,7
83:20
**raising** 68:24
**ran** 6:16 12:2
**rate** 15:23 16:2,2,9
16:10,17 21:15
53:7 54:10 57:3,6
57:8 65:20 78:12
**rates** 8:20
**ratings** 64:12
**reach** 22:24
**read** 36:19 49:3
66:12 89:16 92:25
95:9 97:5
**reading** 20:10
**real** 87:5
**realized** 18:5 19:1

**really** 8:14 19:13
20:21 43:13 44:4
48:15 71:20 74:19
85:23
**realtime** 3:13
**reason** 32:24
63:13 95:11 96:6
96:9,12,15,18,21
**recall** 9:1,7 11:12
15:14 18:21 23:15
24:10 28:20,22,25
29:5,21 30:1,2
32:24 33:2,7
37:16,21 39:5
44:17,18 49:8
53:6 54:16 55:19
55:19 57:21 58:4
58:7,11,12,13,17
58:17,21 59:8,11
59:15 60:5,6,22
61:20 64:14 65:12
68:10,17,20 69:3,5
69:8,11 70:6,19
71:10,13,18 72:2,4
73:9,21,22 74:12
77:23 78:5 79:23
79:25 81:5,11
83:19,21 85:2,4,8
89:25 90:7
**recalling** 60:9
**receipt** 95:18
**receive** 48:21
78:14
**received** 24:1
60:24 65:13 85:4
85:9
**receiving** 15:14
61:2 73:22
**recess** 68:3
**recognize** 77:22

**recollection** 23:21
25:5 28:16 34:14
38:2 43:17 54:8
54:11 55:24 56:6
58:24 60:16 61:1
62:6 63:20 64:7
65:2 66:4 68:23
72:22 73:2,14
74:6 78:3 79:9
82:19
**record** 51:22 68:2
68:5 77:4 90:16
93:3
**recorded** 51:18
59:1 63:15,17
64:5
**recording** 64:4
**recordings** 51:24
74:5
**records** 51:23 72:3
75:16 76:16 77:21
**rectangular** 41:7
**reduced** 94:10
**refer** 25:12
**reference** 15:1
42:7 45:13 79:20
87:19 90:19 92:2
**referenced** 25:24
44:21 64:5 95:6
**referred** 27:1
53:24 54:23 66:15
77:17
**referring** 43:19,23
61:21 85:7 91:20
**reflect** 58:18
**reflected** 90:16
**reform** 80:9,10
82:24
**refresh** 25:5 34:13
54:8,11 55:24
56:6 60:16 64:7

72:22 73:2 79:9
**refreshes** 66:4
**regard** 83:10
**regarding** 22:25
50:22 72:23
**registered** 3:12
**regular** 8:12,13
**reinforcing** 37:21
65:10
**related** 17:2 94:13
**relates** 89:18
**relationship** 6:22
7:9 10:22 11:14
81:4,9,18 82:3,12
88:24
**relative** 94:15
**relevant** 10:6
**remaining** 15:9,18
85:3
**remember** 8:9
9:22 10:21 28:5
38:8 56:9,14
59:17 61:14,14,15
61:15 69:17 79:24
82:5 84:12
**remembered**
56:12
**remote** 21:8,10
**remotely** 57:22
**renew** 13:13
**renewal** 13:9
**rep** 9:6,8 13:8,11
13:16,21,22 14:1
14:19 28:16 29:2
30:13 31:4 46:25
61:18 70:20 72:18
73:4 90:18 91:8
92:11
**repeat** 11:10,11
**rephrase** 35:8
89:2

**report** 18:23
**reported** 1:24
　94:10
**reporter** 3:13,13
　5:10 67:19 94:2
**represent** 22:21
　36:1,15 48:3
　53:11,12 55:21
　59:24 60:12 63:5
　68:21
**representation**
　8:23 12:20,22
**representations**
　15:13,17
**representative**
　7:20 8:5 9:3,18
　10:2,22 11:13
　15:16 17:19 22:9
　24:18 29:1 37:18
　57:24 58:8 63:7
　63:25 68:14,18
　69:6 88:1,9,11,17
　88:21 89:20
**representatives**
　8:1,10,22 9:16
　16:9 21:3 29:14
　31:10
**represented** 10:3
**representing** 5:13
　5:17
**reps** 19:24 22:12
**reputation** 83:10
**request** 40:5
**required** 94:9
　97:13
**requirements** 94:7
**research** 14:20
**reserved** 93:6
**residential** 30:24
　32:7 33:9 42:17
　43:4

**respect** 28:9 41:12
　44:21 47:21 60:4
**respectful** 53:12
　74:25 75:14
**response** 80:10
　87:20 90:19
**responsive** 51:3
**restroom** 67:21
**result** 32:16 81:4
　81:18 82:12
**resume** 92:23
**return** 95:13,17
**review** 95:7
**reviewed** 34:10
**right** 7:8,18 16:8
　17:6 18:17,21
　23:23 25:11,22
　26:5 28:11,14
　29:17 30:8,13,21
　31:13,19 32:8
　33:18,20,21 34:1,6
　34:18,23 35:4,23
　36:15,22 37:16
　38:11,16,24 41:4
　41:15,17,23,24
　43:11,24 44:14
　45:1,24 46:3,4
　47:6,15,22 48:2
　49:2 50:4,7 51:25
　53:14 56:16,23
　57:15 58:2 60:10
　61:22,24 62:5,17
　62:23,25 64:21
　65:20,24 66:19
　67:8,16 69:21,22
　70:3,25 72:11
　73:14,20 75:19
　76:4 77:4,9 78:12
　78:13 80:6 81:2
　82:9,22 83:9 84:1
　84:10,18,25,25

　86:11,18 87:14
　92:13 93:1
**rmr** 1:24 94:2
**room** 34:13 47:3
　49:15,16
**rule** 41:1
**run** 18:8,13,15
　78:19 81:16
**running** 16:15
**runs** 18:23
**rushing** 88:15

**s**

**s** 2:13,19 5:1 96:3
**safety** 40:25
**sale** 21:16
**sales** 10:10 14:1
　17:19 22:9 28:16
　30:13 46:25 61:18
　63:7 70:19 88:1
　88:10 89:20 90:18
　91:1,8 92:11
**salt** 2:14
**satisfactory** 94:4
**satisfied** 8:16
**save** 8:3 10:7 22:1
　30:20 36:17
**saving** 21:21 32:16
　38:23
**savings** 14:10 16:7
　16:18 22:4,6,6
**savvy** 34:25 35:10
**saw** 14:23,23
　32:25 40:24 49:1
　56:8 70:10 90:1
**saying** 10:22 11:17
　11:20 13:22 16:14
　30:6 34:16 43:7
　48:8 52:18 53:4
　54:12 56:1 58:22
　61:8 69:11 70:8
　71:23 73:18 89:10

　91:3 92:2,9,15
**says** 20:19,19
　41:23,25 42:2
　52:21 54:15 55:14
　57:12 64:19 73:3
　74:8 80:15 83:7
　87:16
**schedule** 49:20
**scooter** 21:3,4
**screen** 26:11,16
　41:8,11 48:9 66:9
　77:8 80:12
**second** 55:10
**seconds** 51:23
**security** 1:5 5:4
　8:17 10:9 12:9,12
　30:7,24 32:7
　33:10,15 36:10,14
　36:21 42:18 43:5
　50:14 58:9,16
　85:19,23 88:19
　95:4 96:1 97:1
**see** 13:7,19 16:15
　16:22 17:14,15,17
　18:7,12,18 21:25
　24:7,8,19 26:13,25
　27:4,5,15 40:7,8
　46:13 47:18 53:4
　54:2,4,6 55:1,12
　55:14 56:17 66:3
　66:19,20,23 67:10
　67:11 75:22,23,25
　76:1 77:13 79:17
　80:11,20,21 81:17
**seeing** 13:4 26:17
　27:9
**seemingly** 15:6
**seen** 8:14 87:11
**send** 20:4 48:20
　61:7 85:2

**sending** 78:5
**sense** 11:7 27:19
  52:22,23 71:1,9
**senseless** 80:18
**senses** 51:17
**sensitive** 27:20
**sensor** 34:13
**sensors** 14:15
  49:13,13
**sent** 80:7,9 95:14
**separate** 33:2 57:2
**serious** 74:22
  75:10
**seriously** 57:4
**service** 7:14,15 8:8
  8:16,17 10:9,9
  15:2,4,6 21:25
  22:2,4,5,11 36:4
  52:8 56:17,21
  57:12 60:14 63:19
  64:24 65:18 68:13
  73:11 83:20 86:11
**services** 13:20
  52:7
**sessions** 2:12
**set** 29:15 30:10
  48:19 85:17 94:8
**seven** 28:12
**severing** 83:14
**shape** 41:6,7
**share** 26:11 48:9
  77:8
**shared** 24:22 78:3
**sharing** 77:8
**shark** 89:12
**shb.com** 2:8
**sheet** 4:14 94:9
  95:11
**shirt** 44:16,19
**shivers** 2:24

**shook** 2:4 23:2,16
  25:16 48:18,19,22
  49:4 75:7
**shopping** 8:13
  9:10,11 33:9
**short** 13:25
**show** 24:5 25:11
  32:22 48:9
**showing** 26:16
  40:20
**sic** 71:19
**side** 41:11
**sign** 42:2 95:12
**signature** 57:15
  93:6 94:9,20
**signed** 95:20
**signs** 8:14 29:22
**similar** 32:17
  33:19
**sit** 38:1 60:6
**site** 86:20
**sitting** 18:20
**situation** 36:12
  84:15 91:11
**situations** 84:6
**six** 64:17
**small** 26:20 54:9
**smart** 1:10,12,12
  5:5 14:13 35:17
  50:6,22,22 51:25
  95:4 96:1 97:1
**snow** 2:12 5:15
**solutions** 95:23
**somebody** 22:24
  35:1 52:4 57:22
  57:25 69:19 80:7
  80:9
**somewhat** 33:9
**sorry** 16:12 24:25
  40:2

**sort** 8:23 12:7
  61:17 84:25
**sound** 36:19 38:15
  46:16 53:14 62:17
  65:20
**sounded** 68:16
**sounds** 31:20
  32:14 33:8 45:21
  50:1 60:25 82:19
  85:25
**space** 30:24
**spam** 23:8
**sparked** 8:4
**speak** 29:25 31:8
**speaking** 37:9
  79:11
**specifically** 10:21
**spend** 80:15
**spoke** 23:16 24:11
  30:2,3 74:8,10
**spoken** 24:12
**spreadsheet** 66:10
**start** 17:17
**started** 6:16,18
  7:12 10:18 13:4
  13:17 15:24 16:22
  17:12,14 25:8
  31:3 42:17 51:1
  64:24 65:22 70:11
  79:8,10 88:18
**starting** 60:8
**state** 7:1 81:9,19
**statement** 29:2
  38:3 52:25 61:19
**statements** 17:16
  75:11 81:5
**states** 1:1
**statistics** 80:17
**stay** 16:2,9 18:23
**stenographic** 94:2

**steps** 31:7
**steward** 2:11 4:5,7
  5:14,14 7:21 8:25
  10:24 11:9,15
  16:12 17:23 18:10
  19:4 21:18 22:15
  22:18,20 26:19,21
  28:2 37:1 42:23
  44:2 49:6 67:18
  67:24 68:6 76:20
  86:21 88:3,7,12,25
  89:4,22 90:5,13
  92:18,22
**steward's** 87:20
**stop** 77:8
**stopped** 8:2 86:6
**store** 7:25 8:1,2
  9:1,17,20 46:17
**story** 75:12
**street** 2:13
**stuff** 33:1 42:12
  51:1
**subpoena** 78:22
**subscribed** 97:14
**subsequent** 24:5
  25:14 63:21 64:5
  65:9
**sued** 74:21
**suggest** 30:14
  36:20 37:3 42:8
  92:11
**suggested** 44:25
**suggesting** 76:10
**suite** 2:13,19
**summarize** 21:20
**supplement** 15:8
**supposed** 73:16
**supposedly** 75:2
**sure** 6:25 11:11
  26:8 29:7 35:13
  38:19 42:15 46:12

52:14,19 58:25
62:5 66:1 67:3
77:2 82:7 83:12
83:14,17 87:14
91:20 92:16
**surprise** 16:20
45:22 56:8 89:25
**surprised** 56:10
**swear** 5:10
**switch** 22:5 36:2
**switching** 8:15
**sworn** 94:6 97:14
**system** 6:13 17:2
18:16 34:7 36:10
37:12,14 38:24
39:6 46:18,19,23
47:1,5 50:14
52:15,19 56:21
58:9 59:10 61:6
64:25 65:5 85:12
85:13,15,16 86:12
86:20
**systems** 1:5 5:5
85:11 86:1 95:4
96:1 97:1

**t**

**t** 94:1,1 96:3,3
**tab** 66:18
**tablet** 57:23 58:3,6
**take** 10:14,17
11:19 31:6,7 36:2
36:14,21 37:5,11
37:14 40:6 41:1
42:12 44:5,7,10
57:4 60:10 67:19
70:5,12 86:14
89:14 90:24
**taken** 1:17 3:10
47:22
**talk** 6:21 8:6 19:16
22:2 23:9 24:20

25:19 27:18 40:16
41:2 73:12
**talked** 68:7 79:22
**talking** 30:18 31:3
35:15 48:15 50:17
51:5,11 58:5,17
59:9 70:7 72:24
91:14
**tank** 89:12
**tax** 53:13 56:22
76:11
**teach** 84:4,7
**team** 69:18 82:16
**tech** 34:25 35:10
**technical** 52:8,13
52:14
**technology** 7:6
26:9 35:9,9,14
**telephone** 60:1
**tell** 8:9 10:3,21
11:12 23:22 30:19
38:6 47:17 51:18
52:3 73:15 75:6
76:14 78:2 88:5
91:9 94:7
**telling** 10:7,13
13:11 20:2 24:17
51:2,12 62:7
63:21 65:4 70:16
70:19 71:10 72:4
83:19,21 84:12
**ten** 24:14
**term** 13:20 15:9
70:17
**terminate** 13:20
81:3
**terminated** 81:9
81:18 82:2,12
**terms** 55:12 71:3,5
73:17

**testified** 5:21
25:25 28:4 31:12
35:24 87:23 89:6
94:8
**testimony** 17:11
90:15,18 95:9,18
97:8
**thank** 5:25 11:9
22:16 87:1,4
90:10 92:19
**thanks** 67:24
92:23
**thereof** 94:16
**thing** 19:12 22:3
33:4,16 35:13
40:15,25 41:2
47:19 79:3 89:16
**things** 11:25 12:1
13:18 14:16 20:1
20:10 21:6,22
25:8 35:16,17
41:22 46:14 51:12
71:25 74:4 80:3,5
91:2,6
**think** 12:9,9,11
14:3 16:23 18:22
19:6,19,21 20:12
26:11 28:4 33:6
34:2,3,5 44:18,22
45:11 46:15 47:8
49:12 50:9 51:4
52:21 53:10,19
55:5 56:10 58:5
60:18,23 62:11
63:3,8 64:13
65:14,18,21 69:17
69:25 70:9,13
71:22 72:12,18,19
73:21 75:1 77:9
77:10,25 78:2,3,7
78:25 79:3 80:7

80:24,24 82:16
83:3,5,7,9 84:20
85:1,18 86:6,8
87:19 88:13 89:11
89:13 90:6 91:13
91:24 92:7,9,25
**thinking** 13:8
54:17 77:1 92:1
**third** 17:21,25
18:6 21:15 23:13
89:19
**thought** 16:10
44:6 50:25 61:5
84:16 91:19 92:4
**threat** 52:16,17
**three** 9:10 28:10
28:12,12 41:9
63:4
**tie** 67:8
**time** 5:8 8:16,21
9:8,10 10:8,11
12:4 13:6,9 16:16
16:19 18:13 19:7
19:22 20:7,14,15
20:17 21:2 23:6
23:13 24:20 27:24
28:15 30:12 32:25
33:10 36:10,13
38:4,12,13,25
39:24 43:2,3
44:10 47:25 48:17
48:20,20 50:20
53:12 56:5,14
59:23 62:3 63:3
65:15,16,19 67:22
67:25 68:4,21,25
73:9,12 75:1,14
76:17 77:1 79:11
80:16,17 81:7
82:25 85:14 86:2
86:25 87:1,4

89:24 90:2,6 91:8
91:19 92:19,24
93:2 95:19
**timeframe** 95:8
**timeline** 59:4
**times** 19:15,18
68:16 73:11,13
**today** 5:16 25:3
38:2 60:6 61:9
74:19 75:8 87:12
87:21,23 90:10
**today's** 5:7 22:23
**told** 8:3,19 10:5
16:8,17 18:4 21:7
36:19 54:18 62:15
64:11 69:6 70:20
74:15 75:8 76:5
85:13 91:11
**top** 40:15,25
**topic** 73:20
**topics** 83:3
**total** 14:8 54:2
55:14
**totally** 47:20
**touch** 41:7,8,11
54:6
**tragedy** 80:8
**transaction** 17:2
22:8
**transcript** 93:1
95:6,20 97:5,8
**transitioning** 31:3
**transparency** 88:8
88:11,14
**transparent** 92:15
**traurig** 2:18 5:17
**treated** 14:24,25
82:21
**triangle** 41:6
**tried** 17:14,16

**triggered** 34:12
**trip** 8:13
**true** 12:20,23
20:15 26:23 27:7
27:22 38:19 57:6
97:8
**truth** 94:7
**truthful** 61:9,13
**truthfully** 87:23
**truths** 88:6
**try** 25:5,10 26:6
41:1 48:21 70:5
70:12 71:4,18
**trying** 12:16 19:12
19:23 37:1 46:13
77:13 84:14 92:13
**turn** 40:21,23 77:7
**two** 9:12 10:11
13:14 17:7 18:23
18:24 19:18,18
30:1 33:12 41:5
49:25 54:6 59:20
72:9 91:6
**type** 47:18 69:12
**types** 84:5
**typewritten** 94:11
**typical** 9:9

**u**

**ultimately** 46:19
65:17
**um** 32:9 65:1
**umbrella** 43:2
**uncomfortable**
12:14 21:9 37:11
**understand** 7:18
17:11 38:21 42:4
45:20 47:21 48:18
52:20,24 53:5
74:20 75:5,6 84:3
84:10 92:18

**understanding**
16:1 78:10,17
90:17
**understood** 25:4
30:22 31:10,21
32:11,11 53:5
58:14,22 59:18
79:15 82:22 86:21
89:6
**united** 1:1
**university** 7:1,2
**unknown** 23:9
**unlocked** 20:21
51:2
**unread** 49:1
**upgraded** 41:19
**upper** 55:7
**use** 26:8 35:19
40:1 45:22 57:11
64:25 65:4 71:4,7
80:17 85:13 90:20
**ut** 2:14
**utility** 7:7
**utilize** 35:22 36:4
36:4 37:6
**utilized** 42:19
**utilizing** 36:22

**v**

**v** 1:9 95:4 96:1
97:1
**verbatim** 94:10
**verify** 95:9
**veritext** 95:14,23
**veritext.com**
95:15
**verizon** 31:12
**version** 11:21
**versus** 5:5 33:14
**vest** 47:18
**video** 1:16 3:9
40:13,21,23 52:3

94:6
**videographer** 2:24
5:2 68:1,4 93:2
**videotape** 5:3
**view** 84:11
**visited** 28:17 46:7
**vivint** 1:10,11,12
4:12 5:5 6:4,11,14
6:18,20,22 7:20,24
8:1,10,21 9:3,6
10:2,4,22 11:13,14
11:21 12:7,25
13:12,15,17,19,22
14:1 15:2,16,17
16:3,8,21 17:2,4,5
17:7,8,10,19,20
19:3,10,16 21:17
22:8,9,11,21 24:19
24:21 25:6 28:6
28:16 29:2,14,20
29:21 30:5,7,22
31:10,11,21 32:6
33:19 34:1,2,8,22
35:22 38:21 39:14
41:8,13,17,23,25
42:6,16,25 43:1,2
43:7,11,18 44:14
44:17,22,23 46:2,3
46:4,23 48:1
50:10,20,22 52:7
52:13 55:3,7
56:21 57:4,7,21,24
58:2,7,14,23 59:10
59:19 60:2 61:5,6
62:8,17,24 63:2,6
63:19,22 64:12
69:1,7,11 70:5,23
70:24 71:11 72:14
72:15,17,21,24
73:9,10,15,15,25
74:10,21,22,23

77:13,20,24,25
78:3,5,15 79:5
85:11,15,16,21
86:13,16 88:10,20
88:24 89:10 90:3
91:9 92:11 95:4
96:1 97:1
**vivint's** 65:14
90:20
**voice** 23:4,5,10,12
24:1,4 38:8,9
68:15 79:17
**voicemails** 24:7
25:20
**vourakis** 1:24 3:12
94:2,21

**w**

**w** 2:17 95:1
**walk** 40:16 41:2
**walking** 21:3,10
40:11 45:17
**wall** 39:14,16 40:7
41:5
**want** 11:10 14:20
21:4,13 31:5,6,6,7
31:19 35:21 36:1
38:20 42:4,15
43:16 48:3,7,12,13
48:14 52:14,15
53:11 55:10 59:4
60:15 61:16 64:24
65:4 70:8 71:24
73:11 74:18,19
77:15 78:5 79:20
89:3 91:13
**wanted** 20:3 21:11
24:19 32:7 46:17
53:4 62:7 63:18
63:21 69:25 71:11
71:20 76:5 79:6
79:19 81:17 87:18

**wants** 12:12 64:23
**watched** 82:20
**water** 67:21
**wavelengths** 37:19
**way** 13:23 14:24
18:14,20 39:13
45:19 66:22 76:23
80:16 88:15
**ways** 13:10,16
21:13 62:22
**we've** 8:14 61:25
62:1 72:3
**weekend** 60:13
**weights** 35:9
**went** 17:17 47:5
63:19 86:17
**western** 1:2
**white** 84:4
**wholesale** 7:25
**wife** 6:9 12:2
32:15 46:7 59:11
59:25 71:6,6,7,8
81:23
**willing** 15:17
24:23 25:3
**win** 71:24
**windows** 49:13,14
**withdraw** 49:6
**witness** 5:11 11:8
67:23 95:8,10,12
95:19
**witnesses** 48:20
**wolf** 20:16
**woman** 9:23 68:17
**wondering** 18:19
**word** 44:22 48:6
**words** 28:16,18,20
28:21,22 43:17
45:6,9,10,12 57:11
60:23 69:10

**work** 7:4 11:24
20:12,25 31:16
40:24 45:16 83:4
**worked** 29:3 45:5
50:24
**working** 10:19,20
11:23 20:23 30:15
82:8
**works** 81:23
**world** 84:11

**x**

**x** 4:1

**y**

**yeah** 11:11 12:8
12:18,21 16:14
17:3,9 20:8 23:25
26:2,4,15,21 27:6
27:24 28:13 29:16
29:23 31:25 32:2
32:10 34:10 37:9
37:19,19 38:9,12
38:17,18 40:14
41:19,25 42:23
44:19,22,24 46:6
46:21 47:2,20,20
47:20 50:17,18
51:7,10,23,23 52:1
53:3,5,9,15 54:20
55:4,4 57:2,25
59:3,21 60:18,24
62:5,10,18,20 64:3
64:8,16,16 67:11
67:17 68:11,12
69:14,17,17 70:22
70:23 71:14,15,22
72:25 73:7,10,12
73:17 74:4 75:23
76:1 77:14 78:2
78:17,25 79:3,24
80:13,24 81:6,7,14

82:18,20 84:3
86:3,19 87:13
**year** 6:17,17 12:22
24:2 68:18
**years** 7:12 18:23
18:24 28:10,12
33:12 63:4
**yesterday** 52:4
**young** 80:19,19

**z**

**zaxby's** 91:12,12
91:13
**zero** 55:23 56:5
**zoom** 1:16 2:1,23
2:24 3:9 5:16
40:21 55:1

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.