

1                UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF NORTH CAROLINA
2                    CHARLOTTE DIVISION
          CIVIL ACTION NO. 3:20-CV-00504-FDW-DSC
3

4

5   CPI SECURITY SYSTEMS, INC.,        )
                                       )
6         Plaintiff,                   )
                                       )
7   vs.                                )
                                       )
8   VIVINT SMART HOME, INC. f/k/a      )
    Mosaic Acquisitions Corporation;   )
9   and LEGACY VIVINT SMART HOME,      )
    INC. f/k/a Vivint Smart Home,      )
10  Inc.,                              )
                                       )
11        Defendants and              )
    Counterclaimants.                  )
12
    _____
13

14

15

16

17              DEPOSITION OF JANET NEWMARK

18                (TAKEN BY PLAINTIFF)

19                 TAKEN VIA ZOOM

20             Wednesday, August 25, 2021

21

22

23

24

25              Reported in Stenotype by
                     Erin Ramsey
      Transcript produced by computer-aide transcription

1   APPEARANCES
2  ON BEHALF OF PLAINTIFF:
3       CHARLES EBLEN, ESQUIRE
         Shook, Hardy & Bacon, LLP
4        2555 Grand Boulevard
         Kansas City, Missouri 64108
5        (816) 474-6550
         Ceblen@chb.com
6
7  ON BEHALF OF DEFENDANT:
8       MATTHEW STEWARD, ESQUIRE
         Clyde Snow
9        201 S. Main Street
         Suite 1300
10       Salt Lake City, Utah 84111
         (801) 322-2516
11       Mas@clydesnow.com
12  Also Present:
13      David Cooper, Videographer
14
15
16
17
18
19
20
21      DEPOSITION OF JANET NEWMARK, a witness called
22  on behalf Plaintiff, before Erin Ramsey, Notary
23  Public, in and for the State of North Carolina, taken
24  via Zoom, on Wednesday, August 25, 2021, commencing at
25  11:04 a.m.

1          INDEX OF EXAMINATIONS
2  BY MR. EBLEN............................... PAGE 5
3  BY MR. STEWARD............................. PAGE 28
4  BY MR. EBLEN............................... PAGE 45
5  BY MR. STEWARD............................. PAGE 46
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  Job No. CS4771065

1       THE VIDEOGRAPHER:  We're going on the
2  record at 11:04:15 a.m., Wednesday, August 25th, 2021.
3  This is media unit number one of the remote video
4  recording deposition of Janet Newmark taken by counsel
5  for the plaintiff in matter of CPI Security Systems,
6  Inc., versus Vivint Smart Home, Inc, f/k/a Mosaic
7  Acquisition Corporation and Legacy Vivint Smart Home,
8  Inc, f/k/a Vivint Smart Home, Inc.  In the United
9  States District Court for the Western District of
10  North Carolina Charlotte Division, Case No.
11  3:20-CV-00504-FDW-DSC.
12       The witness for this remote video
13  deposition is located at 2706 Cheverny Place, Unit
14  193m Concord, North Carolina, 28027.  My name is David
15  Cooper, I'm the certified legal videographer with
16  Veritext.  Would counsel and all those attending
17  remotely please state their name and who they
18  represent beginning with the noticing attorney.
19       MR. EBLEN:  Yes.  This is Charlie Eblen
20  for the plaintiff, CPI.
21       MR. STEWARD:  Matt Steward and Greg
22  Herbert on behalf of the defendants.
23       THE VIDEOGRAPHER:  The court reporter,
24  Erin Ramsey, will now swear in the witness and you're
25  on mute.

1       JANET NEWMARK,
2  called as a witness by the Plaintiff, was first duly
3  sworn, as hereinafter certified, examined, and
4  testified as follows:
5            EXAMINATION
6  BY MR. EBLEN:
7    Q.  Good morning, Ms. Newmark.  How are you today?
8    A.  Good morning.  I'm doing well.  Thank you.
9    Q.  So I wanted to start just by getting a little
10  bit of background information for you.  Could you
11  introduce yourself for the jury, please.
12    A.  Sure.  I'm Janet Newmark.
13    Q.  Where do you live currently?
14    A.  I live at 2706 Cheverny Place in Concord, North
15  Carolina.
16    Q.  Are you originally from North Carolina?
17    A.  No, I'm not.
18    Q.  Where are you from?
19    A.  Most recently from Connecticut.
20    Q.  And who do you live with out there in your
21  condo in Concord?
22    A.  It's actually not a condo, it's a home.  The
23  unit 193 was actually my lot number and then I don't
24  use that now.  But yeah -- but I live with my husband,
25  Evan Newmark.

1  Q. And was there a time that you had some
2  interactions with Vivint?
3      MR. STEWARD: Objection, form, leading.
4      Go ahead. Ms. Newmark, I apologize. My
5  name is Matt Steward and I'm an attorney who
6  represents Vivint in this matter and I may from time
7  to time have an objection to a question, the form of
8  the question. I apologize for the interruption. You
9  can go ahead as long as still have the question in
10 mind you can go ahead and answer. Sometimes witnesses
11 will have forgotten the question and you certainly can
12 ask Mr. Eblen to repeat it.
13     THE WITNESS: Okay. Thank you.
14 Q. Do you remember about when you first
15 encountered someone from Vivint?
16     MR. STEWARD: Objection, form, leading.
17 Q. You can answer.
18 A. How am I -- what am I supposed to do? Just not
19 answer anything?
20     MR. STEWARD: No, no. Again, I was try to
21 explain. From time to time will enter an objection to
22 the form of the question because I think there's some
23 defect with the question. For instance, that's it's
24 suggesting the answer, that's a leading objection. As
25 long as you still have the question in mind go ahead

1  and answer it.
2      THE WITNESS: Okay.
3      MR. STEWARD: Unless you're instructed not
4  to answer which is not going to happen during this
5  deposition. I'm just saying sometimes because of that
6  interruption you may not have a perfect recollection
7  of the question and feel free to ask Mr. Eblen or when
8  I'm asking you questions ask me to repeat the
9  question. Does that make sense.
10     THE WITNESS: Yes.
11     MR. STEWARD: Okay. Thank you.
12 BY MR. EBLEN:
13 Q. Ms. Newmark, have you ever met anyone from
14 Vivint?
15 A. Yes, I have.
16 Q. Okay. When did you meet someone from Vivint?
17     MR. STEWARD: Objection, form.
18 A. I believe the date was June 27th, 2020. It was
19 the day after I moved in from -- I had just moved the
20 night before from Connecticut so it was the very next
21 morning.
22 Q. How did that come about?
23 A. He had been at my neighbor's house and I was
24 throwing something out in the trash cans and he saw me
25 and asked if he could come in and talk to me about the

1  program. Their alarm company.
2  Q. And you said he, do you know who this
3  gentleman's name is that you believe was from Vivint?
4  A. Shane.
5  Q. Do you know Shane's last name?
6  A. No, I do not.
7  Q. All right. So as I understand it you're
8  outside and you're approached by a gentleman from
9  Vivint; is that right?
10 A. Yes, yes.
11 Q. All right. And when you first met Shane
12 outside what did he say to you?
13 A. He asked if he could come in and talk to us
14 about switching to Vivint and I told him that I
15 literally just moved -- I just got in at midnight the
16 night before and we just woke up and we were -- had
17 heard about them and we were thinking of calling them
18 later but we weren't interested in talking now because
19 we were exhausted and he told me this will only take
20 five minutes. And I said I really don't know, my
21 husband's inside and you would need to speak to him.
22 So I went and asked him if he could spare five minutes
23 and so my husband said okay.
24     And the only reason that I did go in and ask my
25 husband is that Shane told me that if we agreed to

1  talk to him now that they can offer us three months of
2  our service -- our monitoring service for free and
3  otherwise that would not be if he had to come back
4  later.
5  Q. And so --
6  A. We did agree to meet with him.
7  Q. Okay. So the offer of three months free
8  service, was that part of what led you to allow him to
9  come into your home?
10     MR. STEWARD: Objection, form, leading.
11 A. Yes.
12 Q. Go ahead.
13     MR. STEWARD: You're fine, Ms. Newmark.
14 A. Yes, it was because I really was not -- we
15 literally just got home at midnight the night before
16 and by the time we went to bed it was after 3:00 a.m.
17 and this was around 9:00 a.m. and we were exhausted
18 and really didn't want to talk to him and I tried to
19 telling him I will call you later but right now is not
20 a good time, but he was very insistent and said, you
21 know, he could give us this discount if we would talk
22 to him now but it wouldn't be available later and he
23 promised -- he actually said I promise this will only
24 take five minutes.
25 Q. All right. For some more background as I

3 (Pages 6 - 9)

1  understand it you said you just moved in, were you
2  fully moving from Connecticut to make North Carolina
3  your permanent residence?
4      A. Yes, yes. We actually owned the home for two
5  years prior and we were living in Connecticut and we
6  had some belongings here, you know, furniture here,
7  but we didn't live here. This was not our actual
8  place of residence because my husband was still
9  employed in Connecticut and we literally just moved
10  in. We drove 13 hours from Connecticut to North
11  Carolina and arrived at midnight the night before.
12      And that's what I told Shane, that we're really
13  tired and we'll call him later and he was just very
14  insistent and promised -- he promised, I swear I will
15  only be five minutes.
16      Q. All right. So at the time you run into Shane
17  out by the trash cans at your home, at that moment
18  when he stopped by were you interested in talking
19  about a new alarm system?
20      A. No, I was not.
21      MR. STEWARD: Objection to form.
22      Ms. Newmark, just if you could, I know
23  it's not natural because this isn't how we typically
24  communicate, but if you could just pause briefly after
25  the question is asked before you answer that will

1  serve a couple purposes. One, it will ensure that
2  Mr. Eblen is finished with his question. It will also
3  give me an opportunity to object to the form of the
4  question if I have an objection.
5      THE WITNESS: Okay.
6      MR. STEWARD: It will also be easier on
7  the court reporter who is actually transcribing our
8  discussion as we have it and that's a very difficult
9  job.
10      THE WITNESS: Okay.
11      MR. STEWARD: Does that make sense?
12      THE WITNESS: I see. Okay. Certainly.
13      MR. STEWARD: Thank you.
14      THE WITNESS: You're welcome.
15  BY MR. EBLEN:
16      Q. All right. So we hit the point where you've
17  talked about running into Shane and the promises he
18  made and I assume at some point did you allow Shane to
19  come into your home?
20      A. Yes.
21      Q. What happened then?
22      A. He sat down with my husband and I and discussed
23  the benefits of using Vivint over our current alarm
24  system, CPI, and so that's basically what happened is
25  he went over their products and their claims and we

1  wound up switching over.
2      Q. All right. And as I understand it -- so you
3  said you've been a CPI customer. For how long had you
4  had CPI in that home?
5      A. Two years.
6      Q. At any point in time when you were speaking to
7  Shane on that day, did he say anything that would
8  suggest to you or your husband that Vivint had some
9  sort of relationship or any association with CPI?
10      MR. STEWARD: Objection, form, leading.
11      Q. You can answer.
12      A. I'm not quite sure what you mean by that.
13      Q. Yeah. And I'm asking if he said anything to
14  you that would have suggested that there was any sort
15  of relationship between CPI and Vivint.
16      MR. STEWARD: Objection, form, leading.
17      THE WITNESS: May I answer?
18      MR. STEWARD: Yes.
19      A. The only thing that I distinctly remember him
20  comparing CPI is stating that their motherboard or
21  whatever you want to call it was actually their
22  program that CPI took over. And -- or they sold to
23  CPI, something like that. But that was initially
24  their product. And you know, I don't know what
25  bearing that had on our decision at all but I just

1  remember him saying that that used to be their
2  product, that they developed it.
3      Q. Did Shane at any point in time say whether or
4  not your existing CPI equipment would be compatible
5  with Vivint's services?
6      MR. STEWARD: Objection, form, leading.
7  Go ahead.
8      A. Yes, he did. And that actually wound up posing
9  a problem later on.
10      Q. Tell us what you mean by that.
11      A. Well, he stated that our light modules were
12  compatible and they were not. And they actually wound
13  up charging us for those light modules and I had to
14  make a phone call to tell them that Shane said that
15  because he had already told us ahead of time that they
16  were compatible that they would remove that charge,
17  which they did, they reimbursed us for that. He also
18  said -- there was something else and I don't remember
19  what it was. There was another item that was
20  supposedly compatible and it turned out not to be.
21      Q. And that other item, did you make any phone
22  calls to try to get money refunded related to that?
23      MR. STEWARD: Objection, form.
24      A. You know, that I can't honestly -- I can't
25  answer because I don't remember what the item was. I

1 do remember about the modules though, the light
2 modules. And it was a small amount. It was about a
3 $150 or so and we were reimbursed.
4 Q. Did Shane sell you anything else during the
5 process of speaking to you about Vivint that you later
6 discovered or believed was not truthful or not
7 transparent?
8      MR. STEWARD: Objection, form.
9 A. There was something that he did not say that
10 wound up being a huge issue for us and it wasn't so
11 much what he did say, it was what he did not say
12 that --
13 Q. And what was that issue?
14 A. He failed to mention or show us in writing that
15 there was a $1,799 starter kit that they included and
16 he never mentioned it, never showed it to us while we
17 were sitting with him, never discussed it, and we did
18 not find out about it for about three months. We kept
19 trying to get our contract which he stated he was
20 going to bring back that night and he never did. And
21 we kept calling him and he said he was going to send
22 it and he never did. And we kept calling the company
23 and Vivint kept sending us a -- basically a checklist
24 of every single product that they sell and I kept had
25 to keep reminding them that I didn't want a checklist

1 of what they were selling but I wanted my contract of
2 what I agreed to purchase.
3     And it took them three months to get that to me
4 and that's when I found out about the $1799 charge
5 that we had no idea and nobody could explain it to me.
6 I made numerous phone calls and spoke with numerous
7 people and nobody could ever tell me what that charge
8 was for.
9     And it took months of phone calls and many
10 people to talk to before I finally got an explanation
11 of what that was.
12 Q. So just to break that down a little bit. On
13 the day that you decided to go with Vivint, to sign up
14 with Vivint, did you get a copy of your contract with
15 them?
16 A. No.
17     MR. STEWARD: Objection. Objection, form.
18 Go ahead.
19 A. We did not.
20 Q. And to break down based on your communications
21 with Shane, what amount of money did you think you
22 would be paying Vivint for your alarm system?
23 A. $3,729.95.
24 Q. And how did you find out -- so let me start
25 that over. What was the roughly $1800 that you found

1 out about later on, what was that related to?
2 A. That was what they call a starter kit and
3 basically I -- in my opinion because nobody could ever
4 explain it properly it was for the pleasure of doing
5 business with Vivint. It was, to me, a bogus charge
6 that they kept telling me I would get refunded and
7 they passed me around from person to person, nothing
8 ever happened, I had to make numerous phone calls,
9 they kept saying that they would refund the money,
10 they had to send it to upper management and get them
11 to okay it and it took months and months and months of
12 making phone call after phone call getting the same
13 runaround until I was finally told, nope, sorry I
14 was -- you're not getting your money back.
15     And -- but there was one other thing I now
16 remember in regard to your initial question. You
17 asked if there was anything else that he told us that
18 we would be getting that we did not and first of all,
19 we did not get the three months paid, we later got a
20 portion of that reimbursed to us. And he was supposed
21 to give us a, like, $100 fee for signing up and he
22 didn't give that to us. He said he was going to come
23 back and give that us along with the contract, which
24 he never did either one of those things.
25     And then we eventually did get Vivint to pay

1 us, like, a new customer -- like, I don't even know
2 what it was called but it was for signing up with
3 them. My neighbor who actually had initially talked
4 to us about Vivint, she was supposed to get a finder's
5 fee also and they never sent her anything until months
6 later and it was at my request but they didn't give
7 her that either.
8 Q. So any of the amounts of money that Shane
9 promised to give to you as an incentive, did you
10 receive any of those without calling Vivint?
11 A. No, none of them.
12 Q. All right. So had you not called Vivint and
13 perhaps called Vivint multiple times, do you believe
14 that you would have received the things that Shane
15 promised you?
16     MR. STEWARD: Objection, form.
17 A. Absolutely not. Absolutely not.
18 Q. And throughout this whole transaction with
19 Vivint including the phone calls that you described,
20 how many times would you estimate that you called
21 Vivint to address some of the things that were either
22 promised or not disclosed to you in your interactions
23 with Shane?
24     MR. STEWARD: Objection, form.
25     THE WITNESS: May I answer.

1    MR. STEWARD: Yes.
2    A. I would say I made at least -- somewhere
3 between 10 and 20 phone calls. And each phone call
4 generally -- I talked to about 10 or 15 different
5 people, let's put it that way, because I got passed
6 around -- I would be on hold for a half an hour in
7 between each person, somebody else would come on the
8 line, I'd have to tell the story all over again. So
9 sometimes I would talk to two or three people during
10 one phone call and I would say probably say about 10
11 phone calls at least on individual dates.
12    Q. Do you have any estimate total, I know you said
13 something to the effect of most of the calls would
14 last around half an hour, do you have an estimate in
15 total of much time you spent dealing with Vivint on
16 the issues you've described?
17    A. The actual amount of time that I spent on the
18 phone each time was over an hour, not a half an hour
19 because they would have me tell the story, put me on
20 hold for 20 minutes or so, then somebody else would
21 come on the line, I'd tell them to story, and then
22 we'd have a discussion then they'd transfer me to
23 somebody else. And sometimes I even have one note
24 here that I was so upset that I wrote down how long I
25 was on the phone and it was an hour and 43 minutes and

1 then they disconnected me. So it was -- all of that
2 was for nothing.
3    So I would say all told I probably spent maybe
4 ten hours total trying to get this resolved.
5    Q. Did you feel like they were working to try to
6 help you get your money back that you were promised?
7    MR. STEWARD: Objection, form, leading.
8    A. I felt that they were all very, very, polite
9 and very skilled at passing the buck basically. They,
10 you know, told me how sorry they were and how nice they
11 so wrong and they will definitely get my money back
12 and that they will send it on to a supervisor and that
13 they will escalate this because of the situation that
14 I had been waiting so long for my money and numerous
15 people told me the exact same thing and nothing was
16 ever done. And I didn't get money back, I didn't get
17 phone calls back for the most part. A couple of them
18 did call me back but basically just to tell me that
19 they were going to send it on to somebody else and
20 then I didn't hear anything so then I would have to
21 call them back. And it just kept going on like this
22 for a couple of months.
23    Q. All right. So focussing now just on this
24 starter kit that you described, did you have any sort
25 of conversation with Shane about a starter kit and the

1 cost of it?
2    MR. STEWARD: Objection, form.
3    A. None whatsoever. He did not discuss it nor did
4 he show us anything in writing that we were being
5 charged this dollar amount for any product.
6    Q. And I think you already talked about this, the
7 date of the transaction did you ever have a copy of
8 the contract so that you could look at?
9    A. No, we did not.
10    MR. STEWARD: Objection, form, asked and
11 answered. Go ahead.
12    A. No.
13    Q. Sorry. Go ahead.
14    A. We were just told that he was going to bring it
15 back.
16    Q. And what all steps did you take to get a copy
17 of your contract?
18    A. I made numerous phone calls requesting it.
19    Q. Did they provide a copy eventually for free?
20    MR. STEWARD: Objection, form.
21    A. Eventually.
22    MR. STEWARD: I'm sorry. Objection, form.
23 Go ahead and answer, Ms. Newmark.
24    A. They eventually did send me a copy of the
25 contract. They kept trying to send me basically an

1 equipment list of everything that they sold and I had
2 to kept correcting them and saying that's not what I
3 was requesting, I was requesting a copy of my contract
4 and what I bought and what I paid for and after three
5 months I finally got somebody to send it to me.
6    Q. Did you ever get ahold of Shane when you tried
7 to get ahold of him about the issues we've been
8 discussing?
9    A. No, we did not.
10    Q. And how did you reach out to Shane?
11    A. My husband called him.
12    Q. And on a cell phone?
13    MR. STEWARD: Objection, foundation.
14    Q. Okay. Let me back up. In the interaction with
15 Shane did he give you a phone number?
16    A. I believe he gave my husband his phone number.
17    Q. And to your knowledge is that the number that
18 was used to try to reach out to Shane?
19    A. I believe so.
20    Q. And as I understand your testimony after the
21 day of the transaction did you ever have any
22 interaction again with Shane?
23    A. I personally did not.
24    Q. Did Shane ever come back out to your home and
25 provide you either the gift card or the credit for the

1 first three months of monitoring?
2    A. No, he did not.
3    Q. Okay. So now focusing on the starter kit.
4 Explain what interactions you had in your phone calls
5 with Vivint about the starter kit and their reaction
6 to it.
7      MR. STEWARD: Objection, form, leading,
8 asked and answered.
9    Q. You can answer.
10    A. Okay. Beginning back in -- let me see my
11 notes. In September I made a phone call because we
12 did not receive the money from Shane that he said he
13 would be paying the first four months of our -- I'm
14 sorry, three months of our service or -- forget what
15 it's called, our monthly charge. And they said the
16 best they could do is give is four payments of $40 and
17 that was not -- that was, like, about a third or a
18 quarter of what our monthly payments were but they
19 said that that's all they could do is give us that
20 and --
21    Q. How much are your monthly payments with Vivint?
22    A. That I don't really know.
23    Q. Another related question to that. Did you take
24 out any third-party financing as it relates to your
25 contract with Vivint?

1      MR. STEWARD: Objection, form.
2    A. No.
3    Q. All right. And ultimately what was the
4 resolution with Vivint on the first three month
5 payment issue?
6    A. They agreed to give me four months of -- a
7 credit of $40 towards the first four months of our
8 monthly service charge. It was not the same as paying
9 the full amount, it was only a credit of $40 and they
10 did, in fact, take $40 off for each of those four
11 months.
12    Q. All right. And what was the resolution on the
13 issue that you raised to Vivint with the payment of
14 the starter kit?
15    A. They sent me an e-mail saying they sent it to
16 opportunities and their response was since the Smart
17 Hub was new equipment and not existing the charge
18 within the loan is valid. The case has been closed by
19 our opportunities, feel free to reach out. So they
20 basically washed their hands of it after I'd been told
21 a multitude of times by a variety of different people,
22 which I took notes and have their names and badge
23 numbers and what have you on a few of them, that they
24 promised me they would get my money back and obviously
25 that did not have happen and they said nope, sorry

1 you're not getting your money back.
2    Q. Do you know what department all of the
3 individuals with whom you spoke at Vivint worked in?
4    A. They were customer service, that's who I would
5 be calling.
6    Q. Did your call ever get elevated where you
7 talked to somebody outside of customer service?
8    A. I spoke to a few different -- no, I actually --
9 no, I never did get to speak to any of the upper
10 management people that they kept saying that they were
11 going to go to. I only got customer service
12 individuals that said they would go to upper
13 management and they apparently were trying to get this
14 money returned to me but they would not have me speak
15 with those individuals.
16    Q. In all of your dealings in total with Vivint
17 related to the issues that you testified about, at the
18 end of the day did you feel like you were getting a
19 runaround?
20      MR. STEWARD: Objection, form.
21    A. That would be an understatement.
22    Q. Well, how would you describe the treatment you
23 got by Vivint's customer service in relation to your
24 complaints?
25    A. I felt that they were very polite and they were

1 understanding but I thought it was a complete -- the
2 way they treated me was completely false that -- I
3 felt like they did this to everybody, that's the way I
4 came out feeling that they seemed like they were very
5 sorry and they really wanted to fix my problem but
6 when it came down to it nothing ever happened and I
7 would get disconnected on multiple occasions and I had
8 to make so many phone calls and tell the story so many
9 times that I felt like I was getting nowhere because I
10 kept getting told I was going to get the money back
11 and they felt really bad and they were going to
12 escalate this and they were going to take it to upper
13 management and they were going to get me my money back
14 and it never happened.
15    So I definitely got the runaround and I felt
16 tricked and betrayed and lied to.
17    Q. And if we go back to the time that you met
18 Shane out by the trash that morning and through all of
19 your dealings with Vivint do you feel like they were
20 honest with you?
21      MR. STEWARD: Objection, form.
22    A. I actually do not feel like they were honest
23 with me. There were too many different things that
24 they were not honest about.
25    Q. And do you believe with the experience you've

Veritext Legal Solutions

800-567-8658                                         973-410-4098

1 been through had Shane been honest with you and the
2 discussion you had with him that day do you believe
3 that you would have switched to Vivint?
4          MR. STEWARD:  Objection, form.
5     A.  I would not have switched had I known about
6 that $1800 charge because I had equipment from CPI
7 which I had already paid in full and there was no
8 reason to have to pay $1800 to come onboard with
9 Vivint for simply the pleasure of doing business with
10 them and I would never have agreed to that.  And the
11 only reason I did agree to make the switch was because
12 of the promises that Shane had made and because of
13 hearing from neighbor's that they had better cameras
14 and we had been having issues with CPI's camera and
15 one other thing that bothered us.  But other than that
16 CPI was fabulous and good customer service and we had
17 no reason to change except that the cameras were a big
18 issue and we could see the difference and so we went
19 ahead and made the change.
20     Q.  Question about your neighbors, did any of your
21 other neighbors, to your knowledge, have problems with
22 Vivint?
23          MR. STEWARD:  Objection.  Calls for
24 hearsay.
25     A.  Can I answer that?

1     Q.  Yes, you can.
2     A.  Yes.  I have one neighbor that I've been
3 dealing directly with who has had the exact same
4 situation.  Her dollar amount was smaller, it was
5 $1200 but she did the exact same thing, making
6 multiple phone calls over a period of months and
7 having the exact same types of conversations and never
8 getting the money back.  They never did give her --
9 her finder's fee until I requested it and they finally
10 did give it to her but they only gave her $50 instead
11 of 100.  And she did tell me about other people in the
12 neighborhood complaining for the same reason as well
13 as this particular individual, Shane.
14          Well, we have a neighborhood Facebook page and
15 we, you know, talk amongst the neighbors and Shane
16 promised multiple people that if they give him a good
17 review and Vivint a good review that they would get a
18 gift card and so they did and apparently Shane signed
19 up more and more people and they never got their gift
20 cards.  And so apparently that was something that was
21 going around on Facebook within the neighborhood
22 Faceook page that it's kind of a scam.
23          MR. STEWARD:  I'm going to move to strike
24 that testimony to the extent it lacks foundation and
25 contains hearsay.

1     Q.  And what's your neighbor's name?
2     A.  Merelene Valder.
3     Q.  Did you have any sort of an issue with having
4 to pay CPI a buyout related to the contract you had
5 with CPI when Vivint came to the home?
6     A.  I did initially.  However, CPI did -- either --
7 they either dropped it because I don't think we paid
8 it but they dropped it and they sent me an e-mail
9 stating that I was not responsible for that and they
10 let me out of the contract without paying.
11     Q.  Did you still have time left on your contract
12 with CPI?
13     A.  I believe so.
14          MR. EBLEN:  I think those are all the
15 questions I have for you, Ms. Newmark.  Thank you for
16 your time.
17          THE WITNESS:  You're welcome.
18                EXAMINATION
19 BY MR. STEWARD:
20     Q.  Good morning, Ms. Newmark.  Again, my name
21 is -- good morning, my name is Matt Steward, I'm an
22 attorney for Vivint here in Salt Lake City, Utah,
23 where unfortunately the smoke from the fires in
24 California has returned to the valley.
25     A.  Yes, I've heard.

1     Q.  We had clear days but we're back in the smoke.
2     A.  I feel bad for you.
3     Q.  Well, thanks.  I wish I was in North Carolina.
4 I noted that it looked like maybe you were referring
5 to some notes or documents as you were responding to
6 Mr. Eblen's questions.  Do you have any documents or
7 notes with you?
8     A.  I do.
9     Q.  Can you identify those for me, what you have?
10     A.  Can you excuse me?
11     Q.  Absolutely take whatever time you need.
12          MR. EBLEN:  We'll go off the record.  Why
13 don't we take five minutes just in case.
14          THE VIDEOGRAPHER:  The time is
15 approximately 11:42:24 a.m., we're now off the record.
16          (A recess was taken.)
17          THE VIDEOGRAPHER:  The time is
18 approximately 11:46:49 a.m., we're now on the record.
19 BY MR. STEWARD:
20     Q.  Thank you again, Ms. Newmark.  And I apologize
21 for the challenges and difficulties you had with
22 Vivint's customer service department, but this lawsuit
23 is about CPI alleging that Vivint and its sales
24 representatives represent or misrepresent to customers
25 that they are CPI or that they're affiliated with CPI

1 in some manner.
2      Did Shane do or say anything to cause you to
3 believe that Vivint and CPI were the same company?
4      MR. EBLEN: I'll object to form. That
5 characterization is part of our lawsuit but we don't
6 need to get into that today. So object to form.
7      A. I will answer that and no, he did not say that
8 they were one and the same company.
9      Q. Right. In fact, Shane clearly identified
10 himself as being there on behalf of Vivint, right?
11      A. Yes, he did.
12      Q. And you understood Shane was competing for your
13 business as a home alarm and automation customer and
14 trying to get you signed up for Vivint, a company that
15 was different than your existing provider, correct?
16      A. Correct.
17      Q. Okay. Did Shane have anything on his person, a
18 hat, a uniform, a shirt, that identified him as being
19 a representative of the company Vivint?
20      A. I don't recall.
21      Q. Okay. Do you recall was he did -- he have any
22 vehicle that was parked within your view that had any
23 markings identified as a Vivint vehicle?
24      A. Not that I saw. He was walking when I --
25      Q. Do you recall if he had a badge that identified

1 him as being a Vivint representative?
2      A. No, I do not.
3      Q. Okay. But in any event nothing he wore or said
4 suggested that he was there on behalf of CPI, correct?
5      A. No.
6      Q. Okay. Now, you had -- you had mentioned that
7 Shane told you that the panel you had with CPI had
8 been developed by Vivint; do you recall that?
9      MR. EBLEN: Objection to form.
10      A. Yes, I recall that.
11      Q. Okay. And do you recall was your panel with
12 CPI a 2GIG panel, that's the number 2 and G-I-G?
13      A. I don't recall.
14      Q. Okay. Do you still have that panel?
15      A. No, I do not.
16      Q. Okay. Do you have any reason to believe that
17 Shane's representation regarding Vivint's development
18 of the control panel you had with CPI was false?
19      A. Well, I don't know. I didn't have any reason
20 to not believe it. We were just taking his word for
21 it. But yeah, we didn't research it or anything but
22 we just took his word for it.
23      Q. I'm going to share my screen with you a second.
24 If I've done this correctly there is a photographic
25 image of a panel.

1      Does that panel look like the panel you had
2 with CPI if you recall?
3      A. If it's not it's very close.
4      Q. Okay. I'll represent to you that this is a
5 panel manufactured by 2GIG but it sounds like your
6 panel was very similar to this; is that right?
7      MR. EBLEN: Object to form.
8      A. Yes.
9      Q. Okay. And the Vivint panel that you have now
10 is very different than this panel, correct, it's more
11 like an iPad?
12      A. Correct.
13      Q. Now, I understand you had a long drive the
14 night before and Shane visited you I think you said
15 about 9:00 a.m. the following morning; is that right?
16      A. Correct.
17      Q. Okay. So was -- but you had a CPI system in
18 this home for approximately two years. Was somebody
19 else living in the home?
20      A. No.
21      Q. Okay. You just had a system that you monitored
22 or CPI monitored at this home but you hadn't moved
23 there full-time yet; is that correct?
24      A. That's correct.
25      Q. Did you guys -- did you and your husband

1 vacation there or spend time there?
2      A. Yes. We came time multiple times during the
3 year and stayed for a few days or a week.
4      Q. It was a second home that become a primary home
5 when your husband retired; is that fair?
6      A. That was the whole point. We bought while the
7 prices were good.
8      Q. Congratulations on that. And I hope -- sounds
9 like that's been a good move for you guys.
10      A. Absolutely has been.
11      Q. That's great. I asked you about documents or
12 notes you had with you. Can you identify just what
13 you have there for me.
14      A. I have a copy of my schedule of equipment and
15 services and a list of the different items that we
16 purchased and one of the very first thing it says
17 Vivint Takeover Kit, 1799 full price. And I had put a
18 note there that this was never discussed or shown in
19 writing or given the option to decline.
20      Q. Right.
21      A. And I just wrote notes from conversations that
22 I had with different people and I put dates and, like,
23 little short notes on multiple things.
24      Q. Got it. You had referenced a price of
25 $3,727.95 if I got that right. And what do you

9 (Pages 30 - 33)

1 understand that price to be?
2    A. For the panel, the main panel, and the door
3 locks. What else did we get? We got the doorbell
4 camera, we got smoke detectors, CO2 detectors, and I
5 think that's basically it. The equipment that's what
6 we thought we were paying that amount for, was the
7 equipment.
8    Q. Okay. And I'm surprised because my
9 understanding is that the -- the starter kit is
10 actually -- includes some of the equipment. Are you
11 saying that you believe that the equipment charge of
12 3700 -- approximately $3700 was in addition to the
13 17 -- or almost $1800?
14       MR. EBLEN: Object to form.
15    A. Right.
16    Q. Is that your understanding?
17    A. That's my understanding, yes.
18    Q. I want -- that surprises me and so I'll have
19 somebody reach out to you about that because I'm also
20 a Vivint customer and when I purchased the equipment
21 and like you -- well, let me ask this, when were you
22 given the option -- were you given the option to
23 either finance the equipment over time or pay for it
24 upfront?
25    A. Yes.

1    Q. Okay. And you elected to pay for it upfront;
2 is that right?
3    A. Yes.
4    Q. Okay. And do you have the page that shows at
5 equipment charge in addition to the $1800 charge?
6    A. No, it just -- it lumps it all together.
7    Q. Okay. And --
8    A. It's called a Smart Home Bundle.
9    Q. Right. And that should be just the equipment
10 charge so I will have somebody reach out to you and --
11    A. I do have something under equipment name and
12 pricing it says keypad, pad 1 $50 that's --
13    Q. Right. That should all be totalled up, right?
14 So they itemize the equipment, the itemize what that
15 equipment costs, sometimes they waive certain
16 equipment charges, and then is that totalled at the
17 bottom and is that the $3700 amount?
18       MR. EBLEN: Object to form.
19    A. That was not totalled. I would have to
20 actually total that.
21    Q. Okay. Don't worry about it. But I am going to
22 have somebody reach out to you because the equipment
23 should be one charge, there's not an additional charge
24 for the equipment.
25     It sounds like you ordered a fairly robust

1 suite of equipment; is that fair?
2    A. Yes.
3       MR. EBLEN: Objection.
4    Q. And did you -- do you have the Vivint app on
5 your phone? If you can see that where --
6    A. Yes.
7    Q. Where it pulls up the cameras where you can
8 view from your home; do you have that feature?
9    A. Yes.
10    Q. Is that a feature that you were attracted to
11 when you made the decision to go with Vivint?
12    A. Yes.
13    Q. And you would agree with me that the Vivint
14 suite of equipment you ordered is fair superior to the
15 equipment that was being provided by CPI, right?
16       MR. EBLEN: Object to form.
17    A. We did like it better. It had a few things
18 that we did like better.
19    Q. And did you get the smart exterior high
20 definition cameras?
21    A. Yes.
22    Q. And you would agree with me that that provided
23 a far superior quality image than the CPI camera you
24 had?
25       MR. EBLEN: Object to form.

1    A. Yes.
2    Q. Okay. Do you recall calling CPI to cancel your
3 CPI contract?
4    A. I don't specifically remember if I called or
5 e-mailed but I believe I did call.
6    Q. Okay. And do you recall telling CPI, and these
7 are your words which I quite liked, that their cameras
8 sucked, the quality sucked; do you recall using those
9 words?
10       MR. EBLEN: Object to form.
11    A. No, I don't, but that sounds like me.
12    Q. Okay. And is it your opinion that the CPI
13 cameras sucked?
14    A. Yes, it is my opinion.
15    Q. Right. And you used somewhat less colorful
16 word you also said they're just horrible. Do you
17 recall telling CPI that its cameras were just
18 horrible?
19    A. No, I don't remember saying that but I may
20 have.
21    Q. Okay. Do you recall telling -- well,
22 complaining to CPI that their doorbell camera -- I
23 know this is an exaggeration but you said it sends
24 you, like, 485 billion texts and e-mails over one
25 night. That if a gnat flies by you receive a text and

1 an e-mail and, quote, unquote, it was driving you
2 insane?
3      MR. EBLEN:  Object to form.
4   A.  I definitely do remember that.
5   Q.  That the CPI -- telling CPI that their system
6 was driving you insane?
7   A.  Yes.
8   Q.  Okay.
9   A.  Because both my husband and I would both get
10 the same text and dinging all through the night and we
11 would have literally a gnat fly by and it would send
12 us a message and we did be deleting hundreds of text
13 messages every morning for every ding that we got
14 throughout the night and it was driving us nuts.  And
15 we tried getting the sensitivity adjusted and nothing
16 would stop it.  So that was the main reason that we
17 were unhappy with CPI but everything pretty much we
18 were okay with.
19   Q.  Right.  But isn't it true that you called CPI
20 not just once but on multiple occasions to complain
21 about the doorbell camera not functioning properly?
22   A.  It functioned properly and we did make phone
23 calls regarding the sensitivity of it because it
24 literally was going off when a fly or a gnat or a moth
25 would fly by and we were not under the impression that

1 it was supposed to be that sensitive and so we were
2 unhappy with the cameras overall with the clarity,
3 with the fact that it did not cover as much area as we
4 thought it was going to, and it didn't record when we
5 actually had people come up into our driveway even
6 though you could see in the camera that they were
7 there, it didn't notify us on occasion, other
8 occasions it did.  So it was random.
9      And that was our main complaint was the camera
10 and the sensitivity.  And that was the reason that we
11 were willing to entertain the idea of talking to
12 another alarm company because it wasn't something that
13 was getting resolved.
14   Q.  By CPI?  CPI wasn't resolving your consumer
15 concerns about the sensitivity of the doorbell camera
16 concerns; is that fair?
17   A.  That's fair.
18   Q.  And that's why you were willing to listen to
19 Shane sales presentation regarding the Vivint
20 equipment?
21   A.  Correct.
22   Q.  Okay.  Do you recall on one of the phone calls
23 telling CPI that the Vivint system is great.  Well,
24 this is -- these are your words, quote, the system is
25 great, control panel is better, end quote.

1      Do you recall telling CPI that about the Vivint
2 system when you called to cancel?
3   A.  I don't recall but it's possible.
4   Q.  And that would be accurate, right?  I mean, you
5 were being truthful at that time?
6   A.  If that's what -- yeah.  I mean -- and that
7 still stands.  Their equipment is good, I am very
8 happy with Vivint.
9   Q.  Right.  Your complaint is about, you know, you
10 think that Shane promised a prepaid credit card of
11 $100, he promised to pay the first three months and
12 you haven't received an adequate explanation for this
13 starter kit and the $1800 charge with respect to the
14 starter kit, right?
15   A.  Well, it's more than that.  I never got an
16 explanation, nobody ever told me what it was, every
17 time I would ask they would say hold on let me
18 transfer you to somebody who can explain that.  I
19 would tell the story to that person and they would say
20 I totally understand, you're right, you should get the
21 money back, we will escalate this and let me have this
22 go to upper management and they will get you your
23 money.  And so it sounded to me like they were going
24 to get me my money back on multiple occasions they
25 were going to refund me my money but nobody would

1 explain what it was.  Every single time I would ask
2 what is this for, they would say hold on let me
3 transfer you to somebody.  It was every time.
4   Q.  And I think we all can share your exasperation
5 with the shared human experience of calling a company
6 and trying to get them address the situation and being
7 transferred around and having to retell the same story
8 over and over, right?  That was part of your
9 frustration?
10   A.  That was a huge part of my frustration and
11 getting no result and nobody doing anything and
12 getting hung up on multiple times.
13   Q.  I apologize for that.  That would be
14 frustrating to me as well and again, I will commit to
15 having somebody to reach out to you and get that
16 straightened out.
17   A.  You should also have them reach out to me to
18 get my three months of full service charge instead of
19 just the $40 because that was something that was told
20 to us and that never happened.  You know, I got, you
21 know, a little bit of compensation but not what we
22 were told.
23   Q.  Yeah.  Understood.  I got that note and I will
24 do that -- I will do that as well.  I'll make sure
25 somebody reaches out to you shortly to address both of

1 those concerns.
2     Do you -- are you familiar with -- about the
3 same time you went with Vivint are you familiar with
4 some news reports about comments made by CPI's CEO an
5 individual by the name of Ken Gill?
6 A. No, I'm not familiar.
7 Q. Let me see if this refreshes your recollection.
8 There was -- this article characterizes it as a
9 racially insensitive e-mail that was leaked. I
10 believe this contains -- so there was an e-mail by
11 CPI's CEO that caused quite a stir.
12 A. I actually -- I do remember vaguely something
13 about that but can you remind me of what your question
14 was?
15 Q. Yeah. My question was, it sounds like this did
16 refresh your recollection that you recall some news
17 about Mr. Gill's comment. Did that play any role in
18 your decision to cancel your CPI system?
19     MR. EBLEN: Form and foundation.
20 A. No.
21 Q. Okay. Do you recall having a phone call with
22 CPI where you were complaining that they were charging
23 you an equipment charge when you cancelled even though
24 you had paid for the CPI equipment upfront? It was a
25 $905 charge, they said -- when you called to cancel

1 you were informed that there was an equipment charge
2 of $905 remaining that you were owed; do you recall
3 that?
4 A. Yes, vaguely. Yes.
5 Q. And do you recall your response was no, that's
6 not correct, I actually paid for the equipment upfront
7 similar to what you did with Vivint?
8     MR. EBLEN: Object to form.
9 A. I actually don't recall this conversation but I
10 do remember that CPI was charging me for something and
11 I did make a phone call to them and they decided not
12 to charge me after all and they wrote me an e-mail
13 that states that they are releasing me from any
14 obligation, that I do not have to pay that.
15 Q. And giving the challenges and problems you had
16 with the CPI system, do you think that's a fair
17 resolution that CPI let you out of your contract?
18     MR. EBLEN: Object to form.
19 A. I thought it was fair.
20 Q. Yeah. Do you recall calling CPI in late July
21 2020 to complain that even though you had elected to
22 go with the Vivint service and cancel the CPI service
23 that you were still receiving monitoring e-mails from
24 CPI?
25 A. Yes.

1 Q. Okay. And did they address your complaint at
2 that time and did you, in fact, stop receiving
3 monitoring e-mails from CPI?
4 A. I don't recall. Eventually we did. I don't
5 know if that call prompted it immediately or not.
6 Q. Okay.
7 A. I apologize. I don't remember --
8 Q. That's fine.
9 A. -- distinctly.
10     MR. STEWARD: Let me do this, I think I'm
11 almost finished with my questions but if we could go
12 off the record for five minutes if anybody needs to
13 take a bathroom break or get a drink of water I could
14 just review my notes and make sure I'm finished. Is
15 that okay.
16     THE WITNESS: Fine by me.
17     MR. STEWARD: Okay. Don't leave the
18 meeting, we're just going to go off the record. Okay?
19     THE WITNESS: All right.
20     THE VIDEOGRAPHER: The time is
21 approximately 12:09:38 p.m., we're now off the record.
22     (A recess was taken.)
23     THE VIDEOGRAPHER: The time is
24 approximately 12:17:21 p.m., we're now on the record.
25     MR. STEWARD: Ms. Newmark, those are all

1 my questions. Thank you very much for your time
2 today.
3     MR. EBLEN: Thank you Ms. Newmark, I just
4 have a couple of short follow-up questions.
5     RE-EXAMINATION
6 BY MR. EBLEN:
7 Q. While we were off the record did Mr. Steward,
8 Vivint's lawyer, tell you that he would have somebody
9 from Vivint call you about the complaints you had
10 regarding all the pricing issues?
11 A. Yes, he did.
12 Q. And up until this point had anybody
13 communicated with you that directly about a
14 willingness to solve your issues?
15 A. No.
16 Q. Mr. Steward asked you some questions about
17 which system you like better, which equipment you like
18 better. And my question is, in our American economy
19 do you agree that competition between companies is a
20 good thing?
21 A. Absolutely.
22 Q. Do you believe that Americans should have the
23 ability to choose based on things like price, service,
24 honesty, technology which company they choose to use
25 for products and services?

12 (Pages 42 - 45)

1          MR. STEWARD:  Objection, form, leading.
2     A.  I absolutely agree to all of those.
3     Q.  In competing do you believe that businesses
4  should be honest to their customers or potential
5  customers?
6     A.  Definitely.
7     Q.  From the day that you met Shane to the end of
8  your time trying to get ahold of him do you feel like
9  Shane on behalf of Vivint was honest with you and your
10  husband?
11          MR. STEWARD:  Objection, form.
12     A.  Not at all.
13          MR. EBLEN:  Those are all the questions I
14  have for you.  Thank you.
15          RE-EXAMINATION
16  BY MR. STEWARD:
17     Q.  Just one question, Ms. Newmark.  Shane was
18  honest about the fact that he was there on behalf of
19  Vivint, right?
20     A.  Right.
21     Q.  He was honest about the fact that Vivint and
22  CPI are competitors, right?
23     A.  Right.
24          MR. STEWARD:  Okay.  Thank you that's all
25  I have.

1          THE WITNESS:  Okay.
2          MR. EBLEN:  Good luck with the pool.
3          THE WITNESS:  Thank you.  Can't wait.
4  Won't be ready till Christmas.  That's not going to do
5  me a whole lot of good this year.  But thank you and
6  good luck with yours.
7          THE VIDEOGRAPHER:  This concludes the
8  video deposition of Janet Newmark consisting of three
9  media units.  The time is approximately 12:20:07 p.m.,
10  we're now off the record.
11          (Off the record at 12:20 p.m.)
12          (Signature was waived.)
13
14
15
16
17
18
19
20
21
22
23
24
25

1  STATE OF NORTH CAROLINA
   COUNTY OF GUILFORD
2
3          REPORTER'S CERTIFICATE
4     I, Erin Ramsey, a Notary Public in and for the
5  State of North Carolina, do hereby certify that there
6  came before me on Wednesday, the 25th day of August,
7  2021, the person hereinbefore name, in Cabarrus
8  County, who was by me duly sworn to testify to the
9  truth and nothing but the truth of his knowledge
10  concerning the matters in controversy in this cause;
11  that the witness was thereupon examined under oath,
12  the examination reduced to typewriting under my
13  direction, and the deposition is a true record of the
14  testimony given by the witness.
15     I further certify that I am neither attorney or
16  counsel for, nor related to or employed by, any
17  attorney or counsel employed by the parties hereto or
18  financially interested in the action.
19     IN WITNESS WHEREOF, I have hereto set my hand,
20  this the 30th day of August, 2021, according to the
21  emergency video notarization requirements contained in
22  G.S. 10B-25.
23
24          Erin C Ramsey
25     Erin Ramsey, Notary Public
          Notary Number: 201814200166

**&**

**&** 2:3

**0**

**00504** 1:2 4:11

**1**

**1** 35:12
**1,799** 14:15
**10** 18:3,4,10
**100** 16:21 27:11
  40:11
**10b** 48:22
**11:04** 2:25
**11:04:15** 4:2
**11:42:24** 29:15
**11:46:49** 29:18
**1200** 27:5
**12:09:38** 44:21
**12:17:21** 44:24
**12:20** 47:11
**12:20:07** 47:9
**13** 10:10
**1300** 2:9
**15** 18:4
**150** 14:3
**17** 34:13
**1799** 15:4 33:17
**1800** 15:25 26:6,8
  34:13 35:5 40:13
**193** 5:23
**193m** 4:14

**2**

**2** 31:12
**20** 18:3,20
**201** 2:9
**201814200166**
  48:25
**2020** 7:18 43:21
**2021** 1:19 2:24 4:2
  48:7,20

**21602** 48:24
**25** 1:19 2:24 48:22
**2555** 2:4
**25th** 4:2 48:6
**2706** 4:13 5:14
**27th** 7:18
**28** 3:3
**28027** 4:14
**2gig** 31:12 32:5

**3**

**3,727.95** 33:25
**3,729.95.** 15:23
**30th** 48:20
**322-2516** 2:10
**3700** 34:12,12
  35:17
**3:00** 9:16
**3:20** 1:2 4:11

**4**

**40** 22:16 23:7,9,10
  41:19
**43** 18:25
**45** 3:4
**46** 3:5
**474-6550** 2:5
**485** 37:24

**5**

**5** 3:2
**50** 27:10 35:12

**6**

**64108** 2:4

**8**

**801** 2:10
**816** 2:5
**84111** 2:10

**9**

**905** 42:25 43:2
**9:00** 9:17 32:15

**a**

**a.m.** 2:25 4:2 9:16
  9:17 29:15,18
  32:15
**ability** 45:23
**absolutely** 17:17
  17:17 29:11 33:10
  45:21 46:2
**accurate** 40:4
**acquisition** 4:7
**acquisitions** 1:8
**action** 1:2 48:18
**actual** 10:7 18:17
**addition** 34:12
  35:5
**additional** 35:23
**address** 17:21
  41:6,25 44:1
**adequate** 40:12
**adjusted** 38:15
**affiliated** 29:25
**agree** 9:6 26:11
  36:13,22 45:19
  46:2
**agreed** 8:25 15:2
  23:6 26:10
**ahead** 6:4,9,10,25
  9:12 13:7,15
  15:18 20:11,13,23
  26:19
**ahold** 21:6,7 46:8
**aide** 1:25
**alarm** 8:1 10:19
  11:23 15:22 30:13
  39:12
**alleging** 29:23
**allow** 9:8 11:18
**american** 45:18
**americans** 45:22
**amount** 14:2
  15:21 18:17 20:5

23:9 27:4 34:6
  35:17
**amounts** 17:8
**answer** 6:10,17,19
  6:24 7:1,4 10:25
  12:11,17 13:25
  17:25 20:23 22:9
  26:25 30:7
**answered** 20:11
  22:8
**anybody** 44:12
  45:12
**apologize** 6:4,8
  29:20 41:13 44:7
**app** 36:4
**apparently** 24:13
  27:18,20
**appearances** 2:1
**approached** 8:8
**approximately**
  29:15,18 32:18
  34:12 44:21,24
  47:9
**area** 39:3
**arrived** 10:11
**article** 42:8
**asked** 7:25 8:13,22
  10:25 16:17 20:10
  22:8 33:11 45:16
**asking** 7:8 12:13
**association** 12:9
**assume** 11:18
**attending** 4:16
**attorney** 4:18 6:5
  28:22 48:15,17
**attracted** 36:10
**august** 1:19 2:24
  4:2 48:6,20
**automation** 30:13
**available** 9:22

**b**

**back** 9:3 14:20 16:14,23 19:6,11 19:16,17,18,21 20:15 21:14,24 22:10 23:24 24:1 25:10,13,17 27:8 29:1 40:21,24
**background** 5:10 9:25
**bacon** 2:3
**bad** 25:11 29:2
**badge** 23:22 30:25
**based** 15:20 45:23
**basically** 11:24 14:23 16:3 19:9 19:18 20:25 23:20 34:5
**bathroom** 44:13
**bearing** 12:25
**bed** 9:16
**beginning** 4:18 22:10
**behalf** 2:2,7,22 4:22 30:10 31:4 46:9,18
**believe** 7:18 8:3 17:13 21:16,19 25:25 26:2 28:13 30:3 31:16,20 34:11 37:5 42:10 45:22 46:3
**believed** 14:6
**belongings** 10:6
**benefits** 11:23
**best** 22:16
**betrayed** 25:16
**better** 26:13 36:17 36:18 39:25 45:17 45:18

**big** 26:17
**billion** 37:24
**bit** 5:10 15:12 41:21
**bogus** 16:5
**bothered** 26:15
**bottom** 35:17
**bought** 21:4 33:6
**boulevard** 2:4
**break** 15:12,20 44:13
**briefly** 10:24
**bring** 14:20 20:14
**buck** 19:9
**bundle** 35:8
**business** 16:5 26:9 30:13
**businesses** 46:3
**buyout** 28:4

**c**

**cabarrus** 48:7
**california** 28:24
**call** 9:19 10:13 12:21 13:14 16:2 16:12,12 18:3,10 19:18,21 22:11 24:6 37:5 42:21 43:11 44:5 45:9
**called** 2:21 5:2 17:2,12,13,20 21:11 22:15 35:8 37:4 38:19 40:2 42:25
**calling** 8:17 14:21 14:22 17:10 24:5 37:2 41:5 43:20
**calls** 13:22 15:6,9 16:8 17:19 18:3 18:11,13 19:17 20:18 22:4 25:8 26:23 27:6 38:23

39:22
**camera** 26:14 34:4 36:23 37:22 38:21 39:6,9,15
**cameras** 26:13,17 36:7,20 37:7,13,17 39:2
**cancel** 37:2 40:2 42:18,25 43:22
**cancelled** 42:23
**cans** 7:24 10:17
**card** 21:25 27:18 40:10
**cards** 27:20
**carolina** 1:1 2:23 4:10,14 5:15,16 10:2,11 29:3 48:1 48:5
**case** 4:10 23:18 29:13
**cause** 30:2 48:10
**caused** 42:11
**ceblen** 2:5
**cell** 21:12
**ceo** 42:4,11
**certain** 35:15
**certainly** 6:11 11:12
**certificate** 48:3
**certified** 4:15 5:3
**certify** 48:5,15
**challenges** 29:21 43:15
**change** 26:17,19
**characterization** 30:5
**characterizes** 42:8
**charge** 13:16 15:4 15:7 16:5 22:15 23:8,17 26:6 34:11 35:5,5,10,23

35:23 40:13 41:18 42:23,25 43:1,12
**charged** 20:5
**charges** 35:16
**charging** 13:13 42:22 43:10
**charles** 2:3
**charlie** 4:19
**charlotte** 1:2 4:10
**chb.com** 2:5
**checklist** 14:23,25
**cheverny** 4:13 5:14
**choose** 45:23,24
**christmas** 47:4
**city** 2:4,10 28:22
**civil** 1:2
**claims** 11:25
**clarity** 39:2
**clear** 29:1
**clearly** 30:9
**close** 32:3
**closed** 23:18
**clyde** 2:8
**clydesnow.com** 2:11
**co2** 34:4
**colorful** 37:15
**come** 7:22,25 8:13 9:3,9 11:19 16:22 18:7,21 21:24 26:8 39:5
**commencing** 2:24
**comment** 42:17
**comments** 42:4
**commit** 41:14
**communicate** 10:24
**communicated** 45:13

communications 15:20
companies 45:19
company 8:1 14:22 30:3,8,14,19 39:12 41:5 45:24
comparing 12:20
compatible 13:4 13:12,16,20
compensation 41:21
competing 30:12 46:3
competition 45:19
competitors 46:22
complain 38:20 43:21
complaining 27:12 37:22 42:22
complaint 39:9 40:9 44:1
complaints 24:24 45:9
complete 25:1
completely 25:2
computer 1:25
concerning 48:10
concerns 39:15,16 42:1
concludes 47:7
concord 4:14 5:14 5:21
condo 5:21,22
congratulations 33:8
connecticut 5:19 7:20 10:2,5,9,10
consisting 47:8
consumer 39:14
contained 48:21

contains 27:25 42:10
contract 14:19 15:1,14 16:23 20:8,17,25 21:3 22:25 28:4,10,11 37:3 43:17
control 31:18 39:25
controversy 48:10
conversation 19:25 43:9
conversations 27:7 33:21
cooper 2:13 4:15
copy 15:14 20:7 20:16,19,24 21:3 33:14
corporation 1:8 4:7
correct 30:15,16 31:4 32:10,12,16 32:23,24 39:21 43:6
correcting 21:2
correctly 31:24
cost 20:1
costs 35:15
counsel 4:4,16 48:16,17
counterclaimants 1:11
county 48:1,8
couple 11:1 19:17 19:22 45:4
court 1:1 4:9,23 11:7
cover 39:3
cpi 1:5 4:5,20 11:24 12:3,4,9,15 12:20,22,23 13:4

26:6,16 28:4,5,6 28:12 29:23,25,25 30:3 31:4,7,12,18 32:2,17,22 36:15 36:23 37:2,3,6,12 37:17,22 38:5,5,17 38:19 39:14,14,23 40:1 42:18,22,24 43:10,16,17,20,22 43:24 44:3 46:22
cpi's 26:14 42:4,11
credit 21:25 23:7,9 40:10
cs4771065 3:25
current 11:23
currently 5:13
customer 12:3 17:1 24:4,7,11,23 26:16 29:22 30:13 34:20
customers 29:24 46:4,5
cv 1:2 4:11

**d**

date 7:18 20:7
dates 18:11 33:22
david 2:13 4:14
day 7:19 12:7 15:13 21:21 24:18 26:2 46:7 48:6,20
days 29:1 33:3
dealing 18:15 27:3
dealings 24:16 25:19
decided 15:13 43:11
decision 12:25 36:11 42:18
decline 33:19
defect 6:23

defendant 2:7
defendants 1:11 4:22
definitely 19:11 25:15 38:4 46:6
definition 36:20
deleting 38:12
department 24:2 29:22
deposition 1:16 2:21 4:4,13 7:5 47:8 48:13
describe 24:22
described 17:19 18:16 19:24
detectors 34:4,4
developed 13:2 31:8
development 31:17
difference 26:18
different 18:4 23:21 24:8 25:23 30:15 32:10 33:15 33:22
difficult 11:8
difficulties 29:21
ding 38:13
dinging 38:10
direction 48:13
directly 27:3 45:13
disclosed 17:22
disconnected 19:1 25:7
discount 9:21
discovered 14:6
discuss 20:3
discussed 11:22 14:17 33:18

**discussing** 21:8
**discussion** 11:8 18:22 26:2
**distinctly** 12:19 44:9
**district** 1:1,1 4:9,9
**division** 1:2 4:10
**documents** 29:5,6 33:11
**doing** 5:8 16:4 26:9 41:11
**dollar** 20:5 27:4
**door** 34:2
**doorbell** 34:3 37:22 38:21 39:15
**drink** 44:13
**drive** 32:13
**driveway** 39:5
**driving** 38:1,6,14
**dropped** 28:7,8
**drove** 10:10
**dsc** 1:2 4:11
**duly** 5:2 48:8

**e**

**e** 23:15 28:8 37:5 37:24 38:1 42:9 42:10 43:12,23 44:3
**easier** 11:6
**eblen** 2:3 3:2,4 4:19,19 5:6 6:12 7:7,12 11:2,15 28:14 29:12 30:4 31:9 32:7 34:14 35:18 36:3,16,25 37:10 38:3 42:19 43:8,18 45:3,6 46:13 47:2
**eblen's** 29:6
**economy** 45:18

**effect** 18:13
**either** 16:24 17:7 17:21 21:25 28:6 28:7 34:23
**elected** 35:1 43:21
**elevated** 24:6
**emergency** 48:21
**employed** 10:9 48:16,17
**encountered** 6:15
**ensure** 11:1
**enter** 6:21
**entertain** 39:11
**equipment** 13:4 21:1 23:17 26:6 33:14 34:5,7,10,11 34:20,23 35:5,9,11 35:14,15,16,22,24 36:1,14,15 39:20 40:7 42:23,24 43:1,6 45:17
**erin** 1:25 2:22 4:24 48:4,25
**escalate** 19:13 25:12 40:21
**esquire** 2:3,8
**estimate** 17:20 18:12,14
**evan** 5:25
**event** 31:3
**eventually** 16:25 20:19,21,24 44:4
**everybody** 25:3
**exact** 19:15 27:3,5 27:7
**exaggeration** 37:23
**examination** 5:5 28:18 45:5 46:15 48:12

**examinations** 3:1
**examined** 5:3 48:11
**exasperation** 41:4
**excuse** 29:10
**exhausted** 8:19 9:17
**existing** 13:4 23:17 30:15
**experience** 25:25 41:5
**explain** 6:21 15:5 16:4 22:4 40:18 41:1
**explanation** 15:10 40:12,16
**extent** 27:24
**exterior** 36:19

**f**

**f** 1:8,9 4:6,8
**fabulous** 26:16
**facebook** 27:14,21
**faceook** 27:22
**fact** 23:10 30:9 39:3 44:2 46:18 46:21
**failed** 14:14
**fair** 33:5 36:1,14 39:16,17 43:16,19
**fairly** 35:25
**false** 25:2 31:18
**familiar** 42:2,3,6
**far** 36:23
**fdw** 1:2 4:11
**feature** 36:8,10
**fee** 16:21 17:5 27:9
**feel** 7:7 19:5 23:19 24:18 25:19,22 29:2 46:8
**feeling** 25:4

**felt** 19:8 24:25 25:3,9,11,15
**finally** 15:10 16:13 21:5 27:9
**finance** 34:23
**financially** 48:18
**financing** 22:24
**find** 14:18 15:24
**finder's** 17:4 27:9
**fine** 9:13 44:8,16
**finished** 11:2 44:11,14
**fires** 28:23
**first** 5:2 6:14 8:11 16:18 22:1,13 23:4,7 33:16 40:11
**five** 8:20,22 9:24 10:15 29:13 44:12
**fix** 25:5
**flies** 37:25
**fly** 38:11,24,25
**focusing** 22:3
**focussing** 19:23
**follow** 45:4
**following** 32:15
**follows** 5:4
**forget** 22:14
**forgotten** 6:11
**form** 6:3,7,16,22 7:17 9:10 10:21 11:3 12:10,16 13:6,23 14:8 15:17 17:16,24 19:7 20:2,10,20,22 22:7 23:1 24:20 25:21 26:4 30:4,6 31:9 32:7 34:14 35:18 36:16,25 37:10 38:3 42:19 43:8,18 46:1,11

**found** 15:4,25
**foundation** 21:13
  27:24 42:19
**four** 22:13,16 23:6
  23:7,10
**free** 7:7 9:2,7
  20:19 23:19
**frustrating** 41:14
**frustration** 41:9
  41:10
**full** 23:9 26:7
  32:23 33:17 41:18
**fully** 10:2
**functioned** 38:22
**functioning** 38:21
**furniture** 10:6
**further** 48:15

**g**

**g** 31:12,12
**g.s.** 48:22
**generally** 18:4
**gentleman** 8:8
**gentleman's** 8:3
**getting** 5:9 16:12
  16:14,18 24:1,18
  25:9,10 27:8
  38:15 39:13 41:11
  41:12
**gift** 21:25 27:18,19
**gill** 42:5
**gill's** 42:17
**give** 9:21 11:3
  16:21,22,23 17:6,9
  21:15 22:16,19
  23:6 27:8,10,16
**given** 33:19 34:22
  34:22 48:14
**giving** 43:15
**gnat** 37:25 38:11
  38:24

**go** 6:4,9,10,25 8:24
  9:12 13:7 15:13
  15:18 20:11,13,23
  24:11,12 25:17
  29:12 36:11 40:22
  43:22 44:11,18
**going** 4:1 7:4
  14:20,21 16:22
  19:19,21 20:14
  24:11 25:10,11,12
  25:13 27:21,23
  31:23 35:21 38:24
  39:4 40:23,25
  44:18 47:4
**good** 5:7,8 9:20
  26:16 27:16,17
  28:20,21 33:7,9
  40:7 45:20 47:2,5
  47:6
**grand** 2:4
**great** 33:11 39:23
  39:25
**greg** 4:21
**guilford** 48:1
**guys** 32:25 33:9

**h**

**half** 18:6,14,18
**hand** 48:19
**hands** 23:20
**happen** 7:4 23:25
**happened** 11:21
  11:24 16:8 25:6
  25:14 41:20
**happy** 40:8
**hardy** 2:3
**hat** 30:18
**hear** 19:20
**heard** 8:17 28:25
**hearing** 26:13
**hearsay** 26:24
  27:25

**help** 19:6
**herbert** 4:22
**hereinafter** 5:3
**hereinbefore** 48:7
**hereto** 48:17,19
**high** 36:19
**hit** 11:16
**hold** 18:6,20 40:17
  41:2
**home** 1:8,9,9 4:6,7
  4:8 5:22 9:9,15
  10:4,17 11:19
  12:4 21:24 28:5
  30:13 32:18,19,22
  33:4,4 35:8 36:8
**honest** 25:20,22,24
  26:1 46:4,9,18,21
**honestly** 13:24
**honesty** 45:24
**hope** 33:8
**horrible** 37:16,18
**hour** 18:6,14,18
  18:18,25
**hours** 10:10 19:4
**house** 7:23
**hub** 23:17
**huge** 14:10 41:10
**human** 41:5
**hundreds** 38:12
**hung** 41:12
**husband** 5:24 8:23
  8:25 10:8 11:22
  12:8 21:11,16
  32:25 33:5 38:9
  46:10
**husband's** 8:21

**i**

**idea** 15:5 39:11
**identified** 30:9,18
  30:23,25

**identify** 29:9
  33:12
**image** 31:25 36:23
**immediately** 44:5
**impression** 38:25
**incentive** 17:9
**included** 14:15
**includes** 34:10
**including** 17:19
**index** 3:1
**individual** 18:11
  27:13 42:5
**individuals** 24:3
  24:12,15
**information** 5:10
**informed** 43:1
**initial** 16:16
**initially** 12:23
  17:3 28:6
**insane** 38:2,6
**insensitive** 42:9
**inside** 8:21
**insistent** 9:20
  10:14
**instance** 6:23
**instructed** 7:3
**interaction** 21:14
  21:22
**interactions** 6:2
  17:22 22:4
**interested** 8:18
  10:18 48:18
**interruption** 6:8
  7:6
**introduce** 5:11
**ipad** 32:11
**issue** 14:10,13
  23:5,13 26:18
  28:3
**issues** 18:16 21:7
  24:17 26:14 45:10

45:14

**item** 13:19,21,25
**itemize** 35:14,14
**items** 33:15

**j**

**janet** 1:16 2:21 4:4
5:1,12 47:8
**job** 3:25 11:9
**july** 43:20
**june** 7:18
**jury** 5:11

**k**

**k** 1:8,9 4:6,8
**kansas** 2:4
**keep** 14:25
**ken** 42:5
**kept** 14:18,21,22
14:23,24 16:6,9
19:21 20:25 21:2
24:10 25:10
**keypad** 35:12
**kind** 27:22
**kit** 14:15 16:2
19:24,25 22:3,5
23:14 33:17 34:9
40:13,14
**know** 8:2,5,20
9:21 10:6,22
12:24,24 13:24
17:1 18:12 19:10
22:22 24:2 27:15
31:19 37:23 40:9
41:20,21 44:5
**knowledge** 21:17
26:21 48:9
**known** 26:5

**l**

**lacks** 27:24
**lake** 2:10 28:22

**late** 43:20
**lawsuit** 29:22 30:5
**lawyer** 45:8
**leading** 6:3,16,24
9:10 12:10,16
13:6 19:7 22:7
46:1
**leaked** 42:9
**leave** 44:17
**led** 9:8
**left** 28:11
**legacy** 1:9 4:7
**legal** 4:15
**lied** 25:16
**light** 13:11,13 14:1
**liked** 37:7
**line** 18:8,21
**list** 21:1 33:15
**listen** 39:18
**literally** 8:15 9:15
10:9 38:11,24
**little** 5:9 15:12
33:23 41:21
**live** 5:13,14,20,24
10:7
**living** 10:5 32:19
**llp** 2:3
**loan** 23:18
**located** 4:13
**locks** 34:3
**long** 6:9,25 12:3
18:24 19:14 32:13
**look** 20:8 32:1
**looked** 29:4
**lot** 5:23 47:5
**luck** 47:2,6
**lumps** 35:6

**m**

**mail** 23:15 28:8
38:1 42:9,10
43:12

**mailed** 37:5
**mails** 37:24 43:23
44:3
**main** 2:9 34:2
38:16 39:9
**making** 16:12 27:5
**management**
16:10 24:10,13
25:13 40:22
**manner** 30:1
**manufactured**
32:5
**markings** 30:23
**mas** 2:11
**matt** 4:21 6:5
28:21
**matter** 4:5 6:6
**matters** 48:10
**matthew** 2:8
**mean** 12:12 13:10
40:4,6
**media** 4:3 47:9
**meet** 7:16 9:6
**meeting** 44:18
**mention** 14:14
**mentioned** 14:16
31:6
**merelene** 28:2
**message** 38:12
**messages** 38:13
**met** 7:13 8:11
25:17 46:7
**midnight** 8:15
9:15 10:11
**mind** 6:10,25
**minutes** 8:20,22
9:24 10:15 18:20
18:25 29:13 44:12
**misrepresent**
29:24

**missouri** 2:4
**modules** 13:11,13
14:1,2
**moment** 10:17
**money** 13:22
15:21 16:9,14
17:8 19:6,11,14,16
22:12 23:24 24:1
24:14 25:10,13
27:8 40:21,23,24
40:25
**monitored** 32:21
32:22
**monitoring** 9:2
22:1 43:23 44:3
**month** 23:4
**monthly** 22:15,18
22:21 23:8
**months** 9:1,7
14:18 15:3,9
16:11,11,11,19
17:5 19:22 21:5
22:1,13,14 23:6,7
23:11 27:6 40:11
41:18
**morning** 5:7,8
7:21 25:18 28:20
28:21 32:15 38:13
**mosaic** 1:8 4:6
**moth** 38:24
**motherboard**
12:20
**move** 27:23 33:9
**moved** 7:19,19
8:15 10:1,9 32:22
**moving** 10:2
**multiple** 17:13
25:7 27:6,16 33:2
33:23 38:20 40:24
41:12

**multitude** 23:21
**mute** 4:25

**n**

**name** 4:14,17 6:5
8:3,5 28:1,20,21
35:11 42:5 48:7
**names** 23:22
**natural** 10:23
**need** 8:21 29:11
30:6
**needs** 44:12
**neighbor** 17:3
27:2
**neighbor's** 7:23
26:13 28:1
**neighborhood**
27:12,14,21
**neighbors** 26:20
26:21 27:15
**neither** 48:15
**never** 14:16,16,17
14:20,22 16:24
17:5 24:9 25:14
26:10 27:7,8,19
33:18 40:15 41:20
**new** 10:19 17:1
23:17
**newmark** 1:16
2:21 4:4 5:1,7,12
5:25 6:4 7:13 9:13
10:22 20:23 28:15
28:20 29:20 44:25
45:3 46:17 47:8
**news** 42:4,16
**night** 7:20 8:16
9:15 10:11 14:20
32:14 37:25 38:10
38:14
**nope** 16:13 23:25
**north** 1:1 2:23
4:10,14 5:14,16

10:2,10 29:3 48:1
48:5
**notarization** 48:21
**notary** 2:22 48:4
48:25,25
**note** 18:23 33:18
41:23
**noted** 29:4
**notes** 22:11 23:22
29:5,7 33:12,21,23
44:14
**noticing** 4:18
**notify** 39:7
**number** 4:3 5:23
21:15,16,17 31:12
48:25
**numbers** 23:23
**numerous** 15:6,6
16:8 19:14 20:18
**nuts** 38:14

**o**

**oath** 48:11
**object** 11:3 30:4,6
32:7 34:14 35:18
36:16,25 37:10
38:3 43:8,18
**objection** 6:3,7,16
6:21,24 7:17 9:10
10:21 11:4 12:10
12:16 13:6,23
14:8 15:17,17
17:16,24 19:7
20:2,10,20,22
21:13 22:7 23:1
24:20 25:21 26:4
26:23 31:9 36:3
46:1,11
**obligation** 43:14
**obviously** 23:24
**occasion** 39:7

**occasions** 25:7
38:20 39:8 40:24
**offer** 9:1,7
**okay** 6:13 7:2,11
7:16 8:23 9:7 11:5
11:10,12 16:11
21:14 22:3,10
30:17,21 31:3,6,11
31:14,16 32:4,9,17
32:21 34:8 35:1,4
35:7,21 37:2,6,12
37:21 38:8,18
39:22 42:21 44:1
44:6,15,17,18
46:24 47:1
**onboard** 26:8
**once** 38:20
**opinion** 16:3 37:12
37:14
**opportunities**
23:16,19
**opportunity** 11:3
**option** 33:19 34:22
34:22
**ordered** 35:25
36:14
**originally** 5:16
**outside** 8:8,12
24:7
**overall** 39:2
**owed** 43:2
**owned** 10:4

**p**

**p.m.** 44:21,24 47:9
47:11
**pad** 35:12
**page** 3:2,3,4,5
27:14,22 35:4
**paid** 16:19 21:4
26:7 28:7 42:24
43:6

**panel** 31:7,11,12
31:14,18,25 32:1,1
32:5,6,9,10 34:2,2
39:25
**parked** 30:22
**part** 9:8 19:17
30:5 41:8,10
**particular** 27:13
**parties** 48:17
**party** 22:24
**passed** 16:7 18:5
**passing** 19:9
**pause** 10:24
**pay** 16:25 26:8
28:4 34:23 35:1
40:11 43:14
**paying** 15:22
22:13 23:8 28:10
34:6
**payment** 23:5,13
**payments** 22:16
22:18,21
**people** 15:7,10
18:5,9 19:15
23:21 24:10 27:11
27:16,19 33:22
39:5
**perfect** 7:6
**period** 27:6
**permanent** 10:3
**person** 16:7,7 18:7
30:17 40:19 48:7
**personally** 21:23
**phone** 13:14,21
15:6,9 16:8,12,12
17:19 18:3,3,10,11
18:18,25 19:17
20:18 21:12,15,16
22:4,11 25:8 27:6
36:5 38:22 39:22
42:21 43:11

**photographic** 31:24

**place** 4:13 5:14 10:8

**plaintiff** 1:6,17 2:2 2:22 4:5,20 5:2

**play** 42:17

**please** 4:17 5:11

**pleasure** 16:4 26:9

**point** 11:16,18 12:6 13:3 33:6 45:12

**polite** 19:8 24:25

**pool** 47:2

**portion** 16:20

**posing** 13:8

**possible** 40:3

**potential** 46:4

**prepaid** 40:10

**present** 2:12

**presentation** 39:19

**pretty** 38:17

**price** 33:17,24 34:1 45:23

**prices** 33:7

**pricing** 35:12 45:10

**primary** 33:4

**prior** 10:5

**probably** 18:10 19:3

**problem** 13:9 25:5

**problems** 26:21 43:15

**process** 14:5

**produced** 1:25

**product** 12:24 13:2 14:24 20:5

**products** 11:25 45:25

**program** 8:1 12:22

**promise** 9:23

**promised** 9:23 10:14,14 17:9,15 17:22 19:6 23:24 27:16 40:10,11

**promises** 11:17 26:12

**prompted** 44:5

**properly** 16:4 38:21,22

**provide** 20:19 21:25

**provided** 36:15,22

**provider** 30:15

**public** 2:23 48:4 48:25

**pulls** 36:7

**purchase** 15:2

**purchased** 33:16 34:20

**purposes** 11:1

**put** 18:5,19 33:17 33:22

### q

**quality** 36:23 37:8

**quarter** 22:18

**question** 6:7,8,9 6:11,22,23,25 7:7 7:9 10:25 11:2,4 16:16 22:23 26:20 42:13,15 45:18 46:17

**questions** 7:8 28:15 29:6 44:11 45:1,4,16 46:13

**quite** 12:12 37:7 42:11

**quote** 38:1 39:24 39:25

### r

**racially** 42:9

**raised** 23:13

**ramsey** 1:25 2:22 4:24 48:4,25

**random** 39:8

**reach** 21:10,18 23:19 34:19 35:10 35:22 41:15,17

**reaches** 41:25

**reaction** 22:5

**ready** 47:4

**really** 8:20 9:14,18 10:12 22:22 25:5 25:11

**reason** 8:24 26:8 26:11,17 27:12 31:16,19 38:16 39:10

**recall** 30:20,21,25 31:8,10,11,13 32:2 37:2,6,8,17,21 39:22 40:1,3 42:16,21 43:2,5,9 43:20 44:4

**receive** 17:10 22:12 37:25

**received** 17:14 40:12

**receiving** 43:23 44:2

**recess** 29:16 44:22

**recollection** 7:6 42:7,16

**record** 4:2 29:12 29:15,18 39:4 44:12,18,21,24 45:7 47:10,11 48:13

**recording** 4:4

**reduced** 48:12

**referenced** 33:24

**referring** 29:4

**refresh** 42:16

**refreshes** 42:7

**refund** 16:9 40:25

**refunded** 13:22 16:6

**regard** 16:16

**regarding** 31:17 38:23 39:19 45:10

**reimbursed** 13:17 14:3 16:20

**related** 13:22 16:1 22:23 24:17 28:4 48:16

**relates** 22:24

**relation** 24:23

**relationship** 12:9 12:15

**releasing** 43:13

**remaining** 43:2

**remember** 6:14 12:19 13:1,18,25 14:1 16:16 37:4 37:19 38:4 42:12 43:10 44:7

**remind** 42:13

**reminding** 14:25

**remote** 4:3,12

**remotely** 4:17

**remove** 13:16

**repeat** 6:12 7:8

**reported** 1:24

**reporter** 4:23 11:7

**reporter's** 48:3

**reports** 42:4

**represent** 4:18 29:24 32:4

**representation** 31:17

**representative** 30:19 31:1
**representatives** 29:24
**represents** 6:6
**request** 17:6
**requested** 27:9
**requesting** 20:18 21:3,3
**requirements** 48:21
**research** 31:21
**residence** 10:3,8
**resolution** 23:4,12 43:17
**resolved** 19:4 39:13
**resolving** 39:14
**respect** 40:13
**responding** 29:5
**response** 23:16 43:5
**responsible** 28:9
**result** 41:11
**retell** 41:7
**retired** 33:5
**returned** 24:14 28:24
**review** 27:17,17 44:14
**right** 8:7,9,11 9:19 9:25 10:16 11:16 12:2 17:12 19:23 23:3,12 30:9,10 32:6,15 33:20,25 34:15 35:2,9,13,13 36:15 37:15 38:19 40:4,9,14,20 41:8 44:19 46:19,20,22 46:23

**robust** 35:25
**role** 42:17
**roughly** 15:25
**run** 10:16
**runaround** 16:13 24:19 25:15
**running** 11:17

## s

**s** 2:9
**sales** 29:23 39:19
**salt** 2:10 28:22
**sat** 11:22
**saw** 7:24 30:24
**saying** 7:5 13:1 16:9 21:2 23:15 24:10 34:11 37:19
**says** 33:16 35:12
**scam** 27:22
**schedule** 33:14
**screen** 31:23
**second** 31:23 33:4
**security** 1:5 4:5
**see** 11:12 22:10 26:18 36:5 39:6 42:7
**sell** 14:4,24
**selling** 15:1
**send** 14:21 16:10 19:12,19 20:24,25 21:5 38:11
**sending** 14:23
**sends** 37:23
**sense** 7:9 11:11
**sensitive** 39:1
**sensitivity** 38:15 38:23 39:10,15
**sent** 17:5 23:15,15 28:8
**september** 22:11
**serve** 11:1

**service** 9:2,2,8 22:14 23:8 24:4,7 24:11,23 26:16 29:22 41:18 43:22 43:22 45:23
**services** 13:5 33:15 45:25
**set** 48:19
**shane** 8:4,11,25 10:12,16 11:17,18 12:7 13:3,14 14:4 15:21 17:8,14,23 19:25 21:6,10,15 21:18,22,24 22:12 25:18 26:1,12 27:13,15,18 30:2,9 30:12,17 31:7 32:14 39:19 40:10 46:7,9,17
**shane's** 8:5 31:17
**share** 31:23 41:4
**shared** 41:5
**shirt** 30:18
**shook** 2:3
**short** 33:23 45:4
**shortly** 41:25
**show** 14:14 20:4
**showed** 14:16
**shown** 33:18
**shows** 35:4
**sign** 15:13
**signature** 47:12 48:24
**signed** 27:18 30:14
**signing** 16:21 17:2
**similar** 32:6 43:7
**simply** 26:9
**single** 14:24 41:1
**sitting** 14:17
**situation** 19:13 27:4 41:6

**skilled** 19:9
**small** 14:2
**smaller** 27:4
**smart** 1:8,9,9 4:6,7 4:8 23:16 35:8 36:19
**smoke** 28:23 29:1 34:4
**snow** 2:8
**sold** 12:22 21:1
**solve** 45:14
**somebody** 18:7,20 18:23 19:19 21:5 24:7 32:18 34:19 35:10,22 40:18 41:3,15,25 45:8
**somewhat** 37:15
**sorry** 16:13 19:10 20:13,22 22:14 23:25 25:5
**sort** 12:9,14 19:24 28:3
**sounded** 40:23
**sounds** 32:5 33:8 35:25 37:11 42:15
**spare** 8:22
**speak** 8:21 24:9,14
**speaking** 12:6 14:5
**specifically** 37:4
**spend** 33:1
**spent** 18:15,17 19:3
**spoke** 15:6 24:3,8
**stands** 40:7
**start** 5:9 15:24
**starter** 14:15 16:2 19:24,25 22:3,5 23:14 34:9 40:13 40:14

**state** 2:23 4:17
  48:1,5
**stated** 13:11 14:19
**states** 1:1 4:9
  43:13
**stating** 12:20 28:9
**stayed** 33:3
**stenotype** 1:24
**steps** 20:16
**steward** 2:8 3:3,5
  4:21,21 6:3,5,16
  6:20 7:3,11,17
  9:10,13 10:21
  11:6,11,13 12:10
  12:16,18 13:6,23
  14:8 15:17 17:16
  17:24 18:1 19:7
  20:2,10,20,22
  21:13 22:7 23:1
  24:20 25:21 26:4
  26:23 27:23 28:19
  28:21 29:19 44:10
  44:17,25 45:7,16
  46:1,11,16,24
**stir** 42:11
**stop** 38:16 44:2
**stopped** 10:18
**story** 18:8,19,21
  25:8 40:19 41:7
**straightened**
  41:16
**street** 2:9
**strike** 27:23
**sucked** 37:8,8,13
**suggest** 12:8
**suggested** 12:14
  31:4
**suggesting** 6:24
**suite** 2:9 36:1,14
**superior** 36:14,23

**supervisor** 19:12
**supposed** 6:18
  16:20 17:4 39:1
**supposedly** 13:20
**sure** 5:12 12:12
  41:24 44:14
**surprised** 34:8
**surprises** 34:18
**swear** 4:24 10:14
**switch** 26:11
**switched** 26:3,5
**switching** 8:14
  12:1
**sworn** 5:3 48:8
**system** 10:19
  11:24 15:22 32:17
  32:21 38:5 39:23
  39:24 40:2 42:18
  43:16 45:17
**systems** 1:5 4:5

**t**

**take** 8:19 9:24
  20:16 22:23 23:10
  25:12 29:11,13
  44:13
**taken** 1:17,18 2:23
  4:4 29:16 44:22
**takeover** 33:17
**talk** 7:25 8:13 9:1
  9:18,21 15:10
  18:9 27:15
**talked** 11:17 17:3
  18:4 20:6 24:7
**talking** 8:18 10:18
  39:11
**technology** 45:24
**tell** 13:10,14 15:7
  18:8,19,21 19:18
  25:8 27:11 40:19
  45:8

**telling** 9:19 16:6
  37:6,17,21 38:5
  39:23 40:1
**ten** 19:4
**testified** 5:4 24:17
**testify** 48:8
**testimony** 21:20
  27:24 48:14
**text** 37:25 38:10
  38:12
**texts** 37:24
**thank** 5:8 6:13
  7:11 11:13 28:15
  29:20 45:1,3
  46:14,24 47:3,5
**thanks** 29:3
**thing** 12:19 16:15
  19:15 26:15 27:5
  33:16 45:20
**things** 16:24 17:14
  17:21 25:23 33:23
  36:17 45:23
**think** 6:22 15:21
  20:6 28:7,14
  32:14 34:5 40:10
  41:4 43:16 44:10
**thinking** 8:17
**third** 22:17,24
**thought** 25:1 34:6
  39:4 43:19
**three** 9:1,7 14:18
  15:3 16:19 18:9
  21:4 22:1,14 23:4
  40:11 41:18 47:8
**throwing** 7:24
**till** 47:4
**time** 6:1,6,7,21,21
  9:16,20 10:16
  12:6 13:3,15
  18:15,17,18 25:17
  28:11,16 29:11,14

29:17 32:23 33:1
  33:2 34:23 40:5
  40:17 41:1,3 42:3
  44:2,20,23 45:1
  46:8 47:9
**times** 17:13,20
  23:21 25:9 33:2
  41:12
**tired** 10:13
**today** 5:7 30:6
  45:2
**told** 8:14,19,25
  10:12 13:15 16:13
  16:17 19:3,10,15
  20:14 23:20 25:10
  31:7 40:16 41:19
  41:22
**total** 18:12,15 19:4
  24:16 35:20
**totalled** 35:13,16
  35:19
**totally** 40:20
**transaction** 17:18
  20:7 21:21
**transcribing** 11:7
**transcript** 1:25
**transcription** 1:25
**transfer** 18:22
  40:18 41:3
**transferred** 41:7
**transparent** 14:7
**trash** 7:24 10:17
  25:18
**treated** 25:2
**treatment** 24:22
**tricked** 25:16
**tried** 9:18 21:6
  38:15
**true** 38:19 48:13
**truth** 48:9,9

| | | | |
|---|---|---|---|
| **truthful** 14:6 40:5 | **v** | **w** | **worked** 24:3 |

| | | | |
|---|---|---|---|
| **truthful** 14:6 40:5 | | | **worked** 24:3 |
| **try** 6:20 13:22 | **vacation** 33:1 | **wait** 47:3 | **working** 19:5 |
| 19:5 21:18 | **vaguely** 42:12 | **waiting** 19:14 | **worry** 35:21 |
| **trying** 14:19 19:4 | 43:4 | **waive** 35:15 | **wound** 12:1 13:8 |
| 20:25 24:13 30:14 | **valder** 28:2 | **waived** 47:12 | 13:12 14:10 |
| 41:6 46:8 | **valid** 23:18 | **walking** 30:24 | **writing** 14:14 20:4 |
| **turned** 13:20 | **valley** 28:24 | **want** 9:18 12:21 | 33:19 |
| **two** 10:4 12:5 18:9 | **variety** 23:21 | 14:25 34:18 | **wrong** 19:11 |
| 32:18 | **vehicle** 30:22,23 | **wanted** 5:9 15:1 | **wrote** 18:24 33:21 |
| **types** 27:7 | **veritext** 4:16 | 25:5 | 43:12 |
| **typewriting** 48:12 | **versus** 4:6 | **washed** 23:20 | |
| **typically** 10:23 | **video** 4:3,12 47:8 | **water** 44:13 | **y** |
| | 48:21 | **way** 18:5 25:2,3 | **yeah** 5:24 12:13 |
| **u** | **videographer** 2:13 | **we've** 21:7 | 31:21 40:6 41:23 |
| **ultimately** 23:3 | 4:1,15,23 29:14,17 | **wednesday** 1:19 | 42:15 43:20 |
| **understand** 8:7 | 44:20,23 47:7 | 2:24 4:2 48:6 | **year** 33:3 47:5 |
| 10:1 12:2 21:20 | **view** 30:22 36:8 | **week** 33:3 | **years** 10:5 12:5 |
| 32:13 34:1 40:20 | **visited** 32:14 | **welcome** 11:14 | 32:18 |
| **understanding** | **vivint** 1:8,9,9 4:6,7 | 28:17 | |
| 25:1 34:9,16,17 | 4:8 6:2,6,15 7:14 | **went** 8:22 9:16 | **z** |
| **understatement** | 7:16 8:3,9,14 | 11:25 26:18 42:3 | **zoom** 1:18 2:24 |
| 24:21 | 11:23 12:8,15 | **western** 1:1 4:9 | |
| **understood** 30:12 | 14:5,23 15:13,14 | **whatsoever** 20:3 | |
| 41:23 | 15:22 16:5,25 | **whereof** 48:19 | |
| **unfortunately** | 17:4,10,12,13,19 | **willing** 39:11,18 | |
| 28:23 | 17:21 18:15 22:5 | **willingness** 45:14 | |
| **unhappy** 38:17 | 22:21,25 23:4,13 | **wish** 29:3 | |
| 39:2 | 24:3,16 25:19 | **witness** 2:21 4:12 | |
| **uniform** 30:18 | 26:3,9,22 27:17 | 4:24 5:2 6:13 7:2 | |
| **unit** 4:3,13 5:23 | 28:5,22 29:23 | 7:10 11:5,10,12,14 | |
| **united** 1:1 4:8 | 30:3,10,14,19,23 | 12:17 17:25 28:17 | |
| **units** 47:9 | 31:1,8 32:9 33:17 | 44:16,19 47:1,3 | |
| **unquote** 38:1 | 34:20 36:4,11,13 | 48:11,14,19 | |
| **upfront** 34:24 | 39:19,23 40:1,8 | **witnesses** 6:10 | |
| 35:1 42:24 43:6 | 42:3 43:7,22 45:9 | **woke** 8:16 | |
| **upper** 16:10 24:9 | 46:9,19,21 | **word** 31:20,22 | |
| 24:12 25:12 40:22 | **vivint's** 13:5 24:23 | 37:16 | |
| **upset** 18:24 | 29:22 31:17 45:8 | **words** 37:7,9 | |
| **use** 5:24 45:24 | **vs** 1:7 | 39:24 | |
| **utah** 2:10 28:22 | | **wore** 31:3 | |

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.