**EXHIBIT 7**

1        IN THE UNITED STATES DISTRICT COURT

      FOR THE WESTERN DISTRICT OF NORTH CAROLINA

2            STATESVILLE DIVISION

3      Civil Action No. 3:20-CV-00504-FDW-DSC

4

   CPI SECURITY SYSTEMS, INC.,         )

5                            )

      Plaintiff and Counterclaim Defendant)

6                            )

            vs.                )

7                            )

   VIVINT SMART HOME, INC. f/k/a Mosaic  )

8   Acquisition Corp.; and LEGACY VIVINT  )

   SMART HOME, INC. f/k/a Vivint Smart   )

9   Home, Inc.,                  )

                            )

10      Defendants and Counterclaimants.  )

                            )

11

12

13

14

15   Videotaped Remote Deposition of LAWRENCE DAVID KODACK

16    (Taken by Plaintiff and Counterclaim Defendant)

17            Durham, North Carolina

18         Wednesday, August 25, 2021

19

20

21

22

23

24          Reported in Stenotype by

         Lauren M. McIntee, RPR, CRR

25   Transcript produced by computer-aided transcription

     Job No. CS4771270

1         APPEARANCES
2 ON BEHALF OF THE PLAINTIFF/COUNTERCLAIM DEFENDANT:
3     Eric J. Hobbs, Esquire (via Zoom)
      Shook, Hardy & Bacon, LLP
4     1660 17th Street, Suite 450
      Denver, Colorado 80202
5     (303) 285-5300
      Ehobbs@shb.com
6
7 ON BEHALF OF THE DEFENDANTS/COUNTERCLAIMANTS:
8     Gregory Herbert, Esquire (via Zoom)
      Greenberg Traurig, LLP
9     450 South Orange Avenue, Suite 650
      Orlando, Florida 32801
10     (407) 420-1000
      Herbertg@gtlaw.com
11
      -and-
12
    Matthew A. Steward, Esquire (via Zoom)
13     Clyde, Snow & Sessions
      201 South Main Street, Floor 13
14     Salt Lake City, Utah 84111
      (801) 322-2516
15     Mas@clydesnow.com
16 ALSO PRESENT:
17     DeAndrae Shivers, Videographer (via Zoom)
18
19     VIDEOTAPED REMOTE DEPOSITION OF LAWRENCE DAVID
20 KODACK, a witness called on behalf of Plaintiff and
21 Counterclaim Defendant, before Lauren M. McIntee,
22 Registered Professional Reporter, Certified Realtime
23 Reporter, and Notary Public, in and for the State of
24 North Carolina, in Durham, North Carolina on Wednesday,
25 August 25, 2021, commencing at 1:10 p.m.

1      INDEX OF EXAMINATIONS
2 By Mr. Hobbs...................................... Page 4
  By Mr. Herbert.................................. Page 51
3 By Mr. Hobbs...................................... Page 58
  By Mr. Herbert.................................. Page 60
4
5
6       INDEX OF EXHIBITS
7
NUMBER    EXHIBIT           MARKED
8
Exhibit 1  CPI Contract        15
9
Exhibit 2  CPI Updated Contract     17
10
Exhibit 3  Audio Recording of Telephone Call   51
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1     THE VIDEOGRAPHER: All right. This is the
2 beginning of the videotaped deposition of Larry
3 Kodack in the matter of CPI Security Systems,
4 Incorporated, versus Vivint Home -- or Smart Home,
5 Incorporated, et al.
6     Today's date is August 25th, 2021. And the
7 time is 1:10 p.m. Counsel, please introduce
8 yourselves, after which our court reporter will
9 swear in the witness.
10     MR. HOBBS: This is Eric Hobbs of the law
11 firm of Shook, Hardy and Bacon, on behalf of the
12 plaintiff, CPI Security Systems.
13     MR. HERBERT: Good afternoon. This is
14 Gregory Herbert with the law firm Greenberg Traurig,
15 on behalf of the defendants. And also on the line
16 is Mr. Matthew Steward with the law firm Clyde Snow,
17 also on behalf of the defendants.
18     LAWRENCE DAVID KODACK,
19 having first been duly sworn, was examined
20     and did testify as follows:
21       EXAMINATION
22 BY MR. HOBBS:
23   Q. Well, good afternoon, Mr. Kodack. Are you
24 able to hear me okay?
25   A. Yes, I hear you fine. A lot of hollow --

1   Q. Sure.
2   A. -- in your -- in your location, but that's
3 fine.
4   Q. As you tried to give your answer to the
5 swearing in, your audio cut out at least on my side a
6 little bit. If we continue to have those -- those
7 problems, we might take a break and have you connect by
8 phone while also staying on the computer. There's a way
9 to do that. But for now, we'll just see how things go.
10   A. Okay.
11   Q. Again, my name is Eric Hobbs. I'm one of the
12 attorneys representing CPI Security Systems in this
13 lawsuit. On -- also on the line is Mr. Greg Herbert.
14 He's one of the attorneys for Vivint, who I think will
15 be asking you questions on behalf of Vivint today.
16     Let me first ask. Have you ever given a
17 deposition before?
18   A. No. Particularly, not a online deposition.
19 That's a new phenomenon.
20   Q. Well, it is for us as well. And we do
21 appreciate you letting us virtually into your home. I
22 know that doing this can be a time commitment on your
23 behalf, and we appreciate your time in allowing us to
24 connect this way.
25     I'll go through just a couple ground rules we

1 go through with all witnesses just to help you
2 understand how this process works. You notice we're
3 connected over a Zoom connection. We're not sitting in
4 the same room. That -- that makes the court reporter's
5 job a little bit harder because what tends to happen on
6 this platform is, the attorneys and the witness all tend
7 to talk over each over. As good as the technology is,
8 there's about a one-second lag.
9     So the first thing we always ask is if you
10 could allow either myself or Mr. Herbert to finish our
11 question before you begin an answer, that will allow the
12 court reporter to get a clean transcript. Can you do
13 that?
14     A. I will try.
15     Q. I'm also known to ask some pretty bad
16 questions sometimes. I think it's a hazard of the job
17 being an attorney, but I do do it sometimes. If I ask
18 you a question and it doesn't make sense, perfectly okay
19 to say "I don't understand," and I'll try to rephrase
20 it. Can you do that?
21     A. I will attempt that.
22     Q. Okay. There may be times today where one of
23 the attorneys asks a question, the other attorney states
24 an objection. And you will notice there are many people
25 on the Zoom today, but one of the people we do not have

1 is a judge. So I know it can be kind of awkward, but
2 typically in that scenario, if a question is asked, the
3 other attorney makes an objection, you can then begin
4 answering the question that was asked after the
5 objection is done. That objection is just for the
6 record. Does that make sense?
7     A. Gotcha.
8     Q. Okay. We -- we might remind you as we get
9 under way. But the last thing I always say is, I have a
10 tendency to reference the jury, and you're -- you may be
11 looking around wondering where is the jury. Obviously,
12 we do not have the jury on the line today. The jury in
13 this case has not yet been assembled. The trial date is
14 in November. But this video may ultimately get played
15 to the jury in this case, and that's why I say that.
16 Does that make sense?
17     A. By all means.
18     Q. Okay.
19     A. Very reasonable.
20     Q. Let me first have you just start off by
21 spelling your full name for the record.
22     A. L-A-W-R-E-N-C-E, K-O-D-A-C-K.
23     Q. And --
24     A. Middle name David, D-A-V-I-D.
25     Q. And I've been saying "Mr. Kodack." Am I

1 pronouncing that correctly?
2     A. That's -- that's as good as you can get.
3 That's what -- that's what my father passed down to me.
4     Q. Okay. And do you go by Larry or Lawrence?
5     A. Yes.
6     Q. Both?
7     A. Both or either.
8     Q. Okay. Well, I'll refer to you as Mr. Kodack
9 this morning. If we were in a less formal setting, I'd
10 be more than happy to call you by your first name, but
11 although we're -- we're talking over Zoom, this
12 testimony is as if you're in court. So I'll call you
13 Mr. Kodack, if that's okay.
14     What is your current address?
15     A. 302 Whitney Lane, Durham, North Carolina
16 27713.
17     Q. How long have you been at that address?
18     A. Since 2004. We built the house.
19     Q. Have you always lived in North Carolina?
20     A. No.
21     Q. Where were you before you moved to the
22 address you're at now?
23     A. I've been in one, two, three, four, I can
24 think of five other addresses locally. I grew up in
25 Asheville, North Carolina. I was born in Toronto,

1 Canada. I lived in New York for -- briefly in New York
2 City.
3     Q. And what brought you to Durham?
4     A. Housing. Needed to build -- needed a new
5 house that would accommodate a then-wife who was
6 disabled, incapacitated, and we needed specific
7 requirements, no second floor and some things like that.
8 So we built this house.
9     Q. Does your wife currently live with you today?
10     A. She is deceased. I have -- she died in 2009,
11 April Fools' Day, but -- and I remarried in 2016.
12     Q. Well, first, let me say my condolences on the
13 passing of your former wife. What is the name of
14 your -- your new wife that you remarried?
15     A. Andree Allen.
16     Q. And that must be, I see that name reflected
17 at the bottom of your screen. That must be why
18 that's --
19     A. This is actually her computer.
20     Q. Okay.
21     A. We used it. Mine was a very ancient computer
22 that died, and we put it to rest.
23     Q. Let me ask, are you currently employed?
24     A. I am currently retired, and I retired in
25 2019. I figured at age 70, I better get out before they

1  carry me out in a basket.
2      Q.  Well, congratulations.  What -- where did you
3  retire from?
4      A.  I retired from Duke University Medical
5  Center.  I was a biomed tech in the last part of my
6  career.
7      Q.  How long did you hold that position for?
8      A.  Oh, 20 years.
9      Q.  Did you assist with medical research, or what
10  exactly was your role?
11      A.  The earlier part of my career, I did medical
12  research.  This segment of my career -- I've lost you
13  online.  You no longer are -- are featured.  But anyhow,
14  I did, this part of my career, I fixed their broke
15  machines.
16      MR. HOBBS:  Okay.  If I could have the
17  videographer just take us back to the gallery view,
18  I think that would assist the witness, especially as
19  I get into sharing my screen.
20      THE VIDEOGRAPHER:  The witness can hit the
21  gallery view button.  I -- I can't hit that for him.
22      MR. HOBBS:  Okay.  Some -- something --
23      THE WITNESS:  Locate it for me.
24      MR. HOBBS:  It's up at the top right of your
25  screen, Mr. Kodack.  It should show as a --

1      THE WITNESS:  Remove spotlight?
2      MR. HOBBS:  At the top right, if you hover
3  over, there's kind of a --
4      THE WITNESS:  There's -- there's your
5  picture, Eric.
6      THE VIDEOGRAPHER:  It's -- it says "view."
7  And if you hover over that, it will drop down and
8  you'll see "gallery view."
9      THE WITNESS:  View?  Gallery, there we are.
10  Okay.  Got it.
11  BY MR. HOBBS:
12      Q.  Okay.  Are you able to see me okay now?
13      A.  Yeah.  You now occupy the screen.
14      Q.  So you were just describing your role in the
15  Duke University medical lab.  What is the highest level
16  of education you attained in order to become or I guess
17  to hold that position?
18      A.  That particular position required a two-year
19  community college degree.  So I stepped back from a PhD
20  in biochemistry and went on to, continued with my career
21  when it wasn't reasonable to stay on in the OB-GYN
22  department as a researcher.
23      Q.  Okay.  Well, that -- that prompts a couple
24  other questions I have for you, then.  Have you attained
25  a PhD?

1      A.  Yes, indeed.
2      Q.  Where from and in what field?
3      A.  Duke University.  And when did I do that?
4  2007, biochemistry.
5      Q.  That's when you graduated from --
6      A.  Yes.
7      Q.  -- with the PhD program?
8      And then you mentioned an OB-GYN program?
9      A.  I did fetal physiology in OB-GYN for
10  25 years.
11      Q.  Okay.  Can you explain what generally you did
12  in that practice?
13      A.  Well, we looked at cardiotonic drugs in fetal
14  sheep, a model that is just now coming into use.
15  Vanderbilt has a program where they attempt to treat
16  fetal anomalies or fetal cardiac problems in utero,
17  particularly in multiple gestations.
18      Q.  It sounds like quite complex work.
19      A.  It was very complex.  We did work in fetal
20  sheep, which gave us cardiotonic drugs, drugs that
21  affected the rate and strength of the fetal heart in a
22  sheep model by instrumenting the fetus in a way that you
23  could never or would never allow in human to get
24  information at all.  And it's taken this long since that
25  work was done in, mostly in the '70s and early '80s, to

1  be able to apply it to human fetuses.
2      Q.  And that sounds like it -- it is being
3  applied today?
4      A.  Yeah, it is.  It's -- it's -- it's in its
5  infancy in human realm.  Because sheep are farm animals,
6  the legal aspect of that is much easier to -- to work
7  now.
8      Q.  Sure.  You've mentioned a prior marriage and
9  a current marriage.  Do you have any children?
10      A.  Yes, indeed.  I have two of my own and one
11  from the marriage who died in 2009.
12      Q.  If you don't mind me -- me asking, how old
13  are your children?
14      A.  Oh, late 40s, early to mid 50s.
15      Q.  And you mentioned retiring, if I remember
16  your testimony correctly, at the age of 70.  How old are
17  you today?
18      A.  72.
19      Q.  And besides your current wife, Andree, am I
20  pronouncing that correctly?
21      A.  I beg your pardon.  Repeat.
22      Q.  What is -- what is your present wife's name?
23      A.  Andree, yes.
24      Q.  Andree.  Besides Andree, does anybody else
25  live with you in the home?

4 (Pages 10 - 13)

1    A.   No.  We have a dog.  She thinks she owns it.
2    Q.   What kind of dog?
3    A.   She's a Labradoodle.  She's, you know, she's
4  a dog.  She's 15 years old, and so mostly she sleeps and
5  her responsibility is to guard the floor.  And if the
6  floor is missing when we come back from somewhere, we
7  know she's failed.
8    Q.   Sure.  I kind of want to shift gears a little
9  bit and talk to you about the -- your alarm system in
10  your home.
11   A.   Yes.
12   Q.   Let me first ask.  Do you currently have an
13  alarm system installed in your home?
14   A.   Yes, we do.  We currently have the alarm
15  system from CPI.  The house was built with a Brinks
16  system in it.  We never activated the Brinks system and
17  immediately went to C -- explored and went to CPI and
18  said, what can you do?  And we put in a -- and then was
19  as good a system as they had, and we kept that.  I
20  seldom use it, but it's there.
21   Q.   So you mentioned a couple things in terms of
22  doing some research and -- and choosing an alarm
23  company.  What -- what ultimately led you to choose CPI
24  as your security provider?
25   A.   The predominant factor was local and promise

1  of rapid response.
2    Q.   And was -- do you recall when you had that
3  system first installed in your home?
4    A.   Very shortly after occupying the home.
5    Q.   I'm going to pull up --
6    A.   Within a month -- within a month.  Maybe
7  month and a half.
8    Q.   Okay.  And when did you say you first moved
9  into that home?
10   A.   Would be 2004.
11   Q.   I'm going to pull up, if you'll give me just
12  a moment here, what I'm going to mark -- I'm going to
13  mark this as Exhibit 1.
14   A.   I think that's what my memory is from back
15  there, that that's when we did it.
16   Q.   Okay.
17   A.   You probably have the records from CPI.  I
18  tried to call them and discuss with them what's going
19  on, and I kept getting a runaround.  So I went ahead and
20  said the heck with it.  I asked for their legal
21  department and never got anyone to respond.
22        (Whereupon, Exhibit 1 was marked for
23        identification.)
24  BY MR. HOBBS:
25   Q.   Okay.  I'm going to pull up on the screen

1  here, if I'm able to share my screen.
2    A.   Yeah.
3    Q.   Are you able to see that okay?
4    A.   Oh.  Oh, it was 2003, then, obviously.
5    Q.   Well, it sounds like -- so you can see, I've
6  marked this document as Exhibit 1.  Do you see that down
7  there?
8    A.   You didn't spell my name correctly.
9    Q.   Okay.  Well, you do see where I marked it as
10  Exhibit 1, though?
11   A.   Yeah.
12   Q.   Okay.  And then up at the top, just to ask
13  you, do you recognize this document?
14   A.   It's -- I recognize the signatures.
15   Q.   Okay.  The signatures down at the bottom,
16  whose signatures are those?
17   A.   I don't have any idea of those.  The ones in
18  the middle, mine and Randy's.
19   Q.   Okay.  And who is Randy?
20   A.   Randy was my second wife.
21   Q.   And you see it's dated January 16th, 2003?
22   A.   Yeah.  So it looks like we occupied this
23  house in -- in 2003, in early 2003.  My mistake on that.
24   Q.   No problem.  That was some years ago.  Let
25  me -- I'm going to pull up another document that I'm

1  going to mark as Exhibit 2.
2        (Whereupon, Exhibit 2 was marked for
3        identification.)
4  BY MR. HOBBS:
5    Q.   So I've pulled up what I've marked as
6  Exhibit 2.  Do you see that at the bottom?
7    A.   Yes, indeed.  I'm just looking to see what
8  the date is on it, because that's the bottom.  5/6 --
9    Q.   I'm going to zoom in for you on the bottom
10  left because I know it's hard to see.  But there's --
11   A.   5/8/2010.
12   Q.   And do you see a signature there as well?
13   A.   Yeah, that's -- yes, indeed.
14   Q.   Okay.
15   A.   And I did that obviously.
16   Q.   Do you recall what the circumstances were
17  that ultimately led you to sign this new paperwork with
18  CPI?
19   A.   I think we went from an analogue system to
20  a -- from an analogue system on the telephone line to a
21  digital system with an enclosed cell phone.
22   Q.   Okay.  And I'm just going to focus in on kind
23  of the top half of the document.
24   A.   Okay.
25   Q.   There's some handwriting there in the middle

1  that says "upgrade."
2      A.   Yeah.
3      Q.   Do you recall what work CPI did on your
4  system as a part of your signing this -- this updated --
5      A.   No, they pulled the control box out, replaced
6  it with a direct dial cell phone -- cell phone-like
7  device that connected and tested the system, and it
8  worked.
9      Q.   Okay.  I'm going to pull down that document.
10         So you've testified, with reference
11  Exhibit 2, that you signed it in May of 2010.  Do you
12  recall whether CPI did any other updates or changes to
13  your equipment after that time?
14      A.   One other time.  2000- -- let me grab my
15  notes because I -- I did a quick note on that.  Let me
16  see when that was.  February of 2020, they -- CPI came
17  in and changed the cell phone on the board, the direct
18  dial.  It really isn't a cell phone.  It's a dedicated
19  call system, but they changed it from a 2 or 3 to a
20  Generation 4 cell phone.  That really wasn't the
21  upgrade.  The -- the network was being retired.
22      Q.   Okay.  It sounds like maybe you're referring
23  to 2 or 3G, like --
24      A.   Yeah, 2G.
25      Q.   -- cell phones work off of?

1      A.   The original was put in as a 2G network, yes.
2  Thank you for the correction.  And it went to a 4, is
3  what they said I currently have.
4      Q.   Other than changing the 2 or 3G to a 4 in
5  terms of a cellular connection, did the -- did the
6  equipment itself change in your home?
7      A.   Well, that it was part of the circuit board.
8      Q.   Okay.
9      A.   So -- so I don't quite know how to answer
10  that question.
11      Q.   Sure.
12      A.   It is -- you know, changing a component on a
13  circuit board is not the original.  And from my
14  background in biomed, it's not the same thing.
15      Q.   I -- I understand and appreciate that precise
16  answer.  Let me ask a better question.  It sounds like
17  they changed maybe a part in the motherboard that
18  controls your alarm in your home; is that fair?
19      A.   Fair enough.
20      Q.   Okay.
21      A.   That's close enough.
22      Q.   Can you describe for the jury what other
23  alarm equipment CPI had installed in your home as a part
24  of the system?
25      A.   They had motion -- a single motion sensor and

1  an outside alarm light; meant if it was medically
2  activated and when they tested it, it sets off a
3  flashing light so that if EMS or fire was responding,
4  their -- it is a light outside that is on and it's
5  flashing and might give them a few extra seconds to
6  respond.
7          In town, that isn't critical, but as a
8  volunteer ambulance paramedic, I very much -- in the
9  middle of the night when you go out into the county and
10  somebody calls -- somebody pages -- well, on a call and
11  you're looking for a particular house number that's
12  almost impossible to see at night, oh, we'll turn on the
13  porch light and that -- that really doesn't help because
14  everybody turns on their porch light when they hear a
15  siren going by.
16      Q.   So it sounds like that feature was important
17  to you with your --
18      A.   Yeah, that was an important feature, and that
19  was about all we added to their basic program.
20      Q.   At one point, did you also get a key fob to
21  turn the alarm system on and off?
22      A.   I ordered that, and I don't know when.
23      Q.   Okay.
24      A.   I ordered -- it came with one remote, and
25  then I got a second remote.  I'm not sure which one of

1  the two I still have and -- am using.  I have one.
2      Q.   Okay.  So it sounds like you've been a
3  customer of CPI for many years; is that fair?
4      A.   Yes, indeed.  And...
5      Q.   Over the course of having CPI's alarm system
6  in your home since 2003, have you found CPI's alarm
7  system to be reliable?
8      A.   Yes.  The few times we've used it, it's
9  non-functioned perfectly; I mean, it wasn't necessary.
10  But it is good to have there.  It was good particularly
11  when Randy with only one leg had the -- the safety, and
12  I had redundant fire alarm -- alarm capability and that
13  sort of thing.
14      Q.   Did the system give you a sense of security?
15      A.   It gave my wife a sense of security.  I was
16  pretty calm and pretty relaxed with the, just having the
17  house and locking doors.
18      Q.   And --
19      A.   The neighbors are good.  Several times when
20  we were on vacation or out of the count- -- or out of
21  the country, in fact, we'd get a phone call from the
22  neighbor and, there's a car in your driveway, or
23  something.  And, hey.
24      Q.   That's -- that's a good neighbor.
25      A.   Yeah, that's a good neighbor.

6 (Pages 18 - 21)

1    Q.   Let me ask, as a part of providing this
2  security system in your home, did CPI also provide you a
3  yard sign or any stickers --
4    A.   Yes, indeed.
5    Q.   -- outside?
6    A.   And the yard sign is currently still hiding
7  in the bushes.  It's still up front, almost visible.
8    Q.   Okay.  You say "almost visible"?
9    A.   Yeah, we -- we've replaced it once over the
10  length of time.  I asked for another one, and they
11  promptly delivered me one.  And I said, thank you.
12    Q.   Would that be visible to somebody approaching
13  your home, coming --
14    A.   Yes, indeed.
15    Q.   Did they give you any stickers or anything
16  else, or was it just --
17    A.   They offered them.  We never bothered for the
18  windows.
19    Q.   Okay.  I want to turn again and kind of focus
20  your attention on your interactions with another alarm
21  company.  You understand that's why you're here to
22  testify, correct?
23    A.   Yeah, I have no idea what this is about
24  because I don't know anything about the Vivint.
25    Q.   Okay.

1    A.   Yeah.
2    Q.   And before I go any further, is that the name
3  of the alarm company that you had an interaction with?
4    A.   I have never had any interaction with them to
5  my knowledge.
6    Q.   Okay.  Well, I want to focus your attention,
7  I guess, on July of 2018.  Do you recall being
8  approached by a salesperson from Vivint on that date?
9      MR. HERBERT:  Object to form.
10      THE WITNESS:  Repeat your comment.
11      MR. HERBERT:  We were talk- -- Mr. Kodack,
12  this is Greg Herbert.  I --
13      THE WITNESS:  Yeah.
14      MR. HERBERT:  I might have an occasion to
15  interpose an objection to Mr. Hobbs' question.
16      THE WITNESS:  Yeah, and that's what you did.
17  Okay.
18      MR. HERBERT:  Right.  And so if I object,
19  that's -- I'm objecting --
20      THE WITNESS:  Okay.
21      MR. HERBERT:  -- to the form of the question
22  or some reason regarding my view of the question.
23      THE WITNESS:  So I'll wait and let you two
24  argue it out, and we'll go from there.
25      MR. HERBERT:  Hopefully, we won't argue.

1      THE WITNESS:  Yeah.
2      MR. HERBERT:  Mr. Hobbs and I get along
3  pretty fine so far.
4      THE WITNESS:  Yeah.
5      MR. HERBERT:  But I will interpose an
6  objection.  And generally speaking, you can then
7  answer if you -- if you understand the question.  If
8  you need it to be repeated or rephrased or
9  something, then you can ask Mr. Hobbs to do that.
10  That's up to you.
11    A.   I have no information about this contact
12  in -- in 2018, in July of 2018.  I'm not aware of any
13  change in my plan.  I have no knowledge.
14  BY MR. HOBBS:
15    Q.   Okay.  Let me ask you this.  July of 2018 was
16  a few years ago; is that fair?
17    A.   Yeah.
18    Q.   Okay.
19    A.   But -- but probably CPI has better records of
20  that than I do.  If I was cut off from their network or
21  something and they had to go chase me and get me back
22  on, I was not aware of it.  My wife may have handled
23  that.
24    Q.   Okay.  Just a couple more questions in terms
25  of your -- your memory.  I just want to be clear whether

1  at present you have any memory of a Vivint sales
2  representative coming by your home and interacting with
3  you in July of 2018?
4      MR. HERBERT:  Object to the form.
5    A.   I have no memory of -- of that, of
6  interacting with anyone from another company.  My sign
7  is obvious and sits in the front yard.
8  BY MR. HOBBS:
9    Q.   Okay.  Over the course of having CPI's system
10  in your home, did you ever make phone calls to CPI to
11  talk to them about your alarm services?
12    A.   Only for the remote.  That's the only time
13  I've had any direct phone conversations with them.
14  Maybe a couple of times to change routing on my payment,
15  but, you know, on my -- my monthly payment.  But other
16  than that, no, I have not had any interaction with them.
17  Every once in a while, they call and we test the system
18  and I'd have to remind them to reset the lamp, the
19  strobe lamp outside.
20    Q.   When you call CPI, do you understand whether
21  your phone calls are recorded?
22    A.   No, I do not.  They may well record it.  It
23  is not -- no warning comes up and suggests that this may
24  be recorded.
25    Q.   If I represented to you that CPI received a

7 (Pages 22 - 25)

1 phone call from you in July of 2018 to report an
2 interaction you had with another sales representative
3 from Vivint, would that refresh your recollection at all
4 in terms of that incident?
5     A.   No, I didn't.
6     MR. HERBERT:  Object to form.
7     A.   I'm completely blank on that, that incident.
8 I'm sorry I'm not of any help to you, and maybe I'm not
9 of help to the opposing lawyer.
10 BY MR. HOBBS:
11     Q.   Okay.  I'm going to pull up what I'm going to
12 designate Exhibit 3, if you'll --
13     A.   All right.
14     Q.   -- give me just a moment here.
15     So what I'm going to do is, for the record,
16 this is an audio recording, Bates stamped CPI 054.  It
17 totals 5 minutes and 43 seconds.  Mr. Kodack, what I'm
18 going to do is, I'm going to play just a short segment
19 of this and then ask you a couple questions.
20     A.   Okay.
21     Q.   I'm going to share my computer audio and the
22 first question will be, is whether you can actually hear
23 the sound.  But let me play a segment real quick.
24     MR. HERBERT:  Before you do that, Mr. Hobbs,
25 I'm just going to note an objection to the -- the

1 use or introduction of an exhibit, improper
2 foundation.  And object to the form of the question.
3 BY MR. HOBBS:
4     Q.   Mr. Kodack, I'm going to play the first kind
5 of 10 seconds of this, then ask you a couple questions.
6     A.   Okay.
7     Q.   Subject to the same objections, of course.
8     MR. HERBERT:  Thank you.
9     (Audio recording begins.)
10     CPI REPRESENTATIVE:  CPI Security, this is
11 Dale.  How may I assist you today?
12     CALLER:  Lawrence Kodack, 302 Whitney Lane,
13 Durham, North Carolina.
14     (Audio recording paused.)
15 BY MR. HOBBS:
16     Q.   So I've just paused that at 11 seconds in.
17 Mr. Kodack, did you -- were you able to hear that okay?
18     A.   I heard it fine.  That's my voice.
19     Q.   Okay.
20     A.   Obviously me.
21     Q.   And was that your address that you provided?
22     A.   Yes.
23     Q.   Okay.  I'm going to play just another segment
24 and then ask you another couple questions.
25     (Audio recording begins.)

1     CALLER:  We just had a salesman at the door,
2 he says he's not a salesman, but from Vivint saying
3 that he is prescreening for a new entry panel
4 because they're claiming that our cell phone system
5 here doesn't operate under all conditions and that
6 his is better.  I just didn't know whether that's --
7 they say they work with you.  I'm not aware of
8 anything of that nature and didn't get a preletter
9 from you guys or anybody.  So I was just curious as
10 to what's going on.
11     (Audio recording paused.)
12 BY MR. HOBBS:
13     Q.   So I've paused that at 55 seconds into the
14 recording.  Mr. Kodack, were you able to hear that
15 segment?
16     A.   Yes, by all means.  And that's consistent
17 with the way I generally operate.  And I'm pretty direct
18 with, what do I do with this?  Just like first thing I
19 did after I spoke with the attorney from your side in --
20 earlier, before.  I called CPI and sent them a copy of
21 the document I had, so they've got the subpoena I was
22 issued, and asked their legal department to respond.
23 They did not.  You are the first response I have.
24     Q.   Okay.
25     MR. HERBERT:  Let me -- I'm sorry.

1 Mr. Hobbs, just -- sorry to interrupt.  Just
2 quickly, can I just have a standing objection to any
3 questions related to the exhibit that you're
4 discussing?
5     THE WITNESS:  Okay.
6     MR. HOBBS:  And this is for the record,
7 Mr. Kodack.  I'll come back and ask you a couple
8 questions.
9     Greg, I'm fine with that.  If I could ask you
10 to just articulate on the record what the standing
11 objection is.  I'd like to, I guess, respond
12 briefly.
13     MR. HERBERT:  Okay.  Well, I'm objecting to
14 the form of the question, the exhibit as an improper
15 foundation.  Also contains hearsay.  And I object to
16 the form of any questions that have been asked about
17 it, and also move to strike the last response as
18 nonresponsive to the question posed.
19     MR. HOBBS:  Okay.  As to the hearsay
20 objection, it's CPI's position that this recording
21 would fall under the hearsay exception of 803.5,
22 recorded recollection.  The witness has testified
23 that he has no present memory of the substance of
24 this interaction, which it's CPI's position is
25 reflected on the audio recording.  And so I will,

1  through further questions, attempt to lay the
2  foundation under 803.5, but it's first and foremost
3  CPI's position that it's admissible under 803.5.
4       In addition, it's CPI's position that this is
5  not hearsay because the recording is not being
6  offered to prove the truth of any matter asserted,
7  but rather that the words were said.
8       MR. HERBERT:  Right.  And Mr. Hobbs -- I'm
9  sorry, are you finished?
10       MR. HOBBS:  I am.
11       MR. HERBERT:  Okay.  And I don't want to go
12  back and forth with you and waste Mr. Kodack's time,
13  but just a brief response.
14       And in addition, I would object to the
15  relevance of the exhibit and the line of questioning
16  since, to the extent that the document is
17  authenticated and does have a foundation and to the
18  extent that your position on it is upheld, the
19  statements on the -- on the exhibit clearly indicate
20  that the sales representative identified himself as
21  being from Vivint and, therefore, there cannot be
22  any grounds for confusion.  And therefore, this
23  exhibit would be irrelevant to the claims asserted
24  in this case which relate to alleged consumer
25  confusion.

1  BY MR. HOBBS:
2       Q.  Okay.  So Mr. Kodack, subject to all those
3  objections and the standing objection I have granted to
4  Mr. Herbert, I'd like to go back and I'm going to play
5  this segment of the recording we just listened to again,
6  which is from 11 seconds through 55 seconds, and then
7  I'd like to ask you a couple questions.  If you could
8  just listen in, please.
9       (Audio recording begins.)
10       CALLER:  We just had a salesman at the door,
11  he says he's not a salesman, but from Vivint saying
12  that he is prescreening for a new entry panel
13  because they're claiming that our cell phone system
14  here doesn't operate under all conditions and that
15  his is better.  I just didn't know whether that's --
16  they say they work with you.  I'm not aware of
17  anything of that nature and didn't get a preletter
18  from you guys or anybody.  So I was just curious as
19  to what's going on.
20       (Audio recording paused.)
21  BY MR. HOBBS:
22       Q.  So again, I -- I paused that at 54 seconds.
23  Mr. Kodack, subject to the objections already stated,
24  again, was -- did you recognize that voice as your own?
25       A.  Yes, indeed, I did.

1       Q.  Okay.  And did you recognize this recording
2  as a call you made to CPI's customer service department?
3       A.  Yes, I must have because it's my voice.
4       Q.  And on the -- the segment we just listened
5  to, you were reporting an interaction you had with a
6  Vivint sales representative; is that fair?
7       A.  To the best of my knowledge, yes.
8       Q.  Okay.  As you listened to that recording here
9  today, does that refresh your recollection at all in
10  terms of what happened?
11       MR. HERBERT:  I've got to object, interpose
12  an objection to the form of the question.  I want to
13  get clear on the record whether you're asking the
14  witness, does this refresh his recollection of that
15  telephone call or does it refresh his recollection
16  of whatever events are purportedly described or --
17  or referenced in the call?
18  BY MR. HOBBS:
19       Q.  Well, let me ask both those questions,
20  Mr. Kodack.  First off, listening to this recording,
21  does that refresh your recollection as to making a phone
22  call to CPI to report this incident?
23       MR. HERBERT:  Same objection.
24       A.  No, it does not refresh my memory of that.  I
25  do not remember that call.  That's consistent with my

1  own method of dealing with salesmen at the door.
2  BY MR. HOBBS:
3       Q.  Okay.  My follow-up question to that would
4  be, I understand you've testified it does not refresh
5  your recollection of making the call, but as you
6  listened to the recording that we've just listened to,
7  do you have any reason to dispute that that is you
8  making this report to CPI?
9       A.  No --
10       MR. HERBERT:  Same objection.
11       A.  No reason to -- no reason to object that that
12  was -- that was my voice.
13  BY MR. HOBBS:
14       Q.  Okay.  Now --
15       A.  -- my operation.
16       Q.  The other question I wanted to ask in terms
17  of refreshing your recollection is, does listening to
18  this recording refresh your recollection of actually
19  having an interaction with this Vivint sales
20  representative?
21       MR. HERBERT:  Same objection.
22       A.  No, it does not.  I have no concept of who or
23  what he looked like or anything.
24  BY MR. HOBBS:
25       Q.  And same follow-up question.  As you listened

9 (Pages 30 - 33)

1 to this recording, do you have any reason to dispute
2 that when you reported this to CPI, you were reporting
3 what had recently happened to you?
4 MR. HERBERT: Object to the form.
5 BY MR. HOBBS:
6 Q. You can answer.
7 A. Oh, I have no reason to doubt its veracity.
8 Q. Okay. I want to back up the recording and
9 just play -- I'm going to back it up to 45 or to
10 40 seconds and play a 15-second segment and then ask you
11 another question.
12 (Audio recording begins.)
13 CALLER: -- better. I just didn't know
14 whether that's -- they say they work with you. I'm
15 not aware of anything of that nature and didn't get
16 a preletter from you guys or anybody. So I was just
17 curious as to what's going on.
18 (Audio recording paused.)
19 BY MR. HOBBS:
20 Q. So Mr. Kodack, in that segment I played,
21 you're relaying to the CPI customer service
22 representative that the Vivint representative had stated
23 that they worked with CPI. Did you hear that?
24 MR. HERBERT: Object to form. Leading,
25 mischaracterizes the testimony.

1 BY MR. HOBBS:
2 Q. You can answer subject to those objections.
3 A. Repeat your question. I just want to make
4 sure I'm answering the right...
5 Q. Sure. On the segment that we listened to,
6 you were reporting to CPI that this Vivint sales
7 representative had indicated to you that Vivint works
8 with CPI. Did you hear that?
9 A. Yes.
10 MR. HERBERT: Object to form.
11 BY MR. HOBBS:
12 Q. As you listened to that specific portion, do
13 you have any reason to dispute here today that that is,
14 in fact, what the Vivint representative stated to you?
15 MR. HERBERT: Object to form.
16 A. I can't -- I cannot dispute that. That is --
17 that is real in my impression.
18 BY MR. HOBBS:
19 Q. Okay. And it sounded like you were calling
20 CPI to inquire about this visit. Is -- is that a fair
21 characterization of what we've listened to so far?
22 MR. HERBERT: Object to form.
23 A. Yes.
24 BY MR. HOBBS:
25 Q. Do you, again, have any independent

1 recollection of why you were reaching out to CPI on this
2 day?
3 MR. HERBERT: Object to form.
4 A. Repeat your question. I'm just...
5 BY MR. HOBBS:
6 Q. Do you have any independent recollection
7 sitting here today as to why you were making this call
8 to CPI?
9 MR. HERBERT: Same objection.
10 A. It's consistent with my personality and my
11 follow-through on any of the sales, fly-by-night sales
12 people who come around through the neighborhood. I
13 consistently ask them whether they have a city permit to
14 be here. I ask them to produce that. If they don't, I
15 shut the door in their face.
16 BY MR. HOBBS:
17 Q. And in the segment that we were just
18 listening to, you were asking CPI about these statements
19 that the Vivint representative had made to you; is that
20 fair?
21 MR. HERBERT: Object to form.
22 A. Yes.
23 BY MR. HOBBS:
24 Q. Do you know why you were calling CPI to ask
25 those questions?

1 MR. HERBERT: Object to form.
2 A. This gentleman was suggesting I change --
3 change companies from a company I had worked with for
4 many, many years, and that he was also representing CPI,
5 and it didn't make sense. So I was calling to ask that
6 it -- can they help me make sense out of it. And
7 obviously, years later, here they are.
8 BY MR. HOBBS:
9 Q. I'm going to play another minute-long segment
10 of this. For the record, it's going to start at
11 54 seconds. I'm going to play it for about an
12 additional minute and then, Mr. Kodack, I'm going to ask
13 you a couple additional questions subject to the
14 standing objection.
15 (Audio recording begins.)
16 CPI REPRESENTATIVE: Okay. Verify your
17 password for me, sir.
18 CALLER: -- a moment.
19 CPI REPRESENTATIVE: Okay. And he said he
20 was from?
21 CALLER: Vivint?
22 CPI REPRESENTATIVE: Vivint?
23 CALLER: Vivint. V-I-V-I-N-T, which is a
24 competitor.
25 CPI REPRESENTATIVE: Oh.

10 (Pages 34 - 37)

1      CALLER: And the -- you know --
2      CPI REPRESENTATIVE: Vivint.
3      CALLER: -- a competitor to you guys.
4      CPI REPRESENTATIVE: Vivint, that's what it
5   is. That's -- I was trying to see who it was.
6   Yeah, no, he was not there with us at all.
7      CALLER: Yeah.
8      CPI REPRESENTATIVE: What they do is, they
9   try to get you to sign with -- to, like, get
10   something put in and then you end up signing their
11   contract, and then you're locked in.
12      CALLER: Okay. First question I asked him
13   is, did he have a city permit to solicit like that.
14   And I didn't know, and he never answered the
15   question. And he says he wasn't selling anything,
16   so.
17      (Audio recording paused.)
18   BY MR. HOBBS:
19      Q. So I paused it, Mr. Kodack, at 1 minute and
20   55 seconds. Were you able to hear that segment?
21      MR. HERBERT: Let me -- I'm sorry. I'm going
22   to interpose an objection and in particular move to
23   strike the question and that portion of the -- of
24   the exhibit that's containing hearsay.
25   BY MR. HOBBS:

1      Q. Mr. Kodack, were you able to hear that
2   portion?
3      A. Yes, I was.
4      Q. Okay.
5      A. It was consistent with what I just said to
6   you --
7      Q. Okay.
8      A. -- a minute ago, not remembering this.
9      Q. And --
10      A. So --
11      Q. -- by "consistent," are you referencing the
12   fact of you mentioning on the call that you were asking
13   about a permit?
14      MR. HERBERT: Same objection.
15      A. Yes. Yes.
16   BY MR. HOBBS:
17      Q. Did you hear the portion of the call where
18   you're saying, I thought they were a competitor of
19   yours, but he was saying that they work with CPI?
20      MR. HERBERT: Object to form. I'm sorry, go
21   ahead, Eric. I didn't know -- I thought you were
22   finished.
23   BY MR. HOBBS:
24      Q. Did -- well, I'm going to ask about that
25   specific statement, but do you recall being -- or that

1   dialogue you had with the customer service agent?
2      MR. HERBERT: And I'm sorry, Mr. Kodack. I
3   need to interpose an objection that the question
4   grossly mischaracterizes even the leading hearsay
5   contained in the exhibit.
6   BY MR. HOBBS:
7      Q. Okay. I -- I don't want to misrepresent
8   anything, Mr. Kodack. So I'm going to just back up the
9   recording and play it one more time and then ask you a
10   fresh question. But I'm going to back it up to
11   55 seconds and play that -- that minute-long segment
12   again.
13      (Audio recording begins.)
14      CPI REPRESENTATIVE: Okay. Verify your
15   password for me, sir.
16      CALLER: -- a moment.
17      CPI REPRESENTATIVE: Okay. And he said he
18   was from?
19      CALLER: Vivint?
20      CPI REPRESENTATIVE: Vivint?
21      CALLER: Vivint. V-I-V-I-N-T, which is a
22   competitor.
23      CPI REPRESENTATIVE: Oh.
24      CALLER: In the -- you know --
25      CPI REPRESENTATIVE: Vivint.

1      CALLER: -- a competitor of you guys.
2      CPI REPRESENTATIVE: Vivint, that's what it
3   is. That's -- I was trying to see who it was.
4   Yeah, no, he was not there with us at all.
5      CALLER: Yeah.
6      CPI REPRESENTATIVE: What they do is, they
7   try to get you to sign with -- to, like, get
8   something put in and then you end up signing their
9   contract, and then you're locked in.
10      CALLER: Okay. First question I asked him
11   is, did he have a city permit to solicit like that.
12   And I didn't know, and he never answered the
13   question.
14      (Audio recording paused.)
15   BY MR. HOBBS:
16      Q. So I've paused it at 1:51. Mr. Kodack, the
17   portion I wanted to ask you about is, did you hear when
18   you were indicating to the CPI representative that you
19   were questioning whether Vivint was a competitor of CPI?
20      MR. HERBERT: Same objection.
21      A. Yes, I heard that.
22   BY MR. HOBBS:
23      Q. And do you know why you were asking CPI's
24   customer service representative that question?
25      MR. HERBERT: Object to form, foundation.

11 (Pages 38 - 41)

1    A.   The sales representative made suggestions

2  that they were affiliated with or working with CPI.

3  BY MR. HOBBS:

4    Q.  What I'm going to do now is, I'm going to

5  play the remainder of the recording from 1:51 through

6  5 minutes and 43 seconds.  And Mr. Kodack, I apologize.

7  It's going to be a lengthy segment here, but I want to

8  ask you a couple questions after we do that.

9        (Audio recording begins.)

10      CALLER:  And he says he wasn't selling

11  anything, so.  Somebody else will come around

12  selling something, he said.  So I -- I just brushed

13  him off, but I didn't know whether you were aware in

14  this neighborhood this is what's going on.

15      CPI REPRESENTATIVE:  We -- I don't know if

16  the other reps. I'm going to escalate up to our

17  management team, letting them know that there's --

18  that he's going around portraying he's working with

19  us, because they can't do that.  I mean, that's

20  illegal --

21      CALLER:  Yeah.

22      CPI REPRESENTATIVE:  -- misrepresentation

23  and --

24      CALLER:  Yeah, by all means.  That's the

25  reason why I called you guys to say, hey.

1      CPI REPRESENTATIVE:  Yeah.

2      CALLER:  We've been with you a week or three.

3      CPI REPRESENTATIVE:  Yeah.

4      CALLER:  Like you're...

5      CPI REPRESENTATIVE:  And --

6      CALLER:  As soon as they put in the system in

7  this house, we switched over to you guys.  I've been

8  with you for all along, and we have upgraded once to

9  the cell phone technology, and that's all we've ever

10  done with it.  We just had a service this last week,

11  and he came out and repaired a door switch.

12      CPI REPRESENTATIVE:  Okay.  I'm going to --

13  wait one second.

14      All right.  I'm going to go ahead and send

15  this off to my management team so they can get on

16  top of this.  We definitely appreciate you calling

17  us.  We want to let you know that anytime somebody

18  comes to your home from CPI Security, no matter if

19  it's a sales rep like you said working the

20  neighborhood, they will always have a CPI badge on

21  with an employee number on it.  You ask to see that

22  badge, and you can always verify.  If you go to

23  CPIsecurity.com, it will have employee verification,

24  and you can put in that employee number and it will

25  tell you if they're with this company or not.

1      CALLER:  Okay.

2      CPI REPRESENTATIVE:  But our employees

3  always -- they normally have a CPI shirt on and come

4  up in a CPI vehicle.

5      CALLER:  And he didn't.

6      CPI REPRESENTATIVE:  Yeah, but they always

7  have a badge on them.

8      CALLER:  Yeah.  Yeah.

9      CPI REPRESENTATIVE:  Everybody.

10      CALLER:  And -- and the gentleman who came to

11  the house identified himself and came in to do the

12  work and did so beautifully.

13      CPI REPRESENTATIVE:  Yeah.  We definitely --

14  I'll go ahead and escalate.  Like I said, we really

15  appreciate you letting us know.

16      CALLER:  Yes.

17      CPI REPRESENTATIVE:  And I'm going to send --

18      CALLER:  I just don't like that sort of

19  stuff.

20      CPI REPRESENTATIVE:  No, that's just --

21      CALLER:  I don't like that sort of stuff

22  when --

23      CPI REPRESENTATIVE:  That's --

24      CALLER:  -- when --

25      CPI REPRESENTATIVE:  That's low --

1      CALLER:  Yeah.

2      CPI REPRESENTATIVE:  -- to do that.

3      CALLER:  That's low.  And, yeah, I'm very

4  pleased with what CPI has offered me over the years.

5  And it's -- you know, it works.  Your sign works.

6      CPI REPRESENTATIVE:  Oh, thank you.  We

7  appreciate it, sir.  And thank you for calling us

8  and making us aware.

9      CALLER:  Okay.  Thank you.  And will you

10  communicate with me in some way and let me know

11  what's happened?

12      CPI REPRESENTATIVE:  Our management team will

13  probably reach out to you.

14      CALLER:  Okay.

15      CPI REPRESENTATIVE:  I'm -- like I said, I'm

16  going to send them on now and let them know, and

17  then they will probably reach out.  I will tell

18  them.

19      CALLER:  All right.  Thank you.  I just --

20  you know, it just completes the circle.

21      CPI REPRESENTATIVE:  Okay.

22      CALLER:  Thank you.  You have a good

23  afternoon.

24      CPI REPRESENTATIVE:  All right.  Thank you.

25  Have a good day.  Bye-bye.

**12 (Pages 42 - 45)**

1    (Audio recording end.)
2  BY MR. HOBBS:
3    Q.  So Mr. Kodack, were you able to hear the
4  remainder of that recording as I played it?
5    MR. HERBERT:  Mr. Kodack, I'm sorry, I'm
6  going to interpose an objection.  Again, repeat my
7  prior objection and move to strike the use of that
8  clip, that sound clip as leading and misleading,
9  containing hearsay and improper foundation, and
10  object to the form of any questions related to it.
11  BY MR. HOBBS:
12    Q.  Mr. Kodack, I'll reask the question subject
13  to those objections.  Were you able to hear the
14  remainder of that recording as I played it?
15    A.  Yes, I was.
16    Q.  Okay.  Do you mind just getting a little bit
17  closer to the microphone --
18    A.  Okay.
19    Q.  -- on your computer?  Very good.
20    A.  Yes, I did.
21    Q.  I'm going to ask the same question I -- I
22  asked a few minutes ago.  Does listening to the
23  remainder of this recording, does that refresh your
24  memory sitting here today as to the call that you made
25  to CPI?

1    MR. HERBERT:  Same objections.
2    A.  It is consistent with my demeanor and the
3  kinds of inserts I put in as we went through it.  I
4  don't specifically remember this call.
5  BY MR. HOBBS:
6    Q.  Okay.
7    A.  I've done this with Duke Power and a few
8  others from time to time when salesmen hit the
9  neighborhood, and I very consistently ask them the same
10  kinds of questions.
11    Q.  I appreciate that, but my follow-up question
12  would be, then, as you listened to what I played, do you
13  have any reason to doubt what you relayed to CPI on this
14  call is, in fact, what happened to you when you
15  interacted with this representative from Vivint?
16    MR. HERBERT:  Same objection.  And also
17  object that the question has been asked and answered
18  a couple times now.
19    A.  Repeat your question.
20    Q.  You can answer.
21    MR. HOBBS:  Could I have the court reporter
22  please read the question back, subject to the
23  objection?
24    And you're on mute, sorry.
25    THE COURT REPORTER:  Thank you.

1    (Whereupon, the following question was read:
2    I appreciate that, but my follow-up question
3  would be, then, as you listened to what I played, do
4  you have any reason to doubt what you relayed to CPI
5  on this call is, in fact, what happened to you when
6  you interacted with this representative from
7  Vivint?)
8    MR. HERBERT:  Same objection.
9    A.  I have no reason to doubt the veracity of
10  that recording.
11  BY MR. HOBBS:
12    Q.  On the segment that we listened to, you
13  stated that you had been very pleased with CPI.  Do you
14  remember hearing that as I played it?
15    A.  Yes.
16    MR. HERBERT:  Same objection.
17  BY MR. HOBBS:
18    Q.  And were you interested at this time in
19  making a switch in your alarm services provider?
20    A.  No, I was not interested in switching.
21    Q.  Did the fact of the Vivint sales
22  representative stating he -- that Vivint worked with
23  CPI, did that cause you to question whether you needed
24  to make a change to your alarm system?
25    MR. HERBERT:  Object to form.  The witness

1  has already testified he doesn't remember.
2    A.  No, it would not be -- I would not have
3  considered it.  And to that extent, I called CPI to make
4  sure that they hadn't sold out to somebody.
5  BY MR. HOBBS:
6    Q.  And I assume you were calling CPI because you
7  didn't know the answer to that question?
8    MR. HERBERT:  Object to form.
9    A.  Correct.
10  BY MR. HOBBS:
11    Q.  I -- I know memory can be a tough thing,
12  Mr. Kodack, but let me generally ask.  You've testified
13  that you're in your early 70s.  Do you have any general
14  memory issues?
15    A.  No, I do not.  I've stayed pretty clear, and
16  even kind of pre-knew what the recording was going to do
17  even though I didn't have specific memory of that call.
18  I'm pretty consistent.
19    Q.  Now, I -- I know you don't specifically
20  recall making this phone call to CPI.  I -- I just have
21  to ask.  Do you recall contacting any other party,
22  whether it be Vivint or a third party, about this
23  interaction?
24    A.  No, I do not recall any other.  To me, this
25  was the end of the line from my needs standpoint.

1 Nothing changed on my CPI. It's there. It's there now.

2     Q. And let me ask. I know you've testified as

3 to your memory, but if I represented to you that CPI's

4 records show that this call was received on July 14th of

5 2018, does that refresh your recollection as to when you

6 had an interaction with the Vivint sales representative?

7     MR. HERBERT: Object to form. Same objection

8 as prior objection, standing objection.

9     A. I don't -- I don't specifically recall the

10 particular date as being noteworthy. Obviously, I -- it

11 was consistent with a salesman at my door. Even the

12 timestamp on it would probably tell you the time of day,

13 because knowing my consistency, I would have called CPI

14 immediately and said, is this for real?

15 BY MR. HOBBS:

16     Q. Understood. And that's why I -- I just want

17 to ask a slightly different question, is if CPI's

18 records reflect that they received this call from you on

19 July 14th of 2018, would you have any reason sitting

20 here today to dispute that?

21     MR. HERBERT: Same objection.

22     A. I would not.

23     MR. HOBBS: Okay. Mr. Kodack, those are the

24 only questions I have for now. Just as a

25 housekeeping matter, I have played the audio

1 recording Bates labeled as CPI 54 and designated it

2 as Exhibit 3. I am going to mark it as Exhibit 3

3 and place it in our marked exhibit folder now. And

4 with that, Mr. Kodack, Mr. Herbert is going to have

5 an opportunity to ask you some questions on behalf

6 of Vivint.

7     (Whereupon, Exhibit 3 was marked for

8 identification.)

9     MR. HERBERT: Thank you, Mr. Hobbs.

10         EXAMINATION

11 BY MR. HERBERT:

12     Q. Good afternoon, Mr. Kodack.

13     A. Good afternoon.

14     Q. My name is Greg Herbert and, as I mentioned

15 earlier, I am one of the attorneys representing Vivint

16 in this lawsuit that CPI has brought. First question I

17 want to ask you is, just so we're clear, you and your

18 family who live with you, none of you have ever spent $1

19 with Vivint at any point in your life that you're aware

20 of, right?

21     A. Correct.

22     Q. Okay. And you continue your service with

23 CPI; you've continuously been a customer of CPI since

24 January of 2003, correct?

25     A. Correct.

1     Q. All right. And you've paid your monthly

2 payment to them every month during that time period,

3 right?

4     A. Yes, indeed.

5     Q. So nothing that you testified about today at

6 all persuaded you to do business with Vivint, right?

7     A. Correct.

8     Q. And nothing that you testified about today

9 changed your opinion of CPI; is that a fair statement?

10     A. Yes, that is a fair statement.

11     Q. You didn't discontinue your contract with CPI

12 as a result of anything you testified about today,

13 right?

14     A. No, I did not.

15     Q. Yeah, and in fact, at some point over the

16 lifespan of your agreement with CPI, you agreed to have

17 them upgrade your system at least once, and I think you

18 said twice; is that right?

19     A. Yes, indeed. Two separate instances going to

20 the cell phone connection, which I thought was a great

21 deal safer than the landline, and B, going to upgrade

22 the cell phone when that was -- when that version of

23 cell phone was retired.

24     Q. Right. And one of those upgrades occurred, I

25 believe you said it was in February of 2020; is that

1 right?

2     A. Yes, indeed.

3     Q. So I want to ask you some additional

4 questions about what you may or may not recall about

5 anything you testified about earlier today. From --

6 from your testimony, it sounds to me that as you sit

7 here today and testify under oath, you cannot

8 specifically recall any conversation you might have had

9 or might not have had with a sales representative

10 identifying himself as being from Vivint; is that a fair

11 statement?

12     A. That is a fair statement that I don't have

13 any direct recall of that.

14     Q. Okay.

15     A. Or spontaneous recall of that.

16     Q. So you -- you couldn't testify as to, if you

17 did have such an interaction with a Vivint sales rep,

18 you couldn't testify as to what he looked like, how tall

19 he was, what color hair he had, things like that, right?

20     A. Yeah, I have no recall of any description. I

21 might have immediately after that, but not just -- it

22 was a non-descript salesman to me.

23     Q. Okay. And you don't recall whether or not

24 that person, if you did have such an interaction, was

25 wearing a hat or a name tag or a shirt that identified

1 himself with any particular company?
2    A. No, I do not recall that at all.
3    Q. Okay. And I assume the same would be true
4 for whether or not that person had a -- had a car with
5 a -- with a logo or a company magnet or label on it?
6    A. No, I -- I do not have that information in my
7 store now.
8    Q. And I also assume it's true that you can't
9 recall how long a span of time passed from any
10 interaction that you might have had and the phone call
11 that you testified about when Mr. Hobbs was -- was
12 questioning you; is that a fair statement?
13    A. My consistent pattern is to follow up
14 immediately, but other than that, no. No specific. I
15 can't say so many minutes and so many seconds after he
16 left. But my tendency is, that's a little strange,
17 dear. I'm going to follow up on it.
18    Q. All right. So that's your -- that's your
19 normal course and conduct --
20    A. Yeah.
21    Q. -- but as you sit here today testifying under
22 oath, you cannot say that definitely you called the same
23 day or the next day or -- or what the span of time was,
24 right?
25    A. No, I don't -- and we -- I wasn't given a

1 timestamp on when that call came in. I'm sure at some
2 point in time it was timestamped, the particular call
3 that was recorded.
4    Q. Okay. So in terms of, you know, the -- the
5 possible interaction with the sales rep, as you sit here
6 today, you cannot testify under oath about any
7 particular statement that that sales representative made
8 because you don't remember any interaction; is that a
9 fair statement?
10    A. Yes, but it is consistent with the way I
11 question all salesmen at my door. So the consistency is
12 there, but the specific memory of this particular
13 salesman in this particular incident is not recognized.
14    Q. Understood, understood. So to put it in a
15 simpler way, if I were to ask you, Mr. -- Mr. Kodack,
16 can you testify under oath, can you tell me something
17 that this Vivint sales rep said to you in this
18 interaction that -- that might have happened, could you
19 answer that question?
20    A. No.
21    Q. Let me rephrase that -- that was a "no"?
22    A. Yeah. I was sitting here trying to figure
23 out what -- how I -- how I answer that, yeah.
24    Q. That was not a well-phrased question. I ask
25 you, recognizing that you're testifying as if you're in

1 court, Mr. Kodack, can you tell me from your independent
2 recollection anything that this sales representative
3 might have said to you on that day?
4    A. No.
5    Q. And it sounds like you clearly understand
6 that Vivint and CPI are two companies that compete
7 against each other. Is that a fair statement?
8    A. Or with --
9       MR. HOBBS: Object to form.
10 BY MR. HERBERT:
11    Q. I'm sorry. I couldn't hear your answer,
12 Mr. Kodack.
13    A. With each other rather than against each
14 other.
15    Q. Good -- good point. Good point. You must
16 have been an English major or taken some --
17    A. No, no, I'm just consistent on English
18 language. Just my own personal bug. I've corrected too
19 many papers and research documents and stuff like that
20 for -- for language. And I -- I call people on it.
21    Q. Well, I'm happy to be called out. I was an
22 English major myself, and I -- I have to resist the
23 temptation to do that with folks because I like to do
24 that, and there's a lot of -- lot of bad grammar and
25 usage out there today, so no problem. Feel free to

1 correct me if I ever --
2    A. Oh, no. No, I just wanted to be -- did you
3 mean what I was saying rather than what you were saying.
4    Q. 100 percent. I wanted to make sure you --
5 you understand my meaning. So thank you.
6       I'm just going to look through my notes. I
7 don't think I might have any questions. Just give me
8 one minute, and I will see if we can wrap this up.
9       Let me ask you one -- one last set of
10 questions. And that is, did you happen to hear about
11 some controversial comments that were made by CPI's CEO,
12 a gentleman by the name of Ken Gill, last summer
13 regarding the Black Lives Matter movement?
14    A. No, I have not heard. I didn't even know who
15 Ken Gill was. Thank you for telling me.
16    Q. Okay. Let me ask you. Did you happen to
17 hear anything in the news about some North Carolina
18 sports teams or other businesses terminating the
19 relationship with CPI because of this controversy?
20    A. No.
21    Q. Okay. Are you -- are you a football or
22 basketball fan at all?
23    A. No, not much of one. I'm not particularly a
24 sports nut.
25    Q. You may be the only Duke graduate who is not

15 (Pages 54 - 57)

1  a basketball fan that I've ever met, so.

2     A. Oh, well, hey, it's -- talk about science,

3  yes, I'll be perfectly willing to cheer your team on,

4  but not...

5     MR. HERBERT: I got it. All right. I don't

6  believe I have any further questions. And I'll tell

7  you that if Mr. Hobbs -- he might ask you a couple

8  follow-ups. It's possible I might have a follow-up

9  or two after that. Okay. So I just wanted to give

10  you a fair warning.

11     THE WITNESS: Yeah, thank you.

12     MR. HERBERT: Thank you.

13     MR. HOBBS: Mr. Kodack, I have just a couple

14  very brief questions.

15     EXAMINATION

16  BY MR. HOBBS:

17     Q. Mr. Herbert asked you about your independent

18  recollection and memory sitting here today, and that's a

19  topic we've both asked some questions about. In

20  follow-up to that, would you agree that the phone call

21  we have listened to that you made to CPI would have been

22  closer in time to the interaction you had with this

23  Vivint representative than now?

24     MR. HERBERT: Object to form.

25     A. Yes.

1  BY MR. HOBBS:

2     Q. Would your memory have been fresher at that

3  time of that -- of the incident or of the interaction

4  you had with the Vivint representative?

5     MR. HERBERT: Object to form.

6     A. I'm sure -- I'm sure it would have. My

7  tendency is, is to follow up on those things, to consult

8  with my partner and then to make the phone call

9  immediately. Because it's what's confronting me right

10  then, and if you can clear it up, let's clear it up.

11  The -- it sounded a little funny and a little fishy, and

12  I didn't -- I wanted to reaffirm our relationship with

13  CPI.

14  BY MR. HOBBS:

15     Q. And what sounded funny or fishy?

16     MR. HERBERT: Object to form.

17     A. Just that he said that --

18     (Phone ringing.)

19     A. Just a second.

20     What sounded a little bit fishy was his

21  saying that he worked or -- with CPI. I don't recall

22  whether he was identified as a Vivint employee, but that

23  he worked with CPI as well didn't quite gel.

24     MR. HOBBS: Okay. Mr. Kodack, unless

25  Mr. Herbert has anything else, those are the only

1  questions I have for you today.

2     MR. HERBERT: All right. Mr. Kodack, I just

3  want to clarify something that you just said.

4     EXAMINATION

5  BY MR. HERBERT:

6     Q. You were testifying about some things you

7  heard in a phone call, right, not about any independent

8  recollection of an actual conversation but --

9     A. That's right.

10     Q. -- somebody -- okay.

11     A. And -- and my own general consistency with

12  the timing of a phone call to a company concerning a

13  representation from that company -- of that company.

14  And I wanted to make sure that, am I still with you

15  guys?

16     Q. I understand. And you -- you recall that --

17     A. Not specifically this one, but it is my

18  consistent pattern.

19     MR. HERBERT: Okay. All right. I don't have

20  any further questions. Thank you very much,

21  Mr. Kodack.

22     THE WITNESS: Thank you.

23     MR. HOBBS: Let's go ahead and go off the

24  record.

25     THE VIDEOGRAPHER: The time is 2:27 p.m.

1  We're off the record.

2     (DEPOSITION CONCLUDED AT 2:27 P.M.)

3     (SIGNATURE RESERVED)

1 STATE OF NORTH CAROLINA
2 COUNTY OF FORSYTH:
3
4       REPORTER'S CERTIFICATE
5
6     I, LAUREN McINTEE, RPR, CRR, a Notary Public
7 in and for the State of North Carolina, located in
8 Forsyth County, North Carolina, do hereby certify that
9 there appeared remotely on Wednesday, the 25th day of
10 August, 2021, the person hereinbefore named located in
11 Durham County, North Carolina, who was by me duly sworn
12 to testify to the truth and nothing but the truth of his
13 knowledge concerning the matters in controversy in this
14 cause; that the witness was thereupon examined under
15 oath, the examination reduced to typewriting under my
16 direction, and the deposition is a true record of the
17 testimony given by the witness.
18     I further certify that I am neither attorney
19 or counsel for, nor related to or employed by, any
20 attorney or counsel employed by the parties hereto or
21 financially interested in the action.
22     I signed this notarial certificate on 31st
23 day of August, 2021, according to the emergency video
24 notarization requirements contained in G.S. 10B-25.
25     IN WITNESS WHEREOF, I have hereto set my

1 hand, this the 31st day of August, 2021.
2
3
4     *Lauren McIntee*
    LAUREN McINTEE, RPR, CRR Notary Public
5     Notary Number: 201616600044
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1 Lawrence Kodack
2 Lawrencekodack@gmail.com
3     August 31, 2021
4 RE:   CPI Security Systems, Inc, v. Vivint Smart Home, Inc.
5   8/25/2021, Lawrence Kodack (#4771270)
6   The above-referenced transcript is available for
7 review.
8   Within the applicable timeframe, the witness should
9 read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12   The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 erratas-cs@veritext.com
16
17 Return completed errata within 30 days from
18 receipt of testimony.
19   If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22     Yours,
23     Veritext Legal Solutions
24
25

1 CPI Security Systems, Inc, v. Vivint Smart Home, Inc.
2 Lawrence Kodack (#4771270)
3     E R R A T A   S H E E T
4 PAGE_____ LINE_____ CHANGE_____
5 _____
6 REASON_____
7 PAGE_____ LINE_____ CHANGE_____
8 _____
9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____ _____
24 Lawrence Kodack            Date
25

17 (Pages 62 - 65)

1  CPI Security Systems, Inc, v. Vivint Smart Home, Inc.

2  Lawrence Kodack (#4771270)

3          ACKNOWLEDGEMENT OF DEPONENT

4      I, Lawrence Kodack, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____    _____

12  Lawrence Kodack              Date

13  *If notary is required

14          SUBSCRIBED AND SWORN TO BEFORE ME THIS

15          _____ DAY OF _____, 20___.

16

17

18          _____

19          NOTARY PUBLIC

20

21

22

23

24

25

Veritext Legal Solutions

800-567-8658                                    973-410-4098

**&**

**&** 2:3,13

**0**

**00504** 1:3
**054** 26:16

**1**

**1** 3:8 15:13,22
16:6,10 38:19
51:18
**10** 27:5
**100** 57:4
**10b** 62:24
**11** 27:16 31:6
**13** 2:13
**14th** 50:4,19
**15** 3:8 14:4 34:10
**1660** 2:4
**16th** 16:21
**17** 3:9
**17th** 2:4
**1:10** 2:25 4:7
**1:51** 41:16 42:5

**2**

**2** 3:9 17:1,2,6
18:11,19,23 19:4
**20** 10:8 66:15
**2000** 18:14
**2003** 16:4,21,23,23
21:6 51:24
**2004** 8:18 15:10
**2007** 12:4
**2009** 9:10 13:11
**201** 2:13
**2010** 18:11
**2016** 9:11
**201616600044**
63:5
**2018** 23:7 24:12,12
24:15 25:3 26:1
50:5,19

**2019** 9:25
**2020** 18:16 52:25
**2021** 1:18 2:25 4:6
62:10,23 63:1
64:3
**21567** 63:4
**25** 1:18 2:25 12:10
62:24
**25th** 4:6 62:9
**27713** 8:16
**285-5300** 2:5
**2:27** 60:25 61:2
**2g** 18:24 19:1

**3**

**3** 3:10 18:19 26:12
51:2,2,7
**30** 64:17
**302** 8:15 27:12
**303** 2:5
**31** 64:3
**31st** 62:22 63:1
**322-2516** 2:14
**32801** 2:9
**3:20** 1:3
**3g** 18:23 19:4

**4**

**4** 3:2 18:20 19:2,4
**40** 34:10
**407** 2:10
**40s** 13:14
**420-1000** 2:10
**43** 26:17 42:6
**45** 34:9
**450** 2:4,9
**4771270** 64:5 65:2
66:2

**5**

**5** 26:17 42:6
**5/6** 17:8

**5/8/2010** 17:11
**50s** 13:14
**51** 3:2,10
**54** 31:22 37:11
51:1
**55** 28:13 31:6
38:20 40:11
**58** 3:3

**6**

**60** 3:3
**650** 2:9

**7**

**70** 9:25 13:16
**70s** 12:25 49:13
**72** 13:18

**8**

**8/25/2021** 64:5
**801** 2:14
**80202** 2:4
**803.5** 29:21 30:2
**803.5.** 30:3
**80s** 12:25
**84111** 2:14

**a**

**able** 4:24 11:12
13:1 16:1,3 27:17
28:14 38:20 39:1
46:3,13
**accommodate** 9:5
**accuracy** 64:9
**acknowledgement**
66:3
**acknowledgment**
64:12
**acquisition** 1:8
**action** 1:3 62:21
**activated** 14:16
20:2

**actual** 60:8
**added** 20:19
**addition** 30:4,14
**additional** 37:12
37:13 53:3
**additions** 66:6
**address** 8:14,17,22
27:21
**addresses** 8:24
**admissible** 30:3
**affiliated** 42:2
**afternoon** 4:13,23
45:23 51:12,13
**age** 9:25 13:16
**agent** 40:1
**ago** 16:24 24:16
39:8 46:22
**agree** 58:20
**agreed** 52:16
**agreement** 52:16
**ahead** 15:19 39:21
43:14 44:14 60:23
**aided** 1:25
**al** 4:5
**alarm** 14:9,13,14
14:22 19:18,23
20:1,21 21:5,6,12
21:12 22:20 23:3
25:11 48:19,24
**alleged** 30:24
**allen** 9:15
**allotted** 64:20
**allow** 6:10,11
12:23
**allowing** 5:23
**ambulance** 20:8
**analogue** 17:19,20
**ancient** 9:21
**andree** 9:15 13:19
13:23,24,24

**animals** 13:5
**anomalies** 12:16
**answer** 5:4 6:11
  19:9,16 24:7 34:6
  35:2 47:20 49:7
  55:19,23 56:11
**answered** 38:14
  41:12 47:17
**answering** 7:4
  35:4
**anybody** 13:24
  28:9 31:18 34:16
**anytime** 43:17
**apologize** 42:6
**appearances** 2:1
**appeared** 62:9
**appended** 66:7
**applicable** 64:8
**applied** 13:3
**apply** 13:1
**appreciate** 5:21,23
  19:15 43:16 44:15
  45:7 47:11 48:2
**approached** 23:8
**approaching**
  22:12
**april** 9:11
**argue** 23:24,25
**articulate** 29:10
**asheville** 8:25
**asked** 7:2,4 15:20
  22:10 28:22 29:16
  38:12 41:10 46:22
  47:17 58:17,19
**asking** 5:15 13:12
  32:13 36:18 39:12
  41:23
**asks** 6:23
**aspect** 13:6
**assembled** 7:13

**asserted** 30:6,23
**assist** 10:9,18
  27:11
**assume** 49:6 54:3
  54:8
**attached** 64:11
**attained** 11:16,24
**attempt** 6:21
  12:15 30:1
**attention** 22:20
  23:6
**attorney** 6:17,23
  7:3 28:19 62:18
  62:20 64:13
**attorneys** 5:12,14
  6:6,23 51:15
**audio** 3:10 5:5
  26:16,21 27:9,14
  27:25 28:11 29:25
  31:9,20 34:12,18
  37:15 38:17 40:13
  41:14 42:9 46:1
  50:25
**august** 1:18 2:25
  4:6 62:10,23 63:1
  64:3
**authenticated**
  30:17
**available** 64:6
**avenue** 2:9
**aware** 24:12,22
  28:7 31:16 34:15
  42:13 45:8 51:19
**awkward** 7:1

**b**

**b** 52:21
**back** 10:17 11:19
  14:6 15:14 24:21
  29:7 30:12 31:4
  34:8,9 40:8,10
  47:22

**background** 19:14
**bacon** 2:3 4:11
**bad** 6:15 56:24
**badge** 43:20,22
  44:7
**basic** 20:19
**basket** 10:1
**basketball** 57:22
  58:1
**bates** 26:16 51:1
**beautifully** 44:12
**beg** 13:21
**beginning** 4:2
**begins** 27:9,25
  31:9 34:12 37:15
  40:13 42:9
**behalf** 2:2,7,20
  4:11,15,17 5:15,23
  51:5
**believe** 52:25 58:6
**best** 32:7
**better** 9:25 19:16
  24:19 28:6 31:15
  34:13
**biochemistry**
  11:20 12:4
**biomed** 10:5 19:14
**bit** 5:6 6:5 14:9
  46:16 59:20
**black** 57:13
**blank** 26:7
**board** 18:17 19:7
  19:13
**born** 8:25
**bothered** 22:17
**bottom** 9:17 16:15
  17:6,8,9
**box** 18:5
**break** 5:7
**brief** 30:13 58:14

**briefly** 9:1 29:12
**brinks** 14:15,16
**broke** 10:14
**brought** 9:3 51:16
**brushed** 42:12
**bug** 56:18
**build** 9:4
**built** 8:18 9:8
  14:15
**bushes** 22:7
**business** 52:6
**businesses** 57:18
**button** 10:21
**bye** 45:25,25

**c**

**c** 7:22,22 14:17
**call** 3:10 8:10,12
  15:18 18:19 20:10
  21:21 25:17,20
  26:1 32:2,15,17,22
  32:25 33:5 36:7
  39:12,17 46:24
  47:4,14 48:5
  49:17,20 50:4,18
  54:10 55:1,2
  56:20 58:20 59:8
  60:7,12
**called** 2:20 28:20
  42:25 49:3 50:13
  54:22 56:21
**caller** 27:12 28:1
  31:10 34:13 37:18
  37:21,23 38:1,3,7
  38:12 40:16,19,21
  40:24 41:1,5,10
  42:10,21,24 43:2,4
  43:6 44:1,5,8,10
  44:16,18,21,24
  45:1,3,9,14,19,22
**calling** 35:19
  36:24 37:5 43:16

45:7 49:6
**calls** 20:10 25:10
  25:21
**calm** 21:16
**canada** 9:1
**capability** 21:12
**car** 21:22 54:4
**cardiac** 12:16
**cardiotonic** 12:13
  12:20
**career** 10:6,11,12
  10:14 11:20
**carolina** 1:1,17
  2:24,24 8:15,19,25
  27:13 57:17 62:1
  62:7,8,11
**carry** 10:1
**case** 7:13,15 30:24
**cause** 48:23 62:14
**cell** 17:21 18:6,6
  18:17,18,20,25
  28:4 31:13 43:9
  52:20,22,23
**cellular** 19:5
**center** 10:5
**ceo** 57:11
**certificate** 62:4,22
**certified** 2:22
**certify** 62:8,18
**change** 19:6 24:13
  25:14 37:2,3
  48:24 65:4,7,10,13
  65:16,19
**changed** 18:17,19
  19:17 50:1 52:9
**changes** 18:12
  64:10 66:6
**changing** 19:4,12
**characterization**
  35:21

**chase** 24:21
**cheer** 58:3
**children** 13:9,13
**choose** 14:23
**choosing** 14:22
**circle** 45:20
**circuit** 19:7,13
**circumstances**
  17:16
**city** 2:14 9:2 36:13
  38:13 41:11
**civil** 1:3
**claiming** 28:4
  31:13
**claims** 30:23
**clarify** 60:3
**clean** 6:12
**clear** 24:25 32:13
  49:15 51:17 59:10
  59:10
**clearly** 30:19 56:5
**clip** 46:8,8
**close** 19:21
**closer** 46:17 58:22
**clyde** 2:13 4:16
**clydesnow.com**
  2:15
**college** 11:19
**color** 53:19
**colorado** 2:4
**come** 14:6 29:7
  36:12 42:11 44:3
**comes** 25:23 43:18
**coming** 12:14
  22:13 25:2
**commencing** 2:25
**comment** 23:10
**comments** 57:11
**commitment** 5:22
**communicate**
  45:10

**community** 11:19
**companies** 37:3
  56:6
**company** 14:23
  22:21 23:3 25:6
  37:3 43:25 54:1,5
  60:12,13,13
**compete** 56:6
**competitor** 37:24
  38:3 39:18 40:22
  41:1,19
**complete** 66:8
**completed** 64:17
**completely** 26:7
**completes** 45:20
**complex** 12:18,19
**component** 19:12
**computer** 1:25 5:8
  9:19,21 26:21
  46:19
**concept** 33:22
**concerning** 60:12
  62:13
**concluded** 61:2
**conditions** 28:5
  31:14
**condolences** 9:12
**conduct** 54:19
**confronting** 59:9
**confusion** 30:22
  30:25
**congratulations**
  10:2
**connect** 5:7,24
**connected** 6:3
  18:7
**connection** 6:3
  19:5 52:20
**considered** 49:3
**consistency** 50:13
  55:11 60:11

**consistent** 28:16
  32:25 36:10 39:5
  39:11 47:2 49:18
  50:11 54:13 55:10
  56:17 60:18
**consistently** 36:13
  47:9
**consult** 59:7
**consumer** 30:24
**contact** 24:11
**contacting** 49:21
**contained** 40:5
  62:24
**containing** 38:24
  46:9
**contains** 29:15
**continue** 5:6 51:22
**continued** 11:20
**continuously**
  51:23
**contract** 3:8,9
  38:11 41:9 52:11
**control** 18:5
**controls** 19:18
**controversial**
  57:11
**controversy** 57:19
  62:13
**conversation** 53:8
  60:8
**conversations**
  25:13
**copies** 64:14
**copy** 28:20
**corp** 1:8
**correct** 22:22 49:9
  51:21,24,25 52:7
  57:1 66:8
**corrected** 56:18
**correction** 19:2

corrections 66:6
correctly 8:1
  13:16,20 16:8
counsel 4:7 62:19
  62:20 64:14
count 21:20
counterclaim 1:5
  1:16 2:2,21
counterclaimants
  1:10 2:7
country 21:21
county 20:9 62:2,8
  62:11
couple 5:25 11:23
  14:21 24:24 25:14
  26:19 27:5,24
  29:7 31:7 37:13
  42:8 47:18 58:7
  58:13
course 21:5 25:9
  27:7 54:19
court 1:1 4:8 6:4
  6:12 8:12 47:21
  47:25 56:1
cpi 1:4 3:8,9 4:3
  4:12 5:12 14:15
  14:17,23 15:17
  17:18 18:3,12,16
  19:23 21:3 22:2
  24:19 25:10,20,25
  26:16 27:10,10
  28:20 32:22 33:8
  34:2,21,23 35:6,8
  35:20 36:1,8,18,24
  37:4,16,19,22,25
  38:2,4,8 39:19
  40:14,17,20,23,25
  41:2,6,18,19 42:2
  42:15,22 43:1,3,5
  43:12,18,20 44:2,3
  44:4,6,9,13,17,20

44:23,25 45:2,4,6
  45:12,15,21,24
  46:25 47:13 48:4
  48:13,23 49:3,6,20
  50:1,13 51:1,16,23
  51:23 52:9,11,16
  56:6 57:19 58:21
  59:13,21,23 64:4
  65:1 66:1
cpi's 21:5,6 25:9
  29:20,24 30:3,4
  32:2 41:23 50:3
  50:17 57:11
cpisecurity.com
  43:23
critical 20:7
crr 1:24 62:6 63:4
cs 64:15
cs4771270 1:25
curious 28:9 31:18
  34:17
current 8:14 13:9
  13:19
currently 9:9,23
  9:24 14:12,14
  19:3 22:6
customer 21:3
  32:2 34:21 40:1
  41:24 51:23
cut 5:5 24:20
cv 1:3

**d**

d 7:22,24,24
dale 27:11
date 4:6 7:13 17:8
  23:8 50:10 65:24
  66:12
dated 16:21
david 1:15 2:19
  4:18 7:24

day 9:11 36:2
  45:25 50:12 54:23
  54:23 56:3 62:9
  62:23 63:1 66:15
days 64:17
deal 52:21
dealing 33:1
deandrae 2:17
dear 54:17
deceased 9:10
declare 66:4
dedicated 18:18
deemed 66:6
defendant 1:5,16
  2:2,21
defendants 1:10
  2:7 4:15,17
definitely 43:16
  44:13 54:22
degree 11:19
delivered 22:11
demeanor 47:2
denver 2:4
department 11:22
  15:21 28:22 32:2
deponent 64:13
  66:3
deposing 64:13
deposition 1:15
  2:19 4:2 5:17,18
  61:2 62:16
describe 19:22
described 32:16
describing 11:14
descript 53:22
description 53:20
designate 26:12
designated 51:1
device 18:7
dial 18:6,18

dialogue 40:1
died 9:10,22 13:11
different 50:17
digital 17:21
direct 18:6,17
  25:13 28:17 53:13
direction 62:16
disabled 9:6
discontinue 52:11
discuss 15:18
discussing 29:4
dispute 33:7 34:1
  35:13,16 50:20
district 1:1,1
division 1:2
document 16:6,13
  16:25 17:23 18:9
  28:21 30:16
documents 56:19
dog 14:1,2,4
doing 5:22 14:22
door 28:1 31:10
  33:1 36:15 43:11
  50:11 55:11
doors 21:17
doubt 34:7 47:13
  48:4,9
driveway 21:22
drop 11:7
drugs 12:13,20,20
dsc 1:3
duke 10:4 11:15
  12:3 47:7 57:25
duly 4:19 62:11
durham 1:17 2:24
  8:15 9:3 27:13
  62:11

**e**

e 7:22,22 65:3,3,3
earlier 10:11
  28:20 51:15 53:5

**early** 12:25 13:14
  16:23 49:13
**easier** 13:6
**education** 11:16
**ehobbs** 2:5
**either** 6:10 8:7
**emergency** 62:23
**employed** 9:23
  62:19,20
**employee** 43:21,23
  43:24 59:22
**employees** 44:2
**ems** 20:3
**enclosed** 17:21
**english** 56:16,17
  56:22
**entry** 28:3 31:12
**equipment** 18:13
  19:6,23
**eric** 2:3 4:10 5:11
  11:5 39:21
**errata** 64:11,13,17
**erratas** 64:15
**escalate** 42:16
  44:14
**especially** 10:18
**esquire** 2:3,8,12
**et** 4:5
**events** 32:16
**everybody** 20:14
  44:9
**exactly** 10:10
**examination** 4:21
  51:10 58:15 60:4
  62:15
**examinations** 3:1
**examined** 4:19
  62:14
**exception** 29:21
**exhibit** 3:7,8,9,10
  15:13,22 16:6,10

17:1,2,6 18:11
  26:12 27:1 29:3
  29:14 30:15,19,23
  38:24 40:5 51:2,2
  51:3,7
**exhibits** 3:6
**explain** 12:11
**explored** 14:17
**extent** 30:16,18
  49:3
**extra** 20:5

**f**

**f** 1:7,8
**face** 36:15
**fact** 21:21 35:14
  39:12 47:14 48:5
  48:21 52:15
**factor** 14:25
**failed** 14:7
**fails** 64:19
**fair** 19:18,19 21:3
  24:16 32:6 35:20
  36:20 52:9,10
  53:10,12 54:12
  55:9 56:7 58:10
**fall** 29:21
**family** 51:18
**fan** 57:22 58:1
**far** 24:3 35:21
**farm** 13:5
**father** 8:3
**fdw** 1:3
**feature** 20:16,18
**featured** 10:13
**february** 18:16
  52:25
**feel** 56:25
**fetal** 12:9,13,16,16
  12:19,21
**fetus** 12:22

**fetuses** 13:1
**field** 12:2
**figure** 55:22
**figured** 9:25
**financially** 62:21
**fine** 4:25 5:3 24:3
  27:18 29:9
**finish** 6:10
**finished** 30:9
  39:22
**fire** 20:3 21:12
**firm** 4:11,14,16
**first** 4:19 5:16 6:9
  7:20 8:10 9:12
  14:12 15:3,8
  26:22 27:4 28:18
  28:23 30:2 32:20
  38:12 41:10 51:16
**fishy** 59:11,15,20
**five** 8:24
**fixed** 10:14
**flashing** 20:3,5
**floor** 2:13 9:7 14:5
  14:6
**florida** 2:9
**fly** 36:11
**fob** 20:20
**focus** 17:22 22:19
  23:6
**folder** 51:3
**folks** 56:23
**follow** 33:3,25
  36:11 47:11 48:2
  54:13,17 58:8,8,20
  59:7
**following** 48:1
**follows** 4:20
**fools** 9:11
**football** 57:21
**foregoing** 66:5

**foremost** 30:2
**form** 23:9,21 25:4
  26:6 27:2 29:14
  29:16 32:12 34:4
  34:24 35:10,15,22
  36:3,21 37:1
  39:20 41:25 46:10
  48:25 49:8 50:7
  56:9 58:24 59:5
  59:16
**formal** 8:9
**former** 9:13
**forsyth** 62:2,8
**forth** 30:12
**found** 21:6
**foundation** 27:2
  29:15 30:2,17
  41:25 46:9
**four** 8:23
**free** 56:25
**fresh** 40:10
**fresher** 59:2
**front** 22:7 25:7
**full** 7:21
**functioned** 21:9
**funny** 59:11,15
**further** 23:2 30:1
  58:6 60:20 62:18

**g**

**g.s.** 62:24
**gallery** 10:17,21
  11:8,9
**gears** 14:8
**gel** 59:23
**general** 49:13
  60:11
**generally** 12:11
  24:6 28:17 49:12
**generation** 18:20
**gentleman** 37:2
  44:10 57:12

gestations 12:17
getting 15:19
  46:16
gill 57:12,15
give 5:4 15:11 20:5
  21:14 22:15 26:14
  57:7 58:9
given 5:16 54:25
  62:17 66:9
gmail.com 64:2
go 5:9,25 6:1 8:4
  20:9 23:2,24
  24:21 30:11 31:4
  39:20 43:14,22
  44:14 60:23,23
going 15:5,11,12
  15:12,18,25 16:25
  17:1,9,22 18:9
  20:15 26:11,11,15
  26:18,18,21,25
  27:4,23 28:10
  31:4,19 34:9,17
  37:9,10,11,12
  38:21 39:24 40:8
  40:10 42:4,4,7,14
  42:16,18 43:12,14
  44:17 45:16 46:6
  46:21 49:16 51:2
  51:4 52:19,21
  54:17 57:6
good 4:13,23 6:7
  8:2 14:19 21:10
  21:10,19,24,25
  45:22,25 46:19
  51:12,13 56:15,15
  56:15
gotcha 7:7
grab 18:14
graduate 57:25
graduated 12:5

grammar 56:24
granted 31:3
great 52:20
greenberg 2:8
  4:14
greg 5:13 23:12
  29:9 51:14
gregory 2:8 4:14
grew 8:24
grossly 40:4
ground 5:25
grounds 30:22
gtlaw.com 2:10
guard 14:5
guess 11:16 23:7
  29:11
guys 28:9 31:18
  34:16 38:3 41:1
  42:25 43:7 60:15
gyn 11:21 12:8,9

**h**

h 65:3
hair 53:19
half 15:7 17:23
hand 63:1
handled 24:22
handwriting
  17:25
happen 6:5 57:10
  57:16
happened 32:10
  34:3 45:11 47:14
  48:5 55:18
happy 8:10 56:21
hard 17:10
harder 6:5
hardy 2:3 4:11
hat 53:25
hazard 6:16
hear 4:24,25 20:14
  26:22 27:17 28:14

34:23 35:8 38:20
  39:1,17 41:17
  46:3,13 56:11
  57:10,17
heard 27:18 41:21
  57:14 60:7
hearing 48:14
hearsay 29:15,19
  29:21 30:5 38:24
  40:4 46:9
heart 12:21
heck 15:20
help 6:1 20:13
  26:8,9 37:6
herbert 2:8 3:2,3
  4:13,14 5:13 6:10
  23:9,11,12,14,18
  23:21,25 24:2,5
  25:4 26:6,24 27:8
  28:25 29:13 30:8
  30:11 31:4 32:11
  32:23 33:10,21
  34:4,24 35:10,15
  35:22 36:3,9,21
  37:1 38:21 39:14
  39:20 40:2 41:20
  41:25 46:5 47:1
  47:16 48:8,16,25
  49:8 50:7,21 51:4
  51:9,11,14 56:10
  58:5,12,17,24 59:5
  59:16,25 60:2,5,19
herbertg 2:10
hereinbefore
  62:10
hereto 62:20,25
  66:7
hey 21:23 42:25
  58:2
hiding 22:6

highest 11:15
hit 10:20,21 47:8
hobbs 2:3 3:2,3
  4:10,10,22 5:11
  10:16,22,24 11:2
  11:11 15:24 17:4
  23:15 24:2,9,14
  25:8 26:10,24
  27:3,15 28:12
  29:1,6,19 30:8,10
  31:1,21 32:18
  33:2,13,24 34:5,19
  35:1,11,18,24 36:5
  36:16,23 37:8
  38:18,25 39:16,23
  40:6 41:15,22
  42:3 46:2,11 47:5
  47:21 48:11,17
  49:5,10 50:15,23
  51:9 54:11 56:9
  58:7,13,16 59:1,14
  59:24 60:23
hold 10:7 11:17
hollow 4:25
home 1:7,8,9 4:4,4
  5:21 13:25 14:10
  14:13 15:3,4,9
  19:6,18,23 21:6
  22:2,13 25:2,10
  43:18 64:4 65:1
  66:1
hopefully 23:25
house 8:18 9:5,8
  14:15 16:23 20:11
  21:17 43:7 44:11
housekeeping
  50:25
housing 9:4
hover 11:2,7
human 12:23 13:1
  13:5

| i | | |
|---|---|---|

**idea** 16:17 22:23
**identification**
15:23 17:3 51:8
**identified** 30:20
44:11 53:25 59:22
**identifying** 53:10
**illegal** 42:20
**immediately** 14:17
50:14 53:21 54:14
59:9
**important** 20:16
20:18
**impossible** 20:12
**impression** 35:17
**improper** 27:1
29:14 46:9
**incapacitated** 9:6
**incident** 26:4,7
32:22 55:13 59:3
**incorporated** 4:4
4:5
**independent** 35:25
36:6 56:1 58:17
60:7
**index** 3:1,6
**indicate** 30:19
**indicated** 35:7
**indicating** 41:18
**infancy** 13:5
**information** 12:24
24:11 54:6
**inquire** 35:20
**inserts** 47:3
**installed** 14:13
15:3 19:23
**instances** 52:19
**instrumenting**
12:22
**interacted** 47:15
48:6

**interacting** 25:2,6
**interaction** 23:3,4
25:16 26:2 29:24
32:5 33:19 49:23
50:6 53:17,24
54:10 55:5,8,18
58:22 59:3
**interactions** 22:20
**interested** 48:18
48:20 62:21
**interpose** 23:15
24:5 32:11 38:22
40:3 46:6
**interrupt** 29:1
**introduce** 4:7
**introduction** 27:1
**irrelevant** 30:23
**issued** 28:22
**issues** 49:14

| j | | |
|---|---|---|

**j** 2:3
**january** 16:21
51:24
**job** 1:25 6:5,16
**judge** 7:1
**july** 23:7 24:12,15
25:3 26:1 50:4,19
**jury** 7:10,11,12,12
7:15 19:22

| k | | |
|---|---|---|

**k** 1:7,8 7:22,22
**ken** 57:12,15
**kept** 14:19 15:19
**key** 20:20
**kind** 7:1 11:3 14:2
14:8 17:22 22:19
27:4 49:16
**kinds** 47:3,10
**knew** 49:16

**know** 5:22 7:1
14:3,7 17:10 19:9
19:12 20:22 22:24
25:15 28:6 31:15
34:13 36:24 38:1
38:14 39:21 40:24
41:12,23 42:13,15
42:17 43:17 44:15
45:5,10,16,20 49:7
49:11,19 50:2
55:4 57:14
**knowing** 50:13
**knowledge** 23:5
24:13 32:7 62:13
**known** 6:15
**kodack** 1:15 2:20
4:3,18,23 7:25 8:8
8:13 10:25 23:11
26:17 27:4,12,17
28:14 29:7 31:2
31:23 32:20 34:20
37:12 38:19 39:1
40:2,8 41:16 42:6
46:3,5,12 49:12
50:23 51:4,12
55:15 56:1,12
58:13 59:24 60:2
60:21 64:1,5 65:2
65:24 66:2,4,12
**kodack's** 30:12

| l | | |
|---|---|---|

**l** 7:22
**lab** 11:15
**label** 54:5
**labeled** 51:1
**labradoodle** 14:3
**lag** 6:8
**lake** 2:14
**lamp** 25:18,19
**landline** 52:21

**lane** 8:15 27:12
**language** 56:18,20
**larry** 4:2 8:4
**late** 13:14
**lauren** 1:24 2:21
62:6 63:4
**law** 4:10,14,16
**lawrence** 1:15
2:19 4:18 8:4
27:12 64:1,5 65:2
65:24 66:2,4,12
**lawrencekodack**
64:2
**lawsuit** 5:13 51:16
**lawyer** 26:9
**lay** 30:1
**leading** 34:24 40:4
46:8
**led** 14:23 17:17
**left** 17:10 54:16
**leg** 21:11
**legacy** 1:8
**legal** 13:6 15:20
28:22 64:23
**length** 22:10
**lengthy** 42:7
**letting** 5:21 42:17
44:15
**level** 11:15
**life** 51:19
**lifespan** 52:16
**light** 20:1,3,4,13
20:14
**line** 4:15 5:13 7:12
17:20 30:15 49:25
65:4,7,10,13,16,19
**listen** 31:8
**listened** 31:5 32:4
32:8 33:6,6,25
35:5,12,21 47:12
48:3,12 58:21

| | | | |
|---|---|---|---|
| **listening** 32:20 33:17 36:18 46:22 | **management** 42:17 43:15 45:12 | **mind** 13:12 46:16 | **nature** 28:8 31:17 34:15 |
| **little** 5:6 6:5 14:8 46:16 54:16 59:11 59:11,20 | **mark** 15:12,13 17:1 51:2 | **mine** 9:21 16:18 | **necessary** 21:9 66:6 |
| **live** 9:9 13:25 51:18 | **marked** 3:7 15:22 16:6,9 17:2,5 51:3 51:7 | **minute** 37:9,12 38:19 39:8 40:11 57:8 | **need** 24:8 40:3 |
| **lived** 8:19 9:1 | **marriage** 13:8,9 13:11 | **minutes** 26:17 42:6 46:22 54:15 | **needed** 9:4,4,6 48:23 |
| **lives** 57:13 | **mas** 2:15 | **mischaracterizes** 34:25 40:4 | **needs** 49:25 |
| **llp** 2:3,8 | **matter** 4:3 30:6 43:18 50:25 57:13 | **misleading** 46:8 | **neighbor** 21:22,24 21:25 |
| **local** 14:25 | **matters** 62:13 | **misrepresent** 40:7 | **neighborhood** 36:12 42:14 43:20 47:9 |
| **locally** 8:24 | **matthew** 2:12 4:16 | **misrepresentation** 42:22 | **neighbors** 21:19 |
| **locate** 10:23 | **mcintee** 1:24 2:21 62:6 63:4 | **missing** 14:6 | **neither** 62:18 |
| **located** 62:7,10 | **mean** 21:9 42:19 57:3 | **mistake** 16:23 | **network** 18:21 19:1 24:20 |
| **location** 5:2 | **meaning** 57:5 | **model** 12:14,22 | **never** 12:23,23 14:16 15:21 22:17 23:4 38:14 41:12 |
| **locked** 38:11 41:9 | **means** 7:17 28:16 42:24 | **moment** 15:12 26:14 37:18 40:16 | **new** 5:19 9:1,1,4 9:14 17:17 28:3 31:12 |
| **locking** 21:17 | **meant** 20:1 | **month** 15:6,6,7 52:2 | **news** 57:17 |
| **logo** 54:5 | **medical** 10:4,9,11 11:15 | **monthly** 25:15 52:1 | **night** 20:9,12 36:11 |
| **long** 8:17 10:7 12:24 37:9 40:11 54:9 | **medically** 20:1 | **morning** 8:9 | **non** 21:9 53:22 |
| **longer** 10:13 | **memory** 15:14 24:25 25:1,5 29:23 32:24 46:24 49:11,14,17 50:3 55:12 58:18 59:2 | **mosaic** 1:7 | **nonresponsive** 29:18 |
| **look** 57:6 | | **motherboard** 19:17 | **normal** 54:19 |
| **looked** 12:13 33:23 53:18 | **mentioned** 12:8 13:8,15 14:21 51:14 | **motion** 19:25,25 | **normally** 44:3 |
| **looking** 7:11 17:7 20:11 | **mentioning** 39:12 | **move** 29:17 38:22 46:7 | **north** 1:1,17 2:24 2:24 8:15,19,25 27:13 57:17 62:1 62:7,8,11 |
| **looks** 16:22 | **met** 58:1 | **moved** 8:21 15:8 | **notarial** 62:22 |
| **lost** 10:12 | **method** 33:1 | **movement** 57:13 | **notarization** 62:24 |
| **lot** 4:25 56:24,24 | **microphone** 46:17 | **multiple** 12:17 | **notary** 2:23 62:6 63:4,5 66:13,19 |
| **low** 44:25 45:3 | **mid** 13:14 | **mute** 47:24 | **note** 18:15 26:25 64:10 |
| **m** | **middle** 7:24 16:18 17:25 20:9 | **n** | |
| **m** 1:24 2:21 | | **n** 7:22 37:23 40:21 | |
| **machines** 10:15 | | **name** 5:11 7:21,24 8:10 9:13,16 13:22 16:8 23:2 51:14 53:25 57:12 | |
| **magnet** 54:5 | | **named** 62:10 | |
| **main** 2:13 | | | |
| **major** 56:16,22 | | | |
| **making** 32:21 33:5 33:8 36:7 45:8 48:19 49:20 | | | |

**noted** 66:7
**notes** 18:15 57:6
**noteworthy** 50:10
**notice** 6:2,24
**november** 7:14
**number** 3:7 20:11
   43:21,24 63:5
**nut** 57:24

**o**

**o** 7:22
**oath** 53:7 54:22
   55:6,16 62:15
**ob** 11:21 12:8,9
**object** 23:9,18
   25:4 26:6 27:2
   29:15 30:14 32:11
   33:11 34:4,24
   35:10,15,22 36:3
   36:21 37:1 39:20
   41:25 46:10 47:17
   48:25 49:8 50:7
   56:9 58:24 59:5
   59:16
**objecting** 23:19
   29:13
**objection** 6:24 7:3
   7:5,5 23:15 24:6
   26:25 29:2,11,20
   31:3 32:12,23
   33:10,21 36:9
   37:14 38:22 39:14
   40:3 41:20 46:6,7
   47:16,23 48:8,16
   50:7,8,8,21
**objections** 27:7
   31:3,23 35:2
   46:13 47:1
**obvious** 25:7
**obviously** 7:11
   16:4 17:15 27:20
   37:7 50:10

**occasion** 23:14
**occupied** 16:22
**occupy** 11:13
**occupying** 15:4
**occurred** 52:24
**offered** 22:17 30:6
   45:4
**oh** 10:8 13:14 16:4
   16:4 20:12 34:7
   37:25 40:23 45:6
   57:2 58:2
**okay** 4:24 5:10
   6:18,22 7:8,18 8:4
   8:8,13 9:20 10:16
   10:22 11:10,12,12
   11:23 12:11 15:8
   15:16,25 16:3,9,12
   16:15,19 17:14,22
   17:24 18:9,22
   19:8,20 20:23
   21:2 22:8,19,25
   23:6,17,20 24:15
   24:18,24 25:9
   26:11,20 27:6,17
   27:19,23 28:24
   29:5,13,19 30:11
   31:2 32:1,8 33:3
   33:14 34:8 35:19
   37:16,19 38:12
   39:4,7 40:7,14,17
   41:10 43:12 44:1
   45:9,14,21 46:16
   46:18 47:6 50:23
   51:22 53:14,23
   54:3 55:4 57:16
   57:21 58:9 59:24
   60:10,19
**old** 13:12,16 14:4
**once** 22:9 25:17
   43:8 52:17

**ones** 16:17
**online** 5:18 10:13
**operate** 28:5,17
   31:14
**operation** 33:15
**opinion** 52:9
**opportunity** 51:5
**opposing** 26:9
**orange** 2:9
**order** 11:16
**ordered** 20:22,24
**original** 19:1,13
**orlando** 2:9
**outside** 20:1,4
   22:5 25:19
**owns** 14:1

**p**

**p.m.** 2:25 4:7
   60:25 61:2
**page** 3:2,2,3,3 65:4
   65:7,10,13,16,19
**pages** 20:10
**paid** 52:1
**panel** 28:3 31:12
**papers** 56:19
**paperwork** 17:17
**paramedic** 20:8
**pardon** 13:21
**part** 10:5,11,14
   18:4 19:7,17,23
   22:1
**particular** 11:18
   20:11 38:22 50:10
   54:1 55:2,7,12,13
**particularly** 5:18
   12:17 21:10 57:23
**parties** 62:20
**partner** 59:8
**party** 49:21,22
**passed** 8:3 54:9

**passing** 9:13
**password** 37:17
   40:15
**pattern** 54:13
   60:18
**paused** 27:14,16
   28:11,13 31:20,22
   34:18 38:17,19
   41:14,16
**payment** 25:14,15
   52:2
**people** 6:24,25
   36:12 56:20
**percent** 57:4
**perfectly** 6:18
   21:9 58:3
**period** 52:2
**permit** 36:13
   38:13 39:13 41:11
**person** 53:24 54:4
   62:10
**personal** 56:18
**personality** 36:10
**persuaded** 52:6
**phd** 11:19,25 12:7
**phenomenon** 5:19
**phone** 5:8 17:21
   18:6,6,17,18,20
   21:21 25:10,13,21
   26:1 28:4 31:13
   32:21 43:9 49:20
   52:20,22,23 54:10
   58:20 59:8,18
   60:7,12
**phones** 18:25
**phrased** 55:24
**physiology** 12:9
**picture** 11:5
**place** 51:3
**plaintiff** 1:5,16 2:2
   2:20 4:12

**plan** 24:13
**platform** 6:6
**play** 26:18,23 27:4
27:23 31:4 34:9
34:10 37:9,11
40:9,11 42:5
**played** 7:14 34:20
46:4,14 47:12
48:3,14 50:25
**please** 4:7 31:8
47:22
**pleased** 45:4 48:13
**point** 20:20 51:19
52:15 55:2 56:15
56:15
**porch** 20:13,14
**portion** 35:12
38:23 39:2,17
41:17
**portraying** 42:18
**posed** 29:18
**position** 10:7
11:17,18 29:20,24
30:3,4,18
**possible** 55:5 58:8
**power** 47:7
**practice** 12:12
**pre** 49:16
**precise** 19:15
**predominant**
14:25
**preletter** 28:8
31:17 34:16
**prescreening** 28:3
31:12
**present** 2:16 13:22
25:1 29:23
**pretty** 6:15 21:16
21:16 24:3 28:17
49:15,18

**prior** 13:8 46:7
50:8
**probably** 15:17
24:19 45:13,17
50:12
**problem** 16:24
56:25
**problems** 5:7
12:16
**process** 6:2
**produce** 36:14
**produced** 1:25
**professional** 2:22
**program** 12:7,8,15
20:19
**promise** 14:25
**promptly** 22:11
**prompts** 11:23
**pronouncing** 8:1
13:20
**prove** 30:6
**provide** 22:2
**provided** 27:21
**provider** 14:24
48:19
**providing** 22:1
**public** 2:23 62:6
63:4 66:19
**pull** 15:5,11,25
16:25 18:9 26:11
**pulled** 17:5 18:5
**purportedly** 32:16
**put** 9:22 14:18
19:1 38:10 41:8
43:6,24 47:3
55:14

**q**

**question** 6:11,18
6:23 7:2,4 19:10
19:16 23:15,21,22
24:7 26:22 27:2

29:14,18 32:12
33:3,16,25 34:11
35:3 36:4 38:12
38:15,23 40:3,10
41:10,13,24 46:12
46:21 47:11,17,19
47:22 48:1,2,23
49:7 50:17 51:16
55:11,19,24
**questioning** 30:15
41:19 54:12
**questions** 5:15
6:16 11:24 24:24
26:19 27:5,24
29:3,8,16 30:1
31:7 32:19 36:25
37:13 42:8 46:10
47:10 50:24 51:5
53:4 57:7,10 58:6
58:14,19 60:1,20
**quick** 18:15 26:23
**quickly** 29:2
**quite** 12:18 19:9
59:23

**r**

**r** 7:22 65:3,3
**randy** 16:19,20
21:11
**randy's** 16:18
**rapid** 15:1
**rate** 12:21
**reach** 45:13,17
**reaching** 36:1
**read** 47:22 48:1
64:9 66:5
**reaffirm** 59:12
**real** 26:23 35:17
50:14
**really** 18:18,20
20:13 44:14

**realm** 13:5
**realtime** 2:22
**reask** 46:12
**reason** 23:22 33:7
33:11,11 34:1,7
35:13 42:25 47:13
48:4,9 50:19
64:11 65:6,9,12,15
65:18,21
**reasonable** 7:19
11:21
**recall** 15:2 17:16
18:3,12 23:7
39:25 49:20,21,24
50:9 53:4,8,13,15
53:20,23 54:2,9
59:21 60:16
**receipt** 64:18
**received** 25:25
50:4,18
**recognize** 16:13
16:14 31:24 32:1
**recognized** 55:13
**recognizing** 55:25
**recollection** 26:3
29:22 32:9,14,15
32:21 33:5,17,18
36:1,6 50:5 56:2
58:18 60:8
**record** 7:6,21
25:22 26:15 29:6
29:10 32:13 37:10
60:24 61:1 62:16
**recorded** 25:21,24
29:22 55:3
**recording** 3:10
26:16 27:9,14,25
28:11,14 29:20,25
30:5 31:5,9,20
32:1,8,20 33:6,18
34:1,8,12,18 37:15

38:17 40:9,13
41:14 42:5,9 46:1
46:4,14,23 48:10
49:16 51:1
**records** 15:17
24:19 50:4,18
**reduced** 62:15
**redundant** 21:12
**refer** 8:8
**reference** 7:10
18:10
**referenced** 32:17
64:6
**referencing** 39:11
**referring** 18:22
**reflect** 50:18
**reflected** 9:16
29:25
**refresh** 26:3 32:9
32:14,15,21,24
33:4,18 46:23
50:5
**refreshing** 33:17
**regarding** 23:22
57:13
**registered** 2:22
**relate** 30:24
**related** 29:3 46:10
62:19
**relationship** 57:19
59:12
**relaxed** 21:16
**relayed** 47:13 48:4
**relaying** 34:21
**relevance** 30:15
**reliable** 21:7
**remainder** 42:5
46:4,14,23
**remarried** 9:11,14
**remember** 13:15
32:25 47:4 48:14

**49**:1 55:8
**remembering** 39:8
**remind** 7:8 25:18
**remote** 1:15 2:19
20:24,25 25:12
**remotely** 62:9
**remove** 11:1
**rep** 43:19 53:17
55:5,17
**repaired** 43:11
**repeat** 13:21 23:10
35:3 36:4 46:6
47:19
**repeated** 24:8
**rephrase** 6:19
55:21
**rephrased** 24:8
**replaced** 18:5 22:9
**report** 26:1 32:22
33:8
**reported** 1:24 34:2
**reporter** 2:22,23
4:8 6:12 47:21,25
**reporter's** 6:4
62:4
**reporting** 32:5
34:2 35:6
**representation**
60:13
**representative**
25:2 26:2 27:10
30:20 32:6 33:20
34:22,22 35:7,14
36:19 37:16,19,22
37:25 38:2,4,8
40:14,17,20,23,25
41:2,6,18,24 42:1
42:15,22 43:1,3,5
43:12 44:2,6,9,13
44:17,20,23,25
45:2,6,12,15,21,24

47:15 48:6,22
50:6 53:9 55:7
56:2 58:23 59:4
**represented** 25:25
50:3
**representing** 5:12
37:4 51:15
**reps** 42:16
**required** 11:18
66:13
**requirements** 9:7
62:24
**research** 10:9,12
14:22 56:19
**researcher** 11:22
**reserved** 61:3
**reset** 25:18
**resist** 56:22
**respond** 15:21
20:6 28:22 29:11
**responding** 20:3
**response** 15:1
28:23 29:17 30:13
**responsibility**
14:5
**rest** 9:22
**result** 52:12
**retire** 10:3
**retired** 9:24,24
10:4 18:21 52:23
**retiring** 13:15
**return** 64:13,17
**review** 64:7
**right** 4:1 10:24
11:2 23:18 26:13
30:8 35:4 43:14
45:19,24 51:20
52:1,3,6,13,18,24
53:1,19 54:18,24
58:5 59:9 60:2,7,9
60:19

**ringing** 59:18
**role** 10:10 11:14
**room** 6:4
**routing** 25:14
**rpr** 1:24 62:6 63:4
**rules** 5:25
**runaround** 15:19

**s**

**s** 65:3
**safer** 52:21
**safety** 21:11
**sales** 25:1 26:2
30:20 32:6 33:19
35:6 36:11,11
42:1 43:19 48:21
50:6 53:9,17 55:5
55:7,17 56:2
**salesman** 28:1,2
31:10,11 50:11
53:22 55:13
**salesmen** 33:1
47:8 55:11
**salesperson** 23:8
**salt** 2:14
**saying** 7:25 28:2
31:11 39:18,19
57:3,3 59:21
**says** 11:6 18:1
28:2 31:11 38:15
42:10
**scenario** 7:2
**science** 58:2
**screen** 9:17 10:19
10:25 11:13 15:25
16:1
**second** 6:8 9:7
16:20 20:25 34:10
43:13 59:19
**seconds** 20:5
26:17 27:5,16
28:13 31:6,6,22

34:10 37:11 38:20
40:11 42:6 54:15
**security** 1:4 4:3,12
5:12 14:24 21:14
21:15 22:2 27:10
43:18 64:4 65:1
66:1
**see** 5:9 9:16 11:8
11:12 16:3,5,6,9
16:21 17:6,7,10,12
18:16 20:12 38:5
41:3 43:21 57:8
**segment** 10:12
26:18,23 27:23
28:15 31:5 32:4
34:10,20 35:5
36:17 37:9 38:20
40:11 42:7 48:12
**seldom** 14:20
**selling** 38:15 42:10
42:12
**send** 43:14 44:17
45:16
**sense** 6:18 7:6,16
21:14,15 37:5,6
**sensor** 19:25
**sent** 28:20 64:14
**separate** 52:19
**service** 32:2 34:21
40:1 41:24 43:10
51:22
**services** 25:11
48:19
**sessions** 2:13
**set** 57:9 62:25
**sets** 20:2
**setting** 8:9
**share** 16:1 26:21
**sharing** 10:19
**shb.com** 2:5

**sheep** 12:14,20,22
13:5
**sheet** 64:11
**shift** 14:8
**shirt** 44:3 53:25
**shivers** 2:17
**shook** 2:3 4:11
**short** 26:18
**shortly** 15:4
**show** 10:25 50:4
**shut** 36:15
**side** 5:5 28:19
**sign** 17:17 22:3,6
25:6 38:9 41:7
45:5 64:12
**signature** 17:12
61:3 63:4
**signatures** 16:14
16:15,16
**signed** 18:11 62:22
64:20
**signing** 18:4 38:10
41:8
**simpler** 55:15
**single** 19:25
**sir** 37:17 40:15
45:7
**siren** 20:15
**sit** 53:6 54:21 55:5
**sits** 25:7
**sitting** 6:3 36:7
46:24 50:19 55:22
58:18
**sleeps** 14:4
**slightly** 50:17
**smart** 1:7,8,8 4:4
64:4 65:1 66:1
**snow** 2:13 4:16
**sold** 49:4
**solicit** 38:13 41:11

**solutions** 64:23
**somebody** 20:10
20:10 22:12 41:11
43:17 49:4 60:10
**soon** 43:6
**sorry** 26:8 28:25
29:1 30:9 38:21
39:20 40:2 46:5
47:24 56:11
**sort** 21:13 44:18
44:21
**sound** 26:23 46:8
**sounded** 35:19
59:11,15,20
**sounds** 12:18 13:2
16:5 18:22 19:16
20:16 21:2 53:6
56:5
**south** 2:9,13
**span** 54:9,23
**speaking** 24:6
**specific** 9:6 35:12
39:25 49:17 54:14
55:12
**specifically** 47:4
49:19 50:9 53:8
60:17
**spell** 16:8
**spelling** 7:21
**spent** 51:18
**spoke** 28:19
**spontaneous** 53:15
**sports** 57:18,24
**spotlight** 11:1
**stamped** 26:16
**standing** 29:2,10
31:3 37:14 50:8
**standpoint** 49:25
**start** 7:20 37:10
**state** 2:23 62:1,7

**stated** 31:23 34:22
35:14 48:13
**statement** 39:25
52:9,10 53:11,12
54:12 55:7,9 56:7
**statements** 30:19
36:18
**states** 1:1 6:23
**statesville** 1:2
**stating** 48:22
**stay** 11:21
**stayed** 49:15
**staying** 5:8
**stenotype** 1:24
**stepped** 11:19
**steward** 2:12 4:16
**stickers** 22:3,15
**store** 54:7
**strange** 54:16
**street** 2:4,13
**strength** 12:21
**strike** 29:17 38:23
46:7
**strobe** 25:19
**stuff** 44:19,21
56:19
**subject** 27:7 31:2
31:23 35:2 37:13
46:12 47:22
**subpoena** 28:21
**subscribed** 66:14
**substance** 29:23
**suggesting** 37:2
**suggestions** 42:1
**suggests** 25:23
**suite** 2:4,9
**summer** 57:12
**sure** 5:1 13:8 14:8
19:11 20:25 35:4
35:5 49:4 55:1
57:4 59:6,6 60:14

**swear** 4:9
**swearing** 5:5
**switch** 43:11 48:19
**switched** 43:7
**switching** 48:20
**sworn** 4:19 62:11
66:14
**system** 14:9,13,15
14:16,16,19 15:3
17:19,20,21 18:4,7
18:19 19:24 20:21
21:5,7,14 22:2
25:9,17 28:4
31:13 43:6 48:24
52:17
**systems** 1:4 4:3,12
5:12 64:4 65:1
66:1

**t**

**t** 37:23 40:21 65:3
65:3
**tag** 53:25
**take** 5:7 10:17
**taken** 1:16 12:24
56:16
**talk** 6:7 14:9 23:11
25:11 58:2
**talking** 8:11
**tall** 53:18
**team** 42:17 43:15
45:12 58:3
**teams** 57:18
**tech** 10:5
**technology** 6:7
43:9
**telephone** 3:10
17:20 32:15
**tell** 43:25 45:17
50:12 55:16 56:1
58:6

**telling** 57:15
**temptation** 56:23
**tend** 6:6
**tendency** 7:10
54:16 59:7
**tends** 6:5
**terminating** 57:18
**terms** 14:21 19:5
24:24 26:4 32:10
33:16 55:4
**test** 25:17
**tested** 18:7 20:2
**testified** 18:10
29:22 33:4 49:1
49:12 50:2 52:5,8
52:12 53:5 54:11
**testify** 4:20 22:22
53:7,16,18 55:6,16
62:12
**testifying** 54:21
55:25 60:6
**testimony** 8:12
13:16 34:25 53:6
62:17 64:9,18
66:8
**thank** 19:2 22:11
27:8 45:6,7,9,19
45:22,24 47:25
51:9 57:5,15
58:11,12 60:20,22
**thing** 6:9 7:9 19:14
21:13 28:18 49:11
**things** 5:9 9:7
14:21 53:19 59:7
60:6
**think** 5:14 6:16
8:24 10:18 15:14
17:19 52:17 57:7
**thinks** 14:1
**third** 49:22

**thought** 39:18,21
52:20
**three** 8:23 43:2
**time** 4:7 5:22,23
18:13,14 22:10
25:12 30:12 40:9
47:8,8 48:18
50:12 52:2 54:9
54:23 55:2 58:22
59:3 60:25 64:19
**timeframe** 64:8
**times** 6:22 21:8,19
25:14 47:18
**timestamp** 50:12
55:1
**timestamped** 55:2
**timing** 60:12
**today** 5:15 6:22,25
7:12 9:9 13:3,17
27:11 32:9 35:13
36:7 46:24 50:20
52:5,8,12 53:5,7
54:21 55:6 56:25
58:18 60:1
**today's** 4:6
**top** 10:24 11:2
16:12 17:23 43:16
**topic** 58:19
**toronto** 8:25
**totals** 26:17
**tough** 49:11
**town** 20:7
**transcript** 1:25
6:12 64:6,20 66:5
66:8
**transcription** 1:25
**traurig** 2:8 4:14
**treat** 12:15
**trial** 7:13
**tried** 5:4 15:18

**true** 54:3,8 62:16
66:8
**truth** 30:6 62:12
62:12
**try** 6:14,19 38:9
41:7
**trying** 38:5 41:3
55:22
**turn** 20:12,21
22:19
**turns** 20:14
**twice** 52:18
**two** 8:23 11:18
13:10 21:1 23:23
52:19 56:6 58:9
**typewriting** 62:15
**typically** 7:2

**u**

**ultimately** 7:14
14:23 17:17
**understand** 6:2,19
19:15 22:21 24:7
25:20 33:4 56:5
57:5 60:16
**understood** 50:16
55:14,14
**united** 1:1
**university** 10:4
11:15 12:3
**updated** 3:9 18:4
**updates** 18:12
**upgrade** 18:1,21
52:17,21
**upgraded** 43:8
**upgrades** 52:24
**upheld** 30:18
**ups** 58:8
**usage** 56:25
**use** 12:14 14:20
27:1 46:7

utah 2:14
utero 12:16

**v**

v 7:24 37:23,23
40:21,21 64:4
65:1 66:1
vacation 21:20
vanderbilt 12:15
vehicle 44:4
veracity 34:7 48:9
verification 43:23
verify 37:16 40:14
43:22 64:9
veritext 64:14,23
veritext.com
64:15
version 52:22
versus 4:4
video 7:14 62:23
videographer 2:17
4:1 10:17,20 11:6
60:25
videotaped 1:15
2:19 4:2
view 10:17,21 11:6
11:8,9 23:22
virtually 5:21
visible 22:7,8,12
visit 35:20
vivint 1:7,8,8 4:4
5:14,15 22:24
23:8 25:1 26:3
28:2 30:21 31:11
32:6 33:19 34:22
35:6,7,14 36:19
37:21,22,23 38:2,4
40:19,20,21,25
41:2,19 47:15
48:7,21,22 49:22
50:6 51:6,15,19
52:6 53:10,17

55:17 56:6 58:23
59:4,22 64:4 65:1
66:1
voice 27:18 31:24
32:3 33:12
volunteer 20:8
vs 1:6

**w**

w 7:22
wait 23:23 43:13
want 14:8 22:19
23:6 24:25 30:11
32:12 34:8 35:3
40:7 42:7 43:17
50:16 51:17 53:3
60:3
wanted 33:16
41:17 57:2,4 58:9
59:12 60:14
warning 25:23
58:10
waste 30:12
way 5:8,24 7:9
12:22 28:17 45:10
55:10,15
we've 21:8 22:9
33:6 35:21 43:2,9
58:19
wearing 53:25
wednesday 1:18
2:24 62:9
week 43:2,10
went 11:20 14:17
14:17 15:19 17:19
19:2 47:3
western 1:1
whereof 62:25
whitney 8:15
27:12
wife 9:5,9,13,14
13:19 16:20 21:15

24:22
wife's 13:22
willing 58:3
windows 22:18
witness 2:20 4:9
6:6 10:18,20,23
11:1,4,9 23:10,13
23:16,20,23 24:1,4
29:5,22 32:14
48:25 58:11 60:22
62:14,17,25 64:8
64:10,12,19
witnesses 6:1
wondering 7:11
words 30:7
work 12:18,19,25
13:6 18:3,25 28:7
31:16 34:14 39:19
44:12
worked 18:8 34:23
37:3 48:22 59:21
59:23
working 42:2,18
43:19
works 6:2 35:7
45:5,5
wrap 57:8

**y**

yard 22:3,6 25:7
yeah 11:13 13:4
16:2,11,22 17:13
18:2,24 20:18
21:25 22:9,23
23:1,13,16 24:1,4
24:17 38:6,7 41:4
41:5 42:21,24
43:1,3 44:6,8,8,13
45:1,3 52:15
53:20 54:20 55:22
55:23 58:11

year 11:18
years 10:8 12:10
14:4 16:24 21:3
24:16 37:4,7 45:4
york 9:1,1

**z**

zoom 2:3,8,12,17
6:3,25 8:11 17:9

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.