UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:20-CV-00504-FDW-DSC

| | |
|---|---|
| CPI SECURITY SYSTEMS, INC.<br><br>                              Plaintiff,<br><br>v.<br><br>VIVINT SMART HOME, INC.<br>f/k/a MOSAIC ACQUISITION CORP.;<br>LEGACY VIVINT SMART HOME, INC.<br>f/k/a VIVINT SMART HOME, INC.<br><br>                              Defendants. | **JOINT PRETRIAL<br>SUBMISSIONS** |

Pursuant to the Court's Case Management Order [Doc 35] and the October 12, 2021 Order setting this matter for the mixed trial term beginning January 3, 2022 [Doc 68], Plaintiff CPI Security Systems, Inc. ("CPI") and Defendants Vivint Smart Home, Inc. f/k/a Mosaic Acquisition Corp. and Legacy Vivint Smart Home, Inc. f/k/a Vivint Smart Home, Inc. (together "Vivint") respectfully submit the following joint pretrial submissions.

## JOINT STATEMENT OF THE CASE

Plaintiff CPI sells and monitors alarm systems and smart home technologies. The Defendant Vivint also sells and monitors alarm systems and smart home technologies. CPI and Vivint are competitors.

CPI claims that Vivint sales agents have used sales pitches in door-to-door sales visits to CPI's customers that make CPI's customers believe that the Vivint sales agents are affiliated with CPI or that otherwise misrepresent the nature of the transaction such that CPI's customers do business with Vivint under false pretenses.

CPI also asserts that Vivint engages in additional deceptive sales practices to switch CPI customers like misrepresenting that Vivint will pay off a customer's CPI contract; tricking the customer into believing the right of rescission is longer than three days; and misrepresenting or concealing that the transaction involves taking out a third-party loan. CPI asserts four causes of action against Vivint. The first is a claim of false affiliation under the Lanham Act, which alleges that Vivint's agents made false representations that were likely to confuse CPI's customers as to the Vivint agents' relationship with CPI. The second is a claim of common law unfair competition, which alleges that Vivint's agents engaged in sales practices that are contrary to honest practice in commerce. CPI's third claim is for violation of the North Carolina Unfair and Deceptive Trade Practices Act, which alleges that Vivint has engaged in unfair and deceptive acts or practices in commerce that caused injury to CPI. CPI's fourth claim is for tortious interference with business relationships, which alleges that Vivint's sales representatives were knowledgeable of CPI's customers' contractual and business relationships with CPI yet intentionally and without valid justification interfered with such relationships using improper means.

Vivint denies any liability to CPI on any of CPI's causes of action. Vivint contends that it fairly competes for customers and its sales representatives do not mislead or deceive CPI's customers. To the extent that there is any CPI customer confusion, Vivint contends it is limited to a handful of customers and the nature and scope of any confusion is unique to the individual customers' experience. Vivint disputes CPI's theories regarding the scope of the alleged conduct and alleged

damages as speculative and unreliable. Vivint also contends that CPI's theory is further undermined by CPI's own conduct in contacting and coaching any CPI customer who has decided to terminate their relationship with CPI—in other words, improperly influencing customers to believe that somehow Vivint has done something wrong by trying to win their business.

Vivint contends that CPI customers who have chosen Vivint have done so for any number of legitimate reasons, including that these customers: (a) prefer Vivint's superior products and services; (b) are dissatisfied with CPI's products and services; (c) are upset because of the widely publicized and controversial comments made by or attributed to CPI's President and CEO, Ken Gill[1]; or (d) simply elected to change providers for any number of other reasons.

Vivint further contends that for several reasons—including CPI's inferior products and services, as well as the widely publicized and controversial comments made by CPI's President and CEO that have irreparably damaged CPI's brand— Vivint does not and would not have any reason to want to represent to prospective customers that it has any affiliation with CPI.[2]

---

[1] CPI objects to the inclusion of this paragraph and incorporates the arguments in its forthcoming motion *in limine* on this topic.
[2] Same objection as above to inclusion of the sentence in subsection "(c)."

3

## STIPULATIONS OF LAW OR FACT

1. The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because it presents a federal question based on a federal statute, namely Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[3]

2. The Court also has jurisdiction over this action pursuant to Section 1332 of Title 28 because the parties are completely diverse and the amount in controversy exceeds $75,000.

3. The Court has supplemental jurisdiction over CPI's claims for common law unfair competition, violations of the NCUDTPA, and tortious interference with business relationships under 28 U.S.C. § 1367(a).[4]

4. Venue lies in this Court pursuant to Section 1391(b) of Title 28 because a substantial number of the alleged events giving rise to the claims asserted in CPI's Amended Complaint allegedly occurred in this District.

5. Vivint Smart Home, Inc. is a Delaware corporation with its principal place of business located at 4931 North 300 West in Provo, Utah 84604, and that its registered agent for service of process is The Corporate Trust Company located at Corporation Trust Center, 1209 Orange Street in Wilmington, Delaware 19801. Vivint's 10K filing, which describes the merger and entity formation, can be found at: www.sec.gov/Archives/edgar/data/1713952/000119312520073113/d822776d10 k.htm (Am. Compl. ¶ 12.)

6. Vivint is listed on the New York Stock exchange. (Am. Compl. ¶ 13.)

7. Defendant Legacy Vivint Smart Home, Inc. is a Delaware corporation with its principal place of business located at 4931 North 300 West in Provo, Utah 84604, and that its registered agent for service of process is The Corporate Trust Company located at 4931 N. 300 West in Provo, Utah 84604. (Am. Compl. ¶ 16.)

8. Vivint operates in most states, including North Carolina. (Am. Compl. ¶ 25.)

9. Vivint is registered to do business in North Carolina. (Am. Compl. ¶ 25.)

---

[3] (*See* Defs.' Answer and Counterclaim p. 11, ¶ 5 (alleging the Court has jurisdiction because it presents a federal question under Section 43 of the Lanham Act)).

[4] (*See* Defs.' Answer and Counterclaim p. 11, ¶ 6 (alleging the Court has supplemental jurisdiction over Defendants' state law counterclaims under 28 U.S.C. § 1367(a))).

10. CPI is a North Carolina corporation with its principal place of business located in Charlotte, North Carolina. (Counterclaim ¶ 4.)

11. Vivint is in the security systems, automation, and smart home markets. (Answer to Counterclaim ¶ 8.)

12. CPI is also a business in the security systems, automation, and smart home markets. (Answer to Counterclaim ¶ 11.)

13. Vivint and CPI are direct competitors in the security systems, automation and smart home markets. (Answer to Counterclaim ¶ 12.)

# LEGAL AND FACTUAL CONTENTIONS OF THE PARTIES ABOUT WHICH THE PARTIES HAVE BEEN UNABLE TO STIPULATE

## a. CPI's Contentions

1. That Vivint, through its sales agents, has engaged in the following misconduct:

    a. Stating that the representative is visiting from "the alarm company" or "the security company" without also specifying Vivint's name in the same sentence;

    b. Stating or suggesting that CPI is going out of business, has gone out of business, was bought out, or is in financial difficulty;

    c. Stating CPI does not exist;

    d. Stating CPI is changing or has changed its company name;

    e. Stating or suggesting Vivint has acquired, has merged with, has taken over, or is a part of CPI;

    f. Stating or implying that Vivint, or its representatives, is acting on behalf of, or otherwise acting with the consent or approval of CPI;

    g. Stating that Vivint is a "sister" or related company to CPI (or a similar implication);

    h. Stating or suggesting Vivint manufactures the equipment used by CPI, or that Vivint represents or is visiting on behalf of an alarm equipment manufacturer;

    i. Stating Vivint is merely performing routine maintenance on the customer's CPI equipment;

    j. Stating or suggesting the proposed change to the customer's existing system is just an "update" or "upgrade" without specifying explicitly that such change will require the customer to cease using CPI, to pay required termination charges to CPI, and to begin using and paying for Vivint's services;

    k. Stating a CPI customer's CPI security system is outdated or deficient when it is not;

    l. Stating Vivint is "taking over" the monitoring of an CPI account or has purchased a CPI account or accounts from CPI;

m. Stating or suggesting CPI has stopped monitoring the alarm system for that person, residence, business or geographic area;

n. Stating CPI will no longer be able to monitor or service the alarm system for that person, resident, business or geographic area;

o. Stating Vivint is affiliated with, has the endorsement of, or is in any manner acting at the direction of any governmental or law enforcement agency without the prior explicit approval of such entity;

p. Presenting statistics or other information as accurate which is known by Vivint to be false or misleading, or which Vivint has not made a reasonable effort to objectively quantify or substantiate;

q. Falsely representing the nature, amount or other details of Vivint's promised "buyout" of a given customer's CPI account or failing to abide by the representations made by the sales agent to the respective CPI customer to convert the account to Vivint;

r. Falsely representing the "free trial" period as being longer than the contractual right of rescission;

s. Misrepresenting or omitting that the customer is taking out a bank loan to pay for their equipment and/or that the bank loan does not require a hard credit check;

t. Falsely stating the nature or details regarding certain comments made by CPI's CEO Ken Gill in the summer of 2020 relating to the Black Lives Matter protest, including but not limited to proliferating a false narrative about such comments as an improper means to convert CPI accounts (oftentimes in conjunction with other misrepresentations about the transaction)[5];

u. Falsely representing other aspects of the sales transaction such that a given customer is deprived of a full and fair "free choice" based on complete truthful and accurate information when changing his or her alarm services from CPI to Vivint; and/or

v. Utilizing any combination of the above, or any other false or misleading representation or omission to current or former customers of CPI, in the marketing or sale of an alarm system that Vivint's sales agent knows to be false when made.

---

[5] CPI includes this issue as a theory of liability only if CPI's motion *in limine* relating to the Gill comments is overruled and such evidence is admitted. If CPI's motion to exclude such evidence is granted, CPI will not pursue this theory of liability.

2. That Vivint's sales conduct is in violation of the Lanham Act, 15 U.S.C. § 1125(a).

3. That Vivint's sales conduct constitutes common law unfair competition, a violation of the North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. § 75-1.1 *et seq.*), and/or tortious interference with CPI's business relationships considering all of the circumstances.

4. That Vivint's false and deceptive sales practices (and omissions) are contrary to honest practice in industrial or commercial matters.

5. That Vivint's sales calls on CPI's existing customers are done intentionally and without valid justification using improper means with knowledge of CPI's business or contractual relationships.

6. That Vivint's sales agents' practices are contrary to Vivint's own Code of Conduct and applicable policies.

7. That Vivint's sales agents' practices are contrary to the Electronic Security Association's Code of Ethics.

8. That Vivint's sales agents' practices are contrary to legal claims Vivint itself has asserted against competing alarm companies involving similar conduct.

9. That Vivint's sales agents' practices are likely to cause confusion among consumers.

10. That Vivint's actions have in fact already caused consumer confusion in commerce.

11. That the number of known/reported instances of Vivint's false, deceptive and misleading sales practices is much smaller than the universe of customers actually subject to such misconduct because, among other reasons: (1) many victims of such practices never become aware they have been deceived—which is the intent of the practices in the first place; (2) many victims of such practices (assuming they actually become aware that they have been subject to deceptive conduct) never complain to any entity; (3) many victims of such practices who do complain only complain to Vivint, whose sales agents committed the conduct; (4) Vivint has failed to institute adequate measures for tracking complaints about such practices, including but not limited to tracking the company a given customer was with when he or she was approached in a deceptive or misleading fashion by Vivint's sales agent such that Vivint itself has incomplete records of the underreported incidents by customers who do complain about the conduct; and (5) CPI does not have a comprehensive system for tracking all complaints about Vivint's false and deceptive sales practices

8

during the relevant timeframe such that complaints received by CPI about Vivint cannot be identified after-the-fact.

12. That Vivint is unable to identify the full universe of CPI customers that complained to Vivint about false or misleading sales practices, even recognizing that the universe of customers who actually complain is smaller than the universe of individuals actually subject to the conduct.

13. That even though Vivint is unable to identify the full universe of CPI customers that complained to Vivint about false or misleading sales practices by Vivint, there are still hundreds of such examples found in Vivint's records alone.

14. That even though CPI does not have a comprehensive system for tracking all complaints about Vivint's false and deceptive sales practices during the relevant timeframe, CPI has identified dozens of examples of Vivint sales agents approaching CPI customers in a deceptive and misleading fashion.

15. That Vivint's false and deceptive sales practices are geographically widespread and numerically voluminous, especially considering the fact that complaints about such conduct are drastically underreported and many victims of such practices do not even know they have been misled.

16. That Vivint's false and deceptive sales practices are not limited to only CPI's customers, but instead are part of a widespread campaign to wrongfully steal customers of security providers who compete with Vivint.

17. That Vivint's sales agents' false sales pitches are knowing, willful, and taught or at least sanctioned by Vivint management, in part because the agents who commit such practices are highly profitable to Vivint.

18. That Vivint has failed to take adequate actions to restrain or remedy the use of alleged false and misleading sales pitches after repeatedly being placed on notice of such practices through numerous other private and attorney general lawsuits regarding the same sales conduct and numerous complaints to Vivint by consumers reporting such conduct.

19. That CPI is entitled to all damages permitted under applicable law, including any damages under the Lanham Act, common law, and the North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. § 75-1.1 *et seq.*).

20. That CPI's recoverable damages include but are not limited to:

    a. compensatory damages for injury to CPI's reputation and brand, including costs necessary for a remedial information (corrective

9

marketing) campaign to correct the misinformation Vivint has introduced into the marketplace through its sales agents;

b. compensatory damages for injury to CPI's goodwill based, in part, on CPI's expenditures to build and promote its brand;

c. a forced royalty award for Vivint's unauthorized use of (i.e., failure to lawfully license the use of) the CPI name;

d. compensatory damages relating to the lost and disrupted customers that can reasonably be identified and considering the rates of under-reporting of such conduct;

e. CPI's costs incurred to respond to complaints about Vivint's deceptive and false sales practices; and/or

f. disgorgement of Vivint's profits for accounts generated in CPI's commercial footprint during the relevant timeframe, to be calculated with reference to Vivint's total revenues for residential alarm and smart home accounts generated in CPI's commercial footprint during the relevant timeframe subject to offsets for which Vivint has the burden of proof under Section 35(a) of the Lanham Act. *See* 15 U.S.C. § 1117(a).

21. That CPI is entitled to punitive damages given the willful nature of the conduct, the fact that it is ongoing, the fact that it has persisted after numerous private and attorney general actions directed at stopping Vivint's conduct and thousands of complaints by consumers around the country to Vivint regarding such practices, and the fact that Vivint has paid large financial sums to resolve such claims only to continue the conduct.

22. That CPI is entitled to reasonable attorneys' fees and costs.

### b. Vivint's Contentions

1. Vivint has a legitimate interest in competing for and obtaining the business of CPI's customers.

2. Vivint fairly competes for CPI's customers, and its sales agents utilize pitches that do not mislead or deceive CPI's customers and its sales representatives do not mislead or deceive CPI's customers.

3. Vivint further contends that CPI customers who have chosen Vivint have done so for any number of legitimate reasons, including that these customers: (a) prefer Vivint's superior products and services; (b) are dissatisfied with CPI's

10

products and services; (c) are upset because of the controversial statements made by or attributed to CPI's President and CEO, Ken Gill; or (d) simply elected to change providers for any number of other reasons. Vivint alleges that CPI's agents coach or improperly influence customers to believe that somehow Vivint has done something wrong by trying to win their business.

4. Every encounter in door-to-door sales between an individual sales representative and an individual customer is a unique human interaction where, as in other human interactions, there can be misunderstandings and confusion. CPI's theory that these known interactions can be extrapolated to prove alleged conduct in other theoretical and unknown interactions is inherently flawed.

5. CPI's characterization of customer interactions is biased, unreliable, and inadmissible. Only the testimony, subject to cross-examination, of individuals with personal first-hand knowledge of the customer interaction is reliable and admissible. Even then, customers may have a financial interest in inaccurately portraying the interaction to achieve a desired outcome—for example obtaining a discount or addressing their buyer's remorse.

6. Vivint's products and services are superior to CPI's products and services. For example, Vivint's security cameras offer superior technology for identifying and deterring security threats.

7. CPI's President and CEO Ken Gill made controversial comments in the summer of 2020 that generated public controversy and a boycott of CPI. As a result, at least 2,300 CPI customers cancelled their CPI contracts, and numerous organizations—including the Carolina Panthers, the Charlotte Hornets, the Charlotte Knights, the University of South Carolina, North Carolina State University, and Bojangles—publicly severed ties with CPI.

8. In recent weeks, this public controversy returned to the spotlight after news reports emerged that CPI's highest-ranking Black employee is suing CPI and Mr. Gill individually for racial discrimination.

9. CPI's agents engage in unfair and deceptive conduct in an effort to improperly prevent CPI's customers from freely canceling their CPI contracts and signing with Vivint. For example, CPI's agents tell customers who are attempting to cancel their CPI contracts that it is illegal for them to enter into a contract with Vivint.

10. CPI's agents engage in unfair and deceptive conduct in an effort to generate false complaints about Vivint. For example, CPI's agents tell customers who are attempting to cancel their CPI services that Vivint is untrustworthy and the subject of government investigations of wrongdoing.

11

11. CPI bears the burden of proving its damages to a reasonable degree of certainty through the introduction of admissible evidence. CPI cannot recover damages caused by a particular act absent admissible evidence that the act actually occurred.

12. CPI's proffered expert testimony is unreliable and inadmissible under Rule 702 for the reasons set forth in Vivint's forthcoming Rule 702 motions.

13. CPI is not entitled to the recovery of actual damages on any of its claims.

14. CPI is not entitled to the recovery of punitive damages because CPI cannot show the existence of any conduct that would warrant an award of punitive damages.

15. CPI is not entitled to the recovery of punitive damages because CPI cannot show that Vivint's officers, directors, or managers participated in or condoned any conduct that would warrant an award of punitive damages.

16. Vivint has various affirmative defenses to CPI's causes of action, as set forth in its proposed jury instructions.

17. CPI's claims are time-barred, in whole or in part, by the applicable statute of limitations and the doctrine of laches.

18. CPI's claims are barred, in whole or in part, by Vivint's pro-competitive justification and privilege as a competitor. Vivint has a legitimate business purpose in growing its business by soliciting customers and explaining to them Vivint's pricing, products, and services and how they are different and better than those of Vivint's competitors.

19. CPI's claims are barred, in whole or in part, because they are premised upon constitutionally protected speech.

20. CPI's claims are barred, in whole or in part, by the doctrine of fair use, which entitles Vivint's representatives to mention CPI by name and make true and non-misleading statements about CPI, its goods, and its services, in furtherance of competition.

21. CPI's claims are barred, in whole or in part, by CPI's failure to mitigate any alleged damages. After CPI allegedly lost certain customer accounts, it made no efforts to attempt to recapture those accounts, and it waited years to complain. Accordingly, CPI is precluded from bringing this action or, alternatively, its alleged damages should be reduced by its failure to mitigate its damages.

22. CPI's claims are barred, in whole or in part, because to the extent that any Vivint sales representatives engaged in unlawful conduct or made any false or misleading statements, they were acting outside of their authority and scope of employment.

23. CPI's claims are barred, in whole or in part, because the trademark it registered with the USPTO is a design mark with the words: "Warning CPI Security System." This mark is highly descriptive and weak and, therefore, not entitled to protection under the Lanham Act.

24. CPI's claims seeking damages for loss of goodwill or damage to reputation are barred, in whole or in part, because any purported loss of CPI's goodwill or damage to CPI's reputation were the result of CPI's own conduct or other conduct for which Vivint is not responsible.

25. As set forth in Vivint's forthcoming motion for a bifurcated trial, bifurcating the compensatory and punitive damages phases of trial is warranted.

## EXHIBIT LISTS

The parties' respective exhibit lists are attached hereto.

The parties' objections are set forth within the respective exhibit lists.

## DESIGNATIONS OF DEPOSITION TESTIMONY
## AND DISCOVERY MATERIALS

The parties' respective deposition designations are attached hereto. The parties' designations of other discovery materials, including interrogatories and requests for production, are attached separately.

The parties' objections are set forth within the respective designations.

## WITNESS LISTS

The parties' respective witness lists are attached hereto.

### CPI's Objections to Vivint's Witness List

CPI objects to Vivint's listing of any witnesses not timely disclosed in accordance with Fed. R. Civ. P. 26 and this Court's previous orders, including but not limited to Vivint's listing of 39 undisclosed customer witnesses as "may call" witnesses in section "C." on pages 2-4 of its witness list. The only customer on Vivint's list of 41 that was disclosed by Vivint was Alline Maxwell. Janet Newmark was disclosed by CPI. CPI objects to the listing of the other 39 customers. In addition to not being disclosed, the purported subject matter of these witnesses' testimony is irrelevant to the issues in dispute.

CPI also objects to Vivint's listing of CPI Chief Executive Officer Ken Gill as a "will call" witness in section D. on page 4 of Vivint's witness list because: (1) Mr. Gill

was not disclosed by Vivint under FRCP 26; (2) Mr. Gill has no unique, relevant testimony, and therefore the apex doctrine/ FRCP 26 bars testimony from Mr. Gill; and (3) during discovery the parties agreed not to call the opposing parties' respective Chief Executive Officers at trial. If Mr. Gill is called as a witness, CPI states is should be permitted to depose and/or call Vivint's CEO David Bywater.[6] That said, CPI reserves the right to call Mr. Gill depending on the Court's Order on CPI's forthcoming motion *in limine* relating to Mr. Gill's 2020 private email comments regarding issues relating to the BLM movement.

**<u>Vivint's Objections to CPI's Witness List</u>**

Vivint objects to CPI's listing of any witnesses who were not timely disclosed in accordance with Fed. R. Civ. P. 26 and this Court's previous orders. Vivint further objects to CPI's listing of ADT customers who testified in unrelated litigation for the reasons that will be set forth in Vivint's forthcoming motion in limine. Vivint also objects to CPI calling witnesses to testify remotely absent a showing of good cause and compelling circumstances. *See* Fed. R. Civ. P. 43(a); *see also Graham v. Dhar*, 2020 WL 3470507, at *1 (S.D.W. Va. 2020) (denying a Rule 43(a) motion for remote trial testimony and observing that even during the COVID-19 pandemic, federal

---

[6] CPI noticed the deposition of Mr. Bywater after Vivint noticed the deposition of Ken Gill during discovery. Following those notices, the parties agreed that neither parties' CEO would testify in this case.

15

district courts in the Fourth Circuit have maintained a "strong preference for live testimony").

## PROPOSED JURY INSTRUCTIONS

The parties' proposed jury instructions (with the opposing parties' objections and responses) are attached hereto.

## PROPOSED ADDITIONAL VOIR DIRE QUESTIONS

The parties' joint proposed additional voir dire (with the opposing parties' objections) are attached hereto.

## EXPERTS

The parties recite the qualifications of their respective expert witnesses below. The parties have not stipulated to the qualifications of any opposing expert.

a. **CPI's Experts**

1. **Dr. Russell Mangum III.** Dr. Mangum has over 25 years of experience in economic analysis, research, and teaching. He holds a Ph.D. and a M.A. in economics from the University of Southern California, and a B.A. in economics, with honors, from California State University, Fullerton. Following his graduate education, Dr. Mangum served as an economist with the U.S. Federal Trade Commission, Bureau of Economics, from July 1995 through August 1998. After leaving the Commission, he held positions as an economist and expert for Nathan

16

Associates, PricewaterhouseCoopers, and Analysis Group. In 2021, Dr. Mangum joined Cirque Analytics. His consulting practice centers on economic analysis and damages quantification in matters related to intellectual property and technology, antitrust, class certification, statistical analysis, and complex commercial disputes. Dr. Mangum's experience as an economic expert is extensive, with testimony in over 100 matters before local, state, and federal courts, including several similar matters as this case involving deceptive sales practices in door-to-door sales within the alarm industry. Dr. Mangum has taught graduate and undergraduate courses in economics, statistics, finance, an econometrics. He is currently an Associate Professor of Economics in the School of Business and Economics a Concordia University Irvine, and has previously taught at Johns Hopkins University, The University of Southern California, and Pepperdine University.

2. **Dr. Russell Winer.** Dr. Winer is the William Joyce Professor of Marketing and Deputy Chair of the Marketing Department at the Stern School of Business, New York University. He received his Ph.D. in Industrial Administration from Carnegie Mellon University in 1977. At NYU, Dr. Winer currently teaches marketing management courses to graduate students in the executive, part-time, and full-time MBA programs. He has also taught in MBA and executive programs around the world including on topics such as brands and branding, and

17

marketing concepts such as digital marketing, pricing, and marketing strategy. In the past, Dr. Winer has also taught a wide variety of courses encompassing many marketing topics such as branding, customer loyalty management, marketing communications, marketing strategy, and others. Prior to joining NYU, Dr. Winer was on the faculties of the University of California at Berkeley, Vanderbilt University, and Columbia University. He has also been a visiting faculty member at the Massachusetts Institute of Technology, Stanford University, the Helsinki School of Economics, the University of Tokyo, École Nationale des Ponts et Chausées, Cranfield School of Management (U.K.), Henley Management College (U.K.), and Singapore Management University. Dr. Winer is the author of over 80 articles and four books in the area of marketing. Over the span of his career, Dr. Winer has made methodological and other substantive contributions to the field of marketing in the areas of pricing, advertising, customer relationship management, consumer choice and decision-making, and a number of other areas. In particular, he has studied brands and branding over the course of his 40-year academic career and has written about topics such as customer relationship management and the importance of word-of-mouth in marketing. In his own textbook, Marketing Strategy – a textbook that is used by leading business schools around the world – Dr. Winer wrote a chapter on customer relationship management, products

18

and branding. Dr. Winer has served as an expert witness in several cases involving brands and trademark infringement.

### b. <u>Vivint's Experts</u>

1. **Dr. Brian Buss**. Brian Buss is a is a founding principal of Nevium Intellectual Property Consultants. He is a Chartered Financial Analyst (CFA) with 25 years of experience in valuations, financial analysis and corporate finance. He is also a Certified Patent Valuation Analyst (CPVA). Prior to launching Nevium, Brian worked at San Diego-based consulting firms, a technology start-up, Westpac Institutional Bank, and Deloitte & Touche's Financial Advisory Services group in both New Zealand and San Francisco. Mr. Buss provides strategic advice for intellectual asset owners, guidance in determining economic damages in civil litigation, and performs valuations of trademarks, patents, brand assets, copyrights and other intellectual property. He holds a Master's in Business Administration degree (MBA) from San Diego State University and a bachelor's degree in Biology and Economics from Claremont McKenna College. As an expert witness, Brian provides expert opinions and testimony regarding damages, profit apportionment, lost profits, reasonable royalty, unjust enrichment and valuation. Brian has testified in Federal, State and US Tax Courts, and in arbitration proceedings; providing opinions on patent infringement damages, trademark infringement damages, copyright infringement

damages, trade secret misappropriation damages, IP valuation, business valuation, breach of contract damages, impact of online and social media endorsements, defamation damages, and reasonable compensation.

2. **Mark Gustafson.** Mark Gustafson is an economist and Principal with Analysis Group with over 20 years of experience working on litigation and non-litigation engagements. Mr. Gustafson has worked across numerous practice areas including, among others, commercial damages, intellectual property, employment, insurance, and class actions to analyze issues of liability and damages. He has analyzed damages in numerous class action and non-class action cases. In the context of class action cases, he has evaluated whether plaintiffs have satisfied class certification requirements and evaluated whether the proposed damage methodology can measure class wide damages without requiring individual inquiry. In intellectual property cases, he has analyzed claims related to patent infringement and estimated damages using both reasonable royalty and lost profit frameworks. In non-ligation matters, Mr. Gustafson has assisted clients in patent portfolio negotiations by helping them understand the expected revenue for the products at issue and the associated royalty payments as well as preparing exposure analyses of lost profits and reasonable royalty damages assuming the parties initiate litigation. He has also consulted

20

with organizations like the Washington State Hospital Association on public policy related engagements. Mr. Gustafson earned a Master of Public Policy with a concentration in economics from the Kennedy School of Government at Harvard University where he also taught graduate-level economics as a course assistant. Mr. Gustafson holds a B.A. in business economics and political science-international relations from the University of California, Los Angeles where he graduated with honors. Mr. Gustafson has authored and co-authored numerous publications including "Expert Analysis of Class Certification Issues" and "The Use of Statistical Sampling in Litigation" both in the Fifth and Sixth Editions of the Litigation Services Handbook.

## ESTIMATED TRIAL TIME

Pursuant to the Court's order requesting the parties to provide an estimate of trial time in this submission [Doc 68 at p. 2], the parties state as follows:

a. **CPI's Estimate for Case in Chief and Rebuttal: 5-7 days.** There are numerous witnesses with relevant testimony in this matter, involving claims spanning over a four year period. In order to present sufficient evidence in support of its claims, CPI anticipates calling a critical mass of customer witnesses who will testify as to the various types of sales misrepresentations at issue. CPI has disclosed approximately 50 anticipated customer witnesses during the course of discovery. Because of time constraints, CPI understands that the Court cannot (or will not) allow CPI to call *all* such customer

21

witnesses; however, it is CPI's position that it must, at minimum, be permitted to call enough customer witnesses to support the various allegations of the Amended Complaint to demonstrate the breadth and scope of the alleged misconduct as well as the various ways in which such deceptive and misleading statements have been made by Vivint's sales agents to CPI's customers throughout CPI's commercial footprint. In addition to customer testimony, to adequately present its case CPI will need to present extensive testimony (largely by deposition designation) of current and former Vivint officers, sales representatives and compliance officer whose testimony will show that Vivint's extensive history of deceptive and unfair sales practices have been trained and condoned for many years at Vivint. Finally, there are numerous other critical lay and expert witnesses with relevant testimony for the juries' consideration, including two retained experts who will testify as to some of CPI's alleged damages. CPI respectfully submits that fifteen hours of total time to present its case [*see* Doc 68 at 1] will not be a sufficient amount of time for CPI to present its case. CPI respectfully states that the above estimate itself is very conservative and is based on CPI's counsel's extensive experience trying several similar cases in federal court (including one prior case against Vivint).

b. **Vivint's Estimate for its Case: 3–4 days.** The parties initially estimated that this trial would last a total of 5–7 days. Doc. 30 at 4. CPI is now indicating that it needs 5–7 days for its case alone. Vivint is surprised by this request given that CPI only took the depositions of 7 customers and CPI's entire case

22

is about what a particular Vivint sales representative allegedly said to a particular CPI customer. While CPI has promised that other customers will appear at trial to provide live testimony, that testimony, if any, will be relatively brief. The scope of Vivint's defense will depend to a considerable degree on the Court's resolution of the motions in limine, as well as evidentiary rulings at the final pretrial conference and during the trial. For example, CPI has indicated that it intends to play deposition testimony from customers of an entirely different company, ADT, that was used in a prior lawsuit not involving CPI that went to trial years ago. Similarly, CPI has identified exhibits such as pleadings and discovery from lawsuits not involving CPI or its customers. If CPI focuses on this irrelevant evidence, Vivint will have to rebut it and its defense will be correspondingly longer. To the contrary, if CPI focuses its presentation on the actual evidence of the conduct it complains about—alleged deceptive sales pitches to CPI customers—then the entire trial could be relatively short and Vivint's evidence will focus on rebutting CPI's evidence regarding actual interactions between Vivint sales personnel and CPI customers.

Dated: December 10, 2021

Respectfully submitted,

**SHOOK, HARDY & BACON L.L.P.**

By: s/ *Caroline M. Gieser*
Caroline M. Gieser
North Carolina Bar No. 51610
cgieser@shb.com
1230 Peachtree Street, Suite 1200
Atlanta, Georgia 30309
(470) 867-6013

-and-

s/ *Charlie C. Eblen*
Charles C. Eblen (Admitted *Pro Hac Vice*)
Missouri Bar No. 55166
ceblen@shb.com
Erin M. Fishman (Admitted *Pro Hac Vice*)
Missouri Bar No. 69842
efishman@shb.com
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, Missouri 64108-2613
(816) 474-6550

-and-

s/ *Eric J. Hobbs*
Eric J. Hobbs (Admitted *Pro Hac Vice*)
Colorado Bar No. 46813
ehobbs@shb.com
Daniel E. Rohner (Admitted *Pro Hac Vice*)
Colorado Bar No. 27469
drohner@shb.com
SHOOK, HARDY & BACON L.L.P.
1660 17th Street, Suite 450
Denver, Colorado 80202
(303) 285-5300

***Counsel for Plaintiff CPI Security Systems, Inc.***

24

**GREENBERG TRAURIG, LLP**

By: s/ Michael N. Kreitzer
     Michael N. Kreitzer
     Florida Bar No. 705561
     kreitzerm@gtlaw.com
     333 S.E. 2nd Avenue, Suite 4400
     Miami, Florida 33131
     Telephone: (305) 579-0500

     Gregory W. Herbert
     Florida Bar No. 111510
     herbertg@gtlaw.com
     450 S. Orange Avenue, Suite 650
     Orlando, FL 32801
     Telephone: (407) 420-1000

     *Counsel for Defendants*

**CLYDE SNOW & SESSIONS, P.C.**

By: s/ Matthew A. Steward
     Matthew A. Steward
     Utah Bar No. 7637
     mas@clydesnow.com
     One Utah Center, 13th Floor
     201 South Main Street
     Salt Lake City, UT 84111-2216
     Telephone: (801) 322-2516

     *Counsel for Defendants*

**POYNER SPRUILL LLP**

By: s/ Andrew H. Erteschik
     Andrew H. Erteschik
     N.C. State Bar No. 35269
     aerteschik@poynerspruill.com
     P.O. Box 1801
     Raleigh, NC 27602-1801
     Telephone: (919) 783-2895

     *Local Counsel for Defendants*

**CERTIFICATE OF SERVICE**

      I certify that I have electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of filing to all counsel and parties of record.

      This the 10th day of December, 2021.

s/ Caroline M. Gieser         
Caroline M. Gieser
