CPI SECURITY SYSTEMS, INC.,

Plaintiff,

v.

VIVINT SMART HOME, INC. f/k/a
Mosaic Acquisition Corp.; and LEGACY
VIVINT SMART HOME, INC. f/k/a
Vivint Smart Home, Inc.,

Defendants.

**PLAINTIFF'S DEPOSITION
DESIGNATIONS (WITH
DEFENDANTS' OBJECTIONS
AND COUNTER DESIGNATIONS)**

Defendants Vivint Smart Home, Inc. and Legacy Vivint Smart Home, Inc. (collectively, "Vivint") hereby enter the following objections and counter designations to Plaintiff's deposition designations.

**Objections Key**

A:      authenticity
C:      confidential
F:      foundation
FM:   form (argumentative, asked and answered, compound, leading, hypothetical, narrative, vague, misstates testimony, calls for legal conclusion)
H:      hearsay
IA:     inadmissible
IC:     incomplete testimony
IR:     improper refreshing of recollection
MIL:  subject of motion in limine
R:      relevance
UP:    unduly prejudicial
NR:    nonresponsive
NAR:  narrative response
MTS:  subject of motion to strike
P:      privileged

NP:   not produced in discovery
S:     improper summary
CU:   cumulative/repetitive
DD:   *see* Deposition/Discovery Designation Objections (incorporated by reference)
PBA: prior bad acts/inadmissible character evidence
SD:   settlement discussions

## CUSTOMER WITNESSES

I.    *CPI v. Vivint* – **Case No. 3:20-CV-00504 (W.D. N.C.)**

   1.  Laura Ward, 07/20/2021

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 5:5-5:7 | Intro | | | |
| 5:12-5:21 | Address | | | |
| 6:6-7:1 (omitting objections) | Education and employment background | **R (7:4-9)** | | |
| 7:4-7:19 | Same | | | |
| 7:21-8:15 | Prior to being visited by Vivint, used CPI and was happy with her services / not looking to change | | | |
| 8:21-8:21 | Had a "no solicitation" sign and expects people will heed it | **R** | | |
| 9:13-10:2 | Same | **R** | | |
| 10:10-11:20 | Was visited by a sales rep from Vivint in June of 2020. The rep told her he was not a solicitor and that Vivint was buying out CPI and she will no longer | | | |

Case 3:20-cv-00504-FDW-DSC   Document 81-3   Filed 12/10/21   Page 2 of 307

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | have CPI as her security company | | | |
| 11:24-12:3 | She believed the Vivint representative's statements about Vivint buying out CPI | **FM (leading)** | | |
| 12:6-12:10 | Same. The rep's exact words were that "Vivint was buying out CPI" | | | |
| 12:12-12:19 | Expects solicitors to be truthful when they come to her door | **FM** | | |
| 12:21-13:13 | Does not believe the Vivint rep was truthful in his interactions with her | | | |
| 13:15-13:15 | When she later called CPI, she learned that it was not true that Vivint was buying out CPI | **H** | | |
| 13:20-15:24 | Name of the Vivint sales rep who came by her home was Curis Kuntz. Witness describes that Vivint swapped out her equipment the same day the sales rep came to her home. They | **NR, NAR, FM(leading)-(15:1-15). FM(hypothetical)** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | took out the CPI equipment leaving holes in her home and installed Vivint equipment creating new holes. It was a nightmare. The rep also said they were doing this to a bunch of other homes in the neighborhood. | | | |
| 16:5-16:8 | Had the Vivint rep been honest from the get-go, she would not have been receptive to the sales pitch. | **FM** | | |
| 16:11-20:15 | Had the Vivint rep been honest from the get-go, she would not have let him into her home. She had no intention of changing alarm providers. Witness further describes what was done to remove her CPI equipment. Witness authenticates exhibit as her contract with | **FM, R (16:11-21)** **FM, R (20:9-15)** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | Vivint, signed June 26, 2020. She does not recall discussion about a loan associated with the Vivint transaction | | | |
| 20:25-21:4 | She does not recall discussion about a loan associated with the Vivint transaction | **FM, R** | | |
| 21:6-22:11 | Same. Contract has Vivint sales person's Curtis Kuntz's name on it. She never got a copy of the contract | | **22:12-20 She signed the Vivint contract** | |
| 22:22-24:13 | Signed contract on a tablet. When she called Vivint to cancel, they told her should could not cancel and that she'd have to pay $2,400. She had called Vivint within a matter of days because she didn't like the company or the equipment. She later discovered that Vivint was not, in fact, | **H (23:7-11), FM, NAR, NR** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | buying out CPI when she called CPI to discuss the situation. | | | |
| 24:19-25:7 | Calls with Vivint after the transaction | **H, FM** | | |
| 25:9-25:9 | Same | **H, FM** | | |
| 25:13-29:25 (omitting objections) | Clarifies prior answer. At time she was calling Vivint in immediate days after the transaction, she still believed that Vivint was buying out CPI. She believed that up until the time CPI told her it was not true. In trying to work through this issue, she was brought to tears and was very upset because of the lies she had been told by Vivint and the fact that she couldn't afford to pay $2,400 to cancel the Vivint contract. She further describes her experience with trying to work through | **FM (29:19-25)** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | these issues with Vivint's customer service. She called multiple times and was often placed on hold for extended periods. It was a long, hard process. She felt like she was getting a runaround. Estimates she may have called Vivint 30 to 40 times, at least multiple times for multiple weeks. | | | |
| 30:2-30:17 | After many months of trying to work through the problems, she eventually had CPI's system reinstalled | **FM** | | |
| 30:19-31:2 | Same. | **FM** | | |
| 31:4-31:15 | Estimates it took about 4 months to get her alarm system back to the state it was in before being visited by Vivint. It was very, very upsetting | **F, NR, NAR** | | |
| 31:22-34:2 (omitting objections) | Does not remember whether she had to take a video | **F, NR, NAR** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | survey on the day of the Vivint transaction. She tried to call the Vivint rep Curtis Kunz numerous times in the days following the time he came to her home, but he would not answer her calls. She does not believe a sales manager should come to people's homes and tell flat-out lies. | | | |
| 34:5-34:10 | She would not trust a person like Curtis Kunz to train other Vivint salespeople, much less to feed her dog | **F, NR, NAR** | | |
| 34:13-34:16 | Same. She wishes she could tell Mr. Kunz this in person. | **F, NR, NAR** | | |
| 35:14-36:9 | Witness assumes sales people will heed a "no soliciting sign" | **R** | **38:18-40:3 Can not remember if she took the installation survey – it was a long day** | In response to Vivint's designation of 38:18-40:3 and 41:11-16, CPI also designates 40:7-41:10. |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | | | **41:11-16 Survey video played** | |
| 45:6-46:5 | She expects sales people to be honest about whom they represent. The Vivint rep was not. | | **42:2-8 It is her voice on the video** **43:3-12 It was her in the video** | In response to Vivint's designation of 42:2-8 and 43:3-12, CPI also designates 43:13-44:3. |
| 46:10-47:1 | She was very upset with herself for trusting the Vivint rep because she "fell for it." It made her feel awful | **F, NR, NAR, R** | | |

2. Joyce Mariso, 08/19/2021

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 7:16-7:24 | Intro. Witness lives in Wendell, NC | | | |
| 8:15-9:11 | Is retired. Previously worked as supervisor for service department of insurance co. Has 2 years of college education. | | | |
| 9:17-9:23 | Married for 30 years | | | |
| 10:4-10:7 | Has two children | | | |
| 11:4-11:24 | First had CPI installed in her | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | home when it was built | | | |
| 12:23-13:10 | Ex. 1 is her CPI contract | | | |
| 13:14-14:11 | Her CPI contract was signed on 10/30/2017, and she was paying $49.99 per month | | | |
| 16:4-17:9 | She was happy with the CPI system before being visited by Vivint. She displayed a CPI sign outside of her home that would have been visible to people approaching the home. | | | |
| 18:5-18:15 | Believes the interaction with Vivint may have occurred in the summer of 2019 | | | |
| 19:10-19:23 | Interaction with Vivint rep occurred at her home | | | |
| 20:6-21:2 (omitting objections) | Remembers the Vivint rep had a mask on, which makes her think the interaction took place in the summer of 2020 | | | |
| 21:16-23:1 (omitting objections) | The Vivint sales rep was named Ben. When he came into her home he said that Vivint was taking over CPI. | **NR, NA,** **FM (leading) (22:20-23:1)** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | | | | |
| 23:5-23:13 | When the Vivint rep was talking about Vivint taking over CPI, it led her to believe that Vivint "was going to be in charge of CPI or was in charge of CPI." She believed these statements to be true, and this is what caused her to continue the conversation. | **FM** | | |
| 23:23-25:5 | Continues describing sales interaction. Ben told her that she would need to call CPI to disconnect her current equipment. Everything moved fast. | **NR, NAR** | | |
| 25:7-26:17 (omitting objections) | Rep said that the same company that made CPI's equipment also made Vivint's but Vivint's equipment was better. Rep told her that CPI was a "subdivision" of Vivint | **NR, NAR, R** | | |
| 26:24-28:2 | Witness was confused about the transaction, that there was a credit involved in the process. The rep | **NR, NAR, R, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | actually ran the credit check on her daughter, not her, because she didn't want a credit check run on her. | | | |
| 28:10-28:11 | Same. | **NR, NAR, R, H** | | |
| 28:16-29:17 | Ben ran credit check on her daughter Nia because she was there and was more intrigued by the pitch. Ben did not explain that there would be upfront charges for the work. | **H, NR, NAR, R, FM** | | |
| 29:19-30:4 (omitting objections) | 24 hours after the interaction with Ben, they noticed charges on their credit card statement that had not been disclosed by Ben. The charges were "ridiculous." | **R, NR, NAR, FM** | | |
| 30:9-32:4 | They did not know that they were taking out a loan to help pay for the equipment. Ben did not explain that. | **R, H, NR, NAR** | | |
| 32:8-32:10 | Asked whether Vivint's statements induced her to sign the contract | **FM, F, R** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 32:18-39:22 (omitting all objections) | . The home is titled in her name. The Vivint contract has her daughter and her husband's name. The contract is dated 8/28/2020. She is the final decision maker for these types of decisions in her home. When her daughter and husband were signing the contract electronically, they were not given a copy to review. When they got a copy afterward and saw what it actually said, she wanted Vivint to come pick up the equipment. | **F, FM, R, NR, NAR** | | |
| 40:10-41:17 | Describes work Vivint did in her home. The work began around 9:00 pm but continued past 10:00 pm, which seemed odd | | | |
| 43:9-45:19 | The technician had difficulty overriding the door code on her CPI system. When he was doing that work, it was still her belief that Vivint was taking over CPI but it was | **FM, NR, NAR, MTS** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | never spoken about with the technician.<br><br>It was probably later in the week that she asked CPI to come back to her house to reinstall her system. The Vivint rep, Ben, would not send anyone back out. He would not answer her calls. Vivint did not respond until she started complaining to the BBB and other people | | | |
| 45:22-48:8 (omitting all objections) | He reached out to Vivint to remove the system after discovering the charges that had not been discussed and because Vivint never actually completed the installation of the new system. The sales rep Ben "was like a ghost" when she was trying to reach out to resolve the issues. When she did speak with him, he said there must have been a "misunderstanding," but she disagreed | **FM, NR,NAR, H (48:3-8), MTS** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | with that characterization. The Vivint customer service experience was "horrible." | | | |
| 48:19-49:10 | Spoke with Vivint customer service maybe three times. The wait times were long. | **NR, NAR, MTS** | | |
| 49:13-51:16 | She filed the BBB and consumer protection complaints because she didn't like how Vivint treated her. Before she filed those complaints, she was not successful in getting Vivint to address her issues, but after she did Vivint contacted her. She eventually spoke to an attorney at Vivint | **FM** | | |
| 51:21-53:24 | CPI sent technicians back to her home to reinstall her CPI equipment free of charge.<br><br>She does not believe the Vivint rep was truthful. She believes he was deceptive. She came back to CPI because | **FM** | **54:22-56:7 (End result was her renewing her CPI contract for 3 more years, Vivint refunded all charges)**<br><br>**56:25-57-21** | In response to Vivint's designation of 54:22-56:7 and 56:25-57:21, CPI designates 56:8-24. F.R.E. 106 |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | she liked the CPI system and she did not like Vivint's deception. | | **(she really liked Vivint's equipment and told CPI that was the reason she switched to Vivint and discussed the BLM movement with CPI rep)** | |
| | | | **58:11-59:6 (her daughter wanted to end with CPI because of CEO's comments on BLM); (she did not sign the Vivint contract, it was her daughter Nia and her husband Phillip)** | R, UP, MIL as to 58:11-21 (CEO comments relating to BLM) |
| | | | **60:18-61:8 (CPI rep Felix told her CPI's and Vivint's equipment is** | R, UP as to 60:18-61:8 |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | | | **all basically the same)** | |
| | | | **61:9-62:19 (one reason her family switched from CPI to Vivint was they were impressed with Vivint's more modern equipment; in the end she got upgraded equipment from CPI that was similar to Vivint's)** | |
| | | | **64:10-65:3 (her daughter Nia who signed the contract took the Vivint video survey)** | In response to Vivint's designation of 64:10-65:3, CPI designates 65:4-12. F.R.E. 106. |
| | | | **65:13-24 (recalls CPI's CEO making disparaging comments** | R, UP, F, MIL as to 65:13-24 (BLM comments) |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | | | **about the BLM protesters)** | R, UP, F, MIL as to 66:25-67:4 |
| | | | **66:25-674 (she knows CPI's CEO said some things and people were distancing themselves from CPI)** | |
| | | | **67:16-25 (would not dispute her daughter answered video survey admitting she understood CPI and Vivint were not affiliated)** | A, F, H as to recordings of daughter referenced in 67:16-25. The referenced recordings were not actually introduced to the witness, and there has been no evidence to suggest any such recordings exist. If 67:16-25 is admitted, CPI designates |
| | | | **68:13-69:5 (her daughter and husband signed the Vivint agreement which disclosed the financing component)** | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | | | **69:16-70:7 (she did not sign the Vivint contract, her daughter did, and once she looked at details, she wanted her daughter to cancel it)** | 67:5-15. F.R.E. 106.<br><br>In response to Vivint's designation of 69:16-70:7, CPI designates 69:6-15 (customer clarifying prior answer and confirming she was misled) |
| 70:15-73:11 (omitting objections) | When the Vivint rep was in her home on August 28, 2020, he did bring up the black lives matter controversy in the context of trying to convince her to make a change to the alarm system. It came up in the context of Vivint "taking over" CPI. She did not think it was fair for Vivint to be raising this issue in the context of a sales pitch.<br><br>When Vivint rep Ben was discussing | **H, FM** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | Vivint taking over CPI, he mentioned that CPI was "under Vivint" and Vivint was "taking over CPI" such that "the name CPI would be Vivint, it wasn't going to be anymore CPI." | | | |

3. Johgre Hinton, 08/20/2021

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 5:24-7:20 | Intro. Witness resides in Knighdale, NC. Was previously a CPI customer. Is now a Vivint customer. He has an engineering degree from NC State and an MBA from UNC. He's a manager of a few engineering tech groups. When he was a CPI customer he was pleased with the service and had no problems. | **FM** | | |
| 7:23-8:24 | First interacted with Vivint reps at | **FM** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | a local wholesale store and Vivint said they could probably offer better rates. They later sent a rep to their house to talk in more detail. | | | |
| 9:1-10:19 | The subject of an affiliation between Vivint and CPI came up when Vivint rep came to witness's home. It was a different rep named Craig Darrow that came to their home when they got back from the grocery store.<br><br>When rep came to their home, he was stating that Vivint and CPI work together and that Vivint could just take over the existing equipment | | | |
| 11:12-14:25 (omitting objections) | When the rep was discussing Vivint being able to use CPI's equipment, the witness asked the rep whether CPI and Vivint are partners or work together. The rep said, yes, we kind of work together, | **FM, NAR, NR, H, R** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | but was somewhat vague in his responses. Based on these statements, the witness believed there was a connection between Vivint and CPI and that they were essentially "one in the same." He later found out in June of 2020 that that was not true. | | | |
| 16:8-18:4 (omitting objections) | He was surprised to learn that a Citizen's One loan was opened as a part of the transaction. If he was told that he was going to be taking out a loan as a part of the transaction, he would not have done it. Plus, the amount he ended up being charged was much higher than what the rep had promised. | **FM, R, NR, NAR** | | |
| 19:1-19:3 | Question about loan issue | **FM, R** | | |
| 19:6-19:14 | Called Vivint because they were in a "mess"; wasn't just because of the loan surprise | **FM, R** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 21:14-22:12 | Vivint was not honest and up front about the transaction. | **FM, R** | **28:4-30:20 (objections omitted) 3 years since initial contract – does not remember anything clearly. First met Vivint at booth at BJs – it was orange and had a sign – neither the rep nor the sign said CPI. The person he spoke to identified themselves as being from Vivint, did not say CPI.** | In response to Vivint's designation of 28:4-30:20, CPI designates 30:21-31:5 (witness clarifies when the misleading statements were made) |
| | | | **31:9-34:19 (objections omitted) At BJS, he understood Vivint and CPI were competitors and different companies. They were interested in saving money** | In response to Vivint's designation of 31:9-34:19, CPI designates 37:3-15. F.R.E. 106 |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | | | **and had looked at equipment in Best Buy. The bright orange on the Vivint booth in BJs caught their attention. He remembers maybe a camera and a panel at the BJs booth. CPI and Vivint names are very different and have very different logos. They had problems with their CPI equipment prior to switching to Vivint.** | |
| | | | **42:15-45:6 (objections omitted) Rep at his home said something about Vivint and CPI being one and the same,** | In response to Vivint's designation of 42:15-45:6, CPI designates 45:7-13. F.R.E. 106. |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | | | **could have been the equipment. He remembers the rep said he was with Vivint and had a shirt with the Vivint logo in orange. Nothing on the rep said CPI and the rep did not say he was an employee of CPI.**<br><br>**45:20-46:5 He was interested in the fact some of the equipment was compatible – but some was not like the panel.**<br><br>**49:8-50:19 Thy got additional equipment when going to Vivint**<br><br>**53:5-59:2** | In response to Vivint's designation of 49:8-50:19, CPI designates 50:20-51:5 |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | | | **Ex. 3 – CPI Contract – Ex. 4 – Vivint contract – Pays less for Vivint. Does not remember call with corporate at install.** | |
| | | | **59:17-65:16 (objections omitted) Numerous calls to and from Vivint and CPI – remembers CPI mentioning dual contracts and the BBB** | A, F, H as to calls being referenced but not introduced at 63:12-65:16. |
| | | | **68:7-73:25 (objections omitted) Remembers call with CPI about the controversy and CPI telling him he could call the NC Atty. General – he does not believe he** | A, F, H as to calls being referenced at 68:7-70:14. R, UP, MIL as to 68:7-12 (BLM and Ken Gill statements) |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | | | did. He called both companies too many times and does not clearly remember each call or who it was with.<br><br>75:15-77:3 (objections omitted) CPI first charged him in June of 2015 and it was a 3 year contract. The last payment was June, 2020 so he must have called to cancel. The contract should have expired in May 2020 – maybe you pay in arrears, he is not sure.<br><br>79:22-83:18 (objections omitted) | F, R, UP, MIL (BLM movement and Gill |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | | | **Gill's email – he remembers it was something against back people. He remembers mentioning it to Kay on the June, 2020 call. He remembers now that large organizations cancelled their relationships over the email. He believes Gill needs some awareness. He knows CPI lost business but is not sure of any negative impacts.** <br><br> **85:10-86:20 He did use both systems at the same time when he had both contracts. He just changed the** | statements and related fallout.) If 79:22-83:18 is played and CPI's objections are overruled, then CPI designates 83:19-84:24. |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | | | **batteries in the CPI equipment but knows CPI is no longer monitoring it.** | |
| 87:25-89:17 (omitting objections) | Expects sales people to be honest and to be fully transparent. He understood the Vivint's statements to mean that Vivint and CPI were one in the same. The discussion came up in the context of the rep explaining that Vivint had merged with a lot of companies | **FM, R** | | |

4. Ginger Garren, 08/18/2021

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 4:20-4:22 | Intro | | | |
| 7:18-9:7 | Witness resides in Fletcher, NC and is 52 years old. She is an elementary teacher. She has had CPI security since 2017. | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 9:18-16:23 (omitting objections) | Exhibit 1 is her CPI contract dated 10/4/2019.<br><br>Was solicited by Vivint in late 2019, not long after she signed her CPI contract. When she opened the door, the Vivint rep said that Vivint was "part of CPI" or "with CPI" and just had additional options for her to consider. When the rep said that, the witness understood it to meant that Vivint was an "extension" of CPI but it didn't make sense to her and she was suspicious it was a scam because she'd fallen for scams before. She wasn't sure whether to believe the rep.<br><br>The rep wanted to come into her home to inspect her CPI system but she would not let him. It was nighttime when the rep came, a little after 7:00. | **FM** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | The rep was male in his 20s or 30s. The reason she has a security system is because she is single and it was concerning that the rep was trying to get into her home. At some point after this interaction, she got an email from CPI alerting customers that Vivint was trying to take their customers and she reached out to CPI to report what had happened to her. | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | | | **17:3-5**<br>**Into to Matt Steward**<br><br>**17:20-23**<br>**Doesn't remember when interaction with Vivint sales rep took place.**<br><br>**18:6-20**<br>**Vivint rep was a young man that identified himself as being with Vivint. He had a hat, shirt and badge that all said Vivint.** | In response to Vivint's designation of 18:6-20, CPI designates 20:2-10. F.R.E. 106. |

5. Shantell Cheek, 08/19/2021

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 7:10-11:1 | Intro. Witness resides in Winterville, NC. She is a director of the Uninsured Program. | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | Her CPI contract is Exhibit 1 and is dated May 1, 2018. | | | |
| 11:5-15:2 | She was solicited by Vivint. A Vivint rep rang the doorbell and told her that CPI and Vivint were now run by the same company and were merging. The pitched seemed fishy to her since she had not received any prior notice about CPI and Vivint merging together.<br><br>She was afraid that maybe the incident was a scam and that someone might try to rob the house or something. She is very hyper-vigilant.<br><br>The sales rep was persistent and she had to sternly end the conversation. When she shut the door she watched the sales rep go to another neighbor's home. | **FM** | | |
| 15:8-15:14 | She did not get the name of the Vivint | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | sales rep but she did get a picture of his license plate. | | | |
| 15:21-17:24 | She reported the incident to CPI after getting an email alerting her that Vivint was committing these types of misleading sales tactics with CPI's customers. She sent in the picture of the Vivint rep's license plate. She did see the vehicle again in the neighborhood the next day after this incident.<br><br>After this incident, another Vivint sales person came to their home and tried the same sales pitch again | **NR, NAR, H, FM** | | |
| 18:13-19:13 | When approached the second time, her husband told the Vivint rep that they were not interested. The Vivint rep was very pushy. | **H, FM** | **19:19-20:19 CPI did not lose any money due to visit from Vivint sales rep – they are under CPI contract still and are going to renew** | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | | | **21:10-15 She did not personally hear anything during the Vivint interaction** | In response to Vivint's designation of 21:10-15, CPI designates 20:20-21:09 |
| | | | **25:14-24 Recalls something about the Gill email – knows the Panthers quit their contract over it** | R, UP, MIL as to 25:14-24 (BLM controversy and Gill comments). |
| | | | **27:3-28:13 (objection omitted) She remembers calling CPI due to the comments to see how long she had on her contract. They contemplated cancelling but did not.** | R, UP, MIL as to 27:3-28:13 (BLM controversy and Gill comments). |
| | | | **29:4-9 Despite comments,** | R, UP, MIL as to 29:4-9 (BLM |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | | | **continued contract with CPI** | controversy and Gill comments). |

6. Larry Kodack, 08/25/2021

*Due to unique evidentiary issues raised in the deposition testimony of Mr. Kodack with respect to Mr. Kodack's present memory of his interaction with the Vivint sales representative on or around July 14, 2018, CPI intends to play into evidence the full audio recording marked as Exhibit 3 to his deposition (Trial Ex. P24) as non-hearsay, substantive evidence pursuant to Federal Rule of Evidence 803(5). As the below designations make clear, the audio recording of Mr. Kodack (a) "is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately;" (b) "was made or adopted by the witness when the matter was fresh in the witness's memory;" and (c) "accurately reflects the witness's knowledge" of the incident reported on the audio recording. If, based on the testimony designated below, the Court rules that Fed. R. Evid. 803(5) is satisfied and permits CPI to play the full audio recording where Mr. Kodack details his encounter with the Vivint sales representative in July 2018, then CPI will **__not__** need to offer the deposition designation testimony that is **italicized** below to the jury (i.e., CPI will only offer the non-italicized testimony and then play the audio recording). However, if CPI is __not__ permitted to play the full audio recording for the jury, then CPI intends to offer all of the following testimony to the jury:*

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 4:23-5:3 | Introduction | | | |
| 5:11-19 | Intro of questioning counsel | | | |
| 8:14-18 | Witness resides in Durham, NC | | | |
| 9:12-10:15 | Employment history | **R (9:12-22)** | | |
| 11:12-13:7 | The witness has a PhD from Duke | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | and did complex OB-GYN research for many years | | | |
| 13:15-18 | Witness is 72 years old | | | |
| 14:8-15:4 | Reasons he chose CPI as alarm provider. One primary reason was that CPI is local and had rapid alarm response times | | | |
| 19:22-21:1 | Feature of CPI alarm system included alarm light outside of home and key fob, among other things | | | |
| 21:2-17 | CPI alarm was reliable and gave sense of security | | | |
| 22:1-14 | Displayed CPI sign outside of home | | | |
| | **[If Deposition Exhibit 3 is permitted to be played for the jury, it will be played at this time.]** | **FM, F, H, IR** | | |
| 22:19-23:5 | *Witness does not have a present recollection of interacting with Vivint* | | | |
| 24:15-26:9 (omitting objections) | *Nothing refreshes the witness's recollection regarding his* | **FM** | **24:11-13 He has no information** | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | *interaction with Vivint* | | **about the contract – not aware of any change to his plan – has no knowledge** | |
| 26:7-27:6 (omitting objections) | *To refresh the witness's recollection, an audio recording of a recorded phone call to CPI marked as Exhibit 3 in the deposition* | **F, FM, IR, R** | | |
| 27:9-28:24 | *A segment of a recorded phone call from the witness to CPI customer service is authenticated as being the witness's call. But it still does not refresh his recollection* | **F, FM, IR, R, NR, NAR, MTS, R** | | |
| 31:2-32:7 | *Same* | **F, FM, IR, R, NR, NAR, MTS, R** | | |
| 32:20 (starting at "First off,")-34:7 (omitting all objections) | *Witness authenticates recording but says it does not refresh his recollection* | **F, FM, IR, R, NR, NAR, MTS, R** | | |
| 34:8-36:15 (omitting all objections) | *On the audio recording, Kodack states he is calling because the Vivint rep who came to his home said that* | **F, FM, IR, R, NR, NAR, MTS, R** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | *Vivint "works with" CPI. Witness agrees that is what he said on the call and it would have been an accurate reflection of his memory at the time, but he still does not have any independent recollection of the events even after listening to the audio* | | | |
| 36:17-37:7 (omitting objections) | *Witness explains why he believes he was calling CPI to ask about the statements made by the Vivint rep* | **F, FM, IR, R, NR, NAR, MTS, R** | | |
| 37:9-38:17 | *Another segment of the recording is played where Mr. Kodak is asking the CPI customer service representative about the statements made by the Vivint rep* | **F, FM, IR, R, NR, NAR, MTS, R** | | |
| 39:1-15 (omitting objection) | *Witness authenticates this segment of the recording* | **F, FM, IR, R, NR, NAR, MTS, R** | | |
| 40:8 (starting at "So I'm going to...")- 41:14 | *Segment of audio played again for the witness where Mr. Kodak is asking the CPI representative about the Vivint* | **F, FM, IR, R, NR, NAR, MTS, R** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | *rep's claim that they work with CPI* | | | |
| 41:15-42:2 (omitting objections) | *Witness was calling CPI to seek clarification of the Vivint rep's claims that Vivint was affiliated with CPI* | **F, FM, IR, R, NR, NAR, MTS, R** | | |
| 42:3-46:1 | *Remainder of audio recording is played for the witness* | **F, FM, IR, R, NR, NAR, MTS, R** | | |
| 46:12-47:4 (omitting objections) | *Witness authenticates recording but says it still does not independently refresh his recollection. [Accordingly, it is CPI's position that the audio recording is admissible under F.R.E. 803(5)]* | **F, FM, IR, R, NR, NAR, MTS, R** | | |
| 47:11-15 | *Same* | **F, FM, IR, R, NR, NAR, MTS, R** | | |
| 48:9-10 | *Same* | **F, FM, IR, R, NR, NAR, MTS, R** | | |
| 48:12-49:9 (omitting all objections) | *Witness was calling CPI because he didn't know whether to believe the statements made by the Vivint rep that they were affiliated with CPI* | **F, FM, IR, R, NR, NAR, MTS, R** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 50:16 (starting at "I just want")-22 (omitting objection) | Witness does not have reason to dispute that the phone call recording being reviewed in the deposition was made by him on July 14, 2018 | **F, FM, IR, R, NR, NAR, MTS, R** | **51:14-54:7 Have spent no money with Vivint – still a CPI customer- they actually upgraded with CPI twice. Has no recollection of any conversation with anyone from Vivint and can not recall anything about it.** | |
| 54:8-17 | *Although he can't recall the details of this interaction, the witness's general practice is to follow up and inquire about an incident like this immediately after it happens* | **F, FM, IR, R, NR, NAR, MTS, R** | **55:14-19 Can't remember anything a Vivint rep may or may not have said to him**<br><br>**55:24-56:4 Same** | |
| 58:17-59:23 (omitting all objections) | *Witness agrees the phone recording being referenced would have taken place closer in time to his interaction with the Vivint rep when his memory would have been* | **F, FM, IR, R, NR, NAR, MTS, R** | **60:6-9 Testimony is things he hear in a phone call but not about any specific conversation.** | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | *fresher. It was "fishy" that the Vivint rep said that he worked with CPI.* | | | |

7. Janet Newmark, 08/25/2021

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 4:19-20 | Introduction of counsel | | | |
| 5:7-15 | Witness background | | | |
| 7:13-9:4 (omitting objections) | Interaction with Vivint was on June 27, 2020 and began outside her home. | | | |
| 9:5-24 (omitting objections) | She interacted with the Vivint rep because he promised her 3 months of free service. | **FM** | | |
| 11:16-12:5 | Further discussions with Vivint rep. | | | |
| 12:6-13:2 (omitting objections) | Vivint rep said that CPI used Vivint's motherboard which Vivint developed. | **FM** | | |
| 13:3-20 (omitting objections) | Vivint rep said that CPI equipment would work with Vivint system, which proved to be false. | **FM** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 14:4-15:11 (omitting objections) | Vivint rep failed to disclose that she would be charged $1799 and it took many phone calls afterward to understand what that was for. | **FM, R** | | |
| 15:12-19 (omitting objections) | They did not get a copy of the Vivint contract on the day they interacted with the Vivint rep. | **FM, R** | | |
| 15:20-17:7 | There were charges for the Vivint services that were not explained and took many phone calls to inquire about. | **FM, R, NAR, NR** | | |
| 17:8-17 (omitting objections) | Vivint did not actually provide her the incentives that were promised by the rep to induce her to switch to Vivint, and it required her to make multiple phone calls to Vivint. | **FM, R, NAR, NR** | | |
| 17:17-18:11 (omitting objections) | She estimates she made between 10 and 20 phone calls to Vivint to try to resolve the issues with the false promises made by the sales rep. | **FM, R, NAR, NR** | | |

Case 3:20-cv-00504-FDW-DSC   Document 81-3   Filed 12/10/21   Page 43 of 307

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 18:12-19:4 | Estimates she spent several hours on the phone trying to resolve . | **FM, R, NAR, NR** | | |
| 19:5-22 (omitting objections) | Despite her numerous phone calls, Vivint did not return the money that was promised. Many times Vivint would not return her calls as promised. | **FM, R, NAR, NR** | | |
| 19:23-20:5 (omitting objections) | Vivint sales rep never disclosed the starter kit charge that she later found out costs $1799. | **FM, R, NAR, NR** | | |
| 20:6-21:5 (omitting objections) | It took numerous phone calls just to get a copy of her Vivint contract. | **FM, R, NAR, NR** | | |
| 21:6-22:2 (omitting objections) | Vivint sales rep did not return her calls and never actually provided her the incentive that was promised to induce her to go with Vivint. | **FM, R, NAR, NR** | | |
| 22:3-24:15 (omitting objections) | Vivint never provided what was promised even after all of her phone calls to customer service. Instead, they gave her four credits of $40. | **FM, R, NAR, NR** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 24:16-25:16 (omitting objections) | She felt like she kept getting a "runaround" in all of her interactions with Vivint's customer service. | **FM, R, NAR, NR** | | |
| 25:17-26:19 (omitting objections) | Does not believe Vivint was honest n her interactions with them. Never would have switched to Vivint had they been forthright about the charges . | **FM, R, NAR, NR** | | |
| 28:3-13 | CPI released her from her contract without charge. | **FM, R, NAR, NR** | | |
| 28:20-25 | Introduction of cross examining counsel. | | **29:20-30:16 Rep never said he was with CPI – never said CPI and Vivint were the same**<br><br>**31:3-22 (Objection omitted) Nothing rep said or wore suggested he was with CPI. She does not have any reason to not believe that Vivint did** | (Objection at 30:4-6 should be omitted)<br><br>In response to Vivint's designation of 31:3-22, CPI designates 30:17-31:2. F.R.E. 106 |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | | | **manufacture the CPI panel** | |
| | | | **36:-40:8 (Objections omitted) They have the Vivint app and like it. The Vivint equipment is superior. They had many issues with CPI equipment. They are very happy with Vivint.** | In response to Vivint's designation of 36:[4]-40:8, CPI designates 33:11-23. |
| 40:9-41:22 | Her primary complaint with Vivint is that she did not get what was promised, was charged for things not disclosed to her, and her interactions with Vivint customer service were not successful in resolving her issues | **FM, R, NAR, NR** | **42:21-43:14 She remembers a call with CPI trying to charge her something they should not and eventually CPI did not charge her and released her from the contract.** | |
| 41:23-42:20 (omitting objections) | CPI's CEO Ken Gill's comments did not play any role in her decision | | | *[CPI notes that this is a conditional designation* |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | to cancel her CPI system. | | | *only in the case that the Court permits reference to the BLM controversy and Gill comments. If CPI's MIL on these issues is granted, CPI withdraws this designation.]* |
| 45:3-15 | Prior to the deposition, no one at Vivint offered to resolve her issues, as Vivint's counsel offered to do off the record. | **FM, R, NAR, NR** | | |
| 45:16-46:14 (omitting objections) | Witness agrees there's nothing wrong with competition but states that Vivint was not honest in her interactions with her. | **FM, R, NAR, NR** | | |

## II. *ADT v. Vivint* – Case No. 20-cv-23391-Cooke/Goodman (S.D. Fla.)

1. Ko-Chin Chang, 07/22/2021

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 5:5-10 | Introduction of counsel | | | |
| 5:19-6:3 | Introduction of witness | | | |
| 7:3-9 | Educational background: witness has B.S. in engineering from Rutgers | | | |
| 7:15-9:4 | Witness has Ring doorbell system that video records and stores footage. He is able to access and pull the video footage, and has done so before. | | | |
| 9:5-10:13 (omitting objections) | Witness authenticates the Ring video footage being displayed on the Zoom screen at the deposition. It is from a time in August of 2019 when a couple of Vivint sales people came by the witness's home. | | | |
| 10:14-11:8 | Witness interacted with the Vivint sales representatives depicted on this video over the Ring doorbell system. | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | The Vivint rep said something about being from the police and being there to inspect their security system | | | |
| 11:9-16 (omitting objection) | Ring video footage is played in full over the Zoom for the witness to view and then answer questions about | | | |
| 11:17-12:6 | Witness describes and authenticates first portion of the Ring video clip where Vivint rep indicated something about being from the police and being licensed or having a badge | | | |
| 12:19-13:14 | Witness believed that the rep may have been affiliated with the police based on the rep's statements | | | |
| 13:15-18 | After repeated questioning, the Vivint rep eventually admitted he was not with the police | | | |
| 14:3-14:6 | Witness authenticates that the date of the interaction | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | depicted on the Ring video was displayed on the video clip itself | | | |
| 15:1-16:8 (omitting objections) | Witness was suspicious of statements made by Vivint rep. Vivint rep stated that he was somehow related to ADT | | | |
| 16:9-14 | Witness retrieved the Ring video from his Ring app and then called ADT to report the incident | | | |
| 16:15-20 | Another clip of the Ring video is authenticated | | | |
| 16:21-17:17 | Witness authenticates that the date of the interaction which is included on the Ring video clips was August 2, 2019 at 12:44 Eastern Time | | | |
| 17:21-18:6 | A third clip of the Ring video is played for the witness to view and authenticate | | | |
| 18:7-15 | Witness confirms that the three Ring video clips played at the deposition fairly and | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | accurately depict the audio and video of what transpired on the day the witness interacted with Vivint sales people | | | |
| 18:16-19:9 | The interaction caused the witness to become concerned that the individuals may have been thieves | | | |
| 19:10-18 | Further authenticates video clips are accurate | | | |
| 20:15-21:11 | The rep that the witness interacted with said he was a regional sales manager for Vivint | | | |
| 21:12-22:8 | Witness does not feel like the Vivint sales reps were polite, honest, or forthright in their communications | | | |
| 22:9-12 | Introduction of cross examining counsel | | | |
| 22:13-24:20 | Although the witness did not cancel immediately his ADT services as a result of this interaction with Vivint, the interaction did make him worry | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | about the reliability of his system and question whether he was safe with ADT | | | |
| 35:2-8 | Although the Vivint rep was not wearing an ADT blue octagonal logo, the Vivint rep did state that they were sent from ADT | | | |
| 48:16-49:13 | Witness is asked about judging a company based on the actions of one employee. Witness says that the Vivint rep he interacted with was a regional sales manager, so "yes" he does believe the company can be judged badly based on that individual's behavior | | | |
| 53:6-12 | Vivint representatives said they had been authorized to check the witness's alarm system | | | |
| 53:13-21 (omitting objections) | Vivint reps should be honest and ethical when | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | dealing with customers, but they were not in this witness's experience | | | |
| 54:1-6 | If not for the Vivint representative's misstatements, the witness would not have engaged in second guessing his services with ADT | | | |
| 54:7-18 (omitting objections) | The fact that the Vivint representative the witness dealt with was a sales manager is concerning, in particular because the manager also seemed to be training the other Vivint rep who was present that day | | | |

2. Juan Rubio, 06/10/2021

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 6:22-25 | Introduction of counsel and party represented | | | |
| 18:16-25 | Interaction with Vivint occurred at his home address | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | around February of 2018 but he cannot recall the exact date | | | |
| 19:1-22 | When witness interacted with the Vivint sales rep, the Vivint rep told him that Vivint and ADT were merging, so the witness went forward with the transaction | | | |
| 20:1-5 | When the witness let the Vivint rep into his home, the witness believed what the rep said about Vivint merging with ADT | | | |
| 20:14 (staring with "Can you please explain")-21:23 (omitting objections) | Vivint rep looked at witness's ADT equipment and said that they could "upgrade" it | | | |
| 21:24-22:2 | Vivint rep had customer sign documents as part of transaction | | | |
| 22:23-23:2 | When the witness signed the paperwork as part of the transaction, he still believed that Vivint and ADT were merging | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | based on the rep's statements | | | |
| 23:5-20 (omitting objections) | Had the Vivint rep been truthful the witness would not have changed the system to Vivint | | | |
| 30:16-31:18 | When his wife got home, they called ADT and were informed that Vivint and ADT were not in fact merging together | | | |
| 37:14-17 | Introduction of cross examining counsel | | | |
| 40:10-42:12 (omitting objections) | Witness does not recall telling Vivint on the day of the sales transaction that he understood that ADT and Vivint were different companies. But he does remember feeling like he was "duped" "lied to" and "betrayed" based on the statement that Vivint and ADT were merging. The interaction was insulting to him. | | | |
| 98:8-99:18 | When customer had phone call with Vivint it was still his | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | understanding that Vivint was merging with ADT and that he would not be required to pay for the new equipment being offered | | | |

3. Caren Haught, 04/12/2021

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 10:6-13 | Intro of questioning counsel | | | |
| 20:10-19 | Date of Vivint interaction | | | |
| 20:20-21:5 | Location of Vivint interaction | | | |
| 24:10-22 | Beginning of interaction with Vivint representatives | | | |
| 24:23-25:7 | Vivint representatives said that they were taking over ADT | | | |
| 25:11-26:1 (omitting objections) | Vivint representatives said ADT was going out of business and Vivint was taking ADT over | | | |
| 27:20-28:18 (omitting objections) | When the customer let the Vivint rep into her home, it was her understanding that | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | Vivint was taking over ADT | | | |
| 30:1-9; 30:16-21: 30:24-25 | When Vivint was installing the equipment in her home, it was still her belief that Vivint was simply taking over ADT because that's what the representatives told her | | | |
| 31:1-32:6 | Vivint presented her with electronic documents to sign | | | |
| 32:9-19 | Vivint didn't give her much opportunity to review the documents when signing. When she signed, she still thought Vivint was taking over ADT | | | |
| 32:20-25;33:23-34:1 | Had Vivint presented the transaction truthfully as a legitimate competitive sale by a competitor, the witness would not have changed the alarm system because she was satisfied with her existing services | | | |
| 34:2-13 (omitting objections) | The witness does not recall getting on the phone to speak | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | with a customer service representative as a part of the Vivint transaction | | | |
| 37:8-20 | Following the transaction with Vivint she got billed by both ADT and Vivint and called Vivint because she was surprised that she was getting double billed because she thought Vivint took over ADT | | | |
| 39:8-25 (omitting objections) | When she called Vivint about getting double billed, the Vivint representatives said that the issue would fix itself and she was not able to resolve her complaint at that time | | | |
| 41:4-21 (omitting objections) | When she told Vivint about what the sales reps had told her, Vivint did not offer to cancel her contract and did not otherwise respond | | | |
| 42:8-43:11 | Vivint made her pay $790 to get out of the contract notwithstanding the | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | statements made by the representatives to falsely induce her into the contract | | | |
| 44:18-45:13 | Following this incident, she had to have her boyfriend remove the Vivint equipment because Vivint was going to charge her about $700 or so to remove it | | | |
| 49:11-14 | Witness believes the representations made by Vivint were misleading | | | |
| 49:20-50:7 | Same | | | |
| 50:15-51:4 | Introduction of cross examining counsel and counsel's confirmation that he believed the witness was confused | | | |
| 55:23-56:16 | The first thing the witness recalls the Vivint reps stating when visiting her was that Vivint was affiliated with ADT and was taking over ADT contracts | | | |
| 78:12-24 | The witness did not have a "misunderstanding." She simply believed what the Vivint representatives told her | | | |

Case 3:20-cv-00504-FDW-DSC   Document 81-3   Filed 12/10/21   Page 59 of 307

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 78:25-79:3 | At no point prior to the sworn deposition did Vivint offer to refund the money they required her to pay to get out of the Vivint contract | | | |

4. Victor Howdyshall, 05/25/2021

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 8:19-9:6 | Introduction of questioning counsel | | | |
| 20:10-15 | Witness understands he has been asked to testify regarding his interactions with Vivint sales representatives | | | |
| 21:14-22:3 (omitting objections) | Location of interaction with Vivint | | | |
| 22:4-23:5 | At the beginning of the interaction with Vivint, the rep stated that Vivint had bought out ADT and that if the witness did not work with the rep he would lose his security at his home | | | |
| 23:6-14 | The witness believed the rep's | | | |

| | | | | |
|---|---|---|---|---|
| | statements that Vivint was buying out ADT | | | |
| 23:21-24:9 | Witness was under the understanding that if he did not work with the rep he would lose his security at his home | | | |
| 24:21-25:15 | Additional conversation with the Vivint rep inside of the home | | | |
| 27:22-28:13 | Date of interaction was June 28, 2019 | | | |
| 28:14-25 | Name of Vivint sales rep was Dillon Brough | | | |
| 29:9-16 (omitting objections) | When witness signed the Vivint paperwork, it was still his understanding that Vivint was simply buying out ADT and that his service would just continue with Vivint | | | |
| 30:24-31:5 (omitting objections) | The installer arrived within 15 to 20 minutes of the interaction with the sales rep | | | |
| 31:18-32:5 (omitting objections) | The witness was confused and felt pressured to get the issue resolved so that he did not lose security for his home | | | |
| 40:22-25 | Introduction of cross examining counsel | | | |

| | | | | |
|---|---|---|---|---|
| 63:3-64:4 | Witness confirms details of initiation conversation with Vivint sales rep where the rep stated that Vivint had bought out ADT and had just dealt with some other local customers regarding the same issue | | | |
| 80:9-81:1 | When the rep stated that Vivint had bought out ADT, the witness understood it to mean that one company was buying out the other company, not that Vivint was buying out specific customers in the area | | | |
| 88:23-89:22 (omitting objections) | The fact that the sales rep knew a lot of details about the customer's alarm system before even being let into the home buttressed the witness's belief in the truth of the statements made by the Vivint rep | | | |

### III.  *ADT LLC and ADT U.S. Holding, Inc. v. Vivint, Inc.* - **Case No. 9:17-cv-80432-DMM (S.D. Fla.)**[1]

1. Brian Delaney, September 18, 2017

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| 8:25-9:24 | | | | | |
| 11:16-13:6 | | | | | |
| 13:15-13:21 | | | | | |
| 14:3-14:21 | | | | | |
| 15:4-18:17 | | | R, FM (hypothetical), S 18:13-17 | **18:13-17** **Relevant** to show witness was misled by Vivint's false claim to be a contractor of a competitor. (Proof of actual confusion, while not required, is the best evidence to satisfy the "likelihood of confusion" element in 15 U.S.C. § 1125(a)(1).(A)). *See E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, | Overruled |

---

[1] For these witnesses, CPI designates the deposition testimony using the same tables submitted to the Hon. Judge Middlebrooks prior to trial in Case No. 9:17-cv-80432-DMM (S.D. Fla.), including Judge Middlebrooks' rulings on the parties' objections to such testimony. In the interest of judicial economy, it is CPI's position that the parties should abide by the evidentiary ruling already made by Judge Middlebrooks.

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | 1529 (11th Cir. 1985)<br><br>**Not speculation or improper hypothetical** for the witness to testify that he would have acted differently had she known the true facts and not been misled. *See U.S. v. Ranney*, 719 F.2d 1183, 1189 (1st Cir. 1983); *U.S. v. Hill*, 643 F.3d 807, 840–42 (11th Cir. 2011); *U.S. v. Musselwhite*, 2017 WL 4217398, at *10 (11th Cir. Sept. 22, 2017). | |
| 19:2-19:25 | | | R, FM (hypothetical), S 19:2-9 | **19:2-9 Relevant** to show witness was misled by Vivint employee's false claim that he was a contractor for a competitor. Proof of actual confusion, while not required, is | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | the best evidence to satisfy the "likelihood of confusion" element in 15 U.S.C. § 1125(a)(1).(A)). *See E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1529 (11th Cir. 1985) **19:2-9 Not speculation or improper hypothetical** for the witness to testify that he would have acted differently had he known the true facts and not been misled. *See U.S. v. Ranney*, 719 F.2d 1183, 1189 (1st Cir. 1983); *U.S. v. Hill*, 643 F.3d 807, 840– 42 (11th Cir. 2011); *U.S. v. Musselwhite*, 2017 WL | |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | 4217398, at *10 (11th Cir. Sept. 22, 2017.) | |
| 20:7-25:24 | | | R, FM (hypothetical, leading), S 24:11-23 | **Relevant** to show witness was misled by Vivint employee's false claim that he was a contractor for a competitor. Proof of actual confusion, while not required, is the best evidence to satisfy the "likelihood of confusion" element in 15 U.S.C. § 1125(a)(1).(A). *See E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1529 (11th Cir. 1985) <br><br> **19:2-9 Not speculation or improper hypothetical** for the witness to testify that he would have | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | acted differently had he known the true facts and not been misled. *See U.S. v. Ranney*, 719 F.3d 1183, 1189 (1st Cir. 1983); *U.S. v. Hill*, 643 F.3d 807, 840–42 (11th Cir. 2011); *U.S. v. Musselwhite*, 2017 WL 4217398, at *10 (11th Cir. Sept. 22, 2017. **Not leading.** | |
| 26:24-27:9 | | | | | |
| 28:9 (Beginning with "So,") – 28:11 | | | | | |
| 29:17-34:19 | | | | | |
| 37:1-37:6 | | | FM (leading) 37:1-6 FM (compound, vague) **37:9-16** | **37:1-6 Not leading.** Confirming prior testimony. **37:9-16 Not compound or vague.** | Overruled |
| 37:9-39:22 | | | | | |
| 41:21-42:1 | | | | | |
| 46:1-49:21 | | | FM (compound, leading, vague) 46:23-47:3 | **Not compound, not leading, not vague** | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| 64:20-65:5 | Pg: 60 Ln: 9-14 | | | | |
| 65:19-66:8 | | | | | |

2. Dorothy Weston, August 10, 2017

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| 6:18-6:25 | | | | | |
| 9:16-19:8 | Pg: 19 Ln: 18-Pg: 20 Ln: 6 | | FM (leading) 13:22-25 H 14:22-15:7 F 15:23-16:7 FM (leading) 18:22-19:8 | **13:22-25** **Not leading**. Witness previously testified that a young man came to her house. 13:18-19. The question refers to that testimony for context for the next question. **14:22-15:7** **Not hearsay.** Statements by Vivint agent are statements by a party-opponent. Fed. R. Evid. 801(d)(2). **15:23-16:7** **Not speculation or** | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | **improper hypothetical** for witness to testify she would have acted differently had she known the true facts and not been misled. Hypothetical questions posed to lay witnesses about what they would have done had they known certain representations were false are proper under Fed. R. Evid. 602 (personal knowledge requirement) (see *U.S. v. Ranney*, 719 F.2d 1183, 1189 (1st Cir. 1983)) and, alternatively, Fed. R. Evid. 701 (lay opinion). *See U.S. v. Hill*, 643 F.3d 807, 840–42 (11th Cir. 2011); *U.S. v. Musselwhite*, 2017 WL | |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | 4217398, at *10 (11th Cir. Sept. 22, 2017).<br><br>**18:22-19:8 Not leading.** | |
| 20:7-20:13 | | | | | |
| 20:16-21:16 | | | H | **Not hearsay. 20:16-20:19**. Statement by agent within scope of the relationship ("and then he lied to us about – about the way he performed to sell us the system") is statement of a party-opponent. Fed. R. Evid. 801(d)(2). Statement by witness ("told them that we didn't want the service no more") not offered for the truth of the matter but to show that the witness realized she had been deceived. | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | **20:20-21:16**. No out of court statement | |
| 22:2-22:25 | | | H | **Not hearsay.** Statement of a party-opponent ("He lied and said that he did not tell us that-that they was going to merge with ADT.") Fed. R. Evid. 801(d)(2). | Overruled |
| 23:18-24:24 | Pg: 24 Ln: 25-Pg: 25 Ln: 2 | | | | |
| 26:2-26:7 | | | | | |
| 26:16-27:6 | | | | | |
| 27:25-29:14 | | | | | |
| 31:18-31:23 | | | | | |
| 33:20-34:18 | | | | | |
| 39:11-40:1 | Pg: 39 Ln: 4-10 Pg: 40 Ln: 2-3 Pg: 40 Ln: 4-7 Pg: 40 Ln: 8-14 Pg: 41 Ln: 4-10 Pg: 41 Ln: 16-21 Pg: 47 Ln: 9-18 Pg: 47 Ln: 19-20 Pg: 48 Ln: 20-Pg: 49 Ln: 8 Pg: 49 Ln: 12-18 Pg: 50 Ln: 1-Pg: 51 Ln: 6 | **Incomplete Testimony.** Confusing unless 46:25-47:8 also designated. | | | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | Pg: 51 Ln: 13- Pg: 52 Ln: 1 | | | | |
| 53:6-54:11 | Pg: 52 Ln: 13- Pg: 53 Ln: 5 Pg: 54 Ln: 15- Pg: 55 Ln: 15 Pg: 56 Ln: 20- Pg: 57 Ln: 1 Pg: 57 Ln: 2-20 Pg: 58 Ln: 15- Pg: 59 Ln: 20 Pg: 65 Ln: 7-18 | **Conditional objection. 47:19-53:5 54:15-55:15 56:20-57:20 58:15-59:20** ADT contends that all audio recordings are admissible. If the Court grants Vivint's Motion in Limine [DE124] and excludes ADT's customer recordings, however, Vivint's customer recordings and related | H 53:13-20  H 53:25 to 54:4 | **53:13-20 Not hearsay.** No out of court statement.  **53:25-54:4. Not hearsay.** No out of court statement. | Overruled. The statements are not offered for the truth of the matter asserted. |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | testimony should be excluded as well. **65:7-18 Relevance** | | | |
| 66:22-67:13 | | | | | |
| 67:22-69:25 | | | | | |
| 70:2 (beginning with "Can")- 78:24 | | | | | |
| 83:4-84:2 | | | | | |
| 84:23-85:10 | | | | | |
| 86:6-88:13 | Pg: 90 Ln: 24 Pg: 92 Ln: 3-8 Pg: 99 Ln: 11-18 Pg: 102 Ln: 3-11 | | | | |

3. Trish Henry, August 8, 2017

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| 6:8-6:17 | | | | | |
| 8:20-27:13 | Pg: 36 Ln: 7-11 Pg: 37 Ln: 15-18 Pg: 38 Ln: 8 | **Incomplete Testimony.** | | | Sustained. Add 38:9-38:25 |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | Confusing unless 38:9-38:25 also designated. | | | |
| 39:1-39:21 | | | | | |
| 41:2-42:4 | Pg: 43 Ln: 5-18 Pg: 44 Ln: 3-5 Pg: 44 Ln: 13-23 Pg: 45 Ln: 22-Pg: 46 Ln: 9 | **Conditional objection.** ADT contends that all audio recordings are admissible. If the Court grants Vivint's Motion in Limine [DE124] and excludes ADT's customer recordings, however, Vivint's customer recordings and related testimony should be excluded as well. | | | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| 46:24-48:10 | Pg: 46 Ln: 20-23 | | | | Overruled |
| 48:23-50:18 | | | FM (leading) 49:24-50:17 | **49:20-50:7. Not leading.** Witness previously testified at 49:20-49:23 that he had an existing security system. | Sustained, in part. Strike 49:24-50:11 |

4. Diana Reeder, August 7, 2017

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| 5:21-6:8 | | | | | |
| 8:3 (beginning at "First") – 9:17 | | | | | |
| 11:9-15:17 | | | | | |
| 15:22-17:2 | | | | | |
| 17:15-19:23 | Pg: 17 Ln: 3-14 | | IR, F, FM (leading) 19:18-19:23 | **Proper refreshing of recollection.** Witness testified this his recollection was spotty (18:24-19:2) and that his recollection might be refreshed by listening to | Overruled. The content of the call (22:20-23:14; 24:4-26:3) must be stricken. |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | recordings (19:18-19:23) **Adequate foundation.** Witness has personal knowledge of the call he made **Not leading.** Laying foundation to refresh recollection. | |
| 20:3-21:4 | | | | | |
| 21:12-24:8 | Pg: 21 Ln: 5-11 | | | | |
| 24:11-26:12 | | | | | |
| 26:20-28:8 | | | | | |
| 28:11-29:15 | | | FM (leading) 28:24-29:2 | **28:24-29:2 Not leading.** Witness testified at 28:11-22 that she signed a paper stating that she was satisfied with the Vivint installation and later learned that this paper canceled her ADT contract. Asking if she personally sent that paper to ADT is not leading. | Overruled |
| 29:23-32:7 | | | | | |
| 32:18-35:8 | | | FM (leading) 35:7-15 | **Not leading.** | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| 35:11-36:12 | | | | | |
| 37:21-39:9 | | | F, H 39:6-12 | **Adequate foundation.** Witness has personal knowledge of a document he prepared and sent to the Better business Bureau. **Not hearsay.** No out of court statement. | Overruled |
| 39:12-40:3 | | | | | |
| 40:12-40:15 | | | F, H 40:12-18 | **Adequate foundation.** Witness has personal knowledge of a document he prepared and sent to the Better business Bureau. **Not hearsay.** No out of court statement. | Overruled |
| 40:18-42:23 | | | FM (leading) 42:21-23 | **Not leading.** Witness previously testified (42:10-42:15) that he would not have dealt with Vivint at all had he known that the Vivint representative | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | was not with ADT.  Next question just repeats that testimony. | |
| 43:1-46:13 | Pg: 52 Ln: 3-9 Pg: 57 Ln: 1-24 Pg: 58 Ln: 14-19 Pg: 59 Ln: 4-8 Pg: 59 Ln: 17-19 Pg: 59 Ln: 23- Pg: 60 Ln: 4 Pg: 60 Ln: 5- Pg: 61 Ln: 1 Pg: 61 Ln: 17- Pg: 62 Ln: 16 Pg: 63 Ln: 25- Pg: 64 Ln: 3 | **Incomplete Testimony.** Confusing unless 62:17-63:24 also designated. | | | Overruled |

5.  Lucille Billingsley-Brown, August 28, 2017

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| 6:12-7:11 | | | | | |
| 9:6-9:23 | | | | | |
| 10:8-10:23 | | | | | |
| 11:1-11:10 | | | | | |
| 11:16-12:22 | | | | | |
| 15:7-16:2 | | | FM (leading) | **Not leading. Did not preserve objection to form.** | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| 16:21-18:4 | | | FM (leading), F | **Not leading. Did not preserve objections to form. Adequate foundation: based on the witness's personal knowledge.** | Overruled |
| 20:13-21:8 | | | | | |
| 21:13-22:11 | | | FM (leading) | **Not leading. Did not preserve objection to form.** | Overruled |
| 22:12-24:25 | | | FM (leading) | **Not leading. Did not preserve objections to form.** | Overruled |
| 25:7-29:23 | | | H, IA | **25:7-27:4 Not hearsay**. Statement by Vivint, a party-opponent. Fed. R. Evid. 801(d)(2). <br><br>**27:5-25:16 Not hearsay.** Not offered for the truth of the matter asserted. Offered to show damage to ADT's reputation ("So | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | that's when I got real furious." 27:15-27:16).<br><br>**27:17-29:33 Not hearsay.** No out of court statement **"Inadmissible"** is not a recognized objection under the Fed. R. Evid. | |
| 31:4-32:14 | | | F | **Adequate foundation.** Witness has personal knowledge whether she recognizes her voice on a recording. | Overruled |
| 32:18-33:9 | | | H (motion to strike) | **Not hearsay.** Not offered for the truth of the matter (i.e., "that ADT was switching over to them . . ." - a false statement). In addition, customer recordings are not hearsay under Fed. R. Evid. 801(d) (statement by agent of party-opponent within | Sustained. The parties must strike 32:18-33:9 |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | scope of the relationship), and qualify for exceptions under Fed. R. Evid. 803(3) (then-existing state of mind); Fed. R. Evid. 803(6) (business record); and Fed. R. Evid. 807 (circumstantial guaranties of trustworthiness). In addition, Vivint is judicially estopped from objecting to the admissibility of these recordings. *See* ADT's Response to Vivint's Motion in Limine to Exclude Customer Recordings from Evidence at Trial [DE 131]. | |
| 33:14-36:25 | | | H (motion to strike) | **33:14-24 Not hearsay.** Statement by a party-opponent. Fed. R. Evid. 801(d)(2). | Overruled as to 33:14-24.<br><br>Sustained as to 33:25-34:25 |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | **33:25-34:25** **Not hearsay**. Customer recordings qualify for exceptions under Fed. R. Evid. 803(3) (then-existing state of mind); Fed. R. Evid. 803(6) (business record); and Fed. R. Evid. 807 (circumstantial guaranties of trustworthiness). In addition, Vivint is judicially estopped from objecting to the admissibility of these recordings. *See* ADT's Response to Vivint's Motion in Limine to Exclude Customer Recordings from Evidence at Trial [DE 131]. **35:1-35:11** | Overruled as to 35:1-35:11 Overruled as to 35:12-35:18 Sustained as to 35:19-36:25 |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | **Not hearsay.** No out of court statement. <br><br> **35:12-35:18** <br> **Not hearsay.** Not offered for the truth of the matter. Offered to establish when and how she realized she had been deceived by Vivint. <br><br> **35:19-36:25** Customer recordings qualify for exceptions under Fed. R. Evid. 803(3) (then-existing state of mind); Fed. R. Evid. 803(6) (business record); and Fed. R. Evid. 807 (circumstantial guaranties of trustworthiness). In addition, Vivint is judicially estopped from objecting to the admissibility of these | |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | recordings. *See* ADT's Response to Vivint's Motion in Limine to Exclude Customer Recordings from Evidence at Trial [DE 131]. | |
| 37:11-37:14 | | | FM (asked and answered), F | **Not asked and answered. Adequate foundation.** Witness has personal knowledge of whether she accurately relayed what the Vivint representative told her. | Overruled |
| 38:13-42:16 | | | H, IA | **38:13-38:20 Not hearsay.** Statement by ADT operator that she would transfer the witness's call to Vivint is not offered for the truth of the matter. Operative fact. **38:21-41:6 Not hearsay.** Statements by | Overruled as to 38:13-38:20 Overruled as to 38:21-41:6 Sustained as to 41:7-41:17 Overruled as to 41:16-41:21 |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | Vivint are statements by a party-opponent. Fed. R. Evid. 801(d)(2).<br><br>**41:7-41:17 Not hearsay.** No out of court statement.<br><br>**41:16-41:21 Not hearsay.** Statements by Vivint are statements by a party-opponent. Fed. R. Evid. 801(d)(2).<br><br>**41:22-42:16 Not hearsay.** No out of court statement. **"Inadmissible"** is not a recognized objection under the Fed. R. Evid. | Overruled as to 41:22-42:16 |
| 42:17-46:13 | Pg: 48 Ln: 3-10 Pg: 55 Ln: 21-Pg: 56 Ln: 3 Pg: 70 Ln: 7-16 Pg: 74 Ln: 16-Pg: 75 Ln: 12 Pg: 80 Ln: 23-25 Pg: 82 Ln: 13-23 | **80:23-92:6 Conditional objection.** ADT contends that all audio recordings are | H, IA, F, FM (asked and answered) | **42:17-45:1 Not hearsay.** Statements by Vivint operator are statements by a party-opponent. Fed. R. Evid. 801(d)(2). | Vivint's Objection as to 42:17-45:1: Sustained<br><br>Remained of Vivint's objections: Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | Pg: 84 Ln: 21-Pg: 85 Ln: 21 Pg: 87 Ln: 15-Pg: 89 Ln: 4 Pg: 89 Ln: 16-24 | admissible. If the Court grants Vivint's Motion in Limine [DE124] and excludes ADT's customer recordings, however, Vivint's customer recordings and related testimony should be excluded as well. | | In addition, qualifies for exceptions under Fed. R. Evid. 803(3) (then-existing state of mind); Fed. R. Evid. 803(6) (business record); and Fed. R. Evid. 807 (circumstantial guaranties of trustworthiness). In addition, Vivint is judicially estopped from objecting to the admissibility of these recordings. *See* ADT's Response to Vivint's Motion in Limine to Exclude Customer Recordings from Evidence at Trial [DE 131]. **45:2-46:13 Not hearsay.** No out of court statement. **"Inadmissible"** is not a | ADT's Objection: Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | recognized objection under the Fed. R. Evid. **Adequate foundation.** Witness has personal knowledge of her interactions with ADT and Vivint. **Not previously asked and answered.** | |
| | Pg: 90 Ln: 5-19 Pg: 90 Ln: 23- Pg: 91 Ln: 5 Pg: 91 Ln: 13- Pg: 92 Ln: 6 Pg: 92 Ln: 13- Pg: 93 Ln: 6 Pg: 93 Ln: 17- Pg: 95 Ln: 17 Pg: 95 Ln: 18- Pg: 97 Ln: 9 Pg: 101 Ln: 2- Pg: 104 Ln: 17 Pg: 105 Ln: 2-5 Pg: 109 Ln: 15- Pg: 110 Ln: 12 Pg: 111 Ln: 16- Pg: 112 Ln: 18 | **110:2-110:6. Leading 110:8-110:13. Leading; Foundation** **Incomplete Testimony.** Confusing unless the following testimony also is designated: 97:10-97:16 98:16-99:4 | | | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | 117:25-118:7. | | | |

# FORMER AND CURRENT VIVINT EMPLOYEES

1. Nathan Wilcox, 06/24/2021

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 5:13-6:10 | Worked at Vivint from 2007 to 2018 as General Counsel and Chief Compliance Officer | | | |
| 6:16-6:22 | Has testified on behalf of Vivint a number of times before | R | | |
| 8:2-8:12 | Does not recall a person named Jason Corbridge | R | | |
| 9:2-9:24 | He knew sales manager Jordan Binning from his time at Vivint. Believes Binning was at least initially terminated in 2017 | R | | |
| 13:22-14:13 | Vivint would investigate allegations of a breach of the sales code of ethics and would make recommendations on disciplinary action | F, R | | |
| 20:2-20:4 | Was not involved in the decision to rehire Jordan Binning | R, IC, P | | |
| 20:10-20:11 | Same | R, IC, P, F | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 20:23-21:17 | Same. Brandon Ogletree was not terminated when he was at Vivint. Nor was Jason Newby | **R, IC, P, F** | **20:19-20:23 Was not consulted about the rehiring of Binning** | |
| 22:2-22:14 | Does not recall how many reports of deceptive sales practices were received with respect to Mr. Ogletree while he was at Vivint, but there were reports during the 2018 to 2019 timeframe | **R** | | |
| 23:15-24:1 | Does not recall having a meeting to discuss certain sales managers using the same social security number to open multiple accounts | **FM, IC, R, F** | | |
| 24:3-24:3 | Same | **FM, IC, R, F** | | |
| 24:5-24:6 | Same | **FM, IC, R, F** | | |
| 24:19-25:3 | Does not remember being present where a PowerPoint presentation was presented to Vivint corporate officer Todd Santiago and him about abnormalities with multiple accounts being created with | **FM, R, F** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | the same social security number | | | |
| 26:21-27:25 | Witness is aware of certain sales representatives who were terminated for deceptive sales practices being transferred to work at Vivint Solar and then later returning to work at Vivint Smart Home again. | **FM, R, F** | | |
| 28:15-28:22 | Jordan Binning was one of the sales people who was terminated for deceptive sales practices, transferred to Vivint Solar, and then re-hired by Vivint Smart Home | **R, F, FM** | **28:1-28:9 Does not know why terminated employees were terminated** | |
| 34:2-39:15 | Witness details actions taken by Vivint following the settlement of the ADT v Vivint lawsuit in December 2017. Made changes to the preinstall survey, to training, and to the compliance process | **IA, R, FM, F** | | |
| 39:17-40:9 | Complaints that came in at Vivint | **FM, IC, F, R** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | would be investigated | | | |
| 40:16-42:15 | Witness cannot recall the policy for documenting complaints and investigations into deceptive sales practices of which Vivint was made aware. Cannot recall if there was a central database or repository of the complaints received. | **FM, IC, F, R** | | |
| 42:17-42:25 | Believes it would be important to maintain information regarding complaints and the results of investigations. | **FM, IC, R** | | |
| 43:3-43:20 | Employees in the compliance department had the discretion to document the results of their investigations into deceptive sales practices | **FM, IC, R** | | |
| 43:22-49:23 | There may not be any record of the findings from the compliance department's investigations into | **FM, IC, IA, R, P, F** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | deceptive sales complaints.<br><br>During his time at Vivint, Vivint did track complaints about deceptive sales practices by Sales representative. He does not remember what the document was called that tracked that information.<br><br>Witness does not recall the testimony in the ADT v Vivint case regarding sales rep CJ Adamson having had 47 prior complaints about affiliation misrepresentations.<br><br>Witness does not have an opinion on whether Mr. Ogletree, Mr. Adamson or Mr. Binning should have been terminated after the ADT v Vivint trial. Follows advice of counsel not to answer whether he made a | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | recommendation that they be terminated. | | | |
| 50:18-52:19 | Based on his role in overseeing Vivint's compliance department, he does believe that in 2018 there were complaints about deceptive sales practices by Vivint sales representatives that were true based on the investigation. Cannot say what percentage of the complaints were verified to be true.<br><br>Witness has confirmed customer complaints of Vivint sales persons misrepresenting that Vivint was purchasing the customer's existing alarm company. | **FM, F, R** | | |
| 54:10-55:21 | Witness claims that a representation about an "upgrade" depends on the context, but a Vivint rep suggesting that he | **FM, F, R** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | or she is there on behalf of the customer's existing alarm company would be misleading. He has investigated complaints of that nature and has confirmed that a misleading representation was made of that nature. | | | |
| 57:11-58:19 | At the time he left Vivint in 2019, there was a document that tracked the number of deceptive sales practices that a given sales person has committed. He cannot recall the name of that document. He cannot recall the number of complaints about Mr. Binning, Ogletree, or Adamson on that document. | **FM, F, R** | | |
| 58:22-61:10 | Does not recall whether Mr. Binning was on the tracking list of complaints about sales misrepresentations. | **FM, F, R** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | Does recall that there were DSP complaints against Mr. Ogletree, but cannot recall with respect to Mr. Adamson or Binning. Does not recall if Mr. Ogletree was fined in 2018 for any DSPs.<br><br>Does believe that there were confirmed complaints about sales misrepresentations by Vivint sales reps in 2018, but cannot say how many. Believes it would be below 10,000 but cannot say with any certainty beyond that | | | |
| 65:16-70:9 | Does believe there are complaints that do not get forwarded to the compliance department but cannot say how many. Does not believe Vivint has ever conducted an audit of this nature | **FM, F, R, H** | | |
| 71:12-72:7 | Vivint compliance and customer | **FM, R** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | service reps were trained to take notes about everything the customer says. Vivint's practice, at least by 2018, was to record customer phone calls and to retain them. | | | |
| 73:23-74:19 | Does not know why Mr. Binning, Mr. Ogletree and Mr. Cohen were allowed to stay at Vivint for so long. Does not know that they were terminated | **IC, R, FM, H** | **73:17-73:22 Was never at a meeting where Santiago suggested highly production sales managers/reps should not be fired for DSP – the opposite is true** | |
| 75:8-76:12 | He had no involvement in the decision to rehire Mr. Binning and does not have an opinion on whether Mr. Binning should have been rehired (after being fired for DSPs and spending time at Vivint Solar). He does not know how productive Mr. Binning was in | **IC, FM, F, R** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | terms of revenue or sales | | | |

2. Jason Corbridge, 06/23/2021

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 5:4-5:6 | Introduction of witness. | | | |
| 5:20-6:17 | Started at Vivint in 2005 as a sales rep; worked in corporate from 2011-2018. He was a sales rep, sales manager, SWAT Team member. Moved to Las Vegas, became a Regional Account Manager, and then managed the Account Creation Department. | **R** | | |
| 13:16-15:6 | Moved to Account Creation Department the end of 2015. Managed 10-13 supervisors and 150-200 phone agents. He was responsible for process management. In his role, he uncovered deceptive sales practices, where agents would catch sales reps | **R, H, F, FM, NAR** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | calling in pretending to be a customer. Sales reps unsupervised in the field, so they had conversations with customers to verify what was happening. | | | |
| 15:16-15:25 | Caught Jordan Binning impersonating a customer. He was a big name, a big producer region. | **R, FM, F, H** | | |
| 16:2-16:23 | He did not know when Binning was caught impersonating a customer. Binning was a regional sales manager and ran a group of sales teams. He was a big producer. At the time he was impersonating customers, there were hundreds or more people under his sales umbrella. | **R, F, FM** | | |
| 17:13-18:10 | Regional Sales managers, like Binning, receive compensation for work of sales force. Sales managers get residual and are | **R, F, FM, IR** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | compensated on direct sales to customers. | | | |
| 18:24-21:7 | To grow sales groups, sales reps would recruit in the off season. A flashy game with budgets to show how much money one could make. Budgets are allotted to regional and sales managers, with wining and dining, trips, games.<br><br>When Binning was caught impersonating customers, it was sent to Compliance, which was managed by Harry Risaulo. Nothing happened after reporting Binning to Compliance. Corbridge was not aware of whether Binning was fined. No one from Compliance reached out to him related to his report of Binning. | **R, F, FM, H** | | |
| 21:12-22:7 | Binning was not fired for impersonating a customer. | **R, F, FM, H, NR** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | As Account Creation manager, he could make recommendations to Compliance on what actions to take, but out of his hands.<br><br>Vivint had a blacklist of sales reps, who all tended to be grouped together, trained under the same umbrella. If there was a bad apple at the top, it trickled down. | | | |
| 22:11-22:22 | Account creation had a blacklist of reps. Corbridge remembered two names from the list: Josh Coen and Brandon Ogletree. | **R, F, FM** | | |
| 22:24-24:3 | With respect to Coen and Ogletree on the blacklist, there was a question with credits they ran.<br><br>In Vivint's sales force programs, Corbridge could see all of Coen's credit runs and how often | **R, F, FM, NAR, NR** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | he would manipulate data. Each time Coen ran a credit, it had a unique field, line, in sales force. You could see him making changes in spelling to gain additional attempts to run credit. Corbridge did personal audits after seeing these holes and how they were exploited. He made presentations on findings to executive teams to shine light on the holes. | | | |
| 24:7-29:23 | No one in Compliance took steps to curtail customer impersonations. Compliance not neutral; reported through Cody Veibel, who was over compliance for the sales force. To curtail customer impersonations, Vivint looked at doing video surveys instead of audio. | **R, F, FM, NR, NAR, IC, H, IA** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | Corbridge not aware of any sales reps that were disciplined for impersonating customers.<br><br>Corbridge discussed personal audit with his boss. He found major holes in Street Genie, meant to provide guardrails, that allowed reps to manipulate customer information.<br><br>Reps would "white page" if a customer wanted a system, but failed credit. The reps would pull up white pages and get public information for other individuals with the same name and run credit. Reps also manipulated addresses in the system to get around rule limiting credit runs.<br><br>All this information was found in Sales Force. Corbridge | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | reported to management. He and his boss set up a meeting with 6-7 executives in fall 2017, including Todd Santiago, Nate Wilcox, and Dallin, and presented detailed Power Point.<br><br>Power Point contained data he found, including example of 9-10 accounts set up by Coen with same social security number.<br><br>Corbridge and people in the meeting considered this fraudulent. Vivint leadership expressed concerned during the meeting and were surprised by Corbridge's findings.<br><br>Coen and Ogletree were not fired. | | | |
| 30:20-32:1 | Vivint did not fire Coen because he was an up and coming high | **R, FM, F, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | potential sales manager.

Sales reps' manipulation of customer data and information was deceptive or fraudulent activity. | | | |
| 32:3-34:3 | Department received complaints of deceptive practices at customers' homes. Customers were confused about who Vivint was.

Vivint had intentional questions to make sure customers understood Vivint was not affiliated with Monitronics, ADT or Northstar.

That question about affiliation with other alarm companies was because of complaints and legal issues. | **R, FM, F, H, NAR, NR** | | |
| 34:5-40:17 | A lot of complaints in the past about customers confused with Vivint's affiliation with customer's prior | **R, F, FM, H, NAR, NR, IA** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | alarm company. Account Creation dealt with those issues on nearly a weekly basis.

Binning, Ogletree, and Coen all led teams who had problems with affiliation confusion. They viewed ethical obstacles as preventing a sale and had a reputation of doing what it took to get a sale.

Corbridge reported affiliation misrepresentation concerns to Compliance via email.

During a 2017 meeting Todd Peterson flew in leadership team about cleaning up the shadiness and fired 50-100 sales reps and managers. After they were fired, the reps were sent them to Vivint Solar, and they call came back after a | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | year. Binning was part of that group.<br><br>SWAT unit was a retention effort by Vivint to curtail shady sales pitches from competitors. Sent in person to regions by Vivint to get customers back. | | | |
| 40:20-40:24 | Risaulo was head of Compliance entire time Corbridge was in Account Creation. | **R, F** | | |
| 42:6-42:9 | Corbridge laid off in June 2018 because of budget. | **R** | | |
| 42:19-43:18 | Binning, Coen, and Ogletree were all successful at Vivint. | **R, FM, F** | | |
| 44:3-44:11 | Corbridge had seen internet articles about sales competition, Exhibit 1. | **R, FM, F, MIL** | | |
| 45:16-46:12 | Vivint had sales competitions. A culture of competition in the group with flashy prizes. Sales competitions to motivate production. They also motivated sales reps to stretch ethical lines. He would see a spike in | **R, FM, F** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | flagged accounts at the end of competitions. | | | |
| 46:14-47:16 | Sales competitions had deadlines and money at stake. The money was progressive and the competitions were tournament style. The Vivint Cup was the biggest team competition. Vivint kept statistics and data on competitions to justify winners and pay out. | **R, F, FM,** | **47:17-47:25 Witness does not know who has access to competition data and himself had only limited access while he was in sales.** | |
| 48:2-48:13 | Mr. Coen, referred to in Exhibit 1, is the same Josh Coen previously discussed. | **R, FM, F, MIL, NR, IA** | | |
| 49:5-49:7 | As of May 2018, Coen was a manager. | **R, F** | | |
| 49:20-50:11 | Coen referenced in 300 Plus Club in Ex. 2; he personally sold over 300 accounts. Article from July 2018 and Corbridge had reported his practices in 2017. | **R, FM, F, MIL** | | |
| 50:13-50:19 | Vivint broadcasted 300 Plus club information to motivate others. | **R, FM, F, MIL** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 53:2-56:16 | Ex. 1 is an article about biggest Memorial Day performers and available to all Vivint employees. Coen identified as a big performer, after Corbridge reported his practices. Ex. 2 is the 2018 200 Plus Club, listed Coen under 300 Plus Club. Ogletree in the 200 Plus Club. Ex. 3 is The Cup, identified Coen and Binning as leading. Ex. 4 is a Training Day Podium; identified Coen as on the board for performance. Ex. 5 is Reindeer Games, which mentioned Coen and Ogletree. Ex. 6 is Zero to 60, which stated Coen A team came in second. It also mentioned Ogletree. | **R, FM, F, MIL** | | |
| 56:21-57:5 | "Everyone Sales" appeared under Corporate on Exhibits 1-6, with message to do like these leaders | **R, F, FM, MIL** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 57:16-57:22 | Exhibits 1-6 do not send message to take deceptive sales practices seriously. | **R, F, FM, MIL** | **57:11-57:14 Witness testifies that he was privy to knowledge that other sales agents didn't know.** | |
| 92:17-93:4 | What he saw, as far as issues with sales reps, he assumed to be tip of the iceberg. | **R, F, FM, NR, IC** | **93:13-93:25 Witness does not have personal knowledge about any purported misrepresentations by any Vivint sales rep to any customer** | |
| 102:2-103:3 | Competition is ruined if people are winning in an unfair way. Account Creation department opinion that there were leaders who were not competing fairly, based on day-to-day functions and personal audits. In day-to-day, flagging accounts, he said Vivint managers and sales leaders used deceptive tactics. | **R, FM, F** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 104:9-104:18 | Others within Vivint sales would impersonate customers. He was aware of customer coaching. | **R, FM, F** | | |
| 104:24-105:10 | Managers provide training and coaching to reps. | **R, FM, F** | | |

3. John Taylor, 08/24/2021

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 6:22-6:24 | Witness is doing well. | | | |
| 8:7-8:13 | Regional Sales Manager with Vivint since October or November 2009. Began as a sales rep. | **R** | | |
| 9:1-9:19 | He was involved in recruiting and training sales reps as a manager. As regional manager he recruits and trains managers, occasionally a rep. He supervises managers and has 12 managers reporting to him. | **R** | **9:20-9:22 Covers Las Vegas, Nevada and El Paso** | |
| 10:9-11:6 | He has 200-300 individuals within | **R** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | his team between alarms and solar. He trains managers and his managers recruit. He trains his managers on how to train new recruits | | | |
| 11:20-12:2 | He has worked with well over 1000 reps. | **R** | | |
| 13:12-13:21 | He receives variable compensation based on performance of sales agents. | **R, F, FM** | | |
| 15:13-15:17 | He is compensated off a book of business produced by his region. | **R** | | |
| 16:16-17:2 | His book of business represents 3-5 percent of annual Smart Home volume. | **R, FM** | | |
| 19:25-21:10 | He knew and had met David Madrid, a manager. No recollection of speaking with Madrid about model sales pitches for sales training manual. | **R, FM** | | |
| 21:22-22:10 | He does not recall speaking with Madrid about a | **R** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | sales pitch for training manual. Does not recall any conversations about advice to Madrid on selling alarms. | | | |
| 23:1-23:5 | No recollection of Madrid asking him for advice on sales pitches for Vivint alarm systems. | **R, FM** | | |
| 25:2-26:15 | He had not seen Ex. 1 before and did not help Madrid craft it. He did not speak with Madrid about Door Approach. | **R, F, FM** | | |
| 27:23-28:17 | No recollection of speaking to Wilcox about training manual or conversations with Madrid about training manual. | **R, P** | | |

4. Jared Young, 08/24/2021

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 6:22-7:03 | Stated name. Currently employed by Vivint | | | |
| 8:04-9:10 | Current VP of Sales, in position for 7 years. With | **R** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | Vivint for 19-20 years. Started as a door-to-door sales rep, then manager, to a regional manager (8-9 years). As VP of Sales, he mainly works on retaining sales force and recruiting sales people and leaders. | | | |
| 12:08-12:23 | Reports to Todd Santiago. Reported directly to Todd Pedersen before Santiago. | **R** | | |
| 13:25-14:04 | 14-15 groups reported to him in his last 2 years as regional sales manager. | **R** | | |
| 14:11-15:12 | Couple of hundred individuals in those teams. He helped train recruits on how to sell. Involved in new manager and new sales rep recruitment. As regional sales manager, he received compensation for productivity of team plus salary. | **R, IC, FM** | **14:5-14:10 Only speculating on the number of people reporting to him** | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 16:12-17:06 | Mark Fransen is a manager with Vivint, used to be regional manager and under Young's group umbrella.<br><br>New sales people taken through mandatory Vivint trainings. | **R** | | |
| 17:21-18:25 | Ex. 1 email from Young to Fransen and Jonathan Gubler (gmail address). Gruber was not a manager and did not have Vivint email address. | **R, FM, F, A** | | |
| 21:04-21:23 | Ex. 1 - email had attachment, pdf of Vivint Training Manual 2017 - Shorter. Vivint's email allowed him to attach and send files through email. | **R, FM, F, A** | | |
| 21:25-22:07 | Ex. 2 - he did not recognize. | **R, FM, F, A, H** | | |
| 23:11-23:22 | Ex. 2 title is a Sales Training Manual and has a lanyard of Scott Pedersen. | **R, F, A, H** | | |
| 23:24-24:12 | He does not remember the document. | **R, F, FM, IC, A, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | Date on Exhibit 2 is 3/31/17. He did not create the document, does not know who did or how he got it. He does not recall sending email to Gruber or Fransen. | | | |
| 24:17-27:24 | He does not remember the document. Date on Exhibit 2 is 3/31/17. He did not create the document, does not know who did or how he got it. He does not recall sending email to Gruber or Fransen. | **R, FM, F, A, H** | | |
| 28:12-30:09 | No recollection of whether he sent Ex. 2 to any other Vivint employee or how he came into possession of Ex. 2. Young said he had not seen it before deposition.<br><br>Jason Newby reported to David Alred who reported through Young. | **R, FM, F, A, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | Young had complaints of deceptive practices by Newby; did not recall how many. | | | |
| 30:20-31:15 | Reports of more than a million deceptive sales practices by Newby went through legal. He was not always informed of the complaints. He said he informed a time or two regarding complaints about Newby. | **R, FM, F** | | |
| 33:04-34:07 | Young had not referred managers or regional managers to compliance or legal for report of deceptive sales practices. Recommended termination of Cody Bashton for deceptive sales practices in 2006 or 2007. | **R, FM, IC** | **34:12-34:14 Bashton just was not a good fit for the company – it was nothing he did** | |
| 34:15-34:22 | He could not estimate how many times he recommended to compliance or legal to terminate a salesperson or | **R, FM** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | manager for deceptive sales practices. | | | |

5. Mark Fransen, 08/24/2021

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 5:23-6:8 | Introduction. Fransen lives in Idaho. Employed with Vivint for 18 years and still employed with Vivint. | | | |
| 7:11-7:25 | Currently a recruiter for Vivint, does not know if he has a title. Not a VP position | | | |
| 10:3-11:19 | 5-12 managers worked for him as regional manager. Sales team of 17 (per team) as a regional manager, around 150 individuals. Management involved in training sales people. He trained his sales force. Jared Young is VP of sales of Vivint Smart Home (one of 4 sales vps). | **R, FM, F** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 14:24-15:15 | Regular training within sales teams in different ways. | **R, IC, FM** | **14:21-14:23 "It is a long list of people" that provided training at Vivint** | |
| 16:08-16:24 | Ex. 1 is email from Jared Young's Vivint email to him. | **R, A, H** | | |
| 17:9-17:15 | His email address in Ex. 1 was his business email for Vivint. | **R, FM, A** | | |
| 17:21-18:3 | Smart Home Pros is a sales organization within Vivint Smart Home. | **R, FM, F** | | |
| 18:14-18:17 | He could receive and send emails through markfransen@ Smarthomepros | **R, FM, IC** | **18:4-18:13 He does not know if @smarthomes pros address actually works – he has always just used @vivint.com** | |
| 20:24-22:11 | No specific recollection of receiving Ex. 1 from Young and did not recall seeing Vivint Training Manual 2017-shorter | **R, F, FM, A** | | |
| 23:21-24:10 | Never saw Ex. 2 before and did not | **R, FM, A, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | know why Young sent it to him. | | | |
| 24:25-26:12 | Did not know Young was going to send him the training manual and did not remember any conversations with Young about it. He was not expecting Young to send him the manual | **R, FM, F, A, H** | | |
| 27:21-28:6 | Never saw training manual or had any communications about it with anyone on email. He skimmed the manual. | **R, FM, F, A, H** | | |
| 28:11-29:3 | Ex. 2 did not look like it was created well; it looked cheap and V in Vivint not capitalized. | **R, FM, F, A** | | |
| 29:11-30:3 | Unaware of any training manual managers can edit for use for their teams. He had never used one and he would be prohibited from creating an editable version of a manual to use with his team. | **R, FM, F** | | |

6. Cheyenne Thatcher, 08/24/2021

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 6:25-7:02 | Witness is good. | | | |
| 7:05-7:13 | State name. Thatcher physically located at corporate headquarters in Provo, Utah. | | | |
| 8:10-9:07 | Currently a divisional VP for Vivint and in that role since 2018. Started in November 2004 as a sales rep. Co-managed an office in 2006. Managed her own office in 2007. Regional manager in 2008. 2014 or 2015, became senior regional manager. | **R, FM** | | |
| 10:20-10:22 | 3 or 4 divisions at Vivint | **R, F, IC** | **10:23-11:02 Not sure what the number is that is required to be a divisional VP – may only be Neal Rogers and him, but may also be Puck Haraford** | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 11:03-11:05 | Jordan Binning was a divisional VP before he left Vivint | **R, FM, F** | | |
| 11:13-12:18 | Main role as divisional VP is to recruit and train leaders. Operations to create systems to recruit and develop. Growing locations for recruiting centers and leaders. Recruit leaders as well as new sales people. Under divisional umbrella, 1000-1200 signed reps and 600-700 reps that deploy for summer. | **R** | | |
| 12:25-13:04 | As a manager, regional manager, senior regional manager, provided training to other managers and sales people. | **R, FM** | | |
| 13:18-14:09 | While a regional manager between 2008-2014, reps trained through their leaders. Rely on managers to | **R, FM, IC** | **14:10-14:14 Has not trained sales reps since 2015 – since he is not door-to-door selling,** | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | train new sales recruit and she would participate as well. | | **he is a less effective trainer for the sales reps then the managers** | |
| 15:04-15:14 | Younger sales reps rely on training from superiors in how to sell door to door. | **R, FM** | | |
| 16:11-16:25 | Managers influence how sales reps learn how to sell door to door. | **R, FM** | | |
| 17:04-21:13 | 3/2/17 Email from Amber Martindale, who worked for Vivint and reported to J. P. Arlie. People would use personal email for Vivint business. Subject of email New Rookie Training Manual 2017- Flex Pay. David Madrid worked with Amber, came through J.P. He was not a manager. Anthony Pimentel, she knew of but had | **R, FM, F, A, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | not met. He was not a manager and had a Vivint email (armarketing.com). Did not know Mike Chu, Sarah Schuman, Lucas Gallerdo | | | |
| 21:16-21:16 | Continuation of same | **R, FM, F, A, H** | | |
| 21:19-21:21 | Continuation of same. Stephanie Leatham on email, she did not know her. | **R, FM, F, A, H** | | |
| 22:05-23:14 | Continuation of the same<br>Eli Robertson is a regional manager at Vivint. One of her direct reports since 2017. Taylor Livingston is one of her managers, since 2017.<br><br>Daniel Pessy was a rep, no longer with Vivint and she not know why. | **R, FM, F, A, H** | | |
| 23:18-24:05 | She did not know Matt Dixon.<br><br>Jeremy Hatcher was a rep out of California. She | **R, F, FM, IC, A** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | did not know if he was fired for deceptive sales practices. | | | |
| 24:07-25:18 | Matthew Sessa was rep, he no longer works for Vivint.<br><br>Billy Virgi is a manager at Vivint and under her umbrella since 2017.<br><br>Levi Webster was a manager under her supervision. He was a manager since 2007, 2008, or 2009.<br>He left Vivint this year, terminated | **R, FM, F, IC, A, H** | **25:22-26:6 Webster was terminated for selling Vivint equipment to a customer "off the books"** | |
| 27:07-27:18 | She sees @vivintsolar after Alex Williams. | **R, FM, IC, A, H** | **26:14-26:16 She does not know who Alex Williams is** | |
| 27:20-27:20 | Does not recall other emails with business-related discussions that include Vivint Solar emails on Vivint Smart Home communications. | **R, FM** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 30:09-33:24 | Ex. 2 email from Thatcher on 3/3/17 to Sales-Cheyenne Thatcher Region with group email address to a group (managers).<br><br>Martindale was copied on the email and the subject line was New Rockie [sic] Training Manual 2017 - Flex Pay with attachment, Vivint Training Manual 2017 - Shorter.pdf that she was sending to her region.<br><br>Email stated that Amber helped build a training manual on flex pay and that it was a great recruiting tool.<br><br>She does not know how many people it went to. Space in document to list managers, office name, and badge ID. | **R, FM, F, A, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 34:01-35:01 | She did not recall seeing the document before. No reason to doubt she sent the PDF to her region. She does not believe she reviewed the document well, if she reviewed it all. | **R, FM, F, A, H** | | |
| 35:03-35:13 | In the email, Thatcher encouraged recipients of the email to review the PDF carefully. | **R, A, H** | | |
| 36:01-36:08 | Thatcher asked her region to review carefully before training reps on it. | **R, FM, IC, A, H** | **36:9-36:11 She wanted them to use any parts that were applicable to flex pay** | |
| 37:12-38:12 | She did not recall sending the training manual to anyone else. She agrees that on page 5 of Ex. 3 the way the sales pitch is written is deceptive. | **R, FM, A, H** | | |
| 39:08-42:21 | From the statement that "you were set up as an advertising | **R, FM, F, IC, A** | **38:21-39:7 She reads that first sentence to mean that** | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | home with ADT", a customer could infer there is a relationship between the rep at the door and the existing alarm company.<br><br>From statement that "we're back to all these advertising homes", a customer could infer the rep has an affiliation with the existing alarm company.<br><br>Did not agree that stating a customer had 2 options at original set up created inference of an affiliation between the rep and the existing alarm company.<br><br>Sentence that when rep comes "back to these homes they give us a bigger budget", she did not agree that sentence implies an affiliation. | | **whatever the rep was looking at, is was a house using ADT** | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | The entire script, put together, could confuse a customer. She thinks the sales script is terrible and not a good approach. She can see there would be confusion. | | | |
| 43:03-43:20 | She has recommended the termination of managers or sales reps for deceptive sales practices, but not sure how many. She has recommended the termination of a manager or regional manager, 3 or 4 times. recalled Susie Madlug as one. | **R** | | |
| 44:09-45:11 | Complaints from compliance about Madlug, co-signer.<br><br>She also recommended termination for Kenny Jones and Levi Webster. | **R, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | She does not know whether any managers or sales reps sent Ex. 3 training manual to anyone else. She does not know what future recruits received Ex. 3. | | | |
| 49:01-49:20 | Trust is the best way to progress a sale. Building trust progresses the sell. Part of Vivint's training is to get into the home.<br><br>She agrees you need customer's express permission before entering the home.<br><br>Vivint adequately trains its sales force. | **R** | | |

7. Scott Brown, 08/24/2021

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 6:23-8:1 | Brown employed by Vivint Smart Home since November 2004. | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | Current title is Executive VP. He is transitioning away from company to a consulting role. As EVP, he recruits, trains, leadership development. His main focus is recruiting. | | | |
| 10:4-12:16 | Started as door-to-door sales. He introduced opportunity to friends and cousins. Went through ranks of manager, regional manager on way to EVP. Throughout roles, always involved in recruiting and training sales personnel and managers. He reports to Todd Santiago, chief revenue officer. Identified current and former EVPs. Performance is what qualified him to become EVP. | **R, F** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 12:20-13:3 | Roughly 5-20 regional and/or district managers have worked under his sales umbrella. He brought over 1,000 recruits to Vivint over his tenure. | **R** | | |
| 13:8-14:18 | Ex. 1 email from Jessica Frandsen to Brown. Frandsen is Cheynne Thatcher's regional assistant. Keaton Crocket copied, a sales manager who once worked under Brown Title of email, Shorter Training Manual. | **R, F, FM, A, H** | | |
| 14:22-16:5 | Vivint Training Manual and shorter PDF attached to email. Discussion of email threads regarding who sent the training manual | **R, F, FM, A, H** | | |
| 16:10-16:19 | He has never heard of a "Shorter Training Manual." | **R, F, FM, A, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 16:21-17:13 | "Shorter" is used as a capitalized, proper noun. He had not seen Ex. 2, Sales Training Manual with lanyard of Mr. Pedersen, before. | **R, F, FM, A, H** | | |
| 17:15-17:20 | He did not know what Frandsen was talking about when she sent email. | **R, F, FM, A, H** | | |
| 17:23-18:9 | He does not know what he did in response to Frandsen's email. | **R, F, FM, A, H** | | |
| 18:11-19:14 | Frandsen's email sent directly to him, not a mass email. He does not recall ever reviewing Exhibit 2 and does not know if sent it to anyone. He does not recall talking about the Shorter Manual with anyone. No recollection of advising anyone on the manual. | **R, F, FM, A, H** | | |

8. Scott Bell, 08/31/2021

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 5:6-7:16 | Jeffery Scott Bell, located in Humble Texas. He worked for APX Alarm in 2006. In 2011, APX rebranded to Vivint. He separated employment from Vivint in 2019.<br><br>Last position, divisional VP, responsible for overseeing many individuals through US on door-to-door.<br><br>He supervised hundreds, including regional managers, managers, assistant managers and sales reps.<br><br>At time of separation, he supervised 4-5 regional managers, 20 district managers. | **R** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | Recruited and trained new sales reps and his managers also played role in recruitment and training.<br><br>He operated nationwide, other than California and northeast. Oversaw 18% of the door-to-door volume for Vivint. | | | |
| 7:25-8:12 | He cannot discuss separation from Vivint because currently involved in arbitration regarding dispute over basis for his termination. | **R, IA** | | |
| 9:1-12:1 | He reported to himself, Todd Pedersen, Todd Santiago, and Alex Dunn. Hierarchy chain - he would report to 7 executive vice presidents.<br><br>Vivint had a code of ethics and a compliance program that | **R, F, FM** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | prohibited certain sales practices. Sales rep agreement had dos and don'ts in sale rules, elaborate.<br><br>Vivint did not enforce the compliance agreement while he was there. Selective enforcement, but terminations did not happen often.<br><br>Rep made a mistake, request to executives to give the rep another chance. May even require a bond for the individual.<br><br>Vivint compliance rules that prohibited deceptive sales practices were not consistently enforced. Legal team made mostly good decisions, but executive team | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | would not terminate. | | | |
| 12:17-12:17 | Sales leadership had final say on discipline and termination. | **R, F, FM** | | |
| 12:21-12:22 | Who was involved in decision to terminate him. | **R, F, FM** | | |
| 13:2-13:4 | Shawn Lindquist, Kent Hansen, the board, Todd Pedersen, and Alex Dunning involved in decision to terminate his employment. | **R, F, FM** | | |
| 13:10-13:13 | Did productivity of a sales person impact enforcement of compliance rules against deceptive sales practices. | **R, F, FM** | | |
| 13:15-14:16 | Yes, productivity of sales person a factor in enforcement.

Compliance issues discussed at meetings and deceptive practices were said to be unacceptable. | **R, F, FM, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | Bell Group, which he oversaw, had lowest compliance issues on a per account basis. He wondered how the misrepresentations took place so often. | | | |
| | Todd Pedersen did not tolerate deceptive sales practices. He often gave guys second and third chances. | | | |
| | Sales leadership had a say in who was in good or bad standing. | | | |
| | He was aware of people making false misrepresentations about being affiliated with an existing alarm company. | | | |
| 14:19-15:7 | Aware of times where no discipline was taken when reps made false representations | **R, F, FM, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | about being affiliated with an existing alarm company.<br><br>Aware of fines given for such representations, that were later reimbursed.<br><br>Also times where someone else in the sales hierarchy would pay a fine. | | | |
| 16:3-18:11 | Aware of sales reps making misrepresentations to customers about whether the customer was taking out a hard credit check with a third party.<br><br>Regional meetings with Sales VPs, regionals, Todd Santiago, and sometimes Todd Pedersen and Alex Dunn, sales ops, Josh Crittenden, Dick Jones.<br><br>Compliance issues brought up | **R, FM, H, F** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | on a screen at these meetings. Jordan Binning said, after these issues were shown, that Vivint was not going to fire him.<br><br>Binning's team drew a lot of complaints about compliance issues and deceptive sales practices.<br><br>Binning was terminated in 2017. | | | |
| 19:14-21:11 | After Binning terminated, Todd Santiago asked if Vivint should bring Binning back.<br>He understood it was Alex Dunn's final call on whether to bring back Binning.<br><br>When asked if it was well known to sales reps and managers how to work around safeguards on sales software, Bell said he knew certain | **R, FM, F, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | executives knew ways around things and that he had documentation on that.<br><br>Executives knew of loopholes in Street Genie to get accounts in. He made sales reps aware of internal audits they may be subject to. | | | |
| 21:21-23:21 | He witnessed sales reps misstating or misrepresenting to potential customers the amount of buyout they could provide.<br><br>A small percentage of sales reps repeatedly made that mistake. For those reps, Vivint would tag the fine to the rep and, if not possible, the fine would flow up to the manager. | **R, FM, F, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | Vivint management would waive fines.<br><br>If there was a complaint of a deceptive sales practice, Vivint would try to keep the customer, as opposed to letting the customer out of his or her contract.<br><br>Bell recognized document, that he produced in response to subpoena. | | | |
| 26:13-26:20 | He took a screen shot of any communication that needed to be addressed with someone, which was saved to his Dropbox. | **R, FM** | | |
| 27:25-31:24 | Email from Ashlie Klinger to Bell's Vivint email, did not want to do a hard inquiry because ADT had just run it. She wanted to prove customer had credit, | **R, FM, H, F, A** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | without pulling credit. This was an exception. For every 10,000 accounts, he can approve 100 of these.<br><br>Regional managers and other executives had authority to approve special exceptions.<br><br>He understands that now there are no special exceptions, because they get in trouble for approving and these are not good paying customers.<br><br>Stopped doing special exceptions because of DOJ investigation. And Todd Pedersen wanted to stay clear of retail installment contracts. Citizens would not accept a special exception. | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | Screen shot of text between Scott and Hari Rasolo. In text, Scott asked Hari to move a fine from a sales rep to someone else's budget. It did not happen frequently but happened sometimes.<br><br>He probably sent screen shot of text o Mike Melgar and/or his manager. Melgar was a former sales rep. Scott kept a list of compliance violations by Melgar.<br><br>Vivint aware of everyone's compliance violations. In meetings with managers and sales leadership, they would show all the misrepresentatio ns or unfulfilled promises of the | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | rep, and number of infractions. | | | |
| 32:1-32:2 | Vivint tracked by region the overall number of complaints regarding misrepresentations or other deceptive sales practices. | **R, FM, H, F** | | |
| 32:4-33:17 | Compliance side of Vivint had access to that information.<br><br>Scott, as VP of Sales, did not have ability access complaint info about deceptive sales practices.<br><br>Sales reps also tracked complaints. He was not able to track that either.<br><br>Brandon Ogletree was the rep that drew the most complaints about deceptive sales practices.<br><br>Regional and district managers influenced how | **R, FM, H, F** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | new recruits conducted business. | | | |
| 39:17-40:21 | Small percentage of sales reps, where customers would complain; a discrepancy between what the customer said the sales rep represented about the buyout versus what the sales rep said he told the customer.<br><br>At the time he left, Binning's region was 30,000 accounts. In Scott's last year, Binning's group was dong 25% of Vivint's door-to-door volume.<br><br>Corey Reed did a significant portion of the accounts Binning's group would do. | **R, FM, F, H** | | |
| 41:16-42:2 | Spreadsheet of compliance issues from compliance team for certain reps with notes | **R, FM, F, A, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | and descriptions of issues. Included complaints of deceptive sales practices. | | | |
| 42:4-42:16 | Melgar was a sales rep in one of the offices Scott oversaw. He was like an assistant manager. | **R, FM, F, A, H** | | |
| 42:18-43:7 | The document Scott was looking at was not reviewed/discussed during regional meetings.<br><br>The information shared in those meetings, was a graph by region of complaint type but did not give notes or descriptions. The document he was looking at was for legal departments. | **R, FM, F, A, H** | | |
| 43:19-46:5 | He had seen a document, formatted like what he was reviewing, with the same type of information. He did not got a copy | **R, FM, F, A, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | of the whole company, but had seen saw "rap sheet" for entire company before. He had seen the full version of the document he was reviewing, that contained all complaints, a lot of pages. He had other compliance entries related to other people.<br><br>Bell recalls fighting for Melgar to stay at Vivint. Addressed complaints and kept him around until he did it again.<br><br>Nathan Wilcox made decision to fire Melgar.<br><br>Not aware of how many complaints it took before Vivint would fine the rep. | | | |
| 46:11-46:15 | Inconsistent as to when Vivint would choose to fine or not fine. | **R, FM, F** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 46:17-46:21 | Inconsistent as to when Vivint would choose to fire or not fire a rep based on deceptive sales practices. | **R, FM, F** | | |
| 47:23-48:8 | Text conversation about a business card in which individual representing himself as with Vivint, as well as partners with GE and Honeywell. | **R, FM, F, A, H, IC** | | |
| 48:10-48:24 | Such a representation (above) was considered to be a prohibited active sales practice.<br><br>Text involved Ogletree. Binning and Ogletree came from a different company that went out of business; Vivint did not train them to do what they did. They learned misrepresentatio ns from previous employer. However, people at Vivint did | **R, FM, F, A, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | stupid stuff as well. | | | |
| 54:6-57:13 | Page 8 of Scott's production, buy out discrepancies - with what rep tried to do with buyout.<br><br>Category buyout discrepancy could be rep did not communicate properly what the buyout would be or rep tried buyout process and there was a glitch in street genie.<br><br>At the end of season, received hold list of accounts reps not getting paid on, without removal of hold. If hold removed, because it was fixed.<br><br>Nonpayable hold means sales rep commission is held back but company probably still paid on account. | **R, FM, F, A, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | The following partnerships had the highest buy discrepancies on a a per account basis: Jordan Binning, Puck Hereford, Brad Roster.<br><br>Within Vivint, the following had access to the buyout discrepenacies: Mike Harrison, Connor Callway, Josh Crittenden, and/or Dave Jones, Doug Barnett, Bryan Brothers, One Stop, payroll, Justin Sorensen, Bryce Schumacher. | | | |
| 58:7-58:20 | He knew a sales manager named Josh Coen. He had recurrent complaints of deceptive sales practices. | **R, FM, H, F** | | |
| 59:24-62:4 | Text with Darwik Chatwin, Dillon Chatwin, who were both fined to address manipulations in 2017. | **R, FM, F, A, H, NAR, NR** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | These reps manipulated addresses, "white page." They would find another person with the same name in a different place and pull credit and set up account for customer with another person's credit.<br><br>Reps, fined for doing this, had an agreement with Dave Jones, VP of Sales Ops, who would reimburse them back for the fine.<br><br>Jones played a role in everything sales. The two reps in the text were reimbursed for fines for white paging. | | | |
| 62:6-62:13 | White paging was discussed at meetings with regional managers and sales leadership. | **R, FM, F, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 62:15-62:19 | Discussions of white paging - not discussed as a good thing. | **R, FM, F, H** | | |
| 62:24-64:15 | During meetings, discussions that guys should be fired for white paging. Sometimes, firings occurred. He knows of more than a handful of people, still at Vivint, doing it. More than 10 people at Vivint who got caught white paging.<br><br>Vivint's enforcement of that deceptive sales practice was inconsistent. Example - a 2017 meeting where shown a list of 100 people to be fired, but only a 1/3 actually let go. Other 2/3 stayed out because sales leaders begged they not be let go. | **R, FM, F, H** | | |
| 64:22-65:14 | At the above 2017 meeting, any leader that | **R, FM, F, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | oversaw more than 5000 accounts was present. Corporate officers also there - Todd Pedersen, Alex Dunn, Todd Santiago. Everyone fought to not fire some of the reps, including leadership. | | | |
| 70:4-70:24 | PDF 24 of Ex. 1 spreadsheet similar to one about buyout holds. In hold detail columns, rep impersonated customer meant rep probably did pre-install survey for customer. | **R, FM, F, A, H** | | |
| 72:8-73:24 | Executive hold means the company is not paying a rep on the account. A nonpayable hold - rep is not going to get paid on account. A mismatched payment card means rep sold a customer and customer sold | **R, FM, F, A, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | they had passing credit did not put credit card on file. A different person put credit card on file, sometimes the rep, which he saw occur before. | | | |
| 76:21-77:3 | He knows of managers at Vivint who've had quite a few entries on compliance spreadsheets and that are still with Vivint. | **R, FM, F, IC** | **77:4-77:7 Witness acknowledges that he left Vivint two years ago** | |
| 77:8-79:5 | Back-end pay sheet contains production and performance of sales reps, how many accounts they sold and how many of the accounts are in good standing, and total earnings on the year. It could include compliance fines.<br><br>Chatwin on document reviewed by Scott, with red arrow indicating he was fined and | **R, FM, F, A, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | the fine was written off. Decision to write off fine by Dave Jones. He wrote it off because Chatwins complained about it. Jones agreed to pay fine if the customers were still paying their bill a year from then.<br><br>Form he was reviewing available for every rep at Vivint. | | | |
| 79:17-81:6 | In his role as regional manager and Sales VP, he could pull back-end pay sheets for people he oversaw, under his sales umbrella.<br><br>Waivers of fines would not appear on these sheets. Those submitted/labeled as an incentive. Vivint frequently reimbursed sales for fines. Decision | **R, FM, F, A, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | made by Sales VPs and legal. | | | |
| 81:17-82:7 | Back-end sheet for McKay Ellison. Legal fine from Hari Rasolo. He did not know if was reimbursed. Back-end sheet for Megan Yaw - address manipulation fine (white paging). | **R, FM, F, A, H, NR** | | |
| 82:9-85:19 | Discussion of sales reps who received fines; he did not know whether they were reimbursed.<br><br>Reps learned from sales reps Daniel Tracey and Daniel Anderson, both regional corporate trainers. Tracey is still with Vivint. They told Scott they taught people on the team. Scott reported it up to management. Amount of fines based on amount | **R, FM, F, A, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | of times sale rep did compliance issue. | | | |
| 85:25-86:20 | Spreadsheet of complaints related to deceptive sales practices.

Vivint kept a running spreadsheet of deceptive sales practices | **R, FM, F, A, H, IC, P** | | |
| 87:16-88:20 | He did not have access to spreadsheet of complaints as regional manager or VP. He would receive, likely to get his reps in line.

Info in spreadsheets not shared during regional meetings. That information was more generic with broad descriptions of complaints. | **R, FM, F, A, H, IC, P** | | |
| 89:4-91:11 | P. 43 of Ex. 1 is a file showing the whole company with holds, showing people putting in wrong | **R, FM, F, A, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | social security numbers by region and percentage of time rep input wrong social security number for customer. Done on a weekly basis. | | | |
| 91:13-92:24 | Aaron Katz's group had high complaints, but not sure why. Katz is still with Vivint.<br><br>PDF p. 45 cancellation letter instructing Vivint reps how to cancel alarm company contracts. Reps were not authorized to do so.<br><br>The letter was sent to him by someone Eric Mealey's region. | **R, FM, F, A, H** | | |
| 93:14-94:9 | Cancellation letter created by someone in Eric Mealey senior region. Vivint did not authorize its creation. | **R, FM, F, A, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | Letter instructed reps on where to go to cancel a customer's alarm agreement, to avoid customer interacting with competing alarm company's call center.<br><br>Vivint prohibits sales reps from canceling a customer's other alarm account. | | | |
| 95:14-96:6 | Email from Troy Sariah related to rep misrepresenting himself about buying out a customer's contract. Matthew Packard, the sales rep, had multiple reports of deceptive sales practices. Not terminated for those; he is still with Vivint. | **R, FM, F, A, H** | | |
| 96:17-98:2 | PDF p. 48, Ex. 1 - email from rep, Jacob Owen about covering a buyout.. He had over 60, or $70,000, contract | **R, FM, F, A, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | buyouts, which was not normal.<br><br>Owen paid for the buyouts and when he could not, it rolled up to manager to cover deficit.<br><br>Vivint kept the account in those circumstances.<br><br>P. 48 of Ex. 1 Message between Todd Santiago and Matt Richardson. Richardson called in impersonating a customer. | | | |
| 98:5-99:20 | Richardson was terminated around time of Vivint settlement with ADT. Richardson sent him the text string when he found out Bell was fired. Richardson was not fired at time he was impersonating a customer. | **R, FM, F, A, H, MIL, IA** | | |
| 109:12-110:12 | P. 57 of Ex. 1 - rep promised to buy out a | **R, FM, F, A, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | customer's ADT contract and was dishonest during the pre-install survey.<br><br>Distracting a customer or coaching a customer on pre-install survey is contrary to Vivint's policies.<br><br>Occasionally received emails from Rasolo, compliance or legal related to complaints on his reps. He was expected to address the complaint with the rep. | | | |
| 110:19-111:24 | As regional manager and VP of Sales, Bell had input on fines or discipline as result of complaint. Complaint Bell was reviewing, rep took on full months of service and the ADT commitment. | **R, FM, F, A, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | Sometimes, he would involve compliance or legal to determine appropriate discipline.<br><br>Rasolo email to report an affiliation misrepresentation in June 2015 related to JD Beck. | | | |
| 113:3-113:18 | P. 16 of Ex. 1 Same thing with Jake Owen, who had $80,000 of this - example of buyout discrepancy. | **R, FM, F, A, H** | | |
| 114:24-115:23 | Reps would put their personal credit cards on file to pay for service. Document (p. 64) to notify senior leadership. It was a violation of Vivint policy. | **R, FM, F, A, H** | | |
| 116:5-116:14 | He did not remember of report from August 3, 2017 was representative of the numbers in | **R, FM, F, A, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | the weekly reports. | | | |
| 116:17-116:21 | Every regional manager received the weekly reports. | **R, F, A** | | |
| 147:8-148:7 | Bell has seen senior level sales personnel training sales reps to employ deceptive sales practices. Not in a corporate setting - it's done privately.<br><br>Some sales reps young and inexperienced. People training them should train them the right way. | **R, H** | | |
| 149:24-150:15 | White paging is where a customer fails credit and rep finds another person with the same name in a different location and pass credit as previous address. Then rep puts that person as the primary. When the failed credit customer defaults on the bill, the | **R, IC** | **150:16-150:19 Witness admits white paging has nothing to do with CPI** | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | individual in a different location is notified of a collection action. If that customer pays a year, rep gets paid on account. | | | |
| 150:23-151:13 | Vivint's attorney sat on a letter from a former employee that Vivint was white paging accounts; he did nothing about it.<br><br>Bell said Vivint wanted to the business and that it kept people employed because more drama created. | **R, NAR, NR, IC** | **151:14-151:21 Witness admits that it's not a deceptive sales practice against CPI** | |
| 157:14-157:20 | Not everyone at Vivint trained and conducted business as honestly with customers as he did. | **R, F, FM** | | |
| 157:22-157:24 | Did other managers operated on the other end of the continuum. | **R, FM, F** | | |
| 158:1-158:12 | All the executives' kids worked for Scott. | **R, FM, F** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | He knew of managers in leadership at Vivint who did not do business the right way. These managers were not fired immediately; the ones that were terminated took months and some are still at Vivint. | | | |
| 158:22-159:13 | The time to investigate a rep was drawn out to continue to get production out of the rep.<br><br>Reps and leaders, like him, wanted to give reps another chance. Time invested in reps, did not want to lose them because of behavior that could be corrected. Behavior was not always corrected. | **R, NAR, NR** | **159:15-160:1 Witness acknowledges importance of investigating complaints** | |

9. Hari Rasolo, 10/13/2021

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 6:4-6:13 | Resides in Utah. Previously worked for Vivint. | | | |
| 6:23-7:10 | Started working at Vivint in July 2012. Started as a recruiter, then moved into sales operations and then the compliance team. | | | |
| 7:21-8:14 | Started doing sales compliance in 2014. Briefly transitioned to sales operations in 2018 but then moved back into sales compliance. | | | |
| 9:5-10:23 | Remained in Vivint compliance department until April of 2021, at which point he voluntarily left Vivint.<br><br>Role in compliance was divided into two main functions. One was communication to the team the complaints that were being received and categorizing them. The other primary function was to resolve | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | cases referred to the "SOS" team.<br><br>Landon Potter was his boss while in compliance. His function was under the sales team from 2014 to 2018 or thereabouts. The structure changed sometime after that, and that's when Potter became his boss. | | | |
| 11:17-12:16 | Did not have employees underneath him while in compliance.<br><br>Call center employees were supposed to create feedback cases to route issues to compliance, but they didn't always do so, and so there were lots of times when he would get contacted about compliance issues outside of the feedback cases | **R** | | |
| 14:25-15:3 | It was left to the judgment of the call center employees whether | **R** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | to refer a case to compliance | | | |
| 15:11-16:21 | He would submit fines to Landon Potter or Vivint legal for approval/input. He would communicate with legal before imposing any fine. Can't recall if he made recommendations to terminate any sales reps. | **P, R** | | |
| 17:17-17:20 | Is aware of some Vivint sales reps being terminated for compliance issues. | | | |
| 18:17-18:23 | Recalls sales rep Brandon Ogletree had compliance cases | **R** | | |
| 20:15-20:20 | He did recommend fines for sales reps in his time in compliance | | | |
| 21:3-21:11 | Same. Vivint legal makes the decision whether to impose a fine | | | |
| 21:20-21:24 | He did provide input on whether certain sales reps should be fired. | | | |
| 22:3-22:7 | Does not know who within Vivint ultimately made | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | the decision to terminate a sales rep. | | | |
| 22:14-26:14 | Ex. 1 is an email string with Scott Brown dated February 9, 2016. It includes a chart that has been pasted from a report provided by Vivint legal.<br><br>Does not know how Vivint tracks the number and types of complaints about deceptive sales practices relating to sales managers. Vivint legal has that information. Everything he got in this regard funneled through Landon Potter. | **F, FM, R** | | |
| 28:12-28:19 | In the email being referenced, it includes two charges that track the number of complaints related to a specific region | **F, FM, R** | | |
| 28:22-28:25 | He got the complaint tracking information referenced in the email from Vivint legal | **F, FM, R** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 29:5-30:1 | The complaint tracking information was available to him during his time in compliance. | **F, FM, R** | | |
| 30:14-30:21 | A "feedback case" is created when a customer calls in and the complaint is submitted by the Vivint customer service reps to legal. He does not know what circumstances dictate the creation of a feedback case. | | | |
| 30:23-32:1 | Ex. 2 is an email he sent to Jordan Binning on May 22, 2015 with the subject "forgery", and the email included feedback cases for Brandon/Mark Ogletree. Binning is a senior regional sales manager above Ogletree. | **R, F, FM** | | |
| 32:3-32:4 | Mr. Binning had a large sales region, as do other regional managers | **R, FM** | | |
| 33:9-34:21 | In his tenure in the compliance department from mid-2018 until April 2021, he | **FM, R** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | would still email feedback cases to reps to discuss compliance issues. There were more such communications in the summer.<br><br>The exhibit references a "top rep offender." He is not sure whether Vivint had a document in which it tracked the reps who generated the most compliance complaints. | | | |
| 34:24-35:4 | He does believe in his time at Vivint he has seen a document that tracks which sales representatives were generating the most compliance complaints. | **R, F** | | |
| 36:18-37:17 | The referenced document is an email chain between two Vivint vice-presidents of sales that includes feedback cases.<br><br>The witness believes Ogletree was terminated in | **R, F** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | 2016 but he can't recall if he was terminated more than once | | | |
| 39:21-41:14 | In the email chain, Rasolo references a tally of different types of compliance issues associated with sales reps who had three or more complaints since the "preseason."<br><br>The information being referenced in the email would come from the feedback cases submitted to Vivint legal, which would categorize the complaints | **R, F, FM** | | |
| 41:16-41:19 | The email does refresh his recollection that Vivint would track which sales reps were generated the most compliance reports | **R, F, FM** | | |
| 41:25-42:22 | He does recall having the same complaint reports about sales reps and compliance issues through 2020 and 2021. | **R, F, FM** | | |
| 43:7-43:16 | Todd Santiago at Vivint would | **R, F, FM** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | characterize these complaint tracking reports as the "top offender list" | | | |
| 43:22-44:23 | Otto Zelaya was a regional manager who did generate compliance problems for Vivint. | **R** | | |
| 47:7-49:25 | Ex 6 is an email from Rasolo to Scott Brown and others with the subject "Paul Meeker Report." Witness does recall that Meeker generated a number of compliance problems for Vivint. He was a manager.<br><br>Ex 7 is an email with the topic "forgery case" with respect to Ryne Simmons. Witness does recall Simmons causing significant compliance problems for Vivint. It's possible that Rasolo recommended fines of termination of Simmons. | **R, F** | **50:1-51:25 witness has been responding "that's possible, yeah" even when he does not recall because he is concerned about a faulty memory appearing to be inaccurate testimony, but after explanation by counsel he understands he can say he does not recall and counsel might later refresh his memory** | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 52:11-56:1 | Ex 8 is an email from Rasolo to Yiem dated December 14, 2019 copying VP of sales Josh Crittenden also copying email addresses for "buyout" and "slaims"<br><br>Ex 9 is an email from Fausett to Rasolo dated July 8, 2019. The email references a discrepancy in the buyout amount for the account. This is an issue that the compliance department dealt with frequently. | **R, FM, F** | | |
| 57:11-58:18 | He dealt with buyout problems associated with deceptive sales practice violations. Can't say how often that would happen or how much of his time he devoted to those issues. | **F, R, FM** | | |
| 58:24-62:8 | Ex 10 is an email forwarded from Burtron to Walker dated May 20, 2021, with another email from the competitive | **F, FM, R** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | response team on June 7, 2019. Rasolo sent the bottom email on the chain.<br><br>Ex 11 is an email from Rasolo to Boone et al on March 2, 2020. The email includes information from a "buyout" company's portal with information about the cost of the buyout.<br><br>There was a report that tracked all of the buyout discrepancies be he can't remember what it was called. | | | |
| 62:17-63:2 | Ex 12 is an email from Boone to Rasolo et al dated Nov 7, 2019 relating to a buyout. | **R** | | |
| 63:13-66:13 | On Ex 12 Rasolo references over 100 open cases related to buyouts. Witness explains situation leading to so many open cases | **R, NAR, NR** | | |
| 68:17-68:21 | When Mr. Boone references "high queues" in the | **R** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | email, he means there are a lot of calls relating to these issues | | | |
| 69:15-71:25 | Ex 12 is an email from Wyatt Levin on July 19, 2019 to Rasolo et al relating to a buyout discrepancy. Levin is a Vivint sales manager.<br><br>On the email, Mr. Levin states that the Vivint buyout program is "the dumbest thing that Vivint ever did." He also says "there was way too much confusion with that program and I'm sure you guys are dealing with similar confusion from customers across the board." Rasolo does not agree with Levin's characterizations of the buyout program. | **R, F** | | |
| 75:20-76:12 | Ex 15 is an email from Rasolo to Casey Baugh and Bowdy Gardner that includes information from | **R, F** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | more feedback cases. | | | |
| 76:21-77:3 | Rasolo was communicating these feedback cases because his management told him to do so | **R, F** | | |
| 78:25-83:6 | Ex 16 includes data from 2014 and 2015 on compliance complaints. The bottom portion of the email includes a summary of the cases being categorized by region and senior region. On page 9 of 16, it counts up the number of complaints by individual sales rep.<br><br>He can't recall if there was data by both region and rep available for all years, but says that the data needed to be improved. It was all held by Vivint legal.<br><br>Ex 17 is a two page document that tracks complaints by senior region and has associated | **R, F, FM** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | complaint percentages. The ride side has complaint percentage by top 25 reps. | | | |
| 83:16-84:10 | Witness does not know if the same complaint information was tracked in 2021 as was tracked in 2015. | **FM, R** | | |
| 85:2-85:4 | The referenced document is a fine list for sales reps. | **R** | | |
| 85:10-85:24 | The document is a feedback case by name. He believes that legal continued to track this information in 2020 and 2021 because he would communicate with legal about it. | **FM, F, R** | | |
| 86:5-87:1 | Ex 21 is a feedback case document by employee, batch ID, and the category of complaint.

"AM" stands for "affiliation misrepresentation." He would communicate with employees about | **R** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | these types of complaints. | | | |

10. David Madrid, 08/13/2021

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 7:9-7:22 | Currently works as a consultant in solar sales. Previously worked for Vivint Smart Home and Vivint Solar | | | |
| 8:14-8:21 | Worked at Vivint around 2015 through 2017 but would have to check records to confirm | **IC. R**<br>**R** | **31:12-32:6 Confirms he left Vivint Smart Homes in April 2016** | |
| 8:24-9:4 | He was a regional manager at Vivint and did some new rep training and recruiting. | **R** | | |
| 9:20-10:7 | Estimates there were five to six district managers that reported to him when he was a regional manager at Vivint. | **R** | | |
| 10:10-10:16 | Vivint district managers also had other sales reps who reported to them. | **R, FM** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 10:20-11:2 | Estimates there were approximately 200 or so sales reps under his umbrella when he was a regional manager | **R** | | |
| 11:5-11:13 | Part of his role was to recruit sales reps. Estimates he met with over 1,000 reps to try to recruit them | **R** | | |
| 11:16-13:16 | Estimates he succeeded in recruiting 200 or so reps, including for the summer sales program.<br><br>Says it is ultimately up to the individual rep to train on how to sell. But the regions would provide workshops and conversations walking reps through different pitches. District managers also train, many times by having new reps shadow their sales. Regional managers at Vivint would also coach on how to sell, but he didn't do that much | **R, FM** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | when he was in the role because he focused on recruiting. Most sales training was done through shadowing more experienced reps. | | | |
| 14:5-14:15 | He is familiar with Ex 1 and reviewed it prior to the deposition | **R, A, F, FM** | | |
| 14:21-15:18 | Ex 1 is a document titled Vivint Smart Home Sales Training Manual 2017. It was used to train new reps. | **R, A, F, FM** | | |
| 16:5-16:14 | He used Ex 1 to have reps study the pitches and memorize and learn what they were supposed to say in conducting sales | **R, A, F, FM** | | |
| 16:17-16:17 | [Clarifies question] | **R, A, F, FM** | | |
| 16:19-17:16 | Ex. 1 is something he would provide to his district managers and sales reps while he was at Vivint.

Most sales reps would share documents, either electronically or on paper. They also used a lot of | **R, A, F, FM** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | PowerPoint presentations.<br><br>He did not create Ex 1, but he helped organize it. It includes pitches that reps and managers were using, and were working for them. | | | |
| 19:6-20:7 | Clarifies that he did draft some portions of Ex 1, including sharing the door pitches from some of the top individual sales reps within the company that were being used.<br><br>John Taylor is the Vivint sales manager that Madrid got the sales pitch from that references ADT and takeovers of other alarm provider accounts. Taylor was the Las Vegas manager. | **R, A, F, FM** | | |
| 20:9-20:13 | He included the switchover pitch in Ex 1, but the idea for that pitch was from a top Vivint rep named John Taylor. Does not | **R, A, F, FM** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | know where Taylor got the pitch from. | | | |
| 20:15-20:20 | Does not know if Taylor actually authored the switchover pitch of got it from somebody else. | **R, A, F, FM** | | |
| 22:17-23:18 | Doesn't know whether this training manual was used by other managers or regions. He included the switchover pitch because John Taylor's group had produced more switchovers | **R, A, F, FM** | | |
| 25:3-27:6 | He created Ex 1 by copying and pasting from various sources and also with reference to recorded conversations. He acted like a "secretary" in composing the document from bits and pieces of other information. He does not know where the very first working draft of the document came from. With respect to the switchover pitch, sometimes a | **R, A, F, FM** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | manager will just type pitches into a text and send it around to other reps and shared, and then it might later get included in something like Ex 1. He did not author or create Ex 1; it was just copied and pasted from various other sources. He did discuss this document with Nathan Wilcox [Vivint Chief Compliance Officer] once. | | | |
| 27:25-30:11 | Can't recall when he spoke to Wilcox about Ex 1. He is sure he did speak with other managers about the switchover pitch in Ex 1, but he can't remember who because it was too long ago. The only people he recalls discussing the document with were the reps and district managers that used the pitch. After the fact, he was informed by Vivint that he | **P, R, A, F, FM** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | should not be using the sales training manual comprising Ex 1. He can't remember who told him not to use it, but it would have been passed down from senior regionals. | | | |
| 30:13-31:3 | Most communications on topics like this would occur through conference calls to the regional managers in the field. Sometimes the calls would include different Vivint VPs.<br><br>He was never disciplined in any way by Vivint for utilizing the sales training manual marked as Ex 1. | R, A, F, FM | **31:7-32:22 Testimony for "time at Vivint" in combining time with both Vivint Solar and Vivint Smart Homes- left Vivint Smart Homes in April, 2016 – he has no knowledge about training or policies after that**<br><br>**32:23-34:16 Cannot testify he ever used any of the pitches in Exhibit 1 nor can he testify that any customers did switch over as a result of any** | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | | | of the pitches used by any rep<br><br>34:25-36:18 Since leaving in 2016, does not know any employee that actually saw Exhibit 1, was disciplined or fired for using it. Does remember the code of conduct, that all employees agree to it and that policy indicates an employee will be disciplined for violating code of conduct. | |
| 40:14-40:18 | At some point in 2017, Nathan Wilcox [Vivint Chief Compliance Officer] reached out to him to discuss the sales training manual marked as Ex 1 to the deposition. | **R, A, F, FM** | | |
| 40:21-40:22 | Same | **R, A, F, FM** | | |
| 41:2-41:9 | When Mr. Wilcox contacted him, it was because Mr. | **R, A, F, FM** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | Wilcox was preparing for a deposition where he anticipated questions about this document. Madrid says he told Wilcox at that time the same information Madrid has testified to in this deposition | | | |

11. David Steinbach, 08/13/2021

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 5:12-7:21 | Resides in Draper, Utah. Is currently the CFO at Priority Dispatch Corp. Formerly worked at Vivint [Smart Home], where he started in May 2016. His role was Senior Director of Finance overseeing the chief revenue officers of sales, chief marketing officers, and direct to home and inside sales channels. Responsibilities included budgets, revenue analysis, rates analysis, | **C** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | sales analyses, and attrition analysis. One of the bullets from his Linkedin profile from his time in this role is "Discovered sales practice anomalies that were not in accordance with the Vivint's code of conduct resulting in numerous sales personal terminations." | | | |
| 8:3-10:1 | Explains the bullet point from his Linkedin profile. Part of his stewardship of sales was to track new customers and related sales commissions and financial metrics. They noticed that there were high attrition rates in certain areas and their analysis revealed that there were sales reps calling in on multiple accounts and paying the outstanding balance with the rep's personal credit cards so that the accounts would still be eligible for | **R, C** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | commission payouts. This practice would have been against Vivint's code of conduct. | | | |
| 10:20-12:18 | In the course of investigating this anomaly, he worked with many Vivint executives including Doug Barnett on the sales operation side of direct to home sales, David Jones on the sales operation side, Michael Green in Finance, and Dale Gerrard who was the company treasurer at the time. He also spoke with Nate Penor, who was a collections manager.<br><br>The anomaly he identified was associated primarily with regional sales manager Jordan Binning's sales group, but it was not entirely secluded to his group. | **R, C** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | At the time, Todd Santiago was the leader of the sales group, with seven sales "leaders" beneath him. Regional sales managers, including Jordan Binning, were just underneath the seven sales leaders. The regional managers would have sales reps underneath them. | | | |
| 13:18-14:18 | Sales managers would get a cut of commissions for sales reps in their groups. The higher the group's production, the higher the regional manager's compensation would be.<br><br>Jordan Binning was a very productive regional sales manager. For quite a few years, he was the top regional (and individual) producer. | **R, C, FM** | | |
| 14:20-14:21 | There is a lot of competition in sales at Vivint. | **R, C, FM, F** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 15:11-18:24 | There was a lot of competition at Vivint for top producer. There was a lot of recognition given and also a lot of financial incentives for sales.<br><br>Jordan Binning's group had a reputation for deceptive sales practices and he (Steinbach) would associate DSPs primarily with Binning. Binning had a "very poor reputation" for generating accounts with collection issues, and was number one on the "bad debt collections hit list." This was also true for his entire group.<br><br>Binning's group was always in the top tier of sales performance for many years.<br><br>When he was conducting the analysis of the attrition anomaly, | **R, FM, C, H** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | he noticed Binning's group had 2x attrition compared to others.<br><br>He shared the findings of his investigation with many people at Vivint, including executive leadership. Todd Peterson [Vivint's CEO for a period of time] held a meeting with the regional managers, sales leadership and others and it was discovered that the practice was not just limited to Binning's group. Regional managers and other managers were instructing sales reps to call in and make payments on their customers' behalf to avoid the account from going delinquent and voiding compensation to the reps.<br><br>After Todd Peterson held this meeting, there were almost 100 | | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | people let go from all levels, from reps to regional managers. | | | |
| 19:5-19:11 | Jordan Binning was one of the sales managers that was let go in 2017 following his (Steinbach's) investigation. Binning went to work for Vivint Solar. | **R** | | |
| 19:18-21:4 | Vivint Smart Home and Vivint Solar are separate legal entities but once were related. They have very similar ties from an executive leadership standpoint.<br><br>When Binning went to Vivint Solar, he assumed a similar role as he had with Vivint Smart Home as a regional sales leader. When Binning joined Vivint Solar he worked with David Bywater [Vivint's current CEO] who at the time was the Vivint Solar CEO. | **R, F, FM** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | At some point while Steinbach was still with Vivint Smart Home, Jordan Binning came back to Vivint Smart Home and resumed his role as regional manager. | | | |
| 21:8-21:18 | Of the 100 or so employees that were initially let go following his investigation, Steinbach is aware that there were people that were later hired back by Vivint. The only name he can remember specially is Jordan Binning.<br><br>He was surprised when Jordan Binning was hired back by Vivint Smart Home. | **R, F, FM** | | |
| 22:21-23:8 | He knows others were surprised at the rehiring of Jordan Binning too. Binning was let go for his sales practices and then rehired within about a year's time. | **R, F, H, FM** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| 23:10-24:8 | Todd Peterson [Vivint's CEO for many years] was heavily involved in hiring and firing of Vivint employees, as well as others.<br><br>Although Vivint did trainings of various kinds, it is Steinbach's opinion based on his time at Vivint that Vivint did not impose disciplinary action appropriate to the conduct. He does not believe Vivint took very many disciplinary actions when issues were raised. | **R, FM, F** | | |
| 38:9-38:21 | Vivint is able to track revenue by state using the account addresses associated with invoices. | | | |
| 39:1-39:4 | Steinbach had access to revenue information in his role when he was at Vivint. | **IC** | | |
| 40:23-41:12 | When he was at Vivint, Vivint was able to track revenue by state and by sales rep. The reports would | **F, FM** | | |

| Designations | Description | Defendants' Objections | Defendants' Counter Designations | Plaintiff's Objections |
|---|---|---|---|---|
| | generally be on the calendar year. | | | |

# VIVINT OFFICERS, MANAGERS AND CORPORATE DESIGNEES

**\*\*Vivint may present live testimony of its 30(b)(6) witnesses at trial in lieu of or in addition to the counter designations set forth below\*\***

1. Vivint 30(b)(6) Designee Pat Kelliher, Vivint Chief Accounting Officer, 11/30/2021

| Designations | Description | Vivint's Objections | Vivint Counter Designations | CPI's Objections |
|---|---|---|---|---|
| 5:1-15 | Intro | | | |
| 6:1-7:8 (omitting all objections) | Witness is testifying as corporate rep on Topics 1 and 17 in notice | FM 6:1-5 (legal conclusion) | | |
| 7:18-9:15 | Witness's preparation for testimony | R | | |
| 10:23-11:19 | Background on role as Chief Accounting Officer. Responsibilities include corporate accounting and SEC reporting, among others | R, IC | | |
| 12:10-15 | Reports to Vivint CFO Dale Gerard. | R, IC | | |
| 12:22-13:21 | Vivint, Inc. is a wholly owned subsidiary of Vivint Smart Home, Inc. The companies file a consolidated financial report | R | | |
| 13:22-14:13 | Witness is prepared to testimony on topic 1.B. – "The amount of revenue generated by Vivint's home alarm and automation business, including specifically the revenues earned from home monitoring, | R, MIL | | |

| Designations | Description | Vivint's Objections | Vivint Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | security and automation products/services for accounts generated during the timeframe contemplated in the CPI complaint, including revenue by state." | | | |
| 14:14-17; 14:21-24 | Same | R | | |
| 15:7-16:1; 16:11-14 | Exhibit P127 is a true and accurate copy of Vivint's amended Annual Report filed with SEC for the year ending on December 31, 2020 | R | | |
| 16:15-18:18 | The SEC filing is certified by Vivint's CFO and CEO as having truthful and accurate information | R, F | | |
| 19:4-20:5 (omitting all objections) | The SEC report is filed to comply with SEC requirements. Witness agrees investors would be expected to rely on the information it contains | F, R, IC, FM 19:4-10 (vague, narrative), FM 19:17-21 (leading, misstates testimony, asked and answered), FM 19:22-25 (asked and answered, vague, leading) | | |

| Designations | Description | Vivint's Objections | Vivint Counter Designations | CPI's Objections |
|---|---|---|---|---|
| 20:6-21:7 (omitting objections) | The financial information on page 47 of the document is based on consolidated and audited Vivint financial statements | R, FM 20:25; 21:1-4 (vague, narrative) | | |
| 21:8-22:20 (omitting objections) | This page includes Vivint's total revenue information for years 2016-2020. Revenue for each year was $1.26B, $1.155B, $1.05B, $881M, and $757M, respectively. | R, F, FM 21:25-22:1-5 (leading, vague) | | |
| 23:2-19 (omitting objections) | These total revenue figures include the revenue Vivint generates from the sale of smart home and alarm technology. Recurrent monthly revenue for such products comprises approximately 95% of these figures but the exact figure depends on the year. | R, F | | |
| 24:8-22 (omitting all objections) | It is difficult to say specifically what amounts of Vivint's revenues are not attributable to recurring revenue from the sale of smart home technologies because it is based on revenue recognition policies | R, F, FM 24:8-22 (vague, leading, narrative) | | |

| Designations | Description | Vivint's Objections | Vivint Counter Designations | CPI's Objections |
|---|---|---|---|---|
| 25:19-27:17 (omitting all objections) | With respect to topic 1.B., Vivint claims it cannot break out revenue by state. However, with respect to total revenues, the figures on p. 48 of Exhibit P127 are the relevant figures | R, F, FM 26:4-13 (vague, narrative), 26:17-18, FM 27:6-11 (vague, narrative, asked and answered) | | |
| 27:18-22 | Vivint's revenues have increased each year since 2016. | R, F | | |
| 27:23-28:18 | Page 49 of Exhibit P127 shows that total Vivint subscribers were approximately 1.7 million and 1.5 million in 2020 and 2019, respectively, reflecting an increase of 9.2%. Similarly, revenue increased from $1.2 billion to $1.3 billion, a year over year increase of 9%." | R, F | | |
| 28:19-30:23 (omitting objections) | Page 53 of Ex P127 shows information relating to new Vivint subscribers. For 2020, 2019, and 2018, Vivint had approximately 343,000; 316,000; and 322,000 new subscribers. Revenue increased from 2018 to 2019 and 2019 to 2020. | R, F, FM 30:17-20 (asked and answered) | | |

| Designations | Description | Vivint's Objections | Vivint Counter Designations | CPI's Objections |
|---|---|---|---|---|
| 30:24-32:11 (omitting all objections) | As Vivint has stated in its SEC report, Vivint's ability to attract and sign new customers in a cost-effective manner is claimed to be a "key determinant of future operating performance." Witness states this is a key driver of profitability and cash flow. | R, F, FM 30:24-25; 31:1-5 (misstates text of exhibit in question) | 32:12-17 | |
| 34:13-35:12 (omitting objections) | AMRU is total revenue for all of Vivint's subscriber base divided by the average number of total subscribers | R, F, FM 35:2-12 (vague, narrative) | 35:13-25 | |
| 36:1-23 (omitting objection) | Vivint's AMRU increased from $56.14 in 2013 to $64.75 in 2020 | R, F, FM 36:17-20 (vague, leading) | | |
| 36:24-37:13 (omitting objection) | Vivint's average subscriber lifetime is approximately 92 months, which is longer than the typical initial contract term | R, F, FM 37:10-13 (leading, vague, misstates testimony) | | |
| 38:1-24 (omitting all objections) | Vivint's net service margin for 2020-2018 was 79%, 74% and 69% respectively | R, F, IC, FM 38:22-24 (vague, leading) | 39:9-16 | |
| 39:17-23 | The difference between net service margin and profit is that net service margin is based on the margin generated for | R, IC | 39:24-40:3 40:5-9 | |

| Designations | Description | Vivint's Objections | Vivint Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | serving an average individual account | | | |
| 40:12-42:17 (omitting objections) | On page 22 of Ex P127, in the section identifying risk factors. One section states that Vivint is "highly dependent on [its] ability to attract, train and retain an effective sales force and other key personnel, especially for [its] peak April through August sales season." Vivint's SEC statement says that if it is unable to attract, train and retain and effective sales force, its financial operations could be adversely effected. Witness explains that Vivint's salespeople drive new subscribers. | R, F, FM 41:22-25, 42:1-7 (vague) | | |
| 42:18-45:1 (omitting objection on 44:6-7) | On page 30 of Ex P127, there is a section stating that "new subscriber acquisitions play a particularly important role in [Vivint's] financial model as they not only increase [Vivint's] future operating cash flows but also help to replace the cash flows lost as a result of | R, F, FM 44:15-25, 45:1 (vague) | | |

| Designations | Description | Vivint's Objections | Vivint Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | subscriber attrition." Witness says it is difficult to explain Vivint's "financial model" because there's a lot that goes into it. | | | |
| 45:2-11 | Witness claims Vivint is not able to specify its revenues "by state" because Vivint does not track that information | R | 45:15-17 | |
| 46:21-47:12 | Same | R | | |
| 47:13-48:17 (omitting objections) | Vivint does track and have the ability to pull its customer subscription base by state. Witness says he looked into that to prepare for his testimony on topic 1.B. | R, F, FM 47:19-21 (vague) | | |
| 49:22-50:16 | Same | R, F | | |
| 51:7-51:24 | On page 37 of Ex P127, Vivint states subscribers in the states of Texas and California represent approximately 19% and 9% of Vivint's total customer base for the period ending in 2020. | R, F | | |
| 52:10-:15 | Vivint does track the percentage of its customers by state | R | | |
| 52:22-53:20 | Approximately 2.9% of Vivint's subscribers are in North Carolina. Witness does not | R, F | | |

| Designations | Description | Vivint's Objections | Vivint Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | know the percentages for South Carolina, Tennessee, Georgia, Virginia, Maryland, Alabama, or Florida. But Vivint does track that information. | | | |
| 53:21-54:15 (omitting all objections) | Vivint files separate tax returns in each state it does business. Witness says Vivint does not include "revenue" on those returns because they are done on a "cash" basis. | R, F, FM 54:12-15 (vague) | 54:8 | |
| 54:23-57:17 | After being compelled by the Court to answer CPI's interrogatory no. 13 (within exhibit P60), Vivint did not provide any revenue figures at all | R, F, IC, CU | 58:3-6 58:8-10 | |
| 58:11-59:17 (omitting all objections) | Witness is not sure one way or another whether Vivint's billing system has the ability to provide information by state for a given time period. However, witness agrees Vivint does have information for the percentage of subscribers base by state. | R, F, FM 58:13-19 (vague), FM 58:24-25, 59:1-17 (vague, leading) | 60:3-8 | |
| 60:25-61:4 | Witness is also testifying on behalf of Vivint on topic 1.G. – | R | | |

| Designations | Description | Vivint's Objections | Vivint Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | "Amount spent on marketing and sales for Vivint's alarm business" | | | |
| 61:18-64:16 | Page 105 of Ex P127 includes the financial information the witness reviewed to provide testimony on Vivint's marketing spend. Vivint's advertising costs were $70.9M, $60.4M, and $47.2M for 2020-2018, respectively. Witness cannot provide a more detailed breakdown, but these expenses would include costs associated with marketing and branding activities. Costs for things such as TV commercials may be in addition to these numbers. Those numbers would be reflected elsewhere in Ex. P127, including on page 87 under "selling expenses" or "general and administrative expenses" | R, F | | |
| 64:17-19; 65:7-12 | On topic 1.G., witness is not able to specify an exact amount Vivint has spent on marketing expenses. He has no other information than the | R, F | | |

| Designations | Description | Vivint's Objections | Vivint Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | numbers already discussed | | | |
| 71:8-72:14 | Deposition Exhibit 2 is Vivint's 10-Q for the quarter ending September 30, 2021. This is also one of the documents the witness reviewed to prepare for his testimony on the topics. | R | | |
| 72:15-17; 73:3-74:1 | Exhibit P243 is an investor presentation created in association with Vivint's acquisition by Mosaic. Witness was involved with assembling some of the financial information for this presentation | R, F | | |
| 74:2-75:3 | On page 20 of Ex P243, it indicates that Vivint has "4,500 plus in-home sales representatives" and conducts approximately 8 million in-home conversations per year. Witness says the sales rep figure would have come from Vivint's HR system | R, F | | |
| 75:4-76:10 | On page 49 of Ex P243, it says that it is estimated that the acquisition of Vivint, which took place in | R | | |

| Designations | Description | Vivint's Objections | Vivint Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | January 2020, would result in a "pro forma enterprise value of approximately $5.6 billion." That figure represents the amount the business would have been valued at at the time of the close of the transaction. | | | |

2. Vivint 30(b)(6) Designee Kent Hansen, Vivint Vice President of Legal, 11/30/2021 (Day 1 of Testimony)

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| 5:3-5:6 | Hansen is an attorney | | | |
| 5:12-6:3 | Work History | | | |
| 7:23-8:7 | Job duties include oversight of litigation, among others | | | |
| 8:20-9:24 | Part of role would be to make decisions as to sale rep disciplinary action. He had authority to fire sales reps without further approval. Decisions on sales rep discipline would include compliance committee | IC, F | | |
| 10:5-11:12 | Members of the compliance committee have | | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | included CFO, Chief People Officer, and Senior VP of sales. The compliance committee has changed over time and now includes the new chief ethics and compliance officer | | | |
| 13:7-15:24 | Vivint's position is that it has done a good job of deterring DSPs, at least since Hanson has been there. Agrees keeping good records of misconduct is important to identifying patterns. When he hired on, Hansen did not review past disciplinary records to identify reps with a history of misconduct. | F, FM 14:4-15 (leading, misstates testimony, hypothetical, foundation) | | |
| 16:5-17:21 | Responsibilities include discipline, including up to termination. But Hansen did not review past disciplinary records to identify reps with a history of misconduct; he only reviewed individuals as new | R 16:15-25 | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | complaints arose. Vivint does keep records about reps when they receive them, including in the Sales Force database | | | |
| 19:12-21:20 | Exhibit P749 is a press release announcing the hiring of a new Chief Compliance Officer, Mr. Garen. Hansen agrees with the characterization in the article that Vivint has a strong culture of corporate compliance. Exhibit P478 [erroneously referred to as P479] appears to be a copy of a transcript of Vivint's Q2 earnings call | F, R | | |
| 22:7-22:14 | Hansen does not know what audits were done to deal with sales practices, as referenced in Ex P478 [erroneously referred to on the transcript as P 479] | F, R, FM 22:7-14 (misstates exhibit, vague) | | |
| 22:20-23:3 | Same. Hansen says he cannot answer whether any audits involved DSPs; claims it is privileged information | F, R, FM 23:2-7 (vague) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| 23:7-23:8 | Same | F, R, FM 23:2-7 (vague), P | | |
| 23:19-24:4 | Vivint provides compliance training to its sale representatives, including the conduct that reps should not engage in | | | |
| 24:10-25:20 | Video played depicts Todd Pedersen, founder and (former) CEO of Vivint, which was one of the videos included in Vivint's production as part of an excel file with Vimeo links ending in 3885. The video played was part of the September 3, 2020 compliance training [erroneously stated as "2000" on transcript]. This video is part of the official compliance training at Vivint. | R, F | | |
| 26:5-27:1 | Part of the purpose of Vivint's pre-install survey is to clarify the customer's understanding, so if there is manipulation of the process it could possibly not give the | F, FM 26:22-25, 27:1-6 (vague, compound) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | customer an opportunity to get that clarification. | | | |
| 27:3-30:9 | Vivint's then-CEO Todd Pedersen said on the video that Vivint has a zero tolerance policy for deceptive sales practices. Hansen believes Vivint has had a zero tolerance policy, at least during the time he has been there.

Jason Newby was a Sales Manager at Vivint for 13-14 years. Hansen agrees he was given a video depicting Mr. Newby engaging in deceptive sales practices. Mr. Newby was not immediately fired upon receipt of the video, but Hansen says it's because he thought Newby was no longer selling for Vivint. | R, F, FM 26:22-25, 27:1-6 (vague, compound), FM 27:14-19 (vague, foundation), PBA (as to Newby testimony) | | |
| 30:12-31:4 | [Sean Ricks sales compliance video, titled "Zero Tolerance" was played.] Mr. Ricks would typically | | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | conduct these trainings. The type of conduct Ricks described is the conduct Vivint has zero tolerance for. | | | |
| 31:18-33:17 | Hansen agrees that Vivint has committed deceptive sales practices to CPI customers in the time period of 2017 to present. He does not know how many times, and says he has no way of knowing the number. He has fired some sales reps, including Kurtis Kunz, who was fired in 2020. Thinks it is "fact dependent" whether a sales rep that commits DSPs to one customer would do it to others. | F, FM 33:2-17 (vague, misstates testimony, hypothetical, argumentative) | | |
| 34:1-34:9 | Does not remember ever speaking to Kunz or Newby in person | F, R | | |
| 34:18-36:8 | [Sean Ricks sales compliance video, titled "Misrepresentation," was played.] Vivint's contract is either a term or month to month | F, R | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | service contract. It's important that sales reps accurately describe the contracts so customers understand.<br><br>[Another training video is played, titled "How to Explain Contracts," dated April 28, 2020.] | | | |
| 36:19-39:3 | The video segment played is a training video with Vivint rep Wyatt Levin. [Another portion is played from 35:15 to 37:00.] Hansen agrees that what is trained on the video is not a "very grammatical" answer to the question of whether the transaction involves a service contract. | R, F | | |
| 39:15-40:6 | Hansen did not review any of the customer depositions in this matter. Did not review Laura Ward's deposition. Hansen doesn't recall if Kurtis Kunz, the rep | F | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | Hansen fired, was involved in Ms. Ward's deposition. | | | |
| 40:13-41:2 | Vivint's general policy is to require pre-install surveys be conducted by video. Reps are not supposed to "coach" the customer how to answer the questions. | F, FM 40:25, 41:1-4 (vague) | | |
| 41:4-41:18 | [Laura Ward pre-install video survey played.] Hansen does not know if the rep answered a portion of the question on this survey | F, FM 40:25, 41:1-4 (vague), H (as to Ward video) | | |
| 41:20-43:15 | [Additional segments of Laura Ward pre-install video survey played.]Hansen agrees that the rep said "just say yes whenever the microphone pops up." He agrees some portions of the video were improper conduct, including when he was answering for the homeowner. Other portions of the video were not necessarily improper | F, H (as to Ward video) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| 44:6-44:21 | Hansen cannot tell whether the sound was muted on the video survey by the rep, or whether there was just a lag with the video as it was being played at the deposition. He has never heard of a circumstance where a rep muted the sound. | F, H (as to Ward video) | 44:23-45:9 | |
| 45:10-50:17 | Does not recall whether Kurtis Kunz was a repeat offender for deceptive sales practices. Cannot recall whether he reviewed any of Kunz's past history before firing him. Does not recall what was asked of Kunz in the investigations of his conduct.<br><br>[Portion of Ex P231 (Ring video clip) played.] Hansen agrees there are portions of the sales presentation evidenced on the video that are deceptive. The rep stating that he was "licensed by the police" is technically | F, R, PBA (as to Newby testimony), H (as to video) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | true but prohibited by the sales code of conduct.<br><br>Hansen says when he received the video clip of Newby, he did not immediately fire him because he thought Newby was no longer selling for Vivint. Hansen says if he knew Newby was selling for Vivint in 2020, he would have fired him earlier. Agrees Vivint compensation records could be a reliable place to look to see if Newby was still working for Vivint at this time. | | | |
| 50:19-50:19 | Same | | | |
| 50:21-52:19 | Describes the ways in which a DSP report can come into Vivint. Oftentimes it is by phone call.<br><br>Exhibit P102 is an email chain from a Mr. Bartolini to Vivint "PR" that includes a link to a Ring doorbell video.<br><br>[Portion of the video is played.] Hansen | F, H, FM 52:16-22 (misstates testimony, hypothetical, calls for legal conclusion) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | agrees the portion of the video where the Vivint rep says that Vivint "makes the parts" for CPI alarm systems it is misleading and against Vivint's policies. He does not know who the rep is. | | | |
| 52:22-53:17 | Vivint employees are trained to convey reports of deceptive sales practices to legal. He does not know whether the rep depicted in the video still works for Vivint. | R, F, FM 52:16-22 (misstates testimony, hypothetical, calls for legal conclusion) | | |
| 53:24-57:6 | Hansen says that Vivint does not maintain a single document that tracks history of DSP investigations and conclusions for various reps. However, there is a database where all of the complaints and conclusions reached are stored, which would permit retrieval for individual rep histories. Hansen does not know the name of the database. Says that | R, IC, CU, FM 57:3-8 (vague, foundation) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | there is not a central repository in which all discipline imposed on all reps for DSPs can be retrieved. Hansen says there is "no reason" to maintain records like that. | | | |
| 57:8-57:23 | Vivint has been involved in a lot of litigation relating to sales practices. | FM 57:3-8 (vague, foundation), R, F, PBA, FM 57:22-25 (misstates testimony, foundation, vague), MIL | | |
| 57:25-59:10 | There was a DOJ and FTC investigation into Vivint. Vivint settled the FTC action for $20 million. | R, F, PBA, MIL | | |
| 59:15-59:22 | Question as to whether it would make sense for Vivint to globally track the misconduct of its entire sales force and discipline imposed | R, F, FM 59:15-25 (compound, argumentative, vague, hypothetical, misstates testimony) | | |
| 59:24-60:5 | Hansen says it would not promote Vivint's zero tolerance approach to keep more robust records. | R, F, FM 59:15-25, 60:1-11 (compound, argumentative, vague, hypothetical, misstates testimony) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| 60:7-61:19 | Same. The new Vivint Chief compliance officer may feel differently, however. [Portion of video marked as Exhibit P89 is played] | FM 60:1-11 (compound, argumentative, vague, hypothetical, misstates testimony), F, R, A, H (as to video) | | |
| 61:23-62:9 | Hansen would recommend a different sales approach than what's used in the video | A, H (as to video), R, F, FM 62:7-16 (legal conclusion, misstates video, foundation) | | |
| 62:13-62:23 | Agrees that in the clip reviewed, the rep does not identify himself as being with Vivint, which is what the code of conduct requires | A, H (as to video), F | 62:24-63:15 | |
| 63:16-64:15 | Vivint does not have a problem with Vivint reps characterizing Mr. Gill's comments in his 2020 email as a basis to try to sell Vivint's products… As long as the characterizations are accurate. Vivint did not provide any training or direction to its sales force, to Hansen's knowledge, in connection to Mr. Gill's comments | FM 64:12-21 (compound, vague) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| 64:17-64:21 | Hansen not aware whether Vivint employed additional reps to CPI's service areas following Mr. Gill's comments | FM 64:12-21 (compound, vague) | 64:22-65:13 | |
| 65:14-66:14 | Agrees it would make sense for someone to review the CPI customer depositions if Vivint was taking its zero tolerance stance seriously | F, R, FM 66:10-16 (leading, vague, foundation, compound) | | |
| 66:16-67:2 | Hansen has not reviewed the customer depositions. | F, R, FM 66:10-16 (leading, vague, foundation, compound) | | |
| 67:4-67:9 | Customer testimony would be a source of information for Vivint to utilize in adherence to its stated zero tolerance policy. | R, FM 66:24-25, 67:1-4 (vague, legal conclusions, foundation), FM 67:5-21 (vague, asked and answered, legal conclusions, foundation) | | |
| 67:13-67:21 | Same. Vivint has not undertaken any review of the customer depositions. Hansen is not sure if he will undertake that effort. | R, FM 67:5-21 (vague, asked and answered, legal conclusions, foundation) | | |
| 68:16-71:16 | Exhibit P90, bates stamped Vivint1352, is an excel spreadsheet generated by Vivint | R, H (spreadsheet), F | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | in response to CPI's discovery requests and the court's order. It contains info from Vivint's account notes for accounts that hit on a search for "CPI." Vivint then produced records relating to the customers that hit on the search and are in the spreadsheet. Column A has customer service numbers, Column B has case number, and Column C has date of the contact/call. | | | |
| 71:18-72:21 | The case type column has a general characterization of the nature of the complaint/contact. One of the categories in that column is "slam" | R, H (spreadsheet), F | | |
| 73:3-73:25 | "Slam" as used in the spreadsheet may mean a DSP or it may not depending on the customer service rep's thinking. | H (spreadsheet), R, F, | | |
| 74:12-75:17 | Column E in the spreadsheet is the | H (spreadsheet), R, F, FM 75:16-19 | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | "primary reason" category. This would appear to be the general reason for the interaction. Column F is "secondary reason" which could list additional information about the purpose of the call. "Comment body" is the place in the spreadsheet for the Vivint customer service rep to provide a narrative about the nature of the call. | (foundation, vague) | | |
| 75:19-76:15 | Hansen says that the reason most of the audio recordings associated with the complaints on this spreadsheet were not produced is because Vivint accidently deleted a large portion of its customer files, including video survey and audio. | H (spreadsheet), R, F, FM 75:16-25, 76:1 (vague, foundation), FM 76:12-23 (vague, hypothetical, misstates testimony) | | |
| 76:17-76:21 | The complaints listed on P90 (Vivint1352) may lead to the opening of a feedback report that gets routed to the legal department. | H (spreadsheet), R, F, FM 76:12-23 (vague, hypothetical, misstates testimony) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| 76:23-76:23 | Same | H (spreadsheet), R, F, FM 76:12-23 (vague, hypothetical, misstates testimony) | | |
| 77:1-77:2 | Same | H (spreadsheet), R, F | | |
| 77:6-79:25 | Customer reps are trained that if a call comes in reporting a potential deceptive sales practice, that they should create a "feedback report." Hansen agrees the declaration marked as Exhibit P237 accurately describes customer service rep's role and training with determining whether a customer complaint should be routed to the legal department. Hansen is not familiar with their training. | R, F | | |
| 80:12-81:21 | Ex P90 has 13,005 entries. If a customer hit on the "CPI" search, Vivint included all account notes for that customer | R, F, H (spreadsheet), FM 81:17-21 (vague, misstates testimony) | | |
| 83:14-84:5 | Row 2742 of Ex P90 has a report from 1/26/2021. It is | H (spreadsheet), R, F | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | classified as "Slam" and "Vivint Slam." | | | |
| 84:7-84:7 | Same | H (spreadsheet), R, F | | |
| 84:10-88:25 | This entry references that the customer is elderly and that there is an extremely large number of compliance issues with the sales rep. At row 2741, the entry states that "Sales rep Cameron has over 50 complaints on compliance list from 2020 season." Hansen doesn't know what the compliance list is, and doesn't know how the customer service rep knows that Cameron has over 50 compliance complaints. | H (spreadsheet), R, F | | |
| 89:1-89:5 | Hansen is familiar with Scott Bell because he terminated Bell. | IC, R, PBA | 89:6-10 | |
| 89:11-90:16 | Bell was terminated because he identified a way to take advantage of Vivint's inside sales leads. | IC, R, PBA | 90:17-18 | |
| 90:19-91:9 | Has come across issues with Vivint's | H (spreadsheet), R, F, FM 91:6-15 | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | buyout processes from time to time. Agrees the code of conduct prohibits misrepresentations relating to buyouts. | (legal conclusion, hypothetical, vague) | | |
| 91:11-92:23 | Agrees it would be dishonest to misrepresent the nature of a buyout to a customer. Agrees the example referenced in the spreadsheet is an example of a discrepancy with the buyout. | H (spreadsheet), R, F, FM 91:6-15 (legal conclusion, hypothetical, vague), FM 92:20-25, 93:1 (argumentative, misstates testimony, vague, leading) | | |
| 92:25-93:13 | Cannot say whether sales rep Cameron Kimball was treated with a zero tolerance approach in light of the fact that there were 50 compliance complaints against him in the 2020 sales season. Zero tolerance does not mean Vivint fires every rep for every complaint. | F, R, FM 92:20-25, 93:1 (argumentative, misstates testimony, vague, leading), FM 93:11-16 (leading, vague, foundation) | | |
| 93:15-95:11 | Cannot recall the ultimate reason why Kimball was terminated. Agrees there were multiple complaints about Kimball relating to deceptive sales | R, F, FM 93:11-16 (leading, vague, foundation), FM 95:9-13 (leading, vague, foundation) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | practices, but doesn't know if it was 50 complaints of that nature. Kimball was a sales manager, which means he had the authority to recruit and train other sales reps. Vivint relies heavily on sales managers for training outside of compliance issues. | | | |
| 95:13-95:23 | Not aware of Kimball's past history with deceptive sales complaints. He worked in Jordan Binning's sales group. | R, FM 95:9-13 (leading, vague, foundation) | | |
| 96:3-96:4 | Ex. P90 (Vivint1352) is referenced | H (spreadsheet), R | | |
| 96:9-96:18 | The referenced portion of the exhibit alludes to Vivint making an offer to retain the customer | H (spreadsheet), R, F, FM 96:15-18 (misstates exhibit, leading, foundation) | | |
| 97:1-97:14 | Same | H (spreadsheet), F, R, FM 97:10-20 (leading, misstates exhibit/testimony, foundation) | | |
| 97:16-98:1 | Agrees if the customer took the offer made by Vivint | H (spreadsheet), F, R, FM 97:10-20 (leading, | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | that it would not cover what was owed to CPI | misstates exhibit/testimony, foundation) | | |
| 98:10-99:6 | There is no formalized policy on whether Vivint allows a customer to cancel without penalty outside of the ROR period.<br><br>Hansen does not know how many sales reps Cameron Kimball managed. | R, F, FM 99:4-13 (leading, argumentative, vague, foundation) | | |
| 99:8-99:19 | Hansen does not necessarily agree that the managers who commit DSPs would also train their recruits to engage in the same conduct. | R, F, FM 99:4-13 (leading, argumentative, vague, foundation), FM 99:14-25 (asked and answered, hypothetical, vague) | | |
| 99:21-100:3 | …But it is a risk. For example, in the Newby Ring doorbell video, he has a recruit that is observing his sales tactics. | R, F, FM 99:14-25, 100:1-7 (asked and answered, hypothetical, vague) | | |
| 100:5-102:8 | Same. Hansen says he does not know if Newby was a successful sales rep.<br><br>Line 6300 of Ex P90 is referenced. It is an entry from September 9, 2020 | R, F, FM 99:14-25, 100:1-7 (asked and answered, hypothetical, vague), H (spreadsheet) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | with the description "Vivint slam." The complaint relates to Kurtis Kunz. He is another rep Hansen terminated. The complaint relates to a misrepresentation relating to the buyout of the customer's contract. | | | |
| 102:21-105:3 | The entry at line 6300 references the rep being on Vivint's "naughty list." The rep does not know what that is in reference to or whether it is the same as the "compliance list" referenced earlier. | F, R, H (spreadsheet) | | |
| 105:12-108:5 | Row 6995 of Ex. P90 is referenced. The customer account note notates that the customer "states that they felt that the sales rep made it to be that Vivint and CPI were potentially partner-like related companies." Hansen agrees this type of representation is often referred to by Vivint as an "affiliation misrepresentation." | F, R, H (spreadsheet), FM (foundation, vague) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | Under this narrative, the note says that the sales rep has a "compliance pattern."<br><br>Shelby Guest is still at Vivint. Hansen does not know if he has a history of compliance problems.<br><br>The entry at line 6955 references various offers that were made to retain the customer who had complained to Vivint about deceptive sales practices. Hansen agrees the offers were made. Hansen "assumes" it is still Vivint's practice to make an effort to keep a customer even if the customer reports a deceptive sales practice was involved in their transaction. | | | |
| 108:15-108:20 | [Question as to whether a customer who switches to Vivint will have their prior | R, F, FM 108:15-25 (foundation, vague, hypothetical) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | company's system removed.] | | | |
| 108:23-109:10 | Hansen says it is not necessarily true that a converted customer would have their prior system removed because Vivint can make its system work with other companies' hardware already installed in a customer's home. | R, F, FM 108:15-25, 109:1-7 (foundation, vague, hypothetical), FM 109:8-15 (foundation, vague, hypothetical) | | |
| 109:13-109:20 | …But the panel and some other equipment would likely be removed. | R, F, FM 109:8-15 (foundation, vague, hypothetical), FM 109:16-24 (foundation, vague, hypothetical), H (spreadsheet) | | |
| 109:23-110:1 | With respect to the entries like the one being referenced in Ex P90, the fact that the customers have assigned Vivint account numbers suggest that Vivint has installed equipment in their homes and begun monitoring the home | R, F, FM 109:16-25, 110: 1 (foundation, vague, hypothetical), H (spreadsheet) | | |
| 110:16-111:7 | Exhibit P92 (Vivint19961) is another spreadsheet | H (spreadsheet), F, R, FM 111:4-11 | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | that is a subset of Exhibit P90 which includes the entries where a feedback case was created by Vivint. | (foundation, leading, vague) | | |
| 111:9-116:24 | A feedback case is created by a Vivint customer service representative believes the information reported by the customer warrants an investigation by Vivint legal for potential compliance problems. | H (spreadsheet), R, F, FM 111:4-11 (foundation, leading, vague) | | |
| 117:16-119:1 | Ex. P237 is a declaration by Vivint employee Caleb Banks [erroneously referenced as "Kayla" Banks]. Hansen agrees the categories of information described in the declaration are available to Vivint's compliance personnel. | R, F, H (feedback spreadsheet) | | |
| 119:8-122:13 | The information redacted in Vivint's feedback spreadsheet (Ex. P.92) and described in the declaration | R, F, FM 122:6-20 (compound, leading, foundation, vague), H (spreadsheet) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | would include what Vivint determined happened in its investigation of complaints about compliance issues. | | | |
| 122:15-126:12 | Vivint does not want to share the information redacted on Ex. P92 (Vivint000199961) because Vivint claims it is privileged, even if it would assist Vivint in showing that there was no compliance violation. The spreadsheet also includes numerous other columns of information beyond the outcome of the investigation. The feedback cases are created initially by Vivint customer service reps in response to complaints from customers and are routed to the legal department | R, F, FM 122:6-20 (compound, leading, foundation, vague), H (spreadsheet), FM 126:2-14 (compound, leading, vague, foundation) | | |
| 126:14-126:14 | Vivint customer service reps are trained to accurately document information in | R, FM 126:2-14 (compound, leading, vague, foundation) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | Salesforce in response to complaints from customers. | | | |
| 127:13-127:15 | After a feedback case is created, there is typically an investigation of the incident. | R, F | | |
| 127:18-129:14 | Ex. P240 is a declaration of Vivint employee Clark Hymas that contains information relating to sales rep discipline and identifies of reps that were terminated. | R, F | 129:15-17 | |
| 129:25-132:19 | Certain Vivint sales managers were terminated more than once. Sales Manager Jordan binning was terminated more than once for compliance problems. Cameron Kimball is listed in section 5 of exhibit P240 as one of the sales persons who was rehired after being fired. | R, F, FM 132:15-25 (compound, hypothetical, foundation, vague) | | |
| 132:21-136:8 | Hansen says he has an arrangement with the board of directors that | R, F, FM 132:15-25 (compound, hypothetical, | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | nobody in the company is allowed to rehire someone who is terminated form compliance issues without board approval. However, when Hansen learned that certain reps who'd been terminated were rehired, Hansen did not recommend those individuals be fired, even though he had the power to do so. Nolan Detlsefon was another rep with a history of misconduct. Hansen does not know why he was rehired after he was fired. There are other names on the list who Hansen is not as familiar with. CJ Adamson had historical issues with sales conduct that resulted in his termination. | foundation, vague), IC | | |
| 136:11-139:3 | After Nolan Detlefson was fired, he was participating in sales meetings with CJ Adamson's team. Additionally, after Jordan Binning was fired, | R, F | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | there was evidence to suggest that Binning was still allowing him to sell for Vivint. Vivint's legal department did an investigation, a part of which was requesting phones from certain reps so they could be searched to see if there'd been communications with Binning. Adamson provided a phone to Hansen, by Hansen determined Adamson had been communicating with Binning on another device. The Binning and Detlefsen issues both contributed to Adamson's firing. Adamson was "at least" a manager at the time of his firing. When Binning was fired a second time in 2020, he was a regional sales manager at Vivint. He would have reported to a senior vice presidents, who reported to head of outside sales Josh Crittenden, who | | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | reported to Vivint Chief Revenue officer Todd Santiago | | | |

3. Vivint 30(b)(6) Designee Kent Hansen, Vivint Vice President of Legal, 12/1/2021 (Day 2 of Testimony)

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| 146:8-147:6 | Vivint lost a very significant volume of customer preinstall surveys and potentially audio recordings of inbound complaint calls due to an IT incident. Hansen does not know if all surveys and calls have been produced for the CPI customers that switched to Vivint | R, F, FM 147:3-6 (foundation, vague, misstates testimony) | | |
| 147:9-151:5 | Ex. P90 is referenced. A search is conducted for Laura Ward's service number. There are 52 cells in the spreadsheet that hit on that search. Exhibit P751 [erroneously referenced as P251] is introduced. It contains the cells | R, F, H (VIV 1352 spreadsheet), H, S and A (Exhibit P751) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | from Exhibit P90 that related to customer Laura Ward's account in chronological order. Witness generally agrees that this type of exercise can be conducted to isolate entries relating to a given customer from Ex P90. | | | |
| 151:13-152:15 | The rows on Exhibit P751 [erroneously referenced as P251] would represent the number of times that a particular customer called into or interacted with Vivint, accounting for the fact that there may be a few duplicates. | R, F, H, S and A (Ex. P751), H (1352 spreadsheet) | | |
| 153:21-153:25 | Using the same process as was discussed with respect to Exhibit P751 [erroneously referenced as P251], you could get an idea as to how many times a customer called into Vivint and the general nature of the communication. | R, F, FM (misstates exhibit), H (exhibit and 1352 spreadsheet)) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| 154:18-155:5 | Same | R, F, H | | |
| 155:14-155:19 | Exhibit P751 [erroneously referenced as P251] shows that there was some type of inbound activity to Vivint on her account from July 2, 2020 to November 9, 2020, but Hansen is not otherwise familiar with the document. | R, F, H (as to 1352 spreadsheet), H, S and A (as to summary exhibit) | | |
| 155:21-156:12 | Same.<br><br>There is an attorney general action against Vivint in the state of California. | R, F, H (as to 1352 spreadsheet), H, S and A (as to summary exhibit), PBA (as to CA AG action) | | |
| 157:1-160:21 | The California AG actions involves allegations of three classes of consumers of different demographics. Exhibit P752 is the stipulated final judgment relating to that action. Hansen's predecessor at Vivint signed that stipulation on Hansen's first day on the job. Part of the resolution was an injunction | R, F, PBA and MIL (as to CA AG action), H (exhibit), FM (misstates exhibit, foundation), | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | against Vivint prohibiting certain sales conduct. Hansen is not aware if specific sales rep's behavior gave rise to that action or whether they were disciplined or fined. The stipulated judgment also sets forth certain training and reporting requirements for Vivint. | | | |
| 161:14-161:21 | Same. | R, F, PBA and MIL (as to CA AG action), H (exhibit), FM (misstates exhibit, foundation), | | |
| 162:16-163:1 | Pages 6 to 8 of Ex. P752 memorializes what Vivint agreed to do related to reporting and specifies certain policies and procedures for sales practices | R, F, PBA and MIL (as to CA AG action), H (exhibit) | | |
| 165:19-167:12 | Vivint's "SWAT team" was a team of Vivint sales representatives who would visit customers subject to deceptive sales | R, F | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | by other competitors to try to recapture the customers. The SWAT team does not still exist in its prior form. Vivint's primary response to such actions now is to conduct customer service calls | | | |
| 167:20-169:19 | The SWAT team would analyze data to determine customers who were being taken over by Vivint competitors.<br><br>On Topic 13 of the deposition notice: the range of annual compensation for Vivint's top 10 sales representatives and/or managers is $478,882 to $810,412 for the year 2020.<br><br>The average annual compensation for the top ten sales representatives (excluding managers and | R, F | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | regional managers) is $231,691. | | | |
| 170:17-170:22 | Ex. P230 is the Stipulated Order in the FTC action against Vivint. | R, F, PBA and MIL (as to FTC action), H (exhibit) | | |
| 171:1-171:2 | The action relating to Ex P230 involved "white paging" and use of customer credit without the customer's permission | R, F, PBA and MIL (as to FTC action), H (exhibit) | | |
| 171:25-172:11 | Same | R, F, PBA and MIL (as to FTC action), H (exhibit) | | |
| 172:14-175:25 | White paging is defined in the exhibit.<br><br>Vivint was not able to identify all of the people involved in white paging because if a customer got out of their account, then there was no way to discover who had been a victim of white paging. The company investigated and composed a list of reps potentially involved and terminated some in 2017. Hansen does | R, F, PBA and MIL (as to FTC action), H (exhibit) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | not know the names of any specific reps who were terminated. If any were terminated, he believes it happened before the FTC action was settled. Hansen is not sure if any sales reps fired for "white paging" in 2017 were ever rehired by Vivint. But he does know that of the approximately 130 employees who were terminated in 2017, more than 5 and less than 10 were allowed to come back to Vivint. Vivint fired the 130 or so employees because their attrition rate suggested they were doing something untoward. Ex P230 fairly and accurately describes the terms of Vivint's agreement to resolve the FTC matter. | | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| 177:15-177:17 | Todd Pedersen, the CEO of Vivint at the time, signed the agreement with the FTC | R, F, PBA and MIL (as to FTC action), H (exhibit) | | |
| 178:5-179:7 | Dan Garen took over the employee monitoring role set forth by the FTC agreement. He has begun implementing measures, including setting up an ethics hotline | R, F, PBA and MIL (as to FTC action), H (exhibit) | | |
| 179:19-180:16 | Vivint took actions to fire sales reps implicated in the FTC action before the FTC was involved. | R, F, PBA and MIL (as to FTC action), H (exhibit), FM 180:13-19 (argumentative) | | |
| 180:19-183:13 | Another excel spreadsheet, Vivint15203 (Ex P99), is referenced. It is a document used by Hari Rasolo relating to buyouts. It may have been created by a third party administrator. The spreadsheet has information on certain customer accounts. It references an amount of buyout, an approved amount for buyout, | R, F, H (spreadsheet containing customer-provided info) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | and the customer out of pocket for the remaining amount. It also includes info on the respective sales rep and manager | | | |
| 183:19-183:21 | Reference to new exhibit | R, F, MIL/PBA | | |
| 183:23-183:24 | Exhibit P234 is introduced | R, F, MIL/PBA | | |
| 184:1-184:12 | Ex P234 is a Vivint legal investigation spreadsheet | R, F, MIL/PBA | | |
| 184:17-185:3 | Ex P234 appears to be a document that is maintained by Landon Potter as part of Vivint's compliance program. Hansen has not heard the term "legal investigation spreadsheet" but that may be used by Potter. | R, F, MIL/PBA | | |
| 185:9-186:1 | Same. The document tracks the compliance teams' investigations. | R, F, MIL/PBA | | |
| 186:22-190:10 | On Ex P234, there are some fields that are redacted. Hansen refuses to disclose the information that is in those columns on a claim that it is | R, F, MIL/PBA, FM 190:8-19 (hypothetical) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | privileged. But some of the redacted information includes Vivint's method for classifying the respective incident/complaint as a result of the investigation. It also includes fields for feedback given, and sales reps subject to the respective complaint. The purpose of the spreadsheet is to memorialize compliance complaints and Vivint's investigations. Hansen claims the "investigation result" column is privileged. There are also fields for investigation notes, summary, timeline, and install date. Any fine or action taken would be in column "M," which would include any terminations.<br><br>Once Hansen assumed the role, | | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | his team did not do a lot of fines. He finds them ineffective and has concerns that they do not deter conduct. So he wouldn't expect a lot of fines in column "M." | | | |
| 190:12-192:7 | Hansen is not sure if giving higher fines more frequently would have a deterrent effect. He thinks there's a risk that using fines encourages "business decisions" by the reps, meaning assessing the likelihood of getting caught, the amount of the penalty, etc. and whether there is a possibility of making more money taking the risk.

The information contained in Ex. P234 is the type of information Hansen has used to correlate whether a given rep has had | R, F, MIL/PBA, FM 190:8-25, 191:1 (hypothetical, vague) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | problems with DSPs. It would not surpirse Hansen that sales rep Nolan Detlefson has 138 entries on the spreadsheet. | | | |
| 192:15-192:18 | [Demonstrative document is shared over big screen relating to P234] | S, H, A (demonstrative exhibit), F, R, PBA/MIL | | |
| 194:20-195:7 | Witness agrees that the prior exhibit could be sorted by sales reps to figure out how many entries there are for each | S, H, A (demonstrative exhibit), F, R, PBA/MIL, FM (foundation) | | |
| 195:20-195:22 | It would not surprise Hansen that some sales reps on the legal feedback spreadsheet are still with Vivint | F, R, PBA/MIL, FM 195:20-25, 196:1-2 (leading, vague, foundation) | | |
| 195:24-196:2 | Same. Also not surprised that some of these reps have patterns of complaints. | F, R, PBA/MIL, FM 195:20-25, 196:1-2 (misstates testimony/exhibit, vague, foundation) | | |
| 196:16-200:1 | A legal feedback case is created because Vivint's customer service determines that there is a need for a legal investigation, possibly including a | F, R, PBA/MIL, S, H, A (demonstrative exhibit) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | compliance/ ethics violation. Hansen not familiar whether the reps highlighted on the demonstrative are still at Vivint. Hansen agrees based on the numbers depicted in the demonstrative that some reps who are still at Vivint have more incidents than others who are no longer with Vivint. Sales Rep Kunz has 18 entries on the legal feedback spreadsheet. Hansen agrees sales rep Brandon Ogletree had a history of making affiliation misrepresentations. | | | |
| 201:21-201:24 | Hansen cites privilege with respect to question as to whether he has conveyed his belief to Vivint leadership that fines are not effective | R, F, FM 201:21-25, 202:1-2 (foundation, vague) | | |
| 202:1-202:13 | Same. Vivint does not still issue fines to sales reps | R, F, FM 201:21-25, 202:1-2 | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | relating to DSPs or compliance programs, to Hansen's knowledge. Hansen does not know an exact date that Vivint adopted that approach. | (foundation, vague) | | |
| 204:3-204:25 | Vivint does not have a means to identify how many CPI customers complaints to Vivint about deceptive sales practices or compliance issues. There is also no policy or procedure at Vivint that requires sales reps who field complaints directly from customers to report them to Vivint. | R, F, MIL/PBA, FM 204:22-25, 205:1-8 (foundation, hypothetical) | | |
| 205:3-205:4 | Same. | R, F, MIL/PBA, FM 204:22-25, 205:1-8 (foundation, hypothetical) | | |
| 205:6-205:14 | Hansen would have no way to know how frequently a rep may fail to forward complaints made by customers. Hansen not sure whether a customer | R, F, MIL/PBA, FM 204:22-25, 205:1-8 (foundation, hypothetical) | 205:15 | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | would be more likely to complain to Vivint as opposed to CPI about Vivint's sales conduct | | | |
| 205:20-207:2 | Hansen's team is responsible for investigating and responding to BBB complaints. Hansen does not know how many BBB complaints relating to sales practices Vivint gets each year. | R, F, IC, PBA/MIL, FM 207:2-6 (vague, foundation) | | |
| 207:5-207:14 | Same. Hansen's team is also responsive for investigating and responding to state AG customer complaints. Cannot say how frequently Vivint receives such complaints. | R, F, IC, PBA/MIL, FM 207:2-6 (vague, foundation) | 208:6-12 | |
| 208:13-209:8 | Vivint's process for ensuring a customer does not get bound into contracts with different alarm companies is the pre-install survey. | R, F, FM 209:4-21 (misstates testimony) | | |
| 209:14-209:21 | It also happens that certain customers sign up with Vivint knowing that they | R, F, FM 209:4-21 (misstates testimony) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | are bound on another contract. | | | |
| 210:17-212:7 | It would be in Vivint's best interest to produce all pre-install surveys for the customers at issue. Hansen not sure whether CPI customer's data was lost due to the IT issue previously described.<br><br>[Ex. P59, interrogatory nos. 2 and 3 are referenced.] | F, R | | |
| 212:16-213:24 | In Interrogatory No. 3, Vivint states it produced all agreements, documents, and audio (in its possession) related to the customers identified by Vivint's search for "CPI" | F, R, H (1352 spreadsheet) | | |
| 214:20-215:16 | Same. Vivint did not do anything to determine how many of the audio/video relating to the customers identified were lost as a result of the "IT incident" | F, R, H (1352 spreadsheet) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| 216:3-216:18 | Vivint does not have a way to determine the total number of complaints regarding deceptive sales practices by Vivint against individuals who were customers of CPI at the time they were approached by Vivint's sales rep.<br><br>[Ex. P121 is referenced.] | F, R, H (email re. 1352 spreadsheet) | 218:22 | |
| 220:14-221:18 | Ex P108 is an email from Vivint employee Nesbit to Anderson dated Nov 23, 2020. [The document includes a complaint that Vivint sales reps are using lies and the comments made by CPI's CEO in 2020 to prey on customers.] Hansen does not remember if he's heard complaints like this before. | R, F, H | | |
| 221:22-221:25 | [Question as to whether Hansen plans to investigate the complaint referenced in P108 any further] | R, F, H, FM (foundation, misstates testimony, vague) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| 222:8-222:13 | Same | R, F, H, FM (foundation, misstates testimony, vague) | | |
| 222:20-223:3 | Witness responds that whatever his intentions would be with respect to the question would be work product. | R, F, H, FM (foundation, misstates testimony, vague) | | |
| 223:6-223:17 | This is the only time that Hansen is aware of that a customer has complained that Vivint used Mr. Gill's racist comments, but Hansen is aware that Vivint's reps did make customers in the area aware of Mr. Gill's comments. He does not have a problem with that as a representative of Vivint so long as the representations about Gill's comments are accurate. | R, F, H, FM (foundation, misstates testimony, vague) | | |

### 4. Vivint 30(b)(6) Designee Starr Fowler, Vivint Chief People Officer, 12/21/2021

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| 4:23-5:2 | Name stated for record, Chief People Officer at Vivint and with the company almost 8 years. | | | |
| 5:22-6:4 | Job description of CPO - lead all HR functions. | | | |
| 11:23-13:21 | Describes Vivint's social media policy. Sales force cannot use Vivint marks, documents, etc. in individual accounts. If a sales rep violates policy, Vivint meets with rep and their manager to take down post and apply appropriate discipline. | R, NAR | | |
| 14:1-15:8 | Regional sales managers and sales managers are permitted and encouraged to recruit sales reps. Marketing geared toward recruitment of sales reps. Those marketing materials represents financial opportunities beyond a luxurious lifestyle. | R | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| 15:16-15:22 | Vivint marketing materials directed at sales rep recruitment presents opportunity from a financial perspective | R | | |
| 17:15-18:4 | Played video "Vivint Life, It Ain't Easy" | R, F, FM 18:2-4 (vague, leading) | | |
| 18:6-18:15 | Fowler says it's a funny video that reflects part of sales rep job is recruiting and sometimes the job is fun | R, F, FM 18:6-15 (asked and answered) | | |
| 18:18-18:24 | Video purpose shows sales reps can make a good living at Vivint and live a good lifestyle; it's part of the value proposition. | R, F, FM 18:18-24 (asked and answered) | | |
| 21:14-26:17 | Direct-to-home sales paid commission off sales. Sales managers (district and regional) receive commissions for own sales and commission on team's sales and residual for customers of certain tenure. Managers can also qualify for equity grants - RSUs tied to | R, F, FM 26:14-19 (leading, vague) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | performance criteria. Jordan Binning terminated for compliance violations. Fired twice; terminated in 2017 and went to Vivint Solar. Todd Pederson on Vivint Solar's board in 2017 and CEO of Vivint. Alex Dunn and Todd Pederson decided to bring back Binning. | | | |
| 26:19-26:25 | She did not if Binning managed biggest direct-to-home sales forces at time of his 2020 termination and does not know if Vivint training video where he made that comment. | R, F, FM 26:19 (leading, vague) | | |
| 28:13-30:18 | Review of 3885, Excel spreadsheet with videos. 30 Day to Pro series. Played Day 21, "Perseverance." Binning appeared in video. Videos in 30 Day to Pro used to train new sales reps. | R, F | 30:24-31:8 | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | Regional managers and managers train sales reps; company provides training. | | | |
| 32:2-32:5 | Whether it sends a good message to have regional managers/managers with compliance violations providing training through Vivint-approved videos. | R, IC, FM 32:2-5 (argumentative, vague) | | |
| 32:7-32:14 | Response to above, it depends on compliance history and what training is on. Whether having regional managers and managers with history of compliance problems providing formal training send the wrong message on how to sell | R, F, FM 32:7-9 (argumentative, vague), FM 32:10-14 (asked and answered, argumentative, vague) | | |
| 33:5-33:7 | Response to above, depends on compliance and what they're training on. | R, F, FM (asked and answered, argumentative) | | |
| 34:17-35:9 | Vivint does not track customers who switch over from prior company. No consistent way to determine how many customers | R, FM 35:5-9 (asked and answered, misstates testimony) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | came over from prior alarm company. Reps are not required to put in that information | | | |
| 35:13-35:18 | Because reps are not required to input when an account is a switchover, and which company customer switched from, no way to tell prior alarm company. Unless Vivint took cancellation fee for customer, Vivint needed to know prior alarm company. | R, FM 13-18 (asked and answered) | | |
| 40:9-41:6 | Smart Home Pros is wholly owned subsidiary of parent and contains direct-to-home sales force. No employees other than sales force employed by Smart Home Pros. Vivint, Inc. is publically traded company that issues SEC disclosures. Smart Home Pro sales force works on behalf of Vivint, Inc. | R, F | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| 45:16-48:5 | Sales reps can offer up to $1000 to buy out a customer's contract. That info is entered into Street Genie, including prior alarm company. Link sent to customer to upload documents re: buyout. Vivint does not report off buyouts; buyout info in system for auditing perspective. Could generate a report re: all buyouts; unsure if system can report by prior alarm company. Who could confirm whether data could be sorted by years, company re: buyouts | R, FM (hypothetical) | | |
| 48:13-48:20 | In response to who could confirm how data reported, someone in IT reporting area would have to weigh in. Information cannot be sorted to determined buyouts occurring for specific company in specific time period | R, F, FM (hypothetical, misstates testimony) | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| 49:5-50:19 | She is aware buyout data is there. She has not seen data or attempted to sort it. She does not use Street Genie in her job function. Topic 20 re: policies and procedures for install calls. She talked with Josh Crittenden and IT individuals. Pre-install call is a series of questions with customer to verify sale is consistent with terms of sale | R, F, FM 49:5-14 (hypothetical, misstates testimony) | | |
| 51:7-51:24 | Pre-install calls now down via audio and video; video last two sales seasons. Did not know Vivint's record retention policy re: pre-install surveys or whether any IT issues have caused Vivint to lose pre-install surveys. | F | | |
| 52:8-53:12 | An IT incident may have occurred that caused Vivint to lose pre-install surveys and inbound audio. Sales reps are prohibited from | F | | |

| Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | coaching customers during pre-install surveys. If sales reps do coach, it's a violation of compliance policies and can result in discipline, including termination. She is aware that people have been terminated for that. | | | |

# PRIOR TESTIMONY OF VIVINT OFFICERS, MANAGERS AND CORPORATE DESIGNEES

I. ***ADT LLC and ADT US Holding, Inc. v. Vivint, Inc.*** **- Case No. 9:17-cv-80432-DMM (S.D. Fla)[2]**

1. Nathan Wilcox, Vivint 30(b)(6) Deposition, September 14, 2017

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| 5:5-5:25 | | | | | |
| 6:9-6:11 | Pg: 6 Ln: 1-8 | | | | |
| 6:15-6:23 | Pg: 6 Ln: 12-14 | | | | |
| 7:18-8:11 | | | | | |
| 8:23-9:1 | | | | | |
| 10:3-10:17 | Pg: 10 Ln: 18-Pg: 11 Ln: 7 | R | | | |
| 11:8-12:18 | | | | | |
| 13:3-13:7 | | | | | |
| 13:9-13:10 | Pg: 13 Ln: 11-19 | | | | |
| 13:20-13:23 | Pg: 13 Ln: 24-Pg: 14 Ln: 16 | | | | |
| 14:17-16:21 | | | FM (argumentative) 16:12 R 16:20-21 | **FM**-Agree to de-designate 16:12 R- | Relevance objection overruled. Argumentative objection sustained. |
| 16:23-17:2 | | | R | **R**-Witnesses understanding | Overruled |

[2] For these witnesses, CPI designates the deposition testimony using the same tables submitted to the Hon. Judge Middlebrooks prior to trial in Case No. 9:17-cv-80432-DMM (S.D. Fla.), including Judge Middlebrooks' rulings on the parties' objections to such testimony. In the interest of judicial economy, it is CPI's position that the parties should abide by the evidentiary rulings already made by Judge Middlebrooks.

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | of "goodwill" is necessary context for later questions. | |
| 17:9 (Beginning with "Do") – 18:4 | | | R | **R** – Admissions regarding damages to goodwill flowing from deceptive trade practices is relevant to damages analysis. | Overruled |
| 18:19-18:14 | | | | | |
| 18:18-19:12 | | | R | **R** – Admissions regarding damages to goodwill flowing from deceptive trade practices is relevant to damages analysis. | Overruled |
| 21:8-21:21 | | | | | |
| 22:13-31:3 | | | R 29:17-31:3 | **R**-Relevant to scope of deceptive practices at Vivint and whether Vivint has taken appropriate action to | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | investigate and address deceptive practices. | |
| 31:11-33:24 | | | | | |
| 34:9-35:19 | | | | | |
| 36:7 (beginning with "Tell") – 36:15 | | | | | |
| 37:9 (beginning with "And") – 46:15 | | | S, R 38:21-39:6 S, R 39:18-40:4 | **S,R** – Question to determine scope of deceptive practices is relevant and not speculative. While the witness indicates he does not know exact numbers, it is fair to seek potential ranges. | Speculative objection sustained. |
| 48:21-52:16 | | | | | |
| 55:19-57:21 | | | R 56:9-57:21 | **R**-Relevant to the lack of oversight and inadequate procedures to ensure sales representatives do not already | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | have a history of engaging in deceptive sales practices. | |
| 57:23-59:5 | | | R, UP | **R**-Relevant to the lack of oversight and inadequate procedures to ensure sales representatives do not already have a history of engaging in deceptive sales practices. | Sustained |
| 59:22-61:20 | | | R, UP | **R**-Relevant to the lack of oversight and inadequate procedures to ensure sales representatives do not already have a history of engaging in deceptive sales practices. | Sustained |
| 61:22-61:23 | | | R, UP | **R**-Relevant to the lack of oversight and inadequate procedures to ensure sales representatives do not already have a history of engaging in | Sustained |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | deceptive sales practices. | |
| 62:4-62:9 | | | R, UP | **R**-Relevant to the lack of oversight and inadequate procedures to ensure sales representatives do not already have a history of engaging in deceptive sales practices. | Sustained |
| 62:13-62:21 | | | R, UP | **R**-Relevant to the lack of oversight and inadequate procedures to ensure sales representatives do not already have a history of engaging in deceptive sales practices. | Sustained |
| 63:9-68:17 | | | R, S 65:25-68:10 | **R**-Relevant to the lack of oversight and inadequate procedures to ensure sales representatives do not engage in deceptive practices. | Overruled |
| 68:20-70:9 | | | | | |
| 70:12-70:23 | | | | | |
| 70:25-72:17 | | | | | |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| 72:19-75:13 | | | | | |
| 75:15-77:11 | | | | | |
| 77:13-79:5 | | | | | |
| 79:7-81:7 | | | S 81:4-7 | **S**-This is witness with knowledge designated to address questions regarding employee discipline. Question does not call for speculation given witnesses role at the company and designations for this deposition. | Sustained |
| 81:10-82:5 | | | S 81:10-17 | **S**-This is witness with knowledge designated to address questions regarding employee discipline. Question does not call for speculation given witnesses role at the company and designations | Sustained |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | for this deposition. | |
| 83:24-85:7 | | | R, UP 84:9-85:7 | **R,UP**- Vivint's own records confirming that a sales manager was impersonating customers is relevant to whether the rep is engaging in deceptive practices and whether Vivint had knowledge of such activities. Vivint's own records of investigating their own sales reps are not unduly prejudicial. | Overruled |
| 86:2-86:17 | Pg: 86 Ln: 19-21 | | S, R 86:2-6 | **S, R** – Questions of 30b6 designee regarding the discipline of rep with 21 instances of impersonating customers does not call for speculation and is directly relevant to claims at issue. | Sustained |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| 89:19-97:5 | Pg: 89 Ln: 8-18 | No objection if question at lines 6-7 are added. | FM (argumentative) 92:25-93:8 R, S 97:3-5 | **FM** – Agree to de-designate 92:25-93:8. **R,S** – Question does not call for speculation and collection of slam information is relevant. | Add: 89:6-89:7 Strike 92:25-93:8 Relevance and Speculative objections overruled. |
| 98:9-100:4 | | | | | |
| 100:25-101:20 | | | | | |
| 102:10-102:21 | | | | | |
| 103:6-103:18 | | | R, MIL, H 103:11-18 | **R,H, MIL** – Receipt of customer complaints made to the BBB is relevant to Vivint's knowledge. Complaint itself not offered for truth of matters asserted. | Overruled |
| 103:24-104:24 | | | MIL, R, H | **R,H, MIL** – Receipt of customer complaints made to the BBB is relevant to Vivint's | Sustained |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | knowledge. Complaint itself not offered for truth of matters asserted. Vivint's responses are statement of party. | |
| 105:5-113:15 | | | FM (argumentative) 111:18 S 113:9-15 | **FW** – Agree to de-designate 111:18<br><br>**S**- Question does not call for speculation. Witness is the designee for disciplinary issues. | Overruled |
| 113:17-113:25 | Pg: 114 Ln: 1-8 | Non-responsive | MIL | | Non-responsive objection overruled. Otherwise, sustained. |
| 114:9-114:17 | | | | | |
| 115:3-123:8 | | | MIL | | Sustained |
| 123:10-123:19 | | | | | |
| 123:22-131:18 | | | | | |
| 131:22-133:9 | | | | | |
| 134:13-137:22 | | | | | |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| 137:24-145:14 | | | S 140:11-141:6 R, MIL 142:11-145:14 | **S-** Question does not call for speculation. Witness is the designee for disciplinary issues. **R-** Relevant to knowledge of deceptive conduct by sales representative. | Speculative objection sustained.<br><br>Defer ruling on remaining grounds. |
| 145:22-148:1 | | | R, MIL | **R-** Relevant to knowledge of deceptive conduct by sales representative. Also relevant to regulations on conduct to which Vivint agreed. | Overruled |
| 148:3-149:16 | | | R, MIL | **R-** Relevant to knowledge of deceptive conduct by sales representative. Also relevant to regulations on conduct to which Vivint agreed. | Sustained |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| 149:19-149:25 | | | R, MIL | **R-** Relevant to knowledge of deceptive conduct by sales representative. Also relevant to regulations on conduct to which Vivint agreed. | Sustained |
| 150:2-164:9 | | | R, MIL 150:2-156:20 R 156:21-158:8 R, MIL 159:16-164:9 | **R-** Relevant to knowledge of deceptive conduct by sales representative. Also relevant to regulations on conduct to which Vivint agreed. **R-**Questions regarding his role at company is relevant to assess credibility and foundation. | Objections sustained as to testimony at 150:2-156:20 Relevance objection overruled as to testimony at 15[6]:21-158:8. Relevance objection sustained as to testimony at 1[5]9:16-164:9. |
| 164:12-172:10 | | | R, MIL | **R-** Relevant to knowledge of deceptive conduct by sales representative. Also relevant to regulations | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | on conduct to which Vivint agreed. | |
| 172:16-179:7 | | | R, MIL 172:16-177:9 | **R-** Relevant to knowledge of deceptive conduct by sales representative. Also relevant to regulations on conduct to which Vivint agreed. | Sustained |
| | | | FM (argumentative) 177:10-16 R, MIL 177:17-179:7 | **FM-** No argumentative. **R-** Relevant to knowledge of deceptive conduct by sales representative. Also relevant to regulations on conduct to which Vivint agreed. | Overruled |
| 179:14-179:25 | | | R, MIL | **R-** Relevant to knowledge of deceptive conduct by sales representative. Also relevant to regulations on conduct to which Vivint agreed. | Overruled |

Case 3:20-cv-00504-FDW-DSC   Document 81-3   Filed 12/10/21   Page 274 of 307

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| 180:23-181:2 | Pg: 181 Ln: 3 | | | | |
| 181:5-181:10 | | | R | **R** – Relevant to counter Vivint argument that ADT has improper motives to file lawsuits.  Also relevant to value of reputation and brand. | Sustained |
| 181:12-182:18 | | | R | **R** – Relevant to counter Vivint argument that ADT has improper motives to file lawsuits.  Also relevant to value of reputation and brand. | Sustained |
| 183:2-183:20 | | | R, MIL | **R** – Relevant to counter Vivint argument that ADT has other motives to file lawsuits.  Also relevant to value of reputation and brand.  Also relevant as | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | party admissions. | |
| 183:22-187:15 | | | R, MIL | **R** – Relevant to counter Vivint argument that ADT has other motives to file lawsuits. Also relevant to value of reputation and brand. Also relevant as party admissions. | Overruled |
| 187:25-191:17 | | | R, MIL | **R** – Relevant to counter Vivint argument that ADT has other motives to file lawsuits. Also relevant to value of reputation and brand. Also relevant as party admissions. | Overruled |
| 191:20-192:15 | | | R, MIL | **R** – Relevant to counter Vivint argument that ADT has other motives to file lawsuits. Also relevant to | Sustained |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | value of reputation and brand. Also relevant as party admissions. | |
| 192:17-196:22 | | | R, MIL | **R** – Relevant to counter Vivint argument that ADT has other motives to file lawsuits. Also relevant to value of reputation and brand. Also relevant as party admissions. | Sustained |
| 196:24-198:6 | | | R, MIL | **R** – Relevant to counter Vivint argument that ADT has other motives to file lawsuits. Also relevant to value of reputation and brand. Also relevant as party admissions that impact damages analysis. | Sustained |
| 198:9-199:21 | | | R, MIL | **R** – Relevant to counter | Sustained |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | Vivint argument that ADT has other motives to file lawsuits. Also relevant to value of reputation and brand. Also relevant as party admissions that impact damages analysis. | |
| 199:24-200:2 | | | R, MIL | **R** – Relevant to counter Vivint argument that ADT has other motives to file lawsuits. Also relevant to value of reputation and brand. Also relevant as party admissions that impact damages analysis. | Sustained |
| 200:16-201:19 | | | R, MIL, IC | **R** – Relevant to counter Vivint argument that ADT has other motives to file lawsuits. Also | Sustained |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | relevant to value of reputation and brand. Also relevant as party admissions. | |
| 203:14-206:3 | | | R, S 205:17-206:3 | **R**- Relevant to Vivint's treatment of deceptive practices and its willingness to terminate reps that engage in such conduct. **S**-The question does not call for speculation. | Sustained |
| 206:24-219:20 | | | UP, S 219:4-20 | **S**-The question does not call for speculation. **UP**- Questioning designee on discipline as to whether reps should or will be terminated for certain types of conduct is not unduly prejudicial. | Overruled |
| 221:24-223:20 | Pg: 223 Ln: 22-25 | Non-responsive | | | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| 224:1-227:14 | | | FM (argumentative) 224:6 FM (argumentative) 224:20-21 | FM- Agree to de-designate 224:6 and 224:20-21. | Sustained |

2. Nathan Wilcox, Vivint 30(b)(6) Deposition, December 4, 2017

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| 7:8-22 | | | | | |
| 8:3-9:18 | 9:19-20 | | R | **This document is highly relevant.** On its face, the exhibit purports to be a sales training manual, and it contains scripts for competitor "takeovers" which include misleading phrases which would lead potential customers to be confused as to an affiliation between Vivint a competitor. | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | Although Vivint appears to claim the manual is not an "official" training manual, Vivint admits it was used to train at least some of Vivint's sales force. It is for the jury to determine exactly what this document is and what credit to give to Vivint's testimony attempting to minimize the significance of the document. | |
| 11:6-10 | | | R | Same as above. | Overruled |
| 13:8-23 | 13:24-14:13 | **H**- Self-serving hearsay | R | Same as above. | ADT's Objection: Overruled<br><br>Vivint's Objection: Overruled |
| 14:14-15:19 | 15:20-24; 16:8-12 | **H**- Self-serving hearsay | R | Same as above. | ADT's Objection: Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | | Vivint's Objection: Overruled |
| 17:20-18:13 | 18:14-16 | | R | Same as above. | Overruled |
| 18:17-19: 3 | | | R | Same as above. In addition, this testimony is relevant to whether Vivint condones sales people using the type of phrases and representations in the referenced document, and whether Vivint agrees that such sales pitches are contrary to industry ethics standards for fair practices. | Overruled |
| 19:16-20:5 | 20:6-19 | | R, H | **R** - Same as above. **Not Hearsay** – No out of court statement offered for the truth of the matter asserted. | Overuled |
| 20:20-21:13 | | | R, H | **R** - Same as above. | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | **Not Hearsay** - No out of court statement offered for the truth of the matter asserted. | |
| 21:22-24:2 | 25:13-15; 25:25-26:5; 29:20-25*; 30:10-22 | **H** (25:25-26:5) Self-serving hearsay **S** (29:20-24). *Designation should end at line 24. 25:16-24 must also be played for context if the cross-designations are also played | R, H, S, FM (argumentative) | **R** - Same as above. **Not Hearsay** - No out of court statement offered for the truth of the matter asserted. **Not Speculation** – question does not ask for speculation; asks for an opinion as to whether certain phrasing is misleading as to an affiliation between Vivint and ADT, the central issue in this case. **FM** – not argumentative to ask whether phrasing used in the training manual may mislead consumers into | ADT's objection to hearsay: Sustained  ADT's objection to speculation: Overruled  ADT's request that 25:16-24 be designated: Sustained  Vivint's Objections: Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | believing Vivint and ADT are affiliated. | |
| 32:4-35:23 | | R | | **R** - Same as above. Additionally, the referenced email suggests the training manual was distributed more widely than the deponent had testified. This questioning thus impeaches prior testimony that the training manual was only provided to a limited amount of employees. | Overruled |
| 35:24-36:8 | | R | | **R** - Same as above. (Upon request by the Court, ADT can show the attachment to the email was in fact the same training manual previously discussed with the "takeover" sales script. The documents were | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | produced by Vivint with sequential bates numbering, and the file name of the attached document corresponds to the filename of the attachment in the email) | |
| 36:22-37:3 | | R | | Relevant to how many Vivint sales persons would have been trained by the supposed author of the misleading 'takeover' sales pitch | Overruled |
| 38:6-39:6 | 40:3-15* | **H** – Self-serving hearsay.<br><br>*Line 15 is the beginning of a new question. Appears designation should be 40:3-14. | R, F | **R** - Same as above. Additionally, the referenced email suggests the training manual was distributed more widely than the deponent had testified. This questioning thus impeaches prior testimony that the training manual was | ADT Objection: Overruled<br><br>Vivint's Objections: Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | only provided to a limited amount of employees. The email and testimony also suggests there are other forms of this document, such as PowerPoint presentations incorporating the same content.<br><br>**F** – the witnesses was designated as a 30(b)(6) representative to testify as to the content of this document. Foundation is established by Vivint designating this witness for testimony about this document. | |
| 44:3-17 | | | R, H, F | **R** – The referenced document and testimony are highly relevant as to Vivint's notice and | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | knowledge of BBB complaints, as well as the rate of complaints in comparison to the number of consumers actually effected by misconduct. **H** – no out of court statement being offered for truth of matter asserted. **F** – the witnesses was designated as a 30(b)(6) representative to testify as to the content of this document. Foundation is established by Vivint designating this witness for testimony about this document. | |
| 49:5-50:1 | | | R, H, F | **R** – testimony is relevant as to Vivint's receipt and classification of BBB complaints, and how Vivint | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | responds. Vivint's classification of certain types of complaints is foundational for later testimony about the breadth of deceptive sales conduct in comparison to the number of complaints actually received. **H** – no out of court statement being offered for truth of matter asserted. **F** – the witnesses was designated as a 30(b)(6) representative to testify as to the content of this document. Foundation is established by Vivint designating this witness for testimony about this document. | |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| 50:13-:25 | | | R | **R** – testimony is relevant as to Vivint's receipt and classification of BBB complaints, and how Vivint responds. Vivint's classification of certain types of complaints is foundational for later testimony about the breadth of deceptive sales conduct in comparison to the number of complaints actually received. | Overruled |
| 51:1-53:10 | | | R, H, F | Same responses as above with respect to 49:5-50:1 | Overruled |
| 57:25-58:9 | | | R, S, FM (hypothetical, argumentative) | **R** – Whether Vivint's top offenders for deceptive conduct were terminated for their conduct is directly relevant to whether Vivint | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | sanctioned the activity.<br><br>**S/FM** – the witness is not speculating. He is Vivint's Chief Compliance Officer, whose job responsibilities entail tracking deceptive conduct by Vivint's sales force and taking actions to discipline them. Additionally, the witness was designated to testify as to the content of this document, which was provided in advance of the deposition to allow the witnesses to prepare for questions about the document. | |
| 58:10-70:9 | | | R, H, F, S, FM (misstat es | **R** – This document and testimony are highly relevant | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | testimony), Fed.R.Evid. 403. | to the scope and breadth of Vivint's deceptive sales conduct and ADT's damages. For purposes of analyzing the scope of actual misconduct, Vivint credits marketplace data suggesting as few as 1 in 20 people affected by sales misrepresentations actually take the time to complain to the company headquarters. This supports that the number of reported complaints about Vivint's deceptive sales is actually under-representative of actual misconduct occurring in the marketplace.

**H** – no out of court statement offered for truth | |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | of matter asserted.<br><br>**F/S/FM** – Vivint produced this document after the close of discovery and designated this witness to testify about the content encompassed by it. | |
| 73:7-77:4 | | | R, H, F, S, FM (misstates testimony), Fed.R.Evid. 403. | **H** – Statement by party opponent.<br><br>**R** – Document and testimony cover Vivint's growth strategy for the next several years. This is highly relevant to liability and damages issues because it suggests Vivint had an aggressive growth goal and thus had reason to condone and/or teach aggressive and potentially misleading sales | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | tactics. Objection goes to weight, and that is for the jury to decide. **F/S/FM** – Vivint produced this document after the discovery cutoff and designated this witness to testify as to the content of this document in response to the 30(b)(6) notice. The witness is not speculating; is expected to be prepared to testify within the scope of the 30(b)(6) designation. | |
| 78:22-79:4 | | | R, F, S Fed.R.Evid. 403. | **R** – Relevant to damages issues. Testimony supports that it is impossible to prove with specificity the exact scope of Vivint's deceptive sales. Relevant to the jury's | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | determination of what amount of Vivint's sales and profits are attributable to deceptive sales. The inability to prove the scope of damages with specificity falls on the wrongdoer (Vivint), not ADT. *E.g., Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946) ("[T]his Court has sustained recovery of the full amount of defendant's profits where his own wrongful action has made it impossible for the plaintiff to show in what proportions he and the defendant have contributed to the profits."); *id.* at 264 (where nature of tort "precluded ascertainment of the amount of damages more | |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | precisely," jury "may make a just and reasonable estimate of the damage" based on "probable and inferential as well as upon direct and positive proof"). **F/S** – witness is corporate rep Vivint designated to testify on this subject; is not speculating. | |
| 85:6-12 | | | R, F, H 85:6-12 | **R** – Relevant as to the geographic scope of Vivint's deceptive sales practices.<br><br>**F** – Vivint produced the referenced documents after the discovery cutoff suggesting deceptive sales occurred in Florida. In response to ADT's 30(b)(6) notice regarding such documents, Vivint designated this | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | | witness, and thus it was Vivint's obligation to prepare him to testify about them. In addition, the designee is Vivint' Chief Compliance Officer, whose job entails being knowledgeable about these topics.<br><br>**H** – No out of court statement offered for truth of matter asserted. | |
| 85:18-86:6 | | | R, H, F, S Fed. R. Evid. 403. | **All objections** – same responses as above. | Sustained (hearsay) |
| 89:2-147:3 | | | R, H, F, S, FM (asked and answered, misstates testimony, calls for legal conclusion, argument | **R** – questioning focuses on Vivint's record keeping and knowledge of deceptive sales practices by sales force. Establishes both that DSPs were occurring, and that Vivint | Overruled |

| CPI Designations | Vivint Cross Designations | CPI Objections to Cross Designations | Vivint Objections to CPI Designations | CPI Responses to Vivint Objections | Judge Middlebrooks' Prior Ruling |
|---|---|---|---|---|---|
| | | | ative, assumes facts, compound), Fed. R. Evid. 403, Fed. R. Evid. 106 | knew about them. Also goes to what actions Vivint took to remediate problems with its sales force, and whether Vivint's conduct was intentional.<br><br>**H** – Statement by party opponent (these are Vivint records). Otherwise, not offered for truth of matter asserted, but as foundation for questioning.<br><br>**F/S/FM** –The witness is therefore not speculating. | |

**II.** **_Vivint, Inc. v. NorthStar Alarm Services, LLC_ – Case No. 2:16-00106-JNP-EJF (D. Utah)**

1. Nathan Wilcox Vivint 30(b)(6), 2/16/2018

| CPI Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| 6:10-7:25 | Prefatory. The witness is testifying on behalf of Vivint, which is the plaintiff in the lawsuit against NorthStar. The witness has worked in Vivint's legal department as general counsel and compliance officer | R, MIL | | |
| 23:25-24:4 | Prefatory. The witness is testifying on behalf of Vivint, which is the plaintiff in the lawsuit against NorthStar | R, MIL | | |
| 98:7-25 | Vivint corporate rep estimates that Vivint received between 200 and 1,000 complaints about its sales agents' deceptive sales practices in the year 2017 alone | R, MIL | | |
| 99:16-23 | Same | R, MIL | | |
| 100:7-12 | Vivint corporate rep estimates that Vivint received approximately 3 times as many complaints about deceptive sales | R, MIL | | |

| CPI Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | practices in 2016 as Vivint did in 2017 | | | |
| 100:13-21 | Vivint does not know how many complaints it received about deceptive sales practices by its sales agents in the years 2015, 2014, 2013, or 2012 | R, MIL | | |
| 100:22-102:11 | Describing how Vivint tracks complaints about deceptive sales practices | R, MIL | | |
| 103:4-7 | Vivint could identify the number of deceptive sales practices complaints it gets by year from its records system | R, MIL | | |
| 105:2-14 | Vivint investigates all complaints about deceptive sales practices by Vivint's sales force | R, MIL | | |
| 108:17-22 | Vivint cannot identify the number of sales representatives who were disciplined in 2017 or any other year | R, MIL | | |
| 111:7-14 | Introducing exhibit including deceptive sales incidents that Vivint alleged against competitor | R, MIL | | |

| CPI Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | Northstar in case where Vivint asserted identical claims for the same types of conduct as CPI asserts against Vivint here | | | |
| 112:3-113:21 | Vivint's corporate representative explaining the basis for Vivint's allegations of deceptive sales practices against a competitor—the same basis as CPI's claims here. Authenticates document CPI will offer into evidence here to support CPI's claim that Vivint's conduct is deceptive and misleading. | R, MIL | | |
| 114:5-115:2 | Same | R, MIL | | |
| 170:21(starting at "And then")-173:17 | Vivint's valuation of lost customer accounts for purposes of litigation. Relates to CPI's damages claims for same | R, MIL | | |
| 177:15-178:13 | Vivint's claims of damages to goodwill in cases it has prosecuted against | R, MIL | | |

| CPI Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | competitors for identical sales conduct. Relates to CPI's claims for same | | | |
| 178:20-21 | Same | R, MIL | | |

# **VIVINT'S RETAINED EXPERTS**

1. Brian Buss, 10/08/2021[3]

Vivint objects to the admission of Brian Buss's deposition testimony as inadmissible hearsay. FRCP 32(a)(4) and FRE 804(a) do not allow for the admission of his deposition testimony because there is no indication that Mr. Buss is "unavailable" to testify live. In fact, he is listed on Vivint's witness list. Moreover, CPI has made no attempt to procure Mr. Buss's attendance as required by FRE 804(a)(5), instead simply stating on its witness list: "All Vivint experts are c/o Defendants' counsel." Plaintiff CPI Security Systems, Inc.'s Witness List, at 9 n.7. Unless there is a "finding on the record as to unavailability," it would be error to admit Mr. Buss's former testimony under FRE 804(b)(1). *Kirk v. Raymark Indus., Inc.*, 61 F.3d 147, 165 (3d Cir. 1995).

Vivint further objects to CPI's attempt to offer testimony of Mr. Buss at trial because CPI did not specifically disclose him as an "individual likely to have discoverable information," pursuant to FRCP 26(a)(1)(A)(i); nor as a "witness it may use at trial to present evidence under [FRE] 702, 703, or 705," pursuant to FRCP 26(a)(2)(A).

Vivint further objects to CPI's attempt to offer deposition testimony of Mr. Buss because "CPI does not concede the admissibility of any such testimony or the qualifications of [Mr. Buss]." CPI cannot have it both ways.

Vivint further objects to CPI's attempt to offer deposition testimony of Mr. Buss because Mr. Buss was only disclosed by Vivint as a rebuttal expert to Dr. Winer's disclosed report. Vivint will move to exclude Dr. Winer from testifying at trial. Without Dr. Winer's testimony, Buss's proposed testimony lacks foundation, relevance, and completeness. Untethered testimony regarding Dr. Winer's report would also be unduly confusing under FRE 403.[4]

Vivint further objects that any use of Mr. Buss's testimony in CPI's prima facie case would be also be unduly prejudicial and needlessly cumulative under FRE 403. In that posture, any mention of Vivint's or its counsel's relationship to Mr. Buss would unfairly prejudice the jury.[5] Instead, Vivint should call Mr. Buss in its case; and,

---

[3] By designating testimony from Vivint expert witnesses, CPI does not concede the admissibility of any such testimony or the qualifications of such witness. CPI designates this testimony subject to any and all objections as to the admissibility or qualifications of such witness(es).

[4] CPI's designations of Mr. Buss's deposition testimony include multiple references to Dr. Winer's report. *See, e.g.,* Tx. of Buss Deposition, 49:20-50:2 (referencing Dr. Winer's report); 97:2-5 (same); 100:11-14 (same).

[5] CPI's designations of Mr. Buss's deposition testimony begin with the statement: "Mr. Buss, you've been, as I understand it, retained by Greenberg Traurig to provide expert opinions in this case." Tx. of Buss Deposition, 8:10-12.

thereafter, CPI may cross-examine. During CPI's cross-examination of Mr. Buss, it may use his deposition testimony to impeach him as appropriate under FRCP 32(a)(2).

Finally, CPI should not be allowed to build its case using an expert retained by Vivint. CPI had the same opportunity to retain qualified experts to analyze issues in this case. Yet, the deposition testimony designated by CPI includes CPI's counsel's attempts to elicit new opinions from Mr. Buss not included in his expert report. *See, e.g.,* Tx. of Buss Deposition, 51:7-9 ("So if the jury in this case decides that that CPI's brand was harmed by wrongful conduct by Vivint, can corrective advertising be an appropriate remedy?"). CPI has not identified any "undue hardship" that prevented it from hiring its own expert to develop such "new opinions." *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 304 F.R.D. 379, 383 (S.D.N.Y. 2015).

Vivint does not counter-designate any testimony from Mr. Buss because Vivint will call him live at trial.

| CPI Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| 6:10-14 (ending at "CPI Security Systems") | Introduction of questioning counsel | | | |
| 8:9-9:5 | Areas of witness's proclaimed expertise | | | |
| 12:9-13:12 | Witness's experience and research in the area of corrective advertising | | | |
| 45:17-46:3 | Costs of corrective advertising as measurement of harm | | | |
| 47:19-48:19 | Same | | | |
| 49:16-50:16 (omitting objections) | Appropriateness of corrective advertising as a measure of damages | | | |
| 51:7-11 (omitting objections) | Same | | | |

| CPI Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| 67:23 (starting at "So in your opinion,") – 68:5 | Conducing a brand valuation is not a prerequisite to corrective advertising damages | | | |
| 83:14-85:7 (omitting objections) | Damages to brand may not be reflected in financial statements | | | |
| 85:9-86:11 (omitting objections) | Attempting to quantify brand damages by reference to financial performance requires a complicated analysis of a number of different factors. Another approach to measure such damages would be to identify the cost to correct the conduct that harmed the brand. | | | |
| 96:17-97:6 (omitting objections) | Buss does not opine on the 5% complaint ratio discussed in Dr. Winer's report and Buss is not an expert in this kind of marketing research | | | |
| 99:2-15 | The concept that less people complain than are subject to misconduct "seems reasonable" and is "borne out" in multiple studies | | | |

| CPI Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | cited in Dr. Winer's report | | | |
| 99:16-101:12 (omitting objections) | Complaints received by Vivint would be relevant to attempting to determine how widespread the conduct is and the appropriate amount of damages | | | |
| 104:21-106:25 (omitting objections) | Conducting a lost profits analysis would require knowing, at minimum, the number or identifies of customers that switched from CPI to Vivint, but Vivint has been unable to provide that information making a calculation of lost profits more difficult | | | |
| 107:1-25 (omitting objections) | Conducting a lost profits analysis would also require knowing which customers Vivint actually made sales calls on, so Vivint's inability to identify those customers would also make performing a lost profits analysis more difficult | | | |

| CPI Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| 109:22-110:8 (omitting objections) | Same | | | |
| 116:17-23 | Vivint does not have data differentiating between revenues earned in different states | | | |
| 135:12-24 (omitting objections) | Whether it is possible to determine the total number of potential customers who may have been impacted by Vivint's wrongful conduct. | | | |
| 136:20-137:1 | Buss cannot say who or what number of CPI customers were actually affected by Vivint's conduct because he has not conducted that analysis and was not asked to | | | |
| 147:18-148:17 (omitting objections) | Buss reviewed the call transcripts discussed and cited in Dr. Winer's report to determine whether the respective customer reported that the Vivint sales person claimed an affiliation with CPI | | | |
| 149:2-16 | Same | | | |
| 149:17-24 (omitting objections) | Of the call transcripts Dr. Winer relied on in | | | |

| CPI Designations | Description | Vivint's Objections | Vivint's Counter Designations | CPI's Objections |
|---|---|---|---|---|
| | rendering his opinions and which Buss independently reviewed, Buss identified 17 instances where there was a claim of association by the Vivint sales representative with CPI | | | |