# Exhibit C

1          UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF NORTH CAROLINA
2                  CHARLOTTE DIVISION
       CIVIL ACTION NO. 3:20-CV-00504-FDW-DSC
3

   CPI SECURITY SYSTEMS, INC.,
4

5     Plaintiff and Counterclaim Defendant,
6  V.
7

   VIVINT SMART HOME, INC. f/k/a Mosaic
8  Acquisition Corp.; and LEGACY VIVINT
   SMART HOME, INC. f/k/a Vivint Smart Home,
9  Inc.,
10
      Defendants and Counterclaimants.
11
12
13
14
15     REMOTE VIDEOTAPED VIDEOCONFERENCE DEPOSITION
16                        of
17                   JORGE MILLARES
18      (Taken by Plaintiff and Counterclaim Defendant)
19        at witness's stated physical location of
20          Mecklenburg County, North Carolina
21                 August 31st, 2021
22                    11:12 a.m.
23
24
      Job No. CS4775954
25    Reported by: Leslie Christian Lentkowski

Page 6

1  A. I understand.
2  Q. All right. Well, let's start. Tell us
3 what line of work you're in right now.
4  A. Currently, I am a director of sales and
5 marketing for a retirement community.
6  Q. And what's the name of that company?
7  A. Alders Gate.
8  Q. How long have you been there?
9  A. Since November of last year -- of 2020.
10  Q. And if you could, going back maybe, say,
11 five or ten years just give us an outline of the
12 various jobs that you've held.
13  A. So before working here -- I would say, I
14 guess, five years. We would be looking at around 2016.
15 So I worked at CPI briefly for about a year, and after
16 that I was the executive director of Queen City Unity,
17 a non-profit focused on equity and equality here in
18 Charlotte, and now I work at Alders Gate.
19  Q. Do you still have a role at Queen City
20 Unity?
21  A. I am on the board of directors, yes.
22  Q. All right. So you said you worked for CPI
23 for a period of time. What years did you work at CPI?
24  A. From November, I believe -- well, it was
25 definitely from 2016 to 2017. The months, I don't feel

Page 7

1 comfortable saying them off the top of my head because
2 I'm under oath and I don't remember.
3  Q. That's fine. What was your job function at
4 CPI?
5  A. I was a call center director there.
6  Q. Who were your -- who was your direct report
7 boss?
8  A. John Schockness.
9  Q. How did you get along with Mr. Schockness?
10  A. Well, okay at best. At times, there were
11 some inflicts specifically around some racial
12 undertones and comments that he would make to me about
13 my role there.
14  Q. Who else did you report to other than
15 Mr. Schockness?
16  A. That was it.
17  Q. Did you know Mr. Gill at all when you
18 worked at CPI?
19  A. I think "know" is a powerful word. You
20 know, I knew of him. He interviewed me the first time.
21 Maybe we had several conversations, but I could
22 probably count them -- you know, five to ten
23 conversations during my short period of time there.
24  Q. Did you feel like you had a good
25 relationship with Mr. Gill when you were at CPI?

Page 8

1  A. I don't think we had much of a
2 relationship, I guess is probably the best way to
3 answer that. He was the CEO and owner of the company I
4 worked for, and I think that was the extent of the
5 relationship.
6  Q. Could you describe for us what you did in
7 your job function as a call center director?
8  A. Yeah. I led a team of about 20 --
9 approximately 20 sales reps that were focused on
10 retentions, and -- so, you know, folks would call.
11 They would try to cancel their service. We would
12 either save them. Then we also sold -- anybody moving
13 into a home that had a CPI system, so my job was
14 leading those efforts.
15  Q. And did you have any co-equals, or were you
16 the only team leader in that department?
17  A. Within that department, I was the only
18 person in my role. There was another call center
19 director, but she ran the customer service side of the
20 business.
21  Q. And you said that you had some issues with
22 Mr. Schockness. Can you tell us a little more about
23 what issues you had with him?
24  A. Yeah. You know, the easiest example I can
25 think of was at some point, you know, sales weren't

Page 9

1 really where they needed to be, and he said something
2 to the effect of, "Well, Jorge, if we don't get those
3 numbers up, we're going to have to deport you." So as
4 a United States born citizen of Hispanic descent, that
5 was pretty offensive. That's one example that comes to
6 mind.
7  Q. Did you complain to anyone at CPI about
8 Mr. Schockness's behavior?
9  A. Him and I had a conversation where, you
10 know, I explained to him that it's just not
11 appropriate, but outside of that, my time thereafter
12 was short-lived.
13  Q. How did you leave CPI? What were the
14 circumstances?
15  A. Well, after that I was asked to leave, and
16 then it was a separation agreement where we -- both
17 parties agreed. They thought I should leave. I
18 thought I should leave. Therefore, there was a
19 separation agreement in place.
20  Q. What were the circumstances of how that
21 came about?
22  A. It was, according to them, not a good job
23 fit, which I guess is interesting considering I was
24 there for about a year and a half. So I agreed that it
25 wasn't a good job fit but not necessarily due to the

1 functions of the role itself, more so because of the
2 company culture.
3     Q. What do you mean by that?
4     A. Well, when your boss is telling you you're
5 going to get deported if you don't get numbers up,
6 that's definitely not the type of culture I want to be
7 a part of. Not to mention, you know, some of the
8 instructions that -- so for us not as much, but at
9 least on the customer service side, I heard about a lot
10 of different folks being asked to do things they didn't
11 feel comfortable with.
12     For example, if a customer asks for a white
13 technician rather than a black technician, they would
14 oblige to that. Again, it didn't come across on my
15 side of the work, but that's what I heard from some
16 customer service representatives.
17     Q. Did you ever complain about that to anyone
18 within CPI?
19     A. In terms of an official complaint to human
20 resources, no.
21     Q. Did you ever make an EEOC complaint against
22 CPI?
23     A. No. When these things came to light,
24 that's when the conversations around a potential
25 separation came up, and I just agreed and left quietly.

1     Q. Were you ever part of an EEOC investigation
2 related to any other employees?
3     A. I do remember -- I believe there was a
4 complaint, if I'm not mistaken. I can't remember the
5 gentleman's name. And that one in particular I didn't
6 think was accurate. Therefore, I had a written
7 statement stating what I witnessed, and it did not
8 match what the complaint was.
9     Q. To the best of your recollection,
10 understanding it's been a while, what didn't match up
11 about the complaint based on what you recall occurring?
12     A. From what I recall, it was something to the
13 effect of someone being told that -- a black gentleman
14 being told that he is better off applying for a job as
15 a janitor. I didn't witness it. Therefore, I didn't
16 testify that I witnessed it. It doesn't take away from
17 the fact it may have happened, but I just personally
18 didn't witness it.
19     Q. Did you have any conversations with that
20 gentleman about the accusations he made?
21     A. Before or -- well, I guess after, right?
22 If I recall -- and I'm trying my best to remember.
23 There may have been a text message conversation or a
24 phone conversation where he expressed, you know, what
25 he witnessed happened, and -- so, yes, more than

1 likely, from what I remember, it was either text or a
2 phone conversation. I can't remember. It was a while
3 back.
4     Q. When you separated with CPI, you said you
5 had some sort of an agreement. Do you recall what that
6 was called?
7     A. I believe it may have been called a
8 separation agreement.
9     Q. Do you know how long that agreement was set
10 to last?
11     A. In terms of the pay that was given to me?
12     Q. Yeah. And then my next question was going
13 to be whether there was anything like a
14 non-disparagement clause or anything like that in the
15 agreement if you remember?
16     A. No. I can't say that I do.
17     Q. And how long did you receive pay after your
18 separation from CPI?
19     A. It couldn't have been more than two or
20 three months.
21     Q. When you left CPI, did you retain a number
22 of e-mail addresses of CPI employees?
23     A. No. Sorry. When you say "retain," like,
24 for example, in my open letter to the mayor in 2020,
25 Mr. Kenneth Gill was on that e-mail. He had been added

1 to that e-mail list during my time at CPI, right. So,
2 yeah, he was on the e-mail list.
3     Q. How many other CPI employees are on the
4 e-mail list, to the best of your recollection?
5     A. I really cannot recall. I would probably
6 venture to say a handful maybe.
7     Q. When you left CPI, did you download or save
8 any information related to CPI's business?
9     A. Not at all, no.
10     Q. Do you stay in contact with any CPI
11 employees?
12     A. Current CPI employees or that ever worked
13 there?
14     Q. Current.
15     A. Current -- not that I'm aware of. I don't
16 believe they work there any longer, no.
17     Q. What CPI or former CPI employees have you
18 stayed in contact with?
19     A. Kelley Phelps, who was one of the other
20 call center directors; Dave Raleigh, who was an outdoor
21 sales manager. There was a gentleman named Yusuf who
22 reached out after the e-mail from Mr. Kenneth Gill when
23 he wrote the racist comments to me was publicized. And
24 those are the ones that come to mind right now.
25     Q. Any others you can think of?

1 himself. And in several conversations I've had, he
2 would try to say something, and she would just cut him
3 off. And from my understanding, I was told it's
4 because usually he'll say something racially
5 insensitive, but before he puts his foot in his mouth,
6 she's there to stop him.
7 (BY MR. HERBERT)
8   Q. Let me ask you about one thing you
9 testified about was that CPI -- tell me if this is
10 correct. CPI generally had a policy that if a CPI
11 customer or potential customer required to have a tech
12 or a sales rep come visit them at their home and if
13 they requested -- if they asked that CPI not send an
14 African-American person, CPI would agree to that and
15 would make efforts to make sure that the person who
16 went to that customer's house was white or Caucasian;
17 is that right?
18       MR. EBLEN: Object to form and
19 foundation.
20       THE WITNESS: Yes. That's what I was
21 told by CPI employees, yes -- former CPI employees.
22 (BY MR. HERBERT)
23   Q. Do you know whether or not that policy or
24 practice was ever brought to the attention of
25 higher-level executives at CPI?

1       MR. EBLEN: Foundation.
2       THE WITNESS: So around that time, I
3 heard that the person that used to be my counterpart --
4 so this was after we went public -- Queen City Unity
5 did with the letter and after Kerr Putney was hired, as
6 I understand it -- and this is, again, a third-party
7 story. But from what I've heard, Ms. Kelley Phelps,
8 who was my counterpart as a call center director,
9 brought that up to Chief Kerr Putney -- former Chief
10 Kerr Putney -- and he went and told Mr. Gill. And from
11 the story I heard, Mr. Gill said, "Well, if she doesn't
12 like it, she can leave." And after being there for
13 30 years, she's no longer there.
14 (BY MR. HERBERT)
15   Q. Let me just break that down a little bit.
16 So you're saying your understanding is that somebody
17 who worked at CPI for 30 years brought this policy or
18 practice regarding customers requesting that black
19 people not be sent to their doors to the attention of
20 Kerr Putney and possibly Mr. Gill, and CPI didn't do
21 anything about that but instead suggested that this
22 employee could leave the company if she didn't like it?
23       MR. EBLEN: Form and foundation.
24 (BY MR. HERBERT)
25   Q. Is that generally your understanding of

1 what transpired?
2   A. From the story I was told, yes. That's
3 what I'm being told.
4   Q. Do you know that female employee's name --
5 the employee at CPI?
6   A. Yes. Kelley Phelps, K-e-l-l-e-y Phelps.
7   Q. I'm sorry. What's the last name?
8   A. P-h-e-l-p-s, Phelps.
9   Q. And your understanding is she just recently
10 left CPI?
11   A. I think it's been about -- well, yeah.
12 About six months, maybe more.
13   Q. What was her title or role at CPI again?
14   A. Call center director.
15   Q. Was she there when you worked there?
16   A. She was.
17   Q. Was she one of your superiors?
18   A. No. She was my counterpart. She ran the
19 customer service side, and I ran the retention side.
20   Q. Okay. So do you recall interacting with
21 her while you worked at CPI?
22   A. Oh, yeah. Absolutely.
23   Q. Did you ever raise any of your concerns
24 about racial insensitivity at CPI to Ms. Phelps while
25 you worked there?

1   A. At times. And I think, you know,
2 especially given her tenure there, you know, typically
3 her response was something along the lines of, "Well, I
4 mean, you know how John is" -- "John" being John
5 Schockness -- or, "Well, you know how Mr. Gill is."
6 And it just came to be accepted, I guess.
7   Q. That policy or practice of allowing
8 customers to prohibit black people from coming to their
9 doors, do you know is that widespread at CPI? Was that
10 something widely known among the employees?
11       MR. EBLEN: Form and foundation.
12       THE WITNESS: I think it was more of
13 an as-needed, right. So I can't imagine that there's
14 any document that has outlined this policy. But from
15 the employees that have had to experience that, the one
16 gentleman that told me was a black man, and he said,
17 "Hey, you know" -- he got up and asked his manager,
18 "What should I do?" and they said, "Just tell them that
19 absolutely you will send a white technician without a
20 problem, and put it in the notes."
21 (BY MR. HERBERT)
22   Q. Do you know if it was put in the notes?
23   A. I wasn't there, but according to the
24 gentleman, he did write it in the notes, yes.
25   Q. Do you happen to know who -- what the name

1  of that manager was?
2  A. I don't.
3  Q. Who was the gentleman who told you that?
4  A. That, I don't remember either. I had a lot
5  of conversations from June to, like, maybe September or
6  August with different CPI employees -- or former CPI
7  employees. I can't recall off the top of my head,
8  Mr. Herbert.
9  Q. No problem. Let me ask you -- do you
10 recall whether while you worked at CPI in the call
11 center, do you recall anybody -- let me back up.
12 Strike that.
13     While you worked at CPI, do you recall any
14 customers or potential customers calling and raising
15 the issue of CPI's competitor, Vivint or any Vivint
16 sales reps, that had visited any customers?
17 A. No.
18 Q. Do you know if CPI employees ever told
19 customers or potential customers that Vivint wasn't
20 licensed to work in the state of North Carolina?
21     MR. EBLEN: Foundation.
22     THE WITNESS: Could you repeat the
23 question, Mr. Herbert? I'm sorry.
24 (BY MR. HERBERT)
25 Q. Yeah. Have you ever heard of anybody at

1  CPI telling a customer or a potential customer that
2  Vivint was not licensed to do business in
3  North Carolina?
4     MR. EBLEN: Foundation.
5     THE WITNESS: You've got to remember,
6  it's been quite some time. I do know that CPI sales
7  agents were certainly instructed to say things about
8  Vivint that were, quite frankly, probably more of a
9  matter of opinion, like, "They're not telling you
10 everything they -- there's a lot of information that
11 they won't tell you. I wouldn't trust Vivint." Things
12 of that nature. It wouldn't surprise me if the
13 licensing piece may have been one of those items -- one
14 of the bullet points to countersell Vivint.
15 (BY MR. HERBERT)
16 Q. Those opinions that you just testified
17 about, what is your basis for that testimony? Did you
18 hear that from other CPI employees?
19 A. Yes. Particularly so as the guy -- I ran
20 retention mostly. And then most of the customers that
21 we dealt with from the sales perspective were just
22 folks that were calling in because they had -- you
23 know, the house they moved into had a CPI system, so
24 it's easy for them to activate, so there wasn't a lot
25 of competitive selling on my end.

1  But on the first floor, which is where the
2  sales team was, that's what I heard from some of the
3  sales reps when they were, like, "Oh, yeah. I can
4  easily sell against Vivint because I just talk about
5  how -- you know, how much of a poorly ran company they
6  are and how they're unethical as a corporation."
7  Q. You heard that from multiple CPI sales
8  reps?
9  A. Um-hm.
10     MR. EBLEN: Object to form and
11 foundation.
12 (BY MR. HERBERT)
13 Q. And that was a "yes," that "um-hm"?
14 A. Yes.
15 Q. Okay. One thing about a deposition is you
16 have to give a verbal response. The court reporter
17 can't take down the um-hms or the uh-uhs.
18     And you heard that during the time that you
19 worked at CPI, right?
20 A. Yes.
21     MR. EBLEN: Object to form and
22 foundation.
23 (BY MR. HERBERT)
24 Q. When you say that you heard CPI reps say
25 that Vivint was unethical, anything in particular that

1  CPI reps were saying that they claimed was allegedly
2  unethical?
3     MR. EBLEN: Form and foundation.
4     THE WITNESS: They were claiming, from
5  what I recall, a potential legal entanglement that --
6  that's what I remember. Something to the effect of,
7  "Well, if you look up public records, they" -- some
8  unethical sales practices at the door or something to
9  that effect.
10 (BY MR. HERBERT)
11 Q. And it's your understanding that CPI sales
12 reps who said they could easily compete against Vivint
13 were telling this to customers or potential customers?
14     MR. EBLEN: Form and foundation.
15     THE WITNESS: From what they were
16 telling me, yes.
17 (BY MR. HERBERT)
18 Q. Regarding that policy and practice that you
19 testified about Vivint agreeing to allow customers to
20 bar African-American CPI employees from their homes,
21 what is your personal view on that policy?
22     MR. EBLEN: Form and foundation.
23     THE WITNESS: I mean, I think it
24 speaks to the discrimination, all the way from the top
25 down, of the organization. And I think it actually

| Page 50 | Page 52 |
|---|---|
| 1 creates inequitable pay for technicians of color | 1 to Ken Gill's attention or Chief Kerr Putney's |
| 2 because part of their goal is when they go to a | 2 attention. |
| 3 customer's home is to up-sell, and, you know, if you | 3 (BY MR. HERBERT) |
| 4 are limiting the amount of homes that they can go to, | 4    Q. So, as far as you know, CPI still condones |
| 5 then you're limiting the amount of opportunities -- | 5 that policy or practice? |
| 6 up-sell opportunities that they have. | 6    A. As far as I'm concerned, yeah. I haven't |
| 7 (BY MR. HERBERT) | 7 heard otherwise. |
| 8    Q. Did you hear of any African-American CPI | 8    Q. Let me ask you about your decision to go |
| 9 employees complain about that policy or practice? | 9 public with the comments from Mr. Gill that you |
| 10        MR. EBLEN: Form and foundation. | 10 indicated you believe were racist. I believe you said |
| 11        THE WITNESS: Only after my time at | 11 you consulted with the board at Queen City Unity? |
| 12 CPI, yes. | 12    A. Yes. |
| 13 (BY MR. HERBERT) | 13    Q. Did you have any other input from any other |
| 14    Q. You heard that from people who reached out | 14 people about whether or not you should publicize those |
| 15 to you after the controversy broke out? | 15 comments? |
| 16    A. Correct. | 16    A. Outside of the board? |
| 17    Q. Do you -- do you recall the names of any of | 17    Q. Yes. Um-hm. |
| 18 those individuals? | 18    A. Yeah. You know, I consulted several |
| 19    A. Not at the moment. Not at the moment, but | 19 community leaders and friends that I know. Some of |
| 20 I'm pretty sure if I dig through, I can probably figure | 20 them were very supportive and said, "You should do it." |
| 21 it out. | 21 A couple of them said, "Hey, you know, he's a very rich |
| 22    Q. Can you give me your best estimate on how | 22 and powerful man in our city who is very much in |
| 23 many folks told you that? | 23 cahoots with the CMPD. You should be very careful. |
| 24    A. I would say about five to ten. | 24 I'm worried about you." But overall, the decision lies |
| 25    Q. And were those folks people who -- were | 25 on the board of directors, and the board voted in favor |

| Page 51 | Page 53 |
|---|---|
| 1 some of those folks people who were still at that time | 1 of moving forward with it which I supported and I |
| 2 currently working for CPI? | 2 spearhead. |
| 3    A. The majority of them were former employees. | 3    Q. With you say the CMPD, that's the |
| 4 There could have been a couple that were still | 4 Charlotte-Mecklenburg Police Department? |
| 5 employed, yes. | 5    A. Correct. I'm sorry, yes. |
| 6    Q. Do you know if CPI did anything to change | 6    Q. So folks -- some folks were telling you |
| 7 or alter that policy or practice after this controversy | 7 that because Mr. Gill has a very close relationship |
| 8 about Mr. Gill's comments broke out? | 8 with the local police department that you might be at |
| 9        MR. EBLEN: Form and foundation. | 9 risk if you went public with this information? |
| 10        THE WITNESS: I do not. What I do | 10    A. Correct. Yeah. Which I did receive many |
| 11 know is that Kelley Phelps who used to be my | 11 death threats from just people writing me letters that |
| 12 counterpart at CPI, the other call center director, as | 12 were death threats. Yeah. |
| 13 it was explained to me through a mutual acquaintance is | 13    Q. Did you have any information as to whether |
| 14 that when she brought it to Chief Kerr Putney and Chief | 14 any of the threats you received were from current CPI |
| 15 Kerr Putney brought it to Kenneth Gill to correct the | 15 employees? |
| 16 matter, that then she was asked to leave. | 16        MR. EBLEN: Form and foundation. |
| 17 (BY MR. HERBERT) | 17        THE WITNESS: No. I didn't have any |
| 18    Q. You're not aware of any other action that | 18 information that would confirm that it was CPI |
| 19 CPI or the company took to attempt to resolve or remedy | 19 employees. |
| 20 that policy or practice? | 20 (BY MR. HERBERT) |
| 21        MR. EBLEN: Form and foundation. | 21    Q. Did you suspect that? |
| 22        THE WITNESS: No. At least from the | 22    A. No. Well, perhaps, yes. You know, I'm |
| 23 sound of it to me, it sounds like they were pretty | 23 pretty sure -- it would make sense for one plus one to |
| 24 adamant about keeping it if it, you know, constituted | 24 equal two. I also know that there were -- there were |
| 25 Ms. Kelley Phelps being asked to leave for bringing it | 25 fake Facebook profiles created with images of people of |