# Exhibit D

```
 1
      IN THE UNITED STATES DISTRICT COURT
 2    FOR THE WESTERN DISTRICT OF NORTH CAROLINA
      CHARLOTTE DIVISION         3:20-CV-00504-FDW-DSC
 3
 4
      CPI SECURITY SYSTEMS, INC.,
 5
             Plaintiff and
 6           Counterclaim Defendant,
 7        vs.
 8    VIVINT SMART HOME, INC.
      f/k/a MOSAIC ACQUISITION
 9    CORP.; LEGACY VIVINT SMART
      HOME, INC. f/k/a VIVINT SMART
10    HOME, INC.,
11           Defendants and
             Counterclaimants.
12
13
14
15     VIDEOTAPED VIRTUAL ZOOM 30(b)(6) DEPOSITION OF
        CPI SECURITY SYSTEMS, INC. BY JOHN SHOCKNESSE
16
              (Taken by Defendants/Counterclaimants)
17
                   Charlotte, North Carolina
18
                Thursday, September 23, 2021
19
20
21
22
23    Reported by Andrea L. Kingsley, RPR
24
25    Job No. CS4810616
```

## Page 74

1  additional employees to field that increased volume
2  of calls?
3     A.   No, sir.
4     Q.   Is part of your department's
5  responsibility to track the response time, the wait
6  time or hold time that a customer has when making a
7  call to those departments?
8     A.   Yes, sir. Again, I did not study them
9  prior so I don't know them off the top of my head.
10    Q.   Just very generally, roughly speaking,
11 as of today, do you have an understanding what is
12 the average response time for CPI to respond to a
13 customer making one of those calls?
14       MR. HOBBS: Same objections. You
15    can answer to the extent you know based on
16    your personal knowledge.
17    A.   Generally -- certainly the goal is we
18 want to get it as quickly as possible. Generally,
19 right now, again, we'd like to hire more people,
20 but because of COVID, it's probably within two or
21 three minutes on average.
22    Q.   Going back to say the beginning of this
23 year, 2021 to the present, has that number generally
24 been roughly constant?
25    A.   No. At the beginning of the year it was

## Page 75

1  less, it was probably under a minute.
2     Q.   Do you know what accounted for the
3  increase from the beginning of the year to today?
4     A.   Again, seasonality with the business.
5  So as summer comes in, it gets a lot busier. On
6  top of that, it has been extraordinarily difficult
7  to hire people right now. So I think lots of other
8  companies in our area are struggling with the same
9  thing, so actually bringing people on. So call
10 volume is a little less but you couple that with
11 it's difficult to find people and bring them on
12 board right now.
13    Q.   There's a labor shortage across the
14 country that's affecting those businesses?
15    A.   Absolutely. Unfortunately.
16    Q.   The seasonality number, let's say taking
17 the current labor shortage out of equation, the
18 increase in the response time in the summer, has
19 that been generally consistent year-over-year?
20 Let's leave last summer, 2020, out of that, but in
21 prior years generally the response time increases in
22 the summer due to the seasonality of the business?
23    A.   That volume will definitely increase.
24 How much impact as far as wait time is really
25 pursuant to how well we're able to staff up during

## Page 76

1  those times and what will take place. So usually
2  it will go up a little bit, but depending on how
3  well we navigate through there depends on how far
4  that gap would take place. We would like to not
5  have a big gap is what I'm saying.
6     Q.   Part of your department's goal is to
7  respond to customers quickly and reduce that
8  response time; right?
9     A.   Yes, sir.
10    Q.   Does CPI hire employees seasonally to
11 try to deal with that seasonal adjustment and the
12 influx of calls historically?
13    A.   We do not. What we do is we model it
14 out saying that we know that call volumes go up so
15 we make sure we hire in there, we have natural
16 attrition as the fall and winter months go in, and
17 so we will usually slow down our hiring to then
18 account for it as it comes into the next year.
19    Q.   Makes sense. So you maybe have some
20 hiring push in the beginning of the year or the
21 spring knowing that there's going to be natural
22 attrition later in the year, you try to address that
23 seasonality issue?
24    A.   Yes, sir.
25    Q.   With the increased volume of calls that

## Page 77

1  resulted from the Black Lives Matter controversy,
2  did CPI attempt to hire additional employees to try
3  to field those calls?
4     A.   Actually, when June hit, we had stopped
5  all hiring at that time because of COVID. So we
6  were under strict restrictions here in North
7  Carolina, and Charlotte in particular, so we were
8  not able to do training classes onsite here. So we
9  did not start those up again, I want to say, until
10 July I believe. Later July. But we were --
11 unfortunately, it was -- COVID was very difficult
12 for us during those couple months.
13    Q.   So due to COVID, partly due to COVID,
14 you had fewer employees than you normally would
15 historically during the summer months of last
16 summer, 2020; right?
17    A.   Yes, sir.
18    Q.   In connection with that controversy,
19 some CPI employees quit working for CPI; correct?
20    A.   Yes. I'm aware of two.
21    Q.   Two employees in these departments that
22 we've been talking about --
23    A.   Yes, sir.
24    Q.   Did they indicate the reason they quit
25 was connected to the controversy?

Page 78

1 MR. HOBBS: Objection to the form.
2 Outside the scope. Answer if you know.
3 A. One indicated that, and another one was
4 just upset about the people around it.
5 Q. Was one of those people Kelley Phelps?
6 MR. HOBBS: Same objections.
7 A. No.
8 Q. Do you know who she is?
9 A. I know exactly who she is.
10 Q. You do know she did quit working for
11 CPI?
12 A. Yes, she did quit working for CPI, but
13 your question was directly related to the incident
14 in June and that's what I was answering.
15 Q. The reason that Ms. Phelps quit was in
16 part related to CPI's policy of allowing customers
17 to discriminate against CPI reps coming to their
18 house, not to send African-American reps to their
19 house; right?
20 MR. HOBBS: Objection to the form.
21 Foundation. Outside the scope. You can
22 answer if you have personal knowledge of this
23 subject if you know.
24 A. Yeah, I'm not aware of that being the
25 reason why she resigned.

Page 79

1 Q. Did you say she was fired?
2 A. No. Resigned. I said I am not aware
3 that's the reason why she resigned.
4 Q. You know who Mr. Jorge Millares is;
5 right?
6 A. I do.
7 Q. He's a former employee of CPI; right?
8 A. Yes.
9 Q. He worked in your department when he
10 worked there?
11 A. Yes, sir, he did.
12 Q. Are you aware that his deposition was
13 taken in this case?
14 A. I am aware of a deposition was taken
15 from him. I don't know any details about it.
16 Q. Mr. Millares testified that the reason
17 Ms. Phelps quit was the reasons I just asked you
18 about. Do you have any basis to dispute that?
19 MR. HOBBS: I will state the same
20 objections. It's CPI's position this entire
21 line of questioning is outside the scope of
22 the topics the witness was designated to
23 testify.
24 Subject to that objection to all of
25 these questions, you can answer if you know

Page 80

1 the answer to the question.
2 A. I have no idea what conversations she
3 had with -- Mr. Millares was no longer working for
4 us at that point.
5 Q. Ms. Phelps worked in your department?
6 A. Yes, sir.
7 Q. How long did she work for the company?
8 A. Almost 21 years.
9 Q. So she had some responsibility for
10 customer retention, right, as part of her job?
11 A. She did.
12 Q. Did she talk to you about the reason she
13 quit CPI?
14 MR. HOBBS: Same objections.
15 A. Yeah, we had conversations about it.
16 Q. What did she tell you?
17 MR. HOBBS: Same objections.
18 A. She was about to turn 50, she had been
19 here a long time, she wanted to do something
20 different. She was concerned about change and what
21 was taking place here and what role she may have.
22 We tried very hard to retain her. She gave
23 actually a very long notice. But in the end, she
24 left.
25 Q. When you say change and things that were

Page 81

1 going on there, what are you referring to?
2 MR. HOBBS: Same objections.
3 A. We were trying to -- given the events
4 that took place in June, we were trying to make
5 sure we were listening to employees and we wanted
6 to make sure that any concerns that they had were
7 addressed. I mean, as we recall, it was a tough
8 time regardless for the country with the George
9 Floyd incident which so people were a little bit
10 upset about it. A lot of people were very upset
11 about it. Certainly within the call center. So
12 trying to make sure that we were -- we were more
13 engaging with our employees and we brought on --
14 part of why we brought on, Kerr Putney.
15 Q. Kerr Putney is the former police chief
16 of the Charlotte, Mecklenburg County Police
17 Department; is that correct?
18 A. Yes, sir.
19 Q. Part of the reason you brought him was
20 an effort to attempt to address some of the issues
21 that were related to the Black Lives Matter
22 controversy that CPI became involved in; right?
23 MR. HOBBS: Same objection.
24 A. Actually, my understanding, again, I
25 wasn't directly involved with it, but his

Page 82

1  retirement had been long in the plans.  So he had
2  planned on retiring quite a bit earlier, and the
3  intention was for him to come over here well before
4  then.
5        MR. EBLEN:  Greg, I will jump in
6  here for just a second.  We've given you
7  really broad latitude to ask questions about
8  June 2020 and customers leaving.  But, I mean,
9  you guys aren't prosecuting an employment
10 action.  You're getting into detailed
11 questions about why people left.
12       MR. HERBERT:  I'm going to ask you
13 to minimize the speaking objections.  We can
14 talk separately outside the hearing of the
15 witness if you want.  But your objection is
16 noted.  I'm entitled to ask the witness any
17 question, I'm not limited by the topics in the
18 notice, I think you know that.  And on top of
19 that, he has testified that he was an employee
20 who was customer retention which is
21 specifically identified as one of the topics.
22 So, you know, your objection is noted.  If you
23 want to give more reasons for it, then I would
24 suggest we talk offline.  But I understand the
25 basis of your objection.  I disagree with it.

Page 83

1  I think this is related to the topic notice
2  number 1 and number 2.  If it isn't, I am
3  entitled to ask it.  So I would ask you to
4  please not continue with the speaking
5  objection that might be attempting to send a
6  message to the witness.
7        MR. EBLEN:  I'm not attempting to
8  send anything to the witness, and you're not
9  entitled to ask the questions about anything.
10 You're entitled to ask him questions about the
11 topic.
12       MR. HERBERT:  Disagree.
13       MR. EBLEN:  You're getting very far
14 afield and we've given you broad latitude, but
15 we're hitting a point where we're going to
16 instruct him not to answer.  So.
17       (The court reporter off the record.)
18       MR. HERBERT:  I note an objection.
19 Generally speaking, one lawyer is supposed to
20 speak for a witness for a party.  I understand
21 that we have given leeway in that regard and
22 I'm happy to give leeway in that regard, but I
23 think Mr. Hobbs is primary counsel for this
24 deposition.  So attorneys should be capable of
25 raising objections if you generally ask they

Page 84

1  go through him or if you want to talk
2  separately off the record, we can do that on a
3  break.
4        MR. EBLEN:  I appreciate that.
5  That's not what happened in my depositions.
6        MR. HERBERT:  Which is why we've
7  given each other some leeway.
8        MR. EBLEN:  It's all good.
9     Q.   Mr. Shocknesse, part of the
10 responsibilities in your department is to field
11 customer calls and complaints and concerns about the
12 service that they receive from CPI; correct?
13    A.   Yes, sir.
14    Q.   Let me ask you, are you aware of
15 customers expressing desire or request that
16 African-American CPI employees not be sent to their
17 home?
18    A.   I am aware that it has happened, yes,
19 sir.
20    Q.   You're aware that in some cases CPI
21 agreed with that request with the customer?
22       MR. HOBBS:  I will state the same
23 objection.  I want to be clear that the
24 objection Mr. Eblen has stated is on behalf of
25 CPI.  Our objection is specifically this is

Page 85

1  outside the scope of the topics for which the
2  witness has been designated to testify on
3  behalf of CPI.  So I want to be very clear
4  that any responses to this entire line of
5  questions is on behalf of Mr. Shocknesse
6  personally, not on behalf of CPI.  If the
7  witness knows the answer to this question, we
8  will give you a little bit more leeway to
9  answer but, otherwise, we're not going to
10 answer questions on that topic.
11       MR. HERBERT:  I disagree with the
12 objection but the objection is noted.
13    Q.   Mr. Shocknesse, can you answer?
14    A.   Could you ask the question again?
15    Q.   Are you aware that CPI sometimes agrees
16 with customers when they request that an
17 African-American CPI employee not be sent to their
18 home?
19       MR. HOBBS:  Same objection.
20    A.   We don't agree.  I'm not aware that we
21 agree.
22    Q.   So your testimony is that that does not
23 appear anywhere in any customer account notes, any
24 indication that CPI has agreed to such a request?
25       MR. HOBBS:  Same objections.

Page 86

1   A.  Your question was do we agree with.  I
2   interpret that as do we agree with that request.  I
3   don't agree with that request, nor do I believe the
4   company does.
5       Q.  Let me ask, Mr. Jorge Millares testified
6   that, in fact, the company has agreed with customers
7   not to send an African-American employee to their
8   homes.  Do you have any basis for disputing that?
9           MR. HOBBS:  Same objections.
10          Outside the scope.
11      A.  Are you saying we acquiesced to a
12  request or agreed to a request to me are two
13  different things.
14      Q.  That you honor that request.
15      A.  I am aware afterwards that there's been
16  a couple incidents where the customer requests, and
17  actually Kelly Phelps was the one that advised the
18  reps to go ahead and put that request in.  We've
19  also had requests for customer a to have an
20  African-American technician and we also honored
21  that request.  I'm only aware of I think three or
22  four in the last I don't know how many years.  And
23  that was afterwards, after Ms. Phelps made that
24  comment, and we looked into it and -- but she
25  admitted she's the one that made that call.  And we

Page 87

1   had lots of conversation about it as far as what's
2   the right thing to do or not.  You can make an
3   argument to say that is it safe for an
4   African-American person to go to a home that
5   somebody specifically asked do not send.  Is that
6   safe for a technician?  Unfortunately, there's bad
7   people out there and there's people that have their
8   own opinion on who should be going to their home
9   and we can't control that.
10      Q.  So your testimony is that CPI only
11  agreed to that, that you're aware of, in two or
12  three incidents?
13      A.  I think I said three or four, but,
14  again, this is ballpark and this was afterwards,
15  again, I am not aware of any of them when they
16  occurred.  I'm aware of it well afterwards when we
17  had some conversations about it.  Then we just
18  tried to figure out how many times it happened, and
19  in the end, the only time we could find it was
20  three or four I think.  And one of those -- when I
21  say three or four, that was a specific request
22  whether it was a white or an African-American
23  technician and so we must say there were one or two
24  requests -- that the customer requested an
25  African-American technician of which we honored.

Page 88

1   We've also had a request for a female technician
2   which we didn't have so we were unable to honor.
3       Q.  Out of the three or four that you
4   testified, how many of those were the customer
5   requesting an African-American not come to their
6   house?
7           MR. HOBBS:  Same objections.
8       A.  Again, I want to say it was -- I think
9   it was two but it could be three.  One of those,
10  the only reason why I remember, one of them was
11  there was a long conversation that took place with
12  the customer that the wife had been raped, I want
13  to say two years prior, and had some PTSD and was
14  very concerned about it.  I know that was why that
15  request was honored.
16      Q.  After you learned of the incidents, did
17  CPI change its policy with respect to any of these
18  customers?
19          MR. HOBBS:  Same objections.
20      A.  We do not have a policy on it.  We do
21  not -- right now, if anybody were to ask for
22  something, they would talk to a supervisor or
23  manager and that would be escalated that we want to
24  make sure we figure out what is going on.  So we do
25  not have a policy to send whether it's an

Page 89

1   African-American or white technician they request.
2       Q.  So it's handled on a case-by-case basis?
3       A.  Well, if that request has come up, it's
4   a case-by-case, but I'm not aware of one that has
5   taken place in the last year.
6       Q.  How were the two or three that you
7   mentioned resolved or changed in any way?
8           MR. HOBBS:  Same objections.
9       A.  Again, Kelly Phelps was involved with
10  telling reps to go ahead and do that.  She has
11  advised us afterwards.
12      Q.  I guess what I'm asking is what happened
13  after that?  Did CPI then change its prior agreement
14  to honest the request?
15      A.  Again, we have no formal policy on it at
16  all.  We never did.  This was Kelly made a call on
17  accounts, never had a formal policy, and now
18  that -- we just tell reps if somebody asks for
19  that, that needs to be escalated, we need to be
20  aware of it.  Find out what the reason is, and then
21  the manager gets involved.
22      Q.  So your testimony is you don't know with
23  respect to those two or three incidents, you
24  testified you don't know if CPI is still continuing
25  to honor that agreement or if it has changed its

## Page 90

1 position on that?
2     MR. HOBBS: Same objections.
3   A. Again, we don't have a -- we would not
4 be honoring and it would have come to light in the
5 last year because we've, again, advised reps they
6 can't do that without talking to a manager, the
7 manager would have to escalate it as well as our
8 operations team is aware of it. I feel very
9 confident that we would be aware of it if it
10 happened in the last year.
11   Q. But you can't say with those incidents
12 whether or not CPI is still agreeing to honor those
13 requests?
14     MR. HOBBS: Same objections.
15   A. When you say CPI, I can't say if an
16 individual rep does something and does not follow
17 what we've explained to reps to make sure that a
18 manager is made aware. Unfortunately, a company
19 with this many people, somebody can do something
20 individually. I am not aware of anybody doing
21 that.
22   Q. So with a company with as many employees
23 that CPI has, sometimes employees take actions that
24 they are not supposed to take according to the
25 company's instructions or guidelines; fair enough?

## Page 91

1     MR. HOBBS: Same objections.
2 Outside the scope of this witness.
3   Q. You can answer.
4   A. I'm sure it happens, yes.
5     MR. HERBERT: Let's take another
6 short break. We'll go until a lunchtime break
7 later unless anybody is particularly hungry
8 now, it's an early time for me, but if anyone
9 wants to go to lunch we can do that.
10 Otherwise, I wouldn't mind going for another
11 45 minutes or so and then taking a lunch
12 break.
13   Q. Does that work for you, Mr. Shocknesse?
14   A. Works for me.
15     MR. HERBERT: Is that okay for you,
16 Mr. Hobbs?
17     MR. HOBBS: That works for me. I
18 will insist on a lunch point, but I let you
19 determine when that is, Greg.
20     MR. HERBERT: If at any point
21 anyone is starving, let me know and I'm fine
22 with being flexible. Let's take 10 minutes
23 now and come back at 11:35.
24     THE VIDEOGRAPHER: The time is
25 11:25 a.m. We're off the record.

## Page 92

1     (Recess taken.)
2     THE VIDEOGRAPHER: The time is
3 11:40 a.m. We're back on the record.
4   Q. Mr. Shocknesse, I just wanted to
5 confirm, based on your testimony earlier, I'm
6 correct that CPI has not done a quantification of
7 the total amount of revenue that was lost related to
8 the controversial comments by Mr. Gill last summer;
9 is that correct?
10   A. I'm saying I'm not aware, me personally,
11 I'm not aware.
12   Q. What about in terms of the other reasons
13 for cancellation that you mentioned, you talked
14 about the different percentages of the reasons that
15 folks historically cancel their contract with CPI, I
16 believe you indicated that CPI has not broken down
17 monetarily the total amount of losses over any
18 particular period for each particular category; is
19 that a fair statement?
20   A. Well, I think when we were talking about
21 it, what I said is we will attribute that monthly
22 dollar amount, a singular month, but that I'm not
23 aware of and haven't done any what's that lifetime
24 value of that customer, what's that -- if they had
25 X number of months remaining. So customer X

## Page 93

1 cancels in a certain month, they were paying $50 a
2 month, we will attribute $50 for that month of a
3 cancellation. That's what me and my team, that's
4 all I'm aware of.
5   Q. In addition to a monthly basis, do you
6 gross that up, in effect, to analyze it on a yearly
7 basis, or do you just look at it on a month-by-month
8 basis?
9   A. We look at it month-by-month.
10   Q. So your attempt to measure changes month
11 over month --
12   A. Yes, sir.
13   Q. -- direction things are going?
14   A. Yes, sir.
15   Q. So if I were to ask you in the last
16 let's say the last 12 months, going back from today,
17 has CPI quantified the total amount of losses due to
18 cancellations in the competition category, would you
19 be able to give me that number?
20     MR. HOBBS: Objection to the form.
21 Outside the scope. You can answer.
22   A. I don't have the number off the top of
23 my head, no, sir.
24   Q. You don't know whether or not CPI does
25 that quantification?