UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:20-CV-00504-FDW-DSC

CPI SECURITY SYSTEMS, INC.,

                    Plaintiff,

      v.

VIVINT SMART HOME, INC.,
f/k/a MOSAIC ACQUISITION CORP.;
LEGACY VIVINT SMART HOME, INC.
f/k/a VIVINT SMART HOME, INC.,

                  Defendants.

**DEFENDANTS' RESPONSE
TO PLAINTIFF'S
MOTION IN LIMINE**

## INTRODUCTION

CPI seeks damages from Vivint for "loss of numerous customers, both known and unknown" and "injuries to its goodwill and reputation." Doc. 29 ¶ 3. But CPI's claims suffer from a causation problem.

As CPI admits, it suffered these same losses—a "loss of numerous customers, both known and unknown" and "injuries to its goodwill and reputation" (*id.*)—after CPI's President and CEO made controversial statements that caused (in CPI's own words) a public "fallout." Doc. 103 at 2.

As CPI admits, this public fallout cost it over $6 million in canceled residential accounts alone. The damage to CPI's goodwill and reputation was so catastrophic that the Charlotte Business Journal questioned whether CPI could ever recover.[1]

---

[1]     Caroline Hudson, *Can CPI Security recover after CEO's protest statements?*, Charlotte Business Journal (June 12, 2020), perma.cc/r8lj-nawf.

Given this undisputed, alternative cause of CPI's claimed losses, it takes no effort to see how this evidence is critically probative. Indeed, this evidence is potentially *dispositive* on certain causation and damages issues—namely, whether or to what extent CPI's public "fallout," rather than any alleged conduct by Vivint's sales representatives, caused CPI's claimed losses from June 2020 to the present (the same time period for which CPI seeks damages).

CPI's motion seeks to withhold this critically probative evidence from the jury entirely. In CPI's view, it should be permitted to ask the jury for millions in damages for the "loss of numerous customers, both known and unknown" and "injuries to [CPI's] goodwill and reputation" (Doc. 29 ¶ 3), but hide from the jury that those losses were self-inflicted.

CPI also makes the inflammatory suggestion that Vivint intends to stoke the issue of whether Mr. Gill is racist. *See* Doc. 103 at 5–6. Vivint has no intent (or need) to do so, because whether Mr. Gill is or isn't racist is irrelevant. Rather, it is the *existence* of Mr. Gill's acknowledged comments and the *impact* those comments had on CPI's customer base, goodwill, and reputation that must be brought to the jury's attention. Otherwise, Vivint would be prejudiced by not being able to expose to the jury the critical relevance of CPI's own intervening conduct, thus depriving Vivint of a meritorious defense on both causation and damages.

There is no basis for depriving Vivint of this key defense, particularly when all CPI can muster is an argument under Rule 403—a rule that imposes an exceedingly

high standard that CPI cannot possibly meet. CPI's motion is without merit and should be denied.

## BACKGROUND

In the wake of George Floyd's murder in May 2020, a Charlotte-based nonprofit organization, Queen City Unity, sent an email to its subscribers. The e-mail was an open letter to the mayor and city council urging policing reform and racial justice.

CPI's President and CEO Ken Gill received this email, and he chose to wade into this highly sensitive, high-profile controversy. Mr. Gill told the organization to start spending its time "in a more productive way[,]" noting that "[a] better use of time[ ] would be to focus on the black on black crime and senseless killing of our young men by other young men." Doc. 103-1 at 4. Queen City Unity posted this e-mail on social media.

Regardless of Mr. Gills intentions, CPI immediately became the headline in what it concedes was "a significant wave" of negative "media attention" and "related fallout." Doc. 103 at 2, 5, 7. One-by-one, major institutions—including the Carolina Panthers, the Charlotte Hornets, Bojangles, North Carolina State University, and the University of South Carolina—publicly cut ties with CPI. *See infra* at 7–8. Almost immediately, thousands of CPI's customers also cut ties with CPI, switching their alarm-service provider to competitors like Vivint.

All told, the damage to CPI's customer base, goodwill, and reputation was enormous. *See infra* at 5–7.

After suffering multimillion-dollar losses to its customer base, goodwill, and reputation, CPI filed this lawsuit seeking damages for "loss of numerous customers, both known and unknown" and "injuries to [CPI's] goodwill and reputation." Doc. 29 ¶ 3; *see also, e.g., id.* ¶ 92.

Despite CPI's public fallout being potentially dispositive on certain causation and damages issues, CPI's motion represents that this evidence has "scant probative value," and, therefore, should be excluded under Rule 403. *See* Doc. 103 at 4.

For the reasons that follow, CPI's motion lacks merit.

## ARGUMENT

### I. Evidence of CPI's public fallout and related loss of customers, goodwill, and reputation is critically probative—if not dispositive—on certain causation and damages issues.

Rule 403 provides for excluding relevant evidence only "if its probative value is *substantially* outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403 (emphasis added). Thus, the Rule demands that evidence carrying a "genuine risk" of the jury's emotions being "excited to irrational behavior" should still be admitted unless the risk is "disproportionate to the probative value of the offered evidence." *United States v. Hassan*, 742 F.3d 104, 132 (4th Cir. 2014). Furthermore, district courts "must look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130, 1135 (4th Cir. 1988).

The Fourth Circuit has repeatedly emphasized that "Rule 403 exclusion should be invoked rarely," *United States v. Cooper*, 482 F.3d 658, 663 (4th Cir. 2007), and

that "the balance under Rule 403 should be struck in favor of admissibility." *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 124 (4th Cir. 2011). The Fourth Circuit has further cautioned that district courts "are obligated to . . . remember that the Federal Rules favor placing even the nastier side of human nature before the jury if to do so would aid its search for truth." *Mullen*, 853 F.2d at 1135 (reversing for improper exclusion of evidence under Rule 403).

Against the weight of these exceptionally demanding standards, CPI asks the Court to completely exclude evidence of CPI's public fallout and related loss of customers, goodwill, and reputation because, in CPI's view, it has "scant probative value"[2] in this case—a case in which CPI seeks damages for loss of customers, goodwill, and reputation. Doc. 103 at 4.

CPI's motion is belied by its own damages claims, the testimony of its own witnesses, and the well-documented reality that CPI's public fallout caused a multimillion-dollar "loss of numerous [CPI] customers, both known and unknown" and "injuries to [CPI's] goodwill and reputation." Doc. 29 ¶ 3.

As CPI confirmed, approximately <u>2,300 residential customers canceled their accounts</u> during CPI's public fallout—a loss that CPI conservatively values at more

---

[2] In the same breath, CPI "acknowledges" that it suffered a "loss of accounts and negative publicity" from the public fallout. Doc. 103 at 6 n.3.

than $6.21 million.[3] Bojangles' decision to cut ties with CPI, by itself, resulted in an additional loss that CPI conservatively values at more than $1.1 million.[4] Thus, the loss of residential customers and one corporate relationship alone amounted to more than $7.3 million.

Significantly, CPI has *admitted* that the public fallout damaged its goodwill and reputation. Exhibit 1 (Shocknesse Dep. Tr.) at 190:17–192:10. Its 30(b)(6) designee testified that the public fallout "was difficult" for CPI because it dragged on "way longer than the news story typically would have." *Id.* at 190:22, 191:6–7. When pressed on whether the public fallout caused "damage to CPI's reputation in the community," he admitted that "there was some damage." *Id.* at 192:4–10.

The customers that CPI hand-picked for depositions also confirmed this fact.[5] *See* Exhibit 2 (Maxwell Dep. Tr.) at 79:4–80:5 (describing it as a reason for switching from CPI to Vivint); Exhibit 3 (Cheek Dep. Tr.) at 27:19–28:9 (stating that it caused her to call CPI to inquire about "how long [she] had on [her] contract"); Exhibit 4

---

[3]     *See* Exhibit 5 (Schachner Dep. Tr.) at 115:5–116:23 (CPI's CFO explaining that each customer account equates to an average of $45 per month in recurring monthly revenue, and the industry standard valuation for each account is 60 times the recurring monthly revenue per site; thus, 2,300 customers x $45 x 60 = $6.21 million); *see id.* at 116:20–23 ("Q: Okay. So then roughly speaking, it would be 60 times the 45, times the 2300 to be on the conservative side? A: That's correct.").

[4]     *See* Exhibit 5 at 184:19–185:16 (admitting that the Bojangles cancellation amounted to 330 commercial accounts with an average of $57 per month in recurring monthly revenue; thus, 330 accounts x $57 x 60 = $1.128 million).

[5]     Vivint anticipates that other former CPI customers will testify at trial that this was the reason they switched from CPI to Vivint.

(Mariso Dep. Tr.) at 58:3–21 (explaining how it made her family want to "get out of" their CPI contract).

They are hardly alone. News reports confirmed that CPI customers calling to cancel their CPI accounts in June 2020 faced wait times of up to 24 hours, with CPI sending customers text updates indicating that they were one of "more than 1,000 customers on hold."[6]

This enormous "loss of numerous customers, both known and unknown" and "injuries to [CPI's] goodwill and reputation" (Doc. 29 ¶ 3) followed immediately from what CPI admits was a "significant wave" of negative "media attention" about CPI.[7] Doc. 103 at 5. Below are some examples of this self-inflicted negative publicity that destroyed CPI's goodwill and reputation:

- "More fallout continues from the controversial email sent by CPI Security CEO Ken Gill . . . 'Bojangles stands against racism and injustice of any kind. In light of recent comments made by CPI Security's CEO, Bojangles will end our relationship with the company.'"[8]

---

[6]     Catherine Muccigrosso, *Callers to CPI Security after CEO's protest remarks face wait times of up to 24 hours*, Charlotte Observer (June 15, 2020), perma.cc/zwc3-gntr.

[7]     The issue of whether or to what extent customers switched from CPI to Vivint because of CPI's President and CEO's statements or because of any actionable conduct by Vivint is a hotly contested issue of material fact. CPI all but admits this, noting that both CPI and Vivint intend to present witnesses to testify on this issue, both as to causation and damages. Doc. 130 at 6–7. Vivint agrees that this will be an area of extensive testimony (and, in particular, cross-examination) at trial—another reason why CPI's motion has no merit.

[8]     Fox 46 Charlotte, *Bojangles ends relationship with CPI Security* (June 9, 2020), perma.cc/a6dv-6tz7.

- "The Carolina Panthers have terminated their partnership with Charlotte-based CPI Security, the team announced Saturday night, in the wake of comments by the company's founder and CEO downplaying police brutality against people of color."[9]

- "Following recent statements by the CEO of CPI Security, effective immediately NC State Athletics is ending any partnerships with CPI Security, including removing all sponsorship signage from our venues."[10]

- "The YMCA of Greater Charlotte will no longer name a new facility in the Steele Creek neighborhood after CPI Security CEO Ken Gill, following Gill's remarks about protests in response to the death of George Floyd."[11]

- "Ray Tanner, the Director of Athletics for the University of South Carolina announced a separation from CPI Security amidst controversy surrounding Ken Gill, CEO and president of the Charlotte-based company."[12]

- "Our chairman (Michael Jordan) has been very clear about his thoughts surrounding the issues of racial equality, social justice and diversity . . . . We believe it is appropriate at this time to end our partnership with CPI."[13]

In sum, given CPI's claims that Vivint, rather than CPI's self-inflicted public fallout, is responsible for a "loss of numerous customers, both known and unknown" and "injuries to [CPI's] goodwill and reputation" from June 2020 to the present (Doc. 29 ¶ 3), CPI's public fallout and the multimillion-dollar losses it caused are critically

---

[9]     ESPN, *Panthers cut ties with CPI Security after CEO's comments on police brutality* (June 6, 2020), perma.cc/j9ca-evxy.

[10]     Nick Faulkner, *NC State athletics ends partnership with CPI security following racist comments from CEO*, Technician (June 7, 2020), perma.cc/sz3z-w6nl.

[11]     Rick Bonnell, *Charlotte YMCA, Bojangles cut ties over CPI Security CEO Gill's protest remarks* (June 10, 2020), perma.cc/4zha-4jfj.

[12]     Fox Carolina, *Univ. of S.C. announces end of corp. sponsorship of CPI Security following CEO's remarks* (June 7, 2020), perma.cc/2vlf-7ezx.

[13]     Rick Bonnell, *Hornets, Knights join Panthers in ending ties with CPI Security over CEO's remarks*, Charlotte Observer (June 7, 2020), perma.cc/5994-t6bu.

probative on both causation and damages. CPI's suggestion that this critical evidence is a "red-herring" with only "marginal relevance" is untenable, and the authority that CPI cites is inapplicable on its face.[14] Doc. 103 at 6–7.

Given CPI's claims that it has a stellar reputation among consumers, to which Vivint, alone, did millions of dollars of harm, it follows that Vivint must be permitted to defend itself with evidence directly related to CPI's *true* reputation, and the concrete damage that CPI brought upon itself by voluntarily wading into a highly sensitive, high-profile controversy. Vivint's right to offer an alternative cause for CPI's losses (CPI's own intervening conduct) is essential to explain the real cause of these losses.

For these reasons reason, CPI's motion should be denied.[15]

---

[14]     The few cases CPI cites all involved a situation entirely unlike the one here. Nearly all of them involved situations in which parties attempted to admit evidence about *a party's race* that had zero bearing on any material issue—for example, the plaintiffs' attempt in *McKiver* to tell the jury that the defendant's owners were Chinese. *See McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 998–99 (4th Cir. 2020). And none of those cases involved plaintiffs seeking damages to goodwill and reputation who also sought to hide their race-related statements—much less the well-documented reputational impact of those race-related statements—from the jury.

[15]     Alternatively, if the Court has concerns about admitting evidence of CPI's public fallout, it could issue a limiting instruction rather than taking the drastic step of excluding this critically probative evidence entirely. The Fourth Circuit has explicitly instructed that where district courts have Rule 403 concerns, the evidence should nevertheless be admitted subject to a limiting instruction, if at all possible. *See, e.g.*, *Buckley v. Mukasey*, 538 F.3d 306, 320 (4th Cir. 2008); *accord* Fed. R. Evid. 403, advisory committee note. Thus, blanket exclusions of evidence under Rule 403, such as the one CPI seeks, are strongly disfavored, and the Fourth Circuit has repeatedly reversed such orders where a less extreme approach was available. *See, e.g.*, *Buckley*, 538 F.3d at 320; *Mullen*, 853 F.2d at 1134 (same). CPI's motion does not mention the Fourth Circuit's required approach, nor does it offer a justification for departing from it. Indeed, there is none.

## II.    CPI's recent negative media attention and related lost business is also particularly probative in explaining CPI's loss of "goodwill and reputation," including for impeachment purposes.

CPI also seeks to exclude evidence of negative media attention related to a November 16, 2021 lawsuit against CPI and its President and CEO, which reignited CPI's public fallout and thrust CPI back into the public spotlight.[16] *See* Catherine Muccigrosso, *Former CPI Security manager claims racial discrimination, retaliation in lawsuit*, Charlotte Observer (Nov. 23, 2021), perma.cc/d4dy-vwju. In covering this story, the media harkened back to CPI's public fallout in June 2020, discussing the public's ongoing negative perception of CPI. *See id.*

This negative media attention is so recent that it occurred after the close of fact discovery on August 31, 2021. Thus, unlike the evidence discussed above (*supra* at 4–9), there has not been an opportunity to quantify the full extent of its damage to CPI's goodwill and reputation. Despite its recency, however, this evidence is highly probative of CPI's damages claims for lost goodwill and reputation. As described above, CPI's witnesses testified that negative media attention such as this damaged CPI's goodwill and reputation. *See supra* at 6. Thus, contrary to CPI's argument that this most recent wave of negative media attention is not "germane to any matter" in the case (Doc. 103 at 9), CPI's own corporate representatives have confirmed that it is highly probative on a material issue.

---

[16]    Vivint has filed motions in limine to exclude evidence of prior lawsuits involving Vivint. Docs. 88, 90. The difference between those motions and CPI's motion here, among myriad other things, is that Vivint has not asserted a claim for damages to "goodwill and reputation." Doc. 29 ¶¶ 3, 32, 47, 57, 66, 76.

In addition, testimony from the plaintiff in the lawsuit, Kelly Phelps, is highly probative for impeachment purposes on this same material issue. CPI's CFO attempted to suggest in his deposition that the public fallout did not have "an economic impact on CPI" and did not "damage [CPI's] brand." Exhibit 5 at 109:12–23. Ms. Phelps' testimony, as reflected in her lawsuit, would directly impeach that testimony.

As CPI's Call Center Director in June 2020, Ms. Phelps experienced firsthand the public fallout, including when "[b]usiness and residential customers rushed to cancel their relationships with CPI" such that "Call Center phones rang non-stop as many customers sought to cancel their service contracts." Doc. 103-2 ¶¶ 40–41. She is in a unique position to describe how, "[a]s Call Center Director, Ms. Phelps found herself . . . attempting to salvage these customer relationships." *Id.*

In sum, if CPI is going to seek damages for "injuries to goodwill and reputation" and seek to offer evidence about its *positive* "goodwill and reputation," then Vivint should be entitled to offer evidence of CPI's *lack* of goodwill and *negative* reputation—evidence that CPI's witnesses have confirmed is highly probative on those issues. *See supra* at 6. If CPI believed that this type of reputation-based evidence was a "bell [that] cannot be 'unrung,'" (Doc. 103 at 8), then CPI should have not placed the value of its goodwill and reputation squarely at issue in this case. Doc. 29 ¶¶ 3, 32, 47, 57, 66, 76.

## CONCLUSION

CPI's motion in limine (Doc. 102) should be denied.

Respectfully submitted the 22nd day of December, 2021.

**GREENBERG TRAURIG, LLP**

By:     s/ Michael N. Kreitzer
     Michael N. Kreitzer
     Florida Bar No. 705561
     kreitzerm@gtlaw.com
     333 S.E. 2nd Avenue, Suite 4400
     Miami, FL 33131
     Telephone: (305) 579-0500

By:     s/ Gregory W. Herbert
     Gregory W. Herbert
     Florida Bar No. 111510
     herbertg@gtlaw.com
     Joshua R. Brown
     Florida Bar No. 826391
     brownjr@gtlaw.com
     450 S. Orange Avenue, Suite 650
     Orlando, FL 32801
     Telephone: (407) 420-1000

**Counsel for Defendants**

**CLYDE SNOW & SESSIONS, P.C.**

By:     s/ Matthew A. Steward
     Matthew A. Steward
     Utah Bar No. 7637
     mas@clydesnow.com
     Shannon K. Zollinger
     Utah Bar No. 12724
     skz@clydesnow.com
     One Utah Center, 13th Floor
     201 South Main Street
     Salt Lake City, UT 84111-2216
     Telephone: (801) 322-2516

**Counsel for Defendants**

**POYNER SPRUILL LLP**

By:     s/ Andrew H. Erteschik
     Andrew H. Erteschik
     N.C. State Bar No. 35269
     aerteschik@poynerspruill.com
     John M. Durnovich
     N.C. State Bar No. 47715
     jdurnovich@poynerspruill.com
     N. Cosmo Zinkow
     N.C. State Bar No. 53778
     nzinkow@poynerspruill.com
     P.O. Box 1801
     Raleigh, NC 27602-1801
     Telephone: (919) 783-2895

**Local Counsel for Defendants**

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing document complies with the length requirements set forth in paragraph 3(c) of the Case Management Order (Doc. 35).

This the 22nd day of December, 2021.

s/ Andrew H. Erteschik
Andrew H. Erteschik

## CERTIFICATE OF SERVICE

I certify that I have electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of filing to all counsel and parties of record.

This the 22nd day of December, 2021.

s/ Andrew H. Erteschik
Andrew H. Erteschik
