1    IN THE UNITED STATES JUDICIAL DISTRICT COURT

2    FOR THE WESTERN DISTRICT OF NORTH CAROLINA

3    CHARLOTTE DIVISION

4    _____

5    CPI SECURITY SYSTEMS, INC.,

6           Plaintiff,

7      v.                        CIVIL ACTION NO.

8    VIVINT SMART HOME, INC.      3:20-CV-00504-FDW-DSC

9    f/k/a Mosaic Acquisition

10   Corp; and LEGACY VIVINT

11   SMART HOME, INC., f/k/a

12   Vivint Smart Home, Inc.,

13          Defendants.

14   _____

15              VIDEOTAPED DEPOSITION OF

16                JOSHUA CRITTENDEN

17   DATE:          Thursday, December 16, 2021

18   TIME:          4:08 p.m.

19   LOCATION:      Remote Proceeding

20                  Durham, North Carolina 27705

21   REPORTED BY:   Joshua Seagondollar, Notary Public

22   JOB NO.:       4997856

23

24

25

Case 3:20-cv-00504-FDW-DSC   Document 113-1   Filed 01/05/22   Page 1 of 38

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF CPI SECURITY SYSTEMS, INC.:

   CHARLES EBLEN, ESQUIRE (by videoconference)

   Shook, Hardy & Bacon L.L.P.

   2555 Grand Boulevard

   Kansas City, Missouri 64108

   ceblen@shb.com

   (816) 559-2139

ON BEHALF OF DEFENDANTS VIVINT SMART HOME, INC.

F/K/A MOSAIC ACQUISITION CORP; AND LEGACY VIVINT SMART

HOME, INC., F/K/A VIVINT SMART HOME, INC.:

   MATTHEW A. STEWARD, ESQUIRE (by videoconference)

   Clyde Snow & Sessions, P.C.

   One Utah Center, 22nd Floor

   201 South Main Street

   Salt Lake City, Utah 84111

   mas@clydesnow.com

   (801) 433-2401

A P P E A R A N C E S (cont'd)

   PAULA M. CASTRO, ESQUIRE (by videoconference)

   Greenberg Traurig LLP

   450 South Orange Avenue, Suite 650

   Orlando, Florida 32801

   castrop@gtlaw.com

   (407) 420-1000

   GREGORY W. HERBERT, ESQUIRE (by videoconference)

   Greenberg Traurig LLP

   450 South Orange Avenue, Suite 650

   Orlando, Florida 32801

   herbertg@gtlaw.com

   (407) 420-1000

   STEVEN EPSTEIN, ESQUIRE (by videoconference)

   Poyner Spruill LLP

   301 Fayetteville Street, Suite 1900

   Raleigh, North Carolina 27601

   P.O. Box 1801

   sepstein@poynerspruill.com

   (919) 783-6400

A P P E A R A N C E S (cont'd)

   ANDREW H. ERTESCHIK, ESQUIRE (by videoconference)

   Poyner Spruill LLP

   301 Fayetteville Street, Suite 1900

   Raleigh, North Carolina 27601

   P.O. Box 1801

   derteschik@poynerspruill.com

   (919) 783-6400

   KENT WILLIAM HANSEN, ESQUIRE (by videoconference)

   Vivint, Inc.

   4931 North 300 West

   Provo, Utah 84604

   kent.hansen@vivint.com

   (801) 705-8054

ALSO PRESENT:

   DeAndrae, Videographer (by videoconference)

   Savannah Young, Clyde Snow & Sessions, P.C.

   (by videoconference)

   Emma Tanner, Clyde Snow & Sessions, P.C.

   (by videoconference)

   "jsmuckler" (by videoconference)

I N D E X

EXAMINATION:            PAGE

  By Mr. Eblen         6

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Plaintiff 245 | Article | 44 |
| Plaintiff 246 | Article | 47 |
| Plaintiff 247 | Article | 48 |
| Plaintiff 211 | 2018 Competitions Rule Book | 50 |
| Plaintiff 95 | List of Videos | 64 |

     (Exhibits retained by counsel.)

Case 3:20-cv-00504-FDW-DSC   Document 113-1   Filed 01/05/22   Page 2 of 38
Veritext Legal Solutions
800-567-8658                                                     973-410-4098

1      P R O C E E D I N G S
2           MR. EBLEN:  Matt, do we want to
3  stipulate just to proceed without the read-on, and we
4  can get the witness sworn in and going?
5           MR. STEWARD:  Yes, please.  I -- just,
6  I've got a hard stop at four.
7           MR. EBLEN:  Okay.
8           MR. STEWARD:  So yes.
9           THE REPORTER:  All right, then.
10          Please raise your right hand.
11  WHEREUPON,
12               JOSHUA CRITTENDEN,
13  called as a witness, and having been first duly sworn
14  to tell the truth, the whole truth and nothing but the
15  truth, was examined and testified as follows:
16          THE REPORTER:  Thank you.  Counsel, you
17  may proceed.
18               EXAMINATION
19  BY MR. EBLEN:
20     Q   Could you introduce yourself, please, for
21  the jury?
22     A   Yes.  This is Josh Crittenden.
23     Q   And, Mr. Crittenden, what's your position at
24  Vivint?
25     A   Currently a senior vice president of sales

1  and direct-to-home organization.
2     Q   Could you give us just an outline of your
3  work history at Vivint?
4     A   Yeah.  I came to Vivint a little over five
5  years ago, and I've held various positions in the
6  sales organization.  And about, approximately about a
7  year ago, I'm in the current position where I'm
8  the vice president over our sales and direct to home.
9  So multiple sales channels, like, specifically over
10  our direct-to-home sales channel.
11     Q   Have you ever sold door to door for Vivint?
12     A   Not for Vivint.  No.
13     Q   With any other security company?
14     A   No.  Not security industry.  No.
15     Q   What are your current job duties?
16     A   So -- across my organization, really
17  everything that it entails to support the sales force
18  and sending 4,000 sales reps out to summer.  So we
19  have a housing department.  We have a department that
20  covers, has assets for the sales reps and, well,
21  physical iPads and sales slicks, pay scales.
22  Everything that the sales force needs to be supported
23  to do their job.
24     Q   Are you involved in the training of the
25  sales force?

1     A   Yes.  We have a team that is, curates the
2  videos and, and films in the, or our sales leaders
3  films videos.  Yes.
4     Q   Are you involved in that process?
5     A   Yes.  Not, not in every video, and, you
6  know, scripting everything, but yes.  That's, that
7  team does report to me.
8     Q   So you're able to have some influence over
9  the content of the training videos for the sales
10  force.  Is that fair?
11     A   Yes.  It's a collaboration with the sales,
12  the field, our legal teams.  It's pretty
13  collaborative, but there's a lot of people that have a
14  hand in that.
15     Q   Are you involved in any direct sales
16  training to the sales force?  And when I say direct,
17  do you provide any in-person training to anyone within
18  the sales organization?
19     A   Yeah.  Throughout the the, the year I'll
20  travel and visit teams.  Usually it's motivational,
21  informational.  You know, most of the sales training
22  on how to approach a customer, how to sell the
23  customer, are done by our sales leaders in the field.
24     Q   And when you say sales leaders in the field,
25  that would be the regional managers and the managers.

1  Is that fair?
2     A   That's correct.
3     Q   How many manager -- or how many regional
4  managers are there at Vivint right now?
5     A   So we have, we're ranging from 50 to 60
6  depending on how you classify it but all varying in
7  size of how many teams and sales reps they're
8  responsible for.
9     Q   And as I understand the process, managers
10  and regional managers are also involved in recruiting
11  new representatives to Vivint.  Is that accurate?
12     A   Yes.
13     Q   And are you also involved in some of the
14  video and social media content that's used to recruit
15  new sales representatives?
16          MR. STEWARD:  Objection.  Form.
17  Foundation.
18          If you -- Mr. Crittenden, from time to
19  time I may lodge an objection for the record.  Unless
20  I instruct you not to answer, and if you still have
21  the question in mind, go ahead and answer.  Sometimes
22  it's disruptive, and I apologize for that, and
23  sometimes it causes the witness to no longer have the
24  question in mind.  And you're free to ask Mr. Eblen to
25  re-ask it if that's the case.

1    THE WITNESS:  That's okay.  Yeah.  So
2  there's a variety of content that we create to, for
3  recruiting.  And so, yes, I'm involved in with that,
4  but we have video teams, we have training teams, and
5  the sales forces involved, so I, I do put, but do have
6  a role in that.  Correct.
7  BY MR. EBLEN:
8    Q   And as I understand it, individual regional
9  managers can also create some of their own material to
10  help recruit new Vivint sales reps.  Is that accurate?
11    A   Yes.
12    Q   But some of that is done, from time to time,
13  on social media.  Correct?
14    A   Correct.  We don't control our sales reps'
15  social media pages specifically, so there's content
16  that, you know, we don't have involvement in.  But
17  yes.  You know, each of our sales reps often post on
18  their individual personal pages that we don't have the
19  ability to control.
20    Q   And as I also understand it, compensation
21  for managers is influenced somewhat by how well their,
22  or how productive their sales recruits are during a
23  typical year.  Is that accurate?
24    A   Their compensation is driven by the number
25  of accounts that their, their downline and their sales

1  teams produce, not necessarily the productivity of
2  each individual rep but in, in whole.
3    Q   How many sales representatives are under the
4  umbrella of some of the, you know, say the top three
5  regional teams?
6    MR. STEWARD:  Objection.  Form.
7  Foundation.
8    A   So we'll have -- again, we have some --
9  they, they range in size, so the largest would have,
10  potentially, up to a hundred or several hundred in
11  their, their overview.
12    Q   Do you have any idea in what the rough
13  average is for the size of a regional team?
14    A   A regional team -- again, they, they vary in
15  size.  You can go through exactly how the
16  organization's structured, but there'll be anywhere
17  from two to three teams, and teams constitute of
18  anywhere from 20 to 50 sales representatives.
19  Regional manager could have 3 and high as, you know,
20  10, 20.  So we have -- again, there, there's varying
21  sizes of when you call, to refer to someone as a
22  regional.  A regional is anyone who manages, you know,
23  multiple teams.
24    Q   Are managers compensated simply for
25  recruiting a new sales representative?

1    A   No.  There's no compensation tied to, to
2  signing somebody up to do summer sale, our sales
3  program.  The compensation's based on the overall
4  production and quality of that production of their
5  teams.
6    Q   What did you do to prepare for your
7  deposition today?
8    A   I had actually a pretty busy day, but I've
9  spoken to our attorney, Kent, to ask him what --
10    MR. STEWARD:  Wait, wait, wait, Josh.
11  Josh.  Josh.  You can tell Mr. Eblen that you spoke
12  with Mr. Hansen, but I do not want you to reveal any
13  of the content of that discussion.
14    THE WITNESS:  Sorry.
15  BY MR. EBLEN:
16    Q   Did you do anything else to prepare?
17    A   I have not.
18    Q   Were you provided --
19    MR. HANSEN:  So --
20    MR. EBLEN:  Go ahead.
21    MR. HANSEN:  -- Matt -- part of
22  conversation as well.
23    MR. EBLEN:  What's that?
24    MR. HANSEN:  This is Kent.  I'll
25  interject that Matt was part of the conversation as

1  well.
2    MR. EBLEN:  Okay.  All right.
3  BY MR. EBLEN:
4    Q   At any point in time were you provided with
5  a spreadsheet, an Excel spreadsheet, that has
6  hyperlinks to some Vimeo training videos?
7    A   I believe Mr. Hansen -- I, he, I saw it on
8  his computer.  I believe he may have sent it to me.  I
9  have not had a, the opportunity to review it yet, so I
10  apologize.  I've not reviewed that.
11    Q   Are you generally familiar with the content
12  of the training videos that are up on the Vivint Vimeo
13  site?
14    A   Generally, yes.  I, I think there's,
15  there's, there's a lot on there, so you would have to
16  reference specific ones, and we could, we could see,
17  but I think generally, yes.
18    Q   You did look at the spreadsheet, though,
19  that was provided in connection with this case that
20  has a hyperlink to a number of videos that go back
21  three or four years.
22    A   I, I did not review every, every line in
23  that.  I know Kent had that in reference that he had,
24  which he provided, and I have not reviewed all of
25  those videos or, or read through all of them, though.

1    Q   Let me go ahead and share my screen with

2  you, here.

3    A  Okay.

4    Q  All right.  Mr. Crittenden, are you able to

5  see the spreadsheet that's in front of you?

6    A  Yes.

7    Q  And does the form of that look similar to

8  what you reviewed to prepare for your deposition?

9    A  Yes.  I believe that is.

10    Q  And I'm just going to scroll through here.

11  The way it looks like this is broken down in there's,

12  on the left column there's a video title, and then you

13  see that, kind of, gold heading there.  It looks like

14  it's separated by years.  Do you see that?

15    A  Mm-hmm.

16    Q  So if you scroll down, you know, say to,

17  looks like entry 107, that would appear, at least

18  based on the structure of the spreadsheet, to capture

19  the training videos that Vivint offers to sales

20  representatives from 2021.  Is that accurate?

21    A  That, that's what it appears to be.  Yes.  I

22  didn't create the spreadsheet, but that, that does

23  appear what that's, how it's laid out.

24    Q  And so obviously we're not going to, in this

25  deposition, go through every video because there are

---

1  hours upon hours of content, but the videos that are

2  contained in these hyperlinks on Vimeo, those would be

3  authorized training videos created by Vivint for sales

4  representatives.  Correct?

5        MR. STEWARD: Objection.  Form.

6  Foundation.

7    A  So there, there's a lot, obviously as you

8  see here, there's a lot of videos.  I would need to go

9  through each one to make sure that they were all

10  authorized, but from the few that I'm just

11  spot-checking, I believe those are authorized videos.

12    Q  You don't have any reason to believe that

13  the spreadsheet that counsel for Vivint produced in

14  this case would contain unauthorized videos of Vivint.

15  Correct?

16    A  No.  I don't have reason to believe that.

17    Q  Okay.  All right.  So I won't go through,

18  even, the structure of all of this, but if you go

19  down, then, to, you see on row 108, there's 2020

20  videos.  Do you see that?

21    A  Yes.

22    Q  And then one of the series of videos I'm

23  looking, starting on line or -- let's see here -- row

24  273, it goes up to 243.  Looks like a 30 DTP training

25  course.  Are you familiar with that bundle of training

---

1  videos?

2    A  Yes.  That appears to --

3    Q  -- go ahead.

4    A  -- prior sales year.

5    Q  And there was, there's also one for 2021.

6  But my question, just generally, is, what type of

7  training is offered, and what is the purpose of that

8  series of videos?

9        MR. STEWARD: Objection.

10        THE WITNESS: --

11        MR. STEWARD: I'm sorry.  Objection.

12  Form.  Foundation.

13        THE WITNESS: Yeah.  They're, that is

14  the "Thirty Days to Pro."  Those are released to our

15  sales reps for the first 30 days of summer.  They're

16  our typical selling season.  And there's motivation,

17  there's specific trainings.  It's a variety of

18  content, but there's, they're released every day and

19  throughout the first 30 days of the summer program.

20  BY MR. EBLEN:

21    Q  How are those accessible to the sales force

22  during the first 30 days of summer?

23    A  So a link is texted out to the sales rep to

24  our LMS system, and they go on, and they view it in

25  the, our, inside our LMS.

---

1    Q  Is that through an iPad that they are given

2  by Vivint?

3    A  Yes.

4    Q  Are there other ways other than the

5  Vivint-issued iPad that they're able to access this

6  content if they want to?

7    A  Yeah.  So our training platform can be

8  accessed from any device.  They have to log in to

9  Vivint.  It's behind Okta, which is how we verify that

10  those viewing it are Vivint's sales representatives

11  that are authorized.

12    Q  Did you watch any of the 30-day, DTP series

13  in preparation for your deposition today?

14    A  No.

15    Q  All right.  I'm going to click on day three

16  of the, looks like it was a April 28, 2020, video

17  called "Prospecting".  Are you familiar at all with

18  the content of this video?

19    A  I'm not --

20        MR. STEWARD: Hey, Charlie, just

21  because they're bundled by year and you're in a

22  particular year, would you just identify the row for

23  the record so that the --

24        MR. EBLEN: Yeah.  Sure.  It's row 270.

25        MR. STEWARD: Okay.  Thank you.

---

Veritext Legal Solutions
800-567-8658                  973-410-4098

1      MR. EBLEN: Yep.
2      THE WITNESS: Charlie, based on laid
3  out, this does appear to be a prior sales season.
4  Right? What sales year is this?
5  BY MR. EBLEN:
6      Q   Yeah. This is from 2020.
7      A   Okay.
8      Q   All right. Let me take this down
9  temporarily, and then I'm going to share my screen and
10  go to that video that I clicked on that should now be
11  open on my browser, here. Okay. I'm going to let
12  this play for a little bit and then ask you some
13  questions about some of the content. Okay?
14          (Video played.)
15  BY MR. EBLEN:
16      Q   Before it keeps going, are you able to hear
17  it okay?
18      A   Actually cuts out quite a bit.
19      Q   Okay. Try it again.
20          (Video played.)
21  BY MR. EBLEN:
22      Q   Okay. Were you able to watch the first four
23  minutes of that video okay?
24      A   Yes.
25      Q   Do you agree that legitimacy is the number

1  one objection to overcome for Vivint door-to-door
2  sales reps?
3      A   I, I think that it's something we
4  continually are investing in and trying to build our
5  brand, differentiate who we are, but I think it's
6  often depending on where the sales representatives are
7  knocking, the maybe lesser known name, and also when
8  you're knocking on somebody's door, they're not
9  expecting you to be there. I, I think certainly that
10  is a, an objection that needs to be overcome to help a
11  customer understand why you're there and what value
12  you have to offer to them. I don't know if it's the
13  number one, but it's --
14      Q   In the --
15      A   -- yeah.
16      Q   Sure. In the 30-day direct to pro training,
17  legitimacy is offered as the number one objection.
18  Correct?
19      A   Yes.
20      Q   And in order to minimize the overall number
21  of objections that potential customer may have, Vivint
22  trains that sales reps should focus on homes with an
23  existing alarm system and two cars in the driveway.
24  Correct?
25          MR. STEWARD: Object as to form.

1      A   Yeah. You, I mean, you've watched. You saw
2  the library videos. There's a number of videos and
3  different trainings and approaches that we train on.
4  The, and some of our sales reps have different
5  approaches -- this approach here is training that that
6  is one way to overcome certain objections. As you saw
7  in the video, they're, they're identifying a customer
8  who sees a need in a secure, home security system and
9  also someone that has the values that are willing to
10  pay for it. So that, that is one way that our sales
11  reps, representatives, will train.
12      Q   At least that's how it was trained in this
13  video. You agree with that?
14      A   This video, yes.
15      Q   You would agree that, in the scenario
16  that's being trained there, the existing alarm
17  provider already has legitimacy that the person
18  knocking on the door does not have. Correct?
19      A   Can you restate the question?
20      Q   Sure.
21      A   I didn't understand what you're ...
22      Q   Yeah. No problem. So as it relates to
23  legitimacy in approaching a home that already has an
24  alarm system or an existing alarm provider, the
25  company that that homeowner has already chose to

1  entrust with its security already has legitimacy with
2  the homeowner. Correct?
3          MR. STEWARD: Object as to form.
4  Foundation, vague, and calls for speculation.
5  BY MR. EBLEN:
6      Q   You can answer.
7      A   Yeah. I, I don't know what the customer
8  would assume. They, they may or may not be happy or
9  very familiar with the security system or the company
10  that's providing it. You, you're asking me to make
11  some assumptions there.
12      Q   Yeah. Well, I think, though, it, you would
13  agree that in order for the homeowner to initially
14  choose the alarm company that it chose, that company
15  already had to overcome the legitimacy objection
16  that's being outlined in this video. Right?
17      A   Yeah. I, I don't know, again, how the
18  customer acquired the security system, when they moved
19  in it was there or -- I mean, there's a variety of
20  ways that customer could be a customer. I don't, I,
21  I, I really don't know what, what they would've done
22  to make that decision.
23      Q   Well, part of what -- you would agree, part
24  of what's being trained here is that in order to get
25  to making a sale, you need to be able to ensure that

6 (Pages 18 - 21)

1  you can overcome all five of those objections. Is
2  that fair?
3       A   Yes. You need to overcome, you know,
4  certain customers' objections to be able to get a
5  sale. Yes.
6       Q   Wouldn't you agree that the company that's
7  already being hired by the homeowner in order to gain
8  the homeowner's business would've also had to overcome
9  those same objections?
10          MR. STEWARD: Objection. Form,
11  foundation, calls for speculation, and assumes facts
12  not in evidence.
13       A   Yeah. I, I apologize. I really wouldn't
14  speculate on why the customer bought with the, our,
15  our competitor. We, we train our sales
16  representatives to, you know, talk about who Vivint is
17  and the differentiating factors that bring, that
18  Vivint brings, and we, we know that customers often
19  have service providers that are other than Vivint,
20  and, but we do know that our, our service and our
21  product is far superior, and so yeah.
22          I, I don't -- again, I don't know why a
23  customer would buy with a competitor. I don't know
24  what that competitor or the, how the customer acquired
25  their system through that competitor. But again, our,

1  our trainings, we'll focus our sales representatives
2  on what differentiates Vivint and the value of Vivint.
3  We spend a lot of money and time in innovating our
4  products and services. We hold numerous patents for
5  the products and services we have. Our sales
6  representatives are proud of, you know, the products
7  that we have, and we're very proud of, you know -- you
8  know, I, I have one, a system in my home, and I, I'm
9  very proud of what we have.
10          So I, I don't, I don't -- again, you're
11  asking me to speculate why somebody would buy a
12  competitor's product and whether they, that company's
13  more legitimate than Vivint. I, I -- maybe I'm not
14  understanding your question, but you may, maybe
15  restate it.
16       Q   Do you agree that where a homeowner believes
17  that the Vivint sales representative is affiliated
18  with the homeowner's existing alarm company, that
19  would be one way for the Vivint sales rep to overcome
20  the legitimacy objection?
21          MR. STEWARD: Objection. Form.
22  Foundation. Calls for speculation.
23       A   Our, we would not want the customer to
24  believe that we're with their current provider. We
25  don't believe they're being provided a very good

1  service from that customer, so, or from that prior
2  company. So we, we, we train our sales
3  representatives to clearly articulate who they're
4  with, that they're with Vivint, and what we're
5  providing. There's a reason we're ask, we would, and
6  we would train a sales representative to sell them
7  Vivint even though they have a, a prior, another
8  customer's product. Sorry. Another company's
9  product. So no, we would, we do not train our sales
10  representatives to infer that they're with any other
11  company if that's what you're suggesting.
12       Q   No. I'm not asking if that's trained. I'm
13  -- my question is, as it relates to legitimacy and
14  overcoming this legitimacy objection, do you agree
15  that if the homeowner believes that the Vivint sales
16  rep has an affiliation with the existing alarm
17  provider that that would be one way to overcome the
18  legitimacy objection?
19          MR. STEWARD: Objection. Form,
20  foundation, calls for speculation, and assumes facts
21  not in evidence.
22  BY MR. EBLEN:
23       Q   You can answer.
24       A   Yeah. I'm, I'm sorry. It, it, again,
25  you've asked this question a couple different ways. I

1  -- that is not how we would train our sales
2  representatives to approach a customer, and it would
3  not -- yeah. No. No. I do not think that is the
4  way. We do not train that way, and that is not how we
5  would approach a customer.
6       Q   All right. Let me go back to the
7  spreadsheet real quick, here.
8       A   Okay.
9       Q   You see day 5, one of the things that's
10  trained is transitioning into the house. Are you
11  familiar with that?
12       A   I don't see your screen anymore.
13       Q   Oh. I apologize. I forgot to click on it.
14  How about now?
15       A   That's all right. Not yet. There we go.
16  Yes.
17       Q   All right. Do you see on row 268, day 5,
18  there's a training session called "Transitioning into
19  the Home"? Do you see that?
20       A   Yes. Yes.
21       Q   Do you agree that before a Vivint sales
22  representative goes into a customer's home that the
23  sales representative should get the customer's express
24  approval to enter the home?
25       A   Yes. And that could -- yes. I believe you

Veritext Legal Solutions
800-567-8658                                                  973-410-4098

1  need permission.
2      Q   All right.  I'm going to go ahead and click
3  on this one.  And hold one.  Let me stop my screen
4  share, and I'll go over to the video.  Okay.  Can you
5  see my browser again?
6      A   Yes.
7      Q   All right.  Let me start this one over.
8          (Video played.)
9  BY MR. EBLEN:
10     Q   Do you agree that in that video Vivint
11 trained to not ask the customer for express approval
12 to get in the home?
13         MR. STEWARD:  Objection.  Form.
14     A   Yeah.  So through that trainings you can see
15 he's, he's seeking to get, you know, you have express
16 and implied consent, and so he's, he's seeking for
17 those nonverbal cues from the customer welcoming him
18 into the home.  So we, we do not train customers --
19 you heard him say, there, don't rush into the home,
20 don't rush the customer.  He's working for those cues
21 to make a customer feel very comfortable with the
22 sales representative being there, giving him a reason
23 to be there.  But yeah.  We, we -- and as you heard
24 through the training, it's very, you know, you're,
25 you're trying to help the customer feel comfortable.

1  Right?  And that can come through express and implied
2  consent.
3      Q   And using the different terms that you did,
4  you would agree that this gentleman in the Vivint
5  training video trains not to seek express verbal
6  consent.  Correct?
7          MR. STEWARD:  Objection.  Form.
8      A   I mean, we both watched the same video.
9  He's, he's training the customer or training the sales
10 reps to again get, help the customer feel comfortable
11 with you being on their doorstep and in the home and
12 giving you a reason why.  He's, you know, again,
13 you're looking for verbal and nonverbal cues of that.
14     Q   Do you think there's anything dishonest or
15 unethical about that training video?
16     A   Yeah.  As you watch the training video, like
17 I said, it's, he's, you know, they're, we're, he's
18 trained not to.  You don't want the customer to feel
19 uncomfortable.  We're not lying about why we're there.
20 We're not, we're, we're telling them honestly why
21 we're there.  He's talking about the security system,
22 where you want to put the sensors.  And so he's giving
23 the customer a reason to say, an opportunity to say no
24 but also a reason for him to be in the home and
25 explain that to the customer.

1      Q   And all I'm asking is, do you think that
2  that training is an ethical way to do door-to-door
3  sales?
4          MR. STEWARD:  Objection.  Form.  Asked
5  and answered.
6      A   Yeah.  I, I think as I previously stated,
7  the sales rep is, is -- in that training, there,
8  Danny's training the sales reps on how to help
9  customers feel comfortable with that.  They, there's
10 nothing, he's not training them to lie or deceive the
11 customer.  In my opinion as I watch, I don't see where
12 he's, would train them to deceive or lie to the
13 customer.
14     Q   Okay.  So you think that video trains an
15 ethical sales practice.  Correct?
16     A   Yeah.  I think the, in the training Danny's
17 explained one way to help customers open up their home
18 and welcome you into the home.
19     Q   Is Danny -- is he still with Vivint?
20     A   Danny is still with Vivint.  He's no longer
21 a manager.  He's, he, he moved to, away from his main
22 hub, and he doesn't, he no longer manages, but he
23 still does sale ...
24     Q   Was he a manager or regional manager?
25         MR. STEWARD:  -- form.  Foundation.

1          MR. HANSEN:  -- Josh needs to plug into
2  power for a second.
3          MR. EBLEN:  Oh.
4          THE WITNESS:  I apologize.
5          MR. EBLEN:  Yeah.  No problem.
6          THE WITNESS:  We're good.  Charlie,
7  could you say that question one more time, sir?
8  BY MR. EBLEN:
9      Q   Yeah.  No problem.  Was Danny a regional
10 manager or a manager?
11         MR. STEWARD:  And I -- my objections.
12 Form, foundation, and just vague as to time frame.
13     A   Yeah.  I, I don't recall the exact date on
14 that video, but Danny has not been a regional manager
15 for Vivint.
16     Q   And the video that we watched, like that
17 whole series, is an approved Vivint sales video.
18 Correct?
19     A   Yes.
20     Q   All right.  I'm going to go share my screen
21 one more time.  As I'm in the process of doing that,
22 you agree that sales managers and regional managers
23 have influence over how their sales reps sell.
24 Correct?
25     A   Yes.  Our sales managers and sales regionals

1 do.
2    Q    And you agree that Vivint's sales
3 representatives look up to and emulate successful
4 managers and regional managers?
5            MR. STEWARD: Objection. Form.
6 Foundation. Calls for speculation as well.
7    A    Yeah -- yeah. I would say you're, you're
8 asking me to speculate on, on what, you know, our
9 specific sales representatives do, but we, we have a
10 variety of sales -- trainings -- different, different
11 methods, so there's a variety of content we provide.
12    Q    You agree Vivint trains sales
13 representatives to not reinvent the wheel and use the
14 sales models that have proven successful for more
15 senior managers?
16            MR. STEWARD: Objection. Form,
17 foundation, and vague.
18    A    So I, I've, you've watched, it looks like a
19 -- a lot of our videos. We do have a base, you know,
20 set of trainings that we provide. We have certain
21 required trainings as well, so we have a foundation
22 that we train all sales representatives to follow, and
23 I think you have access to our required trainings.
24    Q    All right. And you see the spreadsheet
25 again, Mr. Crittenden?

1    A    Yes, sir.
2    Q    Okay. I'm going to -- I'm on row 257. Do
3 you see that? "Integrity in Presenting". Day 16.
4    A    Yes.
5    Q    All right. And I'm going to take that down.
6    A    Sure.
7    Q    And I'll share my browser again. All right.
8 Can you see my browser again?
9    A    Yep. Just -- there we go.
10    Q    All right. I'm going to go ahead and -- I'm
11 not going to play all of this one. I'm going to play
12 a chunk of it and ask you a couple questions.
13            (Video played.)
14 BY MR. EBLEN:
15    Q    All right. So we watched about two minutes
16 of that video on integrity. Did you hear that last
17 quote? "How you do one thing is how you do
18 everything."
19    A    Yes.
20    Q    Is that a motto that you've heard before at
21 Vivint?
22    A    Yeah. I've heard that before. Yes.
23    Q    And that's in other training videos as well.
24 Right?
25            MR. STEWARD: Objection. Form.

1 Foundation.
2 BY MR. EBLEN:
3    Q    You can answer.
4    A    Yeah. I haven't gone through every, every
5 training video, but I would, I actually couldn't tell
6 you what one but it, I've heard that often. Yes.
7    Q    Do you believe that's true?
8            MR. STEWARD: Objection. Form.
9    A    I, I, it, it's one of those cliché sayings,
10 and I, I think it sounds good. I, I think it's a,
11 there's a principle behind it that's kind of teaching
12 people to, like -- the, the little things matter is --
13 kind of the principle behind it.
14    Q    Do you think that that motto also holds true
15 for people who choose not to sell the right way?
16            MR. STEWARD: Objection. Form.
17    A    I -- you're ask, you're asking for an
18 assumption on that. I, I, I don't know all aspects of
19 each individual's lives. I, I'm not sure where you're
20 going with that one.
21    Q    Do you agree that it would be reasonable to
22 believe that sales representatives who got caught
23 engaging in some sort of a deceptive sales practice,
24 that that was not the first time or only time that the
25 representative behaved in that manner?

1            MR. STEWARD: Objection. Form.
2 Foundation. Calls for speculation.
3    A    Yeah. I mean, so you would be kind of
4 speculating on a lot of assumptions there. I think if
5 you have a specific case or situation, we could, we
6 could -- this -- speak to a specific. But ...
7    Q    Do you agree that if you applied the motto
8 "how you do one thing is how you do everything"
9 literally that for those sales representatives who
10 were known to have a history of deceptive sales
11 practices, that they probably do it often?
12            MR. STEWARD: Objection. Form.
13 Foundation. Calls for speculation.
14    A    Yeah. I, I -- this, I mean, it is not a
15 literal statement. I think, again, the principle
16 behind it is that little, the little things matter and
17 to kind of -- you -- I mean, you heard a lot of -- he
18 had a lot of other sayings in there on, you know,
19 integrity and building trust with the customer and,
20 and speaking honestly and trustworthy. So -- but no.
21 I do not think it's a literal statement, and I don't
22 think ever, you know, customer or a sales rep can be,
23 like, classified or characterized by one thing they
24 did.
25    Q    Did --

9 (Pages 30 - 33)

1    A   Again --

2    Q   Go ahead.

3    A   I'll just say if you have a specific sales

4    rep or question, we could maybe speak to that.

5    Q   Does Vivint agree with the Mark Twain quote

6    that was read at the start of that training session?

7         MR. STEWARD:  Objection.  Form.

8    A   What was the quote?

9    Q   It was about if you tell the truth, then you

10   don't have anything to remember.

11   A   Yeah.  I think that's a, you know, more --

12   what Mark Twain's referencing is you wouldn't have to

13   remember why, specifically, and so it's, think it's a

14   good motto to, motto.  I like that.

15   Q   All right.  I'm going to share my screen.

16   While I'm doing this, have you, in your role, ever had

17   any involvement in investigating whether sales

18   representatives commit deceptive sales practices?

19        MR. STEWARD:  Object as to form.  And,

20   Charlie, you -- 30(b)(6) notice, as you know, defines

21   deceptive sales practices very specifically, and I

22   think in fairness you need to ask this witness or

23   inform this witness if you're referring to that

24   definition.

25        MR. EBLEN:  You know what?  Why don't I

1    -- I'll back up and ask a different question.

2    BY MR. EBLEN:

3    Q   Mr. Crittenden, you're aware that Vivint

4    has a code of ethics and a code of compliance.  Right?

5    A   Yes.

6    Q   Have you ever been involved, in your role,

7    in investigating whether or not sales representatives

8    have violated Vivint's code of ethics or code of

9    compliance?

10   A   Yes.  Primarily investigations like that are

11   done by our compliance team, but they will often ask

12   questions and, about a specific sales rep or how

13   difference, you know, the sales transactions and our

14   sales tools or about their character.  So I've, I've

15   been involved in some of those.  But again, the

16   investigations are done and handled by our compliance

17   team.

18   Q   Have you ever recommended the termination of

19   any sales representative for a deceptive sales

20   practice or compliance violation?

21        MR. STEWARD:  Objection.  Form,

22   compound, and vague as to deceptive sales practice.

23   A   If you're asking if I've ever recommended

24   that we terminate a sales rep, yes, we have.  I

25   personally have.  Yes.

1    Q   Okay.  Any names that you can think of?

2    A   None, none off the top of my head and would

3    want to make sure it's pertinent to this situation

4    before I use any names.

5    Q   Could you give me just an estimate, in your

6    recollection, of how many you've recommended the

7    termination of in your tenure at Vivint?

8    A   Honestly I, I'd be guessing off the top of

9    my head.  It, I, I don't have a number off the top of

10   my head.  I apologize.

11   Q   No problem.  But could you provide any

12   estimate?  Is it more than a hundred?

13   A   No.  I do not believe it would be more than

14   a hundred.

15   Q   More than a dozen?

16   A   Yes.

17   Q   More than 50?

18   A   Yeah.  Probably around, you know, I've been

19   here ten, been five years -- probably five to ten

20   years.  But again, our, these investigations are

21   handled by our compliance team.  They go through

22   those, and they primarily handle that -- occasionally

23   they, you know, come to me before it gets to them, and

24   I'll, I'll send the investigation to them to make sure

25   that there is a proper and thorough investigation of

1    the sales rep and, and, or actually the practice

2    they're investigating.

3    Q   All right.  I'm now looking at rows 503 to

4    510.

5    A   Okay.

6    Q   Are you familiar with that particular sales

7    manager, Otto Zelaya?

8    A   I'm familiar with him.  He no longer is a

9    sales representative of ours.

10   Q   When did he leave?

11   A   I do not know the date off the top of my

12   head.

13   Q   He was a manager.  Correct?

14   A   I believe he was a, a manager with us.  I

15   believe he was.

16   Q   And it would appear from the spreadsheet

17   that was produced that he taught sales training

18   courses at Vivint.  Correct?

19   A   Yes.  It looks, looks like it's quite a

20   while ago, but based on how the spreadsheet's been

21   organized I believe that would be a few years, a few

22   years ago.

23   Q   Was Mr. Zelaya terminated for compliance or

24   code of ethics violations?

25        MR. STEWARD:  Objection.  Form.

10 (Pages 34 - 37)

1  Foundation.
2      A   I'm not familiar with the conditions around
3  his termination.
4      Q   In your role were you aware that Mr. Zelaya
5  had problems with code of ethics or compliance
6  violations?
7      A   Like I said earlier, I, I, I'm not familiar
8  with the, his termination and his departure.  He, it
9  was a number of years ago.  Was in a different role at
10  that time.
11      Q   All right.  If you go down on the
12  spreadsheet to 519, do you see where it says "Jason
13  Newby full sale"?
14      A   Yes.
15      Q   And Jason Newby, you know, was a regional
16  manager at Vivint.  Right?
17      A   Yes.  Jason Newby had two or three teams
18  that he did manage.
19      Q   And Mr. Newby was terminated from Vivint in
20  2020 for deceptive sales practices.  Correct?
21          MR. STEWARD:  Objection.  Form.
22  Foundation.
23      A   That is correct.  He was terminated for
24  cause.
25      Q   Do you agree that the folks who are used to

1  train other Vivint sales representatives through these
2  videos are people that sales representatives would
3  look up to?
4          MR. STEWARD:  Objection.  Form.  Calls
5  for speculation.
6      A   As you see, as you've gone through our
7  trainings, we have a, a large number and variety of
8  sales reps that we use in our trainings, and at, you
9  know, we do our best to make sure that they have good
10  sales practices and behaviors.  At the point of us
11  doing this, we, there is a review process they go
12  through.  We can't predict what they would do after
13  the fact or anything that we haven't seen, so it's,
14  it's not unreasonable that you would have somebody
15  that later, down the road, may commit some, commit
16  something that would be "terminationable" or fireable,
17  and you're correct.  You're -- Jason Newby was
18  terminated for cause subsequent to this filming of
19  this training.
20      Q   Do you agree that it sets a bad example for
21  younger sales representatives to have a regional
22  manager in training videos who has had problems with
23  compliance or deceptive sales practices?
24          MR. STEWARD:  Objection.  Form.
25      A   Yes.  And, and again, like I, I stated

1  previously, if we acknowledge of this, you know,
2  compliance-related issues with the sales
3  representative or leader, we would not have them do
4  trainings, and that we would be public -- public or,
5  or recorded.  And again, all actions that we get
6  reported, our compliance team reviews those and, and
7  deems appropriate, you know, actions.
8      Q   All right.
9      A   Applies those.
10      Q   Do you see row 523?  There's a video called
11  "The Porsche Incentive".  What was that?
12      A   It looks like it was filmed a while ago.  I,
13  I do not recall, but I do know we'll do different
14  incentives that will give, provide a sales
15  representative a lease to a car.
16      Q   All right.  So do you believe in this
17  instance "The Porsche Incentive" related to a sales
18  incentive that would provide a Porsche lease to the
19  sales representative that won the contest?
20          MR. STEWARD:  Objection.  Form.
21  Foundation.  Calls for speculation.
22      A   I wouldn't want to speculate without
23  watching the video, but again, I can't recall every
24  video that we've created.
25      Q   But again, as with all of these links that

1  were provided in litigation through counsel, you don't
2  doubt that any of the videos that are contained in
3  this spreadsheet through the hyperlinks are official
4  training videos of Vivint.  Correct?
5          MR. STEWARD:  Objection.  Form.
6  Foundation.
7      A   I don't have reason to believe that they
8  were.
9      Q   It looks like you've been involved in some
10  of the training.  I see 5/28, 5/29, there's buyouts
11  and Fortiva training.  Correct?
12      A   Yes.  Occasional.  Yes.
13      Q   Were you also in a video mountain biking and
14  your knee got real torn up?
15      A   Yes.
16      Q   Have you healed up from that?
17      A   Kind of.  I'm getting a, I'm getting back.
18      Q   Okay.  What is Fortiva?
19      A   Fortiva is one of our financing partners.
20      Q   Is Fortiva still a financing partner?
21      A   Yes.
22      Q   And when you say financing partner, Fortiva
23  provides direct to consumer loans for the cost of the
24  equipment.  Is that right?
25      A   Yes.

1    Q   And that's the same thing that Citizens One
2   Bank also does.  Is that correct?
3    A   Yes.  That's correct.
4    Q   Is there any type of compensation that
5   Vivint sales managers or representatives receive that
6   would not be reported on Vivint pay stubs?
7           MR. STEWARD:  Objection.  Form.
8   Foundation.  Calls for speculation and beyond the
9   scope of the 30(b)(6) notice.
10    A   You're, you're asking me, is there any
11   compensation that is not reported on their pay stubs.
12   So I, I do not, you know, report our sales
13   representatives' pay stubs.  I do not know how they
14   come up with those numbers.  I would assume that it
15   does include all of their compensation.
16    Q   All right.  I'm going to stop sharing this
17   screen and switch to some other documents.  Give me
18   just a second, here.
19           UNIDENTIFIED SPEAKER 1: Is this a good
20   time to take a break?
21           MR. EBLEN:  Yeah.  That's fine.  You
22   want to take five minutes?
23           UNIDENTIFIED SPEAKER 2:  Yeah.
24           UNIDENTIFIED SPEAKER: 1: Yeah.
25           UNIDENTIFIED SPEAKER 2: Come back in

1   five.  Thanks.
2           MR. EBLEN:  Okay.
3           (Off the record.)
4           THE WITNESS:  Been recovering from a
5   cold so been taking some cough drops and water.  So
6   ...
7           MR. EBLEN:  No worries.
8           MR. STEWARD:  Hey, Charlie, can we just
9   clarify something?  On the spreadsheet you asked him
10   about -- it has the 615 entries.  I think you asked
11   him if those were all training videos, and he agreed
12   with you, but I don't think that's accurate.  I think
13   there certainly are training videos on the
14   spreadsheet, but I think it includes other videos.  So
15   if we could just clean that bit up, that would be, I
16   would appreciate it.
17           MR. EBLEN:  Yeah.  Let me -- I'll come
18   back to that.  Let me go where my head is real quick,
19   and I'll get back to ...
20           MR. STEWARD:  Okay.
21   BY MR. EBLEN:
22    Q   All right.  I'm going to share my screen
23   with you, Mr. Crittenden.  Are you able to see this
24   document okay?
25    A   Yes.

1    Q   Okay.  And just to identify it for the
2   record, we've marked this as Plaintiff's Trial Exhibit
3   245.  It's also marked Vivint 3660.  Do you know what
4   type of document this is?
5           (Exhibit Plaintiff's 245 was marked for
6           identification.)
7           MR. STEWARD:  In fairness, if you could
8   kind of show it to him in a way he can at least scan
9   it, Charlie.
10           MR. EBLEN:  Yeah.  Sure.
11           MR. STEWARD:  It's not all on one page.
12           MR. EBLEN:  Yeah.  I'll go through it
13   slowly.
14   BY MR. EBLEN:
15    Q   Are you able to see the top of a page at
16   this point, Mr. Crittenden?
17    A   Yes.  Yes, I can.  Yes.
18    Q   All right.  Scroll about halfway down and
19   see if you can see the rest of it.  To me this appears
20   to be some type of internal Vivint news article
21   related to a sales competition.  Is that right?
22    A   Yes.
23    Q   And where are these articles accessible
24   within Vivint's databases?
25    A   Yeah, so these are posted on what's called

1   the Insider.  Insider's internal website that reps,
2   representatives have to access with their Vivint login
3   and credentials, and we post a variety of things on
4   there.  This is, this would be one posted on there.
5   Like you said, kind of, you know, internally written,
6   kind of a news article if you will, reviewing a, one
7   of our preseason competitions is what it appears to
8   be.
9    Q   And where it says, up at the top, upper
10   right-hand corner there, it says "corporate everyone
11   sales".  Do you see that?
12    A   Yes.
13    Q   Does that mean that everybody within the
14   sales department at Vivint would have access to these
15   articles, at least during the time frame in which
16   they're run?
17    A   I believe so.
18    Q   And so one of the purposes of these types of
19   articles that update about sales competitions and
20   things would be to promote the success of
21   representatives who have done well in the
22   competitions.  Is that accurate?
23    A   Yeah.  It reviews, you know, who competed,
24   and typically it gives a little, little bit of a
25   highlight on what happened.

12 (Pages 42 - 45)

1    Q  Do you know Josh Coen?
2    A  I'm familiar with Josh Coen.  Yes.
3    Q  A former regional manager of Vivint.  Right?
4    A  Josh Coen was a manager.  I don't believe he
5 ever hit regional status, and I think, I think he had
6 a team that he managed while he was with us, but I
7 don't ...
8    Q  Is Gunnar -- oh, sorry.  Are you finished?
9    A  Yeah.  No, I'm fine.
10    Q  Is Gunnar Thorderson or however you
11 pronounce that, is he still with Vivint?
12    A  I do not, I don't believe so.  Like, I'd
13 have to, have to check our system --
14    Q  And Mr. Coen was terminated for deceptive
15 sales practices.  Correct?
16        MR. STEWARD:  Objection.  Form.
17    A  I'm not familiar with all of the details
18 around his termination.  Again, as I stated before,
19 our compliance team handles those and does those
20 investigations and terminations, so I'm not familiar
21 with the specific details of his, of his termination.
22 I do know, like you stated, he was terminated for
23 cause.
24    Q  Okay.  Got you.  All right.  I'm going to go
25 to P 246.  Can you see that okay?

1        (Exhibit Plaintiff's 246 was marked for
2        identification.)
3    A  I can.  Yes.
4    Q  And it's essentially the same format as the
5 last article we looked at.  Correct?
6    A  Yes.
7    Q  And does the content of this also appear to
8 be reporting who's doing well in the Valentine's Day
9 championship?
10    A  Yes.  That is what it appears to be.
11    Q  And it speaks again to Mr. Coen.  Right?
12    A  Yes.  That's what it looks like.
13    Q  Some of these names at the top, Tristan
14 Pears.  Are you familiar with Mr. Pears?
15    A  Yes.
16    Q  Is he still with Vivint?
17    A  Yes.  He is.
18    Q  Trey Dougher.  Are you familiar with Mr.
19 Dougher?
20    A  Yes.
21    Q  He was terminated for cause.  Correct?
22    A  Correct.
23    Q  Colton Ramon, terminated for cause.
24 Correct?
25    A  I believe Colton was.

1    Q  Was Josh Adams -- is he still with Vivint?
2    A  I, I'm familiar with the name.  I do not
3 believe he's with us, but I'd have to check our
4 records to verify.
5    Q  Do you know if he was terminated for cause?
6    A  Like I said, I don't, I'd have to check our
7 records to see if he is or is still with Vivint or
8 terminated.  I don't, I can't recall everyone that's
9 been terminated.
10    Q  The name Ogletree down here in the second to
11 last paragraph, he was terminated for cause.  Right?
12    A  We've had a sales representative with the
13 last name of Ogletree work for us.  Yes.  And I
14 believe he was terminated for cause.
15    Q  Same with Kurtis Kunz?
16    A  Kurtis Kunz I'm not as familiar with.  I
17 couldn't tell you.
18    Q  All right.  Let me go to -- this is
19 Plaintiff's Exhibit 247.  Do you see this one?
20        (Exhibit Plaintiff's 247 was marked for
21        identification.)
22    A  Yes.
23    Q  And it looks like it's available to the same
24 audience on Vivint's internal website.  Is that fair?
25    A  Yes.

1    Q  And if you go down to the bottom of this --
2 well, actually, first, this is dated June 8, 2020.
3 Right?
4    A  Yes.  That is what it appears.
5    Q  Do you know Mr. Brandon McGrew?
6    A  I do not know him personally.  No.
7    Q  Do you see the second to the last question
8 in what appears to be an interview with him, what his
9 goals are at Vivint?  Do you see that?
10    A  The second to last question?  Yeah.
11    Q  Yes.  And the last thing that he says in
12 response to that question is that he wants to be the
13 next Jordan Binning.  Do you see that?
14    A  I can see that.  Yes.
15    Q  And Mr. Binning was a highly successful
16 sales representative who was fired for cause twice.
17 Correct?
18        MR. STEWARD:  Objection.  Form.
19 Foundation.
20    A  Jordan Binning did work for us, yes, and he
21 was terminated for cause.
22    Q  And before he left he had the largest
23 regional sales group at Vivint.  Correct?
24        MR. STEWARD:  Objection.  Form.
25 Foundation.

1    A    There were several similar size.  He, he
2    had, he had a large group that he did lead.  Yes.
3        Q    All right.  Let me show you one more
4    document.  This one's a little bit different.  I'll
5    scroll through this one, and this is a multi-page,
6    this is a six-page document, but it looks like, at
7    least from the title, it's a 2018 competitions rule
8    book.  Are you familiar, generally, with that type of
9    document?
10    A    Yes.
11        Q    All right.  And just for the record this is
12    Plaintiff's Trial Exhibit 211.  And I don't have a lot
13    of specific questions, but it looks like the last two
14    pages list out a series of competitions.  One is "The
15    Tour".  Do you see that?
16            (Exhibit Plaintiff's 211 was marked for
17            identification.)
18    A    Yes.  Yeah.  You, you kind of skipped
19    through it quickly, so I don't know everything we've
20    missed there, but yes.  I see what you're looking at.
21        Q    Is "The Tour", based on your experience at
22    Vivint, is that a competition that Vivint holds every
23    year?
24    A    I mean, we, we'll change the names of these
25    tournaments and competitions often, and I don't

1    believe we run that more than one year.  I think that
2    was one year that we ran that.
3        Q    And there it says that the top competition
4    purse is between 10,000 and 30,000 dollars.  Right?
5    A    Yes.  I can see that.
6        Q    And then there's one called "Pickup Games".
7    Do you see that?
8    A    Yeah.  As you read these, just as I'm -- I'm
9    not familiar with -- you've probably read this closer
10    than I have, here.  It's been a while for me -- but
11    what you may note is when you see dollar amounts on
12    these competitions, they are, more often than not they
13    are prizes that are, equate to that value instead of a
14    cash prize.  So there's a variety of ways that these
15    prizes are fulfilled.
16        Q    Let me ask this: "The Cup," I understand, is
17    a competition Vivint has done every year for quite
18    some time.  Is that right?
19    A    Yes.
20        THE WITNESS:  It's not COVID, Charles.
21    I'm, I tested.
22        MR. EBLEN:  I hope not.
23        THE WITNESS:  And I don't think it can
24    go through this, here.
25        MR. EBLEN:  No.  I --

1        THE WITNESS:  I don't know everything
2    about COVID yet.  I'm still learning.
3        MR. EBLEN:  I think we're safe.  Just
4    as long as you don't give COVID to any more of my
5    Chiefs players before the game tonight.
6        MR. STEWARD:  Go ahead.
7        THE WITNESS:  I'm so sorry.
8        MR. STEWARD:  No.  Take a minute, Josh,
9    and --
10        MR. EBLEN:  -- yeah.  Are you good?  Or
11    do you need a break?
12        THE WITNESS:  I'm good.  I got a cough
13    drop and some water.
14        MR. EBLEN:  Okay.
15        THE WITNESS:  And you were asking about
16    the --
17    BY MR. EBLEN:
18        Q    Yeah.  Is the "Premier League [ph]" one that
19    Vivint holds annually?
20    A    Yes.
21        Q    What about "Viper"?
22    A    Yes.  That's one we ran for a few -- all --
23    those three are, are kind of -- they're ones we've ran
24    for a few years.  Yes.  And --
25        Q    "Thirty Days to Pro"?  Is that an annual

1    event?
2    A    Yes.
3        Q    And then these, each section then generally
4    sets out some of the rules and the prizes that can be
5    won for the competitions.  Is that fair?
6    A    Yes.  That's what it looks like.
7        Q    In your position as a vice president of
8    sales, if you wanted to know how much money Vivint was
9    bringing in by an individual state, would you have
10    access to that?
11        MR. STEWARD:  Objection.  Form.
12    Foundation.
13    A    How, how much money Vivint is collecting
14    from customers in specific state?  Is that your
15    question?
16    Q    Correct.  Yes.  Correct.
17    A    I, I've never looked at that.  I, I imagine
18    if I, if I needed that, and I could, I could access
19    that.  I, I've never accessed that or looked at the
20    business that way.
21    Q    If you wanted to undertake that task of,
22    say, finding how much money Vivint was bringing in, in
23    a specific state, where within Vivint's information
24    would you look?
25        MR. STEWARD:  Objection.  Form.

14 (Pages 50 - 53)

1 Foundation. Misstates testimony. Vague as to
2 bringing money in, and I caution the witness not to
3 speculate. If he doesn't have knowledge, he doesn't
4 have knowledge.
5 BY MR. EBLEN:
6 Q Go ahead.
7 MR. STEWARD: If you want to re-ask it,
8 I mean --
9 MR. EBLEN: Sure. Yeah.
10 MR. STEWARD: Bringing money in.
11 MR. EBLEN: Sure.
12 BY MR. EBLEN:
13 Q If Vivint, in terms of all of the customer
14 recurring revenue that was being paid by customers in
15 a specific state, where would you look within Vivint's
16 recordkeeping or databases to try and find that
17 information?
18 MR. STEWARD: Objection. Form,
19 foundation, and vague. I mean, that's a -- so now
20 you're asking recurring? I don't understand what you
21 mean by recurring.
22 MR. EBLEN: Yeah.
23 BY MR. EBLEN:
24 Q All of the -- I'm just asking, if Vivint
25 wanted to find out all of the money in a given year

1 that was being brought in by customers in a given
2 state, where would you look to find that information?
3 MR. STEWARD: Okay. Objection. Form,
4 foundation, and goes beyond the scope of what this
5 witness was noticed for.
6 If you know and you have knowledge, let
7 him know. If you don't, let him know that as well.
8 A Like I said, I, that's not how I look at the
9 business. Yeah. I, I don't know where I would go to
10 get that information. I would imagine our accounting
11 and finance teams could have access to that. That's
12 not something I've ever looked at or would see need
13 for my current role.
14 Q The document that we just looked at, is
15 there something, like, in form, is there a document
16 like that that's generated every year that describes
17 the various competitions that take place?
18 A Yeah. I don't know where that specific
19 document came from. It looked, looked somewhat
20 familiar. It could be gathered from a few different
21 sources, but we do lay out our competitions that we
22 have for the upcoming season, the time, time frame
23 those are participated in. So yes. In some form or
24 fashion we lay that out.
25 Q Do you train -- or actually let me start

1 that question over.
2 In your role are you responsible for
3 overseeing that the Vivint sales force, so regional
4 managers and managers, comply with Vivint's rules as
5 far as social media use to recruit new sales
6 representatives?
7 A We do have a social media policy that we do,
8 that we communicate out to our sales force. We have,
9 as we've stated, thousands of sales representatives.
10 It's very difficult to know what's being posted or how
11 it's being posted. So it's, it's difficult to
12 monitor. We do have certain things that get flagged,
13 but we, we have a policy that's communicated clearly
14 out to the sales force on social media and how to use
15 that.
16 Q Do you agree that one of the ways Vivint
17 managers recruit new sales people is to boast about
18 how much money they make?
19 MR. STEWARD: Objection. Form. Calls
20 for speculation.
21 BY MR. EBLEN:
22 Q Have you ever seen that in social media or
23 otherwise?
24 A You, you asked, is that one of the ways --
25 I, I -- our sales reps have variety of ways that they

1 recruit. That's not the primary way we recruit. When
2 sales representatives talk about the pay scale and how
3 the, the earning opportunity would be, that's
4 certainly a part of the conversation as with any job.
5 You talk about the compensation, earning opportunity.
6 When you say most of the, the earning
7 opportunity, I, I don't know, you know, what you're
8 referring to or speculating there, but again, we
9 would, do train our sales representatives to clearly
10 describe to -- force and as they recruit reps how the
11 compensation works and, and, and what that opportunity
12 looks like. That is part of the recruiting process.
13 Yes.
14 Q Do you agree that part of the recruiting
15 process involves advertising a flashy lifestyle that
16 they could live working with Vivint?
17 MR. STEWARD: Objection. Form.
18 Foundation.
19 A You say flash, a flashing style? I don't --
20 Q Yes.
21 A -- know what you're -- with that.
22 Q A lavish lifestyle. One doing, you know,
23 fancy things. Fancy cars. Do you agree that that is
24 part of what is advertised in the recruiting process
25 to get new Vivint sales reps?

15 (Pages 54 - 57)

1    A    When, when you say advertise, we, we don't,
2    we don't do paid advertisements to recruit.  We, our
3    sales managers often recruit on college campuses or
4    inside their personal networks and circles of
5    influence, so there's not a, there's not a, any paid
6    advertisements that the company sends out.
7        Q    All right.  I'm going to share my screen
8    with you real quick.  Mr. Crittenden, you're on
9    Facebook.  Right?
10    A    Yes.
11    Q    Okay.  Does this look like your Facebook
12    profile?
13    A    Yes.
14    Q    All right.  And you know that one of the
15    things that Facebook tracks are your, people who are
16    your friends.  Correct?
17    A    Yes.
18    Q    And you're friends with Josh Coen.  Right?
19    A    That appears to be so.  Yes.
20    Q    You've met Josh Coen.  Correct?
21    A    Yes.
22    Q    And does that look to you like Josh Coen?
23    A    Yes.  That does look, that is, that looks
24    like the Josh Coen that worked for Vivint.  Yes.
25    Q    Okay.  I'd like to ask you just a few

1    questions about some of his posts related to
2    recruiting.
3    A    Okay.
4    Q    To find out whether or not you deem them to
5    be consistent with what Vivint allows its managers to
6    use to market to new recruits.  So --
7        MR. STEWARD:  Charlie, what does this
8    possibly have to do with CPIs claims?  I mean, you got
9    to be kidding me.  This is --
10        MR. EBLEN:  Well, I'm --
11        MR. STEWARD:  -- this is what you're,
12    this is how you want to spend the time?
13        MR. EBLEN:  I don't have much left, so
14    yeah.  This is.  I mean, we can disagree
15    philosophically on this, and I'm sure you'll seek to
16    keep it out.  But ...
17        MR. STEWARD:  Well, it's more, you
18    know, witnesses have rights to not have their time
19    wasted and being harassed through --
20        MR. EBLEN:  I'm not -- no.  I'm not
21    harassing him, and I'm not wasting his time.
22        MR. STEWARD:  Well, you are in the
23    sense that it bears absolutely no relationship to CPIs
24    allegations, but go ahead.
25        MR. EBLEN:  All right.  Okay.

1    BY MR. EBLEN:
2    Q    I'm getting to --
3    A    You, you've, you've probably now spent more
4    time on my Facebook than I have.  I'm not on social
5    media very often.  I will accept friend requests when
6    they come across and, you know, give them my position.
7    A lot of our sales rep force have requested being a
8    friend on Facebook.  Yeah.  I, I do not have a lot of
9    time on social media.  So --
10    Q    No.  I --
11    A    You, you've probably --
12    Q    I --
13    A    -- more than I have.
14    Q    I appreciate that.  So okay.  So I'm looking
15    at a post from Josh Coen on November 9, 2019.  It's
16    about a guy name Nolan Detlefson.  Do you know who
17    Nolan Detlefson is?
18    A    Yes.  I do.
19    Q    Okay.  And have you met him before?
20    A    I have.  Yes.
21    Q    And does that look like Mr. Detlefson
22    standing by -- I don't know if that's a Lamborghini or
23    a Ferrari with a Vivint shirt on.
24    A    It's kind of small on my screen.  It, it
25    appears to be.  Again, I cannot, can't tell, quite.

1    It's a, it's kind of small.  I, and I'm not familiar
2    with every detail of the case here that we're
3    discussing, but I am confused at how this would relate
4    to the CPI case.  If you could tie that together, that
5    would help.
6    Q    No.  I appreciate your position there.  And
7    my question is simply, is this the kind of marketing
8    from sales managers that Vivint condones as a company?
9        MR. STEWARD:  Objection.  Form.
10    Assumes facts not in evidence.  Foundation.
11    A    I have -- you, you, you scrolled through a
12    long list of posts he's made here.  I haven't read
13    every one.  And it's a picture of a, a person by a
14    car.  I, I don't, I, I really struggle to know what
15    you're asking for.  We do have a social media policy.
16    Our counsel can provide that to you if you deem that
17    important for the case, here.  They can, they can
18    review that for you.  But I -- not, not following the
19    question or the pertinence here.
20    Q    Yeah.  No.  I appreciate that.  But I'm
21    just, I'm asking you if a post like this where he's
22    wearing a Vivint shirt and Josh Coen is describing his
23    success, is that something that Vivint would authorize
24    individual managers to do to recruit new sales people?
25        MR. STEWARD:  Objection.  Form.

16 (Pages 58 - 61)

1  Foundation.  Mischaracterizes the evidence.
2      A   Yeah.  So again, happy to provide you our
3  social media policy.  We have thousands of sales
4  representatives and cannot control what they post or
5  how they post and do, do not have any guidance
6  instructing sales representatives to post anything
7  like this.  This is not part of our recruiting
8  trainings.
9      Q   All right.  What type of sales tracking
10  software do you use to evaluate sales rep performance?
11      MR. STEWARD:  Objection.  Form.
12  Foundation.
13      A   Type of software?
14      Q   Yes.  What program?
15      A   So Insider is the website that reports the
16  data, and that, there's a page on Insider called
17  Mobile Report.  Again, this is internally developed,
18  so I don't know what software specifically is powering
19  that.  I don't know the relevance to the type of
20  software.
21      Q   Does Vivint use any monitoring software
22  provided to monitor social media for violations of the
23  policy?
24      A   I, I, I, I don't know.  It's not something I
25  have information on.

1      Q   In Vivint software do you have the ability
2  to look up how many customers Vivint has in specific
3  markets?  Whether it's by state or city or other
4  region?
5          MR. STEWARD:  Objection.  Form.
6  Foundation.  Goes beyond the scope of what this
7  witness was asked to know.
8      A   You're asking me specifically or a general
9  question about a sales rep?  Whose access are you
10  asking about?
11      Q   Yours.
12      A   Mine.  So I don't look at the business that
13  way.  I don't have any reports that do that, so I, I
14  don't, I don't have anything accessible.  I imagine
15  our data team could pull that, but again, it's not
16  something I, I've ever accessed, necessarily, in the
17  way you're asking.
18          MR. EBLEN:  All right.  Let's take five
19  minutes, here.  I think I'm pretty close to done.
20          MR. STEWARD:  Hey, Charlie.  Just --
21          THE REPORTER:  Time is 5:42 p.m.  We
22  are now off the record.
23          (Off the record.)
24          THE REPORTER:  The time is 5:48 p.m.
25  We are now back on the record.

1  BY MR. EBLEN:
2      Q   All right.  I got ahead of myself.  Okay.
3  Can you see my screen again, Mr. Crittenden?
4      A   Yes.
5      Q   All right.  And this is Plaintiff's 95 that
6  we've been looking at that has the list of videos.  Do
7  you see that there are some videos on here that look
8  like they may have, they may cover topics other than
9  sales training?  Is that accurate?
10          (Exhibit Plaintiff's 95 was marked for
11          identification.)
12      A   Yeah.  Those are, these are, this is a list
13  of videos, not sales training only.  Other content
14  here.
15      Q   Okay.  And have you had time to just
16  generally familiarize yourself with this list?  I'm
17  not saying specifically watch all of them, but have
18  you at least scrolled through the list to see the
19  types of videos that are on here?
20      A   No.  Not other than what you've, I've
21  watched you scroll through today.
22      Q   Okay.  But again, you don't have any reason
23  to believe that any of these videos are unauthorized
24  videos that Vivint didn't create for the purposes of
25  either its sales force or its employees; do you?

1          MR. STEWARD:  Objection.  Form.
2          THE WITNESS:  I, I would want to scroll
3  through that.  You asked that a few times.  I would
4  want to make sure I would go through that, the whole
5  list, here.
6          MR. STEWARD:  Yeah.  I mean --
7          MR. EBLEN:  Okay.
8          MR. STEWARD:  There's 615 entries.  So
9  ...
10          THE WITNESS:  Yeah.  I, I'd want, I'd
11  want to go through it, but again, and I don't believe
12  all of these are still active.  I, I would want to
13  check those too as what's active and, you know, and
14  how long the duration that was active for.  So there's
15  a, there's a, probably more you would want to look at,
16  here, and there's a lot of list, a lot of videos on
17  this list.
18  BY MR. EBLEN:
19      Q   Well, what are some of the other videos used
20  for?
21      A   Well, as you go through, there's promotion
22  content.  There's recognition.  You know, we've had
23  videos that summarize some of the sales incentive
24  trips.  There's highlight videos.  There's, you know,
25  videos that promote to the competition and review,

17 (Pages 62 - 65)

1  like, show the prizes. There's -- again, there's good
2  variety of videos here.
3      Q   The videos that promote competitions, are
4  you involved with their creation?
5      A   No. Well, I mean, again, that team that
6  films them does report to me, but I don't, I'm not out
7  filming with them. No.
8      Q   And the idea behind those videos is to, you
9  know, create a video that encourages the sales force
10  to participate in the competition. Is that generally
11  correct?
12          MR. STEWARD: Objection. Form,
13  foundation, and vague as to idea.
14  BY MR. EBLEN:
15      Q   Well, I mean -- what -- I'll ask a better
16  question. What is the purpose for the sales
17  competition videos?
18      A   Yeah. I'm sure you watched a few of them.
19  We will show some of the different items that can be
20  won, and it's, you know, it's meant to be played in
21  the team correlation meetings, which -- training, talk
22  about the rules. And so we would review the rules,
23  and we'll go over what prizes that can be won. And
24  it's often played in our team correlations throughout
25  the summer.

1      Q   Are there also videos that are created
2  related to trips that sales representatives can go on
3  as an incentive for sales competitions?
4      A   Yeah. I believe -- again, I haven't gone
5  through this full list, but I believe -- I mean, row
6  50 there, that's a video highlighting one of the sales
7  incentive trips that we went on. It's taking pictures
8  from the trip and families that were together on that
9  trip. So I think -- that, that's what that one would
10  be.
11      Q   Are there also videos related to award
12  ceremonies?
13      A   Again, I have not scrolled through all, all
14  of these here, but we do have our video team film
15  those. Again, I don't know what has all been provided
16  here or what they end up using.
17      Q   What's the purpose for filming videos
18  related to the awards shows?
19      A   We like to capture, you know, the full
20  experience of what the, involves working for Vivint,
21  and those are often used to show potential recruits
22  what the full experience looks like. It's a, it's
23  a -- they're often fun events where they, you know,
24  the sales reps and the teams will dress up with their,
25  their spouses or significant others and celebrate the

1  year. So there's, there's a variety of reasons they
2  use it. They're often -- again, it's a, it
3  commemorates an important port of the year and adds
4  fun to show for the team.
5          MR. STEWARD: Charlie, is CPI claiming
6  that it won an award that it didn't receive in one of
7  these competitions?
8  BY MR. EBLEN:
9      Q   Do you know what the average sales rep
10  salary is?
11      A   So, Charlie, our sales reps don't have a
12  salary. Our sales representatives are paid on a
13  commission basis.
14      Q   Do you know what the average sales rep makes
15  per year?
16      A   I don't know that off the top of my head.
17  We have, we have about 4500 reps that made a sale for
18  us last year.
19      Q   Does Vivint disclose sales rep compensation
20  numbers?
21      A   Individual --
22          MR. STEWARD: I'm sorry. Object as to
23  form. Vague.
24          THE WITNESS: Are you asking about an
25  individual's personal compensation?

1  BY MR. EBLEN:
2      Q   Yes.
3      A   If they're, with their permission, they, if
4  they share that, we, you know, we allow a sales
5  representative to talk about their compensation.
6      Q   What about averages? Are averages
7  disclosed?
8      A   It depends on the medium we're displaying
9  that, but sometimes we'll show an average.
10      Q   What are the contexts in which that might
11  occur?
12      A   So we, we'll, we make a recruiting brochure
13  sometimes that talks about the opportunity, who Vivint
14  is, what differentiates us, what we invest in our, in
15  marketing, what we invest in product innovation. So a
16  recruiting brochure would entail a lot of things to
17  talk about the opportunity to talk about the job and
18  who we're recruiting. In that we may show averages,
19  again, over the years. We've been in business a long
20  time. We, we've shown average compensation figures.
21  But again, that's, that's one component in the
22  recruiting process.
23      Q   Are you able to look up the number of
24  customers Vivint has in a given state?
25          MR. STEWARD: Objection.

Veritext Legal Solutions
800-567-8658                                           973-410-4098

1      THE WITNESS:  No.
2      MR. STEWARD:  Form.  I'm sorry.
3  Objection.  Form.  Foundation.  Beyond the scope.
4      THE WITNESS:  No.  I'm, I, I am not
5  able to.  You've asked that a few times.  I, that's
6  not how I look at the business.  I don't have that
7  data.
8  BY MR. EBLEN:
9      Q   What type of data do you assess for purposes
10  of assessing how sales are going?
11      A   Well, obviously look at sales numbers, and
12  we look at, at, by teams.  We look at per rep
13  averages.  We look at number of reps with a sale.
14  We'll look at the different components of how many
15  cameras they're selling.  The, there's a variety of
16  things we look at but more, more around sales
17  performance as a whole with the company and then also
18  down by specific teams and, and by regions.
19      But again, when, when you hear us say region
20  and, and team, we're not summarizing that by a
21  geographic region.  A regional is somebody that's over
22  multiple teams.  So there's nothing -- we don't look
23  at the business geographically at all.  It, it's
24  looked at holistically, total numbers and then by, by
25  the different teams and regions.  But again, that's

1  not geographic.
2      MR. EBLEN:  All right.  I think that's
3  all the questions that I have for you.
4      MR. STEWARD:  Okay.  And no questions
5  for me.  Thanks, Josh.
6      THE WITNESS:  Okay.  Thank you.
7      MR. EBLEN:  Thanks.
8      THE REPORTER:  So just to clarify, so
9  how would we like to handle transcript orders?
10      MR. STEWARD:  Yeah.  I think we both
11  have standing orders with Veritext for this.
12      MR. EBLEN:  Yeah.  We do.  We'll need a
13  rush just as fast as you can, not on the video but on
14  the transcript.
15      THE REPORTER:  All right.
16      MR. EBLEN:  And we'll send to you all
17  the exhibits that were used so that that's clear.
18      THE REPORTER:  All right, then.
19      (Signature reserved.)
20      (Whereupon, at 5:57 p.m., the
21      proceeding was concluded.)
22
23
24
25

1      CERTIFICATE OF DEPOSITION OFFICER
2      I, JOSHUA SEAGONDOLLAR, the officer before
3  whom the foregoing proceedings were taken, do hereby
4  certify that any witness(es) in the foregoing
5  proceedings, prior to testifying, were duly sworn;
6  that the proceedings were recorded by me and
7  thereafter reduced to typewriting by a qualified
8  transcriptionist; that said digital audio recording of
9  said proceedings are a true and accurate record to the
10  best of my knowledge, skills, and ability; that I am
11  neither counsel for, related to, nor employed by any
12  of the parties to the action in which this was taken;
13  and, further, that I am not a relative or employee of
14  any counsel or attorney employed by the parties
15  hereto, nor financially or otherwise interested in the
16  outcome of this action.

17      JOSHUA SEAGONDOLLAR
18      Notary Public in and for the
19      State of North Carolina
20
21  [X] Review of the transcript was requested.
22
23
24
25

1      CERTIFICATE OF TRANSCRIBER
2      I, ERICA MAKUCH, do hereby certify that this
3  transcript was prepared from the digital audio
4  recording of the foregoing proceeding, that said
5  transcript is a true and accurate record of the
6  proceedings to the best of my knowledge, skills, and
7  ability; that I am neither counsel for, related to,
8  nor employed by any of the parties to the action in
9  which this was taken; and, further, that I am not a
10  relative or employee of any counsel or attorney
11  employed by the parties hereto, nor financially or
12  otherwise interested in the outcome of this action.
13
14
15      ERICA MAKUCH
16
17
18
19
20
21
22
23
24
25

19 (Pages 70 - 73)

1  MATTHEW A. STEWARD, ESQUIRE
2  mas@clydesnow.com
3                    December 20, 2021
4  RE:   CPI Security Systems, Inc, v. Vivint Smart Home, Inc.
5  12/16/2021, Joshua  Crittenden (#4997856)
6    The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 Erratas-cs@veritext.com.
16
17  Return completed errata within 30 days from
18 receipt of testimony.
19    If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25

1  CPI Security Systems, Inc, v. Vivint Smart Home, Inc.
2  Joshua  Crittenden (#4997856)
3          ACKNOWLEDGEMENT OF DEPONENT
4    I, Joshua  Crittenden, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11 _____  _____
12 Joshua Crittenden              Date
13 *If notary is required
14      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15      _____ DAY OF _____, 20___.
16
17
18      _____
19 NOTARY PUBLIC
20
21
22
23
24
25

1  CPI Security Systems, Inc, v. Vivint Smart Home, Inc.
2  Joshua  Crittenden (#4997856)
3        E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Joshua  Crittenden                Date
25

20 (Pages 74 - 76)

| & | | | |
|---|---|---|---|

**&**  2:4,14 4:19,21

**0**

**00504**  1:8

**1**

**1**  42:19,24
**10**  11:20
**10,000**  51:4
**107**  14:17
**108**  15:19
**12/16/2021**  74:5
**16**  1:17 31:3
**1801**  3:20 4:6
**1900**  3:18 4:4

**2**

**2**  42:23,25
**20**  11:18,20 74:3
   76:15
**201**  2:16
**2018**  5:10 50:7
**2019**  60:15
**2020**  15:19 17:16
   18:6 38:20 49:2
**2021**  1:17 14:20
   16:5 74:3
**211**  5:10 50:12,16
**22nd**  2:15
**243**  15:24
**245**  5:7 44:3,5
**246**  5:8 46:25 47:1
**247**  5:9 48:19,20
**25490**  72:16
**2555**  2:5
**257**  31:2
**26317**  73:14
**268**  25:17
**270**  17:24
**273**  15:24
**27601**  3:19 4:5

**27705**  1:20
**28**  17:16

**3**

**3**  11:19
**30**  15:24 16:15,19
   16:22 17:12 19:16
   34:20 42:9 74:17
**30,000**  51:4
**300**  4:12
**301**  3:18 4:4
**32801**  3:5,12
**3660**  44:3
**3:20**  1:8

**4**

**4,000**  7:18
**407**  3:7,14
**420-1000**  3:7,14
**433-2401**  2:19
**44**  5:7
**450**  3:4,11
**4500**  68:17
**47**  5:8
**48**  5:9
**4931**  4:12
**4997856**  1:22 74:5
   75:2 76:2
**4:08**  1:18

**5**

**5**  25:9,17
**5/28**  41:10
**5/29**  41:10
**50**  5:10 9:5 11:18
   36:17 67:6
**503**  37:3
**510**  37:4
**519**  38:12
**523**  40:10
**559-2139**  2:8
**5:42**  63:21

**5:48**  63:24
**5:57**  71:20

**6**

**6**  5:3 34:20 42:9
**60**  9:5
**615**  43:10 65:8
**64**  5:11
**64108**  2:6
**650**  3:4,11

**7**

**705-8054**  4:15
**783-6400**  3:22 4:8

**8**

**8**  49:2
**801**  2:19 4:15
**816**  2:8
**84111**  2:17
**84604**  4:13

**9**

**9**  60:15
**919**  3:22 4:8
**95**  5:11 64:5,10

**a**

**ability**  10:19 63:1
   72:10 73:7
**able**  8:8 14:4 17:5
   18:16,22 21:25
   22:4 43:23 44:15
   69:23 70:5
**absolutely**  59:23
**accept**  60:5
**access**  17:5 30:23
   45:2,14 53:10,18
   55:11 63:9
**accessed**  17:8
   53:19 63:16
**accessible**  16:21
   44:23 63:14

**accounting**  55:10
**accounts**  10:25
**accuracy**  74:9
**accurate**  9:11
   10:10,23 14:20
   43:12 45:22 64:9
   72:9 73:5
**acknowledge**  40:1
**acknowledgement**
   76:3
**acknowledgment**
   74:12
**acquired**  21:18
   22:24
**acquisition**  1:9
   2:11
**action**  1:7 72:12
   72:16 73:8,12
**actions**  40:5,7
**active**  65:12,13,14
**adams**  48:1
**additions**  76:6
**adds**  68:3
**advertise**  58:1
**advertised**  57:24
**advertisements**
   58:2,6
**advertising**  57:15
**affiliated**  23:17
**affiliation**  24:16
**ago**  7:5,7 37:20,22
   38:9 40:12
**agree**  18:25 20:13
   20:15 21:13,23
   22:6 23:16 24:14
   25:21 26:10 27:4
   29:22 30:2,12
   32:21 33:7 34:5
   38:25 39:20 56:16
   57:14,23

Case 3:20-cv-00504-FDW-DSC   Document 113-1   Filed 01/05/22   Page 21 of 38

**agreed** 43:11
**ahead** 9:21 12:20
  14:1 16:3 26:2
  31:10 34:2 52:6
  54:6 59:24 64:2
**alarm** 19:23 20:16
  20:24,24 21:14
  23:18 24:16
**allegations** 59:24
**allotted** 74:20
**allow** 69:4
**allows** 59:5
**amounts** 51:11
**andrew** 4:2
**annual** 52:25
**annually** 52:19
**answer** 9:20,21
  21:6 24:23 32:3
**answered** 28:5
**anymore** 25:12
**apologize** 9:22
  13:10 22:13 25:13
  29:4 36:10
**appear** 14:17,23
  18:3 37:16 47:7
**appears** 14:21
  16:2 44:19 45:7
  47:10 49:4,8
  58:19 60:25
**appended** 76:7
**applicable** 74:8
**applied** 33:7
**applies** 40:9
**appreciate** 43:16
  60:14 61:6,20
**approach** 8:22
  20:5 25:2,5
**approaches** 20:3,5
**approaching**
  20:23

**appropriate** 40:7
**approval** 25:24
  26:11
**approved** 29:17
**approximately** 7:6
**april** 17:16
**article** 5:7,8,9
  44:20 45:6 47:5
**articles** 44:23
  45:15,19
**articulate** 24:3
**asked** 24:25 28:4
  43:9,10 56:24
  63:7 65:3 70:5
**asking** 21:10
  23:11 24:12 28:1
  30:8 32:17 35:23
  42:10 52:15 54:20
  54:24 61:15,21
  63:8,10,17 68:24
**aspects** 32:18
**assess** 70:9
**assessing** 70:10
**assets** 7:20
**assume** 21:8 42:14
**assumes** 22:11
  24:20 61:10
**assumption** 32:18
**assumptions** 21:11
  33:4
**attached** 74:11
**attorney** 12:9
  72:14 73:10 74:13
**audience** 48:24
**audio** 72:8 73:3
**authorize** 61:23
**authorized** 15:3
  15:10,11 17:11
**available** 48:23
  74:6

**avenue** 3:4,11
**average** 11:13
  68:9,14 69:9,20
**averages** 69:6,6,18
  70:13
**award** 67:11 68:6
**awards** 67:18
**aware** 35:3 38:4

**b**

**b** 5:5 34:20 42:9
**back** 13:20 25:6
  35:1 41:17 42:25
  43:18,19 63:25
**bacon** 2:4
**bad** 39:20
**bank** 42:2
**base** 30:19
**based** 12:3 14:18
  18:2 37:20 50:21
**basis** 68:13
**bears** 59:23
**behalf** 2:2,10
**behaved** 32:25
**behaviors** 39:10
**believe** 13:7,8 14:9
  15:11,12,16 23:24
  23:25 25:25 32:7
  32:22 36:13 37:14
  37:15,21 40:16
  41:7 45:17 46:4
  46:12 47:25 48:3
  48:14 51:1 64:23
  65:11 67:4,5
**believes** 23:16
  24:15
**best** 39:9 72:10
  73:6
**better** 66:15
**beyond** 42:8 55:4
  63:6 70:3

**biking** 41:13
**binning** 49:13,15
  49:20
**bit** 18:12,18 43:15
  45:24 50:4
**boast** 56:17
**book** 5:10 50:8
**bottom** 49:1
**bought** 22:14
**boulevard** 2:5
**box** 3:20 4:6
**brand** 19:5
**brandon** 49:5
**break** 42:20 52:11
**bring** 22:17
**bringing** 53:9,22
  54:2,10
**brings** 22:18
**brochure** 69:12,16
**broken** 14:11
**brought** 55:1
**browser** 18:11
  26:5 31:7,8
**build** 19:4
**building** 33:19
**bundle** 15:25
**bundled** 17:21
**business** 22:8
  53:20 55:9 63:12
  69:19 70:6,23
**busy** 12:8
**buy** 22:23 23:11
**buyouts** 41:10

**c**

**c** 2:1 3:1 4:1 6:1
**call** 11:21
**called** 6:13 17:17
  25:18 40:10 44:25
  51:6 62:16
**calls** 21:4 22:11
  23:22 24:20 30:6

33:2,13 39:4
40:21 42:8 56:19
**cameras** 70:15
**campuses** 58:3
**capture** 14:18
67:19
**car** 40:15 61:14
**carolina** 1:2,20
3:19 4:5 72:19
**cars** 19:23 57:23
**case** 9:25 13:19
15:14 33:5 61:2,4
61:17
**cash** 51:14
**castro** 3:2
**castrop** 3:6
**caught** 32:22
**cause** 38:24 39:18
46:23 47:21,23
48:5,11,14 49:16
49:21
**causes** 9:23
**caution** 54:2
**ceblen** 2:7
**celebrate** 67:25
**center** 2:15
**ceremonies** 67:12
**certain** 20:6 22:4
30:20 56:12
**certainly** 19:9
43:13 57:4
**certificate** 72:1
73:1
**certify** 72:4 73:2
**championship**
47:9
**change** 50:24 75:4
75:7,10,13,16,19
**changes** 74:10
76:6

**channel** 7:10
**channels** 7:9
**character** 35:14
**characterized**
33:23
**charles** 2:3 51:20
**charlie** 17:20 18:2
29:6 34:20 43:8
44:9 59:7 63:20
68:5,11
**charlotte** 1:3
**check** 46:13 48:3,6
65:13
**checking** 15:11
**chiefs** 52:5
**choose** 21:14
32:15
**chose** 20:25 21:14
**chunk** 31:12
**circles** 58:4
**citizens** 42:1
**city** 2:6,17 63:3
**civil** 1:7
**claiming** 68:5
**claims** 59:8
**clarify** 43:9 71:8
**classified** 33:23
**classify** 9:6
**clean** 43:15
**clear** 71:17
**clearly** 24:3 56:13
57:9
**clichþ** 32:9
**click** 17:15 25:13
26:2
**clicked** 18:10
**close** 63:19
**closer** 51:9
**clyde** 2:14 4:19,21
**clydesnow.com**
2:18 74:2

**code** 35:4,4,8,8
37:24 38:5
**coen** 46:1,2,4,14
47:11 58:18,20,22
58:24 60:15 61:22
**cold** 43:5
**collaboration** 8:11
**collaborative** 8:13
**collecting** 53:13
**college** 58:3
**colton** 47:23,25
**column** 14:12
**come** 27:1 36:23
42:14,25 43:17
60:6
**comfortable** 26:21
26:25 27:10 28:9
**commemorates**
68:3
**commission** 68:13
**commit** 34:18
39:15,15
**communicate** 56:8
**communicated**
56:13
**company** 7:13
20:25 21:9,14,14
22:6 23:18 24:2
24:11 58:6 61:8
70:17
**company's** 23:12
24:8
**compensated**
11:24
**compensation**
10:20,24 12:1
42:4,11,15 57:5,11
68:19,25 69:5,20
**compensation's**
12:3

**competed** 45:23
**competition** 44:21
50:22 51:3,17
65:25 66:10,17
**competitions** 5:10
45:7,19,22 50:7,14
50:25 51:12 53:5
55:17,21 66:3
67:3 68:7
**competitor** 22:15
22:23,24,25
**competitor's**
23:12
**complete** 76:8
**completed** 74:17
**compliance** 35:4,9
35:11,16,20 36:21
37:23 38:5 39:23
40:2,6 46:19
**comply** 56:4
**component** 69:21
**components** 70:14
**compound** 35:22
**computer** 13:8
**concluded** 71:21
**conditions** 38:2
**condones** 61:8
**confused** 61:3
**connection** 13:19
**consent** 26:16 27:2
27:6
**consistent** 59:5
**constitute** 11:17
**consumer** 41:23
**cont'd** 3:1 4:1
**contain** 15:14
**contained** 15:2
41:2
**content** 8:9 9:14
10:2,15 12:13
13:11 15:1 16:18

17:6,18 18:13
30:11 47:7 64:13
65:22
**contest** 40:19
**contexts** 69:10
**continually** 19:4
**control** 10:14,19
62:4
**conversation**
12:22,25 57:4
**copies** 74:14
**corner** 45:10
**corp** 1:10 2:11
**corporate** 45:10
**correct** 9:2 10:6
10:13,14 15:4,15
19:18,24 20:18
21:2 27:6 28:15
29:18,24 37:13,18
38:20,23 39:17
41:4,11 42:2,3
46:15 47:5,21,22
47:24 49:17,23
53:16,16 58:16,20
66:11 76:8
**corrections** 76:6
**correlation** 66:21
**correlations** 66:24
**cost** 41:23
**cough** 43:5 52:12
**counsel** 5:13 6:16
15:13 41:1 61:16
72:11,14 73:7,10
74:14
**couple** 24:25
31:12
**course** 15:25
**courses** 37:18
**court** 1:1
**cover** 64:8

**covers** 7:20
**covid** 51:20 52:2,4
**cpi** 1:5 2:2 61:4
68:5 74:4 75:1
76:1
**cpis** 59:8,23
**create** 10:2,9
14:22 64:24 66:9
**created** 15:3 40:24
67:1
**creation** 66:4
**credentials** 45:3
**crittenden** 1:16
6:12,22,23 9:18
14:4 30:25 35:3
43:23 44:16 58:8
64:3 74:5 75:2,24
76:2,4,12
**cs** 74:15
**cues** 26:17,20
27:13
**cup** 51:16
**curates** 8:1
**current** 7:7,15
23:24 55:13
**currently** 6:25
**customer** 8:22,23
19:11,21 20:7
21:7,18,20,20
22:14,23,24 23:23
24:1 25:2,5 26:11
26:17,20,21,25
27:9,10,18,23,25
28:11,13 33:19,22
54:13
**customer's** 24:8
25:22,23
**customers** 22:4,18
26:18 28:9,17
53:14 54:14 55:1
63:2 69:24

**cuts** 18:18
**cv** 1:8

**d**

**d** 5:1 6:1
**danny** 28:19,20
29:9,14
**danny's** 28:8,16
**data** 62:16 63:15
70:7,9
**databases** 44:24
54:16
**date** 1:17 29:13
37:11 75:24 76:12
**dated** 49:2
**day** 12:8 16:18
17:12,15 19:16
25:9,17 31:3 47:8
76:15
**days** 16:14,15,19
16:22 52:25 74:17
**deandrae** 4:18
**deceive** 28:10,12
**december** 1:17
74:3
**deceptive** 32:23
33:10 34:18,21
35:19,22 38:20
39:23 46:14
**decision** 21:22
**declare** 76:4
**deem** 59:4 61:16
**deemed** 76:6
**deems** 40:7
**defendants** 1:13
2:10
**defines** 34:20
**definition** 34:24
**department** 7:19
7:19 45:14
**departure** 38:8

**depending** 9:6
19:6
**depends** 69:8
**deponent** 74:13
76:3
**deposing** 74:13
**deposition** 1:15
12:7 14:8,25
17:13 72:1
**derteschik** 4:7
**describe** 57:10
**describes** 55:16
**describing** 61:22
**description** 5:6
**detail** 61:2
**details** 46:17,21
**detlefson** 60:16,17
60:21
**developed** 62:17
**device** 17:8
**difference** 35:13
**different** 20:3,4
24:25 27:3 30:10
30:10 35:1 38:9
40:13 50:4 55:20
66:19 70:14,25
**differentiate** 19:5
**differentiates** 23:2
69:14
**differentiating**
22:17
**difficult** 56:10,11
**digital** 72:8 73:3
**direct** 7:1,8,10
8:15,16 19:16
41:23
**disagree** 59:14
**disclose** 68:19
**disclosed** 69:7
**discussing** 61:3

**discussion** 12:13
**dishonest** 27:14
**displaying** 69:8
**disruptive** 9:22
**district** 1:1,2
**division** 1:3
**document** 43:24
  44:4 50:4,6,9
  55:14,15,19
**documents** 42:17
**doing** 29:21 34:16
  39:11 47:8 57:22
**dollar** 51:11
**dollars** 51:4
**door** 7:11,11 19:1
  19:1,8 20:18 28:2
  28:2
**doorstep** 27:11
**doubt** 41:2
**dougher** 47:18,19
**downline** 10:25
**dozen** 36:15
**dress** 67:24
**driven** 10:24
**driveway** 19:23
**drop** 52:13
**drops** 43:5
**dsc** 1:8
**dtp** 15:24 17:12
**duly** 6:13 72:5
**duration** 65:14
**durham** 1:20
**duties** 7:15

**e**

**e** 2:1,1 3:1,1 4:1,1
  5:1,5 6:1,1 75:3,3
  75:3
**earlier** 38:7
**earning** 57:3,5,6
**eblen** 2:3 5:3 6:2,7
  6:19 9:24 10:7

12:11,15,20,23
  13:2,3 16:20
  17:24 18:1,5,15,21
  21:5 24:22 26:9
  29:3,5,8 31:14
  32:2 34:25 35:2
  42:21 43:2,7,17,21
  44:10,12,14 51:22
  51:25 52:3,10,14
  52:17 54:5,9,11,12
  54:22,23 56:21
  59:10,13,20,25
  60:1 63:18 64:1
  65:7,18 66:14
  68:8 69:1 70:8
  71:2,7,12,16
**either** 64:25
**emma** 4:21
**employed** 72:11
  72:14 73:8,11
**employee** 72:13
  73:10
**employees** 64:25
**emulate** 30:3
**encourages** 66:9
**engaging** 32:23
**ensure** 21:25
**entail** 69:16
**entails** 7:17
**enter** 25:24
**entries** 43:10 65:8
**entrust** 21:1
**entry** 14:17
**epstein** 3:16
**equate** 51:13
**equipment** 41:24
**erica** 73:2,15
**errata** 74:11,13,17
**erratas** 74:15
**erteschik** 4:2

**es** 72:4
**esquire** 2:3,13 3:2
  3:9,16 4:2,10 74:1
**essentially** 47:4
**estimate** 36:5,12
**ethical** 28:2,15
**ethics** 35:4,8 37:24
  38:5
**evaluate** 62:10
**event** 53:1
**events** 67:23
**everybody** 45:13
**evidence** 22:12
  24:21 61:10 62:1
**exact** 29:13
**exactly** 11:15
**examination** 5:2
  6:18
**examined** 6:15
**example** 39:20
**excel** 13:5
**exhibit** 44:2,5 47:1
  48:19,20 50:12,16
  64:10
**exhibits** 5:13
  71:17
**existing** 19:23
  20:16,24 23:18
  24:16
**expecting** 19:9
**experience** 50:21
  67:20,22
**explain** 27:25
**explained** 28:17
**express** 25:23
  26:11,15 27:1,5

**f**

**f** 1:9,11 2:11,12
**facebook** 58:9,11
  58:15 60:4,8

**fact** 39:13
**factors** 22:17
**facts** 22:11 24:20
  61:10
**fails** 74:19
**fair** 8:10 9:1 22:2
  48:24 53:5
**fairness** 34:22
  44:7
**familiar** 13:11
  15:25 17:17 21:9
  25:11 37:6,8 38:2
  38:7 46:2,17,20
  47:14,18 48:2,16
  50:8 51:9 55:20
  61:1
**familiarize** 64:16
**families** 67:8
**fancy** 57:23,23
**far** 22:21 56:5
**fashion** 55:24
**fast** 71:13
**fayetteville** 3:18
  4:4
**fdw** 1:8
**feel** 26:21,25 27:10
  27:18 28:9
**ferrari** 60:23
**field** 8:12,23,24
**figures** 69:20
**film** 67:14
**filmed** 40:12
**filming** 39:18 66:7
  67:17
**films** 8:2,3 66:6
**finance** 55:11
**financially** 72:15
  73:11
**financing** 41:19,20
  41:22

**find** 54:16,25 55:2 59:4
**finding** 53:22
**fine** 42:21 46:9
**finished** 46:8
**fireable** 39:16
**fired** 49:16
**first** 6:13 16:15,19 16:22 18:22 32:24 49:2
**five** 7:4 22:1 36:19 36:19 42:22 43:1 63:18
**flagged** 56:12
**flash** 57:19
**flashing** 57:19
**flashy** 57:15
**floor** 2:15
**florida** 3:5,12
**focus** 19:22 23:1
**folks** 38:25
**follow** 30:22
**following** 61:18
**follows** 6:15
**force** 7:17,22,25 8:10,16 16:21 56:3,8,14 57:10 60:7 64:25 66:9
**forces** 10:5
**foregoing** 72:3,4 73:4 76:5
**forgot** 25:13
**form** 9:16 11:6 14:7 15:5 16:12 19:25 21:3 22:10 23:21 24:19 26:13 27:7 28:4,25 29:12 30:5,16 31:25 32:8,16 33:1,12 34:7,19 35:21 37:25 38:21

39:4,24 40:20 41:5 42:7 46:16 49:18,24 53:11,25 54:18 55:3,15,23 56:19 57:17 61:9 61:25 62:11 63:5 65:1 66:12 68:23 70:2,3
**format** 47:4
**former** 46:3
**fortiva** 41:11,18 41:19,20,22
**foundation** 9:17 11:7 15:6 16:12 21:4 22:11 23:22 24:20 28:25 29:12 30:6,17,21 32:1 33:2,13 38:1,22 40:21 41:6 42:8 49:19,25 53:12 54:1,19 55:4 57:18 61:10 62:1 62:12 63:6 66:13 70:3
**four** 6:6 13:21 18:22
**frame** 29:12 45:15 55:22
**free** 9:24
**friend** 60:5,8
**friends** 58:16,18
**front** 14:5
**fulfilled** 51:15
**full** 38:13 67:5,19 67:22
**fun** 67:23 68:4
**further** 72:13 73:9

**g**

**g** 6:1
**gain** 22:7

**game** 52:5
**games** 51:6
**gathered** 55:20
**general** 63:8
**generally** 13:11,14 13:17 16:6 50:8 53:3 64:16 66:10
**generated** 55:16
**gentleman** 27:4
**geographic** 70:21 71:1
**geographically** 70:23
**getting** 41:17,17 60:2
**give** 7:2 36:5 40:14 42:17 52:4 60:6
**given** 17:1 54:25 55:1 69:24 76:9
**gives** 45:24
**giving** 26:22 27:12 27:22
**go** 9:21 11:15 12:20 13:20 14:1 14:25 15:8,17,18 16:3,24 18:10 25:6,15 26:2,4 29:20 31:9,10 34:2 36:21 38:11 39:11 43:18 44:12 46:24 48:18 49:1 51:24 52:6 54:6 55:9 59:24 65:4 65:11,21 66:23 67:2
**goals** 49:9
**goes** 15:24 25:22 55:4 63:6
**going** 6:4 14:10,24 17:15 18:9,11,16 26:2 29:20 31:2,5

31:10,11,11 32:20 34:15 42:16 43:22 46:24 58:7 70:10
**gold** 14:13
**good** 23:25 29:6 32:10 34:14 39:9 42:19 52:10,12 66:1
**grand** 2:5
**greenberg** 3:3,10
**gregory** 3:9
**group** 49:23 50:2
**gtlaw.com** 3:6,13
**guessing** 36:8
**guidance** 62:5
**gunnar** 46:8,10
**guy** 60:16

**h**

**h** 4:2 5:5 75:3
**halfway** 44:18
**hand** 6:10 8:14 45:10
**handle** 36:22 71:9
**handled** 35:16 36:21
**handles** 46:19
**hansen** 4:10 12:12 12:19,21,24 13:7 29:1
**happened** 45:25
**happy** 21:8 62:2
**harassed** 59:19
**harassing** 59:21
**hard** 6:6
**hardy** 2:4
**head** 36:2,9,10 37:12 43:18 68:16
**heading** 14:13
**healed** 41:16
**hear** 18:16 31:16 70:19

**heard** 26:19,23
31:20,22 32:6
33:17
**held** 7:5
**help** 10:10 19:10
26:25 27:10 28:8
28:17 61:5
**herbert** 3:9
**herbertg** 3:13
**hereto** 72:15 73:11
76:7
**hey** 17:20 43:8
63:20
**high** 11:19
**highlight** 45:25
65:24
**highlighting** 67:6
**highly** 49:15
**hired** 22:7
**history** 7:3 33:10
**hit** 46:5
**hmm** 14:15
**hold** 23:4 26:3
**holds** 32:14 50:22
52:19
**holistically** 70:24
**home** 1:8,11,12
2:10,12,12 7:1,8
7:10 20:8,23 23:8
25:19,22,24 26:12
26:18,19 27:11,24
28:17,18 74:4
75:1 76:1
**homeowner** 20:25
21:2,13 22:7
23:16 24:15
**homeowner's** 22:8
23:18
**homes** 19:22
**honestly** 27:20
33:20 36:8

**hope** 51:22
**hours** 15:1,1
**house** 25:10
**housing** 7:19
**hub** 28:22
**hundred** 11:10,10
36:12,14
**hyperlink** 13:20
**hyperlinks** 13:6
15:2 41:3

**i**

**idea** 11:12 66:8,13
**identification** 44:6
47:2 48:21 50:17
64:11
**identify** 17:22
44:1
**identifying** 20:7
**imagine** 53:17
55:10 63:14
**implied** 26:16 27:1
**important** 61:17
68:3
**incentive** 40:11,17
40:18 65:23 67:3
67:7
**incentives** 40:14
**include** 42:15
**includes** 43:14
**individual** 10:8,18
11:2 53:9 61:24
68:21
**individual's** 32:19
68:25
**industry** 7:14
**infer** 24:10
**influence** 8:8
29:23 58:5
**influenced** 10:21
**inform** 34:23

**information** 53:23
54:17 55:2,10
62:25
**informational**
8:21
**initially** 21:13
**innovating** 23:3
**innovation** 69:15
**inside** 16:25 58:4
**insider** 45:1 62:15
62:16
**insider's** 45:1
**instance** 40:17
**instruct** 9:20
**instructing** 62:6
**integrity** 31:3,16
33:19
**interested** 72:15
73:12
**interject** 12:25
**internal** 44:20
45:1 48:24
**internally** 45:5
62:17
**interview** 49:8
**introduce** 6:20
**invest** 69:14,15
**investigating**
34:17 35:7 37:2
**investigation**
36:24,25
**investigations**
35:10,16 36:20
46:20
**investing** 19:4
**involved** 7:24 8:4
8:15 9:10,13 10:3
10:5 35:6,15 41:9
66:4
**involvement** 10:16
34:17

**involves** 57:15
67:20
**ipad** 17:1,5
**ipads** 7:21
**issued** 17:5
**issues** 40:2
**items** 66:19

**j**

**jason** 38:12,15,17
39:17
**job** 1:22 7:15,23
57:4 69:17
**jordan** 49:13,20
**josh** 6:22 12:10,11
12:11 29:1 46:1,2
46:4 48:1 52:8
58:18,20,22,24
60:15 61:22 71:5
**joshua** 1:16,21
6:12 72:2,17 74:5
75:2,24 76:2,4,12
**jsmuckler** 4:23
**judicial** 1:1
**june** 49:2
**jury** 6:21

**k**

**k** 1:9,11 2:11,12
**kansas** 2:6
**keep** 59:16
**keeps** 18:16
**kent** 4:10 12:9,24
13:23
**kent.hansen** 4:14
**kidding** 59:9
**kind** 14:13 32:11
32:13 33:3,17
41:17 44:8 45:5,6
50:18 52:23 60:24
61:1,7

**knee** 41:14
**knocking** 19:7,8
  20:18
**know** 8:6,21 10:16
  10:17 11:4,19,22
  13:23 14:16 19:12
  21:7,17,21 22:3,16
  22:18,20,22,23
  23:6,7,8 26:15,24
  27:12,17 30:8,19
  32:18 33:18,22
  34:11,20,25 35:13
  36:18,23 37:11
  38:15 39:9 40:1,7
  40:13 42:12,13
  44:3 45:5,23 46:1
  46:22 48:5 49:5,6
  50:19 52:1 53:8
  55:6,7,7,9,18
  56:10 57:7,7,21,22
  58:14 59:18 60:6
  60:16,22 61:14
  62:18,19,24 63:7
  65:13,22,24 66:9
  66:20 67:15,19,23
  68:9,14,16 69:4
**knowledge** 54:3,4
  55:6 72:10 73:6
**known** 19:7 33:10
**kunz** 48:15,16
**kurtis** 48:15,16

**l**

**l.l.p.** 2:4
**laid** 14:23 18:2
**lake** 2:17
**lamborghini** 60:22
**large** 39:7 50:2
**largest** 11:9 49:22
**lavish** 57:22
**lay** 55:21,24

**lead** 50:2
**leader** 40:3
**leaders** 8:2,23,24
**league** 52:18
**learning** 52:2
**lease** 40:15,18
**leave** 37:10
**left** 14:12 49:22
  59:13
**legacy** 1:10 2:11
**legal** 8:12 74:23
**legitimacy** 18:25
  19:17 20:17,23
  21:1,15 23:20
  24:13,14,18
**legitimate** 23:13
**lesser** 19:7
**library** 20:2
**lie** 28:10,12
**lifestyle** 57:15,22
**line** 13:22 15:23
  75:4,7,10,13,16,19
**link** 16:23
**links** 40:25
**list** 5:11 50:14
  61:12 64:6,12,16
  64:18 65:5,16,17
  67:5
**literal** 33:15,21
**literally** 33:9
**litigation** 41:1
**little** 7:4 18:12
  32:12 33:16,16
  45:24,24 50:4
**live** 57:16
**lives** 32:19
**llp** 3:3,10,17 4:3
**lms** 16:24,25
**loans** 41:23
**location** 1:19

**lodge** 9:19
**log** 17:8
**login** 45:2
**long** 52:4 61:12
  65:14 69:19
**longer** 9:23 28:20
  28:22 37:8
**look** 13:18 14:7
  30:3 39:3 53:24
  54:15 55:2,8
  58:11,22,23 60:21
  63:2,12 64:7
  65:15 69:23 70:6
  70:11,12,12,13,14
  70:16,22
**looked** 47:5 53:17
  53:19 55:12,14,19
  55:19 70:24
**looking** 15:23
  27:13 37:3 50:20
  60:14 64:6
**looks** 14:11,13,17
  15:24 17:16 30:18
  37:19,19 40:12
  41:9 47:12 48:23
  50:6,13 53:6
  57:12 58:23 67:22
**lot** 8:13 13:15 15:7
  15:8 23:3 30:19
  33:4,17,18 50:12
  60:7,8 65:16,16
  69:16
**lying** 27:19

**m**

**m** 3:2
**main** 2:16 28:21
**making** 21:25
**makuch** 73:2,15
**manage** 38:18
**managed** 46:6

**manager** 9:3
  11:19 28:21,24,24
  29:10,10,14 37:7
  37:13,14 38:16
  39:22 46:3,4
**managers** 8:25,25
  9:4,9,10 10:9,21
  11:24 29:22,22,25
  30:4,4,15 42:5
  56:4,4,17 58:3
  59:5 61:8,24
**manages** 11:22
  28:22
**manner** 32:25
**mark** 34:5,12
**marked** 44:2,3,5
  47:1 48:20 50:16
  64:10
**market** 59:6
**marketing** 61:7
  69:15
**markets** 63:3
**mas** 2:18 74:2
**material** 10:9
**matt** 6:2 12:21,25
**matter** 32:12
  33:16
**matthew** 2:13 74:1
**mcgrew** 49:5
**mean** 20:1 21:19
  27:8 33:3,14,17
  45:13 50:24 54:8
  54:19,21 59:8,14
  65:6 66:5,15 67:5
**meant** 66:20
**media** 9:14 10:13
  10:15 56:5,7,14,22
  60:5,9 61:15 62:3
  62:22
**medium** 69:8

**meetings** 66:21
**met** 58:20 60:19
**methods** 30:11
**mind** 9:21,24
**mine** 63:12
**minimize** 19:20
**minute** 52:8
**minutes** 18:23
  31:15 42:22 63:19
**mischaracterizes**
  62:1
**missed** 50:20
**missouri** 2:6
**misstates** 54:1
**mm** 14:15
**mobile** 62:17
**models** 30:14
**money** 23:3 53:8
  53:13,22 54:2,10
  54:25 56:18
**monitor** 56:12
  62:22
**monitoring** 62:21
**mosaic** 1:9 2:11
**motivation** 16:16
**motivational** 8:20
**motto** 31:20 32:14
  33:7 34:14,14
**mountain** 41:13
**moved** 21:18
  28:21
**multi** 50:5
**multiple** 7:9 11:23
  70:22

**n**

**n** 2:1 3:1 4:1 5:1
  6:1
**name** 19:7 48:2,10
  48:13 60:16
**names** 36:1,4
  47:13 50:24

**necessarily** 11:1
  63:16
**necessary** 76:6
**need** 15:8 20:8
  21:25 22:3 26:1
  34:22 52:11 55:12
  71:12
**needed** 53:18
**needs** 7:22 19:10
  29:1
**neither** 72:11 73:7
**networks** 58:4
**never** 53:17,19
**new** 9:11,15 10:10
  11:25 56:5,17
  57:25 59:6 61:24
**newby** 38:13,15
  38:17,19 39:17
**news** 44:20 45:6
**nolan** 60:16,17
**nonverbal** 26:17
  27:13
**north** 1:2,20 3:19
  4:5,12 72:19
**notary** 1:21 72:18
  76:13,19
**note** 51:11 74:10
**noted** 76:7
**notice** 34:20 42:9
**noticed** 55:5
**november** 60:15
**number** 10:24
  13:20 18:25 19:13
  19:17,20 20:2
  36:9 38:9 39:7
  69:23 70:13
**numbers** 42:14
  68:20 70:11,24
**numerous** 23:4

**o**

**o** 6:1
**object** 19:25 21:3
  34:19 68:22
**objection** 9:16,19
  11:6 15:5 16:9,11
  19:1,10,17 21:15
  22:10 23:20,21
  24:14,18,19 26:13
  27:7 28:4 30:5,16
  31:25 32:8,16
  33:1,12 34:7
  35:21 37:25 38:21
  39:4,24 40:20
  41:5 42:7 46:16
  49:18,24 53:11,25
  54:18 55:3 56:19
  57:17 61:9,25
  62:11 63:5 65:1
  66:12 69:25 70:3
**objections** 19:21
  20:6 22:1,4,9
  29:11
**obviously** 14:24
  15:7 70:11
**occasional** 41:12
**occasionally** 36:22
**occur** 69:11
**offer** 19:12
**offered** 16:7 19:17
**offers** 14:19
**officer** 72:1,2
**official** 41:3
**ogletree** 48:10,13
**oh** 25:13 29:3 46:8
**okay** 6:7 10:1 13:2
  14:3 15:17 17:25
  18:7,11,13,17,19
  18:22,23 25:8
  26:4 28:14 31:2
  36:1 37:5 41:18

43:2,20,24 44:1
  46:24,25 52:14
  55:3 58:11,25
  59:3,25 60:14,19
  64:2,15,22 65:7
  71:4,6
**okta** 17:9
**one's** 50:4
**ones** 13:16 52:23
**open** 18:11 28:17
**opinion** 28:11
**opportunity** 13:9
  27:23 57:3,5,7,11
  69:13,17
**orange** 3:4,11
**order** 19:20 21:13
  21:24 22:7
**orders** 71:9,11
**organization** 7:1,6
  7:16 8:18
**organization's**
  11:16
**organized** 37:21
**orlando** 3:5,12
**otto** 37:7
**outcome** 72:16
  73:12
**outline** 7:2
**outlined** 21:16
**overall** 12:3 19:20
**overcome** 19:1,10
  20:6 21:15 22:1,3
  22:8 23:19 24:17
**overcoming** 24:14
**overseeing** 56:3
**overview** 11:11

**p**

**p** 2:1,1 3:1,1 4:1,1
  6:1 46:25
**p.c.** 2:14 4:19,21

**p.m.** 1:18 63:21,24 71:20
**p.o.** 3:20 4:6
**page** 5:2,6 44:11 44:15 50:5,6 62:16 75:4,7,10,13 75:16,19
**pages** 10:15,18 50:14
**paid** 54:14 58:2,5 68:12
**paragraph** 48:11
**part** 12:21,25 21:23,23 57:4,12 57:14,24 62:7
**participate** 66:10
**participated** 55:23
**particular** 17:22 37:6
**parties** 72:12,14 73:8,11
**partner** 41:20,22
**partners** 41:19
**patents** 23:4
**paula** 3:2
**pay** 7:21 20:10 42:6,11,13 57:2
**pears** 47:14,14
**people** 8:13 32:12 32:15 39:2 56:17 58:15 61:24
**performance** 62:10 70:17
**permission** 26:1 69:3
**person** 8:17 20:17 61:13
**personal** 10:18 58:4 68:25
**personally** 35:25 49:6

**pertinence** 61:19
**pertinent** 36:3
**ph** 52:18
**philosophically** 59:15
**physical** 7:21
**pickup** 51:6
**picture** 61:13
**pictures** 67:7
**place** 55:17
**plaintiff** 1:6 2:2 5:7,8,9,10,11
**plaintiff's** 44:2,5 47:1 48:19,20 50:12,16 64:5,10
**platform** 17:7
**play** 18:12 31:11 31:11
**played** 18:14,20 26:8 31:13 66:20 66:24
**players** 52:5
**please** 6:5,10,20
**plug** 29:1
**point** 13:4 39:10 44:16
**policy** 56:7,13 61:15 62:3,23
**porsche** 40:11,17 40:18
**port** 68:3
**position** 6:23 7:7 53:7 60:6 61:6
**positions** 7:5
**possibly** 59:8
**post** 10:17 45:3 60:15 61:21 62:4 62:5,6
**posted** 44:25 45:4 56:10,11

**posts** 59:1 61:12
**potential** 19:21 67:21
**potentially** 11:10
**power** 29:2
**powering** 62:18
**poyner** 3:17 4:3
**poynerspruill.com** 3:21 4:7
**practice** 28:15 32:23 35:20,22 37:1
**practices** 33:11 34:18,21 38:20 39:10,23 46:15
**predict** 39:12
**premier** 52:18
**preparation** 17:13
**prepare** 12:6,16 14:8
**prepared** 73:3
**preseason** 45:7
**present** 4:17
**presenting** 31:3
**president** 6:25 7:8 53:7
**pretty** 8:12 12:8 63:19
**previously** 28:6 40:1
**primarily** 35:10 36:22
**primary** 57:1
**principle** 32:11,13 33:15
**prior** 16:4 18:3 24:1,7 72:5
**prize** 51:14
**prizes** 51:13,15 53:4 66:1,23

**pro** 16:14 19:16 52:25
**probably** 33:11 36:18,19 51:9 60:3,11 65:15
**problem** 20:22 29:5,9 36:11
**problems** 38:5 39:22
**proceed** 6:3,17
**proceeding** 1:19 71:21 73:4
**proceedings** 72:3 72:5,6,9 73:6
**process** 8:4 9:9 29:21 39:11 57:12 57:15,24 69:22
**produce** 11:1
**produced** 15:13 37:17
**product** 22:21 23:12 24:8,9 69:15
**production** 12:4,4
**productive** 10:22
**productivity** 11:1
**products** 23:4,5,6
**profile** 58:12
**program** 12:3 16:19 62:14
**promote** 45:20 65:25 66:3
**promotion** 65:21
**pronounce** 46:11
**proper** 36:25
**prospecting** 17:17
**proud** 23:6,7,9
**proven** 30:14
**provide** 8:17 30:11,20 36:11 40:14,18 61:16

62:2
**provided**  12:18
  13:4,19,24 23:25
  41:1 62:22 67:15
**provider**  20:17,24
  23:24 24:17
**providers**  22:19
**provides**  41:23
**providing**  21:10
  24:5
**provo**  4:13
**public**  1:21 40:4,4
  72:18 76:19
**pull**  63:15
**purpose**  16:7
  66:16 67:17
**purposes**  45:18
  64:24 70:9
**purse**  51:4
**put**  10:5 27:22

**q**

**qualified**  72:7
**quality**  12:4
**question**  9:21,24
  16:6 20:19 23:14
  24:13,25 29:7
  34:4 35:1 49:7,10
  49:12 53:15 56:1
  61:7,19 63:9
  66:16
**questions**  18:13
  31:12 35:12 50:13
  59:1 71:3,4
**quick**  25:7 43:18
  58:8
**quickly**  50:19
**quite**  18:18 37:19
  51:17 60:25
**quote**  31:17 34:5,8

**r**

**r**  2:1 3:1 4:1 6:1
  75:3,3
**raise**  6:10
**raleigh**  3:19 4:5
**ramon**  47:23
**ran**  51:2 52:22,23
**range**  11:9
**ranging**  9:5
**read**  6:3 13:25
  34:6 51:8,9 61:12
  74:9 76:5
**real**  25:7 41:14
  43:18 58:8
**really**  7:16 21:21
  22:13 61:14
**reason**  15:12,16
  24:5 26:22 27:12
  27:23,24 41:7
  64:22 74:11 75:6
  75:9,12,15,18,21
**reasonable**  32:21
**reasons**  68:1
**recall**  29:13 40:13
  40:23 48:8
**receipt**  74:18
**receive**  42:5 68:6
**recognition**  65:22
**recollection**  36:6
**recommended**
  35:18,23 36:6
**record**  9:19 17:23
  43:3 44:2 50:11
  63:22,23,25 72:9
  73:5
**recorded**  40:5
  72:6
**recording**  72:8
  73:4
**recordkeeping**
  54:16

**records**  48:4,7
**recovering**  43:4
**recruit**  9:14 10:10
  56:5,17 57:1,1,10
  58:2,3 61:24
**recruiting**  9:10
  10:3 11:25 57:12
  57:14,24 59:2
  62:7 69:12,16,18
  69:22
**recruits**  10:22
  59:6 67:21
**recurring**  54:14
  54:20,21
**reduced**  72:7
**refer**  11:21
**reference**  13:16,23
**referenced**  74:6
**referencing**  34:12
**referring**  34:23
  57:8
**region**  63:4 70:19
  70:21
**regional**  8:25 9:3
  9:10 10:8 11:5,13
  11:14,19,22,22
  28:24 29:9,14,22
  30:4 38:15 39:21
  46:3,5 49:23 56:3
  70:21
**regionals**  29:25
**regions**  70:18,25
**reinvent**  30:13
**relate**  61:3
**related**  40:2,17
  44:21 59:1 67:2
  67:11,18 72:11
  73:7
**relates**  20:22
  24:13

**relationship**  59:23
**relative**  72:13
  73:10
**released**  16:14,18
**relevance**  62:19
**remember**  34:10
  34:13
**remote**  1:19
**rep**  11:2 16:23
  23:19 24:16 28:7
  33:22 34:4 35:12
  35:24 37:1 60:7
  62:10 63:9 68:9
  68:14,19 70:12
**report**  8:7 42:12
  62:17 66:6
**reported**  1:21 40:6
  42:6,11
**reporter**  6:9,16
  63:21,24 71:8,15
  71:18
**reporting**  47:8
**reports**  62:15
  63:13
**representative**
  11:25 23:17 24:6
  25:22,23 26:22
  32:25 35:19 37:9
  40:3,15,19 48:12
  49:16 69:5
**representatives**
  9:11,15 11:3,18
  14:20 15:4 17:10
  19:6 20:11 22:16
  23:1,6 24:3,10
  25:2 30:3,9,13,22
  32:22 33:9 34:18
  35:7 39:1,2,21
  42:5,13 45:2,21
  56:6,9 57:2,9 62:4
  62:6 67:2 68:12

**reps** 7:18,20 9:7
10:10,14,17 16:15
19:2,22 20:4,11
27:10 28:8 29:23
39:8 45:1 56:25
57:10,25 67:24
68:11,17 70:13
**requested** 60:7
72:21
**requests** 60:5
**required** 30:21,23
76:13
**reserved** 71:19
**response** 49:12
**responsible** 9:8
56:2
**rest** 44:19
**restate** 20:19
23:15
**retained** 5:13
**return** 74:13,17
**reveal** 12:12
**revenue** 54:14
**review** 13:9,22
39:11 61:18 65:25
66:22 72:21 74:7
**reviewed** 13:10,24
14:8
**reviewing** 45:6
**reviews** 40:6 45:23
**right** 6:9,10 9:4
13:2 14:4 15:17
17:15 18:4,8
21:16 25:6,15,17
26:2,7 27:1 29:20
30:24 31:5,7,10,15
31:24 32:15 34:15
35:4 37:3 38:11
38:16 40:8,16
41:24 42:16 43:22
44:18,21 45:10

46:3,24 47:11
48:11,18 49:3
50:3,11 51:4,18
58:7,9,14,18 59:25
62:9 63:18 64:2,5
71:2,15,18
**rights** 59:18
**road** 39:15
**role** 10:6 34:16
35:6 38:4,9 55:13
56:2
**rough** 11:12
**row** 15:19,23
17:22,24 25:17
31:2 40:10 67:5
**rows** 37:3
**rule** 5:10 50:7
**rules** 53:4 56:4
66:22,22
**run** 45:16 51:1
**rush** 26:19,20
71:13

**s**

**s** 2:1 3:1 4:1 5:5
6:1 75:3
**safe** 52:3
**salary** 68:10,12
**sale** 12:2 21:25
22:5 28:23 38:13
68:17 70:13
**sales** 6:25 7:6,8,9
7:10,17,18,20,21
7:22,25 8:2,9,11
8:15,16,18,21,23
8:24 9:7,15 10:5
10:10,14,17,22,25
11:3,18,25 12:2
14:19 15:3 16:4
16:15,21,23 17:10
18:3,4 19:2,6,22
20:4,10 22:15

23:1,5,17,19 24:2
24:6,9,15 25:1,21
25:23 26:22 27:9
28:3,7,8,15 29:17
29:22,23,25,25
30:2,9,10,12,14,22
32:22,23 33:9,10
33:22 34:3,17,18
34:21 35:7,12,13
35:14,19,19,22,24
37:1,6,9,17 38:20
39:1,2,8,10,21,23
40:2,14,17,19 42:5
42:12 44:21 45:11
45:14,19 46:15
48:12 49:16,23
53:8 56:3,5,8,9,14
56:17,25 57:2,9,25
58:3 60:7 61:8,24
62:3,6,9,10 63:9
64:9,13,25 65:23
66:9,16 67:2,3,6
67:24 68:9,11,12
68:14,19 69:4
70:10,11,16
**salt** 2:17
**savannah** 4:19
**saw** 13:7 20:1,6
**saying** 64:17
**sayings** 32:9 33:18
**says** 38:12 45:9,10
49:11 51:3
**scale** 57:2
**scales** 7:21
**scan** 44:8
**scenario** 20:15
**scope** 42:9 55:4
63:6 70:3
**screen** 14:1 18:9
25:12 26:3 29:20
34:15 42:17 43:22

58:7 60:24 64:3
**scripting** 8:6
**scroll** 14:10,16
44:18 50:5 64:21
65:2
**scrolled** 61:11
64:18 67:13
**seagondollar** 1:21
72:2,17
**season** 16:16 18:3
55:22
**second** 29:2 42:18
48:10 49:7,10
**section** 53:3
**secure** 20:8
**security** 1:5 2:2
7:13,14 20:8 21:1
21:9,18 27:21
74:4 75:1 76:1
**see** 13:16 14:5,13
14:14 15:8,19,20
15:23 25:9,12,17
25:19 26:5,14
28:11 30:24 31:3
31:8 38:12 39:6
40:10 41:10 43:23
44:15,19,19 45:11
46:25 48:7,19
49:7,9,13,14 50:15
50:20 51:5,7,11
55:12 64:3,7,18
**seek** 27:5 59:15
**seeking** 26:15,16
**seen** 39:13 56:22
**sees** 20:8
**sell** 8:22 24:6
29:23 32:15
**selling** 16:16 70:15
**send** 36:24 71:16
**sending** 7:18

sends  58:6
senior  6:25 30:15
sense  59:23
sensors  27:22
sent  13:8 74:14
separated  14:14
sepstein  3:21
series  15:22 16:8
  17:12 29:17 50:14
service  22:19,20
  24:1
services  23:4,5
session  25:18 34:6
sessions  2:14 4:19
  4:21
set  30:20
sets  39:20 53:4
share  14:1 18:9
  26:4 29:20 31:7
  34:15 43:22 58:7
  69:4
sharing  42:16
shb.com  2:7
sheet  74:11
shirt  60:23 61:22
shook  2:4
show  44:8 50:3
  66:1,19 67:21
  68:4 69:9,18
shown  69:20
shows  67:18
sign  74:12
signature  71:19
  72:16 73:14
signed  74:20
significant  67:25
signing  12:2
similar  14:7 50:1
simply  11:24 61:7
sir  29:7 31:1

site  13:13
situation  33:5 36:3
six  50:6
size  9:7 11:9,13,15
  50:1
sizes  11:21
skills  72:10 73:6
skipped  50:18
slicks  7:21
slowly  44:13
small  60:24 61:1
smart  1:8,11,12
  2:10,11,12 74:4
  75:1 76:1
snow  2:14 4:19,21
social  9:14 10:13
  10:15 56:5,7,14,22
  60:4,9 61:15 62:3
  62:22
software  62:10,13
  62:18,20,21 63:1
sold  7:11
solutions  74:23
somebody  12:2
  23:11 39:14 70:21
somebody's  19:8
somewhat  10:21
  55:19
sorry  12:14 16:11
  24:8,24 46:8 52:7
  68:22 70:2
sort  32:23
sounds  32:10
sources  55:21
south  2:16 3:4,11
speak  33:6 34:4
speaker  42:19,23
  42:24,25
speaking  33:20
speaks  47:11

specific  13:16
  16:17 30:9 33:5,6
  34:3 35:12 46:21
  50:13 53:14,23
  54:15 55:18 63:2
  70:18
specifically  7:9
  10:15 34:13,21
  62:18 63:8 64:17
speculate  22:14
  23:11 30:8 40:22
  54:3
speculating  33:4
  57:8
speculation  21:4
  22:11 23:22 24:20
  30:6 33:2,13 39:5
  40:21 42:8 56:20
spend  23:3 59:12
spent  60:3
spoke  12:11
spoken  12:9
spot  15:11
spouses  67:25
spreadsheet  13:5
  13:5,18 14:5,18,22
  15:13 25:7 30:24
  37:16 38:12 41:3
  43:9,14
spreadsheet's
  37:20
spruill  3:17 4:3
standing  60:22
  71:11
start  26:7 34:6
  55:25
starting  15:23
state  53:9,14,23
  54:15 55:2 63:3
  69:24 72:19

stated  28:6 39:25
  46:18,22 56:9
statement  33:15
  33:21
states  1:1
status  46:5
steven  3:16
steward  2:13 6:5,8
  9:16 11:6 12:10
  15:5 16:9,11
  17:20,25 19:25
  21:3 22:10 23:21
  24:19 26:13 27:7
  28:4,25 29:11
  30:5,16 31:25
  32:8,16 33:1,12
  34:7,19 35:21
  37:25 38:21 39:4
  39:24 40:20 41:5
  42:7 43:8,20 44:7
  44:11 46:16 49:18
  49:24 52:6,8
  53:11,25 54:7,10
  54:18 55:3 56:19
  57:17 59:7,11,17
  59:22 61:9,25
  62:11 63:5,20
  65:1,6,8 66:12
  68:5,22 69:25
  70:2 71:4,10 74:1
stipulate  6:3
stop  6:6 26:3
  42:16
street  2:16 3:18
  4:4
structure  14:18
  15:18
structured  11:16
struggle  61:14
stubs  42:6,11,13

**style** 57:19
**subscribed** 76:14
**subsequent** 39:18
**success** 45:20
  61:23
**successful** 30:3,14
  49:15
**suggesting** 24:11
**suite** 3:4,11,18 4:4
**summarize** 65:23
**summarizing**
  70:20
**summer** 7:18 12:2
  16:15,19,22 66:25
**superior** 22:21
**support** 7:17
**supported** 7:22
**sure** 15:9 17:24
  19:16 20:20 31:6
  32:19 36:3,24
  39:9 44:10 54:9
  54:11 59:15 65:4
  66:18
**switch** 42:17
**sworn** 6:4,13 72:5
  76:14
**system** 16:24
  19:23 20:8,24
  21:9,18 22:25
  23:8 27:21 46:13
**systems** 1:5 2:2
  74:4 75:1 76:1

**t**

**t** 5:5 75:3,3
**take** 18:8 31:5
  42:20,22 52:8
  55:17 63:18
**taken** 72:3,12 73:9
**talk** 22:16 57:2,5
  66:21 69:5,17,17

**talking** 27:21
**talks** 69:13
**tanner** 4:21
**task** 53:21
**taught** 37:17
**teaching** 32:11
**team** 8:1,7 11:13
  11:14 35:11,17
  36:21 40:6 46:6
  46:19 63:15 66:5
  66:21,24 67:14
  68:4 70:20
**teams** 8:12,20 9:7
  10:4,4 11:1,5,17
  11:17,23 12:5
  38:17 55:11 67:24
  70:12,18,22,25
**tell** 6:14 12:11
  32:5 34:9 48:17
  60:25
**telling** 27:20
**temporarily** 18:9
**ten** 36:19,19
**tenure** 36:7
**terminate** 35:24
**terminated** 37:23
  38:19,23 39:18
  46:14,22 47:21,23
  48:5,8,9,11,14
  49:21
**termination** 35:18
  36:7 38:3,8 46:18
  46:21
**terminationable**
  39:16
**terminations**
  46:20
**terms** 27:3 54:13
**tested** 51:21
**testified** 6:15

**testifying** 72:5
**testimony** 54:1
  74:9,18 76:8
**texted** 16:23
**thank** 6:16 17:25
  71:6
**thanks** 43:1 71:5,7
**thing** 31:17 33:8
  33:23 42:1 49:11
**things** 25:9 32:12
  33:16 45:3,20
  56:12 57:23 58:15
  69:16 70:16
**think** 13:14,17
  19:3,5,9 21:12
  25:3 27:14 28:1,6
  28:14,16 30:23
  32:10,10,14 33:4
  33:15,21,22 34:11
  34:13,22 36:1
  43:10,12,12,14
  46:5,5 51:1,23
  52:3 63:19 67:9
  71:2,10
**thirty** 16:14 52:25
**thorderson** 46:10
**thorough** 36:25
**thousands** 56:9
  62:3
**three** 11:4,17
  13:21 17:15 38:17
  52:23
**thursday** 1:17
**tie** 61:4
**tied** 12:1
**time** 1:18 9:18,19
  10:12,12 13:4
  23:3 29:7,12,21
  32:24,24 38:10
  42:20 45:15 51:18
  55:22,22 59:12,18

  59:21 60:4,9
  63:21,24 64:15
  69:20 74:19
**timeframe** 74:8
**times** 65:3 70:5
**title** 14:12 50:7
**today** 12:7 17:13
  64:21
**tonight** 52:5
**tools** 35:14
**top** 11:4 36:2,8,9
  37:11 44:15 45:9
  47:13 51:3 68:16
**topics** 64:8
**torn** 41:14
**total** 70:24
**tour** 50:15,21
**tournaments**
  50:25
**tracking** 62:9
**tracks** 58:15
**train** 20:3,11
  22:15 24:2,6,9
  25:1,4 26:18
  28:12 30:22 39:1
  55:25 57:9
**trained** 20:12,16
  21:24 24:12 25:10
  26:11 27:18
**training** 7:24 8:9
  8:16,17,21 10:4
  13:6,12 14:19
  15:3,24,25 16:7
  17:7 19:16 20:5
  25:18 26:24 27:5
  27:9,9,15,16 28:2
  28:7,8,10,16 31:23
  32:5 34:6 37:17
  39:19,22 41:4,10
  41:11 43:11,13
  64:9,13 66:21

**trainings** 16:17 20:3 23:1 26:14 30:10,20,21,23 39:7,8 40:4 62:8
**trains** 19:22 27:5 28:14 30:12
**transactions** 35:13
**transcriber** 73:1
**transcript** 71:9,14 72:21 73:3,5 74:6 74:20 76:5,8
**transcriptionist** 72:8
**transitioning** 25:10,18
**traurig** 3:3,10
**travel** 8:20
**trey** 47:18
**trial** 44:2 50:12
**trip** 67:8,9
**trips** 65:24 67:2,7
**tristan** 47:13
**true** 32:7,14 72:9 73:5 76:8
**trust** 33:19
**trustworthy** 33:20
**truth** 6:14,14,15 34:9
**try** 18:19 54:16
**trying** 19:4 26:25
**twain** 34:5
**twain's** 34:12
**twice** 49:16
**two** 11:17 19:23 31:15 38:17 50:13
**type** 16:6 42:4 44:4,20 50:8 62:9 62:13,19 70:9
**types** 45:18 64:19
**typewriting** 72:7

**typical** 10:23 16:16
**typically** 45:24

**u**

**umbrella** 11:4
**unauthorized** 15:14 64:23
**uncomfortable** 27:19
**understand** 9:9 10:8,20 19:11 20:21 51:16 54:20
**understanding** 23:14
**undertake** 53:21
**unethical** 27:15
**unidentified** 42:19 42:23,24,25
**united** 1:1
**unreasonable** 39:14
**upcoming** 55:22
**update** 45:19
**upper** 45:9
**use** 30:13 36:4 39:8 56:5,14 59:6 62:10,21 68:2
**usually** 8:20
**utah** 2:15,17 4:13

**v**

**v** 1:7 74:4 75:1 76:1
**vague** 21:4 29:12 30:17 35:22 54:1 54:19 66:13 68:23
**valentine's** 47:8
**value** 19:11 23:2 51:13
**values** 20:9

**variety** 10:2 16:17 21:19 30:10,11 39:7 45:3 51:14 56:25 66:2 68:1 70:15
**various** 7:5 55:17
**vary** 11:14
**varying** 9:6 11:20
**verbal** 27:5,13
**verify** 17:9 48:4 74:9
**veritext** 71:11 74:14,23
**veritext.com.** 74:15
**vice** 6:25 7:8 53:7
**video** 8:5 9:14 10:4 14:12,25 17:16,18 18:10,14 18:20,23 20:7,13 20:14 21:16 26:4 26:8,10 27:5,8,15 27:16 28:14 29:14 29:16,17 31:13,16 32:5 40:10,23,24 41:13 66:9 67:6 67:14 71:13
**videoconference** 2:3,13 3:2,9,16 4:2,10,18,20,22,23
**videographer** 4:18
**videos** 5:11 8:2,3,9 13:6,12,20,25 14:19 15:1,3,8,11 15:14,20,22 16:1,8 20:2,2 30:19 31:23 39:2,22 41:2,4 43:11,13,14 64:6,7,13,19,23,24 65:16,19,23,24,25 66:2,3,8,17 67:1

**67:11,17**
**videotaped** 1:15
**view** 16:24
**viewing** 17:10
**vimeo** 13:6,12 15:2
**violated** 35:8
**violation** 35:20
**violations** 37:24 38:6 62:22
**viper** 52:21
**visit** 8:20
**vivint** 1:8,10,12 2:10,11,12 4:11 6:24 7:3,4,11,12 9:4,11 10:10 13:12 14:19 15:3 15:13,14 17:2,5,9 19:1,21 22:16,18 22:19 23:2,2,13,17 23:19 24:4,7,15 25:21 26:10 27:4 28:19,20 29:15,17 30:12 31:21 34:5 35:3 36:7 37:18 38:16,19 39:1 41:4 42:5,6 44:3 44:20 45:2,14 46:3,11 47:16 48:1,7 49:9,23 50:22,22 51:17 52:19 53:8,13,22 54:13,24 56:3,16 57:16,25 58:24 59:5 60:23 61:8 61:22,23 62:21 63:1,2 64:24 67:20 68:19 69:13 69:24 74:4 75:1 76:1

Case 3:20-cv-00504-FDW-DSC   Document 113-1   Filed 01/05/22   Page 35 of 38

| | | |
|---|---|---|
| **vivint's** 17:10 30:2 | **welcoming** 26:17 | 31:22 32:4 33:3 |
| 35:8 44:24 48:24 | **went** 67:7 | 33:14 34:11 36:18 |
| 53:23 54:15 56:4 | **west** 4:12 | 42:21,23,24 43:17 |
| **vivint.com** 4:14 | **western** 1:2 | 44:10,12,25 45:23 |
| **w** | **wheel** 30:13 | 46:9 49:10 50:18 |
| **w** 3:9 | **william** 4:10 | 51:8 52:10,18 |
| **wait** 12:10,10,10 | **willing** 20:9 | 54:9,22 55:9,18 |
| **want** 6:2 12:12 | **witness** 6:4,13 | 59:14 60:8 61:20 |
| 17:6 23:23 27:18 | 9:23 10:1 12:14 | 62:2 64:12 65:6 |
| 27:22 36:3 40:22 | 16:10,13 18:2 | 65:10 66:18 67:4 |
| 42:22 54:7 59:12 | 29:4,6 34:22,23 | 71:10,12 |
| 65:2,4,10,11,12,15 | 43:4 51:20,23 | **year** 7:7 8:19 |
| **wanted** 53:8,21 | 52:1,7,12,15 54:2 | 10:23 16:4 17:21 |
| 54:25 | 55:5 63:7 65:2,10 | 17:22 18:4 50:23 |
| **wants** 49:12 | 68:24 70:1,4 71:6 | 51:1,2,17 54:25 |
| **wasted** 59:19 | 72:4 74:8,10,12,19 | 55:16 68:1,3,15,18 |
| **wasting** 59:21 | **witnesses** 59:18 | **years** 7:5 13:21 |
| **watch** 17:12 18:22 | **won** 40:19 53:5 | 14:14 36:19,20 |
| 27:16 28:11 64:17 | 66:20,23 68:6 | 37:21,22 38:9 |
| **watched** 20:1 27:8 | **work** 7:3 48:13 | 52:24 69:19 |
| 29:16 30:18 31:15 | 49:20 | **yep** 18:1 31:9 |
| 64:21 66:18 | **worked** 58:24 | **young** 4:19 |
| **watching** 40:23 | **working** 26:20 | **younger** 39:21 |
| **water** 43:5 52:13 | 57:16 67:20 | **z** |
| **way** 14:11 20:6,10 | **works** 57:11 | **zelaya** 37:7,23 |
| 23:19 24:17 25:4 | **worries** 43:7 | 38:4 |
| 25:4 28:2,17 | **would've** 21:21 | |
| 32:15 44:8 53:20 | 22:8 | |
| 57:1 63:13,17 | **written** 45:5 | |
| **ways** 17:4 21:20 | **x** | |
| 24:25 51:14 56:16 | **x** 5:1,5 72:21 | |
| 56:24,25 | **y** | |
| **we've** 40:24 44:2 | **yeah** 7:4 8:19 10:1 | |
| 48:12 50:19 52:23 | 16:13 17:7,24 | |
| 56:9 64:6 65:22 | 18:6 19:15 20:1 | |
| 69:19,20 | 20:22 21:7,12,17 | |
| **wearing** 61:22 | 22:13,21 24:24 | |
| **website** 45:1 48:24 | 25:3 26:14,23 | |
| 62:15 | 27:16 28:6,16 | |
| **welcome** 28:18 | 29:5,9,13 30:7,7 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.