EXHIBIT
3

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

*****

| | |
|---|---|
| CPI SECURITY SYSTEMS, INC. ) | |
| ) | |
| Plaintiff, ) | |
| ) | AUDIO TRANSCRIPT |
| v. ) | |
| ) | |
| VIVINT SMART HOME, INC., ) | |
| f/k/a MOSAIC ACQUISITIONS CORP.; ) | |
| LEGACY VIVINT SMART HOME, INC., ) | |
| f/k/a VIVINT SMART HOME, INC., ) | |
| ) | |
| ) | |
| Defendants. ) | |

*****

AUDIO RECORDING OF DIAMOND LOTT

Red Rock Reporting
385.707.7254

 1          MS. LOTT:  Hello.

 2          GERALD:  Hey, this is Gerald with CPI Security.  How

 3   are you doing today?

 4          MS. LOTT:  Good.  How are you?

 5          GERALD:  I'm good.  Thanks for asking.  I'm sorry I

 6   didn't catch your name on the voicemail, can you repeat that

 7   for me?

 8          MS. LOTT:  Diamond.

 9          GERALD:  Thank you, Diamond.  And your last name,

10   ma'am?

11          MS. LOTT:  Lott, L-O-T-T.

12          GERALD:  Okay.  Perfect.  I think I -- all right.  I

13   am seeing something here.  Would you just verify your address,

14   Ms. Lott.

15          MS. LOTT:  9163 Bradstreet Commons Way.

16          GERALD:  And then lastly here, your verbal password,

17   please, ma'am?

18          MS. LOTT:  Crystal.

19          GERALD:  I do apologize for your hold.  Thanks --

20   thanks for waiting for us to get back with you.  But I'll be

21   happy to help.  What can I do for you?

22          MS. LOTT:  I would just like to cancel my service.

23          GERALD:  Okay.  So you're calling to cancel the

24   services?

25          MS. LOTT:  Yes.

Red Rock Reporting
385.707.7254

1          GERALD:  Okay.  Ma'am, well we hate to hear that.

2    Thank you for being with us for the couple years you have

3    been.  Would you mind if I just asked, is there any -- honest

4    feedback you can provide about why you're canceling?

5          MS. LOTT:  I found another company that I'd like to

6    go with and I would just like to cut ties with CPI at this

7    time.

8          GERALD:  Yes, ma'am.  Was there anything that we

9    didn't do, you know, that was great or, you know, that just

10   didn't sit well with you?

11         MS. LOTT:  Just the recent comments of your CEO who

12   has kind of turned me off to the company.

13         GERALD:  I do -- I do understand that.  And thank you

14   for your feedback there.  We've been having real and honest

15   conversations with customers about how they feel about that,

16   and it was very politically not so correct around here these

17   last several weeks, but we got some things rectified.

18         And has anybody had a chance to kind of, A, apologize

19   to you, but B, go over, you know, kind of what the transition

20   looked like since those comments were made and how our owner

21   has been able to, you know, atone and it become a teachable

22   moment?  Has anybody given you that run down or the feedback?

23         MS. LOTT:  No one from the company but I have read

24   about the recent changes.

25         GERALD:  Yeah.  And I -- in most cases, it's probably

Red Rock Reporting
385.707.7254

1   more than what people know, you know, with certain

2   acknowledgments by him, you know, which I really do appreciate

3   myself as a black American and an employee.  But, you know, I

4   can get that to you if you like, but if not, you don't have to

5   accept.  It has been able to help some customers.  I don't

6   know if -- we'd love to find a way to keep your business.

7   Would that help you?

8            MS. LOTT:  No thank you.  I appreciate it, though.

9            GERALD:  You're welcome, ma'am.  If that changes, let

10  us know.  I did want to look for any reason -- you know, any

11  opportunity we had -- are you aware of the time that you have

12  remaining on your agreement at this time, Ms. Lott?

13           MS. LOTT:  Yes, I am.

14           GERALD:  Okay.  Was another company promising to pay

15  that amount back to you or buy that amount off?

16           MS. LOTT:  Yes.

17           GERALD:  There's a reason why I ask, and it's because

18  it's been a -- it's been a topic that's been very, very heavy

19  here.  We've been getting feedback and a lot of on-the-ground

20  information that those charges currently are roughly around

21  929 for you at this time.  But -- or excuse me, I think it's

22  more -- I would have to calculate that, I'm sorry.  But we've

23  been getting feedback that the buyout has not been being paid

24  by those competitors.  Mostly Vivint being the one that's been

25  dishonest about it.

Red Rock Reporting
385.707.7254

1           Would you mind if I ask if it was Vivint that made

2    that promise to you?

3           MS. LOTT:  It is.

4           GERALD:  So here's the key, Ms. Lott, did they -- you

5    know -- and again, we're getting -- we're getting feedback

6    from customers who are trickling back in or trying to get back

7    to us.  Did they put that in writing that we will pay off your

8    balance at X amount and sign an agreement so to speak?

9           MS. LOTT:  Yes.  So I have been in communication with

10   them because they originally gave me the wrong amount, and so

11   I just had -- I called you guys first to see what the amount

12   would be and then I called them to change that amount because

13   there were some discrepancies there, and they have given me

14   the correct amount now.

15          GERALD:  Meaning Vivint has given you the correct

16   amount?

17          MS. LOTT:  Yes, I'm sorry.  Vivint has.

18          GERALD:  Gotcha.  Gotcha.

19          So mostly what we're hearing is that they will front

20   some type of money, but then that on the back end of your

21   agreement, you're being charged for those services.  That's

22   been, you know, pretty -- pretty much the across-the-board

23   standard.  This is the reason -- not the only reason but it's

24   a big part of the reason why they have a lot of government

25   actions and solicitation bans against them right now.

CPI SECURITY SYSTEMS, INC. vs VIVINT SMART HOME, INC., et al.
DIAMOND LOTT -

6

1          And so, you know, had you said to me, hey, you know,

2   we're going with ADT, I'm just being hypothetical, there's --

3   I'll be honest with you, there's really not a whole lot we can

4   say.  I mean ADT is a pretty good company, they don't have a

5   lot of, you know, recognition of bad, you know, faulty sales

6   practices.  Vivint is a different story and there's plenty of

7   information that we're able to kind of direct you to,

8   Ms. Lott, that kind of indicates that or the really shows

9   that, to be honest with you.

10          This is the reason why ADT, a major competitor has a

11   lawsuit against them right now because of misrepresentation,

12   saying things like we've bought out ADT or the we're now a

13   subsidiary of ADT or the something like.  They've done the

14   same thing with us.  I know that doesn't directly relate to

15   you necessarily, but it's -- it's an indication of the rest of

16   the problems that, you know, that Vivint has had.  It's an

17   indication of their reputation as well.

18          They paid -- they paid ADT $10 million two years ago,

19   all right, as a settlement.  We may be joining that -- that

20   fight as well, but can I give you -- before you make the final

21   decision, I don't want you to be stuck holding the nine --

22   roughly 929 -- I don't want you being stuck holding that bag

23   due to, you know, misleading sales tactics.  I mean, can we

24   share some information with you before you officially choose

25   to cancel the services?

Red Rock Reporting
385.707.7254

1          MS. LOTT:  So you can share the information with me
2    but I'm still going to cancel.  I'd like to know, though, you
3    made -- you said something about charging on the back end for
4    those services after they buy you out.  What did you mean by
5    that?
6          GERALD:  Yeah.  That's the inform -- that's the
7    feedback that we've gotten from customers.  I believe that's
8    the reason why a lot of counties or the cities have led them
9    to be being solicited like Huntersville, they cannot solicit
10   in Huntersville.  They cannot solicit in Huntersville, in
11   North Carolina, for example.
12         MS. LOTT:  Okay.
13         GERALD:  We're hearing from customers -- I can't --
14   there's nothing I can show -- show you to prove this, but
15   we're hearing from customers, "Hey, I got charged for that
16   amount, they told me I'd be bought out on the back end of my
17   agreement."  In other words, some sort of monthly fee was
18   going back towards that buyout.
19         If you think about it, it really doesn't even make
20   sense.  You know, $900, $1,000, $2,000, why would a company
21   have reserve capital in place to be able to just buyout a
22   bunch of agreements only to try to make that money back from
23   the customer just on their monitoring fees and equipment fees?
24   I mean, they would be spending a lot of time, years, years
25   trying to get that money back from the customer before they

1   even made a profit.  It just doesn't make good business sense,
2   and that's -- and that's my I just wanted to kind of have that
3   conversation with you because we're hearing that our customers
4   are being fooled by the buyout promises.
5          MS. LOTT:  Yeah.  I -- I understand that but I guess
6   I'm just kind of in a tough spot because I -- I can't keep
7   both and I -- you know, already have the Vivint things
8   installed, so I guess I just have to go ahead and cancel with
9   CPI because I'm kind of stuck at the moment.
10         GERALD:  Okay.  And part of my job, Ms. Lott, is to
11  educate you, particularly with this company.  I hear what
12  you're saying.  I would feel the same way about it, but you're
13  protected here, and that's because you were under contract
14  with CPI.  I'm not saying that we shouldn't do what we can to
15  fight for your business moving forward, whether it's short
16  term or the long term, we should.  But because you were under
17  agreement with us you're protected by a law called tortious
18  interference.
19         Vivint understands this.  This is not news to them,
20  believe me, or the any other alarm service company in the
21  industry.  Tortious interference says you cannot install a
22  service if you already have -- you know, if the customer
23  already has a contracted service.  Now had you not been under
24  contract, you were a month-to-month customer with us, forget
25  what I'm saying, it's off the table.

Red Rock Reporting
385.707.7254

1          But because you were under contract and you can cite

2    tortious interference, they would have to take their equipment

3    down, come back and get it and release you -- whether it's

4    been 10 days or the 30 days, they'd have to release you from

5    whatever contract you signed with them because you can't have

6    two alarm contracts at one time.  It's against the rules.

7    It's against the law.

8          Would that help you?  I mean, how do you feel about

9    that information I guess is what I would ask?

10         MS. LOTT:  Yeah.  It's just really tough.  I can't --

11   ugh, I don't know.  Yeah, I guess that's good to hear, but

12   like I said, they've already -- I don't -- I can --

13         GERALD:  You know -- you know we'll put -- you know

14   we'll put our stuff back up at no cost to you.  You know,

15   we'll come back out, no truck roll fee, no service or the

16   activation fee.  I mean, yes, we want to reearn your business,

17   no doubt about it, but I like to have real conversations with

18   people at the same time.  And they are not -- they will

19   straight lie -- they are not a reputable company.

20         And I mean, what I can do, ma'am, is allow you to

21   have my contact information, you can work with me on this if

22   you like.  I could -- at the very least, even if you don't

23   decide you want to move forward, I can at the very least send

24   you several pieces or tidbits of information that you can

25   review for yourself and not just take my -- take my word for

10

1    it so to speak.

2           MS. LOTT:  Yeah, I appreciate that.  Yeah.  It's

3    just -- it's just -- it's really tough.  I think I do want to

4    go ahead and cancel with CPI because it's just really

5    complicated at this point.  I -- if something were to go wrong

6    with Vivint, knowing what I now know, it would be on me and I

7    would have to figure that out.  But I just think the way

8    things are set up now, it would be easiest to just go ahead

9    and cancel with CPI.

10          GERALD:  Okay.  All right.  I hear you.  Well,

11   certainly my job is not, you know, filibusterer, so I can get

12   that process for you, ma'am.  We would require, you know,

13   payment of the buyout.  Are you able to make the payment

14   basically now or the today?

15          MS. LOTT:  Yes, sir.

16          GERALD:  You can?  Okay.  Let me get the exact amount

17   for you.  Give me just a moment, ma'am and I'll go ahead and

18   start the process of your cancelation.  And by the way, I have

19   your email is it diamond.lott@gmail.com?

20          MS. LOTT:  Yes, that's correct.

21          GERALD:  All right.  I'm here with you.  Give me just

22   a moment.  Thank you.

23          MS. LOTT:  Thank you.

24          GERALD:  Okay.  So, Ms. Lott, probably within the

25   next 10 minutes you'll get an electric cancel document, just

Red Rock Reporting
385.707.7254

 1   sign that for us when you get a chance and we'll start and
 2   complete the process for you.
 3           Other than that, it's just a matter of the payment.
 4   I have 929.77 as your final total, that's 75 percent of your
 5   remaining agreement.  Do you have a debit or credit card today
 6   or how would you like to use -- or pay?
 7           MS. LOTT:  Yes, it is a credit card.
 8           GERALD:  Credit card?  Okay.  And how does the name
 9   read on your card.
10           MS. LOTT:  Diamond Lott.
11           GERALD:  Yes, ma'am.  You were going to say
12   something?  I apologize.
13           MS. LOTT:  Oh, I don't remember.
14           GERALD:  Mean neither.  I don't remember half the
15   time either.  Go right ahead.
16           MS. LOTT:  I guess I'm just like a little -- a little
17   nervous about doing this now.  So they gave me a like a debit
18   card with money on it, so would that be credit or debit?
19           GERALD:  Oh, I -- our system processes --
20   processes -- wow I can't get this out -- processes it the same
21   way -- I can't say that word, but anyway -- so it doesn't
22   matter to us.  You said you have some nervousness?  Anxiety?
23           MS. LOTT:  Yeah.  Just going back and forth between
24   the two companies, I've -- I just don't really know at this
25   point what to do.

Red Rock Reporting
385.707.7254

1        GERALD:  Yeah.  And I mean, trust me, I understand.
2   You don't want to feel like you're the ping-pong ball.  I --
3   you know, we -- we -- we -- we try to arm our customers with
4   education in these types of situations.  And you know, the one
5   thing that I'll say is that, A, we've got your back and that
6   we're not going to hold you responsible for just coming back
7   out and just reactivating your stuff.
8        But the other part of that is that the Better
9   Business Bureau and the Department of Commerce -- or excuse
10  me, the Department of Justice, Attorney General's Office in
11  North Carolina would also have your back so we -- you know, we
12  can always provide you with links, web links, that tell you
13  how to get your complaints filed if Vivint gave you any
14  pushback.  But what I'm telling you about tortious
15  interference is very, very real.
16       So the choice is yours. I'm not making it seem as if
17  it isn't.  The choice is yours and if Vivint did give
18  pushback, you'd have that information handy to say, okay, no
19  problem, I'm just a click away from the DOJ and they would
20  then probably back off their -- them trying to dissuade you.
21       MS. LOTT:  Okay.  I do have text messages from the
22  sales agent who said that he would take care of the buyout and
23  that's why they ended up giving me the a full amount instead
24  of the amount that they were trying to give me initially, so I
25  guess I'm holding onto that in hopes that they don't try to

1    charge me later on for this.

2         GERALD:  And so what -- so what's been happening,

3    what we've been hearing is -- so notice one thing, they never

4    ever put the -- like we provide you a DocuSign with anything

5    we agree to or something hardline in writing that you can sign

6    or that we can sign.  They've never done this.  Not with one

7    customer I've spoken with have they been able to provide this.

8    It's a text message, it's an email, right, that is in and of

9    itself is weird.

10        MS. LOTT:  Yeah.

11        GERALD:  But then what happens is, what I'm hearing,

12   you probably had a young sales rep, like, a young guy I'm

13   guessing?

14        MS. LOTT:  Yes.

15        GERALD:  He was most likely a college student or

16   maybe someone fresh out of college, those are basically

17   interns, they're 1099 employees.  So what happens is they come

18   out, they ship these guys out, they all stay in an appointment

19   or the two together and then they just get the deal, right?

20   And they have a quota they gotta fill and they go back to

21   their home state, wherever that is, and they're 1099, they're

22   not employees with the customer -- you can't reach them -- or,

23   the if you can, they'll say, "Hey, I'm not with that company,

24   I don't have anything to do with that."

25        I do believe that you'd be billed on the back end for

1    the services somehow so they can recoup the $900, that's what

2    we've been hearing.  But again, this is information that I

3    want to make sure you're armed with.

4              MS. LOTT:  You said you'd be able to send that

5    information to me?

6              GERALD:  Yes, ma'am.  I would compile some stuff and

7    then just kind of email you.  You're more than welcome to work

8    with me on it.  I do only have a half day today but, you know,

9    I come back tomorrow.  I also will be here on Saturday so...

10             MS. LOTT:  Okay.  This is just very -- making me --

11             GERALD:  It's frustrating, yeah.

12             MS. LOTT:  But now that -- so -- so one of the big

13   kickers was obviously they're buying me out of my contract

14   with CPI but also they installed the front door camera which I

15   was having a lot of trouble getting from CPI so that was one

16   of the things that really got me.

17             My issue is -- and also the contract was only two

18   years and they said, you know, at two years, the equipment

19   would be paid off and I'd be able to decide what I wanted to

20   do there.  So now that I have this gift card from them, if I

21   were to, you know, not -- if I was to not cancel with CPI, I'm

22   sure they would want their money back so I'm going to have to

23   find a way to get this card back to them, it's just -- it's

24   just very, very complicated.

25             I really, really appreciate all the -- all the

1  information that you've given me.  It has not been a good

2  experience honestly from either company.  I really just wish I

3  did not have a security system to begin with.  But I just feel

4  like it is very complicated and if I -- if Vivint continues to

5  be slimy then I will have to bite the bullet and just come

6  back to CPI or the just cancel altogether and not have a

7  security system, so -- I really, really appreciate all the

8  information but I think I'm just going to go ahead and cancel.

9       GERALD:  Sure, ma'am.  And when you say it hasn't

10  been a good experience, was it because of the social media

11  comments, number one, but also because of the doorbell camera

12  issue?  Us not -- you know, maybe being able to -- or us not

13  doing an upgrade at the time asked for it?

14       MS. LOTT:  That as well as having to sign a five-year

15  contract and I'm not sure -- I'm not even sure if the

16  information that Vivint guy gave me was accurate, but

17  apparently other people in my neighborhood only had a

18  three-year contract and I had a five-year contract.  And my

19  parents also had CPI and I just feel like the contract was

20  very long and, you know, like signing your life away for a

21  really long time.  So like I said, just from both ends, I

22  can't say that I'm like super satisfied with either company.

23       GERALD:  Okay.  All right.  I understand that.  We --

24  we've changed the way we do business moving forward with those

25  contracts.  I mean, I still think our pricing is very fair

Red Rock Reporting
385.707.7254

1  like we'll never pro -- we never price gouge on the equipment

2  but -- or the monitoring, you know, but we don't do the long

3  term agreement so much anymore.  It's more of a cost-sharing

4  program.  And then once you're out of your contract, you don't

5  get automatically renewed into a new agreement, so I can

6  understand how you feel about the long-term contract.  We've

7  kind of changed our business model because we were getting --

8  we were getting that feedback.  So we've kind of said, okay,

9  well let's -- let's do it differently so customers can feel

10  more comfortable when they're ready to make changes or the

11  cancel or what have you.

12       So -- as far as the doorbell camera, we -- I just

13  want you to know, in case you change your mind, it's hard to

14  do like an outright just upgrade when you're under a contract

15  or in the middle of your agreement, but we could always look

16  at, you know, especially for retention efforts, discounting a

17  camera greatly, like 30 percent off or the something like that

18  so you could purchase one and still stay at the same

19  monitoring rate.

20       Just take another look at your Vivint contract.  I

21  think that it's most likely -- nine times out of 10 with the

22  other people that I've been speaking with, it's a 60-month

23  agreement, and they're probably price gouging you on the

24  equipment.  Are you paying about 60 to $65 a month?

25       MS. LOTT:  Yes.

Red Rock Reporting
385.707.7254

 1            GERALD:  The monitoring rated is what about 20 to 24?

 2            MS. LOTT:  I need to pull up my contract.  See if I

 3   can find it quickly.  I'm sorry.

 4            GERALD:  No.  It's fine.

 5            MS. LOTT:  Looking for an email from them.  Yes, I

 6   can see it.  Yep, 60-month contract.

 7            GERALD:  Yep.

 8            MS. LOTT:  So what does that mean?  Why did he tell

 9   me two years?

10            GERALD:  Because he's lied to you.  And then that's

11   one thing that I would say we don't have a reputation of lying

12   to our customers.  If you think -- do the mat -- well, let me

13   help you do the math, actually.  That's -- what's the

14   monitoring rate, about 20 bucks?  24?

15            MS. LOTT:  I do not see a monitoring rate on this

16   one.

17            GERALD:  I've been hearing that it's been, you know,

18   they've been jacking the monitoring rate, you know, way low,

19   right, so maybe 20 bucks-ish, but do -- if I'm right about

20   that -- if I'm right -- it's -- you're probably paying about

21   $40 a month in equipment fees.  Ridiculous.  That's

22   ridiculous.  That's about $2,400 at least.  In fact, one

23   person they had $4,000 worth of equipment charges they're --

24   they're total out the door monthly rate was 60 bucks but they

25   were paying $4,000 in equipment over the life of the 60

Red Rock Reporting
385.707.7254

1    months.

2              So if you -- if you take that same number -- if you

3    take that number of $2,400, let's just call it, that you're

4    probably being charged for the equipment, we only charged you

5    $2,400 for everything for the life of your 60-month agreement.

6    That's why -- that's what I mean when I say we don't price

7    gouge, right?

8              So that means over 60 months with CPI you paid 23 --

9    I'm sorry -- let's just 20 -- let's just call it 2,400, it's

10   $2,400 that you're paying, we provided about $700 worth of

11   equipment, we just decided the way that we'll get that back is

12   through our 60-month agreement and you pay, including your

13   monitoring fees 2,400.  They're charging you 2,400 just for

14   the equipment alone and they probably used our -- our sensors.

15             So, again, ma'am, there -- there you have an

16   indication of how you've been lied to by Vivint.  I mean, I

17   wouldn't be happy, but I would go ahead and process your

18   cancelation and take your payment if you want me to.  I just

19   want to, again, give you all the information and let you --

20   you know, let you know how I can help.

21             MS. LOTT:  I appreciate that.  So it looks like the

22   equipment charges are 18 -- about 1,800, and then 130 for tax

23   and then about 2,000 total.

24             So I guess my big thing now is this 60 months.  So --

25   so does that mean -- so what he told me, which I understand

1    was a lie now, was that after two years, the equipment would

2    be paid off and I would be able to either upgrade at that

3    point or I guess get out of the contract if I wanted to, is

4    that not how it works?

5            GERALD:  No.  If you see a 60-month agreement, it's

6    60 -- it's 60 months.  I do -- I do believe that that means

7    that, you know -- this is just the way the alarm industry

8    would typically work, I do believe that means you would be

9    paying for your equipment for those entire 60 months.

10           If you're saying it's only 1800, that's better than

11   what I've been hearing.  Just go over that with a fine tooth

12   comb to make sure that's the way.  That's way -- that is

13   relatively lower or the significantly lower than what I've --

14   what I've been hearing but it could be the case for you, I

15   don't want to say for sure.  But it's a 60-month agreement is

16   a 60-month agreement.

17           And then Vivint, they're business model is such that

18   you'll see in the fine print, we reserve the right to raise

19   your monitoring rate after those 60 months.  CPI does not do

20   that.  We have customers who have been with us for 20, 25

21   years who are paying the exact same thing even though our

22   prices may have increased a little bit.  So we -- you know, we

23   have a practice of grandfathered rate -- you know, pricing

24   whereas Vivint does not.  They're not going to make much money

25   off of you at only 20 or the 25 bucks a month so they're going

1  to then jack it up after you pay your equipment to about, you

2  know, I guess 60, at least that's what we've heard, I can't

3  say for sure.

4         MS. LOTT:  Okay.

5         GERALD:  I'll do whatever you'd like for me to do at

6  this time, Ms. Lott.

7         MS. LOTT:  Yeah.  I wish I knew.  I -- I.

8         GERALD:  Do you want to take a day?

9         MS. LOTT:  I -- I -- my issue also is it's just

10  really difficult to get in contact with somebody at Vivint who

11  knows what they're talking about and so if I -- if -- like

12  it's taken me a month to get them to give me the amount of

13  money for this buyout and I've been paying CPI as well as

14  them, so I just don't know how much longer it's going to take

15  to get this situation rec -- I'm just really pissed off about

16  this 60 month now.  I guess I have to -- oh, gosh.  Yeah, I

17  guess I just have to cancel the CPI and just bite the bullet,

18  I'm so sorry.

19         GERALD:  That's okay.  That's okay.  I'm glad we had

20  the conversation regardless.

21         Okay.  So what I'm going to do is -- if anything

22  changes let us know.  Would you -- in lieu of what you're

23  saying, I'd give you an option here, I can take the payment

24  now for the 929, that's what they've asked us to do with

25  buyouts, technically we just give you up to 10 days.  If

1  you -- you know, let's just say something some complication
2  came up or you start to feel more uncomfortable with the next
3  couple of days, you can take up to 10 days to make the
4  payment.  So basically after 10 days is up, our billing
5  department will get in touch with you and send you the
6  correspondence and all of that stuff.
7         So I don't have to take the payment now and you can
8  wait if you -- if you'd like take those ten days or I can just
9  go ahead and make the -- help you make the payment.
10        MS. LOTT:  I have one more question.
11        GERALD:  Yes.
12        MS. LOTT:  So with Vivint, I'm paying -- I'm paying
13 them one amount and then I'm paying like another, like, the --
14 what's the department -- I can't remember what it -- but it's
15 a bank, basically I'm paying them an amount and I'm paying the
16 bank an amount.  So if I was to cancel with Vivint, I just
17 want to make sure that like those quote to -- both of those
18 things go away because it's automatic -- automatically being
19 taken out of my account.  It's just a lot to think about.
20        GERALD:  It's a lot.  You know, especially if you
21 don't work in the industry, it is sometimes a lot --
22        MS. LOTT:  Yeah.  It's very confusing.
23        GERALD:  Um --
24        MS. LOTT:  Well, let me -- let me -- let me just take
25 some time and then I will call you back before I make a

1  decision.

2         GERALD:  Sure, ma'am.  That's no problem.  Let me go

3  ahead and send you an email with my contact information.

4         MS. LOTT:  Okay.

5         GERALD:  Yeah.  I already confirmed your email, I'm

6  sorry.  So, yeah, I'll send that to you now, and like I said,

7  I'll be gone shortly here, but you're more than welcome to get

8  in touch with me, you know, Friday or the just whenever, you

9  know, I'll just look out for you.

10        MS. LOTT:  Okay.  I appreciate that.  Thank you.

11        GERALD:  Uh-huh, not a problem.  And you may be

12 working yourself, let me not hold you too much here.  Again,

13 Gerald, I'm with our CFL department so I'm the only one here.

14        MS. LOTT:  Okay.

15        GERALD:  And I can either finish this email now or if

16 you just want me to let you go and expect the email in a

17 couple of minutes, that's fine, too.

18        MS. LOTT:  I'm not going to make a decision today so

19 you can give me your information and I can give you a call

20 back when I'm ready?

21        GERALD:  Yeah.  Yeah, that would be just fine.  No

22 problem at all.

23        MS. LOTT:  Okay.

24        GERALD:  If you get my -- if you get my -- if you

25 call me and get my voicemail, just leave me a message, I'll

1   get back to you.

2            MS. LOTT:  Sounds good.

3            GERALD:  All right.  All right.  Diamond, all right,

4   well, we'll look out for that and it was a pleasure speaking

5   with you today, okay?

6            MS. LOTT:  Thank you so much.  You as well.

7            GERALD:  You're welcome.  Thank you, uh-huh.

8   Bye-bye.

9            MS. LOTT:  Bye-bye.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Red Rock Reporting
385.707.7254

1                              CERTIFICATE

2    STATE OF UTAH          )
                            ) ss.
3    COUNTY OF WEBER        )

4

5           I, Tracy A. Fresh, do hereby certify that the

6    foregoing pages 2 through 23 constitute a true and accurate

7    transcript of the audio proceedings to the best of my

8    knowledge and ability as a Certified Court Reporter in and

9    for the State of Utah.

10          Dated this 21st day of October, 2021.

11

12

13

14                         Tracy A. Fresh, RPR, CCR

15

16

17

18

19

20

21

22

23

24

25

Red Rock Reporting
385.707.7254