**EXHIBIT**

**10**

```
 1              UNITED STATES DISTRICT COURT
 2        FOR THE WESTERN DISTRICT OF NORTH CAROLINA
 3                   CHARLOTTE DIVISION
 4          CIVIL ACTION NO. 3:20-CV-00504-FDW-DSC
 5

      CPI SECURITY SYSTEMS,        )
 6    INC.,                        )
                                   )
 7                                 )
      Plaintiff and Counterclaim   )
 8    Defendant,                   )
                                   )
 9                                 )
      v.                           )
10                                 )
      VIVINT SMART HOME, INC.      )
11    f/k/a Mosaic Acquisition     )
      Corp.; and LEGACY VIVINT     )
12    SMART HOME, INC. f/k/a       )
      Vivint Smart Home, Inc.,     )
13                                 )
      Defendants and              )
14    Counterclaimants.           )
15
16          Zoom Video Deposition of JOHGRE HINTON
17          (Taken by the Plaintiff and Defendants)
18                 Knightdale, North Carolina
19                  Friday, August 20, 2021
20
21
22
23
      Job No. CS4749807
24    Reported by:    Marisa Munoz-Vourakis -
                      RMR, CRR and Notary Public
25
```

```
 1      APPEARANCE OF COUNSEL BY ZOOM:

 2      For the Plaintiff and Counterclaim Defendant:

 3               CHARLES C. EBLEN, ESQ.

 4               Shook, Hardy & Bacon L.L.P.

 5               2555 Grand Boulevard

 6               Kansas City, MO 64108-2613

 7               816-474-6550

 8               ceblen@shb.com

 9

10      For the Defendants and Counterclaimants:

11               MATTHEW A. STEWARD, ESQ.

12               Clyde Snow & Sessions

13               201 S. Main Street, Suite 1300

14               Salt Lake City, UT 84111

15               mas@clydesnow.com

16                          -and-

17               GREGORY W. HERBERT, ESQ.

18               Greenberg Traurig P.A.

19               450 S. Orange Avenue, Suite 650

20               Orlando, FL 32801

21               407-420-1000

22               herbertg@gtlaw.com

23      Also Present by Zoom:  DELISHA HINTON

24      Also Present by Zoom:  DeANDRAE SHIVERS, Videographer

25
```

1

2

3

4

5

6                              OOO

7

8

9            Zoom Video Deposition of JOHGRE HINTON,

10    taken by the Plaintiff and Defendants, at Knightdale,

11    North Carolina, on the 20th day of August, 2021 at 1:01

12    p.m., before Marisa Munoz-Vourakis, Registered Merit

13    Reporter, Certified Realtime Reporter and Notary Public.

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:20-cv-00504-FDW-DSC   Document 117-10   Filed 01/18/22   Page 3 of 13

```
 1                        I N D E X
 2     Examination of:                          Page
 3       JOHGRE HINTON
 4           EXAMINATION BY MR. EBLEN . . . . . . . . . 5
 5           EXAMINATION BY MR. STEWARD . . . . . . . .22
 6           FURTHER EXAMINATION BY MR. EBLEN . . . . .87
 7           FURTHER EXAMINATION BY MR. STEWARD . . . .90
 8                    DEPOSITION EXHIBITS
 9     EXHIBIT NUMBER           DESCRIPTION           PAGE
10     Exhibit 2   Mr. Hinton's LinkedIn profile      27
                   page
11
       Exhibit 3   Bates number CPI 242               54
12
       Exhibit 4   Vivint contract                    55
13
       Exhibit 5   Bates number 244                   66
14
       Exhibit 6   CPI monthly charge sheet           77
15
16
17
18
19
20
21
22
23
24
25
```

1    Carolina State University, civil engineer.  I have a

2    master in business administration from the University

3    of North Carolina, Chapel Hill.

4         Q.     What kind of work are you in?

5         A.     I am a manager over a couple of different

6    engineering, engineering technology groups for the

7    local utility company.

8         Q.     All right.  Drawing your attention now back

9    to your relationship that you had with CPI, for how

10   long did you have a contract with CPI?

11        A.     My contract with CPI was for 60 months,

12   five years.  It started in June of 2015.

13        Q.     Were you pleased with your product and

14   service that you had with CPI?

15        A.     Yes, we were pleased with the service.

16        Q.     Did you have any problems with CPI?

17        A.     There was no problems with CPI.

18        Q.     All right.  And as I understand it,

19   sometime around November of 2018, did you have some

20   interactions with a representative from Vivint?

21             MR. STEWARD:  Objection, leading.

22             BY MR. EBLEN:

23        Q.     You can answer.

24        A.     So our first interaction with Vivint we

25   were at the BJ's, which is the local wholesale store.

Case 3:20-cv-00504-FDW-DSC   Document 117-10   Filed 01/18/22   Page 5 of 13

1    Vivint was in the store.  They had representatives in

2    the store and they stopped us.  We had a conversation.

3    They told us how we could save money with -- you know,

4    that kind of sparked our interest from there.

5              Later on, they had a representative to come

6    out to the house where we could talk more in detail

7    about what they would offer and the cost of the

8    service.

9        Q.    Tell me everything that you remember about

10   your interaction with the Vivint representatives in

11   BJ's?

12       A.    So in BJ's it was just, you know, regular

13   day of -- regular shopping trip.  They were in there.

14   We've seen signs, but you never really, you know,

15   looked at it or had any interest of switching companies

16   at the time.  We were satisfied with our service.

17             They asked who our current security service

18   provider was and informed them it was CPI, and then

19   they told us that, you know, they could probably beat

20   their rates.

21       Q.    At the time you met with the Vivint

22   representatives in BJ's, did either of them make any

23   sort of representation that they had an affiliation

24   with CPI?

25             MR. STEWARD:  Objection, leading.

1    A.    So I don't recall if in the store they said

2  that, you know, they had any affiliation.  It was later

3  when a Vivint representative was in our home is when

4  those -- the conversations that they had affiliation

5  with CPI came up.

6    Q.    Okay.  So fast forward when the Vivint rep

7  came out to your home, do you recall about how much

8  time past before the rep came to your home?

9    A.    It was when we got home.  Our typical

10 grocery shopping is like three hours.  So from the time

11 we're shopping, you know, get back home, put the

12 groceries away.  So it was probably about two hours

13 maybe that -- if that.

14    Q.    It was the same day though?

15    A.    It was the same day, yes.

16    Q.    Was it one of the same representatives who

17 was in the store or a different person?

18    A.    No, it was a different representative.

19 They probably wouldn't have been able to get more

20 customers if the person from the store came to the

21 house.

22    Q.    Do you remember the name of the gentleman

23 who came to your house, or was it a woman or a man?

24    A.    It was a male.  His name is Craig.

25    Q.    Do you know Craig's last name?

1      A.     Craig Darrow.

2      Q.     And when the Vivint representative Craig

3   came to your home, tell us what all he represented to

4   you about Vivint?

5      A.     Well, he basically told in addition -- I

6   don't know if it's relevant or not -- but when he was

7   telling us that they could save us some money, my

8   mother, she didn't have a -- at the time she didn't

9   have a service, a security service.  So I invited her

10  over to the house.  So basically it was a sales pitch

11  coming to two customers at a time.

12          So with, you know, going through that, he

13  basically was telling us how we didn't have to pay for

14  additional equipment, because they could just take over

15  the equipment here at the house.  And that kind of made

16  me question like how are you able to -- how is a

17  different company able to take over another company's

18  equipment?  And that's when he started to allude that,

19  you know, they were working together.

20     Q.     You said he alluded to them working

21  together.  Tell us specifically what all you remember

22  the Vivint representative saying about any relationship

23  with CPI?

24          MR. STEWARD:  Objection to form.

25      Mr. Hinton, I apologize, I periodically am

 1           going to make an objection to the form of

 2           the question, and I apologize, I know that

 3           interrupts you, but unless you're instructed

 4           not to answer, which is very unlikely to

 5           happen, go ahead and answer the question

 6           after I've made the objection.

 7                Does that make sense?

 8                THE WITNESS:  Yes.

 9                MR. STEWARD:  Thank you.

10      A.     You want to repeat the question or?

11      Q.     Yeah, sure.  I can repeat it for you.

12                So tell us everything you recall about your

13   conversation with the Vivint representative about CPI

14   having any relationship with Vivint?

15                MR. STEWARD:  Objection to form.

16                Go ahead, Mr. Hinton.

17      A.     So when he was saying that he didn't have

18   to install any new equipment, because he could

19   basically take over the equipment that they have, he

20   was saying that CPI's equipment was older, but it was

21   of the same version of what Vivint would install, and

22   that, you know from there, it was like so are you a

23   partnership?  Are you working together?  And he was

24   like you know, like yes, you know, we kind of work

25   together, and things of that nature.  No clear answer

1    and direction, but still, still kind of iffy and things

2    of that nature.  Ran it by my wife.  She, you know, was

3    still comfortable with it, so we proceeded at that

4    time.

5         Q.    On that day, based on what you just

6    described, did you have the impression that there was

7    some sort of a connection between CPI and Vivint?

8         A.    Yeah, so from not getting clear answers,

9    and then just when I think of security, I think of this

10   one company is the only person that has access to their

11   equipment.  I don't think of well, this one company and

12   any other security company who wants access to their

13   equipment can have access to it.  To me that's just an

14   uncomfortable feeling.

15             So, you know, those are the questions that

16   I was asking trying to get clarity around that, and

17   then that's when he eventually was basically like oh,

18   yeah, we're one in the same and left it at that.

19        Q.    Did you find out later whether or not that

20   representation was true?

21        A.    Yeah, found out through -- it was around

22   June of last year when we found out that representation

23   was not true.  There was some additional charges that I

24   was -- that was on my credit card.  And basically, I

25   guess up front, Vivint was giving us the difference of

1              MR. EBLEN:  Object to form.

2              BY MR. STEWARD:

3        Q.     Go ahead.

4        A.     I really didn't know what to believe.  I

5   know one, he was already able to take over the

6   equipment.  So that's why I thought, you know, if one

7   company is able to take over another company's

8   equipment, that they must be one in the same as far as

9   companies.  But he just informed me that, you know,

10   companies take over each other equipment all the time.

11   I didn't know that prior to when that conversation with

12   me and Craig was going on.

13        Q.     Okay.  And Craig clearly identified himself

14   as being there on behalf of the company Vivint, right?

15        A.     I believe so, yes.

16        Q.     He likely had a hat and a shirt that had

17   Vivint on it.  Do you recall that?

18        A.     I don't recall -- I think he did have a hat

19   on, but, yeah, I know he had the shirt on.

20        Q.     And probably had some of the orange

21   coloring that you referenced with respect --

22        A.     Yeah, I think it just had the word Vivint.

23        Q.     Vivint in orange?

24        A.     In orange, yeah.

25        Q.     Okay.  Nothing on his person suggested he

```
 1     was there on behalf of CPI, right?

 2          A.     No, nothing, nothing on his person.

 3          Q.     Okay.  Okay.  That's helpful.

 4                 He never said that he was an employee or

 5     that he worked for CPI, did he?

 6          A.     No, he never said those words, no.

 7          Q.     And he didn't say that he was a partner of

 8     CPI, did he?

 9          A.     He didn't say those words.  Like I said,

10     the only words that, you know, made me allude to, you

11     know, think that they were one in the same is those

12     exact words he said, you know, were one in the same.

13     It was reference to a company or just equipment.

14          Q.     Or just equipment, okay perfect.

15          A.     Just was hey, get out -- because, I mean,

16     if you come to my house to do some work, I'm going

17     to -- I'm walking around with you.  So I'm asking

18     questions.  I don't know if it was just to get me out

19     of his way so he can go on about his day.

20          Q.     I understand.  You were interested in kind

21     of the capability of the equipment.  It sounds like it

22     was a surprise to you that one company could use

23     another company's, at least some of their equipment, if

24     it was compatible, right?

25          A.     Correct.
```

Case 3:20-cv-00504-FDW-DSC   Document 117-10   Filed 01/18/22   Page 12 of 13

1          Q.      And the panel, for instance, was obviously

2     not compatible, because they had to put a Vivint panel

3     in there to control the Vivint doorbell cam, right, or

4     to monitor the Vivint doorbell cam, right?

5          A.      Correct.

6          Q.      Okay.  Oh, yeah, let's go to -- oh, was

7     your wife home when Craig visited you at your home?

8          A.      Yes.

9          Q.      And was she part of these conversations?

10              Were you both interacting with Craig?

11         A.      I was more engaging with Craig, you know,

12    but still getting her input, making sure that she was,

13    you know, trying to see if she was comfortable with

14    things.  Like I said, my mother was there as well,

15    because she was, you know, always think, you know

16    because -- I mean, it sound good from when we were in

17    the store, so we wanted her to hear it as well and get

18    a system on her home.

19         Q.      Did she ultimately get a system?

20         A.      My mother?

21         Q.      Yeah.

22         A.      Yes.

23         Q.      And that was a Vivint system?

24         A.      Yes.

25         Q.      And do you know was Craig the sales rep for