UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:20-CV-00504-FDW-DSC

CPI SECURITY SYSTEMS, INC.,

      Plaintiff,

v.

VIVINT SMART HOME, INC. f/k/a
Mosaic Acquisition Corp.; and LEGACY
VIVINT SMART HOME, INC. f/k/a
Vivint Smart Home, Inc.,

      Defendants.

**PLAINTIFF CPI SECURITY SYSTEMS, INC.'S MEMORANDUM IN OPPOSITION TO VIVINT'S CONSOLIDATED MOTION *IN LIMINE* [DOCS 116-117]**

## INTRODUCTION

  Vivint seeks to preclude nearly all evidence relating to Vivint's years of egregious deceptive sales practices ("DSPs") establishing that Vivint's conduct is intentional, systemic, widespread, and damaging to consumers and competitors alike. Vivint's erroneous view of the law—that CPI must prove every individual instance of Vivint's wrongful conduct and only through customer testimony alone—would require hundreds of deceived customers to testify at a trial that would last many months, which the Court has already declined to permit, and would also suppress strong direct and circumstantial evidence that the sales conduct is sanctioned by Vivint leadership. Vivint's attempt to have this case decided in a vacuum must be denied.

# ARGUMENT

### A. Vivint's fails to identify what evidence it seeks to exclude.

Vivint still fails to identify the evidence it wants the Court to exclude. Instead, Vivint refers only to "example" exhibits without justifying the sweeping, categorical exclusion of other supposedly related but unspecified evidence. "District courts routinely deny a motion in limine that does not specify the evidence or argument to be excluded." *A. Hak Indus. Servs. BV v. Techcorr USA, LLC*, No. 3:11–CV–74, 2014 WL 12591696, at *1 (N.D.W.V. Dec. 18, 2014). "[B]road pre-trial evidentiary rulings . . . present a serious risk of excluding admissible evidence." *Id.* "[T]he best course of action is to deny the motion and see how the case unfolds because a blanket exclusion could likely preclude a party from introducing evidence that a court finds admissible with the benefit of knowing the particular evidence and relevant context." *Id.*; *cf. E.I. DuPont De Nemours & Co. v. Kolon Indus., Inc.*, 564 Fed. Appx. 710, 715 (4th Cir. 2014).

### B. Customer complaint records are admissible for non-hearsay purposes, the evidence satisfies several hearsay exceptions, and Vivint's own documents contain party admissions that are not hearsay.

Whether an out of court statement is hearsay depends on the purpose for which it is offered, which is why Vivint's shotgun-style motion overreaches. Additionally, Vivint's request to exclude fails because:

- Audio recordings and complaint records evidence actual confusion from CPI's customers as a result of Vivint's conduct, an essential element of CPI's claim that is *not* hearsay. *See, e.g.*, *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 780 (4th Cir. 2001) (anecdotal reports of actual confusion are not hearsay); *Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc.,* 87 F.3d 654, 661 (4th Cir. 1996) (testimony regarding out of court complaints by

customers that defendant's statements caused confusion admissible on Lanham Act claim); *PNGI Charles Town Gaming, LLC v. Hot Spot CT Real Estate, LLC*, No. 3:18-CV-38, 2019 WL 6869873, at *8 (N.D.W.V. Dec. 16, 2019) (evidence of actual confusion not hearsay); *Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 705 (5th Cir. 1981) (actual customer confusion is "patently the best evidence of likelihood of confusion").

- Vivint should be judicially estopped, *1000 Friends of Md. V. Browner*, 265 F.3d 216, 226-27 (4th Cir. 2001), from taking a position directly inconsistent with the position it successfully took in arguing for admission of the same type of recorded customer complaints in its prior lawsuits against other competitors for the same conduct. (*See* **Ex. A** at 3; **Ex. B**).

- The call recordings are inherently reliable under Rule 807, as Vivint itself has successfully argued. (**Ex. A** at 10-13). *See, e.g.*, *Bourjaily v. United States*, 483 U.S. 171, 179-80 (1987); *FTC v. Kuykendall*, 312 F.3d 1329, 1343 (10th Cir. 2002) (customer complaints admissible under Rule 807), *aff'd en banc*, 371 F.3d 745, 767 (10th Cir. 2004).

- Separately, Vivint's own documentation of the complaints it received—wherein Vivint itself classifies hundreds of the complaints at issue as "Slams"—constitutes party admissions under Rule 801(d)(2) and must be admitted even if other portions of such documents are excluded/redacted, as Judge Middlebrooks ruled in Vivint's prior related litigation with ADT. *See ADT LLC v. Vivint, Inc.*, No. 17-CV-80432-MIDDLEBROOKS, Doc. 201 (S.D. Fla. Dec. 8, 2017) (**Ex. C** at 2) (admitting Vivint statements).

### C. Party admissions where Vivint sued its competitors for this same conduct are highly probative and competent evidence.

For many years, in sworn testimony in lawsuits where Vivint was the aggressor suing smaller competitors for the *very same* DSPs at issue here, Vivint made numerous party admissions that are now damning to its case when the shoe sits on the other foot. For example:

- Vivint has strenuously advocated that, based on settled marketing principles, the number of consumer complaints about DSPs actually reported is dramatically under-representative of the scope of the actual conduct, going so far as to claim that this principle is so uncontroversial it is capable of judicial notice:

3

[1] It is commonly accepted and the Court may take Judicial Notice of the fact that only a limited number of affected customers, roughly 4%, actually will take the time to complain. *See* Sheila Kessler, *Measuring and Managing Customer Satisfaction*, American Society for Quality 63-64 (1996). Therefore, the customers who have complained to Vivint about Defendants' unlawful activities likely represent only a fraction of the Vivint customers who have fallen victim to Defendants' improper conduct. More problematic, it is those who do not complain, and thus remain unidentified, who are likely to have ended their relationship with Vivint. *See* Jerry Plymire, *Complaints as Opportunities*, Business Horizons (Mar.-Apr. 1991)
(available at http://findarticles.com/p/articles/mi_m1038/is_n2_v34/ai_10544096/) (last visited March 23, 2012) (explaining that only 4% of dissatisfied customers complain, but that 91% of dissatisfied customers will never return and each of these dissatisfied customers will likely also repeat their complaints to eight to ten of their friends). Defendants' campaign to smear Vivint's reputation and goodwill is pervasive and consistent—and can be presumed to reach far beyond those Vivint customers who have reached out to Vivint to complain.

(Pl.'s Tr. Ex. P616, 4 n.1 (**Ex. D**)).

- Vivint's own internal documents embrace that consumer complaints about DSPs are underrepresented by a ratio of 20 to 1:



(Pl.'s Tr. Ex. P97, 16 (designated by Vivint as "Attorney Eyes Only," so not attached in full here)).

- Vivint has sworn that the term "slam" is used to denote when a competitor uses false or misleading statements to steal customers from competitors:

> 4. One of my duties and responsibilities at Vivint is to work with our Customer Service Department to track situations where a customer has been "slammed" by a sales representative of another alarms sales company. We use the term "slam" to describe when a competitor contacts a current Vivint customer and uses false or misleading statements in an attempt to have the customer cancel their Vivint service in favor of the competitor's or enter into a second redundant service contract.
>
> 5. Responding to "slams" is a priority of Vivint as we consider the conduct to be damaging to our business and goodwill and to be damaging to the industry as a whole. I will frequently try to contact representatives implicated in customer slams to explain the problem and try to curb the conduct. I have a background as a sales representative and am familiar with sales representative – customer dynamics.

(Pl.'s Tr. Ex. P616, PDF p. 23 of 29 (**Ex. D**)).

Because Vivint's own documents in this case contain admissions showing how many CPI customers were "slammed" by Vivint, Vivint now wishes to redefine the term to mean that a customer just switched alarm companies for *any* reason. Similarly, now that Vivint is playing defense, it wants to change its position and claim that the reported DSPs actually reflect the total universe of the relevant conduct. CPI should be allowed to present Vivint's prior 801(d)(2)(A) statements to establish what "slam" really means in Vivint's own records, and that the conduct reaches far beyond reported incidents. This evidence also impeaches Vivint's credibility.

The Court has broad discretion to admit party admissions from prior lawsuits. *Wyatt v. Security Inn Food & Bev. Inc.*, 819 F.2d 69, 70-71 (4th Cir. 1987) (admitting party deposition testimony from prior civil case); *U.S. v. Jenkins,* 785 F.2d 1387 (9th Cir. 1986) (same).

### D. Evidence from other related cases demonstrates Vivint's culture of promoting (or at least sanctioning) DSPs.

Vivint will contend to the jury that its code of conduct, sales training, and compliance program adequately deter DSPs. Incorrect: evidence spanning many years informed Vivint that its compliance, training, and disciplinary processes always failed miserably at deterring DSPs. Vivint's failure to do anything to actually prevent DSPs despite knowing this massive problem persisted demonstrates intent—a critical issue for CPI's Lanham Act, NCUDTPA, and tortious interference claims. 15 U.S.C. § 1125(a)(1)(A); *RXD Media, LLC v. IP Application Dev. LLC*, 986 F.3d 361, 372–73 (4th Cir. 2021); N.C.G.S. § 75-1.1.

This evidence is also expressly admissible on the issue of punitive damages, where a jury must consider:

- the reprehensibility of Vivint's motives and conduct;

- the likelihood, at the relevant time, of serious harm (***to CPI or others similarly situated***);

- the ***degree of Vivint's awareness of the probable consequences of the conduct***;

- ***the duration of Vivint's conduct***;

- ***the existence and frequency of any similar past conduct by Vivint***.

N.C.P.I. § 810.98.

This evidence will establish, for example, that Vivint entered into 14 assurances of voluntary compliance/consent decrees with state attorneys general over the past 10 years related to DSPs. (*E.g.*, Pl. Tr. Exs. P604-616). Vivint represented in these agreements that it would curtail the conduct; yet nothing changed.

Vivint's other evidentiary objections fail. Vivint intends to argue any CPI customer confusion resulting from its sales visits was just the result of a mistake by the customer. Rule 404(b)(2) expressly *permits* other-bad-act evidence as proof of lack of mistake, *modus operandi*, and intent to rebut such a suggestion. (*See also* **Ex. E**, 2). CPI will not offer this evidence to show the prohibited "action in conformity therewith" inference.

Nor is this evidence hearsay. Most consists of 801(d)(2) statements by a party opponent or documents of independent legal significance that are not hearsay (like the assurances of voluntary compliance). *See Jude v. Health Mgmt. Associates of W. Virginia, Inc.*, 187 F.3d 629, 1999 WL 595352, at \*2 (4th Cir. 1999). Finally, the documents establish notice about the scope of the problem and that Vivint's deterrent "efforts" don't work, another non-hearsay purpose. *See United States v. Ayala*, 601 F.3d 256, 272 (4th Cir. 2010); *Green v. Adm'rs of the Tulane Educ. Fund*, 284 F.3d 642, 660 (5th Cir. 2002).

**E. Sworn customer testimony in related cases rebuts Vivint's defenses, is admissible on the Lanham Act claim, and shows Vivint's compliance program is a sham.**

Vivint contends that the testifying CPI customers are biased or untruthful because CPI representatives coached the witnesses on what to say about Vivint's conduct or otherwise influenced the testimony. For starters, CPI should be permitted to show at least *some* evidence that numerous customers of *other* companies have testified under oath that Vivint committed the same deceptive conduct to them to rebut this suggestion.

7

Further, this testimony will illustrate that Vivint's DSPs are endemic, not the isolated acts of a few "bad apples," as Vivint will contend. Indeed, this evidence will help establish that Vivint's worst offenders have been perennial leaders in the sales force who recruit and pass along this conduct to new sales reps. It will also show that even after Vivint came into possession of extensive sworn testimony about the conduct of certain Vivint sales leaders with long rap sheets, many were *promoted*, not disciplined.

The testimony is also relevant on the "likelihood of confusion" analysis that the jury must undertake under the Lanham Act because it helps show that Vivint's sales conduct has created actual consumer confusion under the relevant objective standard. *See RXD Media, LLC*, 986 F.3d at 372-73; *supra* at 2-3 (authority cited in first bullet point).

Finally, this testimony satisfies Rule 804(b)(1)'s exception for former testimony because the witnesses are outside the trial subpoena power; the testimony was elicited during *de bene esse* depositions; Vivint was a party to that case involving identical allegations (and used the same lawyers); and Vivint cross-examined the customers on the same issues as it did in this case.

### F. CPI has timely disclosed and extensively documented its damages computations.

Vivint's new, vague argument regarding "undisclosed" damages—raised for the first time in this re-filed consolidated motion despite the Court's order to *narrow* the issues from Vivint's numerous, prior motions—misrepresents that CPI's damages are limited to just Dr. Winer's corrective marketing opinion and reeks of an effort to

leverage Vivint's own significant delays in providing information essential to CPI's damage claims, which led to countless discovery disputes.

From the complaint through all of CPI's Rule 26 disclosures, written discovery responses, and corresponding document productions, CPI has extensively documented the numerous categories of damages which CPI will ask the jury to award based on the evidence at trial. *See, e.g.*, Vivint Trial Ex. 55 (compilation of CPI initial disclosures). Throughout discovery, CPI continued to detail its damage theories to Vivint *even though Vivint knew that its extensive delays in document production and making witnesses available for deposition severely impaired CPI's ability to provide details of CPI's damages, which could only be determined through Vivint records.* Indeed, due to *five extensions granted at Vivint's request*, CPI did not have the opportunity to interrogate Vivint's 30(b)(6) witnesses until December 2021 (months after the close of discovery) to understand the meaning of voluminous Vivint Excel files containing thousands of data points related to customers that switched from CPI to Vivint, such as this *single* spreadsheet printed on double-sided paper:



(Pl. Tr. Ex. P90). Notwithstanding Vivint's obstruction and delay, CPI still provided Vivint detailed information about its lost customer calculation based on the available information prior to the close of discovery.

To be clear, CPI has extensively disclosed and documented each of the categories of damages it seeks:

- ***Lost and disrupted customers***: Vivint has known from the outset that this category of damages depended upon <u>Vivint's records</u>, which were not produced until late in discovery following this Court's order and numerous extensions granted by CPI's undersigned counsel. Notwithstanding these delays, CPI disclosed in discovery a spreadsheet showing the 695 CPI customers identified in Vivint's records that switched to Vivint and complained about DSPs. This document identifies the relevant accounts and contains all relevant information. CPI's Rule 26 disclosures explain exactly how CPI's damages relating to this category will be calculated based on Vivint's own sworn testimony and testimony of CPI's witnesses regarding the value of accounts. Vivint's counsel questioned CPI's corporate representative extensively on the bases for its calculation at the 30(b)(6) deposition of CPI. And, Vivint clearly understands this arithmetic because Vivint's own expert embraced it for an alternative damages model, and Vivint has filed several motions embracing this same calculation, including Vivint's opposition to CPI's motion *in limine*, where Vivint ***uses the exact same computation against CPI*** to argue that the value of accounts supposedly lost due to CPI's "own actions" amounts to "more than $7.3 million." *See* Doc. No. 105 at 6, & n.3 & n.4.

- ***Injury to reputation and goodwill***: CPI has produced information establishing CPI's marketing expenditures to build and promote its brand in the past five years. As stated in CPI's responses to Vivint's follow-up discovery on this category of damages, the Lanham Act "demands neither empirical quantification nor expert testimony to support a monetary award of actual damages; many sources can provide the requisite information upon which a reasonable jury may calculate damages." *Skydive Arizona v. Quatrocchi*, 673 F.3d 1105, 1112-13 (9th Cir. 2012). "In measuring harm to goodwill, a jury may consider a plaintiff's expenditures in building its reputation in order to estimate the harm to its reputation after a defendant's bad acts." *Id.* at 1112. That is a function for the jury to do here. Vivint's new argument for exclusion also flies in the face of the fact that Vivint has vigorously argued that CPI's goodwill damage claim permits Vivint to introduce evidence of the financial impact of Mr. Gill's comments regarding police protests. Again, this proves Vivint is well aware of this damage claim; but Vivint cannot have it both ways.

- ***CPI's costs to respond to Vivint's deceptive sales practices***: CPI has disclosed and documented its costs associated with responding to Vivint's deceptive sales practices over the past four years. Vivint's counsel spent much time questioning CPI's corporate representative about the calculation of this element of damages at the 30(b)(6) deposition. Ultimately it will be up to the jury to decide, in its discretion based on the evidence at trial, whether and in what amount to award damages within this category. *See PBM Prods., Inc. v. Mead Johnson & Co.*, 174 F. Supp. 2d 424, 430 (E.D. Va. Oct. 25, 2001) ("[A] plaintiff seeking relief under the Lanham Act is not required to prove the amount of its damages with exacting specificity."); *People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 371 (4th Cir. 2001) ("[T]he award of monetary damages . . . under the Lanham Act is committed to the sound discretion of the Court, based on the equities of each particular case.").

- ***Disgorgement of Vivint's profits***. Under the Lanham Act, CPI is only required to prove Vivint's gross sales, and then the burden shifts to Vivint to show what amount of such sales or other costs are *not* due to its infringing activities. (*See* authority cited at Doc. 81-9, 118). In CPI's disclosures, CPI noted that it will put on proof of Vivint's sales revenues during the relevant period based upon Vivint's own verified financials (later discussed at Vivint's 30(b)(6) deposition). There is no additional number to disclose on this element of damage because the amount to be awarded is dependent upon Vivint's proof of any offsets and the award is in the sound discretion of the jury. Notably, Vivint's own expert, again, has offered an alternative methodology for calculating these damages that CPI may also utilize at trial.

- ***Punitive damages***. CPI has disclosed that it will ask the jury to award punitive damages "in a sum sufficient to deter Vivint from continuing to engage in unfair competition…." CPI is not required to disclose an exact number. That is up to the jury to decide.

- ***Costs and attorney fees.*** This category will be determined by the Court following trial.

In sum, CPI will not claim any damages which have not been disclosed and extensively documented during the discovery process. *Cf.* Fed. R. Civ. P. 26(e)(1)(A) (requiring supplementation only if the additional information "has not otherwise been made known to the other parties during the discovery process"). Vivint's 11th hour attempt to broadly prohibit CPI's damages evidence through a vague, sweeping request (which distorts the record) must be denied. *See Silvagni v. Wal-Mart Stores,*

*Inc.*, 320 F.R.D. 237, 243 (D. Nev. 2017) (disclosure rules "should not be viewed as procedural weapons" "to gain a tactical litigation advantage"; the rules disfavor exclusion of evidence where any alleged prejudice could have been cured through a motion to compel); *Roe v. Nevada*, 621 F.Supp.2d 1039, 1060 (D. Nev. 2007) (same).

### G. Dr. Winer, Vivint's own documents, and Vivint's own expert will speak to the underreporting of consumer complaints.

Vivint's last argument again misrepresents the record. Vivint argues that the Court "correctly" excluded Dr. Mangum, and thus, the Court should also preclude CPI from making any "tip of the iceberg" argument. Troublingly, *Dr. Mangum's opinions have nothing to do with the tip of the iceberg principle*. Rather, Dr. Mangum's opinions related to a royalty calculation.

Dr. **Winer** (not Mangum) speaks to "tip of the iceberg" concept based on established marketing social science, and the Court already denied Vivint's motion to exclude his opinions. (Doc. No. 115 at 2). Thus, the Court already rejected Vivint's arguments on this "tip of the iceberg" issue and Vivint's suggestion that the Mangum ruling impacts this concept is clearly erroneous. Moreover, as discussed above, Vivint's motion should also be denied because Vivint itself has endorsed the tip of the iceberg doctrine in numerous internal documents, as has Vivint's own expert.

12
Case 3:20-cv-00504-FDW-DSC    Document 118    Filed 01/25/22    Page 12 of 15

# CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

In accordance with section 3.c.i. and 4.d. of the Case Management Order (Doc. No. 35), CPI certifies that the text of the above memorandum consists of 3,000 words (excluding the caption and signature block, but including footnotes).


Dated: January 25, 2022                     Respectfully submitted,

**SHOOK, HARDY & BACON L.L.P.**

By: /s/ *Caroline M. Gieser*
North Carolina Bar No. 51610
cgieser@shb.com
1230 Peachtree Street, Suite 1200
Atlanta, Georgia 30309
(470) 867-6013

　　　　-and-

/s/ *Charles C. Eblen*
Charles C. Eblen (Admitted *Pro Hac Vice*)
Missouri Bar No. 55166
ceblen@shb.com
Erin M. Fishman (Admitted *Pro Hac Vice*)
Missouri Bar No. 69842
efishman@shb.com
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, Missouri 64108-2613
(816) 474-6550

　　　　-and-

/s/ *Eric J. Hobbs*
Eric J. Hobbs (Admitted *Pro Hac Vice*))
Colorado Bar No. 46813
ehobbs@shb.com
Daniel E. Rohner (Admitted *Pro Hac Vice*)
Colorado Bar No. 27469

drohner@shb.com
SHOOK, HARDY & BACON L.L.P.
1660 17th Street, Suite 450
Denver, Colorado 80202
(303) 285-5300

*Counsel for Plaintiff*
*CPI Security Systems, Inc.*

## CERTIFICATE OF SERVICE

I certify that on the 25th day of January, 2022, I have electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of filing to all counsel and parties of record.

/s/ *Caroline M. Gieser*