# Exhibit D

Rodney G. Snow (#3028)
  rgs@clydesnow.com
Matthew A. Steward (#7637)
  mas@clydesnow.com
Shannon K. Zollinger (#12724)
  skz@clydesnow.com
**CLYDE SNOW & SESSIONS**
One Utah Center, 13th Floor
201 South Main Street
Salt Lake City, Utah  84111-2216
Telephone (801) 322-2516
Facsimile  (801) 521-6280

*Attorneys for Plaintiff*

---

IN THE FOURTH JUDICIAL DISTRICT COURT OF UTAH COUNTY

STATE OF UTAH

---

| | |
|---|---|
| VIVINT, INC. (formerly APX ALARM SECURITY SOLUTIONS, INC.), | : |
| | : |
| Plaintiff, | :    **VIVINT'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| v. | : |
| | : |
| ELITE SECURITY SERVICES, INC., a Utah corporation, JEFF WILSON, SHAWN HANSON, CHASE ERICKSON, TAYLOR HARRIS, BLAKE MCCARTY, JOHN IABONI, DERK WATSON, JASON TIPPETTS (individuals) and JOHN DOES I through X, | :     Civil No. 120400861 |
| | :     Judge Laycock |
| Defendants. | : |

---

Plaintiff Vivint, Inc. ("Vivint" or "Plaintiff"), by and through its undersigned counsel, respectfully submits this Memorandum in Support of its Motion for Preliminary Injunction against Defendants Elite Security Services, Inc. ("Elite"), and individual Defendants (collectively, "Defendants").



EXHIBIT 26 9-14-17 Wilcox

PLAINTIFF'S EXHIBIT
**P616**
No. 3:20-cv-00504-FDW-DSC

## INTRODUCTION

Defendants are engaged in a widespread campaign to target Vivint customers and employ deceptive sales tactics to deceive Vivint customers into entering into alarm services contracts with Elite.    While Defendants may contend that its acts are merely competition, the overwhelming evidence shows that Defendants have repeatedly and purposefully made false and misleading statements to Vivint customers in order to deceive and confuse them.   Typically, Defendants' misrepresentations are designed to lead a customer believe that the Elite representative is in some way affiliated with Vivint (e.g. Elite has "bought out" or "taken over" Vivint, or other statements intended to deceive the customer).   If successful, the Vivint customer is misled into entering into a second alarm services contract with Elite while believing that Elite has replaced Vivint or that there is something wrong with Vivint or its services that requires the customer to enter into an agreement with Elite.  This type of sales conduct is sometimes referred to in the industry as a "slam".  Documented herein are nine deceptive practices employed by Defendants in at least 22 cases.

Defendants' conduct is a violation of state and federal law and the industry's own code of conduct.  Given that the conduct is widespread and well documented, Elite must be enjoined to prevent this illegal and unethical conduct and to prevent further irreparable harm to Vivint.

## STATEMENT OF FACTS

### Background

1.     Vivint is in the business of providing electronic security and home automation systems and services to residential customers throughout the United States and Canada.  Vivint and its predecessor, APX Alarm Security Solutions, Inc. ("APX Alarm"), have been in business since 1999.  (Compl. ¶ 14.)

2.      On information and belief, as an authorized ADT dealer, Elite is engaged in the business of selling, installing, and servicing ADT electronic security systems and is a competitor of Vivint. (Compl. ¶ 15.) As such, on information and belief, Elite sales representatives present themselves as representing both Elite and/or ADT to prospective customers. (*Id.* at ¶ 16.) Elite's principal place of business is in Utah County, Utah. (*Id.* ¶ 2.)

3.      Vivint maintains existing contracts with its customers to provide security system monitoring services.

4.      On information and belief, Jeff Wilson ("Wilson"), Shawn Hanson ("Hanson"), Chase Erickson ("Erickson"), Taylor Harris ("Harris), Blake McCarty ("McCarty"), John Iaboni ("Iaboni"), Derk Watson ("Watson"), and Jason Tippetts ("Tippetts") are or were employed as sales representatives for Elite. In addition, Elite has or continues to employ John Doe sales representatives whose names or full names are unknown at this time but, in addition to those Defendants named specifically, have engaged in unlawful and improper solicitation of Vivint customers with existing contracts.

## Defendants' Fraudulent and Defamatory Business Practices

5.      As set forth in the affidavits filed in support of Vivint's Motion for Preliminary Injunction, Defendants, in an effort to steal Vivint business, have been misleading Vivint customers and making false statements to Vivint customers. Below are nine different deceptive practices used in at least 22 cases, with specific examples:

**a.      Misrepresenting to Vivint customers that Elite and/or ADT is somehow affiliated or a "sister company" with Vivint and is therefore authorized to provide an "upgrade" or "update" to the Vivint customer's current security system to**

iii

**induce the customer to enter into a new contract with Elite.** (*See* Affidavit of Sean Ricks ("Ricks Aff."), Exhibit 1.) For example:

        i.        On or about May 9, 2011, Wilson misrepresented to a Vivint customer in St. Louis, Missouri that he was upgrading her Vivint equipment. Based on this misrepresentation, the customer's Vivint security equipment was removed and replaced with ADT security equipment. The Vivint customer discovered that Elite was a different company only upon receipt of her Vivint bill. (Compl. at ¶ 21; *see also* Ricks Aff., Ex. 1, Line 2, attached hereto as Exhibit A.)

        ii.       On or about June 23, 2011, Hanson misrepresented to a Vivint customer in Saint Ann, Missouri that ADT was "sister companies" with Vivint. Hanson told the customer that the Vivint security system would no longer work and that the customer needed an upgrade, which would be done at no charge or cost. (Compl. at ¶ 22; Ricks Aff., Ex. 1, Line 3.)

        iii.      In yet another instance, a John Doe sales representative of Elite misrepresented to an elderly Vivint customer in Lake Jackson, Texas that she would receive an upgrade. Based on this misrepresentation, the customer signed a new contract with Elite. (Compl. at ¶ 31; Ricks Aff., Ex. 1, Line 16.)

      **b.**      **Misrepresenting to Vivint customers that the customer's security system no longer worked or should be thrown away.** (*See* Ricks Aff., Ex. 1.) For example:

        i.        On or about June 23, 2011, Hanson misrepresented to a Vivint customer in Saint Ann, Missouri that the customer's Vivint system would not work anymore and needed an upgrade. (Compl. at ¶ 22; Ricks Aff., Ex. 1, Line 3.)

    ii.        On or about June 1, 2011, a John Doe sales representative of Elite told a Vivint customer in Beaumont, Texas to throw away the customer's Vivint security equipment (APX32). (Compl. at ¶ 40, Ex. 1, Line 4.)

    **c.    Misinforming Vivint customers that Elite and/or ADT has "taken over" or "bought out" Vivint.** (*See* Ricks Aff., Ex. 1.) For example:

    i.        On or about June 4, 2011, a John Doe sales representative of Elite misrepresented to a Vivint customer in St. Louis, Missouri that ADT was "taking over for Vivint." Based on this misrepresentation, the customer signed a new contract with Elite. (Compl. at ¶ 35; Ricks Aff., Ex. 1, Line 1.)

    ii.        On or about August 22, 2011, a John Doe sales representative of Elite by the name of "Adam" misrepresented to a Vivint customer that ADT "bought out" Vivint. Based on this misrepresentation, the Vivint customer allowed Elite to install ADT equipment. (Compl. at ¶ 41; Ricks Aff., Ex. 1, Line 7.)

    iii.        On a yet to be identified date, a John Doe sales representative of Elite by the name of "Ben" misrepresented to a Vivint customer in St. Louis, Missouri that ADT had "bought out" Vivint and he was there to change the security system. (Compl. at ¶ 42; Ricks Aff., Ex. 1, Line 8.)

    iv.        On or about July 26, 2011, Harris misrepresented to a Vivint customer in Jonesboro, Arkansas that ADT took over Vivint and the customer would now be under ADT. (Compl. at ¶ 24; Ricks Aff., Ex. 1, Line 11.)

    v.        On or about May 15, 2011, two John Doe sales representatives of Elite by the names of "Mark" and "Ben" misrepresented to a Vivint customer in Hazelwood, Missouri that Elite had bought out Vivint. (Compl. at ¶ 30; Ricks Aff., Ex. 1, Line 12.)

vi. On or about January 15, 2012, Iaboni misrepresented to a Vivint customer in Phoenix, Arizona that Elite was taking over Vivint's business. (Compl. at ¶ 27; Ricks Aff., Ex. 1, Line 15.)

vii. On or about March 24, 2012, McCarty misrepresented to a Vivint customer in Los Angeles, California that Elite had bought out Vivint and was there to install a new panel. (Compl. at ¶ 26; Ricks Aff., Ex. 1, Line 19.)

viii. On or about April 23, 2012, Watson misrepresented to a Vivint customer in St. Louis, Missouri that Elite had taken over Vivint. Based on this misrepresentation, the customer consented to Elite installing their equipment. (Compl. at ¶ 28; Ricks Aff., Ex. 1, Line 18.)

ix. On or about May 8, 2012, a John Doe sales representative of Elite by the name of "Louis" misrepresented to a Vivint customer in Houston, Texas that ADT and Elite were taking over the customer's Vivint contract. (Compl. at ¶ 32; Ricks Aff., Ex. 1, Line 20.)

**d. Falsely telling Vivint customers that had entered into an alarm services agreement with Vivint's predecessor APX Alarm, that Vivint had bought out APX Alarm and the customer's APX Alarm agreement was no longer valid.** (*See* Ricks Aff., Ex. 1.) For example, on or about August 16, 2011, McCarty falsely told a Vivint customer in Chicago, Illinois that Vivint's predecessor, APX Alarm Security Solutions, Inc. ("APX Alarm"), was "bought out" by Vivint and the customer's agreement with APX was no longer valid. McCarty also told the customer that he needed to update his equipment and that Honeywell had authorized updating the equipment. Based on these misrepresentations, the Vivint customer

vi

signed a new contract with Elite, without knowing that he was signing to purchase a new security system. (Compl. at ¶ 25; Ricks Aff., Ex. 1, Line 14.)

      **e.**      **Falsely telling Vivint customers if they sign an Elite contract, Elite would cancel the customer's Vivint contract at no charge or cost to the Vivint customer.** (*See* Ricks Aff., Ex. 1.) For example, on or about July 5, 2011, a John Doe sales representative of Elite by the name of "Adam" misrepresented to a Vivint customer in Lansing, Michigan that Elite would call Vivint and cancel the customer's Vivint account and that the customer would not incur any charge or cost by the cancellation. (Compl. at ¶ 39; Ricks Aff., Ex. 1, Line 9.)

      **f.**      **Misleading or Misrepresenting to Vivint customers that Elite sales representatives are representatives of, agents for, or acting on behalf of, Vivint.** (*See* Ricks Aff., Ex. 1.) For example:

      i.      In or around April 2011, a John Doe sales representative of Elite by the name of "Ben" misled a Vivint customer in St. Louis, Missouri into thinking that he was representing Vivint. (Compl. at ¶ 37; Ricks Aff., Ex. 1, Line 5.)

      ii.      On or about July 28, 2011, Erickson misled a Vivint customer into thinking he was representing Vivint. The customer discovered that Erickson was not a representative of Vivint when a Vivint technician made a trip to her home to determine why her Vivint security system was not responding. (Compl. at ¶ 23; Ricks Aff., Ex. 1, Line 6.)

      iii.      On or about September 1, 2011, John Doe sales representative of Elite, one by the name of "Jeff," misrepresented to a Vivint customer in St. Louis, Missouri that they represented Vivint and were there to update the customer's Vivint security system. (Compl. at ¶ 38; Ricks Aff., Ex. 1, Line 10.)

iv.     On or about April 1, 2011, a John Doe sales representative of Elite misled a Vivint customer in Idaho Falls, Idaho into thinking that he/she was representing Vivint. Based on this misrepresentation, the customer signed a new contract with Elite. (Compl. at ¶ 36; Ricks Aff., Ex. 1, Line 13.)

v.      On or about February 15, 2011, a John Doe sales representative of Elite by the name of "Mack" misled a Vivint customer in Ft. Lauderdale, Florida into thinking he was representing Vivint. (Compl. at ¶ 34; Ricks Aff., Ex. 1, Line 17.)

**g.      Misrepresenting to Vivint customers that Elite and/or ADT had been authorized by Honeywell to upgrade or update the customer's Vivint equipment.** (*See* Ricks Aff., Ex. 1, Line 14.) For example, on or about August 16, 2011, McCarty falsely told a Vivint customer in Chicago, Illinois that Honeywell had authorized updating the equipment. Based, in part, on this misrepresentation, the Vivint customer signed a new contract with Elite, without knowing that he was signing to purchase a new security system. (*Id*; Compl. at ¶ 25.)

**h.      Falsely telling Vivint customers that Vivint has changed or is changing its name.** (*See* Ricks Aff., Ex. 1, Line 21.) For example, in or around April 2012, a John Doe sales representative of Elite by the name of "Matthew" misrepresented to a Vivint customer in E. Saint Louis, Illinois that Vivint was changing its name. In addition, "Matthew" falsely told the customer that they did not owe any money on their Vivint contract, despite more than a year remaining on the contract. (*Id.*; Compl. at ¶ 33.

**i.      Misrepresenting to Vivint customers that Elite and/or ADT was authorized to "upgrade" or "update" the customer's Vivint security system.** (*See* Ricks Aff., Ex. 1, Lines 2, 3, 10, 14, 16, 18, 22.) For example, on a yet to be identified date, a John Doe sales representative of Elite misrepresented to a Vivint customer in Lake Jackson, Texas

that Elite was there to provide an "upgrade." The customer signed a new contract with Elite. (Compl. at ¶ 29, Ricks Aff., Ex. 1, Line 16.)

## ARGUMENT

### I.    LEGAL STANDARD.

Pursuant to Utah Rule of Civil Procedure 65A, Vivint is entitled to the injunctive relief it

seeks. Rule 65A provides that an injunction may issue when:

(1)    The applicant will suffer irreparable harm unless the order or injunction issues;

(2)    The threatened injury to the applicant outweighs whatever damage the proposed order or injunction may cause the party restrained or enjoined;

(3)    The order or injunction, if issued, would not be adverse to the public interest; and

(4)    There is a substantial likelihood that the applicant will prevail on the merits of the underlying claims, or the case presents serious issues on the merits which should be the subject of further litigation.

Utah R. Civ. P. 65A(e). For purposes of a preliminary injunction, Vivint is not required to show

to an absolute certainty entitlement to the relief requested. Rather, Vivint need only show

"probable" entitlement to the relief requested. *System Concepts, Inc. v. Dixon*, 669 P.2d 421,

425 (Utah 1984). As set forth below, Vivint satisfies the elements warranting entry of a

preliminary injunction.

### II.    VIVINT IS ENTITLED TO INJUNCTIVE RELIEF AGAINST ELITE.

#### A.    Vivint is Suffering Irreparable Harm as a Result of Defendants' Widespread and Fraudulent Conduct.

Vivint is suffering irreparable harm as a result of Defendants' conduct. Pursuant to Utah

law, "[l]oss of business and goodwill may constitute irreparable harm susceptible to injunction."

*Hunsaker v. Kersh*, 1999 UT 106 ¶ 10, 991 P.2d 67 (holding trial court improperly denied

plaintiff's motion for preliminary injunction by not considering plaintiff's evidence that it would

1

suffer permanent loss to business goodwill absent preliminary injunction); *Dixon*, 669 P.2d at 428-29 (trial court improperly denied preliminary injunction where plaintiff showed likely and threatened misappropriation of its confidential information and business goodwill); *Tri State Gen. & Transm. Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986) ("A threat to trade or business viability may constitute irreparable harm."). Additionally, Utah's Unfair Practices Act explicitly provides for injunctive relief for unfair methods of competition in commerce or trade. *See* Utah Code Ann. § 13-5-14 (providing that "any person . . . may maintain an action to enjoin a continuance of any act in violation of [the Unfair Practices Act]").

In this case, Elite is in direct competition with Vivint, and Vivint faces ongoing irreparable injury in the form of lost business and goodwill if Defendants are not immediately restrained. As detailed in the statement of facts, Defendants have been misleading Vivint customers and making false statements to Vivint customers in the following ways:

- Misrepresenting to Vivint customers that Elite and/or ADT "bought out" or was "taking over" Vivint.

- Misrepresenting to Vivint customers that Elite and/or ADT is somehow affiliated or a "sister company" with Vivint and is therefore authorized to provide an "upgrade" or "update" to the Vivint customer's current security system to induce the customer to enter into a new contract with Elite.

- Misrepresenting to Vivint customers that Vivint is changing or has changed its name.

- Falsely telling Vivint customers if they sign an Elite contract, Elite would cancel the customer's Vivint contract and/or the customer would incur no charge or cost because of the cancellation.

- Misrepresenting to Vivint customers that Elite sales representatives are representatives of, agents for, or acting on behalf of, Vivint.

- Misrepresenting to Vivint customers that the Vivint customer's security system no longer worked or should be thrown away.

- Falsely telling Vivint customers that their contract with Vivint was no longer valid.

2

- Falsely telling Vivint customers that Elite and/or ADT had been authorized by Honeywell (the manufacturer of Vivint's security system) to upgrade or update the equipment.

- Falsely telling Vivint customers that Elite and/or ADT was authorized to provide "upgrades" or "updates" to Vivint security equipment.

Defendants' statements have the tendency to deceive, and actually have deceived, Vivint's customers, who are being led to believe that Vivint has been "bought out" or that Elite is affiliated with Vivint and will be providing an "upgrade" to the Vivint customer's current security system, and so forth. These deceptive statements go to the very heart of Vivint customers' relationship with Vivint. Vivint has been injured and will be injured by Defendants' conduct, in that Defendants are diverting sales and customers from Vivint to Elite. Defendants' false statements and improper conduct represent an actual and genuine threat to Vivint's reputation and goodwill.

Further, the type of harm caused by Defendants' conduct is difficult to quantify in money damages because the full extent of the damage is not presently known and damage to reputation and goodwill are difficult to precisely measure. "'Irreparable injury' justifying an injunction is that which cannot be adequately compensated in damages *or* for which damages cannot be compensable in money." *Hunsaker*, 991 P.2d at 69 (internal citations omitted). Where, as here, there is evidence of threatened loss of customers or goodwill, a finding of irreparable harm is more than warranted.

## B. The Threatened Harm to Vivint by Defendants Greatly Outweighs Any Damage an Injunction May Cause Defendants.

The facts show that the threatened injury to Vivint without an injunction greatly outweighs any possible harm that may be caused to Defendants by the proposed injunction. In the absence of injunctive relief (which will allow Defendants to continue their fraudulent, defamatory, and misleading campaign), Vivint's reputation and goodwill will continue to be

irreparably damaged. The customer complaints that Vivint has received about Elite are likely the tip of the iceberg.[1] *(See, e.g.,* Ricks Aff., Ex. 1.) The potential for harm to Vivint is immediate, ongoing, and poses a high risk of alienating both current and potential customers of Vivint.

On the other hand, the requested preliminary injunction presents no realistic injury or detriment to Defendants. Vivint is not seeking to prevent Defendants from properly advertising, promoting, or selling any of Elite's products or services. Vivint seeks only to stop Defendants from soliciting Vivint customers based on their improper conduct and making false, misleading, and disparaging statements about Vivint. In other words, Vivint only seeks to preserve the status quo by enjoining the destruction of its goodwill and lost business pursuant to state and federal law. *See Hunsaker,* 1999 UT 106, ¶8 (observing that such efforts to preserve "the status quo" are the proper purpose of a preliminary injunction). Moreover, "[i]n fashioning relief against a party who has transgressed the governing legal standards, a court of equity is free to proscribe activities that, standing alone, would have been unassailable." *Cumulus Media, Inc. v. Clear Channel Communications, Inc.* 304 F.3d 1167, 1179 (11th Cir. 2002) (internal citations omitted). As the court held in *Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 705 (5th Cir. 1981), "'[a] competitive business, once convicted of unfair competition in a given particular, should thereafter be required to keep a safe distance away from the margin line—even if that requirement involves a handicap as compared with those who have not disqualified

---

[1] It is commonly accepted and the Court may take Judicial Notice of the fact that only a limited number of affected customers, roughly 4%, actually will take the time to complain. *See* Sheila Kessler, Measuring and Managing Customer Satisfaction, American Society for Quality 63-64 (1996). Therefore, the customers who have complained to Vivint about Defendants' unlawful activities likely represent only a fraction of the Vivint customers who have fallen victim to Defendants' improper conduct. More problematic, it is those who do not complain, and thus remain unidentified, who are likely to have ended their relationship with Vivint. *See* Jerry Plymire, *Complaints as Opportunities,* Business Horizons (Mar.-Apr. 1991)
(available at http://findarticles.com/p/articles/mi_m1038/is_n2_v34/ai_10544096/) (last visited March 23, 2012) (explaining that only 4% of dissatisfied customers complain, but that 91% of dissatisfied customers will never return and each of these dissatisfied customers will likely also repeat their complaints to eight to ten of their friends). Defendants' campaign to smear Vivint's reputation and goodwill is pervasive and consistent—and can be presumed to reach far beyond those Vivint customers who have reached out to Vivint to complain.

themselves.'" *Id.* (quoting *Broderick & Bascom Rope Co. v. Manoff*, 41 F.2d 353, 354 (6th Cir. 1930)) (*accord*). The only way to stop Defendants' illegal campaign is to keep them away from Vivint customers. As such, Defendants should be required to keep a "safe distance" from Vivint customers. Therefore, in addition to enjoining Defendants from making any false or misleading statements about Vivint, Defendants also should be precluded from making in-person sales calls to any Vivint customer – any home that has visible Vivint signage.

Balancing the potential harms to the parties, any harm to Defendants from the issuance of an injunction is greatly outweighed by the irreparable harm that Vivint will continue to suffer if the Court denies Vivint's request for an injunction and allows Defendants to continue its egregious conduct during this proceeding.

## C.     Vivint is Likely to Succeed on the Merits of Its Claims Against Defendants.

Vivint is likely to succeed on the merits of its claims described below, and this lawsuit "presents serious issues on the merits which should be the subject of further litigation." Utah R. Civ. P. 65A(e)(4). Defendants' conduct is unauthorized and violates both state and federal law.

### 1.     Defendants Have Interfered With Vivint's Current and Prospective Economic Relations.

Pursuant to Utah law, a claim for intentional interference with economic relations "protects both existing contractual relationships and prospective relationships of economic advantage not yet reduced to a formal contract." *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 200 (Utah 1991). To succeed on this claim, a plaintiff must demonstrate that: (1) the Defendants intentionally interfered with plaintiff's existing or potential economic relations; (2) for an improper purpose or by improper means; (3) causing injury to the plaintiff. *Anderson Development Co. v. Tobias*, 116 P.3d 323, 331 (Utah 2005) (quoting *Leigh Furniture & Carpet*

*Co. v. Isom*, 657 P.2d 293, 304 (Utah 1982)). "With respect to the second element, only one alternative, either improper purpose or improper means, need be established; a plaintiff need not prove both." *Id.* (citing *Leigh*, 657 P.2d at 307). Specifically, to "establish the second alternative, improper means, a plaintiff must show 'that the Defendants' means of interference were contrary to statutory, regulatory, or common law or violated an established standard of a trade or profession.'" *Id.* (quoting *Pratt v. Prodata, Inc.*, 885 P.2d 786, 787 (Utah 1994)). This includes acts that are illegal or tortious in themselves. *See Leigh*, 657 P.2d at 304.

Vivint has shown that it can prove the elements of an interference claim against Defendants for improperly interfering with Vivint's current and prospective economic relations. First, Vivint had an economic relationship with customers and potential customers—and has the probability of future economic benefit of its ongoing relationship with those customers. Defendants have actual knowledge of Vivint's customer relationships, as evidenced by Defendants' systematic campaign to contact, harass, and unlawfully solicit Vivint customers. Second, Defendants intentionally disrupted these relationships by engaging in the behavior alleged in the Complaint and further buttressed by the affidavit in support of this Motion, and embarking on a campaign to ruin Vivint's relationship with customers through lies and deceit. Third, these actions caused an actual disruption in the relationships, proximately causing economic harm to Vivint. Thus, Vivint is likely to succeed on its claim for interference with economic relations.

### 2. Defendants have Engaged in Unfair Business Practices Under the Utah Unfair Practices Act.

The Utah Unfair Practices Act prohibits unfair business practices and allows such practices to be enjoined and for the party harmed to recover damages. *See* Utah Code Ann. § 13-5-2.5 (providing that "[u]nfair methods of competition in commerce or trade are unlawful and

shall be enjoined . . ."). Indeed, "the purpose of [the Unfair Practices Act] is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, <u>by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented</u>. This act <u>shall be liberally construed</u> that its beneficial purposes may be subserved." U.C.A. § 13-5-17 (emphasis added).

Vivint easily meets its burden on this claim. Defendants' conduct is unfair and fraudulent, as well as harmful to Vivint. Defendants' conduct here undoubtedly has the capacity, likelihood, and tendency to deceive Vivint's current and future customers and, in fact, has already done so. By repeatedly and systematically using unlawful sales and marketing practices to taint Vivint customers for their own benefit, Defendants have clearly prevented fair and honest competition. Therefore, Vivint has demonstrated a likelihood of success on this claim.

> ### 3. Defendants have Engaged in Unfair Competition Under the Lanham Act and False Advertising Under the Utah Truth in Advertising Act.

Under § 43(a) of the Lanham Act, a plaintiff has a cause of action against any person whose use of a "word, term, name, symbol, or device, or . . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact" is likely to cause confusion regarding the source or origin of the plaintiff's goods. *See* 15 U.S.C.A. § 1125(a)(1)(A); *Two Pesos v. Taco Cabana, Inc.,* 505 U.S. 763 (1992).

The Utah Truth in Advertising Act ("UTAA") provides that a "deceptive trade practice occurs when" a "person passes off goods or services as those of another"; "causes likelihood of confusion or of misunderstanding as to affiliation, connection, association with, or certification by another"; "disparages the goods, services, or business of another by false or misleading

representation of fact"; or "engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Utah Code Ann. § 13-11a-3(1)(a), (c), (h), (t).

Vivint has a clear likelihood of success on its Lanham Act and UTAA claims. Defendants have made multiple false statements of fact about Vivint's status, business, and services, including:

- Misrepresenting to Vivint customers that Elite and/or ADT is somehow affiliated or a "sister company" with Vivint and is therefore authorized to provide an "upgrade" or "update" to the Vivint customer's current security system to induce the customer to enter into a new contract with Elite.

- Misrepresenting to Vivint customers that Vivint is changing or has changed its name.

- Falsely telling Vivint customers if they sign an Elite contract, Elite would cancel the customer's Vivint contract and/or the customer would incur no charge or cost because of the cancellation.

- Misrepresenting to Vivint customers that Elite sales representatives are representatives of, agents for, or acting on behalf of, Vivint.

- Misrepresenting to Vivint customers that the Vivint customer's security system no longer worked or should be thrown away.

- Falsely telling Vivint customers that their contract with Vivint was no longer valid.

- Falsely telling Vivint customers that Elite and/or ADT had been authorized by Honeywell (the manufacturer of Vivint's security system) to upgrade or update the equipment.

Thus, Vivint has met its burden of demonstrating a likelihood of success on the merits of its Lanham Act and UTAA claims.

## 4. Defendants' Statements Amount to Defamation *Per Se.*

Defendants' false and disparaging statements constitute defamation *per se*.

> In order to constitute slander *per se*, without a showing of special harm, it is necessary that the defamatory words fall into one of four categories: (1) charge of criminal conduct, (2) charge of a loathsome disease, (3) charge of conduct that is incompatible with

the exercise of a lawful business, trade, profession, or office; and
(4) charge of the unchastity of a woman.

*Allred v. Cook,* 590 P.2d 318, 320 (Utah 1979)) (emphasis added).  Further, "it is necessary to

show that as a consequence of those words, [the] plaintiff has suffered actual harm." *Id.* at 322.

Defendants have made multiple false and disparaging statements intended to induce

Vivint's customers to break their security contracts with Vivint in favor of Elite including:

• Misrepresenting to Vivint customers that Elite and/or ADT is somehow affiliated
or a "sister company" with Vivint and is therefore authorized to provide an "upgrade" or
"update" to the Vivint customer's current security system to induce the customer to enter
into a new contract with Elite.

• Misrepresenting to Vivint customers that Vivint is changing or has changed its
name.

• Misinforming Vivint customers that Elite and/or ADT has "taken over" or
"bought out" Vivint.

• Misrepresenting to Vivint customers that their security system no longer worked,
should be thrown away, or that the customer's contract with Vivint was no longer valid.

The statements are defamatory *per se* in that the statements suggest conduct incompatible

with the lawful exercise of business.  Vivint has and will suffer damages, both monetarily and to

its reputation and goodwill.  Thus, Vivint has met its burden of demonstrating a likelihood of

success on the merits of this claim.

**D.      The Issuance of the Preliminary Injunction Sought by Vivint Would
         Not be Adverse to the Public Interest.**

No public interest will be adversely implicated by the injunction.  To the contrary,

enjoining Defendants from continuing to engage in further unfair competition serves the public

interest.    Congress enacted Section 43(a) of the Lanham Act "to stop the kind of unfair

competition that consists of lying about goods and services." *Castrol Inc v. Pennzoil Co.,* 987

F.2d 939, 941 (3d Cir. 1993).  Moreover, the injunction is in the public interest because Vivint

customers are being harassed and tricked by Defendants' conduct. The public has an interest in a fair marketplace, as specifically acknowledged by the fact that the Utah Unfair Practices Act provides for injunctive relief in cases where unfair business practices threaten to prevent fair and honest competition. *See* U.C.A. § 13-5-14. Moreover, the type of conduct employed by Defendants has been identified as a problem in the alarm industry. In fact, the Electronic Security Association ("ESA"), an alarm industry trade association, developed a Code of Ethics and Standards of Conduct ("Code of Ethics") to be adhered to by its members. *See* ESA website, "Code of Ethics and Standards of Conduct, Amended May 14, 2010 (available at http://www.alarm.org/Portals/0/Documents/Code_of_Ethics_and_Standards_of_Conduct%20%2 0Final%20EC%20Approved_05_14_10.pdf) (last visited May 16, 2012). Elite is a member of the ESA's Utah chapter, the Utah Alarm Association, and is therefore voluntarily subject to the Code of Ethics, which specifically prohibits the exact type of fraud perpetuated by Defendants.[2] Despite the industry's efforts at self-policing, Defendants' violations continue.

Granting injunctive relief to Vivint is not adverse to the public interest, but instead furthers the public interest in preventing Defendants from engaging in their defamatory competitive scheme.

---

[2] A signatory is prohibited from engaging in a number of deceptive and unlawful trade practices including, *inter alia,* stating that (1) a competitor company is going out of business or is in financial difficulty; (2) a competitor company is changing or has changed its company name; (3) the representative's company is acquiring, merging with, has been taken over, or is part of a competitor company; (4) the representative's company, or any other entity, is "taking over" the monitoring of a competitor company's accounts or has purchased the customer's account from a competitor company; (5) any change proposed during a sales solicitation is an "update" or "upgrade" of an existing system when such a transaction requires execution of a contract with a person, company, or entity different than the consumer's existing home security provider. *See generally id.* § 1.3.

## CONCLUSION

For all the foregoing reasons, and in the interest of fairness and justice, Vivint respectfully requests that the Court grants its Motion for Preliminary Injunction.

DATED this $\underline{15}$ day of June, 2012.

CLYDE SNOW & SESSIONS

Rodney G. Snow
Matthew A. Steward
Shannon K. Zollinger

*Attorneys for Plaintiff*

11

## CERTIFICATE OF SERVICE

I hereby certify that on the 5 day of June, 2012, I caused a copy of the foregoing

**VIVINT'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY**

**INJUNCTION** to be served by first class mail, postage prepaid, to the following:

Michael D. Birchall
495 W. University Pkwy
Orem, UT 84058

*Registered Agent for Defendant Elite Security Systems, Inc.*

12

# EXHIBIT A

EXHIBIT A

Rodney G. Snow (#3028)
  rgs@clydesnow.com
Matthew A. Steward (#7637)
  mas@clydesnow.com
Shannon K. Zollinger (#12724)
  skz@clydesnow.com
**CLYDE SNOW & SESSIONS**
One Utah Center, 13th Floor
201 South Main Street
Salt Lake City, Utah  84111-2216
Telephone (801) 322-2516
Facsimile  (801) 521-6280

*Attorneys for Plaintiff*

---

IN THE FOURTH JUDICIAL DISTRICT COURT OF UTAH COUNTY

STATE OF UTAH

---

| | | |
|---|---|---|
| VIVINT, INC. (formerly APX ALARM SECURITY SOLUTIONS, INC.), | : | **AFFIDAVIT OF SEAN RICKS** |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ELITE SECURITY SERVICES, INC., a | : | Civil No. 120400861 |
| Utah corporation, JEFF WILSON, SHAWN | : | |
| HANSON, CHASE ERICKSON, TAYLOR | : | |
| HARRIS, BLAKE MCCARTY, JOHN | : | Judge Laycock |
| IABONI, DERK WATSON, JASON | : | |
| TIPPETTS (individuals) and JOHN DOES I | : | |
| through X, | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

State of Utah            )
                              : ss
County of Utah         )

Sean Ricks, being first duly sworn on oath, deposes and states as follows:

1.      I am over the age of eighteen, a resident of Utah County, Utah and make this affidavit on my own knowledge regarding matters which I would be competent to testify to at trial.

2.      I am an attorney and am duly licensed to practice law in the state of Utah.

3.      I am employed by Vivint, Inc. as an Assistant General Counsel.

4.      One of my duties and responsibilities at Vivint is to work with our Customer Service Department to track situations where a customer has been "slammed" by a sales representative of another alarms sales company. We use the term "slam" to describe when a competitor contacts a current Vivint customer and uses false or misleading statements in an attempt to have the customer cancel their Vivint service in favor of the competitor's or enter into a second redundant service contract.

5.      Responding to "slams" is a priority of Vivint as we consider the conduct to be damaging to our business and goodwill and to be damaging to the industry as a whole. I will frequently try to contact representatives implicated in customer slams to explain the problem and try to curb the conduct. I have a background as a sales representative and am familiar with sales representative – customer dynamics.

6.      Attached as Exhibit 1 to this affidavit is a spreadsheet of data that I compiled for slams by Elite Security Services, Inc. ("Elite") in the normal course of business as part of Vivint's ongoing efforts to respond to and address slams by competitors.

7.      The data contained in the spreadsheet was first entered into a customer service database by customer service representatives of Vivint in the normal course of Vivint business. That data was entered during or immediately following the customer providing that information

to the customer service agent. I then compiled the attached spreadsheet of data as a subset of the larger customer service database in order to get an idea of the volume of slams attributable to Elite specifically.

DATED this _31_ day of May, 2012.

Sean Ricks

Subscribed and sworn before me this _31ST_ of _MAY_, 2012.

NOTARY PUBLIC

KARA BANKHEAD
NOTARY PUBLIC·STATE OF UTAH
COMMISSION# 605587
COMM. EXP. 03-01-2015

3

# EXHIBIT 1

| Line | Date of Call | Customer Name | City, State | Company Who Slammed | Date of Slam | End of Vivint Agreement | Rep Name | Misconduct Alleged |
|---|---|---|---|---|---|---|---|---|
| 1 | 6/7/2011 | Alex McCain | Saint Louis, MO | Elite | 6/4/2011 | 5/23/2012 | Unidentified | Sales representative from Elite/ADT came and said they were taking over for Vivint, and signed customer up to Elite/ADT account. |
| 2 | 6/21/2011 | Pearlie Davis | Saint Louis, MO | Elite | 5/9/2011 | N/A | Jeff Wilson | The sales representative came and told customer that they were upgrading her equipment and so they took out Vivint's equipment and installed all their equipment.  The customer didn't realize Elite was another company until she received her bill from Vivint. |
| 3 | 6/23/2011 | Robert Derhake | Saint Ann, MO | Elite | 6/23/2011 | 11/30/2014 | Shawn Hanson | Elite/ADT came in and told customer ADT was sister companies with Vivint, and that Vivint's system will not work anymore and that the customer needed an upgrade, and there would be no extra cost and charge. |
| 4 | 7/11/2011 | Kenneth Hunt | Beaumont, TX | Elite | 6/1/2011 | May--2013 | Hunter | Customer got slammed by Elite (partners with ADT).  Elite told him to throw away Vivint's APX32 equipment, so the customer does not have that anymore. |
| 5 | 8/2/2011 | Marietta Hearn | St. Louis, MO | Elite | April--2011 | July--2013 | Ben | Customer did not know that Elite/ADT was a different company based on representations. |

| # | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 6 | 8/4/2011 | Helen Latham | Jonesboro, AR | Elite | 7/28/2011 | 10/30/2012 | Chase Erickson | Vivint customer mislead into thinking that Elite/ADT was representing Vivint. Customer thought she was still with Vivint until a Vivint technician came out to check why her Vivint security system was not responding. |
| 7 | 8/24/2011 | Ronald Gajecki | Eastpointe, MI | Elite | 8/22/2011 | 6/17/2012 | Adam | Diane called in regarding her father's (Ronald) account being anti-slammed by Elite/ADT. In August 2011, Elite sales representative Adam knocked on the customer's door and told the customer that ADT bought out Vivint. Because of this misleading information, Ronald allowed the sales representative Adam to install ADT equipment. It wasn't until the next day that Ronald's daughter was watching TV, and noticed a Vivint commercial, realized that her father (Ronald) had been deceived by this Elite sales representative. |
| 8 | 8/26/2011 | Clarence Armstrong | Saint Louis, MO | Elite | Unspecified | 8/7/2013 | Ben | Elite sales representative Ben told the customer that ADT had bought out Vivint, and the sales representative was there to change the customer's system. |
| 9 | 1/24/2012 | Michael Reitsma | Lansing, MI | Elite | 7/5/2011 | 8/16/2012 | Adam | Elite/ADT sales representative came to the customer's home sold them a new account. The Elite/ADT sales representative told the customer he would call Vivint and cancel the service for them and the customer wouldn't have to worry about anything. Customer also called on January 11, 2012 to report this slam. |
| 10 | 9/9/2011 | Israil Hawkins | Saint Louis, MO | Elite | 9/1/2011 | 7/4/2012 | Jeff | Representatives from Elite/ADT came in claiming to be with Vivint. The representatives told the customer that they were there to update his Vivint security system. Note referencing Elite: I returned Israil's call regarding his slam. He said that he's had a difficult time cancelling with Elite security. I made a conf. call to Elite with Israil, we talked with Wendy, and she said they will cancel his agreement. |
| 11 | 9/18/2011 | Diane Scott | Jonesboro, AR | Elite | 7/26/2011 | 10/27/2012 | Taylor Harris | Customer was told by Elite/ADT that they took Vivint over and she would now be under them. |

| # | Date | Name | City/State | Provider | Date | Date | Rep | Description |
|---|------|------|------------|----------|------|------|-----|-------------|
| 12 | 11/30/2011 | Mary Jane Hardin | Hazelwood, MO | Elite | 5/15/2011 | 5/30/2013 | Mark and Ben | Customer was told by the sales representative that Elite had bought out Vivint. |
| 13 | | Shirley Williams | Idaho Falls, ID | Elite | 4/1/2011 | 3/23/2013 | Unidentified | Customer thought that Elite/ADT sales representative was with Vivint the whole time. The customer said that she was misled that the representative(s) was with Vivint because Elite looked a lot like Vivint. She said that she is elderly and can't believe that she was sucked into another agreement. |
| 14 | 9/6/2011 | Lee Williams | Chicago, IL | Elite | 8/16/2011 | N/A | Blake McCarty | Elite/ADT sales representative told customer that APX Alarm was bought out by Vivint and the agreement with us was no longer valid. Elite/ADT sales representative also told the customer that they needed to update the equipment and they were authorized by Honeywell to update the equipment. The sales representative talked to the customer Lee, who is very ill and was asked to sign for the system without knowing what he was signing. |
| 15 | 1/31/2012 | Hershel M. Taxey | Phoenix, AZ | Elite | 1/15/2012 | 7/18/2013 | John Iaboni | Hershel called in wondering why Vivint had a cell communication fail. Customer also needed help changing verbal passcode. Vivint sent a duress code and it didn't come through. Vivint power cycled the cell unit and the panel. The minimum signal strength was obtained on the panel. Sent another duress code. Nothing would work. Customer said that someone came out to the house with the name of John Ionone (sp?). Called to talk to customer about his Elite Security slam. The customer said that when Elite sales representative John Iaboni(sp?) came to his home, he told him they were taking over Vivint's business. Hershel said John had him sign an order form, but that was it, and he didn't leave him a copy. |
| 16 | 7/28/2011 | Marjorie Fipps | Lake Jackson, TX | Elite | N/A | N/A | Unidentified | Paula (the customer's daughter) called in and said that her mom has dementia and signed an agreement with Elite/ADT when they came to her door. She was confused and they offered her an "upgrade" and she signed. |
| 17 | 5/25/2011 | Beauregard Cummings | Fort Lauderdale, FL | Elite | 2/15/2011 | 5/22/2013 | Mack | Customer didn't know Elite/ADT representative was with a different company than Vivint. |

| # | | | | | | | | Description |
|---|---|---|---|---|---|---|---|---|
| 18 | 4/24/2012 | Catherine Harrall | St. Louis, MO | Elite | 4/23/2012 | 9/7/2012 | Derik Watson | Catherine was at first uncomfortable letting the Elite/ADT sales representative into her home because she didn't recognize the company, but Derik spoke with her and succeeded in convincing her that Elite had taken over Vivint. He told her that she was paying for a medical pendant which she didn't have, and that they were going to upgrade her system. She allowed them to install it because she described him as very convincing and had many evidences that they had taken over Vivint. Customer is 90 years old. |
| 19 | 4/25/2012 | Willie MacCray | Los Angeles, CA | Elite | 3/24/2012 | 5/1/2013 | Blake McCarty | Blake came to Willie (customer) and told her Elite/ADT had bought Vivint,which is not true.  Blake said that they were putting in their panel for her.  Also, when they installed the panel, they did something with the phonelines so customer has trouble receiving calls. |
| 20 | 5/8/2012 | Orviss Young | Houston, TX | Elite | 5/6/2012 | 5/19/2013 | Louis | Elite/ADT sales representative Louis claimed that ADT and Elite were taking over Mr. Young's Vivint contract. |
| 21 | 5/15/2012 | Lucillie Burrell | E. Saint Louis, IL | Elite | April | N/A | Matthew | Elite/ADT sales representative told customer Vivint is changing its name and they don't owe Vivint any money.  The customer is in fact under contract for more than a year.  Installed a new system and now customer is behind on Vivint payments. |
| 22 | 6/1/2012 | Willie Marion | Hammond, IL | Elite | 6/1/2012 | 6/1/2012 | Jason Tippetts | Jason came by telling Willie that Vivint had been bought out and he needed to install an updated system.  Willie was skeptical at first and then the Elite rep managed to get him to believe what he was saying.  Someone then told Willie that he should call Vivint to verify.  Willie is going to tell the technician that is going to install the Elite system not to install.  Willie is going to send his NOC to Elite and call to make sure Elite is not taking any money from him. |