UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:20-CV-504-FDW-DSC

CPI SECURITY SYSTEMS, INC.,

                    Plaintiff,

      v.

VIVINT SMART HOME, INC.
f/k/a MOSAIC ACQUISITION CORP.
and LEGACY VIVINT SMART HOME,
INC. f/k/a VIVINT SMART HOME, INC.,

                  Defendants.

**BRIEF IN SUPPORT
OF VIVINT'S MOTION FOR
POST-TRIAL RELIEF**

## <u>BOTTOM LINE UP FRONT</u>

Vivint respectfully seeks the following relief under Rules 50 and 59:

(1)    Vivint asks that the Court alter or amend the judgment or, alternatively, remit CPI's damages or order a new trial, because limits on double recovery and on non-compensatory damages restrict CPI's recovery to a subset of the damages awards on the verdict sheet.

(2)    Vivint asks that the Court grant judgment as a matter of law for Vivint on CPI's claim under the North Carolina Unfair and Deceptive Trade Practices Act (UDTPA), because CPI failed to prove that it relied on Vivint's alleged misrepresentations.

(3)    Vivint asks that the Court grant judgment as a matter of law for Vivint on damages or, alternatively, remit CPI's damages or order a

new trial, because (a) the jury's inflated awards resulted from the erroneous admission of inflammatory evidence, and (b) CPI failed to introduce sufficient admissible evidence to support the jury's damages awards.

## GOVERNING STANDARDS

Rule 50(b): Rule 50(b) calls for judgment in a defendant's favor if the evidence does not provide a legally sufficient basis for a reasonable jury to find for the plaintiff. *See Fry v. Rand Constr. Corp.*, 964 F.3d 239, 244 (4th Cir. 2020).

A scintilla of evidence is insufficient to support a verdict. *Pracht & Greenwood Motor Lines, Inc.*, No. 3:13-CV-529-RJC-DCK, 2016 WL 3032691, at *2 (W.D.N.C. May 26, 2016). Speculation and conjecture are likewise insufficient. *Fry*, 964 F.3d at 244.

Rule 59(a): Under Rule 59(a), the Court may award a new trial on some or all issues when a verdict (1) is against the clear weight of the evidence, (2) is based on false evidence, or (3) will cause a miscarriage of justice. *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 145 (4th Cir. 2017). The Court may grant a new trial even if substantial evidence supports the verdict. *Poynter v. Ratcliff*, 874 F.2d 219, 223 (4th Cir. 1989). On a Rule 59 motion, the Court may weigh the evidence and evaluate witness credibility. *Id.*

Rule 59(a) also authorizes the Court to remit an excessive damages award. *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 502 (4th Cir. 2007); *Eschert v. City of Charlotte*, No. 3:16-CV-295-FDW-DCK, 2017 WL 3633275, at *7–9 (W.D.N.C.

2

Aug. 23, 2017). If an award is excessive, "it is the court's duty" to order a new trial unless the plaintiff accepts a reduced award. *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 593 (4th Cir. 1996). The Court may remit both compensatory and punitive damages. *Id.*

Rule 59(e): Under Rule 59(e), the Court has discretion to alter or amend a judgment to avoid excessive awards and prevent double recovery. *Gilliam v. Allen*, No. 21-2313, 2023 WL 2395416, at *10–13 (4th Cir. Mar. 8, 2023) (to be published in F.4th); *Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir. 1993).

## ARGUMENT

### I. CPI can recover no more than a subset of the damages awards on the verdict sheet.

The verdict sheet lists four compensatory-damages awards and one punitive-damages award. Doc. 148 at 1–5. For two reasons, CPI can recover only a subset of these awards.

First, all four of CPI's claims arose from the same course of conduct. As a result, CPI can recover only one of the jury's compensatory awards.

Second, CPI cannot recover non-compensatory damages that exceed statutory or constitutional limits. Thus, CPI's choice of compensatory award limits its recovery of non-compensatory damages.

For these reasons, even if the verdict survives Rule 50(b), CPI can recover only one of the following:

1.   $5.4 million in compensatory damages and no punitive damages based on the Lanham Act claim;

2.   $13.5 million in compensatory damages and $40.5 million in punitive damages on the unfair-competition claim;

3.   $1.5 million in compensatory damages and $4.5 million in punitive damages on the tortious-interference claim; or

4.   $87.9 million in treble damages and no punitive damages on the UDTPA claim.

**A.      CPI can recover only one compensatory award.**

All of CPI's claims were based on the same course of conduct. As a result, CPI can recover compensatory damages on only one of its claims.

Under federal law and North Carolina law, a plaintiff cannot recover twice for the same course of conduct. *See, e.g.*, *Winant v. Bostic*, 5 F.3d 767, 775 (4th Cir. 1993); *X-It Prods., L.L.C. v. Walter Kidde Portable Equip., Inc.*, 227 F. Supp. 2d 494, 523–24 (E.D. Va. 2002); *United Lab'ys, Inc. v. Kuykendall*, 437 S.E.2d 374, 379–80 (N.C. 1993); *Trantham v. Michael L. Martin, Inc.*, 745 S.E.2d 327, 335 (N.C. Ct. App. 2013). Thus, if multiple damages awards arise from the same course of conduct, the plaintiff can receive only one of those awards. *E.g.*, *Transamerica Occidental Life Ins. Co. v. Sanders*, No. 96-1147, 1996 WL 378310, at *1 (4th Cir. July 8, 1996) (per curiam); *X-It*, 227 F. Supp. 2d at 523–24; *Volumetrics Med.*

*Imaging, Inc. v. ATL Ultrasound, Inc.*, No. 1:01-CV-182, 2003 WL 21650004, at *3 (M.D.N.C. July 10, 2003).[1]

*X-It* applies the no-double-recovery rule to a case like this one. The jury made separate damages awards on several claims, including claims under the Lanham Act, the North Carolina common law of unfair competition, and the UDTPA. *See* 227 F. Supp. 2d at 500–02, 537. Because those claims arose from the same course of conduct, the court held that the plaintiff could recover only one compensatory award. *See id.* at 499, 522–25, 542–43.

The same result is warranted here. This jury, like the jury in *X-It*, made separate awards of compensatory damages on each of CPI's claims. Doc. 148 at 1–5. Those claims were based on the same course of conduct: alleged misrepresentations to CPI's customers. All aspects of CPI's case, from the complaint through the closing argument, relied on these alleged misrepresentations to customers. Doc. 29 ¶¶ 51–59, 62–67, 71–77, 89–92; 2/6/23 Tr.; 2/16/23 Tr. (acknowledging that the same course of conduct "result[ed] in the four causes of action at issue"); 2/16/23 Tr.; Pl.'s Closing Argument PowerPoint; 2/17/23 Tr.[2]

---

[1]     Courts sometimes frame this rule as prohibiting double recovery for the same injury. *E.g., Eschert*, 2017 WL 3633275, at *7–9; *Murray v. Nationwide Mut. Ins. Co.*, 472 S.E.2d 358, 368 (N.C. Ct. App. 1996). That framing produces the same result in this case because, as shown below, CPI's claims were based on the same course of conduct *and* the same injury.

[2]     Based on consultation with the Court's official court reporter, this brief cites volumes of the forthcoming certified transcripts, rather than citing specific pages of the unedited real-time transcripts. Once certified transcripts of the proceedings are available, Vivint will seek leave to supplement its brief with citations to the certified transcripts, as contemplated by the Court's March 7 order. Doc. 154.

In fact, CPI has conceded that its UDTPA claim rests on the same course of conduct that underlies CPI's other claims. At the charge conference, CPI argued that a finding in its favor on its other claims would automatically satisfy the conduct element of its UDTPA claim. 2/13/23 Tr.  The jury instructions followed that approach: They instructed the jury that if it found Vivint liable on any of CPI's other claims, it must find Vivint liable under the UDTPA. 2/16/23 Tr.

As that instruction shows, the jury's findings on CPI's UDTPA claim and on its other claims rested on the same conduct and the same injury. Because of that overlap, CPI cannot recover on both its UDTPA claim and its other claims. *E.g.*, *Marshall v. Miller*, 268 S.E.2d 97, 103 (N.C. Ct. App. 1980), *aff'd as modified*, 276 S.E.2d 397 (N.C. 1981).

The compensatory awards here are duplicative even though the jury did not award the same amount of compensatory damages on each claim. A plaintiff cannot recover multiple compensatory awards for overlapping claims, even if the awards are for different amounts. *See Eschert*, 2017 WL 3633275, at *1, *7–9; *Volumetrics*, 2003 WL 21650004, at *3; *X-It*, 227 F. Supp. 2d at 542–43.

CPI might respond that the jury misunderstood the above rules, so CPI should be allowed to recover more than one award. This Court rejected that very argument in *Eschert*, concluding that any jury confusion was of the "[p]laintiff's own making." 2017 WL 3633275, at *8. If the plaintiff wanted a large verdict without overlapping recoveries, the Court observed, the plaintiff needed to guide the

jury (in the jury instructions or in closing argument) on how to fill out the verdict sheet. *Id.*

The same is true here. Indeed, this Court has already recognized it. During jury deliberations, CPI expressed concern that the jury might calculate a total amount of damages and divide that amount among the four claims. 2/17/23 Tr. The Court replied that CPI had the duty to address that risk earlier: either in the jury instructions, on the verdict sheet, or in closing argument. *See id.* Having not done so, CPI cannot complain that it is limited to only one compensatory award.

In sum, CPI asserted four claims that were based on the same course of conduct. CPI can therefore recover compensatory damages for only one of those claims.

**B.    CPI's recoverable non-compensatory damages are far less than the award on the verdict sheet.**

The law limits CPI's damages in another way as well: it does not allow CPI to recover all of the *non-compensatory* damages on the verdict sheet.

Two types of non-compensatory damages are potentially available in this case: treble damages under the UDTPA and punitive damages under the common law. Treble damages and punitive damages are mutually exclusive; CPI cannot recover both. N.C. Gen. Stat. § 1D-20; *Ellis v. Northern Star Co.*, 388 S.E.2d 127, 132 (N.C. 1990).

The type and amount of non-compensatory damages that CPI can recover depend on which compensatory damages it elects.

CPI can recover treble damages only if its UDTPA claim survives Rule 50(b) and CPI chooses compensatory damages based on that claim. *See* N.C. Gen. Stat. § 75-16; *Ellis*, 388 S.E.2d at 132. If that happens, CPI's total recovery would be three times the compensatory award on the UDTPA claim: a total of $89.7 million. *See id.*

CPI can recover punitive damages only if it chooses compensatory damages based on its unfair-competition claim or its tortious-interference claim. CPI's claims under the Lanham Act and the UDTPA do not support punitive damages. *E.g.*, *Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 113 (2d Cir. 1988) (Lanham Act); *Pinehurst, Inc. v. O'Leary Bros. Realty*, 338 S.E.2d 918, 925 (N.C. Ct. App. 1986) (UDTPA). Accordingly, the verdict sheet and the jury instructions allowed the jury to award punitive damages only on CPI's unfair-competition and tortious-interference claims. Doc. 148 at 5; 2/16/23 Tr.

If CPI chooses compensatory damages on its unfair-competition claim or its tortious-interference claim, CPI's punitive damages will be capped at three times the award that CPI chooses. *See* N.C. Gen. Stat. § 1D-25(b). For example, if CPI chooses the $13.5 million compensatory award on its unfair-competition claim, its punitive damages will be capped at $40.5 million.

The *X-It* decision illustrates this point. There, the jury awarded both compensatory damages and punitive damages on multiple claims. 227 F. Supp. 2d at 502. The court calculated a separate punitive-damages cap under section 1D-25(b) for each claim. *Id.* at 536, 538. It then limited the plaintiff to recovering only

one of those punitive-damages awards. *Id.* at 542. As *X-It* illustrates, any broader award of punitive damages here would depart from section 1D-25(b) and precedent.

Such an award would also violate federal due-process principles. A punitive-damages award violates due process when it is disproportionate to the plaintiff's compensatory damages, *see, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418, 424–28 (2003), or when it reflects "arbitrariness, uncertainty, and lack of notice," *Philip Morris USA v. Williams*, 549 U.S. 346, 354 (2007).

Here, both types of violations would occur unless CPI's punitive damages remain limited to three times the compensatory award for CPI's unfair-competition claim or its tortious-interference claim. *See* 2/16/23 Tr.; Doc. 148 at 5 ¶ 5(a). Allowing CPI to recover the $140 million punitive award on the verdict sheet would be "grossly excessive [and] arbitrary punishment." *State Farm*, 538 U.S. at 416. That amount exceeds CPI's annual net income in recent years by a factor of almost 150. *See infra* p. 18. Awarding CPI $140 million in punitive damages would also unlawfully punish Vivint for acts "independent from the acts upon which liability was premised," *State Farm*, 538 U.S. at 422—specifically, interactions with non-CPI customers that gave rise to other proceedings. *See infra* p. 17.

*     *     *

For these reasons, Vivint requests that the Court limit CPI to one of the recoveries described above, *see supra* p. 4, then alter the judgment accordingly. Alternatively, Vivint requests that the Court remit CPI's damages as described above or order a new trial.

## II.  CPI's UDTPA claim fails for lack of reliance by CPI.

CPI's UDTPA claim stems from alleged misrepresentations by Vivint. Under North Carolina law, CPI can recover on that claim only by showing that it relied on Vivint's alleged misrepresentations. CPI offered no evidence of that reliance. Vivint therefore requests that the Court grant judgment as a matter of law in Vivint's favor on CPI's UDTPA claim.

Proximate cause is an element of a UDTPA claim. *Bumpers v. Cmty. Bank of N. Va.*, 747 S.E.2d 220, 226 (N.C. 2013). To establish proximate cause on a misrepresentation-based or deception-based claim, a plaintiff must show that it relied on the misrepresentations or deception at issue. *See id.* at 227; *Caper Corp. v. Wells Fargo Bank, N.A.*, 578 F. App'x 276, 287 (4th Cir. 2014); *Dan King Plumbing Heating & Air Conditioning, LLC v. Harrison*, 869 S.E.2d 34, 43–44 (N.C. Ct. App. 2022). In contrast, a plaintiff cannot establish proximate cause by showing that third parties relied on the misrepresentations. *See Bumpers*, 747 S.E.2d at 226; *DC Custom Freight, LLC v. Tammy A. Ross & Assocs.*, 848 S.E.2d 552, 560–61, 563 (N.C. Ct. App. 2020); *Bite Busters, LLC v. Burris*, No. 20 CVS 899, 2021 WL 1161316, at *10 (N.C. Super. Ct. Mar. 25, 2021).

This reliance requirement defeats CPI's UDTPA claim.

CPI's UDTPA claim stems from alleged misrepresentations. CPI tried to satisfy the conduct element of its UDTPA claim by alleging violations of other sources of law: the Lanham Act, the common law of unfair competition, and the common law of tortious interference. *See* 2/16/23 Tr.

Those alleged predicate violations stem from alleged misrepresentations. This Court recognized this point when it noted that CPI's UDTPA claim "is based on underlying conduct that does involve misrepresentations." 2/15/23 Tr. That observation was correct. CPI has argued at every turn—in its complaint, its summary-judgment brief, its opening statement, its closing argument, its proposed jury instructions, and its proposed verdict sheet—that Vivint committed its alleged predicate violations through misrepresentations. *See* Doc. 29 ¶¶ 1–10, 28–30, 52–58, 62–67, 89–90; Doc. 62 at 1, 3–5, 16; 2/6/23 Tr.; 2/16/23 Tr.; Doc. 147 Exs. 1–3.

Because CPI's UDTPA claim alleges misrepresentations, CPI must show that it relied on those misrepresentations. CPI has not even tried to make that showing. It has instead argued that third parties—its customers—relied on the alleged misrepresentations. *See, e.g.*, Doc. 29 ¶¶ 2, 28–33, 45–46, 54–58, 62, 64–66, 89–90; Doc. 62 at 1, 3, 16; 2/6/23 Tr.; 2/16/23 Tr.; Doc. 148 at 2–3. Because that argument clashes with the decisions discussed above, CPI's UDTPA claim fails.

At earlier stages of this case, this Court has held that UDTPA claims do not stem from misrepresentations when they rest on violations of other sources of law. Doc. 77 at 6−8; 2/15/23 Tr. With respect, that conclusion departs from North Carolina law.

The North Carolina Supreme Court and the North Carolina Court of Appeals have addressed UDTPA claims that rest on alleged predicate violations that, in turn, involve misrepresentations. Both courts have held that this type of UDTPA claim is misrepresentation-based, so the plaintiff must show first-party reliance.

The North Carolina Supreme Court made this point in *Bumpers* itself. In *Bumpers*, two borrowers alleged that a bank violated the UDTPA by charging for, but failing to provide, discounted loans. 747 S.E.2d at 223. The borrowers and a dissenting Justice argued that the borrowers need not show reliance because they based their UDTPA claim on a claim for overcharging—a violation of a predicate statute, N.C. Gen. Stat. § 53-238. *Bumpers,* 747 S.E.2d at 230 & n.7 (Hudson, J., dissenting).

The majority disagreed. Writing for the Supreme Court, Justice Newby concluded that "a claim for overcharging is not distinct from one based on misrepresentation." *Id.* at 227. As the *Bumpers* court recognized, the predicate violation in that case stemmed from an alleged misrepresentation: a misrepresentation that the bank would provide discounted loans. *See id.* at 226–27. For that reason, the borrowers needed to show that they relied on the bank's alleged misrepresentation. *Id.*

The North Carolina Court of Appeals reaffirmed this principle in *DC Custom Freight*. There too, the plaintiff based its UDTPA claim on an alleged violation of an independent law: a statute that bars misrepresentations about the terms of insurance policies. *See* 848 S.E.2d at 559–60 (discussing N.C. Gen. Stat. § 58-63-

15(1)). Because that predicate violation stemmed from alleged misrepresentations, the Court of Appeals held that the plaintiff's UDTPA claim was misrepresentation-based. *Id.* Thus, the plaintiff needed to prove its own reliance on the defendant's alleged misrepresentations. *Id.* at 560–61, 563.

*Bumpers* and *DC Custom Freight* control here. On questions of state law, federal courts follow the decisions of the relevant state's highest court. *Assicurazioni Generali, S.p.A. v. Neil*, 160 F.3d 997, 1002 (4th Cir. 1998). Federal courts also follow the decisions of the state's intermediate appellate court unless the federal courts are convinced that the state's highest court would disagree. *Id.* at 1003. Here, North Carolina's Supreme Court and Court of Appeals agree that first-party reliance is required when a UDTPA claim rests on a predicate violation that is itself misrepresentation-based. That rule bars CPI's claim.

Two unpublished Fourth Circuit decisions likewise confirm that CPI's UDTPA claim fails for lack of first-party reliance.

In both cases, the plaintiffs brought UDTPA claims based on misrepresentation-based predicates, including a Lanham Act violation. *See Variety Stores, Inc. v. Walmart Inc.*, 852 F. App'x 711, 726 (4th Cir. 2021); *Caper Corp.*, 578 F. App'x at 287. In both cases, the Fourth Circuit held that, to prove proximate cause, the plaintiffs needed to show first-party reliance.

In *Variety Stores*, when the Fourth Circuit held that the plaintiff needed to show proximate cause, it cited the North Carolina pattern jury instruction that implements *Bumpers* by requiring a showing of first-party reliance for

misrepresentation-based claims. *See* 852 F. App'x at 726; N.C. Pattern Jury Instr. for Civil Cases § 813.70.

In *Caper Corp.*, the Fourth Circuit held that a UDTPA claim failed because the plaintiff had not shown that it relied on the defendant's alleged misrepresentations. *See* 578 F. App'x at 287.

These decisions confirm that a UDTPA plaintiff must show first-party reliance when, as here, the predicate violations for its UDTPA claim stem from misrepresentations.

At summary judgment, this Court reached a contrary conclusion based on the North Carolina Business Court's decision in *Bite Busters*. Doc. 77 at 6–7. For three reasons, however, *Bite Busters* cannot save CPI's UDTPA claim.

First, even if the Business Court's decision in *Bite Busters* conflicted with the North Carolina appellate decisions discussed above, the appellate decisions would control. *See Assicurazioni*, 160 F.3d at 1002.

Second, there is no conflict. *Bite Busters* followed the rule that bars CPI's claim here: "The holding in *Bumpers* precludes a UDTPA claim . . . in which a third party's reliance caused damage to the plaintiff." 2021 WL 1161316, at *10 (quoting *DC Custom Freight*, 848 S.E.2d at 562) (alterations omitted).

Third, the *Bite Busters* court's discussion of slander per se does not help CPI. *Cf.* Doc. 77 at 8. That court held that the plaintiff need not show reliance because the predicate for its UDTPA claim was slander per se. 2021 WL 1161316, at *10. But that holding turned on a unique feature of slander per se: When a per se

slanderous statement is published, the law presumes an injury, so no evidence of proximate cause is required. *See, e.g.*, *Andrews v. Elliot*, 426 S.E.2d 430, 432 (N.C. Ct. App. 1993). Thus, the *Bite Busters* court's no-reliance holding is limited to the special context of slander per se. *See* 2021 WL 1161316, at *10.

Here, CPI has no claim for slander per se. To the contrary, CPI voluntarily dismissed its slander claim. Doc. 37. Thus, to prove proximate cause, CPI must prove its own reliance. *See supra* pp. 10–14. The problem for CPI is that it has tried to prove only the reliance of third parties—the very type of reliance that North Carolina law rejects. *See Bumpers*, 747 S.E.2d at 226; *DC Custom Freight*, 848 S.E.2d at 560–61, 563.

For these reasons, CPI's failure to prove its own reliance defeats its UDTPA claim. Vivint requests that the Court grant it judgment as a matter of law on that claim.

### III. The record contains insufficient admissible evidence to support the jury's damages awards.

The jury's inflated awards are the product of erroneously admitted inflammatory evidence. For this reason, the law calls for a new trial or a remittitur.

Even if CPI's inflammatory evidence were admissible, moreover, the jury still could not calculate CPI's damages to a reasonable degree of certainty. As a result, Vivint is entitled to judgment as a matter of law.

#### A. The jury's inflated awards resulted from the erroneous admission of inflammatory evidence.

When a damages award is excessive, Rule 59 allows the Court to order a new trial or remit the damages award. *See supra* pp. 2–3.

Throughout the trial, CPI used inflammatory evidence to incite the jury into punishing Vivint. The jury took the bait, awarding massive amounts of damages. But that inflammatory evidence was inadmissible. Admitting that evidence without bifurcating the trial caused grave prejudice to Vivint. These errors call for a new trial.

##### 1. CPI focused its case on evidence that inflamed the jury.

CPI introduced two main types of inflammatory evidence at trial. First, CPI introduced evidence of other proceedings and regulatory actions against Vivint. Second, CPI introduced complaints about Vivint that customers made to third parties, such as the Better Business Bureau and ADT.

Throughout the trial, CPI highlighted this evidence and asked the jury to punish Vivint because of it.

In CPI's opening statement, it stressed enforcement actions by state attorneys general, the FTC, and the DOJ, along with other prior-acts evidence. CPI then asked the jury to address Vivint's alleged conduct—including the conduct that gave rise to these other proceedings—by punishing Vivint with "significant monetary and punitive damages." 2/6/23 Tr.  To quantify the punishment CPI was seeking, it stressed Vivint's $5 billion valuation. *Id*. Vivint moved for a mistrial, which was denied. *Id*.

CPI continued inciting the jury through the rest of the trial. Although the Court excluded evidence of the DOJ action, the FTC actions, and the ADT settlement amount, CPI still presented all of that evidence to the jury over Vivint's objections. It did so through its expert's testimony (2/10/23 Tr.) and through video testimony that CPI played for the jury well after Vivint's counsel stood to object (2/8/23 Tr.). Because no curative instruction could overcome the prejudice caused by this evidence, Vivint moved for a mistrial on each occasion. Those motions were denied.

CPI also presented evidence of the sixteen actions by state attorneys general, along with multiple examples of prior acts involving non-CPI customers. The Court allowed CPI to introduce all of this evidence over Vivint's objections. *See, e.g.*, 2/10/23 Tr.

CPI emphasized its inflammatory evidence again in its closing arguments. It argued repeatedly that Vivint was a rogue company that deserved punishment. CPI even told the jury that a punitive-damages award was "the most important issue in this case." 2/16/23 Tr.

CPI's tactics worked. The jury, having been provoked by the evidence described above, awarded massive amounts of compensatory and punitive damages. The combined amount of compensatory damages on the verdict sheet is $49.7 million. Doc. 148. That amount exceeds CPI's annual net income in recent years *by a factor of fifty*. *See* Pl.'s Ex. 87; Def.'s Ex. 57. When those compensatory amounts are combined with the $140 million punitive-damages award, the total exceeds CPI's annual net income *by a factor of two hundred*.

These enormous awards cannot be squared with the evidence. The jury heard from only twelve CPI customers who alleged a deceptive sales practice. Of those twelve customers, CPI ultimately lost only three and retained nine. Those figures illustrate the weak evidentiary foundation of the damages awarded here.

The jury's awards on some of CPI's claims even exceeded the highest valuations that CPI assigned to them. For example, on CPI's tortious-interference claim, the jury awarded an amount *sixty times* the value that CPI assigned to that claim. *See infra* p. 36. Awards like that have no basis in evidence. Instead, they are the product of an inflamed jury.

As shown in the next two sections, the law prohibited CPI from instigating this runaway verdict.

### 2. Admitting CPI's inflammatory evidence violated the Rules of Evidence.

CPI's inflammatory evidence was inadmissible under Rules 402, 403, 404(b), and 802 of the Federal Rules of Evidence. *See* Doc. 117. CPI argued that this evidence was relevant to punitive damages. But even if that were the case, the evidence would still be inadmissible for other reasons.

When a plaintiff requests punitive damages, the Federal Rules of Evidence continue to apply. *See In re C.R. Bard, Inc.*, 810 F.3d 913, 919 n.1 (4th Cir. 2016); *see also McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 976–77 (4th Cir. 2020) (holding that inflammatory financial evidence would be inadmissible in a new trial on punitive damages).

Thus, to be admissible, CPI's punitive-damages evidence needed to satisfy the Federal Rules of Evidence. It did not.

Rule 404(b) barred CPI's introduction of evidence on prior, unrelated proceedings brought by and against Vivint. *See Lanham v. Whitfield*, 805 F.2d 970, 972 (11th Cir. 1986). CPI could not use the issue of "notice" to bootstrap in this evidence. *See Gillis v. Murphy-Brown, LLC*, No. 7:14-cv-185, 2018 WL 5831994, at *2 (E.D.N.C. Nov. 7, 2018).

Furthermore, Rule 403 barred CPI's prior-litigation evidence. Any probative value of that evidence was substantially outweighed by its unfair prejudice to Vivint: the false impression that Vivint needed to justify, in this trial, the positions

it took in prior litigation. *See United States v. Hill*, 322 F.3d 301, 306 (4th Cir. 2003).

Lastly, Rule 802 barred all this evidence because it consisted of out-of-court allegations, by non-testifying third parties, to which no hearsay exception applied. *See United States v. May*, 87 F. App'x 867, 868 (4th Cir. 2004); *Roberts v. Harnischfeger Corp.*, 901 F.2d 42, 44–45 (5th Cir. 1989).

With this evidence admitted, the jury was able to—and did, as described above—punish Vivint for unrelated prior conduct. *See supra* pp. 16–18. The law prohibits that type of punishment. *See State Farm*, 538 U.S. at 422.

These errors call for a new trial.

### 3. It was erroneous to admit CPI's inflammatory evidence without bifurcating the trial.

Even if CPI's inflammatory evidence might have been admissible in some situations, it was inadmissible in a non-bifurcated trial.

In cases with punitive-damages claims, a North Carolina statute guarantees defendants a bifurcated trial. N.C. Gen. Stat. § 1D-30. North Carolina's federal courts have deferred to that guarantee of bifurcation. *See*, *e.g.*, *Silicon Knights, Inc. v. Epic Games, Inc.*, No. 5:07-CV-275, 2011 WL 13234787, at *1–2 (E.D.N.C. Oct. 31, 2011) (relying almost exclusively on North Carolina's punitive-damages statute in granting motion to bifurcate); *Gillis v. Murphy-Brown, LLC*, No. 7:14-CV-185-BR, ECF No. 249, slip op. at 3 (E.D.N.C. Nov. 26, 2018) (same).

They have done so for good reason: When, as here, inflammatory evidence is admitted in a non-bifurcated trial, that evidence is sure to "prejudic[e] . . . the jury's consideration of liability or compensatory damages." *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95, 110 (4th Cir. 1991); *see also, e.g.*, *Silicon Knights*, 2011 WL 13234787, at *2; *Gillis*, 2018 WL 5831994, at *2; 1 John J. Kircher & Christine M. Wiseman, *Punitive Damages: Law and Practice* § 12:1 (2d ed. 2022) (collecting cases).

As courts have consistently recognized, limiting instructions cannot guard against prejudice this severe. *See United States v. Foutz*, 540 F.2d 733, 738 (4th Cir. 1976) (limiting instructions could not ensure that the jury "properly segregated the evidence into separate intellectual boxes") (alterations omitted); *see also, e.g.*, *Ballentine v. Town of Coats*, No. 5:11-CV-524-FL, 2012 WL 4471605, at *4 (E.D.N.C. Sept. 26, 2012) (granting motion to sever because "limiting instructions would not adequately safeguard against the confusion and improper prejudice likely to accrue" in a combined trial).

Here, the introduction of inflammatory evidence on punitive damages in a non-bifurcated trial produced inflated compensatory awards. *See supra* p. 18. For this reason, a new, bifurcated trial is warranted.

## B. The erroneous admission of undisclosed damage computations and related testimony led to inflated damages awards.

### 1. CPI failed to disclose its damages computations before trial.

Because CPI failed to disclose its damages computations before trial, those computations should have been excluded from evidence.

Rule 26(a)(1)(A)(iii) of the Federal Rules of Civil Procedure requires a plaintiff to disclose "a computation of each category of damages" it seeks. The rule requires not only specific dollar amounts for each category of damages, but also category-specific damages computations. *Liberty Ins. Underwriters, Inc. v. Beaufurn, LLC*, No. 1:16-CV-1377, 2021 WL 2109479, at *5 (M.D.N.C. May 25, 2021); *accord Silicon Knights, Inc. v. Epic Games, Inc.*, No. 5:07-CV-275-D, 2012 WL 1596722, at *1–10 (E.D.N.C. May 7, 2012). To enforce that requirement, this Court's Case Management Order requires parties to supplement their Rule 26(a)(1) disclosures "sufficiently in advance of the discovery deadline to put opposing counsel in a realistic position to make strategic judgments about whether to pursue follow-up discovery." Doc. 35 ¶ 1(d).

When a party fails to disclose a calculation of damages, it cannot pursue those damages at trial unless the failure was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1); *see, e.g.*, *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 512 n.10 (4th Cir. 2002) (excluding damages that were not properly disclosed); *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, No. 3:19-CV-515-

KDB-DSC, 2022 WL 884275, at *7–9 (W.D.N.C. Mar. 24, 2022) (excluding damages that were fully disclosed nine days after the close of discovery).

These rules barred most of the computations that CPI used at trial. CPI disclosed only one damages computation before trial: corrective-advertising damages of $10.8 million. Doc. 117 at 8 n.16. For every other category of damages CPI sought—lost profits, goodwill, and disgorgement of Vivint's profits—CPI did not disclose a computation or even a dollar amount. Doc. 81 at 9–10. CPI refused to disclose its computations despite Vivint's repeated requests and despite a motion to prohibit CPI from pursuing these undisclosed damages. Doc. 117 at 8.

Despite this lack of pretrial disclosure, the Court allowed CPI to reveal its damages computations in front of the jury, with some computations revealed as late as closing argument. 2/9/23 Tr.; 2/16/23 Tr.  The undisclosed computations also featured an unexpected damages multiplier. 2/9/23 Tr.; 2/10/23 Tr.; *see also infra* pp. 24–27 (discussing other problems with this multiplier).

Forcing Vivint to defend against these surprise damages theories on the fly during trial caused massive prejudice. Rule 26's damages-disclosure requirements ensure that parties have the opportunity to test damages computations before trial—for example, in Rule 30(b)(6) depositions and through rebuttal experts—and to disprove them at trial. *See, e.g.*, *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 (4th Cir. 2014) ("The purpose of Rule 26(a) is to allow the parties to adequately prepare their cases for trial and to avoid unfair surprise.").

Here, CPI deprived Vivint of that opportunity. Instead, Vivint heard most of CPI's damages computations only when CPI presented them to the jury—precisely the kind of ambush that Rule 26 prohibits.

This error warrants a new trial.

### 2. CPI's evidence of a damages multiplier was inadmissible.

CPI had the burden to prove its damages to a reasonable degree of certainty. *Olivetti Corp. v. Ames Bus. Sys., Inc.*, 356 S.E.2d 578, 586 (N.C. 1987). It did not carry that burden here.

At trial, CPI told the jury to calculate CPI's alleged damages and then multiply them by twenty. As the massive awards on the verdict sheet show, the jury complied. The evidence that CPI relied on to argue for this damages multiplier, however, was inadmissible.

The 20x multiplier was central to CPI's damages requests. CPI argued that, to calculate CPI's lost profits and Vivint's profits, the jury should multiply each company's profits per customer by the number of customers CPI lost to Vivint. *See* 2/16/23 Tr.  To determine how many customers CPI lost, CPI told the jury to take the number of former CPI customers who complained to Vivint and multiply that number by twenty. *Id.* The resulting formula looked like this:

Total profits = (profit per customer) x (number of complaining customers) x 20

When CPI asked the jury to apply a 20x multiplier, it relied on two pieces of evidence. Neither one was admissible.

The first was an image in a 2014 Vivint slide deck. Pl.'s Ex. 623 at 31; Winer PowerPoint at 15. That image states that 5% of customers "[c]omplain to HQ," 45% of customers "[c]omplain to [a] frontline worker," and 50% of customers "[n]ever complain." Pl.'s Ex. 623 at 31.

The second piece of evidence was a statement in a 2012 Vivint brief in another lawsuit. *See* 2/16/23 Tr.; Pl.'s Ex. 616 at 4 n.1; Winer PowerPoint at 16. That brief stated that 4% of affected customers complain. Pl.'s Ex. 616 at 4 n.1.

CPI argued that the statements in these documents support its 20x multiplier by showing that only 5% of customers who are affected by conduct complain about that conduct. *See* 2/16/23 Tr.

Neither of these statements was admissible. These statements address an issue—the percentage of disgruntled customers who actually complain—that calls for the application of specialized knowledge. As a result, the only way to show this figure is through expert testimony. *See* Fed. R. Evid. 701(c); *United States v. Perkins*, 470 F.3d 150, 155−56 (4th Cir. 2006).

CPI could not avoid this requirement by presenting the 20x multiplier through documents. *See, e.g.*, *BlackRock Eng'rs, Inc. v. Duke Energy Progress, LLC*, No. 7:15-CV-250-D, 2019 WL 4267863, at *5 (E.D.N.C. Sept. 9, 2019) (holding that a party may not circumvent Rule 702 by relying on documents without related expert testimony); *Gunkel v. Robbinsville Custom Molding, Inc.*, No. 2:11-CV-07-MR, 2013 WL 139736, at *10 (W.D.N.C. Jan. 10, 2013) (same).

The statements at issue in the slide deck and brief were inadmissible under Rule 403 as well. Because CPI introduced this evidence through documents rather than expert testimony, CPI asked the jury to derive a multiplier from the documents through speculation alone. As a result, any probative value that the multiplier evidence might have had was substantially outweighed by the dangers of unfair prejudice, confusing the issues, and misleading the jury. Fed. R. Evid. 403.[3]

In addition to introducing the Vivint slide deck and brief, CPI also offered the testimony of Mr. Groner and Dr. Winer, who testified that 5% of disgruntled customers complain about sales misconduct. 2/9/23 Tr.; 2/10/23 Tr. Both witnesses' testimony on this point was inadmissible.

Mr. Groner's testimony was inadmissible because he had no basis for it. Mr. Groner was not an expert witness, so he could not base his testimony on any scientific knowledge. *See* Fed. R. Evid. 701(c). Mr. Groner also could not give lay-opinion testimony on this issue, because he admitted that he had no personal knowledge on the percentage of disgruntled customers who complain. *See* Fed. R. Evid. 701(a); 2/9/23 Tr.

To try to avoid these problems, Mr. Groner testified only that, in his view, *the Vivint slide deck* meant that "for every one complaint that's filed, 20 were not filed." 2/9/23 Tr. As described above, however, that statement in the Vivint slide deck was

---

[3]     The image in the Vivint slide deck was also inadmissible hearsay to which no exception applied. *See* Fed. R. Evid. 801(c), 802. That image was not a party admission because, as testimony revealed, it was copied and pasted from an unknown Internet source—and was thus its own layer of hearsay.

inadmissible. Mr. Groner's testimony about that statement was inadmissible for the same reasons.

Dr. Winer's testimony on this point was likewise inadmissible.

First, in his testimony on the multiplier, Dr. Winer discussed the Vivint slide deck and the 2012 brief. 2/10/23 Tr. Because that underlying evidence was inadmissible, Rule 703 barred Dr. Winer from testifying about that evidence unless its probative value substantially outweighed its prejudicial effect. *See* Fed. R. Evid. 703; *Rambus, Inc. v. Infineon Techs. AG*, 222 F.R.D. 101, 111–12 (E.D. Va. 2004). Here, for the reasons discussed above, the opposite was true.

Second, as discussed below, all of Dr. Winer's testimony was inadmissible under Rule 702. *See infra* pp. 28–29.

For these reasons, all of the expert and non-expert evidence that CPI introduced on the multiplier issue was inadmissible.

This erroneously admitted evidence caused significant prejudice. In its closing argument, CPI relied on the inadmissible evidence to tell the jury to multiply CPI's damages by twenty and to award $52 million in disgorgement of Vivint's profits. 2/16/23 Tr. Without the multiplier, CPI's request for disgorgement damages would have been $2.6 million, far less than the tens of millions of dollars the jury awarded. Doc. 148 at 1–5. The verdict sheet thus shows that the jury used CPI's multiplier to inflate CPI's damages.

In sum, the erroneous admission of CPI's damages multiplier calls for a remittitur of CPI's damages or a new trial.

### 3.    CPI's expert testimony on damages was inadmissible.

CPI's evidence on damages also included the testimony of its expert, Dr. Winer. Dr. Winer's testimony was the sole basis for CPI's request for corrective-advertising damages.

For multiple reasons, Dr. Winer's testimony violated Rule 702.

First, Dr. Winer had no scientific knowledge to impart to the jury. *See* Fed. R. Evid. 702(a). "[T]o qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method." *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 590 (1993); *accord Sardis v. Overhead Door Corp.*, 10 F.4th 268, 291 (4th Cir. 2021). Here, Dr. Winer admitted, both in his deposition and at trial, that he was not applying the scientific method. 2/10/23 Tr.; Winer Dep. Tr. 105:23–106:1.

Second, Dr. Winer's testimony violated the common-knowledge rule. That rule bars expert testimony on opinions that the jury could reach on its own, without expert testimony. *United States v. Dorsey*, 45 F.3d 809, 815 (4th Cir. 1995).

Here, Dr. Winer's opinion not only failed to assist the jury, but supplanted the role of the jury altogether. He relied on his review of limited call transcripts, hand-picked by CPI's counsel, to testify that certain CPI customers were confused. 2/10/23 Tr.  He offered this conclusion despite admitting that he never did anything to verify it. *Id.* The jury could just have easily reached its own conclusion from the evidence on whether those customers were confused. Dr. Winer's testimony on this point was especially objectionable because he was testifying on a key issue in the case: the existence or nonexistence of customer confusion.

Third, Dr. Winer stated damages figures without connecting those figures to any reliable data. Instead, he relied on a series of untested assumptions—for example, the assumption that deceived customers shared misinformation with others in the community and thus exacerbated CPI's injury. *See* 2/6/23 Tr. Rule 702, however, bars "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Here, there was "simply too great an analytical gap between the data and the opinion proffered" for Dr. Winer's testimony to satisfy Rule 702. *Id.*

For all of these reasons, Dr. Winer's testimony was inadmissible. The admission of his testimony warrants a new trial.

### C. Even if all of CPI's damages evidence were admissible, that evidence still was insufficient to support the jury's damages awards.

#### 1. CPI's evidence was insufficient for each type of damages it sought.

CPI asked the jury to award several types of damages: CPI's lost profits, disgorgement of Vivint's profits, harm to CPI's goodwill, and corrective-advertising costs. 2/16/23 Tr. CPI, however, failed to back these requests with legally sufficient evidence. That failure justifies judgment as a matter of law for Vivint.

To satisfy Rule 50, CPI needed to prove its damages with reasonable certainty. That requirement applies under North Carolina law. *See, e.g., Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 343 (4th Cir. 1998) (applying North Carolina law); *Olivetti,* 356 S.E.2d at 585. It also applies under the Lanham

Act. *See, e.g.*, *Pharmanetics, Inc. v. Aventis Pharms., Inc.*, No. 5:03-CV-817-FL(2), 2005 WL 6000369, at *12 (E.D.N.C. May 4, 2005), *aff'd*, 182 F. App'x 267 (4th Cir. 2006).

Speculative damages calculations fail the reasonable-certainty standard. *E.g.*, *Ross v. Washington Mut. Bank*, 566 F. Supp. 2d 468, 482 (E.D.N.C. 2008), *aff'd sub nom. Ross v. FDIC*, 625 F.3d 808 (4th Cir. 2010); *Castle McCulloch, Inc. v. Freedman*, 610 S.E.2d 416, 420−21 (N.C. Ct. App. 2005), *aff'd per curiam*, 620 S.E.2d 674 (N.C. 2005). Whether evidence satisfies the reasonable-certainty standard is a legal question for the Court. *Ross*, 566 F. Supp. 2d at 482.

For each type of damages it sought, CPI failed to present sufficient evidence to allow the jury to calculate damages with reasonable certainty. CPI instead asked the jury to speculate. CPI's evidence thus failed to support any award of damages, let alone the inflated awards the jury made.

### a. Lost profits

CPI did not prove its lost profits with reasonable certainty. CPI's own witness on this issue, Mr. Groner, admitted that CPI could not calculate its lost profits "with any sort of comfort or accuracy." 2/9/23 Tr.  CPI's evidence was therefore insufficient to support a lost-profits award.

CPI asked the jury to calculate CPI's lost profits by multiplying three numbers: (1) CPI's profit per customer, (2) the number of customers who complained after allegedly being deceived into switching from CPI to Vivint, and (3) a 20x

multiplier. *See supra* p. 24. CPI's evidence on each of those numbers was too speculative to meet the reasonable-certainty standard.

First, CPI's evidence on its profit per customer was insufficient because CPI failed to introduce key evidence on its expenses.

To prove lost profits, a plaintiff must show both its revenues and its expenses. *E.g.*, *Catoe v. Helms Const. & Concrete Co.*, 372 S.E.2d 331, 334–35 (N.C. Ct. App. 1988). The expenses must include the plaintiff's operating expenses. *E.g.*, *ELC Transp., Inc. v. Larson Grp.*, No. 1:20-CV-964, 2022 WL 673648, at *4–6 (M.D.N.C. Mar. 7, 2022); *Tillis v. Calvine Cotton Mills, Inc.*, 111 S.E.2d 606, 612–13 (N.C. 1959).

CPI did not show its operating expenses here. Mr. Groner testified about CPI's *revenue* per customer. 2/9/23 Tr.  He also testified about CPI's profit margin per customer, but he admitted that this profit margin accounted for direct, customer-related expenses alone, not for CPI's total operating expenses. 2/10/23 Tr. Thus, CPI failed to show its full expenses, leaving the jury to speculate about CPI's true profit per customer.

Second, CPI asked the jury to speculate on the number of customers who complained about being deceived into switching from CPI to Vivint. Mr. Groner calculated this figure by counting the number of former CPI customers whom a Vivint spreadsheet identified as having mentioned CPI on a call to Vivint. 2/9/23 Tr. But the spreadsheet itself showed that most of those customers *had not* been deceived into switching from Vivint to CPI. Instead, they had switched for unrelated

reasons. *See* 2/14/23 Tr.; 2/15/23 Tr.  CPI's evidence thus required the jury to speculate on how many customers actually complained about Vivint's alleged deception.

Third, CPI's damages multiplier was speculative. As discussed above, CPI had no admissible evidence of a damages multiplier. *See supra* pp. 25–27. That lack of admissible evidence alone is fatal to CPI's request for lost profits.

Even if CPI's multiplier evidence were admissible, however, that evidence still would have been too speculative to support a lost-profits award. CPI argued that the jury should use a 20x multiplier. But the evidence failed to support a 20x multiplier with reasonable certainty.

Dr. Winer's testimony illustrates this problem. When Dr. Winer testified on the concept of a multiplier, he admitted that he could not identify "a specific number" to use. 2/10/23 Tr.  Dr. Winer thus acknowledged that CPI's 20x multiplier was based on speculation.

CPI nevertheless argued for a 20x multiplier based on Vivint's slide deck and earlier brief. 2/16/23 Tr.  That argument extrapolated from the documents in speculative ways. These documents say only that 4% or 5% of affected customers complain *in certain ways*—for example, "to HQ." Pl.'s Ex. 616 at 4 n.1; Pl.'s Ex. 623 at 31. They do not say that these figures apply to all customers or all types of complaints. More importantly, they do not supply the key figure that CPI's damages theory required it to prove: the percentage of customers who called Vivint to complain *after being deceived into switching from CPI to Vivint*. Thus, CPI not only

failed to prove the reliability of its 20x multiplier, but also failed to prove the number of customers that it actually lost.

As shown above, the only permissible way to prove these figures was through admissible expert testimony. *See supra* pp. 25, 28–29. By relying instead on generalized statements in a 2014 slide deck and a 2012 brief, CPI failed to prove its multiplier with reasonable certainty.

In all of these ways, CPI's evidence was insufficient to prove its lost profits.

### b.     Disgorgement

For the same reasons that CPI's evidence was insufficient to support an award of lost profits, it was also insufficient to support the disgorgement of Vivint's profits.

CPI sought the disgorgement of Vivint's profits based on a formula that mirrored the formula CPI used to seek its own lost profits. *See* 2/16/23 Tr.  CPI asked the jury to multiply (1) Vivint's profit per customer, (2) the number of customers who complained about being deceived into switching from CPI to Vivint, and (3) a 20x multiplier. *See id.*

The second and third numbers in that formula are the same as the second and third numbers in CPI's lost-profits formula. Thus, for the reasons discussed above, the evidence did not allow the jury to calculate those numbers with reasonable certainty.

For these reasons, CPI's evidence failed to support a disgorgement award.

### c. Corrective advertising

CPI's evidence also failed to support a damages award for CPI's costs of corrective advertising.

To seek damages for corrective advertising, CPI relied on Dr. Winer's testimony. 2/16/23 Tr.  That testimony was insufficient for two reasons.

First, as shown above, Dr. Winer's testimony was inadmissible. *See supra* pp. 28–29.

Second, Dr. Winer failed to offer any corrective-advertising figure tied to Vivint's alleged conduct. To provide a basis for a corrective-advertising award, expert testimony must tie the corrective advertising to the alleged misconduct. *See, e.g.*, *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1252 (11th Cir. 2007).

CPI did not do that here. Dr. Winer calculated CPI's corrective advertising costs as $10.8 million. 2/10/23 Tr.  But that amount included costs for corrective advertising to *every* CPI customer—including customers who were never even visited by a Vivint representative. *See id.* Thus, Dr. Winer's calculation of corrective-advertising costs lacked any link—much less a reliable link—to Vivint's alleged misconduct.

As these points show, CPI's evidence was insufficient to support a corrective-advertising award.

### d. Goodwill

Finally, CPI failed to submit sufficient evidence to support damages for loss of goodwill.

On this issue, CPI introduced evidence that it spent $135 million on marketing from 2016 to the time of trial. 2/9/23 Tr. CPI then asked the jury to calculate CPI's loss of goodwill by multiplying that $135 million by 10%. 2/16/23 Tr. CPI presented no evidence, however, that this calculation was a sound way to measure any loss of goodwill from Vivint's alleged conduct. CPI merely invited the jury to speculate on this point. As discussed above, the law prohibits calculating damages based on this type of speculation. *See supra* pp. 30–32.

CPI thus cannot recover damages for loss of goodwill.

\* \* \*

For these reasons, CPI failed to introduce sufficient evidence on any of the four types of damages that it sought. That failure calls for judgment as a matter of law in Vivint's favor on each of CPI's requests for damages. Alternatively, it calls for a remittitur of CPI's damages or a new trial.

### 2. There was insufficient evidence to support the jury's award on tortious interference.

Fourth Circuit case law requires a new trial or a remittitur when an award cannot be reconciled with the evidence. *See, e.g.*, *Legacy Data Access, Inc. v. Cadrillion, LLC*, 889 F.3d 158, 167–68 (4th Cir. 2018); *Atlas Food*, 99 F.3d at 593. Here, the jury's tortious-interference award exceeds CPI's own evidence by a factor of sixty.

The Court correctly limited the damages on CPI's tortious-interference claim to the value of the contracts of CPI customers who testified in this case. 2/15/23 Tr.; *accord* N.C. Pattern Jury Instr. for Civil Cases § 807. There were only seven of these customers. Doc. 148 at 3–4.

CPI's own evidence showed that each customer contract was worth, at most, $3,477.60.[4] 2/9/23 Tr. Thus, CPI's maximum damages for tortious interference were seven times that number: $24,343.20.

The jury, however, awarded $1.5 million on CPI's tortious-interference claim. Doc. 148 at 4. That award exceeds CPI's own valuation by a factor of sixty.

The Fourth Circuit has required a new trial on damages for an error far smaller than this: a 2x differential between the verdict and the nearest damages valuation at trial. *See Cadrillion*, 889 F.3d at 167–68. Here, we have a *60x*

---

[4] Mr. Groner testified that the average customer remains under contract with CPI for 96 months. 2/9/23 Tr. He also testified that CPI's recurring monthly revenue on an average customer account is $48.30. *Id.* Finally, he testified that CPI's profit margin per account is between 65% and 75%. *Id.* These figures mean that CPI's average account is worth, at most, $3,477.60 in profit.

differential. The award is a prime example of how the jury's compensatory damages awards were designed to punish Vivint, rather than compensate CPI based on the evidence. By any standard, this award warrants a new trial.

### 3. There was insufficient evidence to support the jury's award on the UDTPA claim.

The evidence also does not support the jury's $29.3 million award on CPI's UDTPA claim. As described above, CPI's UDTPA claim arises from the same conduct that underlies CPI's other claims. *See supra* pp. 4–7. The jury awarded compensatory damages of $5.4 million, $13.5 million, and $1.5 million for those other claims. Doc. 148 at 1, 3–4. Even if the evidence supported those amounts of damages, it would support *only* those amounts of damages. It does not support the jury's decision to award a far greater amount, for the same conduct, under the UDTPA. Vivint therefore requests that the Court remit the UDTPA award or order a new trial.

### D. At a minimum, a remittitur is warranted.

Even if the law allowed CPI to recover the sum of the awards on the verdict sheet—almost $190 million—that sum is grossly excessive. For the reasons discussed above, that sum contains multiple recoveries for the same conduct, violates statutory and constitutional limitations on non-compensatory damages, and

lacks support in admissible evidence. Allowing CPI to recover that sum would thus result in a miscarriage of justice.

Vivint therefore requests that, at a minimum, the Court order a remittitur of CPI's total damages or a new trial.

## **CONCLUSION**

Vivint requests that the Court alter or amend the judgment or, alternatively, remit CPI's damages or order a new trial, as discussed in section I of this brief. Vivint also requests that the Court grant it judgment as a matter of law on CPI's UDTPA claim. Finally, Vivint requests that the Court grant judgment as a matter of law for Vivint on damages or, alternatively, remit CPI's damages or order a new trial.

Respectfully submitted, this the 17th day of March, 2023.

**GREENBERG TRAURIG, LLP**

Michael N. Kreitzer
Florida Bar No. 705561
kreitzerm@gtlaw.com
333 S.E. 2nd Avenue, Suite 4400
Miami, FL 33131
Telephone: (305) 579-0500

**Counsel for Defendants**

**CLYDE SNOW & SESSIONS, P.C.**

Matthew A. Steward
Utah Bar No. 7637
mas@clydesnow.com
One Utah Center, 13th Floor
201 South Main Street
Salt Lake City, UT 84111-2216
Telephone: (801) 322-2516

**Counsel for Defendants**

**ROBINSON, BRADSHAW & HINSON, P.A.**

s/ Matthew W. Sawchak
Matthew W. Sawchak
N.C. State Bar No. 17059
msawchak@robinsonbradshaw.com
Erik R. Zimmerman
N.C. State Bar No. 50247
ezimmerman@robinsonbradshaw.com
434 Fayetteville St., Suite 1600
Raleigh, NC 27601
Telephone: (919) 239-2600

**Counsel for Defendants**

**POYNER SPRUILL LLP**

s/ Andrew H. Erteschik
Andrew H. Erteschik
N.C. State Bar No. 35269
aerteschik@poynerspruill.com
John M. Durnovich
N.C. State Bar No. 47715
jdurnovich@poynerspruill.com
P.O. Box 1801
Raleigh, NC 27602-1801
Telephone: (919) 783-2895

**Counsel for Defendants**

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that the foregoing brief complies with the word-limit requirements set forth in paragraph 3(c)(ii) of the Case Management Order (Doc. 35).

This the 17th day of March, 2023.

s/ Matthew W. Sawchak
Matthew W. Sawchak

## CERTIFICATE OF SERVICE

I certify that I have electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of filing to all counsel and parties of record.

This the 17th day of March, 2023.

s/ Matthew W. Sawchak
Matthew W. Sawchak